Page 1

1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF OHIO

3    _____

4    MICHAEL REDDEN,

5            Plaintiff,

6        v.                              Case No.

7    TIM BAIRD and ROSS TOWNSHIP,        1:24-CV-00342

8            Defendants.

9    _____

10                   DEPOSITION OF

11                   TIMOTHY BAIRD

12   DATE:          Friday, April 11, 2025

13   TIME:          9:32 a.m.

14   LOCATION:      Remote Proceeding

15                  Lawrenceburg, IN 47025

16   REPORTED BY:   Benjamin Fantauzzo

17   JOB NO.:       7308805

18

19

20

21

22

23

24

25

1               A P P E A R A N C E S

2  ON BEHALF OF PLAINTIFF MICHAEL REDDEN:

3      JOSHUA ENGEL, ESQUIRE (by videoconference)

4      Engel & Martin LLC

5      4660 Duke Drive, Suite 101

6      Mason, OH 45040

7      engel@engelandmartin.com

8      (513) 445-9600

9

10  ON BEHALF OF DEFENDANT TIM BAIRD:

11      STEVEN RIGGS, ESQUIRE (by videoconference)

12      Surdyk, Dowd & Turner Co., L.P.A.

13      8163 Old Yankee Street, Suite C

14      Dayton, OH 45458

15      sriggs@sdtlawyers.com

16      (937) 222-2333

17

18  ALSO PRESENT:

19      Michael Redden, Plaintiff (by videoconference)

20

21

22

23

24

25

1                    I N D E X

2    EXAMINATION:                                    PAGE

3         By Mr. Engel                               6

4         By Mr. Riggs                               89

5

6                    E X H I B I T S

7    NO.              DESCRIPTION                     PAGE

8    Exhibit 11    Ohio Peace Officer Training

9                  Academy Officer Record - Timothy

10                 Baird                             13

11   Exhibit 12    Ross Township Police Department

12                 Policy 308 on Domestic Violence   17

13   Exhibit 13    Ross Township Police Department

14                 Policy 600 - Investigation and

15                 Prosecution                       22

16   Exhibit 14    07/07/2023 - CAD Call Report      24

17   Exhibit 15    Ross Township Police Department

18                 Investigative Report, Incident

19                 Number 202300319                  39

20   Exhibit 16    Video - "Filtered - (3)"          61

21   Exhibit 17    Video - "Filtered - (1)"          63

22   Exhibit 18    Video - "PW Forcing Way Into Home" 64

23   Exhibit 19    Video - "Filtered - (2)"          67

24   Exhibit 20    Video - "IMG_2607"                69

25   Exhibit 21    Video - "Filtered -"              71

Page 4

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 22 | Court of Appeals Decision | 76 |
| Exhibit 23 | Complaint | 81 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
                                                        Page 5
 1                    P R O C E E D I N G S
 2                THE REPORTER:  Good morning.  My name
 3   is Ben Fantauzzo.  I'm the reporter assigned by
 4   Veritext to take the record of this proceeding.  We're
 5   now on the record at 9:32 a.m.
 6                This is the deposition of Tim Baird,
 7   taken in the matter of Michael Redden vs. Tim Baird,
 8   et al.  It is Friday, April 11, 2025, at Lawrenceburg,
 9   Indiana, 47025.  I am a notary authorized to take
10   acknowledgements and administer oaths in Ohio.
11   Parties agree that I will swear in the witness
12   remotely.
13                Additionally, absent an objection on
14   the record before the witness is sworn, all parties
15   and the witness understand and agree that any
16   certified transcript produced from the recording of
17   this proceeding:
18                        - is intended for all uses permitted
19                          under applicable procedural and
20                          evidentiary rules and laws in the
21                          same manner as a deposition recorded
22                          by stenographic means; and
23                        - shall constitute written stipulation
24                          of such.
25                        At this time, will everyone in
```

```
                                                    Page 6
 1    attendance please identify yourself for the record.
 2                    MR. ENGEL:  Joshua --
 3                    MR. RIGGS:  Hi --
 4                    MR. ENGEL:  Oh, I'm sorry --
 5                    MR. RIGGS:  Hi.  Steven Riggs from
 6    Surdyk, Dowd & Turner, here to represent Officer
 7    Timothy Baird.
 8                    MR. ENGEL:  My name is Joshua Engel.  I
 9    am counsel for the plaintiff in this case, who is also
10    on the line here.
11                    THE REPORTER:  Okay.  Thank you.
12                    Hearing no objection, I will now swear
13    in the witness.
14                    Please raise your right hand.
15    WHEREUPON,
16                       TIMOTHY BAIRD,
17    called as a witness and having been first duly sworn
18    to tell the truth, the whole truth, and nothing but
19    the truth, was examined and testified as follows:
20                    THE REPORTER:  You may continue.
21                       EXAMINATION
22    BY MR. ENGEL:
23        Q    Would you please state and spell your name?
24        A    Yeah.  First name is Timothy, last name is
25    Baird, B-A-I-R-D.
```

```
                                                  Page 7

 1        Q     Okay.  Where are you employed

 2        A     Currently?

 3        Q     Currently.

 4        A     I work for the Village of Golf Manor.

 5        Q     Okay.  What do you do for that?

 6        A     I am a -- I am the night shift detective.

 7        Q     How long have you been at Golf Manor?

 8        A     2023 -- December of 2023.

 9        Q     Where did you work before then?

10        A     I worked for Ross Township.

11        Q     Okay.  And what did you do for Ross

12  Township?

13        A     I was just a patrol officer.

14        Q     Okay.  Was that your first job as a law

15  enforcement officer?

16        A     No.

17        Q     Okay.  Where did you work before Ross

18  Township?

19        A     The City of Mount Healthy.

20        Q     What'd you do for them?

21        A     I was a regular patrolman as well.

22        Q     Okay.  Did you have any other previous law

23  enforcement jobs?

24        A     I was in the military for six years.  I was

25  an MP, which on the outside is the same thing as a
```

```
                                           Page 8
 1    police officer.
 2         Q     Which branch of the military?
 3         A     I was in the Air Force.
 4         Q     All right.  Well, thank you for your service
 5    there.  Have you ever been in a deposition before?
 6         A     I have.
 7         Q     Okay.  What was the reason you were in a
 8    deposition before?
 9         A     I was a witness for an automobile accident
10    involving another officer from another jurisdiction.
11         Q     I think we lost your answer there on the
12    Zoom.  Would you mind repeating that?
13         A     Yes.  I was a witness to an automobile
14    accident involving a -- an officer from another
15    jurisdiction.
16                    THE REPORTER:  Mr. Engel, I think it's
17    you cutting out.
18                    MR. RIGGS:  Just to confirm, I heard
19    him both times, so I'm not sure what the actual glitch
20    is.
21                    THE REPORTER:  Yeah.  Do you want to go
22    off the record for the moment?  I think we lost him.
23                    MR. RIGGS:  Yeah, that sounds good
24    until we can recover and make sure our connection's
25    good.
```

Page 9

1                    THE REPORTER:  Okay.

2                    We are off the record at 9:35 a.m.

3                    (Off the record.)

4                    THE REPORTER:  We are back on the

5     record at 9:36 a.m.

6                    MR. ENGEL:  Okay.  I apologize for that

7     interruption.

8     BY MR. ENGEL:

9          Q    You were starting to explain the reason that

10    you were in a deposition before?

11         A    Yes, I was a witness to an automobile

12    accident involving another police officer from a -- a

13    different jurisdiction.

14         Q    Okay.  Any other depositions before?

15         A    No.

16         Q    Okay.  I assume you've had to testify in

17    court before?

18         A    Yes.

19         Q    So I've got a couple of rules and guidelines

20    for depositions that I like to go over with everyone

21    at the beginning.  You know, the first is I will do my

22    best to ask clear and concise questions.  But if for

23    any reason you don't understand a question that I ask,

24    please let me know, and I will do my best to clarify

25    it.  Fair enough?

Page 10

1      A     Yes.

2      Q     Okay.  Similarly, if I -- if you do answer a

3  question, I'm going to assume you understood it and

4  that it was clear and understandable.  Okay?

5      A     Yes.

6      Q     Okay.  If at any time you feel you need to

7  use what we sometimes call as "a term of art," meaning

8  a specialized term or a term that has a specialized

9  meaning within your field or occupation, let us know,

10  and we'll make sure we define that term correctly;

11  okay?

12      A     Okay.

13      Q     Okay.  Otherwise we'll just give all the

14  words their plain and standard English meaning.  I do

15  remind everyone, as the court reporter noted before we

16  went on the record, that all your answers have to be

17  out loud.

18           So those normal human interactions of

19  nodding your head, pointing, gesturing like that, our

20  talented court reporter cannot take those down.  So do

21  you understand you have to answer orally to all of my

22  questions?

23      A     Yes.

24      Q     I remind everyone that you are not a hostage

25  here.  So if for any reason you need to take a break,

Page 11

1    please let us know, and we will do so.  The only thing

2    I ask is that if you need to take a break, we'll

3    answer any pending questions first, and then we can do

4    so.  Fair enough?

5        A    Yes.

6        Q    Okay.  And you understand that includes any

7    breaks if you need time to confer with counsel in this

8    matter as well?

9        A    Yes.

10       Q    Okay.  Any reason that you can't answer all

11   the questions here today?

12       A    I foresee no reason why not.

13       Q    Okay.  You're not under the influence of any

14   medications or anything like that that inhibits your

15   memory or ability to understand what's going on?

16       A    No, sir.

17       Q    Okay.  So where did you go to the police

18   academy?

19       A    Butler Tech Police Academy in -- I believe

20   it's in Fairfield Township, Ohio.

21       Q    What year did you graduate from there?

22       A    2015.

23       Q    Where did you graduate high school?

24       A    Harrison High School.

25       Q    Okay.  Did you -- are you a college grad as

Page 12

1    well?

2         A    I am not.

3         Q    Okay.  Have you taken any college classes?

4         A    Yes.

5         Q    Okay.  Where did you take those classes?

6         A    A variety of schools.  You earn college

7    credits when you -- when you learn how to do your job

8    in the -- in the military.  I've gotten a -- a few

9    classes here and there from trainings that I've gone

10   through throughout the years in my current profession.

11        Q    Okay.  So in your educational background

12   with Butler Tech and other places, have you studied

13   investigative techniques?

14        A    Yes.

15        Q    Okay.  And have you studied the

16   constitutional obligations on law enforcement

17   officers?

18        A    Yes.

19        Q    Okay.  So, for example, are you aware of the

20   obligation of law enforcement officers to disclose

21   what's called "exculpatory evidence"?

22        A    Yes.

23        Q    Okay.  And can you explain that in your own

24   words?

25        A    Exculpatory evidence would be evidence that

Page 13

1    is discovered during the course of an investigation.

2    You would have to provide that to prosecution.

3         Q    Okay.  When you say "evidence" that's

4    discovered during an investigation, do you mean

5    evidence that's favorable to the accused?

6         A    Any and all evidence, be it statements,

7    physical evidence, anything that is collected during

8    the investigation.

9         Q    And what about -- well, let me ask a

10   different question.  Okay.  Let me remove that animal.

11   Have you taken classes at OPOTA?

12        A    Yes.

13        Q    Okay.  And that's the Ohio Police [sic]

14   Officer Training Academy?

15        A    Yes --

16        Q    Sorry.  So I'm going to show you -- I'm

17   going to share my screen here in a second -- what

18   we'll mark as -- and I forget what number we're up to,

19   so we'll just call this Exhibit 11 because we have a

20   new court reporter.  Share screen.  There we go.

21   Okay.  Are you able to see this document?

22                  (Exhibit 11 was marked for

23                  identification.)

24        A    Yes.

25        Q    Okay.  And this is a document entitled -- I

Page 14

1    don't know where to put this -- "Ohio Peace Officer

2    Training Academy Officer Record - Timothy Baird."  And

3    is that you?

4         A    Yes.

5         Q    Okay.  And is this document -- and I'll show

6    you it looks like it's five pages, and I will scroll

7    through all five pages for you.  Does this document

8    appear to be your training record?

9         A    Yes.

10        Q    And it looks like in particular you had

11   training in November of 2023 on domestic violence

12   cases?

13        A    That's correct.

14        Q    Okay.  Do you remember anything about that

15   training?

16        A    The -- the specifics?  No, I do not.  That

17   was two -- about two years ago, so I'm sorry.

18        Q    Okay.  And have you also received training

19   in -- well, you received training in qualified

20   immunity in September of 2022.  Do you remember what

21   that was about?

22        A    It was about qualified immunity.

23        Q    Okay.  And what do you remember from that

24   training?

25        A    The specifics of the training, I -- I do not

Page 15

1    recall.

2         Q    Okay.  Do you have any knowledge as you sit

3    here today of what "qualified immunity" is?

4         A    Yes.

5         Q    Okay.  And what is your understanding of

6    "qualified immunity"?

7         A    It's a legal doctrine that shields

8    government officials, law enforcement from civil

9    lawsuits unless their actions are -- like, clearly

10   violate established -- like, established

11   constitutional rights.

12        Q    Okay.  Do those clearly established

13   constitutional rights, to the best of your

14   understanding, include the fact that a warrantless

15   arrest cannot be made without probable cause?

16        A    That is correct.

17        Q    Okay.  And does your understanding of the

18   clearly established constitutional rights include the

19   fact that officers must consider exculpatory evidence

20   in making the probable cause determination?

21        A    All evidence needs to be considered.

22        Q    So in any of your trainings, have you heard

23   the term "confirmation bias"?

24        A    I do not recall that term.

25        Q    Do you recall receiving any training on the

Page 16

1  tendency of investigators to receive information and

2  process it in a way that confirms their current

3  conceptions, attitudes, and beliefs?

4      A    I'm not sure of the question that you're

5  asking.  I'm sorry.

6      Q    Okay.  Well, let me ask you a different way.

7  Have you ever heard the term "tunnel vision" when it

8  comes to investigations?

9      A    Not when it comes to investigations.

10 I've -- I've heard of it in other ways.

11     Q    Other ways related to law enforcement?  Or

12 just in general conversations?

13     A    Both.

14     Q    Okay.  So tell me how you've heard it in

15 terms of law enforcement?

16     A    So one way that I've heard of it in law

17 enforcement would be you are responding lights and

18 sirens to an emergency call for service, and you get

19 tunnel vision, and you aren't paying attention to your

20 surroundings.

21     Q    Okay.  Have you ever heard the term used in

22 terms of the manner in which officers conduct

23 investigations?

24     A    No.

25     Q    Have you ever heard it specifically used in

Page 17

1    terms of the fact that officers tend to believe the
2    first story they hear and then look for evidence to
3    support that story?
4         A    No.
5         Q    Okay.  I'm going to show you what we'll mark
6    as Exhibit 12, a document entitled "Ross Township
7    Police Department Policy 308 on Domestic Violence."
8    Are you familiar with this document?
9                   (Exhibit 12 was marked for
10                  identification.)
11        A    Yes.
12        Q    Okay.  And did you file this document when
13   you worked for Ross Township?
14        A    To the best of my ability.
15        Q    Okay.  So I'm going to direct you to Section
16   308.4 in "Investigations," and --
17        A    Okay --
18        Q    -- I'll give you the opportunity to read
19   this if you wish, and so I'm going to ask you a couple
20   questions about that.  Are you familiar with this
21   section of the policy?
22        A    I -- I have reviewed it, yes.
23        Q    Okay.  And then there is a -- okay.  Is your
24   understanding of -- generally of this policy that a
25   full and complete investigation should be undertaken

Page 18

1 before an arrest is made on a domestic violence case?

2     A    Are you asking me for my opinion?

3     Q    Yeah.

4     A    Okay.  I believe that investigation should

5 be conducted in every single complaint that is derived

6 from a complainant.

7     Q    Okay.  And do you believe those

8 investigations should be full and complete?

9     A    To the best of the investigating officer's

10 ability, yes.

11     Q    So in other words, Section D, to the best of

12 your ability, you would try to obtain video or audio

13 recordings of statements; right?

14     A    To the best of the ability -- with

15 cooperation of whomever would like to give a statement

16 that was there at the time that the alleged offense

17 occurred.

18     Q    Okay.  In Section J, it says "Officers

19 should take appropriate enforcement action when there

20 is probable cause to believe an offense has occurred."

21 What is your understanding of that policy provision?

22     A    Well, probable cause is the reasonable

23 belief based upon facts and circumstances that a crime

24 has been committed or there's evidence -- evidence of

25 a crime to support that.

1      Q    Okay.  So now I want to direct your

2    attention to Section 3.8.9 on legal mandates and

3    relevant laws, and you're familiar with this section

4    as well --

5      A    Okay.  I -- I have reviewed it, yes.

6      Q    Okay.  And so on Section (a) it says "An

7    officer who has reasonable grounds to believe that a

8    person has committed the offense of domestic violence

9    or a violation of a protection order should arrest and

10    detain the person"?

11      A    That's correct.

12      Q    Okay.  And that's your understanding of

13    current law?

14      A    Yes.

15      Q    Okay.  And they use the term "reasonable

16    grounds" here.  Do you understand that to be distinct

17    from "probable cause"?  Or to say essentially the same

18    thing?

19      A    I would say that they're very similar, yes.

20      Q    Okay.  But you're -- when you made a

21    decision to arrest somebody for domestic violence

22    while working for Ross Township, did you always make

23    sure you had probable cause?

24      A    Yes, of course.

25      Q    Okay.  And then there's a discussion of two

Page 20

1     people being arrested for domestic violence.  Why

2     one -- when would that happen?

3          A     I have always been told and trained that you

4     avoid every aspect to arrest two persons for domestic

5     violence.

6          Q     And why is that based on your training and

7     experience?

8          A     Because if you arrest two people for the

9     same offense against each other, the prosecution

10    cannot question a defendant in a case.  So you would

11    essentially have two defendants that the prosecutor

12    could not talk to.

13             And it -- furthermore, in Section C, it said

14    "The officer should only arrest and detain the primary

15    physical aggressor."  So I would not arrest two people

16    for the same domestic violence against each other.

17         Q     So in other words, if there's a fight

18    between two people where they may have both

19    committed domestic violence, it would be your job to

20    determine who was the primary aggressor?

21         A     That is correct.

22         Q     And how would you make that determination?

23         A     Subsection 1 clearly states "Any history of

24    domestic violence or any other violent acts by either

25    persons involved in the alleged offense" -- I would

Page 21

1  determine the seriousness of the physical harm that

2  was done to either person.  I would take their

3  aggression, their demeanor, and their attitude into

4  effect on determining the primary physical aggressor.

5      Q    Okay.  And then there's a section on

6  records.  It's -- based on your training, it's

7  important that you write an accurate report of any

8  incident that you respond to?

9      A    I will write an accurate report to the best

10  of my recollection and the evidence that is in front

11  of me.

12      Q    Okay.  Have you been trained that it's

13  important to document everything that happens in an

14  incident in your report?

15      A    Again, I've been trained to document what I

16  can recall that is factual and is not opinion based.

17      Q    Okay.  Have you ever been told, "If it's not

18  noted in the report, it didn't happen"?

19      A    I -- I have not heard of that.

20      Q    You've never heard that phrase in your

21  training or anything like that?

22      A    I -- I do not recall.  Again, I try to be as

23  thorough as possible when documenting my reports or

24  incidents to the best of my recollection.

25      Q    All right.  Now I'm going to show you what

Page 22

1   we'll mark as Exhibit 13, a document titled "Policy

2   600 - Ross Township Police Department Investigation

3   and Prosecution."  Are you familiar with this

4   document?

5                  (Exhibit 13 was marked for

6                  identification.)

7        A    I have reviewed it, yes.

8        Q    Okay.  And is it your understanding that

9   this document describes the obligation of officers

10  during the initial investigation of a matter?

11       A    Section 600.1 says "The purpose of this

12  policy is to set guidelines and requirements

13  pertaining to the handling and disposition of criminal

14  investigations."  That's what that policy covers,

15  sir --

16       Q    Okay.  And -- okay.  So if we look at

17  Section 600.3, this talks about initial

18  investigations; right?

19       A    It does say "initial investigations."

20       Q    And Section (a) there talks about "A

21  preliminary determination on whether a crime has been

22  committed."  How do you make that preliminary

23  determination?

24       A    I'm not sure what your specific question is,

25  sir.

1      Q    Okay.  Well, let me ask a different

2 question.  On Section (a), it says that the officer is

3 required to "Make a preliminary determination of

4 whether a crime has been committed."  Do you

5 understand --

6      A    Okay --

7      Q    -- that would be different than determining

8 whether there's probable cause that a crime has been

9 committed?

10     A    I would be -- I'm not sure how to answer

11 that question, sir.  I would be using initial

12 statements from any witnesses or complainants to

13 determine if there is probable cause to -- to effect

14 an arrest.

15     Q    And when you make that probable cause to

16 effect an arrest, do you consider all the evidence

17 that you've collected in the case?

18     A    That is correct.  All evidence, initial

19 statements from any witnesses or complainants.

20     Q    Okay.  And does that include a requirement

21 to consider any evidence that you collected that is

22 favorable to the accused?

23     A    Any and all evidence, sir.

24     Q    So just so it's clear on the record here,

25 you would agree with me that it's clearly established

Page 24

1   that in making a probable cause determination you have

2   an obligation to consider evidence that is favorable

3   to the accused?

4        A     Any and all evidence, sir.

5        Q     Okay.  So I'm going to now mark as Exhibit

6   14 a CAD call report from July 7th of 2023.  And

7   you're aware this is the call that brings us here

8   today?

9                    (Exhibit 14 was marked for

10                   identification.)

11       A     I'm not sure how to answer that question,

12  sir, because there are -- this is not what brought my

13  attention to the call that day.  It was the female

14  half showing up in my lobby.

15       Q     Okay.  That's -- well, so let me back up a

16  step.

17       A     Okay --

18       Q     You said the "female half."  Does the

19  "female half" have a name?

20       A     Yes.

21       Q     What is her name?

22       A     I -- I believe it's Bridget, I believe.

23       Q     Okay.  And then you also know the plaintiff

24  in this case, Michael?

25       A     I -- I do recall the name, yes.

Page 25

1    Q    Okay.  So had you ever met Michael Redden
2  before July 7th of 2023?
3    A    I do not believe so.
4    Q    Okay.  Had you ever met Bridget before July
5  7th of 2023?
6    A    I do not believe so.
7    Q    Okay.  So looking at this CAD
8  report -- well, first of all, tell us:  what is a CAD
9  report?
10   A    The CAD report stands for computer-automated
11 dispatch call report.  It is a computer-automated
12 dispatch that is sent to my computer from the dispatch
13 center.
14   Q    Okay.  Who runs -- who ran the dispatch
15 center for Ross Township?
16   A    Butler County Sheriff's Office.
17   Q    Okay.  And you said it would appear on your
18 computer screen.  This is a computer screen in your
19 car?
20   A    That is correct.
21   Q    Okay.  So you would've received a copy of
22 this CAD before you responded to the location for the
23 incident; right?
24   A    It would have been on my computer.  Whether
25 I was sitting in front of it or not is a -- is totally

Page 26

1   different things.  It would've appeared on my

2   computer.

3        Q    Okay.  And so if we look at this document at

4   the bottom, there's a box that says "caller info."

5   What is that?

6        A    The person that made the call to

7   Harrison -- or to Butler County Dispatch, sorry.

8        Q    Okay.  And then it indicates -- the first

9   line under "comments," who creates that information

10  under the "comments" section?

11       A    I -- I believe that it's auto-populated at

12  the time that the dispatcher puts in the comments if

13  you're specifically asking about the date and time.

14       Q    I was actually going to ask about

15  the -- well, that's a great clarification.  So the

16  date and time you believe is automatically populated,

17  and then the dispatcher types in comments.  Is that

18  how this works?

19       A    To the -- to the best of my knowledge, yes.

20       Q    Okay.  So the first comment here reads

21  "Caller's ex-fiance Bridget Langen punched him and

22  broke his TV, no longer ONS."  Does "ONS" mean on

23  site?

24       A    On scene.

25       Q    On scene.  Okay.  So you would've received

Page 27

```
 1    this information then on your computer screen in your
 2    car?
 3         A    It would've auto-populated on my computer,
 4    yes.
 5         Q    Okay.  And when you reviewed this matter,
 6    you would've referred to the CAD information in order
 7    to determine what had happened in the matter?
 8         A    Depending on the circumstances, that could
 9    be a yes or a no.
10         Q    Okay.  And then the second line says "Female
11    half is in the lobby, 605 on PX with male."  What does
12    that mean?
13         A    The female half was at my police department
14    when this call came in.  That was me telling the
15    dispatcher that the female half was in my lobby and
16    that me -- 605 -- was on public service with the male
17    at my police department.
18         Q    And when you say "on public service," what
19    does that mean?
20         A    Public service means a phone call.
21         Q    Okay.  So let me see if I set the scene.  So
22    here, it looks like at 1833 -- that's 6:33 to
23    civilians -- p.m. --
24         A    Yes --
25         Q    Okay.  You were talking with Ms. Langen in
```

Page 28

1    the lobby of the police station?

2         A    Yes.  She was there long before that, but

3    that's at the time that I told my dispatcher that she

4    was in my lobby.

5         Q    Okay.  And then when she was in the lobby,

6    you also got on the phone and spoke to Mr. Redden?

7         A    Yes.  She was filling out a -- a statement,

8    and I spoke to Mr. Michael -- Mr. Redden while she was

9    doing that.

10        Q    Okay.  So let's talk about her.  So when she

11   came into the police department, what did she tell you

12   had happened?

13        A    The specifics?  I would need to look at my

14   report.

15        Q    Okay.  And so that would help you?  Well,

16   let me ask, before I pull that up on the screen, a

17   couple more questions about this document.

18        A    Okay.

19        Q    Did -- when you spoke to Mr. Redden, did he

20   say that Ms. Langen had punched him and broke his TV?

21        A    I -- I do not recall, sir.

22        Q    Do you have any reason to believe that what

23   he told you was different than when he called

24   dispatch?

25        A    I -- do I have any reason to believe that it

Page 29

1    was different?  I'm not sure, sir.  I didn't take the
2    call from dispatch, so I have no idea --
3         Q    Okay.  Well --
4         A    -- and I'm -- I'm not going to speculate on
5    what he said to somebody else.
6         Q    Okay.  Well, the note here -- and these are
7    notes that the dispatcher creates as -- I assume as
8    the case is -- or the call's going on?
9         A    That's correct, as --
10        Q    Okay.  So they're --
11        A    -- far as I'm aware.  Again, I'm not a
12   dispatcher.  I don't know their policies or
13   procedures, what they do.  I have no idea, sir.
14        Q    That's fine.  I'm just basing --
15        A    For face value, that's what it says.  At
16   which time it was typed in, who typed it in, I have no
17   idea.  I can't even tell you the legitimacy of it
18   because I wasn't there.
19        Q    Okay.  Do officers in reviewing a case rely
20   on information that they receive from dispatchers in
21   the CAD report?
22        A    "Rely"?  I would say no.  Do we listen to
23   what they say to get a general idea of what happened
24   before we get there?  Yes.  Oftentimes situations are
25   different than what was reported to the dispatcher.

Page 30

```
 1       Q    Okay.  So do you have any specific memory of
 2   Mr. Redden saying anything different than that his
 3   ex-fiance had punched him and broke his TV?
 4       A    I -- I'm not sure of your questioning, sir.
 5   Can you rephrase?
 6       Q    Yeah, it's a very lawyerly question.  So I
 7   think you indicated you don't recall what Mr. Redden
 8   told you during that phone call with him?
 9       A    Yeah, that's correct.
10       Q    Okay.  And I just want to be sure that if
11   Mr. Redden were to say, "Hey, I told Officer Baird
12   that my ex-fiance punched me and broke my TV," you're
13   not going to later come in and say, "No, that didn't
14   happen"?
15       A    On the phone call?  Like I said, I -- I do
16   not recall specifically the phone call.
17       Q    Okay.  You later spoke to Mr. Redden; right?
18   In person --
19       A    In person, yes.
20       Q    Okay.  And it indicates on the CAD report
21   "Secondary location on Wagon Wheel Drive."  Is that
22   the location where the incident allegedly occurred?
23       A    Yes.
24       Q    Okay.  And did you proceed to that location?
25       A    I did.
```

Page 31

1      Q    Okay.  Now, it indicates someone at 1919
2  "Requested CCH for male half for prior DV and
3  arrest."  What does that mean?
4      A    So in the -- obviously, like I had stated
5  earlier, I use all avenues to determine a primary
6  physical aggressor.  That was me requesting that the
7  Butler County Sheriff's Office do a -- a background
8  history check on Mr. Redden for prior DV arrests
9  and/or arrest involving -- like violent arrest,
10 assault, et cetera.
11     Q    Okay.  Why did you only request a -- and you
12 made that request; right?
13     A    Yeah, that's correct.
14     Q    Okay.  And how do we tell that you're the
15 one who made that request from this document?
16     A    I -- I couldn't tell you, sir.
17     Q    Okay.  So it says, like, "JRA" here.  Does
18 that have any significance here?
19     A    No, I don't -- I don't know what that means,
20 sir.  I have no idea.  I'm sorry.
21     Q    Okay.  But you -- as you sit here today, you
22 recall asking for the criminal history for Mr. Redden?
23     A    Yes.  That is common practice, it is -- that
24 I do every time I effect an arrest for domestic
25 violence for reasons --

```
                                                    Page 32
 1        Q    Okay.  So as of 1919, had you determined
 2   that you were going to arrest Mr. Redden?
 3        A    Yes.
 4        Q    Okay.  So how long -- so it says "1858,
 5   secondary location."  Does that mean you were at that
 6   location at that time?
 7        A    I -- I do not recall.  I either said I was
 8   going there, or I was there, but I do not recall if I
 9   was there or I was on my way.  I'm -- I'm -- I do not
10   recall.
11        Q    Okay.  I'm just trying to figure out how
12   long this all took.
13        A    Okay --
14        Q    So it looks like, if I'm reading the
15   timeline right, at 1833 you're still at the police
16   station lobby; right?
17        A    At eight -- your question was at 1833, I was
18   still at the police department; is that correct?
19        Q    Yeah.
20        A    Yes, I believe that I was still there, yes.
21        Q    Okay.  And then at some point around 1858
22   you went to Wagon Wheel Drive?
23        A    Again, I'm not sure whether I was on my way
24   there or I was there.  I do not recall.
25        Q    Okay.  Why did you not request a criminal
```

Page 33

1    history for Ms. Langen?

2        A    Because probable cause led me to effect an

3    arrest on Mr. Redden for domestic violence, therefore

4    the only CCH that was necessary was his.

5        Q    Okay.  His --

6        A    His CCH does not specifically determine

7    whether I conduct an arrest or not.  It determines

8    whether the level of offense is either a misdemeanor

9    or a felony per se.

10       Q    Okay.  So --

11       A    It's used in both ways.

12       Q    So I'm trying to get the outer limits of the

13   time that happened here.  So is it fair to say that at

14   19 -- sometime before 1919 is when you decided to make

15   the arrest of Mr. Redden?

16       A    I -- I believe so, yes, if I'm remembering

17   correctly.

18       Q    Is a statement from an alleged victim

19   sufficient to constitute probable cause?

20       A    A mere statement, is that what you're

21   asking?  A statement only?  The only evidence that I

22   have is a statement?  Is that what you're asking?

23       Q    Yeah.  Can that constitute probable cause?

24       A    It is a determining factor into establish

25   probable cause.

Page 34

```
 1      Q    Okay.  Did you have -- okay.  So getting
 2  back to this timeline --
 3      A    Okay --
 4      Q    So it's fair to say that your investigation
 5  occurred sometime between 1833 and 1919?
 6      A    My investigation -- investigation started
 7  long before 1833, sir.  She was in my lobby long
 8  before that.  That is the time at which she was
 9  filling out a written statement.  I had spoken to her
10  verbally, and she told me the story.  That's when I
11  had her fill out a statement.  The investigation
12  started long before that.
13      Q    Okay.  So you say "long before that."
14  Approximately how long was she in the lobby before
15  1833?
16      A    I would say approximately 15 or so minutes,
17  enough to get her to calm down -- because she was
18  visibly upset, crying -- to be able to get a statement
19  from her verbally.
20      Q    So other than -- while you were at the
21  police station, other than obtaining a statement from
22  her, what investigative actions did you take?
23      A    I also documented and took photos of her
24  injuries from the incident that occurred.
25      Q    Anything else?
```

Page 35

1      A    I -- I do not recall, I don't.

2      Q    Okay.  And so there's two entries at 1901.

3  It says "CAD person query."  What does that mean?

4      A    So in Butler County, it's common

5  practice -- I was -- I was trained that anybody

6  involved in the situation that has a driver's license,

7  et cetera, you tell dispatch what that -- their

8  driver's license number is, and then they attach it to

9  whatever in-house system that they use.

10        Again, I'm not -- I'm not 100 percent sure

11  on where it goes, what it's used for.  I have no idea.

12  That's not my -- that's not my expertise.

13      Q    Okay.  And then at the bottom there's a

14  section that says "Unit on call times."

15      A    Okay.

16      Q    And you're Unit 605?

17      A    That is correct.

18      Q    Okay.  And there's column that says "DISP,"

19  D-I-S-P.  I assume that's dispatched?

20      A    I -- I believe so.  I -- it's kind of hard

21  to see, I apologize, but I believe so --

22      Q    Oh, yeah, let me make it bigger --

23      A    It says -- I think says -- is the one right

24  next to it "En Route"?  Yes, that's correct --

25      Q    Yeah.  So tell me what those

Page 36

1  timeline -- those mean?  And how does that help us

2  with our timeline?

3      A    Dispatch would be the time that the Butler

4  County Sheriff's Office dispatcher, I -- I believe,

5  sends it to me or when they take the phone call.  I'm

6  not 100 percent sure.  This is not something that I

7  can answer with extreme confidence.

8      Q    Okay.  And you've got a section "On Scene."

9  Is that -- do you think that's when you would've been

10 at the Wagon Wheel Drive location?  Or would that have

11 been -- that looks like when you're still talking to

12 the female half in the lobby?

13     A    Yes, I'm -- I -- again, I -- I know nothing

14 about the times or when -- when they were inputted.  I

15 didn't -- I had nothing to do with that.  I don't -- I

16 don't know anything about that.

17          They -- the dispatcher -- this is pure

18 speculation, but they may have put me on scene because

19 I said that the female half was in the lobby with me.

20 I'm, again, not 100 percent sure.

21     Q    Okay.  So why did you leave the lobby and go

22 to Wagon Wheel Drive?

23     A    To further investigate the complaint of

24 domestic violence alleged by Ms. Bridget.

25     Q    Okay.  And were you also investigating the

Page 37

1   alleged in -- domestic violence as described by

2   Mr. Redden?

3       A    I was investigating the complaint of

4   domestic violence.  Whomever was the victim was the

5   victim, and whomever was the assailant -- I guess you

6   would say, it was -- I was going there to investigate.

7   I had her story.  I needed to get his story.

8       Q    Okay.  But you had already spoken to him on

9   the phone; right?  Before you left the department?

10      A    I -- again, I do not recall what was stated

11  on the phone to Mr. Redden.  However, I do not take

12  statements over the phone because I cannot verify who

13  is on the other end of that phone.  So that's the

14  reason for going up there -- was to take a statement

15  from Mr. Redden.

16      Q    Okay.  But you were aware, at least based on

17  what's on your computer screen at -- by the time you

18  left the department, that Mr. Redden had also alleged

19  that he had been punched?

20      A    To answer your question very

21  specifically -- you asked if I was aware of what was

22  on my computer.  No, I was not aware of what was on my

23  computer.

24          My computer was stationary inside of my

25  vehicle, and I was standing in the police department

Page 38

1  lobby, taking photographs, and taking a verbal and

2  written statement from Ms. Redden -- or, I'm sorry,

3  from Ms. Bridget. I forget her last name. I'm sorry.

4      Q    Okay. But you got into your car in order to

5  travel to Wagon Wheel Drive; right?

6      A    That is correct.

7      Q    And when you got in your car, you had your

8  computer screen available to you?

9      A    My computer was in the vehicle, yes. I

10 don't believe nor do I recall that I actually flipped

11 it open to look at it. I'm trying to --

12     Q    Okay. But it's possible you did?

13     A    It's possible. I -- I do not recall.

14     Q    When you decided to leave for Wagon Wheel

15 Drive, had you determined whether there was probable

16 cause to arrest Mr. Redden?

17     A    I needed further information to complete the

18 investigation.

19     Q    So just so the records here are clear, as of

20 1833 you did not believe you had probable cause to

21 arrest Mr. Redden?

22     A    Again, I was investigating. I -- I hadn't

23 completed my investigation. I hadn't gotten the

24 statement or the -- yeah -- yeah, the statement

25 of -- of Mr. Redden at the time. Therefore I was on

```
                                                    Page 39
 1   my way to continue and further the investigation.
 2        Q    All right.  So let's pull up then what we'll
 3   mark as Exhibit 15 -- is that right -- which is the
 4   report in this case.
 5                    (Exhibit 15 was marked for
 6                    identification.)
 7              Okay.  I assume you've seen this document
 8   before?
 9        A    Yes, I have reviewed it.
10        Q    Okay.  And this is, just so we're clear, a
11   Ross Township Police Department Investigative Report,
12   Incident Number 202300319.  And that's the same
13   incident we've been discussing?
14        A    Yes.  That is -- that is not the complete
15   that report.  Oh, there we go.  I'm sorry.
16        Q    Okay.  Yeah, sorry --
17        A    I -- I didn't see that.  I apologize.
18        Q    No, it was my fault.  I -- so now you're
19   seeing the first page there, and this is the report we
20   were talking about?
21        A    Yes, that is correct.
22        Q    Okay.  Same location, same date?
23        A    7/7, yes, 2023.  Same location, 2043 Wagon
24   Wheel, that is correct.
25        Q    Okay.  And you had completed this report?
```

Page 40

1      A     That is correct.

2      Q     Okay.  And it -- did anyone review this

3  report before you completed it?

4      A     Before I completed it?  I do not believe so.

5  I believe I was the only one working that day.

6      Q     Okay.  Did you have any supervisor review

7  this report before it was filed?

8      A     I'm -- I'm unsure of what you mean by

9  "filed."

10     Q     Well, okay.  So I'm ask -- this is great.  I

11  want to make sure I'm using the right words.

12  What -- after you type up this report, what do you do

13  with it?

14     A     I have to validate the report to make sure

15  that it meets State standard, and then a supervisor

16  will then review it at their discretion.  I don't -- I

17  don't know when.  I'm -- I'm not a supervisor, and I

18  don't keep tabs on when they review reports.

19     Q     Okay.  Do you know if a supervisor actually

20  reviewed this report?

21     A     I -- I have no idea.  I was not there.

22  Again, I do not follow my supervisors around, so I

23  have no idea if they actually looked at it or just

24  clicked a button.  I have no idea.

25     Q     Okay.  And it indicates "Supervisor Bryan

```
                                        Page 41
 1   Rogers," would he have been the person who was
 2   responsible for reviewing the report?
 3        A    Again, sir, I'm not a supervisor, and I
 4   don't know what their responsibilities are, so
 5   therefore I cannot answer that question.
 6        Q    So let me go through this report.  So
 7   looking at your narrative -- and can you read that
 8   okay?
 9        A    Yes, sir.  Sorry, excuse me one second.
10        Q    Okay.  And do you need to take a break?
11   We've been going almost an hour.  Or are you good?
12        A    I'm fine.  I just --
13        Q    Okay --
14        A    -- I mean, I got -- I got bad allergies.
15   It's -- I don't know if you've got a -- I know if
16   you've got your allergy notification on your phone
17   this morning, but they're -- they're terrible today.
18        Q    Well, that's -- I concur with that.  So like
19   I said, if you need to take a break at any time, let
20   us know, and we can do that.
21        A    I understand.
22        Q    So looking at your narrative report there,
23   again, as we discussed, your goal in the narrative
24   report was to write down everything that you believed
25   was important in the case?
```

Page 42

1       A     Everything that I can recall, sir.

2       Q     Okay.  And you included information whether

3   it was favorable to the accused or not?

4       A     Everything that I could recall.

5       Q     Okay.  So first it begins with "On 7/7/23 at

6   1823, I responded to the lobby of my police department

7   for a report of domestic violence."  So again, does

8   that help us with the timeline a little bit?

9       A     Yes.

10      Q     Okay.  And so based on your report and your

11  recollection, you made first contact with Ms. Langen

12  at 1823?

13      A     Yes.

14      Q     And if we look at the CAD report, that's

15  consistent with the first line of when Mr. Langen

16  [sic] called into the police department?

17      A     Yes.  I -- I believe that that's

18  a -- a -- an error in my typing there.  I -- it

19  happened long before that.

20      Q     You used that term "long before that,"

21  is -- when you say "long before" -- I think before you

22  said 15 minutes, so --

23      A     That's correct, 15 minutes, yes.

24      Q     Okay.  So I --

25      A     That -- that was an approximate, that wasn't

Page 43

1   a -- that was not a firm 15 minutes, that was an
2   approximate 15 minutes.
3       Q    Okay.  I just want to make sure then when we
4   use the term "long before," we mean --
5       A    All right --
6       Q    -- something like 15 minutes.
7       A    Yeah, approximately 15 minutes, yes.
8       Q    Okay.  And so tell me what you remember from
9   your initial conversation with Ms. Langen?
10      A    Okay.  I responded to the lobby of the
11  police department for a domestic violence report.  I
12  made contact with the female.  I now recall her name
13  is Ms. Langen.  She was visibly upset.  She was
14  distraught, crying.
15           She stated that she wanted to report the
16  domestic violence incident that had occurred at the
17  Wagon Wheel address.  She stated that she went to the
18  address to pick up her juvenile daughter that
19  Mr. Redden and her share in common.
20           They had -- she told me that they
21  had -- that she -- they had recently lived together
22  and that she had recently moved out; that they were
23  never married within their relationship; and that she
24  was allowing -- the reason for why she was up there
25  was she was allowing Mr. Redden to visit the child

Page 44

1    or -- yeah, to visit the child.

2            And she was getting the child from the

3    residence as they had agreed upon for that day or the

4    hour or whatever, I -- I don't recall what it

5    was -- what the agreement was.

6            She stated that when she was putting the

7    child inside of the vehicle, Mr. Redden had reached in

8    to her vehicle and stole the cell phone that was hers

9    from the front seat of the vehicle. And she stated

10   that she began to chase Mr. Redden on foot so she

11   could get her phone back her.

12           And then while she was running and chasing

13   him, she had stated that he was making derogatory

14   comments that he was going to take her daughter away

15   from her and that allegedly the phone was his.

16           Ms. Langen stated that she continued to

17   follow Mr. Redden as he ran into the residence through

18   the back door to try to get her phone back from him so

19   that she could call 911.

20           That's when he slammed the door on her,

21   shoved her out of the doorway. And at that point is

22   when she sustained injuries to her forearm and her

23   knee and also tore her -- her pants, her leggings,

24   whatever -- whatever they were. I apologize.

25       Q    Is there -- was that it from her initial

Page 45

1    statement?

2         A    That's as much as I can recall.  I would

3    have to look at her actual statement again that was

4    written.  She wrote a -- a volunteer statement.  So

5    while it be brief, I'm sure that I'm missing some

6    things out of that statement.  Again, this was two

7    years ago almost.

8         Q    Okay.  And it looks like that there's a

9    statement -- a written statement attached to this

10   report here on page 6 --

11        A    That's correct.

12        Q    Is that the written statement that she

13   wrote?

14        A    That is the first page of the top half.

15   That is the first page of the second half, and that is

16   the second page of the top half.

17        Q    Okay.  What I've shown you on the screen

18   here attached to the report is her entire statement?

19        A    Can you scroll down, please?  Yes.  That

20   appears to be the statement that she gave -- her

21   written statement, sorry.

22        Q    Okay.  Is there anything in that written

23   statement that you have subsequently determined was

24   inaccurate?

25        A    Again, I would have to read the whole thing

```
                                                        Page 46
 1   again.  I -- I -- again, this was two years ago.  I
 2   apologize.
 3        Q    Okay.  Well, as you sit here today, do you
 4   recall that anything that she told you or wrote in her
 5   initial statement was not correct?
 6        A    I -- I don't recall, sir.  This was two
 7   years ago.  I'm sorry --
 8        Q    Okay.  For example, did she tell you that
 9   the phone was actually owned by Mr. Redden?
10        A    I -- I don't -- I don't recall her saying
11   that it was owned by him.  She just told me that it
12   was her phone.
13        Q    Okay.  Did you make any inquiries of
14   Ms. Langen about the allegation from Mr. Redden that
15   she had struck him and broke his TV?
16        A    I could visibly see a TV sitting there.  It
17   looked like the screen part was on the ground when I
18   got there.  And then the --
19        Q    Well --
20        A    You said, "The punch"?  Is that what you
21   said?
22        Q    Well, back up.  She's sitting with you --
23        A    Okay --
24        Q    We're talking about the statement you got
25   with her at the police department; right?
```

Page 47

1       A    Okay.

2       Q    Okay.  And if we look at the CAD report, it

3   says that someone had called and said that Bridget

4   Langen had punched him and broke his TV.  Did you

5   ask --

6       A    Okay --

7       Q    -- her about that at all when she was

8   sitting with you in the police department?

9       A    Verbally?  I -- I do not recall.  I -- I'm

10  not sure if she wrote it in her statement.

11  I -- again, I would need to read the statement that

12  she had wrote again --

13      Q    Well, do you recall -- let me ask some very

14  specific questions.  Do you recall asking her

15  specifically about those allegations?

16      A    I -- I do not recall.

17      Q    Okay.  Do you recall her saying at any point

18  that she had struck Mr. Redden and broke his TV?

19      A    I -- I, again, don't recall.  This was over

20  two years ago.  I would need to read the statement

21  again to be able to tell you --

22      Q    Okay.  Well, let's do that.  Let's read her

23  statement here, and you can tell me if you remember

24  anything about that.

25      A    Sorry, it's a little tough to read.  I'm

Page 48

1    trying --

2         Q    Does it help if it make it a little bigger?

3         A    No, it's just her penmanship is not of ease

4    to read.  That's a bit better.  Okay.  Can you scroll

5    down just a little bit, please?  Right there.  Thank

6    you.

7              Can you make out that last sentence?  Can

8    you read it better?  "I" -- "and I got so upset"

9    or -- "drop the" -- something -- "the DV off the

10   wall."  There's like a really bad smudge.  I can't

11   read that.  I'm sorry.  "He held me" --

12        Q    Yeah, I can't either.  So --

13        A    "He held me up against" -- can you scroll

14   down?  I'm onto the second page:  "He held me up

15   against the fence and told Kylee to take my daughter;

16   that he was taking her.  I had to leave and make a

17   report."  Okay.

18             Sorry.  It's -- that one is very hard to

19   read.  I apologize.  Yeah.  So in the -- and to answer

20   your question, it says in here that she hit him by

21   mistake.

22        Q    Okay.  And did you make any effort to

23   determine whether she actually did hit him by mistake?

24        A    I believe that I looked to see if he had any

25   injuries --

```
                                                    Page 49
 1        Q     Okay.  And so --
 2        A     -- that were consistent with a -- a punch.
 3        Q     So you believe that based on a person's
 4   injuries you can tell whether they are hit by mistake
 5   or intentionally?
 6        A     No, absolutely not.  Nope.  Her alleged was
 7   that -- I'm sorry, his alleged was that he hit her.
 8   She is saying that it was by mistake.  Therefore I
 9   used --
10        Q     Yeah.  So how did you --
11        A     -- or I checked him for injuries, correct.
12        Q     Okay.  So how did you try to -- you knew
13   there was physical contact made; right?
14        A     Between the both of them where she sustained
15   injuries, yes -- visible injuries, yes, multiple
16   visible injuries.
17        Q     Okay.  So does whether one party sustains
18   multiple visible injuries help you determine who the
19   primary aggressor is?
20        A     The severity and how many injuries, yes.
21        Q     And how does that help you to determine who
22   was the initial or primary aggressor?
23        A     That determines -- who is the primary
24   physical aggressor would be determined by --
25        Q     So --
```

Page 50

1      A    -- injuries, severity of injuries, et

2  cetera.

3      Q    So let me give you a hypothetical situation.

4  If Party A hits Party B and doesn't cause a physical

5  injury, and then Party B hits Party A back and breaks

6  Party A's nose, who's the primary aggressor?

7      A    That would be the person that -- who created

8  the bloody nose punch.

9      Q    So even though Party A was the first person

10 to throw a punch, you believe that Party B would be

11 the primary aggressor in that scenario?

12     A    Well, it depends on their -- what is their

13 relationship?  Because you're just saying two

14 hypothetical people that are unknown to each other.  I

15 would probably end up arresting them both for DCs

16 if -- if it was out in public.  But you're talking

17 about --

18     Q    Yeah.  Well, let's say --

19     A    -- a -- you're talking about a domestic

20 violence situation where the entire situation wouldn't

21 have happened had Mr. Redden not stolen the phone out

22 of --

23     Q    Okay.  You're --

24     A    -- Ms. Langen's personal vehicle --

25     Q    -- getting way ahead of me, sir.  I'm

```
                                              Page 51
 1   asking -- so let me give you a scenario because
 2   I'm -- if I understood you right before, you said that
 3   you can determine who the primary aggressor was based
 4   on the severity of the injuries that the parties
 5   incurred.  Did I understand that --
 6        A    One of the -- one of the determining factors
 7   is the severity.
 8        Q    Okay.  But it's not a determining factor?
 9   It's very possible that the person who was not the
10   primary aggressor suffered more severe injuries?
11        A    That is one factor that is used.
12        Q    Okay.  Or I asked the question badly.  Is it
13   very possible that the person who was the primary
14   aggressor actually was the only one who suffered
15   injuries; right?
16        A    Anything's possible, sir.  I -- I'm only
17   sticking to the facts of this case.  Anything's
18   possible.
19        Q    All right.  And so your job is to then
20   investigate the case and investigate the allegations
21   from both sides; right?
22        A    Any and all evidence, sir, as it's
23   presented --
24        Q    Okay.  So as you sit here under oath, can
25   you testify that you asked Ms. Langen any questions
```

Page 52

1    about Mr. Redden's allegations that she struck him?

2         A    I -- again, sir, I do not recall.  She wrote

3    it down in her statement.  I do not recall if I

4    specifically asked her about that or not.

5         Q    Okay.  So going back to your narrative then,

6    it looks like you arrived on scene at 2043?

7         A    No.  I arrived -- that's the residence

8    address.  I did not arrive at 2043, sir --

9         Q    Okay.  Oh, I'm sorry.  Yes.  I'm sorry.  I

10   asked the wrong question.  You don't indicate then in

11   your narrative what time you actually arrived on

12   scene?

13        A    That is correct.

14        Q    Okay.  Do you recall how long you actually

15   spent on scene?

16        A    I -- I do not recall unless I look at the

17   report that says what time I started on my way to the

18   jail.

19        Q    Okay.  Well, how far is it from the police

20   station to this address?

21        A    I have no idea, sir.

22        Q    Okay.  Is it relatively close or far away?

23   I mean, how long are we talking to -- that it probably

24   took you to get there?

25        A    Okay.  That would be up to your discretion

1   on what's "close" or -- or not.  You know, that's a

2   opinion question.  I'm -- I would say --

3        Q    Well, fair enough --

4        A    -- it's probably -- it's also during the

5   day, there's also traffic.  So that's a very hard

6   question to answer, sir.

7        Q    Well, what's your best estimate of how long

8   it took you to get from the police station to Wagon

9   Wheel Drive?

10       A    Again, I'm -- this was two years ago, sir.

11  I'm -- it would be pure speculation, and I don't want

12  to do that.  I -- I don't know.

13       Q    So if the CAD report indicates you were

14  there around 1858, does that seem about right?

15       A    No, sir, it does not.  Again, I don't know

16  if that's when I left the police department and said I

17  was on my way there or if that's when I actually got

18  there.  I'm -- I don't recall.

19       Q    Okay.  So it's possible?  So those are the

20  two possibilities; right?  One is that 1858 is when

21  you arrived, and the other is 1858 is when you left

22  the police department --

23       A    Left -- left -- that is correct.

24       Q    So what did you do when you arrived at the

25  location?

Page 54

1      A     So when I arrived at the Wagon Wheel

2   location, Mr. Redden was in the driveway.  I met with

3   Mr. Redden to continue my investigation and get a

4   statement from Mr. Redden.  He said that he had an

5   incident involving Ms. Langen.  Mr. Redden said that

6   he had video footage.  I was -- I asked him to provide

7   that video footage.

8           His daughter then came over -- his oldest

9   daughter then came over, showed me the footage.  From

10  what I remember, the footage was a couple of different

11  videos that were relatively short in duration.  It

12  wasn't like one big giant encompassing of the whole

13  situation.

14          It was short clips of parts of what

15  happened, again, not the entire situation.  And I had

16  asked him again what had -- had happened during this

17  situation.

18      Q     Did you obtain a written or recorded

19  statement from Mr. Redden?

20      A     Written or recorded?  No, I did not.

21      Q     Did you obtain a written and recorded

22  statement from the juvenile, K.R., who was there?

23      A     Real quick, I want to clarify both of them

24  no "writtens."  When you say "recorded," what -- what

25  do you mean by "recorded"?  I did not have a video.  I

Page 55

1  did not have a camera, I did not have a voice

2  recorder.  I did not have any of that stuff.  I

3  obtained verbal statements from both of them.

4      Q    Well, and I'm just asking what happened;

5  right?  I mean, so you didn't ask to them --

6      A    Okay --

7      Q    -- to write a written statement?  And you

8  didn't make a video or audio recording of their

9  statement in any way, shape, or form; right?

10     A    That is correct.

11     Q    Okay.  So here's what I'm confused about.

12  If I look at the domestic violence policy that we had

13  previously marked as Exhibit 12, look at the

14  "Investigation" section under Section 308.4D, it says

15  "When practicable and legally permitted, video or

16  audio record all significant statements and

17  observations."

18          So did you comply with this policy in

19  obtaining video or audio recordings of the statements

20  of Mr. Redden and other witnesses?

21     A    I was never given by the department a video

22  or audio recording device to be able to follow this

23  policy.  Therefore, I did not have the means to do

24  that.

25          And if you look at Subsection B, it says

Page 56

```
 1   "When practical, officers shall obtain documented
 2   statements."  It does not say that I'm required to.  I
 3   retain -- I obtained verbal statements from Mr. Redden
 4   and her daughter.
 5        Q    Why did you not obtain a written statement
 6   from Mr. Redden and his daughter?
 7        A    I'm sorry.  Can you ask -- you cut out
 8   there.  I apologize.  Can you ask that again --
 9        Q    Okay.  Yeah.  Why did you not retain a
10   written statement from Mr. Redden and the witness?
11        A    I -- I don't recall if I asked or not.  I do
12   not recall why I did not.  And it also says "When
13   practical," doesn't mean it's required.
14        Q    Well, was there any practicable or legal
15   reason that prohibited you from obtaining a written
16   statement from Mr. Redden and the witness?
17        A    I do -- I do not recall.  I -- I don't
18   recall if I asked.  I -- I do not recall.  I'm sorry.
19   I can tell you, though, when I got there Mr. Redden
20   was hostile, was argumentative to begin with.
21        Q    Yeah, he was upset; right?
22        A    A -- a -- I would say a little bit more than
23   upset, yes.
24        Q    Is it common for victims of domestic
25   violence to be upset?
```

Page 57

1       A    Of course.  Of course.  Yep -- yep.
2   Ms. Langen was upset as well, so a very traumatic
3   situation.
4       Q    Okay.  So the fact that Mr. Redden was upset
5   doesn't necessarily indicate to you whether he was the
6   primary aggressor or not, for example.
7       A    It determines what your definition of
8   "upset" is.  Again, if he's being argumentative
9   and -- verbally argumentative, et cetera, toward the
10  police who is there to -- what he believes -- to help
11  him, that is a -- one of the, not -- again, not the
12  sole determining factor.
13      Q    Now, your report indicates you looked at
14  some video clips; right?
15      A    That's correct.
16      Q    And you collected these video clips as
17  evidence?
18      A    Yes.  I had the oldest daughter send them to
19  me.  I -- I don't remember her name, I'm sorry.  K.R.
20  are her initials.  She's -- she's the one that sent
21  them to me --
22      Q    Okay.  So I'm going to show you some of the
23  video clips, and they may not be in the right
24  order --
25      A    Okay.  All right --

Page 58

1     Q    But I want to ask you if these are the clips
2   you had.  So we'll mark as Exhibit 16 --
3                MR. RIGGS:  Before we show these, I
4   hate to ask, but counsel here needs a quick break.
5                MR. ENGEL:  Yeah, no, not at all.
6                MR. RIGGS:  Okay --
7                MR. ENGEL:  And I'm -- that's perfect
8   because I'll figure out the best way to view these.
9   And maybe before we go on the record, we can test to
10  make sure that we've got the screen shared --
11                MR. RIGGS:  So I appreciate -- I only
12  need, I would say, five minutes.
13                MR. ENGEL:  Yeah, that's fine.  Let's
14  do ten minutes.  How about that?
15                MR. RIGGS:  Okay.  Thank you --
16                THE REPORTER:  All righty.
17                We are off the record at 10:44 a.m.
18                (Off the record.)
19                THE REPORTER:  We are back on the
20  record at 10:57 a.m.
21                MR. ENGEL:  All right.
22  BY MR. ENGEL:
23     Q    So we were in the process of discussing your
24  investigation and referring to the police report,
25  which let me get back up on the screen here.  All

Page 59

1  right.  So on the -- looks like the second page of

2  your report, first full paragraph, you described some

3  videos there.  Do you remember reviewing those videos?

4      A    Yes.

5      Q    And did you review those videos in

6  determining whether there was probable cause to arrest

7  Mr. Redden?

8      A    That is correct.

9      Q    So the first one is a three-second clip that

10 you said "Of Mr. Redden running in the street after he

11 took Ms. Langen's phone from her, keeping it from

12 her."

13     A    Okay.

14     Q    So first question, I guess, I want to ask

15 you about your description.  In your description, you

16 say "He took Ms. Langen's phone."  At that point, had

17 you done anything to determine who actually was the

18 owner of the phone?

19     A    So she had told me that it was her phone,

20 and he had said that it was a phone that was given

21 to -- hang on, I forgot to put my AirPod back in.  One

22 second.  I apologize.

23     Q    Take your time.

24     A    Sorry.  Here we go.  He had said that it was

25 a phone that was given to her during the course of

Page 60

1   their relationship to be able to communicate back and
2   forth with each other and so that he could talk to
3   his -- his youngest daughter during the time of their
4   separation.
5       Q    I guess my question was have you done
6   anything to determine who actually owned the phone?
7       A    I did not call the phone provider to see
8   whose name was on the account.  I -- I felt that that
9   was unreasonable for the circumstances that I was
10  dealing with.
11      Q    Okay.  Well, I'm just asking because you
12  described it as "Ms. Langen's phone," but at that
13  point you didn't actually know who owned the phone;
14  right?
15      A    Based off of the statements that I already
16  previously stated and using common sense, he told
17  me -- his own statement -- that he gave her the phone
18  to use during their relationship and then after their
19  relationship to communicate with his daughter -- his
20  youngest daughter, the daughter that they have in
21  common.
22      Q    So now I'm going to show you then -- okay.
23  I think I need to switch this one, make sure I got the
24  right one -- what we'll mark as Exhibit 16, which is a
25  Video "Filtered - (3)," and it appears to be a

Page 61

1    three-second video.  So let me play it for you.

2                    (Exhibit 16 was marked for

3                    identification.)

4                    (Video played.)

5    BY MR. ENGEL:

6        Q    Well, is that the three-second video that

7    you believe was referenced in your police report?

8        A    Yes, I believe so.

9        Q    Okay.  And having played that video, is

10   there anything in this video that you believe

11   established probable cause to arrest Mr. Redden?

12       A    It was used in determining the primary

13   aggressor.

14       Q    Okay.  And so what in that three-second

15   video do you believe supported your determination that

16   Ms. -- that there was probable cause to arrest

17   Mr. Redden and that he was the primary aggressor?

18       A    Give me just one second.  I'm trying to get

19   my AirPod to connect here, it's not -- it's not.  I

20   can hear you a lot better.  I couldn't hear

21   any -- I -- I believe that there were audio in that

22   video, and I couldn't hear it at all.

23       Q    Yeah, I didn't --

24       A    Okay.  You had it off.  All right.  I

25   believe that there's --

Page 62

1      Q      Yeah.  So let me -- so let's start over.
2  Let me play this video for you again with the audio
3  turned on.
4                  (Video played.)
5  BY MR. ENGEL:
6      Q      Okay.  And I didn't hear any words in that
7  video.  Did you?
8      A      I -- I didn't, I did not.  But again, I'm
9  looking at it via third party from your computer as
10  well, so I apologize --
11     Q      So I guess the question is you can't -- in
12  order to arrest Mr. Redden, you need to have probable
13  cause he committed the crime; right?
14     A      Absolutely.
15     Q      Is there anything in that three-second video
16  that I played you that supports the conclusion that
17  there is probable cause that Mr. Redden committed a
18  crime?
19     A      Potentially.  There is -- what I observe is
20  the female half running after the male half after he
21  reached into her car and took her phone from her
22  possession.
23     Q      Okay.  So the fact that someone's running
24  after another person you believe is -- helps support
25  probable cause for an arrest?

Page 63

1    A    Any and all evidence helps support claims

2    of -- claims or disproves claims --

3    Q    Well, is there anything in this video that

4    is inconsistent with the statement that Mr. Redden had

5    provided you about what happened?

6    A    Inconsistent?  I don't -- I don't believe

7    that he told me that he chased after her at all, from

8    what I can recall.

9    Q    Okay.  Did you ask her --

10   A    Or, I'm sorry, that he was being chased by

11   her.  I apologize.

12   Q    Okay.  Did you ask him about that?

13   A    I believe so.  I believe that I asked about

14   all the videos that -- that were presented to me.

15   Q    Okay.  So let me now ask you to look at what

16   we'll mark as Exhibit 17, which is the 16-second video

17   that you put in your complaint.  And, I guess -- well,

18   let me ask you -- first, let me go back to your

19   report.

20              (Exhibit 17 was marked for

21              identification.)

22        Your report says "The second is a 16-second

23   clip of Ms. Langen standing at the neighbor's

24   residence, knocking on the door seeking assistance"?

25   A    Yes.

Page 64

1        Q     And I have two 16-second videos, which we'll

2    mark 17 and 18, and I want to ask you which one you

3    were referring to first --

4                    (Exhibit 18 was marked for

5                    identification.)

6        A     Okay.

7        Q     So the first is a video that we'll mark as

8    Exhibit 17 titled "Filtered - (1)," and I'll play this

9    for you.

10                   (Video played.)

11   BY MR. ENGEL:

12       Q     So do you believe that that is the video of

13   her standing at the door knocking for assistance?  Or

14   is it what I'll mark as Exhibit 18?

15       A     Sir, I did not see any video.  I can only

16   see you staring at your monitor.

17       Q     Oh, my gosh.  I'm sorry.  I didn't share the

18   screen.  All right.  So let me go back and play what

19   we marked as Exhibit 17 again for you.

20                   (Video played.)

21   BY MR. ENGEL:

22       Q     Can you see it now?

23       A     I can see, yeah, yes, I can.  Now I can.

24                   (Video played.)

25   //

Page 65

1    BY MR. ENGEL:

2        Q    And then what we'll mark as Exhibit 18 is

3    another 16-second video with the title "PW Forcing Way

4    Into Home"

5                    (Video played.)

6    BY MR. ENGEL:

7        Q    So do you know which of those videos, 17 or

8    18, is the one that you've referenced in your report

9    when you say "It's a clip of her standing at the

10   neighbor's residence, knocking on the door seeking

11   assistance"?

12       A    It was -- it was the first video that you

13   showed where Mr. Redden is standing directly behind

14   her while she is knocking on the door.  I didn't hear

15   any audio during that video, but there definitely is

16   audio.  She is saying things during that

17   interaction --

18       Q    Okay.  So let me go back then to Exhibit 17

19   now that we know we got the right one and ask you

20   about that.

21       A    Okay.

22                    (Video played.)

23   BY MR. ENGEL:

24       Q    Okay.  So looking at Exhibit 17, were you

25   able to make out what was said on that video?

Page 66

1      A    I'm -- I'm not sure which video you're

2    referring to.  Could you play it again?  You've played

3    two videos, and I'm thoroughly confused.

4      Q    Okay.  So I am showing you what is -- we've

5    marked as Exhibit 17, which you've just testified you

6    believe this is the one that you've referenced in your

7    police report.

8      A    Okay.  Can you please play that again?  And

9    I will --

10     Q    Absolutely --

11     A    -- reverify.

12               (Video played.)

13   BY MR. ENGEL:

14     Q    What in Exhibit 17 do you believe helped

15   establish probable cause that Mr. Redden committed the

16   crime?

17     A    So that was -- again, I couldn't hear any

18   audio with that video.  I don't -- I'm not sure what

19   the issue is there, but I believe that the statements

20   that are made would help benefit and support my

21   opinion of this video.

22               But that is -- what is observed is

23   Mr. Redden standing directly behind Ms. Langen as she

24   is attempting to seek assistance from the neighbor to

25   call the police for, you know, somebody to respond to

Page 67

1    that incident while, mind you, Mr. Redden has

2    both -- oh, I'm sorry, her phone in his hand and is

3    not calling the police for assistance.

4        Q    Okay.  Were you able to understand the audio

5    when you were standing out there on the street

6    investigating this matter?

7        A    I believe so.  I believe that I held

8    the -- the juvenile's phone up to my ear so I could

9    hear it more definitively.  I had to do that with all

10   of them.  I got a lot of -- a lot of years shooting

11   guns and stuff like that.  So it's kind of hard to

12   hear these days.

13       Q    So let me show you next what we'll mark as

14   Exhibit 19, which is a ten-second video clip that I

15   believe you referenced in your report.  And this is

16   document -- or video number "Filtered - (2)," and I'll

17   play this for you.

18                    (Exhibit 19 was marked for

19                    identification.)

20                    (Video played.)

21                    THE WITNESS:  And please turn on the

22   sound.  Thank you, sir.

23                    (Video played.)

24                    THE WITNESS:  Okay.

25   //

Page 68

1   BY MR. ENGEL:

2        Q    You need me to play it again?

3        A    It -- I don't think playing it's going to

4   help me hear it.  The one thing that I did hear

5   Mr. Redden call her was "a piece of shit," and I

6   believe she said, "You took my phone," or something

7   along those lines.  I would have to listen to it

8   again, please.

9                   (Video played.)

10                  THE WITNESS:  Okay.  That time I heard

11  something about "Take a child away from the home."

12  BY MR. ENGEL:

13       Q    Okay.  Does that video --

14       A    I'm telling you, it's -- it's like I'm

15  listening to something underwater, so I -- I apologize

16  for my -- my ignorance in this.

17       Q    No, that's okay.  Do you believe that this

18  video supported your conclusion that there was

19  probable cause to arrest Mr. Redden?

20       A    I believe that parts of it were used to

21  determine who the primary physical aggressor was.  You

22  know, he's -- from what I can hear and then from what

23  I remember, he's calling her "a piece of shit."  That

24  definitely assisted with identifying the primary

25  physical aggressor.

Page 69

1          I -- it also was extremely helpful in

2    determining -- because while she is trying to walk

3    away, he is continuing to engage her with very coarse

4    language in front of a juvenile female that they have

5    a child in common with together.

6          Q    Next I'll show you what we'll mark as

7    Exhibit 20, which is the minute -- 00:01:08 video clip

8    that you referenced in your report.

9                    (Exhibit 20 was marked for

10                   identification.)

11         A    Okay.  I'm going to lean in so I can try to

12   hear it.

13         Q    Yeah.  And this is document

14   number -- IMG_2607.

15         A    Okay.

16                   (Video played.)

17   BY MR. ENGEL:

18         Q    And I'll see if we can get the audio to play

19   a little better here.

20                   (Video played.)

21   BY MR. ENGEL:

22         Q    Do you believe that that video helped

23   establish probable cause that Mr. Redden had committed

24   a crime?

25         A    It -- it did.  I do want to say, sir, I

Page 70

1   can't hear anything.

2   It -- it -- I -- there's -- there's no audio.  Well,

3   there is audio coming through, but it sounds like a

4   fishbowl.

5           So there are -- I -- if I do recall, there

6   are statements that are made by Mr. Redden, again, in

7   a derogatory, inflammatory way toward Ms. Langen.

8           If I remember correctly, she's saying, "Give

9   me my phone, give me my phone," et cetera.  But

10  I -- I'm sorry, I can't -- I can't hear what is going

11  on on your computer.  I apologize.

12  I'm -- that's -- that's all I got --

13      Q   Okay.  Are you -- and were you able to hear

14  the course language from her as well?  Do you remember

15  that?

16      A   I -- I'm sure that -- that there was.

17  I -- I -- again, I don't -- I don't know.  I -- I

18  believe she said, "Give me my effing phone."  But what

19  I'm specifically referring to is the direct

20  inflammatory, derogatory comments toward her from

21  him -- is what I remember.

22          So again, if -- if I could get this to play

23  a little bit better, I could better say what I'm

24  hearing, if that makes sense.  I'm sorry.

25      Q   Yeah.  Well, let me ask you a couple

Page 71

1    questions, and then maybe --

2         A    Okay --

3         Q    -- we can send you the videos, and you can

4    watch them during a break, and we can see if that

5    changes under your answers.  How about that?  Let me

6    just now show you what we've marked as Exhibit 21,

7    which is the one-minute long clip that you referenced

8    in your report, and that is document

9    number -- "Filtered -"

10                   (Exhibit 21 was marked for

11                   identification.)

12                   (Video played.)

13   BY MR. ENGEL:

14        Q    Okay.  Do you believe -- what in that video

15   supported your conclusion that there was probable

16   cause that Mr. Redden had committed the crime?

17        A    Okay.  Sir, again, I couldn't hear what was

18   being said, but I saw Ms. Redden trying to get her

19   phone back from -- I'm sorry, Ms. -- Ms. Langen trying

20   to get her phone back from Mr. Redden when he had fled

21   into the house.

22             And then she was again trying to get her

23   phone back.  He's pushing her down, holding her down

24   on the ground, which caused the injuries that she

25   sustained.

Page 72

1      Q     And then let me go back to Exhibit 18 and
2    ask you if this was one of the videos that you
3    reviewed as well?
4                  (Video played.)
5    BY MR. ENGEL:
6      Q     Okay.  Do you remember if that was one of
7    the videos that you reviewed as part of your
8    investigation?
9      A     Yes.
10     Q     Okay.  Why don't we do this before I ask
11   some questions about it?  I am going to put in the
12   chat a link to this discovery folder.
13     A     Okay.  I -- I apologize for not having the
14   ability to -- to hear easily --
15     Q     No.  I -- we, we do these things multiple
16   ways.  And so what I'm going to do is put this in the
17   chat and so you can link to it and look at the videos.
18           And why don't we go off the record and give
19   you a chance to look at the videos on your machine,
20   and then you can come back and tell me if having a
21   better opportunity to listen to the videos changes any
22   of your answers?
23     A     Okay --
24     Q     I caution you, of course, that you're not
25   supposed to speak to anyone about your testimony while

Page 73

1    we're off the record here.

2        A    Yeah, absolutely.

3                THE REPORTER:  All righty.  We are off

4    the record at 11:19 a.m.

5                (Discussion held off the record.)

6                THE REPORTER:  Back on the record at

7    11:27 a.m.

8                MR. ENGEL:  Okay.  Thank you, sir.

9    BY MR. ENGEL:

10       Q    You had an opportunity to review all those

11   videos?

12       A    Yeah, that is correct.

13       Q    Okay.  And just to clarify -- and there were

14   some discussions off the record between counsel -- the

15   videos that you reviewed and referenced in your report

16   are Exhibit Number 16, 17, 19, 20, and 21.  Is that

17   correct?

18       A    To be honest with you, sir, I don't remember

19   the -- the numbers.  But with the audio that I was

20   able to review, it helped pretty substantially in

21   remembering this.

22                MR. ENGEL:  Okay.  And maybe I'll

23   direct that to Counsel.

24                We agree that those are the right

25   exhibits and that the 16-second clip -- 18 -- was an

Page 74

1   excerpt from another clip?

2                  MR. RIGGS:  Agreed.  Yep.  I think

3   we're on the same page there.

4                  MR. ENGEL:  Awesome.

5   BY MR. ENGEL:

6       Q    Okay.  So now that you've had a chance to

7   review the audio, does that change any of the answers

8   that you gave me previously?

9       A    No, it does not as far as whether those

10  videos were used to establish probable cause for an

11  arrest and to determine the primary physical

12  aggressor.

13      Q    Okay.  So do you agree that the videos show

14  Ms. Langen repeatedly trying to push her way inside

15  the house while Mr. Redden tried to keep her out?

16      A    The -- I'm not sure which video you're

17  talking about, but one of the videos depicts

18  Ms. Langen trying to get her phone that Mr. Redden had

19  stolen from her.  It shows her trying to get it from

20  him.

21                  They are standing at the doorway, and it is

22  also viewed that she is then on the ground.  He is

23  pushing her down onto the ground and holding her down

24  on the ground while she is trying to receive -- or

25  trying to get property that is hers.

1      Q    Okay.  Do you believe that the videos showed

2  Ms. Langen sustaining injuries during the parties'

3  scuffle at the sliding glass door when she was trying

4  to force her way into the house and Redden was trying

5  to keep her out of the house and close the door?

6      A    What is observed and what Ms. Langen said to

7  me was she received the injury to her knee while

8  Mr. Redden was forcefully pushing her down onto the

9  ground, causing the scratch and the subsequent tear on

10  her -- her leggings or her pants or whatever they

11  were.

12      Q    Okay.  Do you agree that the videos clearly

13  showed that Mr. Redden came into physical contact with

14  Ms. Langen when she tried to push her way inside the

15  house, and he tried to block her from entering the

16  house and close the door?

17      A    I see physical contact with Mr. Redden

18  forcefully pushing Ms. Langen down on the ground,

19  causing the subsequent scratch on her knee and the

20  tearing of her pants.

21      Q    Okay.  And do you agree that the evidence

22  showed that Mr. Redden's actions were motivated by his

23  need to keep Ms. Langen out of his house?

24      A    I believe that his actions were to keep her

25  from retrieving her phone and calling the police for

Page 76

1    assistance.
2        Q    Okay.  I'm going to show you what we'll mark
3    as Exhibit 22, which is the Court of Appeals decision
4    in this case.  Have I -- and have you ever read this
5    decision, which is found at 2024-OHIO-1088?
6                    (Exhibit 22 was marked for
7                    identification.)
8        A    I have not.
9        Q    Okay.  So in this opinion -- were you aware
10   that the Court of Appeals had reversed the conviction
11   in this case?
12       A    I was.
13       Q    Okay.  And how did you become aware of that?
14       A    When I was made aware of the lawsuit.
15       Q    Okay.  Do you believe that the Court of
16   Appeals got it wrong?
17       A    I do.
18       Q    Why is that?
19       A    Because I had probable cause to an -- effect
20   an arrest for domestic violence on Mr. Redden,
21   substantiated by video evidence, injuries to the
22   victim in the case.
23       Q    Okay.  So let me refer you now to -- ask you
24   to review exhibit -- or paragraph 12 of that exhibit.
25   The second sentence reads "A videorecording of a

Page 77

1    portion of the incident shows Langen trying to crawl

2    sideways inside the house past Redden as the sliding

3    door is partially open and Redden is standing in the

4    doorway" --

5         A    Okay --

6         Q    Do you believe that the Court of Appeals has

7    correctly characterized the videos in this case?

8         A    They are referring to one video, not all of

9    the videos, so no, I do not.  I am only seeing -- I'm

10   only seeing an opinion about one video.

11        Q    The next thing they say is "Langen never

12   disputed that she persistently tried to force her way

13   inside the house."  Are you aware of anything that

14   contradicts the language from the Court of Appeals?

15        A    I -- I am unaware.  No, I -- I wasn't

16   present for her testimony, so I have no idea.

17        Q    Okay.  Are you aware of any evidence that

18   you developed during your investigation that had her

19   disputing that she tried to force her way inside the

20   house?

21        A    I -- I do not recall, sir.

22        Q    Next thing the Court of Appeals says "The

23   evidence at trial indicates that Langen sustained

24   bruises on the back of her leg and the bruise and

25   scrape on her right arm during the parties' scuffle at

Page 78

1    the sliding glass door when she was trying to force

2    her way inside the house and Redden was trying to keep

3    her out of the house and close the door."

4            Are you aware of any evidence obtained

5    during your investigation that contradicts that

6    description of the evidence by the Court of Appeals?

7        A    Yes, I believe that the -- the

8    injury -- well, the injury that I documented was on

9    the -- was on her knee, which was on the front of her

10   leg, not on the back.

11       Q    And how does that make a difference?

12       A    Well, because of -- of the location of the

13   injury.  That makes a -- that makes a world of

14   difference.  It doesn't make too much of a difference

15   that there is an injury.

16           An injury is an injury, and it was sustained

17   while she was being held down onto the ground, which

18   caused the -- the scraping of her knee.  But I -- I

19   know nothing about the back of her leg, so --

20       Q    Okay.  Does the fact of where the --

21       A    You asked if there was a discrepancy, and I

22   said, "Yes, there is."

23       Q    Okay.  Does the fact that there is an injury

24   on the back of her leg help you determine whether she

25   sustained that injury while trying to force her way

Page 79

1    inside the house?

2         A    While -- it could, but there was video

3    evidence of her knee on the ground as Mr. Lang

4    [sic] -- or I'm sorry, Mr. Redden was forcefully

5    pushing her down on the ground.

6              That shows to me substantial evidence to

7    indicate that she sustained the injury to her knee

8    while Mr. Redden was forcefully pushing her on the

9    ground, and she didn't receive it tripping or falling

10   or anything like that.  It was a direct cause of him

11   forcing her onto the ground.

12        Q    In paragraph 13, the Court of Appeals writes

13   "The record demonstrates that Redden came into

14   physical contact with Langen when she persistently

15   tried to push her way inside the house and he tried to

16   block her from entering the house and close the door

17   and that Redden's actions were solely motivated by his

18   need to keep Langen out of the house."

19             Did you develop any evidence during your

20   investigation that contradicts that statement from the

21   Court of Appeals?

22        A    I believe that his actions were solely

23   motivated to keep the phone away from her so she could

24   not call the police.

25        Q    And what evidence did you determine to allow

Page 80

1   you to draw the conclusions about Mr. Redden's

2   motivations?

3       A    So multiple times -- we can go back and

4   watch the video.  Multiple times she is not only

5   asking for him to call the police, she is asking for

6   her -- for his older daughter to call the police.

7           She seeks asylum from him at the neighbor's

8   house, who doesn't answer the door, to call the police

9   multiple times.  He's also running away from her with

10  phone in hand as she is screaming, "Give me my phone."

11  I believe that he was solely motivated in efforts to

12  keep her from calling the police.

13      Q    What --

14      A    And, again, had the phone not been stolen

15  out of the car under his own admission, this entire

16  incident wouldn't have occurred.

17          And the daughter even said the same thing

18  when I asked her, "Had this" -- "had the phone not

19  been stolen, would this have happened?"  It's clearly

20  stated in my report that she agreed that it would not

21  have happened had he not taken the phone.

22      Q    Again, you didn't ask her to provide a

23  written statement; right?

24      A    Not a written, but she was -- she provided

25  me a verbal statement, and it was documented on my

Page 81

1    report.

2         Q    Okay.  All right.  So you determined -- you

3    arrested Mr. Redden and took him to the jail?

4         A    Subsequent to the arrest he was taken to the

5    jail.  That is correct.

6         Q    Okay.  And I'll show you what's been

7    marked -- what we'll mark as Exhibit 23, which is the

8    complaint in this matter.

9                   (Exhibit 23 was marked for

10                  identification.)

11        A    Yep.

12        Q    Did you sign this complaint?

13        A    What I am seeing, there is no signature.

14   Yes, there is a digital signature.

15        Q    Okay.  So you caused the charges to be filed

16   against Mr. Redden?

17        A    At the complaint of the victim.

18        Q    Okay.  Well, it's your determination; right?

19   It's your signature there at the bottom; right?

20        A    Yes.  Given the facts that were presented to

21   me, yes.

22        Q    And you booked him into the Butler County

23   Jail?

24        A    That is correct.

25        Q    So I'm going to go back to our domestic

Page 82

1  violence policy here, and I'm referring you to Section

2  8 -- 308.9.1C, and there's some factors you're

3  supposed to look at in determining who's the primary

4  aggressor.

5          So prior to making the determination that

6  Mr. Redden was the primary aggressor, did you consider

7  whether there was any history of domestic violence or

8  any other violent acts by either Mr. Redden or

9  Ms. Langen?

10     A    Yes, I -- if you go -- if you recall on the

11 CAD report, there was -- I -- I asked my county

12 dispatcher to run a CCH on Mr. Redden to see if there

13 was any prior arrests or convictions for domestic

14 violence.

15     Q    But I'm confused.  I thought you testified

16 that you did that after you arrested him because you

17 wanted to know what the level of the charge would be?

18 Did you do that --

19     A    Yeah.  So it's -- it's both.

20     Q    Is it your testimony now that you asked

21 dispatch for his history before you made the

22 determination to arrest him?  Or after --

23     A    So it's -- it's both, encompassing.  You use

24 the history to determine primary physical aggressor,

25 and you use the history to determine -- one of the

Page 83

1    factors to determine, it's not the sole determining

2    factor -- one of the factors to determine whether the

3    charge is a misdemeanor or a felony.

4         Q    Okay.  So I'm going into the CAD report

5    here.  At 1919, had you at that moment determined that

6    you were going to arrest Mr. Redden?

7         A    If you look at 1920 -- I'm sorry, 1934,

8    that's when he was placed into custody.  That's when

9    it was determined that he was going to be placed under

10   arrest.

11            Again, you use a CCH to determine -- one of

12   the factors, not the sole factor, but one of the

13   factors in determining whether to arrest -- or I'm

14   sorry, whether to -- or who is the primary physical

15   aggressor.  I apologize.

16        Q    Okay.  So why didn't -- so if at 1919 you

17   were still conducting your -- so let me back up.  Is

18   it your testimony that at 1919 you were still

19   conducting your investigation to determine whether

20   Mr. Redden or Ms. Langen was the primary aggressor?

21        A    I believe so, yes.

22        Q    So why didn't you ask for a CCH for

23   Ms. Langen as well?

24        A    Because the immediate facts that I had at

25   the time in the video footage, absent other evidence

1  that came about -- Mr. Redden caused serious

2  harm -- or I'm sorry, didn't cause serious -- caused

3  physical harm to a family or household member, be it

4  the mother of his child, with video footage and

5  evidence that showed that Mr. Redden was forcefully

6  holding her down on the ground, which caused the

7  scrape to the knee as well as the -- the injury to her

8  arm.

9       Q    But I'm looking back at your domestic

10 violence policy.  It says that you're supposed to look

11 for any history of domestic violence or other violent

12 acts by either person involved.  Did you make any

13 efforts to determine if there was a history of

14 domestic violence or other violent acts by Ms. Langen

15 before you arrested Mr. Redden?

16      A    I -- I believe so.  We also have our -- our

17 computers -- our MDCs that can run criminal history on

18 subjects.  I mean --

19      Q    Is it now your testimony that you ran the

20 criminal history for Ms. Langen from your computer?

21      A    I -- I do not recall if I specifically did.

22 However, I'm stating that there is a possibility that

23 I did.

24      Q    Well, I want to know your testimony.  Do

25 you -- are you able to sit here under oath and tell us

Page 85

1    that you've checked the criminal history of

2    Ms. Langen --

3         A    I -- again, I do not recall.  I'm telling

4    you that there is a possibility, but I do not recall.

5         Q    And we'd be able to check that by going into

6    OHLEG, right, and asking them?

7         A    No, that is incorrect.

8         Q    Doesn't it record every time you check

9    someone's history?

10        A    I -- we do not use OHLEG to run criminal

11   history.  That's why we have the county do it

12   officially.  We have our computers in our car that can

13   run local history on people.

14        Q    And do the computers in your car log

15   whenever you check someone's criminal history?

16        A    I -- I believe yes, it should.  Yep.

17        Q    Okay.  So even though you have no memory of

18   doing that, if it happened, you should be able to

19   produce a document showing us that you did that?

20        A    Well, I would not be able to produce

21   anything.  I don't work there anymore.  So that would

22   be something that --

23        Q    But Ross Township should be able to?

24        A    I'm -- I'm not sure.  I'm not sure if they

25   wiped me out of the system when I stopped working

Page 86

1   there.  I'm not sure, sir.  I -- I no longer work

2   there and haven't worked there for a year -- or over a

3   year.  I apologize.

4        Q    Okay.  And just give me one moment here.

5        A    That's fine.

6        Q    And I apologize if I asked you this before.

7   Do you recall if your report was ever reviewed by a

8   supervisor?

9        A    I -- I would -- I would have no idea.  I'm

10  not a supervisor, and I don't follow everything that

11  they do.  I -- I couldn't tell you whether they read

12  the whole thing, looked at the entire thing.  I -- I

13  have no idea.  I don't -- I was not nor am I a

14  supervisor.

15       Q    Okay.  Well, but my question was a little

16  more precise and lawyerly, which is it looks like

17  there's at the bottom of your report a line for

18  "Supervisor Bryan Rogers," and then "Approved by

19  Burton Roberts" --

20       A    Okay --

21       Q    Do you have any knowledge as you sit here

22  today as to what, if anything, they did to actually

23  review this report?

24       A    Again, sir, I -- I don't.  I -- I'm sorry if

25  I didn't answer this before, but I -- I don't.  I

Page 87

1    don't sit there and look over their shoulder to see if
2    they read every report.  I have no idea.
3              I submit the report.  If it's reviewed, I
4    have -- I couldn't tell you.  That's on them to do.
5    That's not my job nor my responsibility to follow up
6    with them to make sure that they did their job.  I'm
7    sorry --
8         Q    Okay.  Did you discuss this matter with
9    anyone before you determined that there was probable
10   cause to arrest Mr. Redden?
11        A    Did I discuss it with anybody with -- inside
12   of my department?  Supervisors, et cetera --
13        Q    Yeah, that was a terrible question --
14        A    No, I was the only one -- I was the only one
15   working that day --
16        Q    Yeah, and so let me rephrase the question.
17   I'm sorry.  We're talking over each other.  Let me
18   rephrase the question.
19        A    Okay.
20        Q    Did you discuss this matter with anyone
21   inside your department before you made the decision to
22   arrest Mr. Redden?
23        A    I did not.  I was working by myself that
24   day.  I was the only Ross Township officer on duty.
25        Q    One moment.  Have you spoken to Mr. Redden

Page 88

1    subsequent to this incident?

2         A    No.

3         Q    Have you spoken to anyone else in your

4    department about this incident?

5         A    No, I don't work there anymore.  I have no

6    reason to talk to anybody.

7         Q    Did any of your supervisors or anyone else

8    after this matter -- or after this arrest, I'm sorry,

9    talk to you about this case?

10        A    No.  The only person I've talked to about

11   this case is my counsel.

12        Q    Okay.  So other than your counsel, have you

13   spoken to anyone else -- well, let me be clear about

14   "this case."  When I was asking about that "case"

15   before, I meant the arrest of Mr. Redden.  Have

16   you --

17        A    No --

18        Q    -- spoken to anybody about that?

19        A    About the arrest of Mr. Redden?  That --

20        Q    Yeah --

21        A    When I got off of my shift, my -- there was

22   a officer there that was -- relieved me.  I don't

23   remember who it was, but it -- we did a shift brief,

24   like, "Hey, what did you have last night?"  That's the

25   only communication that I've had about this case.

Page 89

1      Q    Okay.  And then have you spoken to anyone
2   about the lawsuit filed by Mr. Redden other than
3   counsel?
4      A    No.  Just my counsel, no.
5      Q    Okay.  And I don't want to know about those
6   conversations, so --
7      A    Yeah, I -- I have -- I haven't talked to
8   anybody about it.  Like I said, I don't work there
9   anymore.  I have since moved on to a different
10  department.  I --
11              MR. ENGEL:  Okay.  Well, that is all
12  the questions I have.
13              THE WITNESS:  Great.
14              MR. ENGEL:  I'll stop sharing screen.
15  I don't know if Mr. Riggs has questions or not, but we
16  will turn it over to him.
17              MR. RIGGS:  I did have one thing I
18  wanted to clarify.
19                    EXAMINATION
20  BY MR. RIGGS:
21      Q    You know, going back to the recording of
22  statements --
23      A    Okay --
24              MR. RIGGS:  Yeah.  Can you bring back
25  up the policy just so I'm clear?  I got kind of

Page 90

1  confused tracking it.

2  BY MR. RIGGS:

3      Q    So I want to make sure when we say "recorded

4  statements," are we discussing --

5                  MR. RIGGS:  -- and this may be a

6  question for Counsel to clarify, are we discussing

7  statements that were recorded in the form that they

8  were documented in a report?  Or are you -- were you

9  trying to ask questions related to statements that

10  were recorded via a mechanical, audio, digital

11  recording means?

12                  MR. ENGEL:  I believe it was -- if

13  you're asking me -- audio, video --

14                  MR. RIGGS:  Well, I'm not -- I'm kind

15  of asking you what you were asking --

16                  MR. ENGEL:  Yeah --

17                  MR. RIGGS:  -- with the intent to have

18  it clarified through Mr. Baird's testimony.

19                  MR. ENGEL:  Yeah.  So let's -- let me

20  find that section for you here, and then we can make

21  sure we're clear on this.  Okay.  So here's -- the

22  section we're referring to, I believe, is 3. -- 308.4,

23  Sub D.  Is that what you're referring to?  So I don't

24  know if you want to ask a couple questions to clarify

25  it.  Are we talking about the same thing here?

Page 91

1            MR. RIGGS:  I believe -- well, hold on.
2    I believe so.  Let me pull -- I'm pulling it up on my
3    side so I can see.  It's a little small on my laptop.
4            MR. ENGEL:  Oh, yeah, I'll make it a
5    little bigger here.
6            MR. RIGGS:  Okay.  And it is 308.4,
7    titled "Investigations."
8            MR. ENGEL:  Yeah.
9    BY MR. RIGGS:
10       Q    At one point, I know you referred to a
11   bullet point below.  But I know, Mr. Baird, you
12   referred to (b), that section.  So if you could scroll
13   up for me, I'd appreciate it.
14       A    Okay.
15       Q    And it says "When practicable, officers
16   should obtain and document statements from the
17   victim."  When it says "document statements" -- just
18   let me clarify.  It says "The victim, suspect, and any
19   witnesses, including children," to finish the
20   statement more thoroughly.
21            "Document statements," does that include
22   recording that you spoke with and took a verbal
23   statement from one of those individuals on scene?
24   Would a verbal statement that you took from somebody
25   and then later documented in your written report

Page 92

1   satisfy that?

2       A    Are you asking me, Mr. Riggs?

3       Q    I am, yes.

4       A    Okay.  Yes.  To me, that -- that's -- that's

5   the way that I perceive that -- is that a documented

6   statement is either verbal, it is written, it is

7   photo -- or I'm sorry, videographed and then

8   documented in my report.

9       Q    Okay.  And then you stated you did not have

10  any means to record video, audio, or otherwise the

11  statements other than --

12      A    Yeah, that -- that is correct.  Ross

13  Township does not have body cams.  They do not have

14  cruiser cams.  I was not provided or issued a audio

15  recording device, like a little pocket one or -- or

16  however you want to look at that.

17          I -- I did not have anything that was

18  supplied to me to be able to take a recorded verbal

19  statement from somebody.  My only means was to be able

20  to take a -- them telling me verbally, thus

21  documenting it in my report --

22      Q    Okay.  All right.  And then just one last

23  thing on this same policy, if we could go to section

24  308.9.1, the standards for arrest.  I believe you just

25  answered a question related to why -- let me rephrase

Page 93

1    this.

2            Section C there says "In the event that two

3    persons may be arrested for an act of domestic

4    violence against each other," so all of the following

5    statements there relate to that specific situation.

6    Is that how you perceived this situation with

7    Ms. Langen and Mr. Redden --

8       A    I'm -- I'm not sure your question.  I -- I

9    apologize --

10                MR. RIGGS:  You know what?  That's

11   too -- I'm getting too lawyerly with it, and I'm going

12   to confuse you further --

13                THE WITNESS:  Okay.  Sorry --

14                MR. RIGGS:  I think I'm good to go.  I

15   just wanted to clarify the recording.

16                THE WITNESS:  So --

17                MR. RIGGS:  There's no question.

18   There's no question, Mr. Baird.

19                THE WITNESS:  Oh, there's no -- okay.

20   I'm sorry.  I apologize.

21                MR. RIGGS:  I'm going to renege that.

22   There's no reason to question that.  I'm --

23                THE WITNESS:  I apologize --

24                MR. RIGGS:  -- proceeding further than

25   I need to.  I think we're good to go.

Page 94

1                    THE WITNESS:  Okay.

2                    MR. ENGEL:  I think we're all --

3                    THE REPORTER:  All right.  You're all

4    set then?

5                    MR. ENGEL:  Nothing based on that.  I

6    think we are off the record.

7                    THE REPORTER:  Real quick while we're

8    still on the record, Mr. Engel, would you like to

9    order the transcript of the proceeding?

10                   MR. ENGEL:  Yes, please.

11                   THE REPORTER:  Okay.

12                   And then, Mr. Riggs, would you like to

13   order a copy?

14                   MR. RIGGS:  Yes, please.

15                   THE REPORTER:  Thank you very much --

16                   MR. ENGEL:  And I don't need a hard

17   copy, Ben, just digital is fine.

18                   THE REPORTER:  Okay.  Sounds good.

19                   We are off the record at 11:52 a.m.

20                   (Signature reserved.)

21                   (Whereupon, at 11:52 a.m., the

22                   proceeding was concluded.)

23

24

25

Page 95

1          CERTIFICATE OF DEPOSITION OFFICER

2              I, BENJAMIN FANTAUZZO, the officer before

3    whom the foregoing proceedings were taken, do hereby

4    certify that any witness(es) in the foregoing

5    proceedings, prior to testifying, were duly sworn;

6    that the proceedings were recorded by me and

7    thereafter reduced to typewriting by a qualified

8    transcriptionist; that said digital audio recording of

9    said proceedings are a true and accurate record to the

10   best of my knowledge, skills, and ability; that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to the action in which this was taken;

13   and, further, that I am not a relative or employee of

14   any counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in the

16   outcome of this action.

17

18                    BENJAMIN FANTAUZZO

19                    Notary Public in and for the

20                    State of Ohio

21

22   [X] Review of the transcript was requested.

23

24

25

Page 96

1                    CERTIFICATE OF TRANSCRIBER

2            I, ETHAN SIEGEL, do hereby certify that this

3    transcript was prepared from the digital audio

4    recording of the foregoing proceeding, that said

5    transcript is a true and accurate record of the

6    proceedings to the best of my knowledge, skills, and

7    ability; that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in

9    which this was taken; and, further, that I am not a

10   relative or employee of any counsel or attorney

11   employed by the parties hereto, nor financially or

12   otherwise interested in the outcome of this action.

13

14

15

                        ETHAN SIEGEL
16

17

18

19

20

21

22

23

24

25

Page 97

1                      Veritext Legal Solutions
                             1100 Superior Ave
2                               Suite 1820
                           Cleveland, Ohio 44114
3                       Phone: 216-523-1313
4

   April 29, 2025
5

   To: Steven Riggs, Esq.
6

   Case Name: Redden, Michael v. Baird, Tim, et al.
7

   Veritext Reference Number: 7308805
8

   Witness:  Timothy Baird       Deposition Date:  4/11/2025
9

10  Dear Sir/Madam:

11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25    NO NOTARY REQUIRED IN CA

Page 98

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 7308805
3       CASE NAME: Redden, Michael v. Baird, Tim, et al.
        DATE OF DEPOSITION: 4/11/2025
4       WITNESS' NAME: Timothy Baird
5       In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
as transcribed by the court reporter.
8
   _____        _____
9  Date                    Timothy Baird
10      Sworn to and subscribed before me, a
Notary Public in and for the State and County,
11 the referenced witness did personally appear
and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
              Statement; and
14      Their execution of this Statement is of
              their free act and deed.
15
        I have affixed my name and official seal
16
this _____ day of_____, 20_____.
17
              _____
18            Notary Public
19            _____
              Commission Expiration Date
20
21
22
23
24
25

Page 99

1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 7308805
3        CASE NAME: Redden, Michael v. Baird, Tim, et al.
         DATE OF DEPOSITION: 4/11/2025
4        WITNESS' NAME: Timothy Baird
5        In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7        I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9        I request that these changes be entered
   as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____          _____

   Date                      Timothy Baird
14
         Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18           in the appended Errata Sheet;
         They signed the foregoing Sworn
19           Statement; and
         Their execution of this Statement is of
20           their free act and deed.
21       I have affixed my name and official seal
22 this _____ day of_____, 20_____.
23           _____

             Notary Public
24
             _____

25           Commission Expiration Date

Page 100

1                      ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 7308805
3     PAGE/LINE(S) /          CHANGE          /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____        _____
20    Date                    Timothy Baird
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                    _____
              Notary Public
24
                      _____
25    Commission Expiration Date

**[& - 6:33]** Page 1

| & | | | |
|---|---|---|---|
| **&** 2:4,12 6:6 | **16** 3:20 58:2 | **2015** 11:22 | **308.4d** 55:14 |

**&**

**&** 2:4,12 6:6

**0**

**00342** 1:7
**00:01:08** 69:7
**07/07/2023**
   3:16

**1**

**1** 3:21 20:23
   64:8
**100** 35:10 36:6
   36:20
**101** 2:5
**1088** 76:5
**10:44** 58:17
**10:57** 58:20
**11** 1:12 3:8 5:8
   13:19,22
**1100** 97:1
**11:19** 73:4
**11:27** 73:7
**11:52** 94:19,21
**12** 3:11 17:6,9
   55:13 76:24
**13** 3:10,13 22:1
   22:5 79:12
**14** 3:16 24:6,9
**15** 3:17 34:16
   39:3,5 42:22
   42:23 43:1,2,6
   43:7

**16** 3:20 58:2
   60:24 61:2
   63:16,22 64:1
   65:3 73:16,25
**17** 3:12,21
   63:16,20 64:2
   64:8,19 65:7
   65:18,24 66:5
   66:14 73:16
**18** 3:22 64:2,4
   64:14 65:2,8
   72:1 73:25
**1820** 97:2
**1823** 42:6,12
**1833** 27:22
   32:15,17 34:5
   34:7,15 38:20
**1858** 32:4,21
   53:14,20,21
**19** 3:23 33:14
   67:14,18 73:16
**1901** 35:2
**1919** 31:1 32:1
   33:14 34:5
   83:5,16,18
**1920** 83:7
**1934** 83:7
**1:24** 1:7

**2**

**2** 3:23 67:16
**20** 3:24 69:7,9
   73:16 98:16
   99:22 100:22

**2015** 11:22
**2022** 14:20
**2023** 7:8,8
   14:11 24:6
   25:2,5 39:23
**202300319** 3:19
   39:12
**2024** 76:5
**2025** 1:12 5:8
   97:4
**2043** 39:23
   52:6,8
**21** 3:25 71:6,10
   73:16
**216-523-1313**
   97:3
**22** 3:15 4:3
   76:3,6
**222-2333** 2:16
**23** 4:4 81:7,9
**24** 3:16
**2607** 3:24
   69:14
**29** 97:4

**3**

**3** 3:20 60:25
   90:22
**3.8.9** 19:2
**30113** 96:15
**308** 3:12 17:7
**308.4** 17:16
   90:22 91:6

**308.4d** 55:14
**308.9.1** 92:24
**308.9.1c** 82:2
**33367** 95:17
**39** 3:19

**4**

**4/11/2025** 97:8
   98:3 99:3
**44114** 97:2
**445-9600** 2:8
**45040** 2:6
**45458** 2:14
**4660** 2:5
**47025** 1:15 5:9

**5**

**513** 2:8

**6**

**6** 3:3 45:10
**600** 3:14 22:2
**600.1** 22:11
**600.3** 22:17
**605** 27:11,16
   35:16
**61** 3:20
**63** 3:21
**64** 3:22
**67** 3:23
**69** 3:24
**6:33** 27:22

[7/7 - answer]                                                    Page 2

| **7** | 65:25 67:4 | **actions** 15:9 | **ago** 14:17 45:7 |
|---|---|---|---|
| **7/7** 39:23 | 70:13 73:20 | 34:22 75:22,24 | 46:1,7 47:20 |
| **7/7/23** 42:5 | 84:25 85:5,18 | 79:17,22 | 53:10 |
| **71** 3:25 | 85:20,23 92:18 | **acts** 20:24 82:8 | **agree** 5:11,15 |
| **7308805** 1:17 | 92:19 | 84:12,14 | 23:25 73:24 |
| 97:7 98:2 99:2 | **above** 97:17 | **actual** 8:19 | 74:13 75:12,21 |
| 100:2 | **absent** 5:13 | 45:3 | **agreed** 44:3 |
| **76** 4:3 | 83:25 | **actually** 26:14 | 74:2 80:20 |
| **7th** 24:6 25:2,5 | **absolutely** 49:6 | 38:10 40:19,23 | **agreement** 44:5 |

**7**
**7/7** 39:23
**7/7/23** 42:5
**71** 3:25
**7308805** 1:17
  97:7 98:2 99:2
  100:2
**76** 4:3
**7th** 24:6 25:2,5

**8**
**8** 82:2
**81** 4:4
**8163** 2:13
**89** 3:4

**9**
**911** 44:19
**937** 2:16
**9:32** 1:13 5:5
**9:35** 9:2
**9:36** 9:5

**a**
**a.m.** 1:13 5:5
  9:2,5 58:17,20
  73:4,7 94:19
  94:21
**ability** 11:15
  17:14 18:10,12
  18:14 72:14
  95:10 96:7
**able** 13:21
  34:18 47:21
  55:22 60:1

65:25 67:4
70:13 73:20
84:25 85:5,18
85:20,23 92:18
92:19
**above** 97:17
**absent** 5:13
  83:25
**absolutely** 49:6
  62:14 66:10
  73:2
**academy** 3:9
  11:18,19 13:14
  14:2
**accident** 8:9,14
  9:12
**accordance**
  98:5 99:5
**account** 60:8
**accurate** 21:7,9
  95:9 96:5
**accused** 13:5
  23:22 24:3
  42:3
**acknowledge**
  98:11 99:16
**acknowledge...**
  5:10
**act** 93:3 98:14
  99:20
**action** 18:19
  95:12,16 96:8
  96:12

**actions** 15:9
  34:22 75:22,24
  79:17,22
**acts** 20:24 82:8
  84:12,14
**actual** 8:19
  45:3
**actually** 26:14
  38:10 40:19,23
  46:9 48:23
  51:14 52:11,14
  53:17 59:17
  60:6,13 86:22
**additionally**
  5:13
**address** 43:17
  43:18 52:8,20
  97:15
**administer**
  5:10
**admission**
  80:15
**affixed** 98:15
  99:21
**aggression** 21:3
**aggressor**
  20:15,20 21:4
  31:6 49:19,22
  49:24 50:6,11
  51:3,10,14
  57:6 61:13,17
  68:21,25 74:12
  82:4,6,24
  83:15,20

**ago** 14:17 45:7
  46:1,7 47:20
  53:10
**agree** 5:11,15
  23:25 73:24
  74:13 75:12,21
**agreed** 44:3
  74:2 80:20
**agreement** 44:5
**ahead** 50:25
**air** 8:3
**airpod** 59:21
  61:19
**al** 5:8 97:6 98:3
  99:3
**allegation**
  46:14
**allegations**
  47:15 51:20
  52:1
**alleged** 18:16
  20:25 33:18
  36:24 37:1,18
  49:6,7
**allegedly** 30:22
  44:15
**allergies** 41:14
**allergy** 41:16
**allow** 79:25
**allowing** 43:24
  43:25
**animal** 13:10
**answer** 8:11
  10:2,21 11:3

**[answer - authorized]** Page 3

11:10 23:10
24:11 36:7
37:20 41:5
48:19 53:6
80:8 86:25
**answered**
92:25
**answers** 10:16
71:5 72:22
74:7
**anybody** 35:5
87:11 88:6,18
89:8
**anymore** 85:21
88:5 89:9
**anything's**
51:16,17
**apologize** 9:6
35:21 39:17
44:24 46:2
48:19 56:8
59:22 62:10
63:11 68:15
70:11 72:13
83:15 86:3,6
93:9,20,23
**appeals** 4:3
76:3,10,16
77:6,14,22
78:6 79:12,21
**appear** 14:8
25:17 98:11
99:15

**appeared** 26:1
**appears** 45:20
60:25
**appended**
99:11,18
**applicable** 5:19
**appreciate**
58:11 91:13
**appropriate**
18:19
**approved**
86:18
**approximate**
42:25 43:2
**approximately**
34:14,16 43:7
**april** 1:12 5:8
97:4
**argumentative**
56:20 57:8,9
**arm** 77:25 84:8
**arrest** 15:15
18:1 19:9,21
20:4,8,14,15
23:14,16 31:3
31:9,9,24 32:2
33:3,7,15
38:16,21 59:6
61:11,16 62:12
62:25 68:19
74:11 76:20
81:4 82:22
83:6,10,13
87:10,22 88:8

88:15,19 92:24
**arrested** 20:1
81:3 82:16
84:15 93:3
**arresting** 50:15
**arrests** 31:8
82:13
**arrive** 52:8
**arrived** 52:6,7
52:11 53:21,24
54:1
**art** 10:7
**asked** 37:21
51:12,25 52:4
52:10 54:6,16
56:11,18 63:13
78:21 80:18
82:11,20 86:6
**asking** 16:5
18:2 26:13
31:22 33:21,22
47:14 51:1
55:4 60:11
80:5,5 85:6
88:14 90:13,15
90:15 92:2
**aspect** 20:4
**assailant** 37:5
**assault** 31:10
**assigned** 5:3
**assignment**
98:2 99:2
100:2

**assistance**
63:24 64:13
65:11 66:24
67:3 76:1
**assisted** 68:24
**assume** 9:16
10:3 29:7
35:19 39:7
**asylum** 80:7
**attach** 35:8
**attached** 45:9
45:18 99:7
**attempting**
66:24
**attendance** 6:1
**attention** 16:19
19:2 24:13
**attitude** 21:3
**attitudes** 16:3
**attorney** 95:14
96:10
**audio** 18:12
55:8,16,19,22
61:21 62:2
65:15,16 66:18
67:4 69:18
70:2,3 73:19
74:7 90:10,13
92:10,14 95:8
96:3
**authorize**
99:11
**authorized** 5:9

**[auto - bruise]** Page 4

**auto** 26:11 27:3
**automated**
  25:10,11
**automatically**
  26:16
**automobile** 8:9
  8:13 9:11
**available** 38:8
**ave** 97:1
**avenues** 31:5
**avoid** 20:4
**aware** 12:19
  24:7 29:11
  37:16,21,22
  76:9,13,14
  77:13,17 78:4
**awesome** 74:4

**b**

**b** 3:6 4:1 6:25
  50:4,5,10
  55:25 91:12
**back** 9:4 24:15
  34:2 44:11,18
  44:18 46:22
  50:5 52:5
  58:19,25 59:21
  60:1 63:18
  64:18 65:18
  71:19,20,23
  72:1,20 73:6
  77:24 78:10,19
  78:24 80:3
  81:25 83:17

84:9 89:21,24
97:15
**background**
  12:11 31:7
**bad** 41:14
  48:10
**badly** 51:12
**baird** 1:7,11
  2:10 3:10 5:6,7
  6:7,16,25 14:2
  30:11 91:11
  93:18 97:6,8
  98:3,4,9 99:3,4
  99:13 100:20
**baird's** 90:18
**based** 18:23
  20:6 21:6,16
  37:16 42:10
  49:3 51:3
  60:15 94:5
**basing** 29:14
**began** 44:10
**beginning** 9:21
**begins** 42:5
**behalf** 2:2,10
**belief** 18:23
**beliefs** 16:3
**believe** 11:19
  17:1 18:4,7,20
  19:7 24:22,22
  25:3,6 26:11
  26:16 28:22,25
  32:20 33:16
  35:20,21 36:4

38:10,20 40:4
40:5 42:17
48:24 49:3
50:10 61:7,8
61:10,15,21,25
62:24 63:6,13
63:13 64:12
66:6,14,19
67:7,7,15 68:6
68:17,20 69:22
70:18 71:14
75:1,24 76:15
77:6 78:7
79:22 80:11
83:21 84:16
85:16 90:12,22
91:1,2 92:24
**believed** 41:24
**believes** 57:10
**ben** 5:3 94:17
**benefit** 66:20
**benjamin** 1:16
  95:2,18
**best** 9:22,24
  15:13 17:14
  18:9,11,14
  21:9,24 26:19
  53:7 58:8
  95:10 96:6
**better** 48:4,8
  61:20 69:19
  70:23,23 72:21
**bias** 15:23

**big** 54:12
**bigger** 35:22
  48:2 91:5
**bit** 42:8 48:4,5
  56:22 70:23
**block** 75:15
  79:16
**bloody** 50:8
**body** 92:13
**booked** 81:22
**bottom** 26:4
  35:13 81:19
  86:17
**box** 26:4
**branch** 8:2
**break** 10:25
  11:2 41:10,19
  58:4 71:4
**breaks** 11:7
  50:5
**bridget** 24:22
  25:4 26:21
  36:24 38:3
  47:3
**brief** 45:5
  88:23
**bring** 89:24
**brings** 24:7
**broke** 26:22
  28:20 30:3,12
  46:15 47:4,18
**brought** 24:12
**bruise** 77:24

**bruises** 77:24
**bryan** 40:25
  86:18
**bullet** 91:11
**burton** 86:19
**butler** 11:19
  12:12 25:16
  26:7 31:7 35:4
  36:3 81:22
**button** 40:24

**c**

**c** 2:1,13 5:1
  20:13 93:2
**ca** 97:25
**cad** 3:16 24:6
  25:7,8,10,22
  27:6 29:21
  30:20 35:3
  42:14 47:2
  53:13 82:11
  83:4
**call** 3:16 10:7
  13:19 16:18
  24:6,7,13
  25:11 26:6
  27:14,20 29:2
  30:8,15,16
  35:14 36:5
  44:19 60:7
  66:25 68:5
  79:24 80:5,6,8
**call's** 29:8

**called** 6:17
  12:21 28:23
  42:16 47:3
**caller** 26:4
**caller's** 26:21
**calling** 67:3
  68:23 75:25
  80:12
**calm** 34:17
**camera** 55:1
**cams** 92:13,14
**car** 25:19 27:2
  38:4,7 62:21
  80:15 85:12,14
**case** 1:6 6:9
  18:1 20:10
  23:17 24:24
  29:8,19 39:4
  41:25 51:17,20
  76:4,11,22
  77:7 88:9,11
  88:14,14,25
  97:6 98:3 99:3
**cases** 14:12
**cause** 15:15,20
  18:20,22 19:17
  19:23 23:8,13
  23:15 24:1
  33:2,19,23,25
  38:16,20 50:4
  59:6 61:11,16
  62:13,17,25
  66:15 68:19
  69:23 71:16

  74:10 76:19
  79:10 84:2
  87:10
**caused** 71:24
  78:18 81:15
  84:1,2,6
**causing** 75:9,19
**caution** 72:24
**cch** 31:2 33:4,6
  82:12 83:11,22
**cell** 44:8
**center** 25:13,15
**certificate** 95:1
  96:1 99:11
**certification**
  98:1 99:1
**certified** 5:16
**certify** 95:4
  96:2
**cetera** 31:10
  35:7 50:2 57:9
  70:9 87:12
**chance** 72:19
  74:6
**change** 74:7
  97:13,14 99:8
  100:3
**changes** 71:5
  72:21 97:12
  98:7 99:7,9
**characterized**
  77:7
**charge** 82:17
  83:3

**charges** 81:15
**chase** 44:10
**chased** 63:7,10
**chasing** 44:12
**chat** 72:12,17
**check** 31:8 85:5
  85:8,15
**checked** 49:11
  85:1
**child** 43:25
  44:1,2,7 68:11
  69:5 84:4
**children** 91:19
**circumstances**
  18:23 27:8
  60:9
**city** 7:19
**civil** 15:8 98:5
  99:5
**civilians** 27:23
**claims** 63:1,2,2
**clarification**
  26:15
**clarified** 90:18
**clarify** 9:24
  54:23 73:13
  89:18 90:6,24
  91:18 93:15
**classes** 12:3,5,9
  13:11
**clear** 9:22 10:4
  23:24 38:19
  39:10 88:13
  89:25 90:21

**[clearly - convictions]**                                        Page 6

clearly  15:9,12
   15:18 20:23
   23:25 75:12
   80:19
cleveland  97:2
clicked  40:24
clip  59:9 63:23
   65:9 67:14
   69:7 71:7
   73:25 74:1
clips  54:14
   57:14,16,23
   58:1
close  52:22
   53:1 75:5,16
   78:3 79:16
coarse  69:3
collected  13:7
   23:17,21 57:16
college  11:25
   12:3,6
column  35:18
come  30:13
   72:20
comes  16:8,9
coming  70:3
comment  26:20
comments  26:9
   26:10,12,17
   44:14 70:20
commission
   98:19 99:25
   100:25

committed
   18:24 19:8
   20:19 22:22
   23:4,9 62:13
   62:17 66:15
   69:23 71:16
common  31:23
   35:4 43:19
   56:24 60:16,21
   69:5
communicate
   60:1,19
communication
   88:25
complainant
   18:6
complainants
   23:12,19
complaint  4:4
   18:5 36:23
   37:3 63:17
   81:8,12,17
complete  17:25
   18:8 38:17
   39:14
completed
   38:23 39:25
   40:3,4 97:15
comply  55:18
computer
   25:10,11,12,18
   25:18,24 26:2
   27:1,3 37:17
   37:22,23,24

   38:8,9 62:9
   70:11 84:20
computers
   84:17 85:12,14
conceptions
   16:3
concise  9:22
concluded
   94:22
conclusion
   62:16 68:18
   71:15
conclusions
   80:1
concur  41:18
conduct  16:22
   33:7
conducted  18:5
conducting
   83:17,19
confer  11:7
confidence
   36:7
confirm  8:18
confirmation
   15:23
confirms  16:2
confuse  93:12
confused  55:11
   66:3 82:15
   90:1
connect  61:19
connection's
   8:24

consider  15:19
   23:16,21 24:2
   82:6
considered
   15:21
consistent
   42:15 49:2
constitute  5:23
   33:19,23
constitutional
   12:16 15:11,13
   15:18
cont'd  4:1
contact  42:11
   43:12 49:13
   75:13,17 79:14
continue  6:20
   39:1 54:3
continued
   44:16
continuing
   69:3
contradicts
   77:14 78:5
   79:20
conversation
   43:9
conversations
   16:12 89:6
conviction
   76:10
convictions
   82:13

cooperation
18:15
copy 25:21
94:13,17
correct 14:13
15:16 19:11
20:21 23:18
25:20 29:9
30:9 31:13
32:18 35:17,24
38:6 39:21,24
40:1 42:23
45:11 46:5
49:11 52:13
53:23 55:10
57:15 59:8
73:12,17 81:5
81:24 92:12
corrections
97:12 99:17
correctly 10:10
33:17 70:8
77:7
counsel 6:9
11:7 58:4
73:14,23 88:11
88:12 89:3,4
90:6 95:11,14
96:7,10
county 25:16
26:7 31:7 35:4
36:4 81:22
82:11 85:11
98:10 99:15

couple 9:19
17:19 28:17
54:10 70:25
90:24
course 13:1
19:24 57:1,1
59:25 70:14
72:24
court 1:1 4:3
9:17 10:15,20
13:20 76:3,10
76:15 77:6,14
77:22 78:6
79:12,21 98:7
covers 22:14
crawl 77:1
created 50:7
creates 26:9
29:7
credits 12:7
crime 18:23,25
22:21 23:4,8
62:13,18 66:16
69:24 71:16
criminal 22:13
31:22 32:25
84:17,20 85:1
85:10,15
cruiser 92:14
crying 34:18
43:14
current 12:10
16:2 19:13

currently 7:2,3
custody 83:8
cut 56:7
cutting 8:17
cv 1:7

**d**

d 3:1 5:1 6:25
18:11 35:19
90:23
date 1:12 26:13
26:16 39:22
97:8 98:3,9,19
99:3,13,25
100:20,25
daughter 43:18
44:14 48:15
54:8,9 56:4,6
57:18 60:3,19
60:20,20 80:6
80:17
day 24:13 40:5
44:3 53:5
87:15,24 98:16
99:22 100:22
days 67:12
97:18
dayton 2:14
dcs 50:15
dealing 60:10
dear 97:10
december 7:8
decided 33:14
38:14

decision 4:3
19:21 76:3,5
87:21
deed 98:14
99:20
deemed 97:19
defendant 2:10
20:10
defendants 1:8
20:11
define 10:10
definitely 65:15
68:24
definition 57:7
definitively
67:9
demeanor 21:3
demonstrates
79:13
department
3:11,13,17
17:7 22:2
27:13,17 28:11
32:18 37:9,18
37:25 39:11
42:6,16 43:11
46:25 47:8
53:16,22 55:21
87:12,21 88:4
89:10 97:22
depending 27:8
depends 50:12
depicts 74:17

**[deposition - domestic]** Page 8

| | | | |
|---|---|---|---|
| **deposition** 1:10 | 84:13 | **directly** 65:13 | **dispatchers** |
| 5:6,21 8:5,8 | **determined** | 66:23 | 29:20 |
| 9:10 95:1 97:8 | 32:1 38:15 | **disclose** 12:20 | **disposition** |
| 97:11 98:1,3 | 45:23 49:24 | **discovered** | 22:13 |
| 99:1,3 | 81:2 83:5,9 | 13:1,4 | **disproves** 63:2 |
| **depositions** | 87:9 | **discovery** | **disputed** 77:12 |
| 9:14,20 | **determines** | 72:12 | **disputing** 77:19 |
| **derived** 18:5 | 33:7 49:23 | **discrepancy** | **distinct** 19:16 |
| **derogatory** | 57:7 | 78:21 | **distraught** |
| 44:13 70:7,20 | **determining** | **discretion** | 43:14 |
| **described** 37:1 | 21:4 23:7 | 40:16 52:25 | **district** 1:1,2 |
| 59:2 60:12 | 33:24 51:6,8 | **discuss** 87:8,11 | **doctrine** 15:7 |
| **describes** 22:9 | 57:12 59:6 | 87:20 | **document** |
| **description** 3:7 | 61:12 69:2 | **discussed** 41:23 | 13:21,25 14:5 |
| 4:2 59:15,15 | 82:3 83:1,13 | **discussing** | 14:7 17:6,8,12 |
| 78:6 | **develop** 79:19 | 39:13 58:23 | 21:13,15 22:1 |
| **detain** 19:10 | **developed** | 90:4,6 | 22:4,9 26:3 |
| 20:14 | 77:18 | **discussion** | 28:17 31:15 |
| **detective** 7:6 | **device** 55:22 | 19:25 73:5 | 39:7 67:16 |
| **determination** | 92:15 | **discussions** | 69:13 71:8 |
| 15:20 20:22 | **difference** | 73:14 | 85:19 91:16,17 |
| 22:21,23 23:3 | 78:11,14,14 | **disp** 35:18 | 91:21 |
| 24:1 61:15 | **different** 9:13 | **dispatch** 25:11 | **documented** |
| 81:18 82:5,22 | 13:10 16:6 | 25:12,12,14 | 34:23 56:1 |
| **determine** | 23:1,7 26:1 | 26:7 28:24 | 78:8 80:25 |
| 20:20 21:1 | 28:23 29:1,25 | 29:2 35:7 36:3 | 90:8 91:25 |
| 23:13 27:7 | 30:2 54:10 | 82:21 | 92:5,8 |
| 31:5 33:6 | 89:9 | **dispatched** | **documenting** |
| 48:23 49:18,21 | **digital** 81:14 | 35:19 | 21:23 92:21 |
| 51:3 59:17 | 90:10 94:17 | **dispatcher** | **doing** 28:9 |
| 60:6 68:21 | 95:8 96:3 | 26:12,17 27:15 | 85:18 |
| 74:11 78:24 | **direct** 17:15 | 28:3 29:7,12 | **domestic** 3:12 |
| 79:25 82:24,25 | 19:1 70:19 | 29:25 36:4,17 | 14:11 17:7 |
| 83:1,2,11,19 | 73:23 79:10 | 82:12 | 18:1 19:8,21 |

**[domestic - evidentiary]** Page 9

20:1,4,16,19,24
31:24 33:3
36:24 37:1,4
42:7 43:11,16
50:19 55:12
56:24 76:20
81:25 82:7,13
84:9,11,14
93:3
**door** 44:18,20
63:24 64:13
65:10,14 75:3
75:5,16 77:3
78:1,3 79:16
80:8
**doorway** 44:21
74:21 77:4
**dowd** 2:12 6:6
**draw** 80:1
**drive** 2:5 30:21
32:22 36:10,22
38:5,15 53:9
**driver's** 35:6,8
**driveway** 54:2
**drop** 48:9
**duke** 2:5
**duly** 6:17 95:5
**duration** 54:11
**duty** 87:24
**dv** 31:2,8 48:9

**e**

**e** 2:1,1 3:1,6 4:1
5:1,1

**ear** 67:8
**earlier** 31:5
**earn** 12:6
**ease** 48:3
**easily** 72:14
**educational**
12:11
**effect** 21:4
23:13,16 31:24
33:2 76:19
**effing** 70:18
**effort** 48:22
**efforts** 80:11
84:13
**eight** 32:17
**either** 20:24
21:2 32:7 33:8
48:12 82:8
84:12 92:6
**email** 97:17
**emergency**
16:18
**employed** 7:1
95:11,14 96:8
96:11
**employee** 95:13
96:10
**en** 35:24
**enclosed** 97:11
**encompassing**
54:12 82:23
**enforcement**
7:15,23 12:16
12:20 15:8

16:11,15,17
18:19
**engage** 69:3
**engel** 2:3,4,7
3:3 6:2,4,8,8,22
8:16 9:6,8 58:5
58:7,13,21,22
61:5 62:5
64:11,21 65:1
65:6,23 66:13
68:1,12 69:17
69:21 71:13
72:5 73:8,9,22
74:4,5 89:11
89:14 90:12,16
90:19 91:4,8
94:2,5,8,10,16
**engelandmart...**
2:7
**english** 10:14
**entered** 99:9
**entering** 75:15
79:16
**entire** 45:18
50:20 54:15
80:15 86:12
98:5 99:5
**entitled** 13:25
17:6
**entries** 35:2
**errata** 97:13,18
99:7,10,18
100:1

**error** 42:18
**es** 95:4
**esq** 97:5
**esquire** 2:3,11
**essentially**
19:17 20:11
**establish** 33:24
66:15 69:23
74:10
**established**
15:10,10,12,18
23:25 61:11
**estimate** 53:7
**et** 5:8 31:10
35:7 50:1 57:9
70:9 87:12
97:6 98:3 99:3
**ethan** 96:2,16
**event** 93:2
**evidence** 12:21
12:25,25 13:3
13:5,6,7 15:19
15:21 17:2
18:24,24 21:10
23:16,18,21,23
24:2,4 33:21
51:22 57:17
63:1 75:21
76:21 77:17,23
78:4,6 79:3,6
79:19,25 83:25
84:5
**evidentiary**
5:20

**[ex - footage]** Page 10

ex  26:21 30:3
30:12
examination
3:2 6:21 89:19
examined  6:19
example  12:19
46:8 57:6
excerpt  74:1
exculpatory
12:21,25 15:19
excuse  41:9
executed  99:10
execution
98:14 99:19
exhibit  3:8,11
3:13,16,17,20
3:21,22,23,24
3:25 4:3,4
13:19,22 17:6
17:9 22:1,5
24:5,9 39:3,5
55:13 58:2
60:24 61:2
63:16,20 64:4
64:8,14,19
65:2,18,24
66:5,14 67:14
67:18 69:7,9
71:6,10 72:1
73:16 76:3,6
76:24,24 81:7
81:9
exhibits  73:25

experience  20:7
expertise  35:12
expiration
98:19 99:25
100:25
explain  9:9
12:23
extreme  36:7
extremely  69:1

**f**

face  29:15
fact  15:14,19
17:1 57:4
62:23 78:20,23
factor  33:24
51:8,11 57:12
83:2,12
factors  51:6
82:2 83:1,2,12
83:13
facts  18:23
51:17 81:20
83:24
factual  21:16
fair  9:25 11:4
33:13 34:4
53:3
fairfield  11:20
falling  79:9
familiar  17:8
17:20 19:3
22:3

family  84:3
fantauzzo  1:16
5:3 95:2,18
far  29:11 52:19
52:22 74:9
fault  39:18
favorable  13:5
23:22 24:2
42:3
feel  10:6
felony  33:9
83:3
felt  60:8
female  24:13
24:18,19 27:10
27:13,15 36:12
36:19 43:12
62:20 69:4
fence  48:15
fiance  26:21
30:3,12
field  10:9
fight  20:17
figure  32:11
58:8
file  17:12
filed  40:7,9
81:15 89:2
fill  34:11
filling  28:7
34:9
filtered  3:20,21
3:23,25 60:25
64:8 67:16

71:9
financially
95:15 96:11
find  90:20
97:11
fine  29:14
41:12 58:13
86:5 94:17
finish  91:19
firm  43:1
first  6:17,24
7:14 9:21 11:3
17:2 25:8 26:8
26:20 39:19
42:5,11,15
45:14,15 50:9
59:2,9,14
63:18 64:3,7
65:12
fishbowl  70:4
five  14:6,7
58:12
fled  71:20
flipped  38:10
folder  72:12
follow  40:22
44:17 55:22
86:10 87:5
following  93:4
follows  6:19
foot  44:10
footage  54:6,7
54:9,10 83:25
84:4

[force - harm] Page 11

**force** 8:3 75:4
  77:12,19 78:1
  78:25
**forcefully** 75:8
  75:18 79:4,8
  84:5
**forcing** 3:22
  65:3 79:11
**forearm** 44:22
**foregoing** 95:3
  95:4 96:4
  98:13 99:18
**foresee** 11:12
**forget** 13:18
  38:3
**forgot** 59:21
**form** 55:9 90:7
**forth** 60:2
**forward** 97:15
**found** 76:5
**free** 98:14
  99:20
**friday** 1:12 5:8
**front** 21:10
  25:25 44:9
  69:4 78:9
**full** 17:25 18:8
  59:2
**further** 36:23
  38:17 39:1
  93:12,24 95:13
  96:9
**furthermore**
  20:13

**g**

**g** 5:1
**general** 16:12
  29:23
**generally** 17:24
**gesturing** 10:19
**getting** 34:1
  44:2 50:25
  93:11
**giant** 54:12
**give** 10:13
  17:18 18:15
  50:3 51:1
  61:18 70:8,9
  70:18 72:18
  80:10 86:4
**given** 55:21
  59:20,25 81:20
**glass** 75:3 78:1
**glitch** 8:19
**go** 8:21 9:20
  11:17 13:20
  36:21 39:15
  41:6 58:9
  59:24 63:18
  64:18 65:18
  72:1,18 80:3
  81:25 82:10
  92:23 93:14,25
**goal** 41:23
**goes** 35:11
**going** 10:3
  11:15 13:16,17

17:5,15,19
  21:25 24:5
  26:14 29:4,8
  30:13 32:2,8
  37:6,14 41:11
  44:14 52:5
  57:22 60:22
  68:3 69:11
  70:10 72:11,16
  76:2 81:25
  83:4,6,9 85:5
  89:21 93:11,21
**golf** 7:4,7
**good** 5:2 8:23
  8:25 41:11
  93:14,25 94:18
**gosh** 64:17
**gotten** 12:8
  38:23
**government**
  15:8
**grad** 11:25
**graduate** 11:21
  11:23
**great** 26:15
  40:10 89:13
**ground** 46:17
  71:24 74:22,23
  74:24 75:9,18
  78:17 79:3,5,9
  79:11 84:6
**grounds** 19:7
  19:16

**guess** 37:5
  59:14 60:5
  62:11 63:17
**guidelines** 9:19
  22:12
**guns** 67:11

**h**

**h** 3:6 4:1
**half** 24:14,18
  24:19 27:11,13
  27:15 31:2
  36:12,19 45:14
  45:15,16 62:20
  62:20
**hand** 6:14 67:2
  80:10
**handling** 22:13
**hang** 59:21
**happen** 20:2
  21:18 30:14
**happened** 27:7
  28:12 29:23
  33:13 42:19
  50:21 54:15,16
  55:4 63:5
  80:19,21 85:18
**happens** 21:13
**hard** 35:20
  48:18 53:5
  67:11 94:16
**harm** 21:1 84:2
  84:3

**harrison** 11:24 26:7
**hate** 58:4
**head** 10:19
**healthy** 7:19
**hear** 17:2 61:20 61:20,22 62:6 65:14 66:17 67:9,12 68:4,4 68:22 69:12 70:1,10,13 71:17 72:14
**heard** 8:18 15:22 16:7,10 16:14,16,21,25 21:19,20 68:10
**hearing** 6:12 70:24
**held** 48:11,13 48:14 67:7 73:5 78:17
**help** 28:15 36:1 42:8 48:2 49:18,21 57:10 66:20 68:4 78:24
**helped** 66:14 69:22 73:20
**helpful** 69:1
**helps** 62:24 63:1
**hereto** 95:15 96:11

**hey** 30:11 88:24
**hi** 6:3,5
**high** 11:23,24
**history** 20:23 31:8,22 33:1 82:7,21,24,25 84:11,13,17,20 85:1,9,11,13,15
**hit** 48:20,23 49:4,7
**hits** 50:4,5
**hold** 91:1
**holding** 71:23 74:23 84:6
**home** 3:22 65:4 68:11
**honest** 73:18
**hostage** 10:24
**hostile** 56:20
**hour** 41:11 44:4
**house** 35:9 71:21 74:15 75:4,5,15,16,23 77:2,13,20 78:2,3 79:1,15 79:16,18 80:8
**household** 84:3
**human** 10:18
**hypothetical** 50:3,14

**i**

**idea** 29:2,13,17 29:23 31:20 35:11 40:21,23 40:24 52:21 77:16 86:9,13 87:2
**identification** 13:23 17:10 22:6 24:10 39:6 61:3 63:21 64:5 67:19 69:10 71:11 76:7 81:10
**identify** 6:1
**identifying** 68:24
**ignorance** 68:16
**img** 3:24 69:14
**immediate** 83:24
**immunity** 14:20,22 15:3 15:6
**important** 21:7 21:13 41:25
**inaccurate** 45:24
**incident** 3:18 21:8,14 25:23 30:22 34:24

39:12,13 43:16 54:5 67:1 77:1 80:16 88:1,4
**incidents** 21:24
**include** 15:14 15:18 23:20 91:21
**included** 42:2 97:13
**includes** 11:6
**including** 91:19
**inconsistent** 63:4,6
**incorporated** 99:12
**incorrect** 85:7
**incurred** 51:5
**indiana** 5:9
**indicate** 52:10 57:5 79:7
**indicated** 30:7
**indicates** 26:8 30:20 31:1 40:25 53:13 57:13 77:23
**indicating** 97:13
**individuals** 91:23
**inflammatory** 70:7,20
**influence** 11:13
**info** 26:4

justify

[langen - make]                                                    Page 14

**langen** 26:21
27:25 28:20
33:1 42:11,15
43:9,13 44:16
46:14 47:4
51:25 54:5
57:2 63:23
66:23 70:7
71:19 74:14,18
75:2,6,14,18,23
77:1,11,23
79:14,18 82:9
83:20,23 84:14
84:20 85:2
93:7
**langen's** 50:24
59:11,16 60:12
**language** 69:4
70:14 77:14
**laptop** 91:3
**law** 7:14,22
12:16,20 15:8
16:11,15,16
19:13
**lawrenceburg**
1:15 5:8
**laws** 5:20 19:3
**lawsuit** 76:14
89:2
**lawsuits** 15:9
**lawyerly** 30:6
86:16 93:11
**lean** 69:11

**learn** 12:7
**leave** 36:21
38:14 48:16
**led** 33:2
**left** 37:9,18
53:16,21,23,23
**leg** 77:24 78:10
78:19,24
**legal** 15:7 19:2
56:14 97:1
100:1
**legally** 55:15
**leggings** 44:23
75:10
**legitimacy**
29:17
**letter** 97:19
**level** 33:8 82:17
**license** 35:6,8
**lights** 16:17
**limits** 33:12
**line** 6:10 26:9
27:10 42:15
86:17 97:13
99:7 100:3
**lines** 68:7
**link** 72:12,17
**listed** 99:7,17
**listen** 29:22
68:7 72:21
**listening** 68:15
**listing** 99:7
**little** 42:8 47:25
48:2,5 56:22

69:19 70:23
86:15 91:3,5
92:15
**lived** 43:21
**llc** 2:4
**lobby** 24:14
27:11,15 28:1
28:4,5 32:16
34:7,14 36:12
36:19,21 38:1
42:6 43:10
**local** 85:13
**location** 1:14
25:22 30:21,22
30:24 32:5,6
36:10 39:22,23
53:25 54:2
78:12
**log** 85:14
**long** 7:7 28:2
32:4,12 34:7,7
34:12,13,14
42:19,20,21
43:4 52:14,23
53:7 71:7
**longer** 26:22
86:1
**look** 17:2 22:16
26:3 28:13
38:11 42:14
45:3 47:2
52:16 55:12,13
55:25 63:15
72:17,19 82:3

83:7 84:10
87:1 92:16
**looked** 40:23
46:17 48:24
57:13 86:12
**looking** 25:7
41:7,22 62:9
65:24 84:9
**looks** 14:6,10
27:22 32:14
36:11 45:8
52:6 59:1
86:16
**lost** 8:11,22
**lot** 61:20 67:10
67:10
**loud** 10:17

| m |
|---|

**machine** 72:19
**madam** 97:10
**made** 15:15
18:1 19:20
26:6 31:12,15
42:11 43:12
49:13 66:20
70:6 76:14
82:21 87:21
98:7
**make** 8:24
10:10 19:22
20:22 22:22
23:3,15 33:14
35:22 40:11,14

**[make - needs]**                                                    Page 15

43:3 46:13
48:2,7,16,22
55:8 58:10
60:23 65:25
78:11,14 84:12
87:6 90:3,20
91:4
**makes** 70:24
78:13,13
**making** 15:20
24:1 44:13
82:5
**male** 27:11,16
31:2 62:20
**mandates** 19:2
**manner** 5:21
16:22
**manor** 7:4,7
**mark** 13:18
17:5 22:1 24:5
39:3 58:2
60:24 63:16
64:2,7,14 65:2
67:13 69:6
76:2 81:7
**marked** 13:22
17:9 22:5 24:9
39:5 55:13
61:2 63:20
64:4,19 66:5
67:18 69:9
71:6,10 76:6
81:7,9

**married** 43:23
**martin** 2:4
**mason** 2:6
**matter** 5:7 11:8
22:10 27:5,7
67:6 81:8 87:8
87:20 88:8
**mdcs** 84:17
**mean** 13:4
26:22 27:12,19
31:3 32:5 35:3
36:1 40:8
41:14 43:4
52:23 54:25
55:5 56:13
84:18
**meaning** 10:7,9
10:14
**means** 5:22
27:20 31:19
55:23 90:11
92:10,19
**meant** 88:15
**mechanical**
90:10
**medications**
11:14
**meets** 40:15
**member** 84:3
**memory** 11:15
30:1 85:17
**mere** 33:20
**met** 25:1,4 54:2

**michael** 1:4 2:2
2:19 5:7 24:24
25:1 28:8 97:6
98:3 99:3
**midwest** 97:17
100:1
**military** 7:24
8:2 12:8
**mind** 8:12 67:1
**minute** 69:7
71:7
**minutes** 34:16
42:22,23 43:1
43:2,6,7 58:12
58:14
**misdemeanor**
33:8 83:3
**missing** 45:5
**mistake** 48:21
48:23 49:4,8
**moment** 8:22
83:5 86:4
87:25
**monitor** 64:16
**morning** 5:2
41:17
**mother** 84:4
**motivated**
75:22 79:17,23
80:11
**motivations**
80:2
**mount** 7:19

**moved** 43:22
89:9
**mp** 7:25
**multiple** 49:15
49:18 72:15
80:3,4,9

**n**

**n** 2:1 3:1 5:1
**name** 5:2 6:8
6:23,24,24
24:19,21,25
38:3 43:12
57:19 60:8
97:6 98:3,4,15
99:3,4,21
**narrative** 41:7
41:22,23 52:5
52:11
**necessarily**
57:5
**necessary** 33:4
**need** 10:6,25
11:2,7 28:13
41:10,19 47:11
47:20 58:12
60:23 62:12
68:2 75:23
79:18 93:25
94:16
**needed** 37:7
38:17
**needs** 15:21
58:4

| | | | |
|---|---|---|---|
| **neighbor** 66:24 | **numbers** 73:19 | 80:16 | 13:13 14:1 |
| **neighbor's** | 99:7 | **offense** 18:16 | 76:5 95:20 |
| 63:23 65:10 | **o** | 18:20 19:8 | 97:2 |
| 80:7 | **o** 5:1 | 20:9,25 33:8 | **ohleg** 85:6,10 |
| **neither** 95:11 | **oath** 51:24 | **office** 25:16 | **okay** 6:11 7:1,5 |
| 96:7 | 84:25 | 31:7 36:4 | 7:11,14,17,22 |
| **never** 21:20 | **oaths** 5:10 | **officer** 3:8,9 | 8:7 9:1,6,14,16 |
| 43:23 55:21 | **objection** 5:13 | 6:6 7:13,15 8:1 | 10:2,4,6,11,12 |
| 77:11 | 6:12 | 8:10,14 9:12 | 10:13 11:6,10 |
| **new** 13:20 | **obligation** | 13:14 14:1,2 | 11:13,17,25 |
| **night** 7:6 88:24 | 12:20 22:9 | 19:7 20:14 | 12:3,5,11,15,19 |
| **nodding** 10:19 | 24:2 | 23:2 30:11 | 12:23 13:3,10 |
| **nope** 49:6 | **obligations** | 87:24 88:22 | 13:13,21,25 |
| **normal** 10:18 | 12:16 | 95:1,2 | 14:5,14,18,23 |
| **nose** 50:6,8 | **observations** | **officer's** 18:9 | 15:2,5,12,17 |
| **notarized** | 55:17 | **officers** 12:17 | 16:6,14,21 |
| 97:14 | **observe** 62:19 | 12:20 15:19 | 17:5,12,15,17 |
| **notary** 5:9 | **observed** 66:22 | 16:22 17:1 | 17:23,23 18:4 |
| 95:19 97:25 | 75:6 | 18:18 22:9 | 18:7,18 19:1,5 |
| 98:10,18 99:15 | **obtain** 18:12 | 29:19 56:1 | 19:6,12,15,20 |
| 99:23 100:23 | 54:18,21 56:1 | 91:15 | 19:25 21:5,12 |
| **note** 29:6 97:12 | 56:5 91:16 | **official** 98:15 | 21:17 22:8,16 |
| **noted** 10:15 | **obtained** 55:3 | 99:21 | 22:16 23:1,6 |
| 21:18 | 56:3 78:4 | **officially** 85:12 | 23:20 24:5,15 |
| **notes** 29:7 | **obtaining** | **officials** 15:8 | 24:17,23 25:1 |
| **notification** | 34:21 55:19 | **oftentimes** | 25:4,7,14,17,21 |
| 41:16 | 56:15 | 29:24 | 26:3,8,20,25 |
| **november** | **obviously** 31:4 | **oh** 2:6,14 6:4 | 27:5,10,21,25 |
| 14:11 | **occupation** | 35:22 39:15 | 28:5,10,15,18 |
| **number** 3:19 | 10:9 | 52:9 64:17 | 29:3,6,10,19 |
| 13:18 35:8 | **occurred** 18:17 | 67:2 91:4 | 30:1,10,17,20 |
| 39:12 67:16 | 18:20 30:22 | 93:19 | 30:24 31:1,11 |
| 69:14 71:9 | 34:5,24 43:16 | **ohio** 1:2 3:8 | 31:14,17,21 |
| 73:16 97:7,13 | | 5:10 11:20 | 32:1,4,11,13,21 |

| | | | |
|---|---|---|---|
| 32:25 33:5,10 | 75:12,21 76:2 | **outer** 33:12 | **parts** 54:14 |
| 34:1,1,3,13 | 76:9,13,15,23 | **outside** 7:25 | 68:20 |
| 35:2,13,15,18 | 77:5,17 78:20 | **own** 12:23 | **party** 49:17 |
| 36:8,21,25 | 78:23 81:2,6 | 60:17 80:15 | 50:4,4,5,5,6,9 |
| 37:8,16 38:4 | 81:15,18 83:4 | **owned** 46:9,11 | 50:10 62:9 |
| 38:12 39:7,10 | 83:16 85:17 | 60:6,13 | **past** 77:2 |
| 39:16,22,25 | 86:4,15,20 | **owner** 59:18 | **patrol** 7:13 |
| 40:2,6,10,19,25 | 87:8,19 88:12 | | **patrolman** 7:21 |
| 41:8,10,13 | 89:1,5,11,23 | **p** | **paying** 16:19 |
| 42:2,5,10,24 | 90:21 91:6,14 | **p** 2:1,1 5:1 | **peace** 3:8 14:1 |
| 43:3,8,10 45:8 | 92:4,9,22 | 35:19 | **pending** 11:3 |
| 45:17,22 46:3 | 93:13,19 94:1 | **p.m.** 27:23 | **penmanship** |
| 46:8,13,23 | 94:11,18 | **page** 3:2,7 4:2 | 48:3 |
| 47:1,2,6,17,22 | **old** 2:13 | 39:19 45:10,14 | **people** 20:1,8 |
| 48:4,17,22 | **older** 80:6 | 45:15,16 48:14 | 20:15,18 50:14 |
| 49:1,12,17 | **oldest** 54:8 | 59:1 74:3 | 85:13 |
| 50:23 51:8,12 | 57:18 | 97:13,15 99:7 | **perceive** 92:5 |
| 51:24 52:5,9 | **ons** 26:22,22 | 100:3 | **perceived** 93:6 |
| 52:14,19,22,25 | **open** 38:11 | **pages** 14:6,7 | **percent** 35:10 |
| 53:19 55:6,11 | 77:3 | **pants** 44:23 | 36:6,20 |
| 56:9 57:4,22 | **opinion** 18:2 | 75:10,20 | **perfect** 58:7 |
| 57:25 58:6,15 | 21:16 53:2 | **paragraph** | **permitted** 5:18 |
| 59:13 60:11,22 | 66:21 76:9 | 59:2 76:24 | 55:15 |
| 61:9,14,24 | 77:10 | 79:12 | **persistently** |
| 62:6,23 63:9 | **opota** 13:11 | **part** 46:17 72:7 | 77:12 79:14 |
| 63:12,15 64:6 | **opportunity** | 99:9 | **person** 19:8,10 |
| 65:18,21,24 | 17:18 72:21 | **partially** 77:3 | 21:2 26:6 |
| 66:4,8 67:4,24 | 73:10 | **particular** | 30:18,19 35:3 |
| 68:10,13,17 | **orally** 10:21 | 14:10 | 41:1 50:7,9 |
| 69:11,15 70:13 | **order** 19:9 27:6 | **parties** 5:11,14 | 51:9,13 62:24 |
| 71:2,14,17 | 38:4 57:24 | 51:4 75:2 | 84:12 88:10 |
| 72:6,10,13,23 | 62:12 94:9,13 | 77:25 95:12,14 | **person's** 49:3 |
| 73:8,13,22 | **outcome** 95:16 | 96:8,11 | **personal** 50:24 |
| 74:6,13 75:1 | 96:12 | | |

**[personally - primary]** Page 18

| | | | |
|---|---|---|---|
| **personally** | 83:14 84:3 | 11:17,19 13:13 | 53:19 |
| 98:11 99:15 | **pick** 43:18 | 17:7 22:2 | **potentially** |
| **persons** 20:4,25 | **piece** 68:5,23 | 27:13,17 28:1 | 62:19 |
| 93:3 | **placed** 83:8,9 | 28:11 32:15,18 | **practicable** |
| **pertaining** | **places** 12:12 | 34:21 37:25 | 55:15 56:14 |
| 22:13 | **plain** 10:14 | 39:11 42:6,16 | 91:15 |
| **phone** 27:20 | **plaintiff** 1:5 2:2 | 43:11 46:25 | **practical** 56:1 |
| 28:6 30:8,15 | 2:19 6:9 24:23 | 47:8 52:19 | 56:13 |
| 30:16 36:5 | **play** 61:1 62:2 | 53:8,16,22 | **practice** 31:23 |
| 37:9,11,12,13 | 64:8,18 66:2,8 | 57:10 58:24 | 35:5 |
| 41:16 44:8,11 | 67:17 68:2 | 61:7 66:7,25 | **precise** 86:16 |
| 44:15,18 46:9 | 69:18 70:22 | 67:3 75:25 | **preliminary** |
| 46:12 50:21 | **played** 61:4,9 | 79:24 80:5,6,8 | 22:21,22 23:3 |
| 59:11,16,18,19 | 62:4,16 64:10 | 80:12 | **prepared** 96:3 |
| 59:20,25 60:6 | 64:20,24 65:5 | **policies** 29:12 | **present** 2:18 |
| 60:7,12,13,17 | 65:22 66:2,12 | **policy** 3:12,14 | 77:16 |
| 62:21 67:2,8 | 67:20,23 68:9 | 17:7,21,24 | **presented** |
| 68:6 70:9,9,18 | 69:16,20 71:12 | 18:21 22:1,12 | 51:23 63:14 |
| 71:19,20,23 | 72:4 | 22:14 55:12,18 | 81:20 |
| 74:18 75:25 | **playing** 68:3 | 55:23 82:1 | **pretty** 73:20 |
| 79:23 80:10,10 | **please** 6:1,14 | 84:10 89:25 | **previous** 7:22 |
| 80:14,18,21 | 6:23 9:24 11:1 | 92:23 | **previously** |
| 97:3 | 45:19 48:5 | **populated** | 55:13 60:16 |
| **photo** 92:7 | 66:8 67:21 | 26:11,16 27:3 | 74:8 |
| **photographs** | 68:8 94:10,14 | **portion** 77:1 | **primary** 20:14 |
| 38:1 | 97:11,11 | **possession** | 20:20 21:4 |
| **photos** 34:23 | **pocket** 92:15 | 62:22 | 31:5 49:19,22 |
| **phrase** 21:20 | **point** 32:21 | **possibilities** | 49:23 50:6,11 |
| **physical** 13:7 | 44:21 47:17 | 53:20 | 51:3,10,13 |
| 20:15 21:1,4 | 59:16 60:13 | **possibility** | 57:6 61:12,17 |
| 31:6 49:13,24 | 91:10,11 | 84:22 85:4 | 68:21,24 74:11 |
| 50:4 68:21,25 | **pointing** 10:19 | **possible** 21:23 | 82:3,6,24 |
| 74:11 75:13,17 | **police** 3:11,13 | 38:12,13 51:9 | 83:14,20 |
| 79:14 82:24 | 3:17 8:1 9:12 | 51:13,16,18 | |

**[prior - reason]**

| | | | |
|---|---|---|---|
| **prior** 31:2,8 82:5,13 95:5 | **production** 97:15,17,22 | **purpose** 22:11 | **questioning** 30:4 |
| **probable** 15:15 15:20 18:20,22 19:17,23 23:8 23:13,15 24:1 33:2,19,23,25 38:15,20 59:6 61:11,16 62:12 62:17,25 66:15 68:19 69:23 71:15 74:10 76:19 87:9 | **profession** 12:10 | **push** 74:14 75:14 79:15 | **questions** 9:22 10:22 11:3,11 17:20 28:17 47:14 51:25 71:1 72:11 89:12,15 90:9 90:24 |
| | **prohibited** 56:15 | **pushing** 71:23 74:23 75:8,18 79:5,8 | |
| | **property** 74:25 | **put** 14:1 36:18 59:21 63:17 72:11,16 | **quick** 54:23 58:4 94:7 |
| | **prosecution** 3:15 13:2 20:9 22:3 | | |
| | | | **r** |
| | **prosecutor** 20:11 | **puts** 26:12 | |
| | | **putting** 44:6 | **r** 2:1 5:1 6:25 |
| **probably** 50:15 52:23 53:4 | **protection** 19:9 | **pw** 3:22 65:3 | **raise** 6:14 |
| | **provide** 13:2 54:6 80:22 | **px** 27:11 | **ran** 25:14 44:17 84:19 |
| **procedural** 5:19 | | **q** | |
| | **provided** 63:5 80:24 92:14 | | **reached** 44:7 62:21 |
| **procedure** 98:5 99:5 | | **qualified** 14:19 14:22 15:3,6 95:7 | |
| | **provider** 60:7 | | **read** 17:18 41:7 45:25 47:11,20 47:22,25 48:4 48:8,11,19 76:4 86:11 87:2 98:5,6,12 99:5,6,17 |
| **procedures** 29:13 | **provision** 18:21 | **query** 35:3 | |
| | **public** 27:16,18 27:20 50:16 95:19 98:10,18 99:15,23 100:23 | **question** 9:23 10:3 13:10 16:4 20:10 22:24 23:2,11 24:11 30:6 32:17 37:20 41:5 48:20 51:12 52:10 53:2,6 59:14 60:5 62:11 86:15 87:13,16 87:18 90:6 92:25 93:8,17 93:18,22 | |
| **proceed** 30:24 | | | |
| **proceeding** 1:14 5:4,17 93:24 94:9,22 96:4 | | | **reading** 32:14 97:19 |
| | **pull** 28:16 39:2 91:2 | | **reads** 26:20 76:25 |
| | **pulling** 91:2 | | |
| **proceedings** 95:3,5,6,9 96:6 | **punch** 46:20 49:2 50:8,10 | | **real** 54:23 94:7 |
| **process** 16:2 58:23 | | | **really** 48:10 |
| | **punched** 26:21 28:20 30:3,12 37:19 47:4 | | **reason** 8:7 9:9 9:23 10:25 |
| **produce** 85:19 85:20 | | | |
| **produced** 5:16 | **pure** 36:17 53:11 | | |

11:10,12 28:22
28:25 37:14
43:24 56:15
88:6 93:22
97:14 99:8
100:3
**reasonable**
18:22 19:7,15
**reasons** 31:25
**recall** 15:1,24
15:25 21:16,22
24:25 28:21
30:7,16 31:22
32:7,8,10,24
35:1 37:10
38:10,13 42:1
42:4 43:12
44:4 45:2 46:4
46:6,10 47:9
47:13,14,16,17
47:19 52:2,3
52:14,16 53:18
56:11,12,17,18
56:18 63:8
70:5 77:21
82:10 84:21
85:3,4 86:7
**receipt** 97:18
**receive** 16:1
29:20 74:24
79:9
**received** 14:18
14:19 25:21
26:25 75:7

**receiving** 15:25
**recently** 43:21
43:22
**recollection**
21:10,24 42:11
**record** 3:9 5:4
5:5,14 6:1 8:22
9:2,3,5 10:16
14:2,8 23:24
55:16 58:9,17
58:18,20 72:18
73:1,4,5,6,14
79:13 85:8
92:10 94:6,8
94:19 95:9
96:5 99:9
**recorded** 5:21
54:18,20,21,24
54:25 90:3,7
90:10 92:18
95:6
**recorder** 55:2
**recording** 5:16
55:8,22 89:21
90:11 91:22
92:15 93:15
95:8 96:4
**recordings**
18:13 55:19
**records** 21:6
38:19
**recover** 8:24
**redden** 1:4 2:2
2:19 5:7 25:1

28:6,8,19 30:2
30:7,11,17
31:8,22 32:2
33:3,15 37:2
37:11,15,18
38:2,16,21,25
43:19,25 44:7
44:10,17 46:9
46:14 47:18
50:21 54:2,3,4
54:5,19 55:20
56:3,6,10,16,19
57:4 59:7,10
61:11,17 62:12
62:17 63:4
65:13 66:15,23
67:1 68:5,19
69:23 70:6
71:16,18,20
74:15,18 75:4
75:8,13,17
76:20 77:2,3
78:2 79:4,8,13
81:3,16 82:6,8
82:12 83:6,20
84:1,5,15
87:10,22,25
88:15,19 89:2
93:7 97:6 98:3
99:3
**redden's** 52:1
75:22 79:17
80:1

**reduced** 95:7
**refer** 76:23
**reference** 97:7
98:2 99:2
**referenced** 61:7
65:8 66:6
67:15 69:8
71:7 73:15
98:11 99:15
**referred** 27:6
91:10,12
**referring** 58:24
64:3 66:2
70:19 77:8
82:1 90:22,23
**regular** 7:21
**relate** 93:5
**related** 16:11
90:9 92:25
95:11 96:7
**relationship**
43:23 50:13
60:1,18,19
**relative** 95:13
96:10
**relatively** 52:22
54:11
**relevant** 19:3
**relieved** 88:22
**rely** 29:19,22
**remember**
14:14,20,23
43:8 47:23
54:10 57:19

59:3 68:23
70:8,14,21
72:6 73:18
88:23
**remembering**
33:16 73:21
**remind** 10:15
10:24
**remote** 1:14
**remotely** 5:12
**remove** 13:10
**renege** 93:21
**repeatedly**
74:14
**repeating** 8:12
**rephrase** 30:5
87:16,18 92:25
**report** 3:16,18
21:7,9,14,18
24:6 25:8,9,10
25:11 28:14
29:21 30:20
39:4,11,15,19
39:25 40:3,7
40:12,14,20
41:2,6,22,24
42:7,10,14
43:11,15 45:10
45:18 47:2
48:17 52:17
53:13 57:13
58:24 59:2
61:7 63:19,22
65:8 66:7

67:15 69:8
71:8 73:15
80:20 81:1
82:11 83:4
86:7,17,23
87:2,3 90:8
91:25 92:8,21
**reported** 1:16
29:25
**reporter** 5:2,3
6:11,20 8:16
8:21 9:1,4
10:15,20 13:20
58:16,19 73:3
73:6 94:3,7,11
94:15,18 98:7
**reports** 21:23
40:18
**represent** 6:6
**request** 31:11
31:12,15 32:25
99:9,11
**requested** 31:2
95:22
**requesting** 31:6
**required** 23:3
56:2,13 97:25
**requirement**
23:20
**requirements**
22:12
**reserved** 94:20
**residence** 44:3
44:17 52:7

63:24 65:10
**respond** 21:8
66:25
**responded**
25:22 42:6
43:10
**responding**
16:17
**responsibilities**
41:4
**responsibility**
87:5
**responsible**
41:2
**retain** 56:3,9
**retrieving**
75:25
**returned** 97:18
**reverify** 66:11
**reversed** 76:10
**review** 40:2,6
40:16,18 59:5
73:10,20 74:7
76:24 86:23
95:22 97:12
98:1 99:1
**reviewed** 17:22
19:5 22:7 27:5
39:9 40:20
72:3,7 73:15
86:7 87:3
**reviewing**
29:19 41:2
59:3

**riggs** 2:11 3:4
6:3,5,5 8:18,23
58:3,6,11,15
74:2 89:15,17
89:20,24 90:2
90:5,14,17
91:1,6,9 92:2
93:10,14,17,21
93:24 94:12,14
97:5
**right** 6:14 8:4
18:13 21:25
22:18 25:23
30:17 31:12
32:15,16 35:23
37:9 38:5 39:2
39:3 40:11
43:5 46:25
48:5 49:13
51:2,15,19,21
53:14,20 55:5
55:9 56:21
57:14,23,25
58:21 59:1
60:14,24 61:24
62:13 64:18
65:19 73:24
77:25 80:23
81:2,18,19
85:6 92:22
94:3
**rights** 15:11,13
15:18

**[righty - severity]** Page 22

**righty** 58:16
73:3
**roberts** 86:19
**rogers** 41:1
86:18
**ross** 1:7 3:11,13
3:17 7:10,11
7:17 17:6,13
19:22 22:2
25:15 39:11
85:23 87:24
92:12
**route** 35:24
**rules** 5:20 9:19
98:5 99:5
**run** 82:12
84:17 85:10,13
**running** 44:12
59:10 62:20,23
80:9
**runs** 25:14

**s**

**s** 2:1 3:6 4:1 5:1
35:19 97:15
99:8,8 100:3
**satisfy** 92:1
**saw** 71:18
**saying** 30:2
46:10 47:17
49:8 50:13
65:16 70:8
**says** 18:18 19:6
22:11 23:2

26:4 27:10
29:15 31:17
32:4 35:3,14
35:18,23,23
47:3 48:20
52:17 55:14,25
56:12 63:22
77:22 84:10
91:15,17,18
93:2
**scenario** 50:11
51:1
**scene** 26:24,25
27:21 36:8,18
52:6,12,15
91:23
**school** 11:23,24
**schools** 12:6
**scrape** 77:25
84:7
**scraping** 78:18
**scratch** 75:9,19
**screaming**
80:10
**screen** 13:17,20
25:18,18 27:1
28:16 37:17
38:8 45:17
46:17 58:10,25
64:18 89:14
**scroll** 14:6
45:19 48:4,13
91:12

**scuffle** 75:3
77:25
**sdtlawyers.co...**
2:15
**se** 33:9
**seal** 98:15
99:21
**seat** 44:9
**second** 13:17
27:10 41:9
45:15,16 48:14
59:1,9,22 61:1
61:6,14,18
62:15 63:16,22
63:22 64:1
65:3 67:14
73:25 76:25
**secondary**
30:21 32:5
**section** 17:15
17:21 18:11,18
19:2,3,6 20:13
21:5 22:11,17
22:20 23:2
26:10 35:14
36:8 55:14,14
82:1 90:20,22
91:12 92:23
93:2
**see** 13:21 27:21
35:21 39:17
46:16 48:24
60:7 64:15,16
64:22,23 69:18

71:4 75:17
82:12 87:1
91:3
**seeing** 39:19
77:9,10 81:13
**seek** 66:24
**seeking** 63:24
65:10
**seeks** 80:7
**seem** 53:14
**seen** 39:7
**send** 57:18 71:3
**sends** 36:5
**sense** 60:16
70:24
**sent** 25:12
57:20
**sentence** 48:7
76:25
**separation** 60:4
**september**
14:20
**serious** 84:1,2
**seriousness**
21:1
**service** 8:4
16:18 27:16,18
27:20
**set** 22:12 27:21
94:4
**severe** 51:10
**severity** 49:20
50:1 51:4,7

**[shape - specifically]** Page 23

shape  55:9
share  13:17,20
  43:19 64:17
shared  58:10
sharing  89:14
sheet  97:13
  99:7,10,18
  100:1
sheriff's  25:16
  31:7 36:4
shields  15:7
shift  7:6 88:21
  88:23
shit  68:5,23
shooting  67:10
short  54:11,14
shoulder  87:1
shoved  44:21
show  13:16
  14:5 17:5
  21:25 57:22
  58:3 60:22
  67:13 69:6
  71:6 74:13
  76:2 81:6
showed  54:9
  65:13 75:1,13
  75:22 84:5
showing  24:14
  66:4 85:19
shown  45:17
  97:16
shows  74:19
  77:1 79:6

sic  13:13 42:16
  79:4
side  91:3
sides  51:21
sideways  77:2
siegel  96:2,16
sign  81:12
signature  81:13
  81:14,19 94:20
  95:17 96:15
  97:14
signed  98:13
  99:18
significance
  31:18
significant
  55:16
signing  97:19
similar  19:19
similarly  10:2
sincerely  97:21
single  18:5
sir  11:16 22:15
  22:25 23:11,23
  24:4,12 28:21
  29:1,13 30:4
  31:16,20 34:7
  41:3,9 42:1
  46:6 50:25
  51:16,22 52:2
  52:8,21 53:6
  53:10,15 64:15
  67:22 69:25
  71:17 73:8,18

77:21 86:1,24
  97:10
sirens  16:18
sit  15:2 31:21
  46:3 51:24
  84:25 86:21
  87:1
site  26:23
sitting  25:25
  46:16,22 47:8
situation  35:6
  50:3,20,20
  54:13,15,17
  57:3 93:5,6
situations
  29:24
six  7:24
skills  95:10
  96:6
slammed  44:20
sliding  75:3
  77:2 78:1
small  91:3
smudge  48:10
sole  57:12 83:1
  83:12
solely  79:17,22
  80:11
solutions  97:1
  100:1
somebody
  19:21 29:5
  66:25 91:24
  92:19

someone's
  62:23 85:9,15
sorry  6:4 13:16
  14:17 16:5
  26:7 31:20
  38:2,3 39:15
  39:16 41:9
  45:21 46:7
  47:25 48:11,18
  49:7 52:9,9
  56:7,18 57:19
  59:24 63:10
  64:17 67:2
  70:10,24 71:19
  79:4 83:7,14
  84:2 86:24
  87:7,17 88:8
  92:7 93:13,20
sound  67:22
sounds  8:23
  70:3 94:18
southern  1:2
speak  72:25
specialized
  10:8,8
specific  22:24
  30:1 47:14
  93:5
specifically
  16:25 26:13
  30:16 33:6
  37:21 47:15
  52:4 70:19
  84:21

**[specifics - supposed]**                                        Page 24

**specifics** 14:16
14:25 28:13
**speculate** 29:4
**speculation**
36:18 53:11
**spell** 6:23
**spent** 52:15
**spoke** 28:6,8,19
30:17 91:22
**spoken** 34:9
37:8 87:25
88:3,13,18
89:1
**sriggs** 2:15
**standard** 10:14
40:15
**standards**
92:24
**standing** 37:25
63:23 64:13
65:9,13 66:23
67:5 74:21
77:3
**stands** 25:10
**staring** 64:16
**start** 62:1
**started** 34:6,12
52:17
**starting** 9:9
**state** 6:23
40:15 95:20
98:10 99:15
**stated** 31:4
37:10 43:15,17

44:6,9,13,16
60:16 80:20
92:9
**statement**
18:15 28:7
33:18,20,21,22
34:9,11,18,21
37:14 38:2,24
38:24 45:1,3,4
45:6,9,9,12,18
45:20,21,23
46:5,24 47:10
47:11,20,23
52:3 54:4,19
54:22 55:7,9
56:5,10,16
60:17 63:4
79:20 80:23,25
91:20,23,24
92:6,19 98:13
98:14 99:19,19
**statements**
13:6 18:13
23:12,19 37:12
55:3,16,19
56:2,3 60:15
66:19 70:6
89:22 90:4,7,9
91:16,17,21
92:11 93:5
**states** 1:1 20:23
**stating** 84:22
**station** 28:1
32:16 34:21

52:20 53:8
**stationary**
37:24
**stenographic**
5:22
**step** 24:16
**steven** 2:11 6:5
97:5
**sticking** 51:17
**stipulation**
5:23
**stole** 44:8
**stolen** 50:21
74:19 80:14,19
**stop** 89:14
**stopped** 85:25
**story** 17:2,3
34:10 37:7,7
**street** 2:13
59:10 67:5
**struck** 46:15
47:18 52:1
**studied** 12:12
12:15
**stuff** 55:2 67:11
**sub** 90:23
**subjects** 84:18
**submit** 87:3
**subscribed**
98:10 99:14
100:21
**subsection**
20:23 55:25

**subsequent**
75:9,19 81:4
88:1
**subsequently**
45:23
**substantial**
79:6
**substantially**
73:20
**substantiated**
76:21
**suffered** 51:10
51:14
**sufficient** 33:19
**suite** 2:5,13
97:2
**superior** 97:1
**supervisor** 40:6
40:15,17,19,25
41:3 86:8,10
86:14,18
**supervisors**
40:22 87:12
88:7
**supplied** 92:18
**support** 17:3
18:25 62:24
63:1 66:20
**supported**
61:15 68:18
71:15
**supports** 62:16
**supposed** 72:25
82:3 84:10

**[surdyk - tim]** Page 25

| | | | |
|---|---|---|---|
| **surdyk** 2:12 6:6 | **t** | **techniques** | 98:6,7 99:6,9 |
| **sure** 8:19,24 | | 12:13 | 99:12 |
| 10:10 16:4 | **t** 3:6 4:1 | **tell** 6:18 16:14 | **thank** 6:11 8:4 |
| 19:23 22:24 | **tabs** 40:18 | 25:8 28:11 | 48:5 58:15 |
| 23:10 24:11 | **take** 5:4,9 | 29:17 31:14,16 | 67:22 73:8 |
| 29:1 30:4,10 | 10:20,25 11:2 | 35:7,25 43:8 | 94:15 |
| 32:23 35:10 | 12:5 18:19 | 46:8 47:21,23 | **thing** 7:25 11:1 |
| 36:6,20 40:11 | 21:2 29:1 | 49:4 56:19 | 19:18 45:25 |
| 40:14 43:3 | 34:22 36:5 | 72:20 84:25 | 68:4 77:11,22 |
| 45:5 47:10 | 37:11,14 41:10 | 86:11 87:4 | 80:17 86:12,12 |
| 58:10 60:23 | 41:19 44:14 | **telling** 27:14 | 89:17 90:25 |
| 66:1,18 70:16 | 48:15 59:23 | 68:14 85:3 | 92:23 |
| 74:16 85:24,24 | 68:11 92:18,20 | 92:20 | **things** 26:1 |
| 86:1 87:6 90:3 | **taken** 5:7 12:3 | **ten** 58:14 67:14 | 45:6 65:16 |
| 90:21 93:8 | 13:11 80:21 | **tend** 17:1 | 72:15 |
| **surroundings** | 81:4 95:3,12 | **tendency** 16:1 | **think** 8:11,16 |
| 16:20 | 96:9 | **term** 10:7,8,8 | 8:22 30:7 |
| **suspect** 91:18 | **talented** 10:20 | 10:10 15:23,24 | 35:23 36:9 |
| **sustained** 44:22 | **talk** 20:12 | 16:7,21 19:15 | 42:21 60:23 |
| 49:14 71:25 | 28:10 60:2 | 42:20 43:4 | 68:3 74:2 |
| 77:23 78:16,25 | 88:6,9 | **terms** 16:15,22 | 93:14,25 94:2 |
| 79:7 | **talked** 88:10 | 17:1 | 94:6 |
| **sustaining** 75:2 | 89:7 | **terrible** 41:17 | **third** 62:9 |
| **sustains** 49:17 | **talking** 27:25 | 87:13 | **thirty** 97:18 |
| **swear** 5:11 | 36:11 39:20 | **test** 58:9 | **thorough** 21:23 |
| 6:12 | 46:24 50:16,19 | **testified** 6:19 | **thoroughly** |
| **switch** 60:23 | 52:23 74:17 | 66:5 82:15 | 66:3 91:20 |
| **sworn** 5:14 | 87:17 90:25 | **testify** 9:16 | **thought** 82:15 |
| 6:17 95:5 | **talks** 22:17,20 | 51:25 | **three** 59:9 61:1 |
| 98:10,13 99:14 | **tear** 75:9 | **testifying** 95:5 | 61:6,14 62:15 |
| 99:18 100:21 | **tearing** 75:20 | **testimony** | **throw** 50:10 |
| **system** 35:9 | **tech** 11:19 | 72:25 77:16 | **tim** 1:7 2:10 5:6 |
| 85:25 | 12:12 | 82:20 83:18 | 5:7 97:6 98:3 |
| | | 84:19,24 90:18 | 99:3 |

**[time - understand]** Page 26

| | | | |
|---|---|---|---|
| **time**  1:13 5:25 | 30:11 34:10 | **transcribed** | **turn**  67:21 |
| 10:6 11:7 | 43:20 46:4,11 | 98:7 | 89:16 |
| 18:16 26:12,13 | 48:15 59:19 | **transcriber** | **turned**  62:3 |
| 26:16 28:3 | 60:16 63:7 | 96:1 | **turner**  2:12 6:6 |
| 29:16 31:24 | **took**  32:12 | **transcript**  5:16 | **tv**  26:22 28:20 |
| 32:6 33:13 | 34:23 52:24 | 94:9 95:22 | 30:3,12 46:15 |
| 34:8 36:3 | 53:8 59:11,16 | 96:3,5 97:11 | 46:16 47:4,18 |
| 37:17 38:25 | 62:21 68:6 | 97:12 98:5,12 | **two**  14:17,17 |
| 41:19 52:11,17 | 81:3 91:22,24 | 99:5,11,17 | 19:25 20:4,8 |
| 59:23 60:3 | **top**  45:14,16 | **transcriptionist** | 20:11,15,18 |
| 68:10 83:25 | **tore**  44:23 | 95:8 | 35:2 45:6 46:1 |
| 85:8 | **totally**  25:25 | **traumatic**  57:2 | 46:6 47:20 |
| **timeline**  32:15 | **tough**  47:25 | **travel**  38:5 | 50:13 53:10,20 |
| 34:2 36:1,2 | **toward**  57:9 | **trial**  77:23 | 64:1 66:3 93:2 |
| 42:8 | 70:7,20 | **tried**  74:15 | **type**  40:12 |
| **times**  8:19 | **township**  1:7 | 75:14,15 77:12 | **typed**  29:16,16 |
| 35:14 36:14 | 3:11,13,17 | 77:19 79:15,15 | **types**  26:17 |
| 80:3,4,9 | 7:10,12,18 | **tripping**  79:9 | **typewriting** |
| **timothy**  1:11 | 11:20 17:6,13 | **true**  95:9 96:5 | 95:7 |
| 3:9 6:7,16,24 | 19:22 22:2 | **truth**  6:18,18 | **typing**  42:18 |
| 14:2 97:8 98:4 | 25:15 39:11 | 6:19 | |
| 98:9 99:4,13 | 85:23 87:24 | **try**  18:12 21:22 | **u** |
| 100:20 | 92:13 | 44:18 49:12 | |
| **title**  65:3 | **tracking**  90:1 | 69:11 | **unaware**  77:15 |
| **titled**  22:1 64:8 | **traffic**  53:5 | **trying**  32:11 | **under**  5:19 |
| 91:7 | **trained**  20:3 | 33:12 38:11 | 11:13 26:9,10 |
| **today**  11:11 | 21:12,15 35:5 | 48:1 61:18 | 51:24 55:14 |
| 15:3 24:8 | **training**  3:8 | 69:2 71:18,19 | 71:5 80:15 |
| 31:21 41:17 | 13:14 14:2,8 | 71:22 74:14,18 | 83:9 84:25 |
| 46:3 86:22 | 14:11,15,18,19 | 74:19,24,25 | **understand** |
| **together**  43:21 | 14:24,25 15:25 | 75:3,4 77:1 | 5:15 9:23 |
| 69:5 | 20:6 21:6,21 | 78:1,2,25 90:9 | 10:21 11:6,15 |
| **told**  20:3 21:17 | **trainings**  12:9 | **tunnel**  16:7,19 | 19:16 23:5 |
| 28:3,23 30:8 | 15:22 | | 41:21 51:5 |
| | | | 67:4 |

**[understandable - waived]**                                        Page 27

| | | | |
|---|---|---|---|
| **understandable** 10:4 | **v** | 62:4,7,15 63:3 | **violation** 19:9 |

**understandable**
  10:4
**understanding**
  15:5,14,17
  17:24 18:21
  19:12 22:8
**understood**
  10:3 51:2
**undertaken**
  17:25
**underwater**
  68:15
**unit** 35:14,16
**united** 1:1
**unknown** 50:14
**unreasonable**
  60:9
**unsure** 40:8
**upset** 34:18
  43:13 48:8
  56:21,23,25
  57:2,4,8
**use** 10:7 19:15
  31:5 35:9 43:4
  60:18 82:23,25
  83:11 85:10
**used** 16:21,25
  33:11 35:11
  42:20 49:9
  51:11 61:12
  68:20 74:10
**uses** 5:18
**using** 23:11
  40:11 60:16

**v**

**v** 1:6 97:6 98:3
  99:3
**validate** 40:14
**value** 29:15
**variety** 12:6
**vehicle** 37:25
  38:9 44:7,8,9
  50:24
**verbal** 38:1
  55:3 56:3
  80:25 91:22,24
  92:6,18
**verbally** 34:10
  34:19 47:9
  57:9 92:20
**verify** 37:12
**veritext** 5:4
  97:1,7 100:1
**veritext.com.**
  97:17
**victim** 33:18
  37:4,5 76:22
  81:17 91:17,18
**victims** 56:24
**video** 3:20,21
  3:22,23,24,25
  18:12 54:6,7
  54:25 55:8,15
  55:19,21 57:14
  57:16,23 60:25
  61:1,4,6,9,10
  61:15,22 62:2

62:4,7,15 63:3
63:16 64:7,10
64:12,15,20,24
65:3,5,12,15,22
65:25 66:1,12
66:18,21 67:14
67:16,20,23
68:9,13,18
69:7,16,20,22
71:12,14 72:4
74:16 76:21
77:8,10 79:2
80:4 83:25
84:4 90:13
92:10
**videoconfere...**
  2:3,11,19
**videographed**
  92:7
**videorecording**
  76:25
**videos** 54:11
  59:3,3,5 63:14
  64:1 65:7 66:3
  71:3 72:2,7,17
  72:19,21 73:11
  73:15 74:10,13
  74:17 75:1,12
  77:7,9
**view** 58:8
**viewed** 74:22
**village** 7:4
**violate** 15:10

**violation** 19:9
**violence** 3:12
  14:11 17:7
  18:1 19:8,21
  20:1,5,16,19,24
  31:25 33:3
  36:24 37:1,4
  42:7 43:11,16
  50:20 55:12
  56:25 76:20
  82:1,7,14
  84:10,11,14
  93:4
**violent** 20:24
  31:9 82:8
  84:11,14
**visible** 49:15,16
  49:18
**visibly** 34:18
  43:13 46:16
**vision** 16:7,19
**visit** 43:25 44:1
**voice** 55:1
**volunteer** 45:4
**vs** 5:7

**w**

**wagon** 30:21
  32:22 36:10,22
  38:5,14 39:23
  43:17 53:8
  54:1
**waived** 97:19

**[walk - zoom]** Page 28

| | | | |
|---|---|---|---|
| **walk** 69:2 | **what'd** 7:20 | **works** 26:18 | 48:12,19 49:10 |
| **wall** 48:10 | **wheel** 30:21 | **world** 78:13 | 50:18 56:9,21 |
| **want** 8:21 19:1 | 32:22 36:10,22 | **would've** 25:21 | 58:5,13 61:23 |
| 30:10 40:11 | 38:5,14 39:24 | 26:1,25 27:3,6 | 62:1 64:23 |
| 43:3 53:11 | 43:17 53:9 | 36:9 | 69:13 70:25 |
| 54:23 58:1 | 54:1 | **write** 21:7,9 | 73:2,12 82:19 |
| 59:14 64:2 | **wiped** 85:25 | 41:24 55:7 | 87:13,16 88:20 |
| 69:25 84:24 | **wish** 17:19 | **writes** 79:12 | 89:7,24 90:16 |
| 89:5 90:3,24 | **witness** 5:11,14 | **written** 5:23 | 90:19 91:4,8 |
| 92:16 | 5:15 6:13,17 | 34:9 38:2 45:4 | 92:12 |
| **wanted** 43:15 | 8:9,13 9:11 | 45:9,12,21,22 | **year** 11:21 86:2 |
| 82:17 89:18 | 56:10,16 67:21 | 54:18,20,21 | 86:3 |
| 93:15 | 67:24 68:10 | 55:7 56:5,10 | **years** 7:24 |
| **warrantless** | 89:13 93:13,16 | 56:15 80:23,24 | 12:10 14:17 |
| 15:14 | 93:19,23 94:1 | 91:25 92:6 | 45:7 46:1,7 |
| **watch** 71:4 | 95:4 97:8,11 | **writtens** 54:24 | 47:20 53:10 |
| 80:4 | 98:1,4,11 99:1 | **wrong** 52:10 | 67:10 |
| **way** 3:22 16:2,6 | 99:4,15 | 76:16 | **yep** 57:1,1 74:2 |
| 16:16 32:9,23 | **witnesses** 23:12 | **wrote** 45:4,13 | 81:11 85:16 |
| 39:1 50:25 | 23:19 55:20 | 46:4 47:10,12 | **youngest** 60:3 |
| 52:17 53:17 | 91:19 | 52:2 | 60:20 |

| | | **x** | **z** |
|---|---|---|---|
| 55:9 58:8 65:3 | **witness'** 97:14 | | |
| 70:7 74:14 | **words** 10:14 | **x** 3:1,6 4:1 | **zoom** 8:12 |
| 75:4,14 77:12 | 12:24 18:11 | 95:22 | |
| 77:19 78:2,25 | 20:17 40:11 | | |
| 79:15 92:5 | 62:6 | **y** | |
| **ways** 16:10,11 | **work** 7:4,9,17 | **yankee** 2:13 | |
| 33:11 72:16 | 85:21 86:1 | **yeah** 6:24 8:21 | |
| **we've** 39:13 | 88:5 89:8 | 8:23 18:3 30:6 | |
| 41:11 58:10 | **worked** 7:10 | 30:9 31:13 | |
| 66:4 71:6 | 17:13 86:2 | 32:19 33:23 | |
| **went** 10:16 | **working** 19:22 | 35:22,25 38:24 | |
| 32:22 43:17 | 40:5 85:25 | 38:24 39:16 | |
| | 87:15,23 | 43:7 44:1 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.