# In The Matter Of:

*Michael Redden v.*
*Tim Baird, et al.*

---

*Bryan Rogers*
*March 27, 2025*

---

*Jackson-Whitney Reporting*

Original File ROGERSBRYAN.txt
Min-U-Script® with Word Index

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

CASE NO. 1:24-CV-C0342

- - -

MICHAEL REDDEN,              -vs-   TIM BAIRD, ET AL.,

     Plaintiff,                        Defendants.

- - -

          Zoom Deposition of BRYAN ROGERS, the Witness
herein, taken by the Plaintiff as upon
Cross-Examination and pursuant to the Federal Rules of
Civil Procedure on Thursday, March 27, 2025, at
12:17 p.m., before Pamela L. Jackson, a Notary Public
within and for the State of Ohio.

- - -

2

1                          I N D E X

2   Witness:                                  Page:

3   BRYAN ROGERS
    Cross-Examination by:
4           By Mr. Engel, Esq.                    5

5   Plaintiff's Exhibits:              Page Marked:

6   1 ...............................................8
    (Ohio Peace Officer Training Academy Records -- not
7   attached to the deposition transcript)

8   2 ..............................................11
    (Police 308 Ross Township Police Department Domestic
9   Violence -- not attached to the deposition transcript)

10  3 ..............................................20
    (Policy 600 Ross Township Police Department
11  Investigation and Prosecution Policy-- not attached to
    the deposition transcript)

12
    4 ..............................................25
13  (CAD Report July 7th -- not attached to the deposition
    transcript)

14
    5 ..............................................29
15  (Officer Baird's report -- not attached to the
    deposition transcript)

16

17

18

19

20

21

22

23

24

25

3

1    APPEARANCES:

2          For the Plaintiff (via Zoom):

3                    Joshua Adam Engel
                     Engel & Martin, LLC
4                    4660 Duke Drive
                     Suite 101
5                    Mason, Ohio 45040
                     Phone: 513-445-9600

6

7          For the Defendants (via Zoom):

8                    Dawn Frick
                     Steven Riggs
9                    Surdyk, Dowd & Turner Co., LPA
                     8163 Old Yankee Street
10                   Suite C
                     Dayton, Ohio 45458
11                   Phone: 937-222-2333

12                         - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1       S T I P U L A T I O N S

2            It is stipulated by and between counsel

3  for the respective parties that the deposition of

4  BRYAN ROGERS, the Witness herein, called as upon

5  Cross-Examination by the Plaintiff, may be taken at

6  this time and place pursuant to the Federal Rules of

7  Civil Procedure as to time and place of taking said

8  deposition; that the deposition was recorded in

9  stenotypy by the court reporter, Pamela L. Jackson,

10 and transcribed out of the presence of the witness;

11 and that said deposition is to be submitted to the

12 witness for examination and signature, and that

13 signature may be affixed out of the presence of the

14 Notary Public.

15                        - - -

16

17

18

19

20

21

22

23

24

25

5

1                           BRYAN ROGERS

2     of lawful age, the Witness herein, being first duly

3     sworn as hereinafter certified, was examined and

4     deposed as follows:

5                      CROSS-EXAMINATION

6     BY MR. ENGEL:

7           Q         Good afternoon.  Would you please

8     state and spell your name.

9           A         Lieutenant Bryan Rogers.

10    B-R-Y-A-N, R-O-G-E-R-S.

11          Q         Okay.  Lieutenant, where are you

12    employed?

13          A         Ross Township Police Department,

14    Butler County.

15          Q         How long -- how long have you been

16    there?

17          A         Since 2016.

18          Q         What did you do before that?

19          A         I was an athletic trainer for

20    20 years.

21          Q         Where -- where was that?

22          A         I spent most of my career down in

23    Tennessee and then when we moved here in 2006, I was

24    at Kettering Health Network.

25          Q         So is Ross -- is the current job

6

 1    you're in the only employer you have had as a law

 2    enforcement officer?

 3            A         No.  I spent one year at Dayton

 4    Hospital.

 5            Q         Where did you go to the Academy?

 6            A         Sinclair.

 7            Q         What year did you graduate?

 8            A         2014.

 9            Q         Okay.  Have you ever been in a

10    deposition before?

11            A         No, sir.

12            Q         Okay.  I'm sure you have had to

13    testify in court many times, though, right?

14            A         Many times, yes, sir.

15            Q         Okay.  So similar to that, except

16    that this is a civil case so the rules are a little

17    bit different than we use in a -- in a courtroom.

18                      Basically what I remind everyone at

19    this stage is a few things.  First, just like in

20    court, all of your answers have to be out loud, so all

21    that matters here is the transcript, so those normal

22    human interactions where you nod your head or point or

23    gesture, things like that, our court reporter can't

24    take that down.  So even though sometimes when you

25    testify in court you might point to something to a

1   jury, we can't see that on a transcript.  So we're

2   good with everything has to be out loud?

3          A          Yes, I understand that.

4          Q          Okay.  The second thing I remind

5   everyone is that you are not a hostage here, so if for

6   any reason you need to take a break, just let us know,

7   and we will do that.  That includes if you need to

8   take a break to talk to your counsel or if you have a

9   question or anything like that.

10              The only thing I would ask is that

11  if there's a question pending, we'll answer that

12  question first, and then we'll take whatever break you

13  need.  Fair enough?

14         A          Fair enough.

15         Q          Okay.  I will do my best to ask

16  clear and concise questions, but I don't always

17  succeed in that endeavor.  So if at any point you do

18  not understand a question, please let me know, and I

19  will clarify it, okay?

20         A          Okay.

21         Q          Okay.  The reverse of that is that

22  if you answer a question, I'm going to assume that you

23  understood what I meant, okay?

24         A          Okay.

25         Q          Okay.  And in particular, if

8

1   there's any specific terms of art or -- or words that

2   have special significance in your line of work, let us

3   know, and we'll make sure we define those terms and

4   that we're speaking the same language; otherwise,

5   we'll just give words their common and plain meaning,

6   okay?

7           A        Okay.

8           Q        All right.  Any reason that we

9   can't -- that you can't testify here today?

10          A        I'm sorry, I coughed.  I didn't

11  hear what you said.

12          Q        Any reason that you can't testify

13  here today such as use of medication or anything like

14  that?

15          A        No.

16          Q        Okay.  So I'm going to mark --

17  we'll start this way -- as Exhibit 1, the copy of your

18  Ohio Peace Officer Training Academy records, and I'm

19  going to show it on the screen here.

20                        (Exhibit 1 marked for

21                         identification.)

22  BY MR. ENGEL:

23          Q        Okay.  Are you able to see the

24  document that I've shared with you?

25          A        Yes.

9

1          Q          And this appears to be your
2     training records as of probably not that recent but
3     maybe a year ago or so?
4          A          Yes.
5          Q          Okay.  And it looks like it's
6     broken down into first OPOTA advanced training
7     records.  What is advanced training?
8          A          I'm not sure what OPOTA's
9     definition of advanced training is, but we have -- my
10    first thought would be, we have required training that
11    we have to do as far as CPTs go every year that we're,
12    like I said, required to do.  So I would think that is
13    what that is talking about.  Other than -- if you
14    could go back for me real quick?
15         Q          Yeah, so I'm seeing looking on
16    page 2 it's something called "LMS Training Records."
17    What is that, if you know?
18         A          Those are -- those look like the
19    online training records that we are required to do for
20    our CPT hours.
21                     Now, going back to your advanced
22    question, I did see --
23                     MS. FRICK:  Can you make that a
24         little bit bigger, Josh?  Just a little bit?
25         A          There you go.

10

1          Yeah, so answering your advanced
2   training, these -- these look like specific trainings
3   that are not required as far as the CPTs go.  It's -
4   it's training that I chose to -- to do on my own.
5          Specifically like firearms
6   instructor, which I am, there's not a CPT required
7   class.  Driving simulators, judgment firearm
8   simulators, those are -- those are just training that
9   I did on top of the CPT stuff.  So I think that's what
10  they mean by advanced training records.
11      Q       Okay.  And then LMS training, I
12  think you indicated this is online training that you
13  mostly take?
14      A       Yes.
15      Q       Okay.  And in particular I see
16  there is a section it looks like December 25th of
17  2023, "Domestic Violence Legal Updates"?
18      A       Yes.
19      Q       Do you remember that course?
20      A       Yes.
21      Q       Okay.  Do you know if since that
22  day you have had any training in domestic violence
23  cases?
24      A       Specifically going to class, I have
25  no recollection of it, other than the required CPTs

1  that we have to do.

2          Q          Okay.  Now, are you familiar with

3  the policies and procedures for -- for your

4  department?

5          A          Yes.

6          Q          And so I am going to show you next

7  what we'll mark as Exhibit 2, a document entitled --

8                  MS. FRICK:  Would it be easier if I

9          go print a copy real quick for him to look

10         at?  Are you going to ask him a lot of

11         questions about this?

12                  MR. ENGEL:  I'm not going to ask a

13         lot of questions, so I think we'll be --

14                  MS. FRICK:  Okay.

15                  MR. ENGEL:  -- okay.

16                  But if that helps you to print a

17         copy, just let us know, and we can do that.

18                  MS. FRICK:  I think I might have a

19         copy here.  Yeah, he's got a copy in front of

20         him.

21                  (Exhibit 2 marked for

22                  identification.)

23  BY MR. ENGEL:

24          Q          Okay.  So just for the record,

25  Exhibit 2 is a document entitled, "Policy 308 Ross

12

1   Township Police Department Domestic Violence."  Are

2   you familiar with this policy?

3          A         Yes.

4          Q         Okay.  And is this the current

5   policy that's in effect at your department?

6          A         Yours says Policy 308 and mine says

7   Policy 309.  The change may have been with our -- with

8   our chief coming in, if he might have added a certain

9   policy, it might have just changed the number.  But

10  looking at the wording, it looks like the same thing

11  other than the policy number itself.

12         Q         Okay.  And in particular, we are

13  concerned about an incident that happened back on --

14  let me get the exact day -- and we'll mark this in a

15  minute, but this is an incident that happened in July

16  of 2023.

17                   Is the policy that I'm showing you

18  what was the policy that you believe was in effect for

19  2023 -- in July of 2023?

20         A         I think so, yes.

21         Q         Okay.  So I want to ask you a

22  couple of questions about that policy.  First, let's

23  go to Section 308.9.  It says, "Legal Standards for

24  Arrest."

25                   What is your understanding of the

13

1    legal standards for an arrest in accordance with this

2    policy and --

3                          MS. FRICK:  Objection.  Go ahead.

4              You can answer if you understand it.

5              A          Yeah.  It's my understanding that

6    the officer makes a decision whether to make the

7    arrest or not based on reasonable cause or probable

8    cause of the arrest.  So the officer will go in and

9    gather the information while on scene and make that

10   decision whether or not he has enough information to

11   make that arrest.  Is that what you're asking?

12             Q          Yeah.  So let me -- let me drill

13   down a little bit more.

14                          In little "a" of this it says,

15   quote, An officer who has reasonable grounds to

16   believe that a person has committed the offense of

17   domestic violence.

18                          What -- what is your understanding

19   of the term "reasonable grounds"?

20             A          That something has occurred to lead

21   the officer to make that decision to make the arrest.

22   So there was either some kind of threat made, somebody

23   put their hands on somebody, specifically -- talking

24   specifically of domestic violence.  So there has to

25   be, like it says, reasonable grounds to make that

14

1  decision to make the arrest.  So he's -- he or she

2  would have evidence that those threats or some kind of

3  physical altercation took place.

4         Q        Is the term "reasonable grounds"

5  different than the term "probable cause"?

6         A        Yes.

7         Q        How is that different?

8                  MS. FRICK:  Objection.  Go ahead.

9         A        I'm not sure what -- if you're

10 wanting me to give you a definition, I don't have a

11 definition in front of me.

12                  But the reasonable grounds would

13 lead me to believe that the officer feels like he has

14 enough information that he can make the arrest based

15 on what is being told or what -- what he's seeing

16 while he's on scene.

17        Q        As part of your training, are

18 you -- is it your understanding that an officer needs

19 to have probable cause before they can make a

20 warrantless arrest?

21        A        I believe that's my understanding

22 of it, yes.

23        Q        Okay.  And what is your

24 understanding of the term "probable cause"?

25        A        That the evidence is there to make

15

1     the arrest.

2          Q          And is that probable cause standard

3     something that is -- is well established in -- in your

4     experience?

5                     MS. FRICK:  Objection.  You can

6          answer.

7          A          Can you repeat the question one

8     more time for me, please?

9          Q          Sure.  That term "probable cause,"

10    is that a well established standard based on your

11    training?

12         A          Yes.

13                    MS. FRICK:  Objection.

14         Q          So just to close the loop:  In

15    other words, if an officer does not have probable

16    cause, they cannot make an arrest?

17         A          Yes.

18         Q          Okay.  And when I asked that

19    question, I should have been clearer.  A warrantless

20    arrest.  If there's a warrant, it's a whole different

21    standard, right?

22         A          Correct.

23         Q          Okay.  So what should an officer do

24    in order to determine if there is probable cause that

25    a crime has been committed?

16

1      A        Well, he needs to gather

2  information, do the investigation.  So he needs to --

3  if there's any evidence while on scene, he needs to

4  gather the evidence.  He needs to speak to victims,

5  suspects, witnesses.

6                  Gather as much information that he

7  can to make sure that what he's called there for is

8  lining up for that arrest.  So he's got to have the

9  information and/or the evidence in order to have

10  that -- to make that arrest.

11      Q        Okay.  Does that include evidence

12  that is favorable to the accused?

13              MS. FRICK:  Objection.

14      Q        You can answer.

15              MS. FRICK:  I'm sorry, you can

16          answer.

17      A        Yeah.  Can you -- can you repeat it

18  one more time, please?

19      Q        Sure.  Does -- does what you just

20  described include the review of evidence that is

21  favorable to the accused?

22      A        Favorable to the person being -- to

23  the -- my suspect?  That's what you're asking?

24      Q        Yeah.

25      A        If I -- if I have evidence that

17

1   points one way or -- or the other, that's what I'm
2   going to be looking at, yes.
3           Q        Okay.  Now, in this policy -- now,
4   let's go to Section 308.4.  This is a description of
5   how investigations should occur in domestic violence
6   cases.  Are you familiar with that section?
7           A        Yes.
8           Q        And -- so let me run through a
9   couple of these.  Little "a" it indicates that,
10  Domestic violence calls are of, quote, extreme
11  importance, should be considered among the highest
12  response priorities.  Why is that?
13          A        Domestic violence calls are one of
14  the most dangerous calls that an officer can go on.
15  Throughout the years it's been documented that some of
16  these calls officers get hurt on, so we go into these
17  calls with a heightened sense for our safety.
18          Q        Okay.  And then Section B it
19  indicates that officers should obtain a document
20  statements from various people.  How do they usually
21  go about doing that?
22          A        We can take a verbal statement or a
23  written statement from victim, suspect, witnesses and
24  then document it in our Incident Report.
25          Q        Is it important to record the

18

1    statements?

2          A         Record as in documenting it in our

3    Incident Report, yes.

4          Q         What about making like an audio or

5    visual recording?

6          A         Well, at the time -- it helps, yes,

7    but at the time we did not have body-worn cameras that

8    would have recorded that if that's what you're asking.

9          Q         Was it common -- so I guess we'll

10   talk about July of 2023 -- to obtain written

11   statements from people?

12         A         A lot of the incidents we go on we

13   get written statements, yes.

14         Q         Okay.  And should the officers try

15   to obtain written statements from both the -- the

16   victim and the suspect?

17                   MS. FRICK:  Objection.  Go ahead.

18         A         Either a written statement or a

19   verbal statement.  If -- if we are getting one or the

20   other, the statements that are given are documented in

21   the Incident Report itself.

22         Q         Okay.  And if we look at Section D,

23   it says, When practicable and legally permitted, video

24   or audio recording of all significant statements and

25   observations.  Why is that important?

19

1        A        Well, it's -- like you said, it's

2    recorded either by video or audio.

3        Q        Okay.  Now, in July 2023 I think

4    you indicated your department didn't wear body cams?

5        A        Correct.

6        Q        Okay.  Did the officers have any

7    other way of recording statements?

8        A        Not anything that is given to them

9    by the department at the time, no.

10       Q        Okay.  Did some officers carry

11   things not given to them by the department to record

12   statements?

13                MS. FRICK:  Objection.  Go ahead.

14       A        Yes, most of our officers have

15   their personal cellphones.

16       Q        And so it would not be uncommon

17   then for officers to use their personal cellphones to

18   record statements?

19                MS. FRICK:  Objection.  Go ahead.

20       A        We try to tell our officers not to

21   use their personal cellphones as if something happens,

22   it can be taken as evidence and now they're losing

23   their personal property, so --

24       Q        But -- but it had happened, right?

25       A        It does happen, yes.

20

1          Q          Okay.  What about, were there
2   cameras in cars?
3          A          We do not have cameras in our
4   cruisers, no.
5          Q          Okay.  And then in Section J we see
6   that probable cause language again.  Is that the same
7   standard you described to me before?
8          A          Can you repeat that one more time,
9   please?
10          Q          Yeah.  In -- in Section J it says,
11   Officers should take appropriate enforcement actions
12   where there is probable cause to believe an offense
13   has occurred.  Is that the same standard we talked
14   about before?
15          A          Yes.
16                     (Exhibit 3 marked for
17                     identification.)
18   BY MR. ENGEL:
19          Q          Okay.  So let me show you what
20   we're marking as Exhibit 3 something titled, "Policy
21   600 Ross Township Police Department Investigation and
22   Prosecution Policy."  Are you familiar with this
23   policy?
24          A          Yes.
25          Q          Okay.  And was this policy in

21

1   effect during the incident that brings us here in July

2   2023?

3           A           I believe so, yes.

4           Q           Okay.  And then there's a section

5   called, "Initial Investigation."  What -- what is an

6   initial investigation?

7           A           Typically our initial investigation

8   is when we arrive on scene, we are gathering that

9   initial information.  Are there witnesses?  Do I need

10  to speak to the victim?  Do I need to speak to the

11  suspect and gather information, statements from them?

12  Is there visual evidence that I need to collect based

13  on what I'm called there for?

14                      So it's -- most of our initial

15  investigation is what's happening when we first get on

16  scene and things are happening, so --

17          Q           Is it fair to say the initial

18  investigation, that's the first step of the process?

19          A           Absolutely, yes.

20          Q           So there's an expectation after

21  that initial investigation that more work would be

22  done?

23          A           If needed, yes.

24          Q           Now, in the course of your

25  training, have you run into something called

1  confirmation bias?

2          A          Yes.

3          Q          What -- what is that?

4          A          I -- I know the term.  I couldn't

5  give you a definition.

6          Q          All right.  So let me offer a

7  definition and see if this fits with what your

8  understanding is.

9          A          Okay.

10         Q          Confirmation bias is the tendency

11 for people to receive information and process it in a

12 way that confirms their current preconceptions,

13 attitudes and beliefs.

14         A          Okay.

15         Q          Is that consistent with what you

16 recall from your training?

17         A          Yes.

18         Q          Were you also trained that

19 confirmation bias sometimes leads people to avoid,

20 discount or forget information that challenges those

21 initial beliefs?

22                     MS. FRICK:  Objection.  Go ahead.

23         A          To be honest with you, I haven't

24 really thought of it that way.

25         Q          How have you thought about it?

1           A           Well, based on what you just said,

2    I haven't looked at -- at confirmation bias that --

3    that deeply to make that recollection (sic) or -- I

4    think I'm guessing or I'm asking, Are you trying --

5    are you making it sound like our officers are going in

6    with a preconceived notion of what happened and

7    they're making their decisions before they do the

8    investigation?  Is that what you're asking?

9           Q           No.  And that's a fair question.  I

10   appreciate that.

11          A           Okay.

12          Q           One -- one of the ways that we've

13   seen confirmation bias occur, for example -- let me

14   explain it this way:  When -- when I was a young

15   prosecutor, we had an expression that, you know, the

16   first person who went to the police never got charged

17   because the police officer would believe the first

18   story they hear and look for evidence that supported

19   that story only.

20                      Does that sound something familiar

21   with what you have been trained to either do or avoid

22   or has happened in your career?

23                      MS. FRICK:  Objection.  Go ahead.

24          A           I have not been trained that way,

25   no.

24

1          Q          Okay.  Are you aware if -- if you

2    or other officers of Ross Township have received any

3    training on how to avoid confirmation bias?

4          A          Not to my recollection, no.

5          Q          Have you also heard it described

6    sometimes as tunnel vision?

7          A          Yes.

8          Q          Okay.  What -- what is your

9    understanding of the term "tunnel vision" when it

10   comes to investigations?

11         A          The officers get locked in on one

12   particular thing instead of looking at the whole

13   picture.

14         Q          And so how have you been trained to

15   avoid tunnel vision?

16         A          I make sure that I gather all

17   information that I can before making my final

18   decision.  I'm gathering all the evidence possible.

19   I'm talking to everybody that I can and then making a

20   decision based on what I find.

21         Q          And in your role as a supervisor,

22   is it part of your job to make sure that the officers

23   under you do the same thing?

24         A          Yes.

25         Q          Okay.  In other words, so when you

25

1  review their actions, you attempt to make sure that

2  they haven't been impacted by this tunnel vision?

3          A          As a supervisor, it's my

4  responsibility to make sure that they're doing what

5  they have been trained to do, yes.

6          Q          Now, just so we're on the same page

7  on the standards here, is it your understanding that

8  the 4th Amendment prohibits a warrantless arrest where

9  there is not probable cause to believe that a criminal

10 offense has been committed?

11                     MS. FRICK:  Objection.  Go ahead if

12         you can.

13         A          I believe so, yes.

14         Q          All right.  Since you're my first

15 witness, you get to help me out with a couple of

16 things here in this case.

17                     (Exhibit 4 marked for

18                     identification.)

19 BY MR. ENGEL:

20         Q          So I'm going to show you what was

21 marked as Exhibit 4 which is the CAD report from

22 July 7th.  Are you familiar with this type of

23 document?

24         A          Yes, I am.

25         Q          Okay.  And is this the type of

26

1  document that is kept in the regular course of

2  business by your police department?

3        A        When you say "kept," I'm not sure

4  exactly what you mean.  This is our -- this is our CAD

5  report, so this is actually what is seen by the

6  officers when they're on scene.

7                  So when they have got a call up on

8  their screen, this is what their screen looks like.

9  So that's -- it's recorded electronically, but we do

10 not keep physical records of it, if that's what you're

11 asking.

12       Q        But somewhere there's an electronic

13 copy that's maintained by your department, right?

14       A        Yes, yes.

15       Q        Okay.  And this --

16       A        Well, if not -- if not our

17 department, it's going to be through dispatch through

18 the CAD system because CAD comes actually through our

19 dispatch.  It's not something that my department

20 controls.

21       Q        Who handles the dispatch for your

22 department?

23       A        Butler County Sheriff's Office.

24       Q        So they would maintain these --

25 what does CAD stand for, by the way, if you know?

27

```
1          A          I don't know.  It's -- it's
2     computerized -- it's computerized something dispatch,
3     so --
4          Q          All right.  And so help me out with
5     some of the terms on what we're seeing on this sheet
6     here.  It gives the address of the -- of the incident;
7     is that right?
8          A          Yes.
9          Q          Okay.  And then there's a section
10    under "Comments."  What is all that information down
11    there?
12         A          That is the information that is
13    being typed in by the dispatchers, so if there's any
14    kind of radio traffic between our officers and
15    dispatch, that is what they're recording.  When I say
16    "they," I mean the dispatcher.
17         Q          Okay.  So if we look at the first
18    line, it says -- it has a date and a time 7/7/23,
19    1823.  That's 6:23 to non-officers?
20         A          Yes.
21         Q          Okay.  And it says, Caller's
22    ex-fiance Bridget Langen punched him and broke his TV.
23    No longer ONS.  What is -- how do you interpret that
24    phrase?
25         A          No longer on scene.
```

28

1        Q       Okay. And so it looks like there's

2 a call then that came in then from it looks like

3 probably Mr. Redden; is that right?

4        MS. FRICK: Objection. Go ahead.

5        A       I'm not sure where you're seeing a

6 call come in.

7        Q       Okay. It says, Caller's --

8        A       Oh, yes, yes. Caller's ex-fiance,

9 so I'm -- there's no name on it, but I'm assuming that

10 would be Mr. Redden, yes.

11        Q       Okay. And then the second line,

12 Female half is in lobby. 605 on PX with male.

13        How do you interpret that line?

14        A       So that tells me that the female

15 that was involved is in the PD lobby. 605 is on PX so

16 our officer that is responding is on the phone with

17 the male that called in.

18        Q       Okay. 605, is that, do you know,

19 Officer Baird?

20        A       That's Officer Baird, yes.

21        Q       Okay. Did you ever go to the scene

22 in this case?

23        A       I did not. I was not involved in

24 this case at all.

25        Q       Were you the supervisor for

29

1   Officer Baird?

2           A           Yes.

3           Q           Okay.  So were you -- were you

4   working on this day?

5           A           I do not recall.  If I were, I was

6   not at work during this.  I would have been working

7   first-shift hours so I would have already left for the

8   day.

9           Q           Okay.  As -- as Officer Baird's

10  supervisor, do you review his reports?

11          A           Not all reports, no.

12          Q           Okay.  Did you review the report in

13  this case?

14          A           I did not.

15                      MR. ENGEL:  Let me pull it up here.

16          We'll mark this as Exhibit 5.

17                              (Exhibit 5 marked for

18                              identification.)

19  BY MR. ENGEL:

20          Q           Have you seen this -- this report?

21          A           Yes.

22          Q           When's the first time you saw this

23  report?

24          A           I actually printed it off two days

25  ago so I would know and I could read through it to

30

1    make sure that I had a good understanding of what

2    happened.

3         Q         Okay.  Had you seen it beforehand?

4         A         Not that I recall, no.

5         Q         Okay.  Now, it indicates that

6    you're the supervisor in the case.  Why does it list

7    you as the supervisor if you had no involvement?

8         A         The way that our RMS system works,

9    when our officers make an Incident Report, I believe

10   it's on our third tab over -- when the officer's doing

11   the incident, the officer inputs his number directly.

12   Under that, it lists who the supervisor or the direct

13   supervisor is.  And then the third line down is

14   actually the supervisor that approves the report.

15              So whoever approves the report,

16   it's based on that log-in, and in this case it was

17   actually Chief Burton Roberts.  It was not me.

18        Q         Okay.  So did you do anything to

19   assure that Officer Baird had probable cause to arrest

20   Mr. Redden and charge him with domestic violence?

21        A         I was not involved in the case.

22        Q         So are you able to tell us, for

23   example, that the videos that's described on page 2 of

24   the report clearly show that Mr. Redden did not cause

25   or attempt to cause physical harm to the victim?

1                    MS. FRICK:  Objection.  Go ahead.

2        A          I have not seen the videos.

3        Q          What would you have expected Mr. --

4   I'm sorry, Officer Baird to do in regards to the

5   videos that he describes in this report?

6                    MS. FRICK:  Objection.  Go ahead.

7        A          I would expect him to review the

8   videos, speak to the suspect, speak to the victim,

9   speak to any witnesses that may or may not be there

10  and make a decision -- based on the ORC and based on

11  our policy, that he is making a determination who the

12  primary aggressor was in the situation.

13                   And -- and you're asking about the

14  videos.  I would ask him to -- or do the videos show

15  this?  Do the videos give you the information who the

16  primary aggressor is?  That would be one question that

17  I would ask.

18       Q          Would you expect him to accurately

19  describe the videos in his report?

20       A          Yes.

21       Q          Would you expect him in making the

22  decision to arrest Mr. Redden to consider both

23  information that was inculpatory and exculpatory?

24                   MS. FRICK:  Objection.

25       A          Can you be more specific in your

32

1  question?

2      Q       Yeah.  That's a terrible question.

3  I apologize.

4              Are you familiar with the term

5  "exculpatory evidence"?

6      A       Vaguely, yes.

7      Q       Okay.  What is your understanding

8  of the term?

9      A       Is it -- does it go against or for

10 my suspect or victim.  That's my understanding.  Is

11 the evidence that I'm gathering the information that I

12 need to make my decision.

13     Q       Okay.  So what are your obligations

14 when you come across evidence that is favorable to

15 your suspect?

16             MS. FRICK:  Objection.

17     A       If I come across evidence that's

18 favorable to my suspect, I have to make the decision

19 on is he -- is he truly my suspect or am I looking at

20 the wrong person?  Because if I'm -- I'm sorry.

21     Q       Go ahead.  No, finish your thought,

22 please.  I'm sorry.

23     A       What I was thinking is if I'm

24 gathering information and I have an initial decision

25 based on what the suspect says, what the victim says,

33

1  but then I go back and I watch video, and the video

2  says something totally against what was told to me,

3  then I have a decision to make at that point.

4  　　　　　Q　　　　Now, did you ever speak to

5  Mr. Redden about this case?

6  　　　　　A　　　　I have no recollection of any

7  conversations with Mr. Redden.

8  　　　　　Q　　　　Okay.  So specifically, do you

9  recall speaking to Mr. Redden about his desire to file

10  a complaint against Officer Baird?

11  　　　　　　　　　MS. FRICK:  Objection.  Go ahead.

12  　　　　　A　　　　No, I don't have a recollection

13  about that conversation.

14  　　　　　Q　　　　Do you have a recollection of

15  telling Mr. Redden that Officer Baird was wrong?

16  　　　　　A　　　　No.

17  　　　　　Q　　　　And when you say "no," are you

18  saying it didn't happen or you just don't have

19  recollection of it?

20  　　　　　A　　　　Probably a little bit of both.  I

21  would not -- I would not tell somebody involved in a

22  case that one of my officers is wrong.

23  　　　　　Q　　　　How -- if you thought one of your

24  officers was wrong, what would you do?

25  　　　　　A　　　　I would tell them that I would

34

```
1    investigate -- whether it's a complaint coming in or
2    if there's information that I have as a supervisor,
3    I'm going to speak to the appropriate people involved
4    and make sure that that information is accurate.
5              Q         Okay.  Do you remember telling
6    Mr. Redden that you were going to look into pressing
7    charges against Ms. Langen?
8              A         No, I have no recollection of that.
9              Q         And same question:  Do you -- do
10   you -- when you say you have no recollection, do you
11   mean it didn't occur or you just don't remember?
12             A         I have no recollection of -- of
13   that conversation, no.
14             Q         Okay.  But I got to be clear.  This
15   is a lawyer-like question.  I apologize, but --
16             A         Sure.
17             Q         -- I just got to be clear.  Are you
18   saying that you don't believe the conversation
19   occurred or are you just saying, I don't remember if
20   the conversation occurred or not?
21             A         I don't believe the conversation
22   occurred because I would not tell people that.  I
23   would do my investigation as a supervisor.
24             Q         Do you remember speaking to the
25   prosecutor about this case?
```

35

1        A        I do not.

2        Q        Do you remember telling the

3   prosecutor that you believed that the case shouldn't

4   move forward?

5        A        I do not.

6        Q        Do you promise -- do you remember

7   promising to call Mr. Redden back after you had done

8   further investigation?

9        A        I do not.

10       Q        Okay.  Do you know if you ever

11   called him back?

12       A        I do not.

13       Q        Have you ever read the -- the

14   Appeals Court decision in this case?

15       A        I have not read that, no.

16       Q        So as you're able to test -- sit

17   here today, can you testify that Officer Baird had

18   probable cause to arrest Mr. Redden and charge him

19   with domestic violence?

20              MS. FRICK:  Objection.  Go ahead.

21       A        Based on reading the incident

22   report, yes, but, again, I was not on scene so I am

23   not sure what other information Officer Baird

24   gathered.  I am not sure who he spoke with, so I

25   cannot speak for him, no.

36

1          Q          Okay.  And in -- in giving your

2     answer, I assume you're assuming that the Incident

3     Report accurately describes the evidence that he had?

4          A          Yes.

5          Q          Have you reviewed the videos in

6     this case?

7          A          I have not.

8          Q          So do you know if the videos in

9     this case show that Mr. Redden sought to keep

10    Ms. Langen from entering the house, and once inside,

11    to prevent her from breaking things or hitting him?

12               MS. FRICK:  Objection.

13         A          I have not reviewed the videos, so

14    I am not sure what they show.

15         Q          Okay.  If that is what they showed,

16    would that be consistent with what is described in the

17    Incident Report by Officer Baird?

18               MS. FRICK:  Objection.

19         A          I have read -- I have read the

20    Incident Report, and it -- it states from

21    Officer Baird that he looked at the videos, reviewed

22    the videos, I'm assuming on scene, because I think it

23    says it in there, and he documents what the video

24    shows.

25         Q          So would a supervisor also view

37

1   those videos?

2           A           If the supervisor is involved, yes.

3           Q           Well, there's a supervisor who

4   signed off on this report.  Who --

5           A           Chief Burton Roberts, yes.

6           Q           Would -- it's -- it's Chief

7   Roberts; is that right?

8           A           Chief Roberts at the time, yes.

9           Q           Okay.  Would Chief Roberts have

10  viewed the evidence -- or would Chief Roberts be

11  expected to view the evidence that Officer Baird had

12  recovered?

13          A           In approving the incident?  Yes.

14          Q           Just so we're clear, he would be

15  expected then to view the videos?

16          A           Yes.

17          Q           Did you have any other involvement

18  with Mr. Redden?

19          A           No.

20          Q           Have you ever -- have you spoken to

21  him since this incident happened at all?

22          A           Not that I recall, no.

23          Q           Did you testify in this case at

24  trial?

25          A           I did not.

38

```
 1          Q          Have you reviewed any of the
 2   transcripts of this case?
 3          A          I have not.
 4                     MR. ENGEL:  Okay.  Give me just one
 5          second.  This might be -- might be done here,
 6          so -- I am going to go off-line here for one
 7          second.  Let's go off the record.
 8                     (Deposition stood in recess at
 9                     12:57 p.m.)
10                     (Deposition reconvened at
11                     12:58 p.m.)
12                     MR. ENGEL:  Back on the record.
13   BY MR. ENGEL:
14          Q          Do you specifically remember having
15   a conversation with Mr. Redden in front of his mother
16   and sister at the police station?
17          A          I do not recall that, no.
18                     MR. ENGEL:  Okay.  I have nothing
19          further to ask.  I'll turn it over to counsel
20          if she wants to ask anything; otherwise, I
21          thank you very much for your time,
22          Lieutenant.
23                     THE WITNESS:  I appreciate it.
24          Thank you.
25                     MS. FRICK:  I have no questions.
```

39

1

2

3    _____

4                              BRYAN ROGERS

5        (DEPOSITION CONCLUDED AT 1:00 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

40

1                          C E R T I F I C A T E

2     STATE OF OHIO        :
                                      SS:
3     COUNTY OF BUTLER     :

4          I, Pamela L. Jackson, a duly qualified and

5     commissioned notary public in and for the State of

6     Ohio, do hereby certify that prior to the giving of

7     his deposition, the within named BRYAN ROGERS, was by

8     me first duly sworn to testify to the truth, the whole

9     truth, and nothing but the truth; that the foregoing

10    pages constitute a true and correct transcript of

11    testimony given at said time and place by said

12    deponent; that said deposition was taken by me in

13    stenotypy and transcribed under my supervision; that I

14    am neither a relative of nor attorney for any of the

15    parties to this litigation, nor relative of nor

16    employee of any of their counsel, have no interest

17    whatsoever in the result of this litigation, and am

18    not, nor is the court reporting firm for which I am

19    affiliated, under a contract as defined in Civil Rule

20    28(D).

21              IN WITNESS WHEREOF, I hereunto set my

22    hand and official seal of office at Hamilton, Ohio,

23    this 27th day of May, 2025.

24                          _____

25                          Commission Expires 11/17/28

DECLARATION

I, Brenda Whitney, declare under penalty of perjury, that the following is true and correct. On April 14, 2025, Pamela Jackson, passed away prior to being able to transcribe the attached transcript for the deposition of Bryan Rogers. Based upon stenographic record I received in order to transcribe this deposition, prior to the giving of his deposition, the within named BRYAN ROGERS, was by Pamela Jackson first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by Pamela Jackson in stenotypy and transcribed by me; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, have no interest whatsoever in the result of this litigation, and am not, nor is the court reporting firm for which I am affiliated, under a contract as defined in Civil Rule 28(D).

Executed on this 17th day of September, 2025.

_Brenda Whitney_
Brenda Whitney

Michael Redden v.
Tim Baird, et al.

Bryan Rogers
March 27, 2025

## A

**able (3)**
8:23;30:22;35:16
**Absolutely (1)**
21:19
**Academy (2)**
6:5;8:18
**accordance (1)**
13:1
**accurate (1)**
34:4
**accurately (2)**
31:18;36:3
**accused (2)**
16:12,21
**across (2)**
32:14,17
**actions (2)**
20:11;25:1
**actually (5)**
26:5,18;29:24;
30:14,17
**added (1)**
12:8
**address (1)**
27:6
**advanced (6)**
9:6,7,9,21;10:1,10
**afternoon (1)**
5:7
**again (2)**
20:6;35:22
**against (4)**
32:9;33:2,10;34:7
**age (1)**
5:2
**aggressor (2)**
31:12,16
**ago (2)**
9:3;29:25
**ahead (14)**
13:3;14:8;18:17;
19:13,19;22:22;
23:23;25:11;28:4;
31:1,6;32:21;33:11;
35:20
**altercation (1)**
14:3
**always (1)**
7:16
**Amendment (1)**
25:8
**among (1)**
17:11
**and/or (1)**
16:9
**apologize (2)**
32:3;34:15
**Appeals (1)**
35:14
**appears (1)**

9:1
**appreciate (2)**
23:10;38:23
**appropriate (2)**
20:11;34:3
**approves (2)**
30:14,15
**approving (1)**
37:13
**Arrest (18)**
12:24;13:1,7,8,11,
21;14:1,14,20;15:1,
16,20;16:8,10;25:8;
30:19;31:22;35:18
**arrive (1)**
21:8
**art (1)**
8:1
**assume (2)**
7:22;36:2
**assuming (3)**
28:9;36:2,22
**assure (1)**
30:19
**athletic (1)**
5:19
**attempt (2)**
25:1;30:25
**attitudes (1)**
22:13
**audio (3)**
18:4,24;19:2
**avoid (4)**
22:19;23:21;24:3,
15
**aware (1)**
24:1

## B

**back (7)**
9:14,21;12:13;33:1;
35:7,11;38:12
**Baird (12)**
28:19,20;29:1;
30:19;31:4;33:10,15;
35:17,23;36:17,21;
37:11
**Baird's (1)**
29:9
**based (11)**
13:7;14:14;15:10;
21:12;23:1;24:20;
30:16;31:10,10;
32:25;35:21
**Basically (1)**
6:18
**beforehand (1)**
30:3
**beliefs (2)**
22:13,21
**best (1)**
7:15

**bias (6)**
22:1,10,19;23:2,13;
24:3
**bigger (1)**
9:24
**bit (5)**
6:17;9:24,24;13:13;
33:20
**body (1)**
19:4
**body-worn (1)**
18:7
**both (3)**
18:15;31:22;33:20
**break (3)**
7:6,8,12
**breaking (1)**
36:11
**Bridget (1)**
27:22
**brings (1)**
21:1
**broke (1)**
27:22
**broken (1)**
9:6
**BRYAN (2)**
5:1,9
**B-R-Y-A-N (1)**
5:10
**Burton (2)**
30:17;37:5
**business (1)**
26:2
**Butler (2)**
5:14;26:23

## C

**CAD (5)**
25:21;26:4,18,18,
25
**call (4)**
26:7;28:2,6;35:7
**called (7)**
9:16;16:7;21:5,13,
25;28:17;35:11
**Caller's (3)**
27:21;28:7,8
**calls (5)**
17:10,13,14,16,17
**came (1)**
28:2
**cameras (3)**
18:7;20:2,3
**cams (1)**
19:4
**Can (21)**
9:23;11:17;13:4;
14:14,19;15:5,7;16:7,
14,15,17,17;17:14,22;
19:22;20:8;24:17,19;
25:12;31:25;35:17

**career (2)**
5:22;23:22
**carry (1)**
19:10
**cars (1)**
20:2
**case (17)**
6:16;25:16;28:22,
24;29:13;30:6,16,21;
33:5,22;34:25;35:3,
14;36:6,9;37:23;38:2
**cases (2)**
10:23;17:6
**cause (16)**
13:7,8;14:5,19,24;
15:2,9,16,24;20:6,12;
25:9;30:19,24,25;
35:18
**cellphones (3)**
19:15,17,21
**certain (1)**
12:8
**certified (1)**
5:3
**challenges (1)**
22:20
**change (1)**
12:7
**changed (1)**
12:9
**charge (2)**
30:20;35:18
**charged (1)**
23:16
**charges (1)**
34:7
**chief (7)**
12:8;30:17;37:5,6,
8,9,10
**chose (1)**
10:4
**civil (1)**
6:16
**clarify (1)**
7:19
**class (2)**
10:7,24
**clear (4)**
7:16;34:14,17;
37:14
**clearer (1)**
15:19
**clearly (1)**
30:24
**close (1)**
15:14
**collect (1)**
21:12
**coming (2)**
12:8;34:1
**Comments (1)**
27:10
**committed (3)**

13:16;15:25;25:10
**common (2)**
8:5;18:9
**complaint (2)**
33:10;34:1
**computerized (2)**
27:2,2
**concerned (1)**
12:13
**concise (1)**
7:16
**confirmation (6)**
22:1,10,19;23:2,13;
24:3
**confirms (1)**
22:12
**consider (1)**
31:22
**considered (1)**
17:11
**consistent (2)**
22:15;36:16
**controls (1)**
26:20
**conversation (6)**
33:13;34:13,18,20,
21;38:15
**conversations (1)**
33:7
**copy (6)**
8:17;11:9,17,19,19;
26:13
**coughed (1)**
8:10
**counsel (2)**
7:8;38:19
**County (2)**
5:14;26:23
**couple (2)**
12:22;17:9;25:15
**course (3)**
10:19;21:24;26:1
**court (5)**
6:13,20,23,25;
35:14
**courtroom (1)**
6:17
**CPT (3)**
9:20;10:6,9
**CPTs (3)**
9:11;10:3,25
**crime (1)**
15:25
**criminal (1)**
25:9
**CROSS-EXAMINATION (1)**
5:5
**cruisers (1)**
20:4
**current (3)**
5:25;12:4;22:12

Michael Redden v.
Tim Baird, et al.

Bryan Rogers
March 27, 2025

**D**

**dangerous (1)**
17:14
**date (1)**
27:18
**day (4)**
10:22;12:14;29:4,8
**days (1)**
29:24
**Dayton (1)**
6:3
**December (1)**
10:16
**decision (13)**
13:6,10,21;14:1;
24:18,20;31:10,22;
32:12,18,24;33:3;
35:14
**decisions (1)**
23:7
**deeply (1)**
23:3
**define (1)**
8:3
**definition (5)**
9:9;14:10,11;22:5,7
**Department (13)**
5:13;11:4;12:1,5;
19:4,9,11;20:21;26:2,
13,17,19,22
**deposed (1)**
5:4
**deposition (3)**
6:10;38:8,10
**describe (1)**
31:19
**described (5)**
16:20;20:7;24:5;
30:23;36:16
**describes (2)**
31:5;36:3
**description (1)**
17:4
**desire (1)**
33:9
**determination (1)**
31:11
**determine (1)**
15:24
**different (4)**
6:17;14:5,7;15:20
**direct (1)**
30:12
**directly (1)**
30:11
**discount (1)**
22:20
**dispatch (5)**
26:17,19,21;27:2,
15
**dispatcher (1)**

27:16
**dispatchers (1)**
27:13
**document (7)**
8:24;11:7,25;17:19,
24;25:23;26:1
**documented (2)**
17:15;18:20
**documenting (1)**
18:2
**documents (1)**
36:23
**Domestic (10)**
10:17,22;12:1;
13:17,24;17:5,10,13;
30:20;35:19
**done (3)**
21:22;35:7;38:5
**down (6)**
5:22;6:24;9:6;
13:13;27:10;30:13
**drill (1)**
13:12
**Driving (1)**
10:7
**duly (1)**
5:2
**during (2)**
21:1;29:6

**E**

**easier (1)**
11:8
**effect (3)**
12:5,18;21:1
**either (4)**
13:22;18:18;19:2;
23:21
**electronic (1)**
26:12
**electronically (1)**
26:9
**employed (1)**
5:12
**employer (1)**
6:1
**endeavor (1)**
7:17
**enforcement (2)**
6:2;20:11
**ENGEL (13)**
5:6;8:22;11:12,15,
23;20:18;25:19;
29:15,19;38:4,12,13,
18
**enough (4)**
7:13,14;13:10;
14:14
**entering (1)**
36:10
**entitled (2)**
11:7,25

**established (2)**
15:3,10
**even (1)**
6:24
**everybody (1)**
24:19
**everyone (2)**
6:18;7:5
**evidence (19)**
14:2,25;16:3,4,9,11,
20,25;19:22;21:12;
23:18;24:18;32:5,11,
14,17;36:3;37:10,11
**exact (1)**
12:14
**exactly (1)**
26:4
**examined (1)**
5:3
**example (2)**
23:13;30:23
**except (1)**
6:15
**exculpatory (2)**
31:23;32:5
**ex-fiance (2)**
27:22;28:8
**Exhibit (11)**
8:17,20;11:7,21,25;
20:16,20;25:17,21;
29:16,17
**expect (3)**
31:7,18,21
**expectation (1)**
21:20
**expected (3)**
31:3;37:11,15
**experience (1)**
15:4
**explain (1)**
23:14
**expression (1)**
23:15
**extreme (1)**
17:10

**F**

**Fair (4)**
7:13,14;21:17;23:9
**familiar (7)**
11:2;12:2;17:6;
20:22;23:20;25:22;
32:4
**far (2)**
9:11;10:3
**favorable (5)**
16:12,21,22;32:14,
18
**feels (1)**
14:13
**Female (2)**
28:12,14

**few (1)**
6:19
**file (1)**
33:9
**final (1)**
24:17
**find (1)**
24:20
**finish (1)**
32:21
**firearm (1)**
10:7
**firearms (1)**
10:5
**first (13)**
5:2;6:19;7:12;9:6,
10;12:22;21:15,18;
23:16,17;25:14;
27:17;29:22
**first-shift (1)**
29:7
**fits (1)**
22:7
**follows (1)**
5:4
**forget (1)**
22:20
**forward (1)**
35:4
**FRICK (26)**
9:23;11:8,14,18;
13:3;14:8;15:5,13;
16:13,15;18:17;
19:13,19;22:22;
23:23;25:11;28:4;
31:1,6,24;32:16;
33:11;35:20;36:12,
18;38:25
**front (3)**
11:19;14:11;38:15
**further (2)**
35:8;38:19

**G**

**gather (6)**
13:9;16:1,4,6;
21:11;24:16
**gathered (1)**
35:24
**gathering (4)**
21:8;24:18;32:11,
24
**gesture (1)**
6:23
**given (3)**
18:20;19:8,11
**gives (1)**
27:6
**giving (1)**
36:1
**Good (3)**
5:7;7:2;30:1

**graduate (1)**
6:7
**grounds (5)**
13:15,19,25;14:4,
12
**guess (1)**
18:9
**guessing (1)**
23:4

**H**

**half (1)**
28:12
**handles (1)**
26:21
**hands (1)**
13:23
**happen (2)**
19:25;33:18
**happened (7)**
12:13,15;19:24;
23:6,22;30:2;37:21
**happening (2)**
21:15,16
**happens (1)**
19:21
**harm (1)**
30:25
**head (1)**
6:22
**Health (1)**
5:24
**hear (2)**
8:11;23:18
**heard (1)**
24:5
**heightened (1)**
17:17
**help (2)**
25:15;27:4
**helps (2)**
11:16;18:6
**herein (1)**
5:2
**hereinafter (1)**
5:3
**highest (1)**
17:11
**hitting (1)**
36:11
**honest (1)**
22:23
**Hospital (1)**
6:4
**hostage (1)**
7:5
**hours (2)**
9:20;29:7
**house (1)**
36:10
**human (1)**
6:22

**Michael Redden v.**
**Tim Baird, et al.**

**Bryan Rogers**
**March 27, 2025**

hurt (1)
  17:16

## I

identification (5)
  8:21;11:22;20:17;
  25:18;29:18
impacted (1)
  25:2
importance (1)
  17:11
important (2)
  17:25;18:25
incident (15)
  12:13,15;17:24;
  18:3,21;21:1;27:6;
  30:9,11;35:21;36:2,
  17,20;37:13,21
incidents (1)
  18:12
include (2)
  16:11,20
includes (1)
  7:7
inculpatory (1)
  31:23
indicated (2)
  10:12;19:4
indicates (3)
  17:9,19;30:5
information (20)
  13:9,10;14:14;16:2,
  6,9;21:9,11;22:11,20;
  24:17;27:10,12;
  31:15,23;32:11,24;
  34:2,4;35:23
Initial (9)
  21:5,6,7,9,14,17,21;
  22:21;32:24
inputs (1)
  30:11
inside (1)
  36:10
instead (1)
  24:12
instructor (1)
  10:6
interactions (1)
  6:22
interpret (2)
  27:23;28:13
into (4)
  9:6;17:16;21:25;
  34:6
investigate (1)
  34:1
investigation (11)
  16:2;20:21;21:5,6,
  7,15,18,21;23:8;
  34:23;35:8
investigations (2)
  17:5;24:10

involved (6)
  28:15,23;30:21;
  33:21;34:3;37:2
involvement (1)
  30:7;37:17

## J

job (2)
  5:25;24:22
Josh (1)
  9:24
judgment (1)
  10:7
July (6)
  12:15,19;18:10;
  19:3;21:1;25:22
jury (1)
  7:1

## K

keep (2)
  26:10;36:9
kept (2)
  26:1,3
Kettering (1)
  5:24
kind (3)
  13:22;14:2;27:14

## L

Langen (3)
  27:22;34:7;36:10
language (2)
  8:4;20:6
law (1)
  6:1
lawful (1)
  5:2
lawyer-like (1)
  34:15
lead (2)
  13:20;14:13
leads (1)
  22:19
left (1)
  29:7
Legal (3)
  10:17;12:23;13:1
legally (1)
  18:23
Lieutenant (3)
  5:9,11;38:22
line (5)
  8:2;27:18;28:11,13;
  30:13
lining (1)
  16:8
list (1)
  30:6
lists (1)

30:12
little (7)
  6:16;9:24,24;13:13,
  14;17:9;33:20
LMS (2)
  9:16;10:11
lobby (2)
  28:12,15
locked (1)
  24:11
log-in (1)
  30:16
long (2)
  5:15,15
longer (2)
  27:23,25
look (7)
  9:18;10:2;11:9;
  18:22;23:18;27:17;
  34:6
looked (2)
  23:2;36:21
looking (5)
  9:15;12:10;17:2;
  24:12;32:19
looks (6)
  9:5;10:16;12:10;
  26:8;28:1,2
loop (1)
  15:14
losing (1)
  19:22
lot (3)
  11:10,13;18:12
loud (2)
  6:20;7:2

## M

maintain (1)
  26:24
maintained (1)
  26:13
makes (1)
  13:6
making (7)
  18:4;23:5,7;24:17,
  19;31:11,21
male (2)
  28:12,17
many (2)
  6:13,14
mark (4)
  8:16;11:7;12:14;
  29:16
marked (6)
  8:20;11:21;20:16;
  25:17,21;29:17
marking (1)
  20:20
matters (1)
  6:21
may (3)

12:7;31:9,9
maybe (1)
  9:3
mean (4)
  10:10;26:4;27:16;
  34:11
meaning (1)
  8:5
meant (1)
  7:23
medication (1)
  8:13
might (6)
  6:25;11:18;12:8,9;
  38:5,5
mine (1)
  12:6
minute (1)
  12:15
more (6)
  13:13;15:8;16:18;
  20:8;21:21;31:25
most (4)
  5:22;17:14;19:14;
  21:14
mostly (1)
  10:13
mother (1)
  38:15
move (1)
  35:4
moved (1)
  5:23
much (2)
  16:6;38:21

## N

name (2)
  5:8;28:9
need (7)
  7:6,7,13;21:9,10,
  12;32:12
needed (1)
  21:23
needs (5)
  14:18;16:1,2,3,4
Network (1)
  5:24
next (1)
  11:6
nod (1)
  6:22
non-officers (1)
  27:19
normal (1)
  6:21
notion (1)
  23:6
number (3)
  12:9,11;30:11

## O

Objection (20)
  13:3;14:8;15:5,13;
  16:13;18:17;19:13,
  19;22:22;23:23;
  25:11;28:4;31:1,6,24;
  32:16;33:11;35:20;
  36:12,18
obligations (1)
  32:13
observations (1)
  18:25
obtain (3)
  17:19;18:10,15
occur (3)
  17:5;23:13;34:11
occurred (5)
  13:20;20:13;34:19,
  20,22
off (3)
  29:24;37:4;38:7
offense (1)
  13:16;20:12;25:10
offer (1)
  22:6
Office (1)
  26:23
officer (27)
  6:2;8:18;13:6,8,15,
  21;14:13,18;15:15,
  23;17:14;23:17;
  28:16,19,20;29:1,9;
  30:11,19;31:4;33:10,
  15;35:17,23;36:17,
  21;37:11
officers (18)
  17:16,19;18:14;
  19:6,10,14,17,20;
  20:11;23:5;24:2,11,
  22;26:6;27:14;30:9;
  33:22,24
officer's (1)
  30:10
off-line (1)
  38:6
Ohio (1)
  8:18
once (1)
  36:10
one (15)
  6:3;15:7;16:18;
  17:1,13;18:19;20:8;
  23:12,12;24:11;
  31:16;33:22,23;38:4,
  6
online (2)
  9:19;10:12
only (3)
  6:1;7:10;23:19
ONS (1)
  27:23

Michael Redden v.
Tim Baird, et al.

Bryan Rogers
March 27, 2025

**OPOTA (1)**
9:6
**OPOTA's (1)**
9:8
**ORC (1)**
31:10
**order (2)**
15:24;16:9
**otherwise (2)**
8:4;38:20
**out (4)**
6:20;7:2;25:15;
27:4
**over (2)**
30:10;38:19
**own (1)**
10:4

**P**

**page (3)**
9:16;25:6;30:23
**part (2)**
14:17;24:22
**particular (4)**
7:25;10:15;12:12;
24:12
**PD (1)**
28:15
**Peace (1)**
8:18
**pending (1)**
7:11
**people (6)**
17:20;18:11;22:11,
19;34:3,22
**permitted (1)**
18:23
**person (4)**
13:16;16:22;23:16;
32:20
**personal (4)**
19:15,17,21,23
**phone (1)**
28:16
**phrase (1)**
27:24
**physical (3)**
14:3;26:10;30:25
**picture (1)**
24:13
**place (1)**
14:3
**plain (1)**
8:5
**please (6)**
5:7;7:18;15:8;
16:18;20:9;32:22
**pm (2)**
38:9,11
**point (4)**
6:22,25;7:17;33:3
**points (1)**

**17:1**
**Police (7)**
5:13;12:1;20:21;
23:16,17;26:2;38:16
**policies (1)**
11:3
**Policy (17)**
11:25;12:2,5,6,7,9,
11,17,18,22;13:2;
17:3;20:20,22,23,25;
31:11
**possible (1)**
24:18
**practicable (1)**
18:23
**preconceived (1)**
23:6
**preconceptions (1)**
22:12
**pressing (1)**
34:6
**prevent (1)**
36:11
**primary (2)**
31:12,16
**print (2)**
11:9,16
**printed (1)**
29:24
**priorities (1)**
17:12
**probable (13)**
13:7;14:5,19,24;
15:2,9,15,24;20:6,12;
25:9;30:19;35:18
**probably (3)**
9:2;28:3;33:20
**procedures (1)**
11:3
**process (2)**
21:18;22:11
**prohibits (1)**
25:8
**promise (1)**
35:6
**promising (1)**
35:7
**property (1)**
19:23
**Prosecution (1)**
20:22
**prosecutor (3)**
23:15;34:25;35:3
**pull (1)**
29:15
**punched (1)**
27:22
**put (1)**
13:23
**PX (2)**
28:12,15

**Q**

**quick (2)**
9:14;11:9
**quote (2)**
13:15;17:10

**R**

**radio (1)**
27:14
**read (5)**
29:25;35:13,15;
36:19,19
**reading (1)**
35:21
**real (2)**
9:14;11:9
**really (1)**
22:24
**reason (3)**
7:6;8:8,12
**reasonable (6)**
13:7,15,19,25;14:4,
12
**recall (6)**
22:16;29:5;30:4;
33:9;37:22;38:17
**receive (1)**
22:11
**received (1)**
24:2
**recent (1)**
9:2
**recess (1)**
38:8
**recollection (10)**
10:25;23:3;24:4;
33:6,12,14,19;34:8,
10,12
**reconvened (1)**
38:10
**record (7)**
11:24;17:25;18:2;
19:11,18;38:7,12
**recorded (3)**
18:8;19:2;26:9
**recording (4)**
18:5,24;19:7;27:15
**records (7)**
8:18;9:2,7,16,19;
10:10;26:10
**recovered (1)**
37:12
**Redden (15)**
28:3,10;30:20,24;
31:22;33:5,7,9,15;
34:6;35:7,18;36:9;
37:18;38:15
**regards (1)**
31:4
**regular (1)**

**26:1**
**remember (8)**
10:19;34:5,11,19,
24;35:2,6;38:14
**remind (2)**
6:18;7:4
**repeat (3)**
15:7;16:17;20:8
**Report (19)**
17:24;18:3,21;
25:21;26:5;29:12,20,
23;30:9,14,15,24;
31:5,19;35:22;36:3,
17,20;37:4
**reporter (1)**
6:23
**reports (2)**
29:10,11
**required (6)**
9:10,12,19;10:3,6,
25
**responding (1)**
28:16
**response (1)**
17:12
**responsibility (1)**
25:4
**reverse (1)**
7:21
**review (5)**
16:20;25:1;29:10,
12;31:7
**reviewed (4)**
36:5,13,21;38:1
**right (11)**
6:13;8:8;15:21;
19:24;22:6;25:14;
26:13;27:4,7;28:3;
37:7
**RMS (1)**
30:8
**Roberts (6)**
30:17;37:5,7,8,9,10
**ROGERS (2)**
5:1,9
**R-O-G-E-R-S (1)**
5:10
**role (1)**
24:21
**Ross (5)**
5:13,25;11:25;
20:21;24:2
**rules (1)**
6:16
**run (2)**
17:8;21:25

**S**

**safety (1)**
17:17
**same (7)**
8:4;12:10;20:6,13;

**24:23;25:6;34:9**
**saw (1)**
29:22
**saying (3)**
33:18;34:18,19
**scene (10)**
13:9;14:16;16:3;
21:8,16;26:6;27:25;
28:21;35:22;36:22
**screen (3)**
8:19;26:8,8
**second (4)**
7:4;28:11;38:5,7
**section (4)**
10:16;12:23;17:4,6,
18;18:22;20:5,10;
21:4;27:9
**seeing (4)**
9:15;14:15;27:5;
28:5
**sense (1)**
17:17
**shared (1)**
8:24
**sheet (1)**
27:5
**Sheriff's (1)**
26:23
**show (8)**
8:19;11:6;20:19;
25:20;30:24;31:14;
36:9,14
**showed (1)**
36:15
**showing (1)**
12:17
**shows (1)**
36:24
**sic (1)**
23:3
**signed (1)**
37:4
**significance (1)**
8:2
**significant (1)**
18:24
**similar (1)**
6:15
**simulators (2)**
10:7,8
**Sinclair (1)**
6:6
**sister (1)**
38:16
**sit (1)**
35:16
**situation (1)**
31:12
**somebody (3)**
13:22,23;33:21
**sometimes (3)**
6:24;22:19;24:6
**somewhere (1)**

Michael Redden v.
Tim Baird, et al.

Bryan Rogers
March 27, 2025

26:12
**sorry (5)**
    8:10;16:15;31:4;
    32:20,22
**sought (1)**
    36:9
**sound (2)**
    23:5,20
**speak (9)**
    16:4;21:10,10;31:8,
    8,9;33:4;34:3;35:25
**speaking (3)**
    8:4;33:9;34:24
**special (1)**
    8:2
**specific (3)**
    8:1;10:2;31:25
**Specifically (6)**
    10:5,24;13:23,24;
    33:8;38:14
**spell (1)**
    5:8
**spent (2)**
    5:22;6:3
**spoke (1)**
    35:24
**spoken (1)**
    37:20
**stage (1)**
    6:19
**stand (1)**
    26:25
**standard (5)**
    15:2,10,21;20:7,13
**Standards (3)**
    12:23;13:1;25:7
**start (1)**
    8:17
**state (1)**
    5:8
**statement (4)**
    17:22,23;18:18,19
**statements (11)**
    17:20;18:1,11,13,
    15,20,24;19:7,12,18;
    21:11
**states (1)**
    36:20
**station (1)**
    38:16
**step (1)**
    21:18
**stood (1)**
    38:8
**story (2)**
    23:18,19
**stuff (1)**
    10:9
**succeed (1)**
    7:17
**supervisor (14)**
    24:21;25:3;28:25;
    29:10;30:6,7,12,13,

14;34:2,23;36:25;
    37:2,3
**supported (1)**
    23:18
**sure (19)**
    6:12;8:3;9:8;14:9;
    15:9;16:7,19;24:16,
    22;25:1,4;26:3;28:5;
    30:1;34:4,16;35:23,
    24;36:14
**suspect (10)**
    16:23;17:23;18:16;
    21:11;31:8;32:10,15,
    18,19,25
**suspects (1)**
    16:5
**sworn (1)**
    5:3
**system (2)**
    26:18;30:8

**T**

**tab (1)**
    30:10
**talk (2)**
    7:8;18:10
**talked (1)**
    20:13
**talking (3)**
    9:13;13:23;24:19
**telling (3)**
    33:15;34:5;35:2
**tells (1)**
    28:14
**tendency (1)**
    22:10
**Tennessee (1)**
    5:23
**term (9)**
    13:19;14:4,5,24;
    15:9;22:4;24:9;32:4,8
**terms (3)**
    8:1,3;27:5
**terrible (1)**
    32:2
**test (1)**
    35:16
**testify (6)**
    6:13,25;8:9,12;
    35:17;37:23
**thinking (1)**
    32:23
**third (2)**
    30:10,13
**though (2)**
    6:13,24
**thought (5)**
    9:10;22:24,25;
    32:21;33:23
**threat (1)**
    13:22
**threats (1)**

14:2
**Throughout (1)**
    17:15
**times (2)**
    6:13,14
**titled (1)**
    20:20
**today (3)**
    8:9,13;35:17
**told (2)**
    14:15;33:2
**took (1)**
    14:3
**top (1)**
    10:9
**totally (1)**
    33:2
**Township (4)**
    5:13;12:1;20:21;
    24:2
**traffic (1)**
    27:14
**trained (5)**
    22:18;23:21,24;
    24:14;25:5
**trainer (1)**
    5:19
**Training (20)**
    8:18;9:2,6,7,9,10,
    16,19;10:2,4,8,10,11,
    12,22;14:17;15:11;
    21:25;22:16;24:3
**trainings (1)**
    10:2
**transcript (2)**
    6:21;7:1
**transcripts (1)**
    38:2
**trial (1)**
    37:24
**truly (1)**
    32:19
**try (2)**
    18:14;19:20
**trying (1)**
    23:4
**tunnel (4)**
    24:6,9,15;25:2
**turn (1)**
    38:19
**TV (1)**
    27:22
**two (1)**
    29:24
**type (2)**
    25:22,25
**typed (1)**
    27:13
**Typically (1)**
    21:7

**U**

**uncommon (1)**
    19:16
**under (3)**
    24:23;27:10;30:12
**understood (1)**
    7:23
**up (3)**
    16:8;26:7;29:15
**Updates (1)**
    10:17
**use (4)**
    6:17;8:13;19:17,21
**usually (1)**
    17:20

**V**

**Vaguely (1)**
    32:6
**various (1)**
    17:20
**verbal (2)**
    17:22;18:19
**victim (7)**
    17:23;18:16;21:10;
    30:25;31:8;32:10,25
**victims (1)**
    16:4
**video (5)**
    18:23;19:2;33:1,1;
    36:23
**videos (15)**
    30:23;31:2,5,8,14,
    14,15,19;36:5,8,13,
    21,22;37:1,15
**view (3)**
    36:25;37:11,15
**viewed (1)**
    37:10
**Violence (10)**
    10:17,22;12:1;
    13:17,24;17:5,10,13;
    30:20;35:19
**vision (4)**
    24:6,9,15;25:2
**visual (2)**
    18:5;21:12

**W**

**wants (1)**
    38:20
**warrant (1)**
    15:20
**warrantless (3)**
    14:20;15:19;25:8
**watch (1)**
    33:1
**way (9)**
    8:17;17:1;19:7;
    22:12,24;23:14,24;
    26:25;30:8
**ways (1)**

23:12
**wear (1)**
    19:4
**what's (1)**
    21:15
**When's (1)**
    29:22
**whole (2)**
    15:20;24:12
**Witness (3)**
    5:2;25:15;38:23
**witnesses (4)**
    16:5;17:23;21:9;
    31:9
**wording (1)**
    12:10
**words (4)**
    8:1,5;15:15;24:25
**work (3)**
    8:2;21:21;29:6
**working (2)**
    29:4,6
**works (1)**
    30:8
**written (5)**
    17:23;18:10,13,15,
    18
**wrong (4)**
    32:20;33:15,22,24

**Y**

**year (4)**
    6:3,7;9:3,11
**years (2)**
    5:20;17:15
**young (1)**
    23:14

**1**

**1 (2)**
    8:17,20
**12:57 (1)**
    38:9
**12:58 (1)**
    38:11
**1823 (1)**
    27:19

**2**

**2 (5)**
    9:16;11:7,21,25;
    30:23
**20 (1)**
    5:20
**2006 (1)**
    5:23
**2014 (1)**
    6:8
**2016 (1)**
    5:17

**2023 (7)**
  10:17;12:16,19,19;
  18:10;19:3;21:2
**25th (1)**
  10:16

### 3

**3 (2)**
  20:16,20
**308 (2)**
  11:25;12:6
**308.4 (1)**
  17:4
**308.9 (1)**
  12:23
**309 (1)**
  12:7

### 4

**4 (2)**
  25:17,21
**4th (1)**
  25:8

### 5

**5 (2)**
  29:16,17

### 6

**6:23 (1)**
  27:19
**600 (1)**
  20:21
**605 (3)**
  28:12,15,18

### 7

**7/7/23 (1)**
  27:18
**7th (1)**
  25:22