# In The Matter Of:

*Michael Redden v.*
*Tim Baird, et al.*

---

*Michael Redden*
*March 27, 2025*

---

*Jackson-Whitney Reporting*

1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF OHIO

 3               CASE NO. 1:24-CV-C0342

 4                      - - -

 5

 6

 7

 8   MICHAEL REDDEN,          -vs-   TIM BAIRD, ET AL.,

 9        Plaintiff,                 Defendants.

10                      - - -

11

12

13           Zoom Deposition of MICHAEL KENNETH REDDEN,

14   JR., the Plaintiff herein, taken by the Defendants as

15   upon Cross-Examination and pursuant to the Federal

16   Rules of Civil Procedure on Thursday, March 27, 2025,

17   at 9:30 a.m., before Pamela L. Jackson, a Notary

18   Public within and for the State of Ohio.

19                      - - -

20

21

22

23

24

25
```

2

```
 1                    I N D E X

 2   Witness:                              Page:

 3   MICHAEL KENNETH REDDEN, JR.
     Cross-Examination by:
 4         By Ms. Frick, Esq.                 5

 5

 6   Plaintiff's Exhibit:            Page Marked:

 7   A ..............................................100
     (Screenshot -- not attached to the deposition
 8   transcript)

 9   Defendants' Exhibit:            Page Marked:

10   1 ..............................................100
     (Ross Township Police Department Investigative
11   Report -- not attached to the deposition transcript)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    APPEARANCES:

2            For the Plaintiff (via Zoom):

3                        Joshua Adam Engel
                         Engel & Martin, LLC
4                        4660 Duke Drive
                         Suite 101
5                        Mason, Ohio 45040
                         Phone: 513-445-9600

6

7            For the Defendants (via Zoom):

8                        Dawn Frick
                         Steven Riggs
9                        Surdyk, Dowd & Turner Co., LPA
                         8163 Old Yankee Street
10                       Suite C
                         Dayton, Ohio 45458
11                       Phone: 937-222-2333

12                            - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1            S T I P U L A T I O N S

2            It is stipulated by and between counsel

3    for the respective parties that the deposition of

4    MICHAEL KENNETH REDDEN, JR., the Plaintiff herein,

5    called as upon Cross-Examination by the Defendants,

6    may be taken at this time and place pursuant to the

7    Federal Rules of Civil Procedure as to time and place

8    of taking said deposition; that the deposition was

9    recorded in stenotypy by the court reporter, Pamela L.

10   Jackson, and transcribed out of the presence of the

11   witness; and that said deposition is to be submitted

12   to the witness for examination and signature, and that

13   signature may be affixed out of the presence of the

14   Notary Public.

15                        - - -

16

17

18

19

20

21

22

23

24

25

5

```
 1              MICHAEL KENNETH REDDEN, JR.,
 2    of lawful age, the Plaintiff herein, being first duly
 3    sworn as hereinafter certified, was examined and
 4    deposed as follows:
 5                    CROSS-EXAMINATION
 6    BY MS. FRICK:
 7         Q         Good morning.  Will you please
 8    state your full name for the record.
 9         A         Michael Kenneth Redden, Jr.
10         Q         Okay.  Mr. Redden, my name is
11    Dawn Frick.  I represent the Defendants in this case,
12    Tim Red -- or, excuse me, Tim Baird.  I'm going to be
13    asking you some questions today.  Have you ever had
14    your deposition taken before?
15         A         No, ma'am.
16         Q         Okay.  I'm going to go over just a
17    couple ground rules that your attorney may have
18    already discussed with you, but I just want to go over
19    them a little bit briefly today.
20                   You know, we are doing this on Zoom
21    so it makes the court reporter's job even just a
22    little bit tougher particularly if we're speaking over
23    one another.  So if you do your very best to allow me
24    to finish my question, I will do my very best to allow
25    you to finish your answer before I start asking a new
```

6

1  one; is that fair?

2          A          Fair.

3          Q          Okay.  I don't expect that this is

4  going to take a super long time, but at any point in

5  time if you need a break -- you know, sometimes after

6  we've been going an hour or so, we can take a quick

7  break -- just let me know, okay?

8                     All I ask is that if we have a

9  question pending, we finish that up and then we'll

10  take whatever breaks are necessary, okay?

11         A          Okay.

12         Q          Also you're doing all right so far.

13  You want to make sure that all your responses are

14  verbal responses, yeses and noes, versus uh-huh,

15  unh-unh or shaking, just because when she transcribes

16  this, types it all up for us, it makes it much easier

17  for that to all be accurate -- you know, the record to

18  be accurate, okay?

19         A          Makes sense.

20         Q          So if I say, Is that a yes, I'm not

21  trying to be rude.  I just want to make sure that we

22  have it all clear.

23         A          Okay.

24         Q          Finally, if I ask you a question

25  that you don't understand, you want repeated or

7

1    rephrased or if for some reason, which happens on

2    occasion, the Internet gets kind of wonky and you

3    don't hear my question, please let me know; otherwise,

4    I will assume that you understood the question; is

5    that fair?

6              A        Fair.

7              Q        Okay.  Are you on any type of

8    medication or anything that hinders your ability to

9    remember things or to answer truthfully in any way?

10             A        No.

11             Q        Okay.  What's your date of birth?

12             A        9/19/77.  September 19th, 1977.

13                  MS. FRICK:  Okay.  And Joshua -- or

14             Josh -- are you okay if we go off the record

15             that I get his Social Security number?

16                  MR. ENGEL:  That's fine, yeah.  I

17             think it's probably in some of the documents

18             already, but yeah, that's fine.

19                  MS. FRICK:  Okay.  Can we go off

20             the record just briefly while I get that?

21                  THE REPORTER:  Yes.

22                  (Off the record.)

23                  MS. FRICK:  Okay.  We can go back

24             on the record.

25                  And just for purposes of the

8

1              record, he did provide that, his

2              Social Security number, to us off of the

3              record.

4    BY MS. FRICK:

5          Q          And, Mr. Redden, what's your

6    current address?

7          A          2043 Wagon Wheel Drive in Hamilton,

8    Ohio 45013.

9          Q          How long have you lived at that

10   address?

11         A          Since August of 2018, so almost --

12   it will be seven years this summer.

13         Q          Okay.  Who currently lives at that

14   address with you?

15         A          Myself and then my children come

16   and go.  All my children are here half the time.

17         Q          Okay.  And how many children are

18   there?

19         A          Three.  I have three.

20         Q          Okay.  And they're all daughters?

21         A          Yes.

22         Q          Okay.  And can I get their names

23   and ages, please?

24         A          You got Rylee Redden who is 17 --

25   or 18.  You got Kylee Redden who is 18, and you have

9

1  Maisley who is five.  Rylee pretty much doesn't --
2  she's -- she's on her own pretty much, but she doesn't
3  technically live here.
4          Q          Okay.  And Maisley, does she use
5  the last name Redden?
6          A          Yes, everybody has the last name
7  Redden.
8          Q          Okay.  And were there similar --
9  similar living arrangements with those three daughters
10 in July of '23 when the incident that we're here about
11 took place?
12         A          Yes, except for Maisley, we were --
13 we didn't have anything officially in court, but,
14 yeah.
15         Q          Okay.  And just so we have it for
16 the record, Maisley's mother is Bridget -- is it
17 Langen?
18         A          Correct.
19         Q          Okay.  And what about the mother of
20 Rylee and Kylee?  Mothers, whatever.
21         A          What are you asking?
22         Q          Who are their mothers or mother?
23         A          Her name is Lori Imhoff,
24 I-M-H-O-F-F.
25         Q          Okay.  Have you ever been married?

10

1          A          No.

2          Q          Okay.  Are you originally from the

3  Hamilton area?

4          A          No.

5          Q          Okay.  How long have you been in

6  the Hamilton or Ross Township area?

7          A          Since 2018 when I bought the home.

8          Q          Okay.  Where are you originally

9  from?

10         A          The west side of town, Price Hill

11  area.

12         Q          Did you graduate from high school?

13         A          Yes, Elder High School.

14         Q          And when was that?

15         A          1995.

16         Q          After graduating from Elder, did

17  you have any formal education through either a

18  university or any kind of training program?

19         A          I eventually became an elevator

20  constructor so I had to go through elevator classes.

21  I have that education.  NEIEP is what it's called.

22  N-E-I-E-P, NEIEP.  National Elevators Industries

23  Education Program.

24         Q          And is that -- at the end of that,

25  you get like a certification for that?

1          A          Yes.  I did not finish.  I left the
2    career.
3          Q          Okay.  Are you currently employed?
4          A          Self-employed.
5          Q          And what do you do?
6          A          Basically work with sports teams
7    apparel.
8          Q          I'm sorry, what kind of apparel?
9          A          Pretty much uniforms, team
10   uniforms.
11         Q          So like sales of that?
12         A          Yes.
13         Q          Okay.  Do you operate under a
14   company name?
15         A          My company was All Hustle.
16         Q          You said that like maybe that
17   doesn't -- it's no longer All Hustle or you no longer
18   have that company?
19         A          Because it's all in limbo.  I mean,
20   everything's -- I'm trying to hold it all together.
21   Yeah, I may have to change my career.
22         Q          Okay.  How long have you done that
23   through All Hustle?
24         A          2018.
25         Q          And through that employment or

1   through that work, are you paid like on a commission

2   basis?

3            A       No.

4            Q       Okay.  How do you get paid for

5   that?

6            A       Myself.

7            Q       Based on what you sell?

8            A       Yeah.  Okay, so commission, yes,

9   commission-based.

10           Q       Okay.  And let me without getting

11  too far into this -- as a result of the incident that

12  we're here for today that we're going to talk about,

13  are you claiming any lost income or lost wages?

14           A       No.

15           Q       Okay.  When did you first meet

16  Bridget Langen?

17           A       I'm not going to be accurate on

18  this.  It was a long time ago.

19           Q       Sure.

20           A       I would say around 2020 I would

21  say, but I can't really be for sure.

22           Q       And is it accurate or am I accurate

23  when I say at some point she was your fiance?

24           A       Correct.

25           Q       And at what point did Ms. Langen

13

1   move into the property, approximately, ballpark, at

2   Wagon Wheel Drive?

3           A           March of 2019, April of 2019.

4           Q           And then approximately when did she

5   leave or no longer use that property as her residence?

6           A           May 23rd of 2023 was official.

7           Q           And did you live together

8   consistently between that April 2019 and May 2023rd

9   (sic) dates?

10          A           Yes.

11          Q           Okay.  And how would you describe

12  the reasons for which she moved out and no longer

13  lived at that residence?

14          A           Can you say that again?

15          Q           Sure.  If someone asked you why she

16  moved out, how would you explain that?

17          A           Just raised differently.  We

18  couldn't coincide.  Difference in parenting, things

19  like that.  Drinking.  She drank a lot.

20          Q           Now, the date of this incident I

21  have as July 7th, 2023.  Does that sound accurate to

22  you?

23          A           Yes, July 7th of 2023.

24          Q           Okay.  Between July 7th -- or

25  between May 23rd and July 7th of 2023, as I understand

14

1    it, there was not any kind of formal custody agreement

2    in place related to Maisley; is that correct?

3         A       Correct.

4         Q       Okay.  And so what was sort of the

5    arrangement between you and Bridget with respect to

6    visiting time and parenting as to Maisley during that

7    time period?

8         A       My older children have a specific

9    schedule, so she agreed to let me have Maisley on the

10   same days that I had my older children.

11                Do you understand that?  Did I

12   explain that good?

13        Q       Yes.  Yes, I'm sorry, I was taking

14   some notes.

15                So was that a certain period of

16   time every week?

17        A       Yeah.  I can tell you the schedule

18   if you'd like to know that.

19        Q       Sure, go ahead.

20        A       It's Wednesday -- well, it's

21   switched now.  It's completely -- it's completely

22   different now.  But back then it was Wednesday through

23   Sunday one week and then Wednesday through Friday the

24   second week.

25                It's not like that anymore because

15

1    when I received custody, they made it exactly the

2    opposite.

3            Q        Okay.  And did you all begin those

4    arrangements pretty much right after she moved out of

5    the house?

6            A        Yes.

7            Q        Okay.  And so on each given

8    Wednesday, would she drop Maisley off or would you

9    pick Maisley up from somewhere?

10           A        There's so much that happened.

11                    MR. ENGEL:  So this is my usual

12           lawyer instruction of don't speculate.  If

13           you know, you know.

14           Q        Yeah, if you don't remember, that's

15   fine.

16           A        I don't -- I don't think Maisley

17   was even in daycare when this was going on because she

18   had none.  Bridget took her out of daycare.  So I

19   think I just -- I don't know honestly.  I can't -- I

20   can't know.

21           Q        Okay.

22           A        I know that Bridget would pick

23   Maisley up from my home on Wednesday, but I can't

24   imagine she brought her here.  I would have had to

25   pick her up somewhere.  There was a Protection Order

16

1   so I don't know how -- oh, no, that was me.  I

2   honestly can't answer this question.

3          Q          Okay.  So you mentioned a

4   Protective Order.  Was that in place prior to this

5   incident --

6          A          No.

7          Q          -- or after this incident?

8          A          Right, it was after the incident.

9   And then I couldn't have contact with her anymore.

10  There's just so many things that have happened.

11         Q          Currently who has custody of

12  Maisley?

13         A          I do.

14         Q          Okay.  And is there still a shared

15  parenting arrangement?

16         A          She has visitation, but I have --

17  I'm the custodial parent.

18         Q          Okay.  And when did you become the

19  custodial parent?

20         A          It's -- I'll say August 1st of

21  2024, but it was July or August.  I think the official

22  ruling came August 1st of 2024.  It took me 18 months

23  to get that.

24         Q          And what county was -- were those

25  custody proceedings in?  Was that Butler County?

17

```
1          A          Hamilton.

2          Q          Hamilton.

3          A          I have no idea why.

4          Q          Prior to this incident occurring on
5   July 7th of 2023, how would you describe the
6   relationship between yourself and Bridget Langen?

7          A          Stable, but always issues.

8          Q          When you and Ms. Langen lived
9   together at the Wagon Wheel address prior to her
10  moving out in May of 2023, had there ever been any
11  incidents in which -- or altercations in which the
12  police had been called?

13         A          Not to my knowledge.  Oh, yes,
14  there was one other one.  There was an incident where
15  she was -- she had some things in the garage, and she
16  had called.  It was actually the same officer,
17  Officer Baird.  He had came here.

18                    Over getting belongings out of her
19  house.  She wanted to do it on her terms, and I wanted
20  to do it on my terms basically.

21         Q          And this was before this July
22  incident?

23         A          Yes.

24         Q          Okay.

25         A          I couldn't tell you the month.
```

18

1  Probably a month or two before.

2          Q          And who called the police?  Was

3  that you or her?

4          A          I think she did because I wouldn't

5  let her get her clothes out of the garage.

6          Q          And what was the outcome of that?

7          A          Nothing.  She got her clothes and

8  that was it.

9          Q          Okay.  No charges or anything were

10  brought?

11          A          No, ma'am.

12          Q          And you said that was also with

13  Officer Baird?

14          A          Yes.  I wasn't here.  I had left --

15          Q          Okay.

16          A          -- to diffuse the situation.  So

17  when he was here -- when he got here, I wasn't even

18  here.

19          Q          So was there someone else then at

20  the home that allowed her to get her stuff out of the

21  garage at that point?

22          A          No.  I walked -- I just didn't

23  trust her.  I didn't want her in my house, and she's

24  violent.  I can't trust that person.  So I basically

25  locked the door to my garage so she couldn't get

19

```
 1    inside of the house while that was -- yeah, and then I

 2    left.  I figured if she stole anything, if she could

 3    steal it out of the garage --

 4                         (Court reporter asked for

 5          clarification.)

 6          A        I locked my house door because I

 7    felt like if she could -- if she was going to steal

 8    anything out of the garage, okay, but I'm not going to

 9    have anything stolen out of my house.  That's kind of

10    why I locked her out of the house from the garage.

11    You know how you got a lock on your garage door, you

12    can't get in the house?

13          Q        Yeah.

14          A        Yeah.

15          Q        From the inside.  I understand

16    that.

17          A        Right.

18          Q        Was there -- did you have any

19    specific reason to believe, based on interactions

20    prior to this, that she might steal something from

21    your home?

22          A        She's just -- she's unpredictable.

23    Yeah, she's -- she's a very unpredictable person.

24          Q        Prior to the July 7th incident that

25    we're here about, had there ever been any physical
```

1  altercations between you and Bridget Langen?

2       A        No, ma'am.

3       Q        Had there been any physical

4  altercations involving any of your children and

5  Ms. Langen?

6       A        No, ma'am.

7       Q        Have you ever had any incidents in

8  which the police had to be called related to yourself

9  and Lori Imhoff?

10      A        Not to my knowledge.  Not that I

11 can remember.  I mean, I haven't been with Lori for --

12 not that I can remember, no.

13      Q        Okay.  Were there ever any physical

14 altercations between you and Lori Imhoff?

15      A        No.

16      Q        Okay.  On the day of July 7th,

17 2023, the date of the incident we're here about, did

18 Ms. Langen still have belongings in the home?

19      A        Not to my knowledge.  They were all

20 removed on May 23rd.  She was officially moved out

21 May 23rd so there shouldn't have been anything here

22 July 7th.

23      Q        To your knowledge, did she ever

24 claim that there was additional things still at the

25 home at that time?

21

1          A          No, not to my knowledge.  She said

2    in court several times that she was moved out when the

3    incident happened.

4          Q          Now, going to that day on July 7th

5    of 2023, were you aware that Ms. Langen was coming to

6    pick Maisley up from your home?

7          A          I was.

8          Q          Okay.  Did you know what time to

9    expect Ms. Langen generally?

10          A          I know about -- about the time,

11    yes.

12          Q          Okay.  Do you recall approximately

13    when it was that she arrived?

14          A          After 5:00 p.m. -- between 5:00 and

15    6:00 p.m.

16          Q          To your knowledge, was she coming

17    from work?

18          A          Yes.

19          Q          And what type of work did

20    Ms. Langen do, if you know?

21          A          She's a cleaner.  She cleans

22    houses.

23          Q          When Ms. Langen arrived at the

24    home, where were you?

25          A          Backyard.  Everyone was in the

22

1    backyard.

2         Q        And when you say "everyone," do you

3    mean yourself and the kids?

4         A        Correct, and Bridget when she came

5    to the backyard.

6                  My children -- Kylee was out there

7    with me.  Maisley was out there with me.  And Bridget

8    came into the backyard, and she was out there sitting

9    on the couch.  There was four of us sitting outside on

10   the patio.

11        Q        Was Rylee at the home?

12        A        No, she was not.

13        Q        Are Rylee and Kylee twins?

14        A        Yes.

15        Q        Okay.  So why don't you briefly

16   kind of in your own words tell me up until the point

17   where Bridget went out to her car and you got the

18   phone from her car, tell me kind of in your own words

19   there what happened up to that point.

20        A        Can you say the last sentence you

21   said again?  I know you want me to tell the story, but

22   you said something about Bridget and a phone.  Can you

23   repeat that?

24        Q        Sure.  I was going to -- rather

25   than going through the whole day or the whole evening

23

1    incident, I was going to start with what led up to

2    when she first arrived up until the point where you

3    got the phone from her car.  Tell me about in your own

4    words what happened.

5          A       After the phone or before the

6    phone?

7          Q       Before the phone.

8          A       Before the phone everything was

9    fine.  We were all sitting in the backyard just having

10   a discussion about Florida I think.  We were going to

11   take -- me and Kylee were talking about when we could

12   take Maisley to Florida.  That's what initiated the

13   argument.  So everything was fine until a conversation

14   came up about Florida, I believe.

15        Q       And you said at that -- at the time

16   you all were having a conversation, you were all in

17   the backyard, correct?

18        A       Correct.

19        Q       Okay.

20        A       Back patio.  Sitting on the couch.

21   There's a couch outside.

22        Q       And you said then once you all

23   started discussing taking Maisley to Florida, that

24   started an argument; is that correct?

25        A       Basically there was no discussing

24

1   things with Bridget.  So when Bridget heard something

2   that she didn't want to hear, she got up and left, so

3   there wasn't any conversation.  So Bridget got mad,

4   got up and left.

5           Q        And did she take Maisley with her?

6           A        Yes.  Maisley didn't end up leaving

7   the driveway, but Maisley got loaded into the car.

8           Q        When Bridget got up, took Maisley

9   with her and went to the car, did you follow her?

10          A        Yes.

11          Q        Why?

12          A        To -- I was asking for that phone

13  back.

14          Q        Let's talk about the phone for a

15  little bit.  At some point in time during the

16  relationship had you gotten that phone for her?

17          A        Not that phone.

18          Q        Okay.

19          A        I purchased a phone with service

20  for Bridget to use to stay in contact with me and my

21  children and all that, but Bridget broke the first

22  phone so I had to supply her a second phone which was

23  my personal phone.  So the phone that I was asking

24  Bridget back for since she left the house was mine.  I

25  paid for it, and it was mine, so it was my property.

25

1 And she wouldn't give it back, so I had the

2 opportunity to take it off the seat of her car, and I

3 took it.

4          Q          So let me kind of break that down a

5 little bit.  So when you said you had previously

6 purchased a phone and service for her -- or for you to

7 be able to have contact with your daughter, was

8 that -- did you do that when she left like in May of

9 2023 or that was prior to her leaving that you

10 purchased the original phone?

11          A          No, in the beginning of our

12 relationship.  At the beginning of our relationship, I

13 provided a telephone for her to be able to contact me

14 and my children and basically have a line of

15 communication.

16          Q          And she used that phone at least

17 throughout part of the time that you all had the

18 relationship; is that fair?

19          A          Yes.

20          Q          Okay.  And then you said at some

21 point she broke that phone?

22          A          Correct.

23          Q          And when was that approximately?

24          A          On my children's 16th birthday, so

25 let's do some math.  They were born in 2006 so

26

1   16 years, so 2022.  She broke the phone on the

2   sidewalk.  She shattered her own phone.

3          Q        And so at that point you then gave

4   her your phone to use?

5          A        Yes, I put my -- another phone on

6   the account for her to use since she broke hers,

7   correct.

8          Q        Okay.  And that's kind of two

9   different things, so let me just clarify.  So you got

10  a new phone on your account for her to use?

11         A        Initially.

12         Q        Okay.  And --

13         A        The second phone was mine.  So you

14  know when you get an upgrade and then you keep your

15  other phone?  The second phone was mine, and I gave

16  that to her to use until she replaced her own phone

17  that she had bashed on the ground.  And so the second

18  phone -- all the phones were mine, but the second

19  phone was mine that I actually physically used and

20  then I upgrade my phone.

21         Q        Gotcha, okay.

22                  And so she began using that in or

23  about 2000 --

24         A        '22.

25         Q        '22?  Okay.

27

1          And she was still using that phone

2    at the time she moved out in May of '23?

3          A          Yes.  When she moved out, I

4    basically said, I would like to have my phone back and

5    you just -- I'll give you the number, but I want the

6    phone, and you just basically transfer it over and

7    give me my phone back.

8          Q          And what did she say to that?

9          A          She said, I will.  She just -- she

10   will.  She will, she will, she will.  She just never

11   will.  She still has that phone to this day using it.

12         Q          Okay.  And how many times had you

13   asked her for that phone back?

14         A          Several.  I would say six.

15         Q          Okay.  Okay.  So going back then to

16   the day July 7th of 2023, you talked that she,

17   Bridget, had gotten upset, took Maisley with her, went

18   to her car.  Where was her car parked?

19         A          My driveway.

20         Q          On past occasions when she had come

21   to pick up Maisley, did she generally get out of the

22   car and come talk to you all or sometimes did you just

23   bring Maisley to the car?

24         A          It just depends.  I'd say mainly

25   Bridget just sits in the car and let's you bring the

28

1    car -- bring Maisley to the car and even load her into

2    the car door.  So yes, it's kind of odd for Bridget to

3    get out of the car at dropoff, yeah.  Kind of odd that

4    she was even back there.

5         Q         And do you know why she did?

6         A         No, I don't recall.

7         Q         Okay.

8         A         I'm to be curious now.

9    Interesting.

10        Q         So after she took Maisley and

11   walked to the car, did she and Maisley get into the

12   car?

13        A         She was buckling Maisley into the

14   backseat.  So she was -- she wasn't in her car.  I

15   don't know if she was leaning -- I honestly don't

16   know.  She was either on her passenger's side loading

17   Maisley in or on -- in her door.  She had to be on the

18   other side.  She was loading Maisley into the car.

19        Q         Okay.  So let me kind of ask it in

20   a different way then.  To your recollection, was

21   Bridget sitting at the driver's -- in the driver's

22   seat at the time --

23        A         No.

24        Q         -- you pulled or grabbed the phone?

25        A         No, she was not in the driver's

29

1   seat.

2           Q           Okay.

3           A           The phone was on the driver's seat.

4   That's where I got the phone from.

5           Q           On the seat or -- I'm sorry, go

6   ahead.

7           A           On the seat.  I've read all these

8   court papers and they're all wrong.  Like I got that

9   phone off of the seat of her car.

10          Q           The driver's side seat?

11          A           Yes, driver's side seat.  Which is

12  actually my car.

13          Q           And you reached in through the

14  window and grabbed the phone?

15          A           No.  I reached -- the door was

16  open.  I reached in and grabbed the phone.  It was

17  very easy.

18          Q           So the driver's door was open?  You

19  reached in --

20          A           Yeah, I just grabbed -- yeah.  Some

21  of those court papers say I reached in the window and

22  all that.  That's not true.  I reached in the driver's

23  seat and the phone was on a charger on the seat, and I

24  just took it off.

25          Q           It was on a charger on the seat.

30

1    What kind of charger was it on?

2            A        The car charger.  She had it

3    plugged into the cigarette lighter adapter and it was

4    plugged in -- the phone was sitting right on the seat.

5            Q        Okay.  So you unplugged the phone

6    and then took it with you?

7            A        Correct.

8            Q        And what happened next?

9            A        She chased me.

10           Q        Where did she chase you?

11           A        I ran into my front yard.  She

12   chased me through the front yard.  She fell down the

13   hill trying to chase me.

14                    And then I ran -- once I got down

15   the front hill, then I ran up the sidewalk and up the

16   driveway and started to come to my back door.  So she

17   chased me through my front yard and into my house --

18   all the way into the backyard into my house.

19           Q        At some point did she go over to

20   your neighbor's house?

21           A        Yes, she did.

22           Q        Okay.  Was this before you all

23   ended up in the back?

24           A        It was after I had taken the phone,

25   so the neighbor -- so I don't know what you meant by

1    that.  The first situation when we were in the back,

2    everything was fine.  She went to my neighbor after I

3    took that phone off the seat.

4            Q        Okay.  And that's fair.  That's --

5    just to clarify:  So after you took the phone, she was

6    chasing you around the front yard?

7            A        I don't know at what point she went

8    to my neighbors.  She went there at some point, but I

9    can't tell you what point in the process it was.

10           Q        Did you follow her to the

11   neighbors?

12           A        No.  She was at the -- no.  I'm

13   looking over there because it's right to the left.

14   No.

15           Q        You weren't standing behind her at

16   the neighbors' door?

17           A        No.

18           Q        Have you seen the video regarding

19   when she was at the neighbors?

20           A        No.

21           Q        So was it then after she was at the

22   neighbors that she came to your backyard -- again,

23   after you had the phone, and she came to your

24   backyard?

25           A        I think she came -- she went to the

32

1    neighbors after the whole incident happened.  I think

2    that was after the whole incident happened.

3                    After she pulled the TV off the

4    wall, after she forced her way into my house, that's

5    when she went to the neighbors.  I don't believe that

6    she went there before, but I can't -- I can't answer

7    it exactly when she went there.

8         Q         And you don't have any recollection

9    of going there with her?

10        A         I did not go there with her.

11        Q         Okay.

12        A         There was no one home.  I watched

13   her stand at the front door hollering.  I didn't go --

14   I mean, I wasn't trying to get in there at all.

15                  I was standing over my -- Maisley

16   was here.  I was just supervising everything going on.

17   I kept my distance from Bridget all the time.  She

18   can't -- I didn't want her swinging on me anymore.  I

19   was trying to keep her out of house.  I didn't want to

20   be close to her at all.

21        Q         Other than yourself, Bridget,

22   Maisley and Kylee, was anyone else in the area?

23        A         My sister came here after the fact,

24   but I don't know why.  Because it took them 45 minutes

25   to get here, I guess, so people -- like she came to

33

1   make sure everything was okay.  My sister was here

2   when I got arrested, I know that, because there was --

3            Q         What's your sister's name?

4            A         Say that?

5            Q         What's your sister's name?

6            A         Carly.

7            Q         Is that with a C or a K?

8            A         C.

9            Q         And is it Carly Redden?

10           A         No.  Parks is her last name.

11   P-A-R-K-S.

12           Q         And she came to your house after

13   Bridget had left?

14           A         I think she came here when Bridget

15   was at the police station.  Because when I called the

16   police, it took them about approximately 45 minutes to

17   get to my home, and I believe my sister came here in

18   that process because I had called -- I called my mom.

19   I called family.  And I just said, Hey, Bridget just

20   did this.  She attacked me.  And I think people

21   came -- my sister came here.  My mom was too far away.

22   But Carly came after the attack happened.

23           Q         Let me ask that question again

24   though.  But Bridget was gone at that point, correct?

25           A         Oh, Bridget was at the police

34

1   station, yes.  She was at the police station when

2   Carly was here.

3            Q          Okay.  So you all are running

4   around the front of the house first.  She falls down

5   the hill.  You go to the back of the house and go into

6   the -- through the back door; is that accurate?

7            A          Correct.

8            Q          Okay.  And she follows you back

9   there; is that correct?

10           A          Correct.

11           Q          And approximately how far behind

12  you was she?

13           A          Chasing me.  She was probably

14  4 feet, 5 feet.

15           Q          Okay.

16           A          There's a video that shows it

17  exactly, but I'm faster than her, but she was -- she

18  was chasing me.  Chased me into the back door.

19           Q          When you first got to the house and

20  went into the house, what did you do?

21           A          Put the phone on the counter.

22           Q          And there was a sliding glass door

23  from the back porch into your house, correct?

24           A          Correct.

25           Q          Okay.  So you go into the house and

35

1    put the phone on the counter.  Did you close the

2    sliding glass door?

3            A        Uh-huh.

4            Q        Is that a yes?

5            A        Yes, sorry.

6            Q        Okay.  Did you lock the door?

7            A        Yes.

8            Q        So, again, just kind of thinking of

9    the timeline.  You had enough time to come into the

10   house, close and lock the door --

11           A        I --

12           Q        -- until Bridget got there?

13           A        I rushed into that door, slammed it

14   shut, closed it, locked it, put the phone on the

15   counter.  That's exactly what I did, yes.

16           Q        And then --

17           A        And I went back to -- I went back

18   to the door because she was at the door.

19                    Yeah, she was right behind me.  I

20   had the time to close that door and then she started

21   banging on it.

22           Q        Where were Kylee and Maisley at

23   this point?

24           A        20 feet from the back door.  I

25   would say 20 to 25 feet from the back door in the

36

1  yard.  Kylee was holding Maisley.

2          Q          And at that point had Kylee begun

3  videotaping the incident?

4          A          Yeah, it was already -- she was

5  videotaping it when Bridget started chasing me around.

6          Q          And were you aware that Kylee was

7  videotaping the incident?

8          A          I asked her to.  I said, Make sure

9  you get this all on video.

10          Q          So once you locked the door, you

11  come back to it and you said Bridget was banging on

12  the glass door; is that correct?

13          A          She was trying to get into the

14  house, correct.

15          Q          Okay.  But -- but was she banging

16  on the glass door?

17          A          Yes.

18          Q          Okay.

19          A          Hard.  Very, very hard.

20          Q          Okay.  Tell me what happens next.

21          A          I kept her out of my house.  I just

22  kept struggling with her at the door.  And in the

23  process of her trying to force her way into my door,

24  she bit me first, and then I got punched in the side

25  of my face.

37

1                    We really only wrestled around.  I

2   don't think she hit me inside.  At the door is when

3   all that happened.  And then I was able to just, I

4   guess, lift her up and get her out of my house.

5           Q          Okay.  Let me kind of ask you some

6   things about that.  In order for her to have started

7   to get into the house, you had to have unlocked the

8   door, correct?

9           A          Correct, I did.

10          Q          And why did you unlock the door?

11          A          To make sure my kids were okay.  I

12  mean, I didn't want her -- I thought she was going to

13  come through that door.  It was just like all

14  reactions.  I needed to protect my kids, and I

15  couldn't be behind a locked door.  It just was kind of

16  a scary situation.  You don't know what to do at the

17  time.

18          Q          Now, she hadn't gone after your

19  kids in any way, correct?

20          A          No, she didn't attack the kids.

21          Q          Okay.  And you were at the glass

22  door and could see the kids, correct?

23          A          Correct.

24          Q          Okay.  But then you still

25  determined you were going to unlock the door, correct?

38

1          A          I did unlock that door, yes.

2          Q          Okay.  And at some point then did

3    you open that door?

4          A          I don't think I opened the door.  I

5    think it was just like her trying to get in the door.

6    Because I was in the doorway like there, and she just

7    kept trying to get in, kept trying to get in.  I kept

8    trying to hold her out.  Wasn't a -- I never really

9    tried to go outside.  I just wanted to see what was

10   going on, make sure everything was okay.  And she just

11   kept forcing her way in, forcing her way in.

12                    I mean, I didn't know what she was

13   going to do if I didn't open that door.  She could

14   have attacked Kylee.  I don't know.  It's just you

15   can't -- I couldn't take the chance in that situation.

16         Q          Okay.  So you're standing at the

17   door.  You unlock it.  Do you know, does Bridget see

18   you unlock the door?

19         A          Yeah, she was at the door.

20         Q          Okay.

21         A          She was at the door the whole time.

22         Q          Okay.  So she sees you unlock the

23   door, and is it your testimony, then, that she opened

24   the door?

25         A          She was trying to get in the house

39

1  all the time, always pulling on that door.

2          Q          So the answer is yes?

3          A          Trying to force her way -- she was

4  trying to force her way into my home at all costs.

5          Q          And what did she do to try and get

6  into your home?

7          A          Bit and punched me to try to get

8  through the doorway.  Pushing, biting, punching.

9          Q          And what were you doing to keep her

10  out?

11          A          I was just -- had my arms around

12  her, just restraining her.  So she didn't swing.  I

13  was just trying at keep her out, restrained.

14          Q          As she's trying to get in through

15  the glass door, the door is open, at least partially,

16  and she's trying to come through, correct?

17          A          Uh-huh.

18          Q          Yes?

19          A          She gets in.  Yes, she got into my

20  house.

21          Q          Okay.  There are points in time

22  where she's partially in and partially outside of the

23  house in the doorway, correct?

24          A          Yes.

25          Q          Okay.  And what are you doing to

40

1   prevent her from getting fully into the home?

2          A          Because I'm in the way restraining

3   her.  I mean, at one point I had her in a bear hold so

4   she couldn't go anywhere.  I was just keeping her out

5   of the house.  I'm pretty much holding the door, and

6   I'm probably doing this.  I mean, there was no -- all

7   I did was try to keep her out of my home.

8          Q          And I understand that, Mr. Redden.

9   I just need to understand how this was taking place,

10  and that's what I'm trying to determine.  So you --

11         A          So if I had her in a bear hug -- so

12  if I have her in a bear hug, that's how it's taking

13  place.  Like I'm trying to just hold her so she's -- I

14  have her arm so she can't swing.  I don't know what

15  else happened.  Like nothing else happened.

16                    All I'm trying to do is keep her

17  out of my house.  I'm trying to hold her back.  I

18  don't even -- I don't even use my hands to do it.

19  Like I'm holding her into the doorway.

20                    Like I have ahold of the glass.

21  I'm just kind of recalling it.  I had ahold of the

22  door and the wall at the same time.  I lost control

23  when she's forcing her way in, so it was just me

24  wrapping my arms around her on the floor is all I

25  remember so she didn't run through the house.

41

1    I didn't want her to go any further
2  than that area right there so that she stayed within
3  like two or three feet of that front door.  She did
4  push me into the house.  She got in.
5    Q    When you had her in this bear hug
6  with your arms wrapped around her, was she on the
7  ground?
8    A    She was on the floor -- yeah, she
9  was just rolling all over the carpet right by that
10 back door.
11   Q    And were you standing --
12   A    We were both on the ground.
13   Q    You were on the ground with her at
14 that point?
15   A    Yeah.  I was trying to -- I was
16 low -- I was low by that door because she was trying
17 to force her way in there, and that's how she was able
18 to push me in because I was lower to the ground.  And,
19 yeah, she was in there.  She got in the door.
20    All I remember is having her -- her
21 arms restrained so she couldn't swing and so she
22 couldn't run through the house.  Like I didn't want
23 her running through the house or hitting me anymore.
24 I can't even remember how I got her out.  I don't even
25 remember.

42

1        Q       Did you lift her up to get her out

2  of the house?

3        A       I can't recall.  Maybe she left on

4  her own.  I really don't know.

5        Q       How long would you estimate this

6  struggle took place between you and Bridget?

7        A       Not more than like two minutes or

8  so.  Fairly quick.

9        Q       While you were holding the door and

10  holding the wall, at that point in time she was trying

11  to push her way into the house; is that your

12  testimony?

13        A       Yeah, she was always trying to push

14  her way into the house.  The only way she wasn't

15  trying to push into the house is when she was banging

16  and smashing on the door with her fist.  She wasn't

17  doing it with her closed fist.  She was doing it with

18  her -- just smashing that window.  And I really

19  thought she was going to break the window at one

20  point.

21        Q       And did you at some point while she

22  is in between the wall and the doorway trying to get

23  in the home, try to close that door to prevent her

24  from getting in?

25        A       Yes, I did.

43

1      Q        Okay.  Did you ever have to kind of
2  push on her to try and shove her out the door as she's
3  trying to get in?
4      A        Not that I can recall.  It was her
5  forcing -- like I was on the defensive the whole time.
6  I was on my heels the whole time.
7      Q        But you were using your body to
8  block her from coming in?
9      A        Correct.
10     Q        And when you're using your body to
11 block her from coming in, what are you doing with your
12 hands?
13     A        I really think I had my hand -- I
14 just can't be for sure, but I think the motion was I
15 held the wall -- like the molding of the wall and the
16 door, so she couldn't get between.  It was me, the
17 door and the wall.  She couldn't get, and that's when
18 she was trying to force her way.  She was just trying
19 to barrel in the house.
20     Q        Did you ever use your feet to keep
21 her out?
22     A        No.
23     Q        And at some point she did get
24 pretty much fully into the home, correct?
25     A        I would say like she got a foot or

44

1    two into the door, yeah, but it wasn't -- she didn't

2    get too far.  I don't know how she even got out.

3    Sorry.

4              Q         But she was on the ground when she

5    got in the door?

6              A         Yeah, she did force her way into

7    the -- she forced her way into the house and landed on

8    the ground, yes.

9              Q         Okay.  And you have no recollection

10   of how she got out of the house then?

11             A         I don't really remember how she got

12   out.

13             Q         At some point you indicated that

14   she bit you; is that correct?

15             A         Yes.

16             Q         When did that occur?

17             A         While she was pushing her way into

18   the house.

19             Q         Explain to me, though, how that

20   happened.

21             A         So I remember I had my hands

22   like -- my hands were up because she bit me -- she bit

23   me over here, so that's how -- I was holding the door,

24   and she bit me right there.  I remember yanking back,

25   and that's how she got into the house.

45

1              Like I think that motion of me

2    yanking my arm and getting bit enabled her to get into

3    the house.  Then when she got into the house, that's

4    when -- that's when I got punched to the face.  The

5    punch to the face happened after the bite.

6         Q       So just so the record's clear,

7    because you were pointing to it, she bit you on your

8    forearm; is that correct?

9         A       Yeah.

10        Q       Yes?

11        A       Yes.

12        Q       Was that your right forearm?

13        A       I think this was my right forearm

14   that she bit me, and then I had my elbow -- this elbow

15   was bad from the -- from the incident.  So I think

16   it -- I'm almost positive it was the right forearm and

17   then my left elbow got affected in the -- in the

18   tussle.

19        Q       And just so we're clear so the

20   record's clear when this is typed up, when you say she

21   bit you on the right forearm, that was on sort of the

22   palm side of your right forearm?

23        A       Yeah, it was like right here.  It

24   was -- it was the inside of my arm like this.

25        Q       Okay.

46

```
1           A        Because when I was holding that
2    wall like that, she was able to get to that meat of my
3    arm.  So she just bit me, and I yanked in there.
4    That's how it happened.  She got in when she bit me.
5           Q        And were you standing over her at
6    that point?
7           A        No, we were kind of crouched down.
8    Like I was crouched down at the doorway, kind of like
9    on my knees.  Because she had gotten low enough --
10   there's two steps -- there's two steps by that door,
11   and she was low enough to where I had to be down low
12   so if she came -- if she came -- you understand?  Like
13   she's 5'4".  She's on two steps, and she leaned
14   forward, it's like -- like the door height.  So I had
15   to bend down to be able to stop her.
16          Q        You said she was about 5'4"?
17          A        Yeah.  She's like 5'2" or 5
18   something.
19          Q        And about approximately how much
20   would you estimate she weighed?
21          A        Maybe 120, 125.
22          Q        And how tall are you?
23          A        I'm only 5'4".
24          Q        And what was your approximate
25   weight at the time?
```

47

1          A          Probably 165.

2          Q          Okay.  Now, when you talked

3    about -- you said that she hit you; is that correct?

4          A          She punched me, yes.

5          Q          Okay.  Punched you how?  Was there

6    an actual closed fist, she punches you right in the

7    face?

8          A          Yeah, closed fist, punched me in

9    the face.

10         Q          Where did she punch you?

11         A          I believe it was my right side

12   because I was -- yeah, I believe it was my right side.

13         Q          And was it because her arm was

14   swinging around, or do you believe that was an

15   intentional punch?

16         A          She was physically trying to hurt

17   me is what she was trying to do the whole --

18         Q          Why do you say that?

19         A          Because she wanted her phone.  She

20   was physically trying to hurt me to get her phone.  At

21   all costs she was going to get that phone.  She lost

22   full com -- full -- every emotion.  She blew up.  You

23   could see it in her face.

24         Q          Eventually she gets -- she gets out

25   of the house --

48

```
1          A          Um-hum.
2          Q          -- and she leaves the house,
3    correct?
4          A          Uh-huh.
5          Q          Yes?
6          A          Yes, ma'am.
7          Q          Okay.  And Maisley is still at your
8    house?
9          A          Yes, ma'am.
10         Q          Okay.  And --
11         A          She left Maisley here.
12         Q          Okay.  At some point before the
13   police arrive did you view the videos that Kylee had
14   recorded of the incident?
15         A          No, no.  Took me a while to get --
16   I just know that -- I mean, it took me a while to even
17   get the videos and even want to look at the videos,
18   so, no.
19         Q          Was there one long video or
20   multiple small videos?
21         A          There -- my child has a long video
22   and then it has to be broken down into a few of them
23   because you couldn't transmit it all at one time.  I
24   mean, that was done by the lawyers.  I don't know how
25   many videos there ended up being.  I can't recall.
```

49

1         Q         So I just want to make sure I

2    understand your testimony.  At some point there was

3    one long video, but then lawyers did something to

4    break that into multiple videos?

5         A         I'm sure that there's still a long

6    video.  Someone still has the long video, but they had

7    to chop up videos for court, I guess, because they

8    couldn't bring in -- like they didn't want to bring in

9    two minutes' worth of video.  They would bring in

10   30 seconds of this and 30 seconds of that.  I can't

11   really speak on that.  But there is multiple videos.

12   Yes, there is -- there is multiple.

13        Q         When the video was cut up into

14   smaller portions, were any of the portions of the

15   video not included or deleted?

16        A         I can't answer that.  My -- my

17   child supplied the videos to Baird here.  He got the

18   videos while he was here.  He -- yeah.  The videos

19   were figured out before -- I didn't even have anything

20   to do with that.  My daughter did that.

21        Q         He viewed the videos there?

22        A         Correct.

23        Q         Okay.  But --

24        A         To my knowledge, I think so.  I am

25   not positive, but I remember my daughter -- he asked

50

1    my daughter to see the videos.

2              Q        Okay.

3              A        She showed them to him.

4              Q        But -- and those were on your

5    daughter's cell phone, correct?

6              A        Correct.

7              Q        And Officer Baird never took your

8    daughter's cell phone that day, correct?

9              A        Took it like to leave my house with

10   it --

11             Q        Yeah.

12             A        -- or look at it?  He looked at it.

13             Q        But he didn't take it with him, did

14   he?

15             A        No.

16                      MR. ENGEL:  Counsel, I just want to

17             be -- make sure.  You have those videos,

18             right?

19                      MS. FRICK:  I have several videos,

20             yeah, but he just testified there was one

21             long video.

22                      MR. ENGEL:  Okay.  No, no, I just

23             want to make sure that you've got them so

24             that your questions are -- okay, that's fine.

25             I just want to confirm that you did receive

51

1          them.

2                         MS. FRICK:  Okay.

3     BY MS. FRICK:

4          Q          So the videos remained on your

5     daughter's phone, correct?

6          A          I don't know if they're still on

7     there or not, ma'am.  I mean, they were.

8          Q          That's not my question.

9          A          After that day?

10         Q          Yes.

11         A          Yes.

12         Q          Okay.

13         A          So he left and the videos stayed on

14    my daughter's phone unless she deleted them, which I

15    don't think she did.

16         Q          At some point who did you or your

17    daughter provide those videos to?

18         A          I -- every lawyer.  I've probably

19    provided those to three lawyers, Baird.  I don't know.

20    There was three law teams involved here.

21                    There's a lot of people have those

22    videos.  Hamilton County has those videos.  Hamilton

23    Court has those videos.  Maybe I'm not understanding

24    what you're trying to ask.

25         Q          Well, I'm a little confused,

52

1   Mr. Redden, I'm going to be honest with you.

2          A       Okay.

3          Q       Because you testified that there

4   was one video -- one long video --

5          A       Okay.

6          Q       -- but then somebody cut it up into

7   smaller videos.  And what I'm trying to find out is:

8   Who did that and how did they get the one long video?

9   And for what reason were the videos cut up?  Why was

10  the video changed?

11                 MR. ENGEL:  Object to the form.

12         You can answer if you can understand the

13         question.

14         A       I think it was just the lawyers

15  wanted to just shrink it for testimony.  I really

16  think that's what it was.

17         Q       Okay.  And when you say "the

18  lawyers," which lawyers are you referring to?

19         A       I have -- so since this incident,

20  I've had to hire three sets of law teams.  So the

21  lawyers that I'm talking about that had those videos

22  were Brad Groene.  He was my criminal.  And then

23  John Treleven was custody.  So there was two lawyer

24  teams involved.  I mean, there's a lot of people

25  involved here, so -- both of those teams have those

53

1  lawyers (sic).

2              The criminal is the one who had to

3  shrink the videos down into Hamilton Court.  I don't

4  think that my -- and then Treleven got the videos from

5  them.  So I'm just telling you what I know.  I

6  don't -- I don't necessarily know.

7              I know that the videos by my

8  criminal defense team, I know they shrunk it down like

9  to just -- the video -- the video had her ripping my

10  TV off the wall so they took that in there.  So I feel

11  like there's -- they just took and broke it into

12  pieces for certain situations that they needed, but I

13  don't know.  Not sure.

14              They have those videos, though.

15  Everybody had the videos from the beginning, and I

16  think Baird had it from day one.

17     Q        And how did you provide the videos

18  to your criminal lawyer?

19              MR. ENGEL:  I'm just going to

20          caution the witness not to disclose any

21          communications with -- with his lawyer, but I

22          don't think that's what you're asking.  I'm

23          just --

24              MS. FRICK:  No, it's not.

25              MR. ENGEL:  -- cautioning him to be

54

1    careful in his answer.

2    A       So what -- what am I answering

3    again?  What are you asking me?

4    Q       How did you provide your criminal

5    lawyers the videos?  Did you physically give them the

6    phone?  Were the videos downloaded onto something?

7    How did they get the actual videos?

8    A       I would have to check with my

9    daughter.  I think my daughter sent Baird the video.

10   I think that's what happened.

11           My criminal, we did the same thing.

12   It would have been email or text, one or the other.

13   I'm not -- I'm not positive.  No one -- no lawyer took

14   a phone to their office.

15   Q       Okay.  And so you believe that your

16   daughter may have emailed the videos to Baird?

17   A       I think she was -- yeah, she was

18   made to send her -- send the video that day because

19   the police had it -- so the police had it as evidence.

20   To my knowledge, that's what happened.  I would have

21   to ask.  I don't know.

22   Q       Okay.  And then similarly as to

23   your criminal lawyers, you believe that that -- the

24   video or videos would have been sent probably via text

25   or email?

55

```
 1         A         It was via text -- it was text or

 2  email.  But I remember at one point something wouldn't

 3  transmit.  I don't know.  It's email or text.  There

 4  is no other way to do it.  There was no flash drive

 5  involved.  It would have been email or text.  No one

 6  actually had a phone or a flash drive or anything.

 7                   MS. FRICK:  Okay.  If we can --

 8              we've been going for about an hour.  I would

 9              just like to take about a five-minute break

10              if we can real quick.  All right?  Thanks.

11                   (Deposition stood in recess at

12                   10:37 a.m.)

13                   (Deposition reconvened at

14                   10:46 a.m.)

15                   MS. FRICK:  Okay.  Going back on

16              the record.

17  BY MS. FRICK:

18         Q         Mr. Redden, what did you do to

19  prepare for your deposition today?

20         A         Just tried to remember everything I

21  could, be relaxed for it.  That's about it.  I don't

22  know how else you can prepare for something like this.

23                   MR. ENGEL:  And I'll note,

24              obviously Mr. Redden met with his lawyer, and

25              he's not to discuss any communications with
```

56

```
 1          counsel.
 2                    MS. FRICK:  Sure.
 3   BY MS. FRICK:
 4          Q          Did you review any documents?
 5          A          I don't believe so.
 6          Q          Did you review the videos?
 7          A          No.
 8          Q          Okay.  You testified earlier that
 9   at some point you called the police; is that correct?
10          A          Uh-huh.
11          Q          Yes?
12          A          Yes, ma'am.
13          Q          Okay.
14          A          I'm sorry.
15          Q          And when -- when did you call the
16   police?
17          A          As soon as things kind of settled
18   down, I think I called when she went over to the
19   neighbors, but I can't exactly be for sure when I
20   called.  I just called when I had the opportunity to
21   call, and she wasn't trying to force her way into my
22   home.
23          Q          Okay.  And just for the record, so
24   it's clear when I review the videos, what were you
25   wearing that day?
```

57

```
 1          A           Swimming trunks.
 2          Q           Were they kind of tropical floral
 3   looking?
 4          A           Yes.  My palm tree ones, yes.
 5          Q           Okay.  And do you recall what
 6   Ms. Langen was wearing?
 7          A           No.  I think like leggings and her
 8   work shirt probably.  Sunglasses.  I know she had
 9   sunglasses on when she came.
10          Q           And when you called the police, you
11   called 911?
12          A           I can't be for sure.  I know I
13   called 911, but I might have called Officer Little
14   first.  I know I called 911, but I also called
15   Officer Little in the meantime because I had -- I
16   mean, I just felt really comfortable with him as a
17   officer because he's helped my kids at school.
18                      I think I called him and he said he
19   wasn't -- or he was working.  I can't remember.  I did
20   call 911, but I also might have called Officer Little
21   in the meantime.  I might have called him twice.  I
22   know I called him once.
23          Q           Let me just see if I can figure
24   that out.  Was that before you were arrested that you
25   would have called Officer Little?
```

58

1          A          Yes, I did.  I called him before I
2    was arrested.
3          Q          Okay.  And you called him because
4    you knew him because of him helping out your kids at
5    school?
6          A          He was -- he's the resource officer
7    at school, and if my kids got -- I think there was
8    someone trying to bully my kid at one point.  My kid
9    just stands up for everyone.  That was just
10   something -- he stopped by and talked to me.  How's
11   the kids -- how's the kids doing?  And I had his
12   number in my phone, and I called him to see if he
13   would help, and he -- I don't know if I called him
14   once or twice though.
15                    I know I called him during the
16   process and he told me that she had came down to the
17   police station and they were going to come out here.
18   So I talked to him, but I don't know if I talked to
19   him once or twice.
20         Q          Okay.  But he told you she had been
21   to the police station and someone was coming over
22   there?
23         A          Correct.  I believe it took like
24   45 minutes for someone to get here.  From the time I
25   called, it took like 45 minutes.

1        Q          Okay.  And you said that you
2   believe you may have also called 911?
3        A          I did call 911.  I know I did.  But
4   I might have called Little first.  Like I might have
5   just called to see if I could get a police officer
6   before I called 911.  I'm not sure.
7        Q          Do you remember what you said to
8   911?
9        A          Probably that she attacked me?  No,
10  I don't remember exactly.
11       Q          Now, eventually Officer Baird
12  arrived at your home, correct?
13       A          Uh-huh.
14       Q          Yes?
15       A          Yes, ma'am.
16       Q          Okay.  And tell me about that.
17  What did Officer Baird do when he arrived?
18       A          Pretty much insinuated that I was
19  guilty.  He basically just said I was wrong from the
20  get-go.
21       Q          Did he ask you questions about what
22  happened?
23       A          He asked me about the phone.  He
24  asked me all the questions.  He basically made me
25  give -- he gave me two choices:  Give -- give my phone

60

1    back or I was going to be charged with felony theft or

2    return it and get charged with misdemeanor domestic

3    violence.  I was given two options right there.

4            Q        And when he was there and

5    indicated, was anyone -- indicated these things, gave

6    you those two choices, was anyone else with you and

7    him at that time?

8            A        Like having the conversation?

9    There was people here.  Like Kylee was still here.

10   Maisley was still here.  Bridget was still here.  My

11   sister was out there.  Her husband was out there.  But

12   I was the only one -- I mean, I would think that Baird

13   was just discussing this with me.

14           Q        And you said Bridget was there at

15   that point?  Did she come back?

16           A        Yeah, he brought -- yeah, he

17   basically came back to the house, and Bridget followed

18   him in her car.  It was like a little parade.

19           Q        Okay.  And so when he first

20   arrived, did he ask you, you know, what had happened?

21           A        Yes.

22           Q        Okay.  And you gave him your

23   version of what had occurred, correct?

24           A        Correct.

25           Q        Okay.

61

1          A          Then I told him it was on video,
2    and he went and got that from my daughter.  He watched
3    the whole thing.  I don't know what else happened.  I
4    got arrested.
5          Q          Okay.  Did he talk to your
6    daughter?
7          A          Yes.  Away from me.  I don't -- it
8    wasn't near me.
9          Q          But you saw him review the videos
10   with your daughter?
11         A          I saw him discussing it, and I
12   don't know if he -- I think he told me he watched the
13   video.  That's how I know, he said, well, this video,
14   but -- I mean, I didn't actually physically see any of
15   it.  I was in a police car.
16         Q          Okay.  And did he tell you that you
17   have these two choices before or after he watched the
18   video?
19         A          I can't say.  I'm not sure.
20         Q          Did he tell you you had these
21   choices before or after he asked you what happened?
22         A          After.
23         Q          Okay.  Do you know, had he already
24   spoken with your daughter at that point?
25         A          No.  I don't know.

62

1        Q        Okay.  And so when he said this to

2  you that you had two choices, give the phone back or

3  be charged with a misdemeanor domestic violence, what

4  did you say or do?

5        A        I was baffled.  Just -- like, sir,

6  the phone is mine.  I didn't touch her.  I did nothing

7  wrong.  I was just dumbfounded the whole time.  I have

8  been dumbfounded for two years.

9        Q        You did touch her, though, correct?

10  You said you put her in a bear hug, right?

11        A        Yeah, while she was inside -- after

12  she forced her way into a home that was mine and she

13  didn't belong in here.  I mean, I thought that was

14  protecting your home.

15        Q        Do you know whether he spoke with

16  anyone else at the scene?

17        A        My sister was here because I

18  know -- I know my sister was like, Are you really

19  going to do this?  Like -- but I don't know what was

20  said.  Ultimately my sister ended up filing a

21  complaint against Baird.  I don't know if it ever

22  even -- if anybody even saw it.

23        Q        When -- tell me about that.  She

24  filed a complaint against him related to this

25  incident?

63

```
1           A           Yes, because of how it was handled
2    and everything.  Yeah, she filed a complaint at the
3    police station with Sergeant Rogers.  I did as well.
4           Q           And what was your or her concern
5    about how it was handled?
6           A           I mean, he arrested the wrong
7    person.  Like he handled the whole situation wrong.
8    All the evidence in the world was there for him to
9    make a decision that I didn't cause domestic violence.
10   I wasn't the aggressor here ever.  Like I didn't
11   attack anyone.
12                      We just all thought it was just
13   plain and simple, like it was right there in the video
14   what happened.  She attacked me, forced her way into
15   my home.  I didn't think that was legal.
16          Q           And just so we're clear, you -- you
17   understood that Officer Baird viewed those same
18   videos, right?
19          A           I knew he did.  I mean, he said he
20   videoed -- he said he watched them.
21          Q           Okay.
22          A           I just went by what he said.
23          Q           Were there any other officers with
24   Officer Baird that day?
25          A           There was a Butler County Sheriff
```

64

1    here at the same time.  He looked baffled, too.  I
2    said, How is this man arresting me?  He's like, I
3    don't know.
4            Q        Do you know what the sheriff's
5    deputy's name was?
6            A        I do not.
7            Q        Do you know why he was there?
8            A        I do not.  There was also a
9    Hamilton police officer here, too.  No idea why he was
10   here either.
11           Q        Did you ever talk to him?
12           A        No.  But there was only one Ross
13   officer here the whole time.  Only one.
14           Q        And that was Officer Baird?
15           A        Correct.
16           Q        Okay.  You said that you also went
17   and spoke with then Sergeant Rogers; is that correct?
18           A        I spoke to Little first after the
19   incident, and I don't even know.  Like after I kind of
20   thought about things like what just happened, like I
21   contacted Little again.  And I said, Buddy, do you
22   know what happened that night?  Like do you know I got
23   arrested?  And he said, No, not at all.
24                    He said, Come down here and talk to
25   me.  And I went down to the school to talk to Little,

65

1    and he's the one that told me to go to Sergeant

2    Rogers.  He looked at me and said, I need you to go to

3    Sergeant Rogers and file a complaint.  And I went to

4    Sergeant Rogers and filed a complaint, and that's

5    how -- my sister did also.  I don't know what

6    happened.

7            Q        Okay.  Let me ask you a little bit

8    about that.  So you said when you went to talk to

9    Little after the incident and went to the school, that

10   was after you had been released from jail, correct?

11           A        Uh-huh.

12           Q        Yes?

13           A        Yes, ma'am.

14           Q        How long after?

15           A        Let's say -- like I want to say 30

16   to 60 days.  Like it was a while before I wanted to

17   speak about it, you know.

18           Q        And he advised you to go talk to

19   Rogers and file a complaint?

20           A        He advised me to go file a

21   complaint with Sergeant Rogers.

22           Q        And then you did go and filed a

23   complaint with Sergeant Rogers?

24           A        Correct.

25           Q        Did you actually speak with

66

1    Sergeant Rogers?

2            A          Oh, yes, at length.

3            Q          Okay.  Did you fill out any

4    paperwork about this complaint?

5            A          I did, and my sister.

6            Q          And tell me about that conversation

7    you had at length with Sergeant Roberts [sic].

8            A          In a nutshell, Sergeant Rogers

9    says, My officer was wrong.  Once we get this taken

10   care of and we get the charges dropped against you or

11   reversed, we will arrest Bridget for at least three

12   crimes that she committed.  He's -- he's the one that

13   told me she committed the three crimes that day.

14                      I mean, I have had -- every time

15   Sergeant Rogers said he was going to call me back, he

16   never called me back.  It's like he wasn't concerned

17   about me and my incident and my family.  He wasn't --

18   he wouldn't follow up with me at all.

19           Q          So just so I'm clear, did you

20   follow up with him and then he didn't return your

21   calls?  Is that what you're saying?

22           A          Correct.  Several times.

23           Q          And what did you do to follow up

24   with him?

25           A          I would call and leave messages and

67

1   walk in and talk to him.  Several different ways.

2          Q          How many times did you talk to

3   Sergeant Rogers?

4          A          I would say three.  Can't be for

5   sure, but I think three.  And I think two were in

6   person and one was on the phone.

7          Q          And was this around the same time

8   that you talked to Little?

9          A          Yes, it was around the same time.

10  Little said he was going to go to Sergeant Rogers and

11  try to get the lead on the case.  He said, I think I'm

12  better apt to handle this.  I'm going to go to Rogers

13  and I'm going to see if I can take care of this.

14         Q          So is it fair to say this would

15  have been sometime in August or September of 2023?

16         A          Yes, those -- I mean, I had contact

17  again with them in March of 2024 after the 12th

18  District reversed the conviction.  I went right back

19  into the police station the same day and filed another

20  report, and I talked to Rogers that day and then he --

21  I actually gave the report to Roberts, the Captain,

22  because Rogers left.

23                     There's just been multiple contact

24  with them.  It didn't -- it didn't stop in -- after

25  the incident in that August or September like you

68

1    said.  It was probably then some of the contact --

2    there was more contact in March of -- man, it's just

3    ongoing contact.

4                    There was contact in March after my

5    conviction got reversed.  There was contact in January

6    when I had to keep my child from Bridget because of a

7    child abuse thing in Harrison.

8                    There's just been a lot.  Like I've

9    interacted with them people a lot, and none of them

10   followed up and called me back.  None of them would

11   act like they were concerned about my situation at

12   all.

13        Q        Okay.  So let me ask a couple

14   things about that.  So you said you went back in March

15   of 2024 after the Court of Appeals overturned your

16   conviction?

17        A        Correct.

18        Q        And you filed another report?  You

19   filled out an actual form?

20        A        Yes, with Captain -- I get them

21   confused sometimes.  So it's Captain Roberts took that

22   report.  I mean, I'm almost pretty sure it was

23   March 25th of 2024 I walked in there and I saw

24   Sergeant Rogers first, and I said, I'm not sure if

25   you're aware, but my conviction was overturned in the

69

1    12th District, and you told me once Bridget's -- or my

2    charges were done, that you would bring them against

3    Bridget.

4                        So I went back in there to do that

5    on March 25th of 2024, and when I went back -- I took

6    the paper from him, went and filled it out, and then I

7    brought it back and he wasn't here, and

8    Captain Roberts then took the report and I said, Sir,

9    this has changed my life.  And he said, I bet it has.

10   That's Captain Roberts' comment to me.  That was

11   pretty nice of him.

12           Q         Okay.  I apologize because I locked

13   up there for a minute.

14                        So you said to Rogers -- so I just

15   have to make sure because I don't know what I missed.

16   You said to Rogers when you first went in that this --

17   you didn't know if he was aware, but the conviction

18   got overturned; is that correct?

19           A         Correct.

20           Q         Okay.  And then -- then it locked

21   up, so I didn't hear what you said after that.

22           A         Then he told me to file the report,

23   the new report, so he gave me the new report to file.

24   I left the building because I didn't want to stand

25   there and do all that.  So I left the building, went

70

1   and filled out the new report on March 25th of 2024,

2   and then when I went back into the office,

3   Captain Roberts was there, and he's the one that

4   signed off on the report on March 24th of 2024 --

5   2025 -- March 25th of 2024.

6                    And I only went back in there

7   because Sergeant Rogers told me the whole entire time

8   that after we get your charges taken care of --

9   because he basically was telling me I didn't do this

10  the whole time in the police station.  My officer is

11  wrong.  Once we get this situated, we'll bring charges

12  against her.  I can see three charges that she

13  committed here -- three crimes that she committed.

14          Q        Did he tell you what those three

15  crimes were?

16          A        One was criminal damaging one.  I

17  think trespassing was the other one.  And there was

18  another one.  Domestic violence was probably the third

19  one.

20                   But I've talked to -- I talked to

21  Rogers and Little at the same time.  I mean, I was

22  talking to both of them.  Both of them said the same

23  charges, that they both were -- I don't know how we

24  got here.

25          Q        So when you say you talked to

71

1    Rogers and Little at the same time, they were both

2    present?

3          A          No.  I was -- I had spoke to Little

4    on the phone.  I spoke to Little on the phone several

5    times.  Like I haven't told you that I spoke to Little

6    on the phone for 45 minutes one day.  Like he gave me

7    45 minutes of his time.  It was awesome.  I was like,

8    Man, you really care about this.  You're really going

9    to help me.

10                    And after that phonecall that

11   lasted 45 minutes, I thought, Man, they're really

12   going to make this right.  They're going to fix it.

13   And then he never called me back either.  He was

14   supposed to call me back on a Thursday, and then he

15   never called me back.  So it was like every one of

16   them just ignored it.

17         Q          This 45-minute call with Little,

18   was that before or after your trial?

19         A          Before my trial because he was

20   saying he was going to take the lead on it.  He said,

21   I want to take the lead on this.

22         Q          Did you ever keep copies of any of

23   the things you said that you filed with the police

24   department?

25         A          They would have to give me a copy,

72

1    correct?  No.  I mean, I might have pictures of it

2    with my phone if I go back, but I don't know for sure.

3          Q         Can you check and see?  And if you

4    do, please provide those copies of those photos to

5    your attorney?

6          A         Yes.

7          Q         Okay.

8          A         I know I don't have a picture of

9    the second report because I did that -- I did that

10   that day.  I just went and filled it out and took it

11   right back into the office.

12                   But I know the day.  I mean, I know

13   about the dates.  March 25th there should be a report

14   filed by me.  And then the other complaint -- those

15   complaints were filed -- filled out like the month

16   after the incident I believe.

17         Q         And did your sister ever speak with

18   anyone from the police department?

19         A         No.  She just filled out the

20   complaint and then they never did anything to my

21   knowledge.  I can't -- I can't be for sure, but I

22   don't think it never -- no one ever spoke to her.

23         Q         And those -- the first -- the

24   complaint that you made and the complaint that your

25   sister made, did -- was there ever any discussion

73

1   about that at your trial?

2           A           No.  I believe that -- I thought

3   this whole time that everybody just was trying to

4   sweep this under the rug and cover up what was wrong.

5   I feel that's why I got convicted also.

6           Q           And at the trial did you ever

7   indicate or testify about these conversations you had

8   with Officer Little?

9           A           No.  I don't think it came up at

10  trial, no.  For the domestic violence, no.

11          Q           How long -- or when you were

12  arrested, where were you taken?

13          A           Butler County.  I think that's what

14  it was called, Butler County Jail.

15          Q           And were you transported there by

16  Officer Baird?

17          A           Yes, I was.

18          Q           Did you have any conversations with

19  Officer Baird during your transport?

20          A           I can't recall.

21          Q           How long were you at the jail?

22          A           Four days.

23          Q           So you were released -- if this,

24  July 7th, 2023, was a Friday, were you released on

25  Monday?

74

1          A          Yes, at 2:00 p.m.

2          Q          Prior to the incident on July 7th,

3    had you ever threatened to take Maisley from Bridget?

4          A          No.

5          Q          Now, let's talk about -- after you

6    were released from jail, there was a trial held before

7    the judge, correct?

8          A          Correct.

9          Q          And you testified at that trial,

10   correct?

11         A          Correct.

12         Q          Okay.  And if I told you that was

13   on or about September 13th, 2023, does that sound

14   about correct?

15         A          That was about correct.  It was

16   right near my birthday.

17         Q          And as a result of the trial, the

18   judge found you guilty of the domestic violence,

19   correct?

20         A          Yes.  I think his words were:

21   You're guilty of something.  But he convicted me of

22   domestic -- domestic violence.

23                    THE WITNESS:  She froze.

24                    (Off the record.)

25   BY MS. FRICK:

75

1          Q          Your daughter, Kylee, she testified

2     at the trial, correct?

3          A          Yes.

4          Q          Okay.  And it was your

5     understanding that Bridget testified at the trial as

6     well?

7          A          Yes.

8          Q          And you appealed that conviction,

9     correct?

10          A          Correct.

11          Q          And the Court of Appeals overturned

12     that conviction, right?

13          A          Correct.

14          Q          Okay.  Tell me about after the

15     trial and this conviction and then subsequently the

16     appeal, if I were to ask you how this whole incident

17     has kind of affected you, how would you describe that

18     in terms of how it has affected you?

19          A          It's changed my life forever.  Like

20     I --

21          Q          In what way?

22          A          It's always anxious.  It's

23     always -- like when you -- I'm a guy that wants to do

24     the right thing so now I have to question doing the

25     right thing because of what Ross Police did to me.

76

1          I can just give you a perfect

2     scenario.  About a week or two ago, Bridget showed up

3     at my house to pick up Maisley with a -- an empty can

4     of White Claw in the back of her car I found.  I just

5     leaned in and I see an empty can of White Claw.  And I

6     just had to make my judgment by that, Is she okay?

7               Like I can't call Ross Police and

8     say, Hey, Bridget's in my driveway.  Bridget has a can

9     of White Claw.  Like I can't even trust that they're

10    going to have in the best interest of my family.  Like

11    it's -- I can't even talk to my neighbors anymore.

12    They watched me get arrested.

13              I'm just on edge all the time.

14    Like you can do the right thing and you can still go

15    to jail.  You can still just get locked up for

16    four days for doing the right thing, protecting your

17    family.  And it's -- it doesn't sit well with me at

18    all.  Like I want to move.  I'm going to sell my house

19    here.  I don't want to live here.

20         Q          Have you sought any type of

21    counseling or medical help for this anxiety or your

22    concerns?

23         A          I just don't really want to.  Like

24    I feel like I can handle this myself, and I don't want

25    to.  I don't want to go into a doctor and tell him all

77

1  my situation.  Like -- I mean, I have to go to

2  counseling and talk about it weekly?  Like I don't

3  want to talk about this ever again.  Like I just want

4  it to go away.  I've been dealing with it for

5  two years.

6         Q        But you brought this lawsuit so you

7  understood that you would have to discuss it, correct?

8         A        I understood it.  I believe this is

9  the right thing to do, and that's why we're here.

10         Q        Okay.  Has this affected your

11  relationship with any of your children?

12         A        I feel like -- not damaged forever,

13  but they don't know what to believe, and they don't

14  know what to trust.

15         Q        And how do you know that?

16         A        Rylee still communicates with

17  Bridget because Bridget has her completely bamboozled.

18  Yeah, it's like a -- it's a mess.

19         Q        Okay.  So Rylee still communicates

20  with Bridget.  Did she ever say to you --

21         A        Every once in a while.  Like she's

22  probably seen Maisley at Bridget's probably three

23  times since the incident.

24         Q        Has Rylee ever said to you, She

25  doesn't know what to believe?

78

1          A          No, she hasn't.  It's just --

2          Q          Okay.  Has Kylee ever indicated

3    that to you?

4          A          No.  Kylee 100 percent was here and

5    knows the situation.

6          Q          And have you ever discussed it with

7    Maisley to see what she does or does not remember?

8          A          No, no, no.  No.  She knows that

9    that TV is missing off my back patio.  She knows what

10   happened that day, Mommy broke that TV.  She knows.

11   It's lasted -- it's stuck in her brain, but we don't

12   discuss that.

13         Q          And how do you know she knows that?

14   Has she said something to you?

15         A          Yeah, she said, Mommy broke the TV.

16   We have to get a new TV.  Mommy broke the TV.

17         Q          Were you working at the time of

18   this incident?

19         A          Yeah.  I wasn't at work.  I was at

20   my house but --

21         Q          Let me rephrase that then if

22   there's some confusion.

23         A          Right.

24         Q          Were you employed during that time?

25         A          Yes, I was working.

79

```
 1            Q           Okay.  And were you self-employed
 2   during that time?
 3            A           Yes.
 4            Q           Okay.  And was that with the
 5   business that you discussed, the --
 6            A           Yes.
 7            Q           Okay.  Any other ways that you can
 8   tell me that this has affected your life?
 9            A           I don't even know if I realize how
10   it's affected my life.  I can't -- I mean, I have
11   problems sleeping.  I have problems with all kinds of
12   stuff.  It's really just me not even wanting to come
13   to my house.  Like I don't even want to walk around my
14   neighborhood.  I don't even want to interact with the
15   people that I used to.  They all just think I'm a
16   different man.  Like they think I'm a woman beater.
17            Q           Has anyone ever told you that or
18   said anything?
19            A           No, but it's just you can see.
20   They don't talk to you -- they don't talk to me
21   anymore.  Won't even talk.  You walk down your
22   neighborhood and people used to say hi, and they don't
23   anymore.
24            Q           And your assumption is that it's
25   based on this incident?
```

80

1          A          I imagine.  I talked to them all

2     before.

3          Q          Okay.  But just to be clear,

4     nobody's ever asked you specifically about this

5     incident?

6          A          No.  No one's -- no.

7          Q          Okay.  You said you have had

8     trouble sleeping.  Have you ever discussed that with

9     any medical provider or anyone else?

10         A          No.  It's just all the things on

11    your mind.

12                    MS. FRICK:  Okay.  Can I share a

13            document, Pam?

14                    THE REPORTER:  Yes, you should be

15            able to.

16    BY MS. FRICK:

17         Q          Okay.  I am going to show you a

18    couple quick things just to see --

19                    MR. ENGEL:  Let -- yeah, let me

20            make sure I have the settings here.

21                    MS. FRICK:  Yeah.  It says, Sharing

22            is not turned on.

23                    MR. ENGEL:  Okay.  It should be

24            good now.  Can you do it now?

25                    MS. FRICK:  Okay.  Yeah, now it's

81

1        letting me.

2                        MR. ENGEL:  Sorry about that.

3                        MS. FRICK:  That's okay.

4    BY MS. FRICK:

5        Q        Now, Mr. Redden, I have here in

6    front of you what is titled, "The Ross Township Police

7    Department Investigative Report."  Do you see that?

8        A        I see the top half of it, yes.

9        Q        Okay.  And I understand.  It's

10   unfortunately just sort of part of using Zoom.

11   Sometimes we don't get all of it at once.

12                        Have you ever reviewed this police

13   report before?

14       A        I can't recall, but I might have

15   seen this recently.

16       Q        Okay.

17       A        Like I might have seen this just

18   recently from Josh, but that was the first time I had

19   seen this before.

20       Q        Okay.  And I don't want to know

21   about any discussions you may have had with Josh, but

22   let me ask you a little bit about this narrative in

23   the report.

24       A        Okay.

25       Q        Okay.  And do you see the paragraph

82

1  that says, "I arrived on scene at 2043 Wagon Wheel"?

2          A          Uh-huh.

3          Q          Is that a yes?

4          A          Uh-huh, yes, ma'am.

5          Q          Okay.  And this is the narrative

6  written by Officer Baird.  He indicates he was met in

7  the driveway by Mr. Redden.  Do you recall that?

8          A          Yes.

9          Q          Okay.  And it indicates:

10 Mr. Redden stated that he had an incident at the

11 residence involving Ms. Langen.  Does that sound

12 accurate?

13         A          Yes.

14         Q          Okay.  He indicates:  Mr. Redden

15 was asked to provide the video footage he had, and

16 then it said:  KR, I believe that's your daughter,

17 Kylee, was able to show me the footage.

18         A          Um-hum.

19         Q          Anything that you dispute about

20 that?

21         A          That Kylee showed him the footage?

22         Q          Right.

23         A          I believe that happened.

24         Q          Okay.  And he talks about:  First

25 of all, one of the videos is a three-second clip of

83

1    Mr. Redden running in the street after he took

2    Ms. Langen's phone from her keeping it from her.

3                        Is that your recollection as to one

4    of the video clips?

5         A         There's no way it could have been a

6    three-second video.  I mean, he -- I don't -- I can't

7    speak on this because he would have viewed these

8    videos from my daughter, and he says in here one of

9    the videos is a three-second clip.  And no -- none of

10   that -- I don't even know how that's possible.  Like

11   she recorded the whole video at one time.

12                        So this would have been an actual

13   report that he wrote from this day saying he saw a

14   three-second and a ten-second clip.  I don't know how

15   that's possible.  My daughter didn't record multiple

16   clips in my opinion.  I think she just recorded one

17   and showed him.  But that's a Kylee thing.  I don't

18   know.

19        Q         Okay.  Well, let me -- I just want

20   to make sure so that we're all on the same page here.

21                        You don't believe that there were

22   multiple clips; you believe it was one video?

23        A         Correct.

24        Q         Okay.

25        A         I don't know how it could have been

84

1   multiple clips because Kylee hit "record" on her phone

2   and then recorded the incident and showed him.  There

3   would have been no -- the only reason that anybody did

4   any clips -- like I remember someone took a ten-second

5   clip and made -- like Bridget dragging a TV.  It was

6   shown in court.

7                   So all of these videos were created

8   after 7/7.  On 7/7 it was only one video so this

9   report seems like a lie to me, but I don't know.

10                  MS. FRICK:  Okay.  Okay.  Well,

11          based on that testimony, Josh, I'm going to

12          ask you to have your client check with his

13          daughter to see if he has this one video,

14          okay?

15                  MR. ENGEL:  We'll -- we'll take a

16          look.  I mean --

17                  MS. FRICK:  What we have are clips.

18          That's what I'm looking at.

19                  MR. ENGEL:  I've given you what I

20          have obviously, and we'll -- we'll see if

21          there's anything more that might exist,

22          but --

23                  MS. FRICK:  Okay.

24                  MR. ENGEL:  And -- you know, but we

25          did give you -- there is a lengthy video --

85

1          like -- lengthy -- a minute-long video, too,

2          that was included.

3               MS. FRICK:  Sure.  Yeah, it's like

4          a minute long, though.  I mean, he's

5          indicating and testifying today that this

6          whole thing was all one long video.

7               MR. ENGEL:  Yeah.  I mean, he's --

8          to be fair, I think -- we'll take a look and

9          see if there's anything, but I think he's

10         kind of -- you got three levels of hearsay

11         here, right?  I mean, he's saying what his

12         daughter might have had and so --

13               THE WITNESS:  It's all one video.

14               MR. ENGEL:  Yeah.  We'll take a

15         look.  Whatever it is, it is.  And we'll --

16         we will -- obviously we will produce

17         everything that we have, and if we don't have

18         it, we don't have it.

19               MS. FRICK:  Okay.  Yeah, if we

20         don't have it all, we want to figure out why

21         that is, but okay.

22    BY MS. FRICK:

23         Q          Just to go on -- and I understand

24    it's your position that this isn't accurate, but I'm

25    going to ask you about it.  It says, The second video

86

1    is a 16-second clip of Ms. Langen standing at the

2    neighbors' residence knocking on the door seeking

3    assistance.  Have you ever seen a part of a video that

4    shows that?

5            A        I know that there was a video of

6    her knocking on the door, but I don't know if I have

7    seen it before.

8            Q        Okay.  The third 10-second clip is

9    Ms. Langen holding the child in her arms and

10   Mr. Redden calling Ms. Langen a piece of shit and

11   Ms. Langen asking him to call the police.  Do you have

12   a recollection of that?

13           A        Yes, I do.

14           Q        Okay.  So you don't dispute that

15   that happened; you just dispute whether these are

16   separate video clips?

17           A        Did I -- you're saying I just

18   called her a piece of shit.  I said yes, I did.

19           Q        Okay.  The fourth one minute and

20   8-second clip is Ms. Langen yelling that she wanted

21   her phone and asking the other daughter to call the

22   police multiple times and a verbal argument ensuing

23   over the phone and damage to a television.  Have

24   you --

25           A        Okay.

87

1    Q        -- seen portions of the video that

2 reflect that?

3    A        That's the video that I -- that's

4 the main video.  The minute and 8-second video was the

5 one I thought was the whole -- that's the video that

6 was taken, so I don't -- I can't -- I can't speak on

7 these other videos.

8            I would think the minute and eight

9 had the whole incident with me running through the

10 yard, coming up -- coming around the back of the

11 house, and then the altercation.  Because I think that

12 would have probably taken like 20 seconds outside

13 because it happened pretty fast.  I would think that

14 whole -- the one and eight is the video.

15    Q        Okay.  But as you sit here today,

16 you're not entirely certain; is that accurate?

17    A        Yeah, because I don't know -- I

18 mean, I don't know what happened with these videos.

19 The one -- I'm kind of confused.

20            If Kylee went over the videos with

21 Baird and sent them to Baird as evidence, how does

22 this ever even -- how does this report ever get

23 written?  Because there was no -- there was one video

24 that my daughter gave to Baird.  So all these other

25 videos, where are they coming from?  Like I see three,

88

1   16, 10.  There's multiple videos in here.  And this is

2   the day of the report.  This is on the day it

3   happened.

4                   MR. ENGEL:  Let me -- let me just

5           say -- let me suggest this, which is -- we

6           can do this later or I can do it when you're

7           done with your line of questioning.

8                   I'll just-- I can create a record

9           here, and I think it would be helpful of what

10          documents were -- what videos were produced

11          and what we have in our possession.

12                  MS. FRICK:  Oh, I'm getting there.

13                  MR. ENGEL:  So we're all on the

14          same page.

15                  MS. FRICK:  I'm getting there.

16                  MR. ENGEL:  Okay.

17                  MS. FRICK:  Okay.

18                  MR. ENGEL:  Well, I mean, but if

19          you're getting there, let's -- instead of

20          trying to, you know, ask the witness or trap

21          him into what videos might be --

22                  MS. FRICK:  I'm not trapping --

23                  MR. ENGEL:  Let me finish.  What

24          videos might be somewhere from a couple years

25          ago from his daughter's conversation with a

89

1           police officer, let's just talk about the

2           videos that we know exist and --

3                   MS. FRICK:  We'll --

4                   MR. ENGEL:  -- and you can just ask

5           him if there's other videos.  And we'll

6           search for any other videos.

7                   But, I mean, I think we're getting

8           a lot of confusion here in the record, and I

9           don't want -- you know, I don't -- I'll just

10          leave it at that.  Like we're getting --

11                  MS. FRICK:  Josh, I appreciate your

12          concern and your testimony here for your

13          client, but what I'm trying to do -- and we

14          can go through the videos.  I -- I expect to

15          do that.  But I'm just asking him about the

16          report, and I am asking these questions based

17          on his own testimony.  I am not -- it's not

18          my testimony; it's his.  And so --

19                  MR. ENGEL:  At the end of the day

20          you're asking him --

21                  MS. FRICK:  Let me finish.  I let

22          you finish; let me finish.

23                  I understand that he may be

24          confused.  I'm not trying to trap him or

25          confuse him.  I am confused because

1           everything I have ever seen is that there's

2           multiple videos.  And he may be confused

3           about that, but that's his testimony; not

4           mine.

5                   MR. ENGEL:  Well, no, I think -- I

6           think the evidence -- the testimony or the

7           questioning is causing some confusion here,

8           and that's why I'll just note an objection to

9           the form of all these questions because

10          you're asking him about information in a

11          police report that he did not write that's

12          describing a conversation that he was not

13          present for and --

14                  MS. FRICK:  Actually --

15                  MR. ENGEL:  -- so, you know, we've

16          got multiple ways that this is causing

17          confusion and so you can -- it's your

18          deposition.  You're free to ask whatever you

19          want, but I don't want you to come back and

20          say my client's intentionally withholding any

21          information or anything like that.

22                  I want to be clear that we produced

23          everything we have.  I'm willing to create a

24          record here of what exactly was produced

25          which includes two videos that are short

91

1      length and some videos of longer length, like
2      a minute.  That's -- that's what I think the
3      record here should be.
4              And so -- but it's your deposition.
5      But I just don't want to create more
6      confusion than necessary when it would be
7      really easy to clean this up.
8              MS. FRICK:  Well -- and again,
9      Josh, just so we're clear, I agree with you
10     that's what you've produced and that's what's
11     reflected in this report.  I am just
12     questioning because your client is saying
13     something different.
14             MR. ENGEL:  Well, I'm not sure he
15     is.  That's why I think there's some
16     confusion, and I'm objecting to the form, and
17     I want to give you an opportunity to clean it
18     up.
19             Because you're asking -- again,
20     you're asking your questions not -- you can
21     just ask him, what videos do you have, what
22     videos do you think exist.  But instead
23     you're asking him about a report he didn't
24     write, describing a conversation he wasn't
25     present for -- and so that's why we're having

92

1         some confusion.

2                 That's the basis for my objection

3         to the form of the questions.  But I think I

4         have created a good record here so we're

5         good.

6                 MS. FRICK:  Okay.  And I -- to be

7         frank, I've never asked him about

8         conversations that he wasn't present for.

9         I've asked him if he's seen the clips that

10        these are referencing.  That's what my

11        questions have been.

12                They're very different than what

13        you are representing in this, but I think at

14        this point we can go back and review the

15        transcript as it is, but I am going to

16        continue in my questioning.

17                MR. ENGEL:  No, that's fine.

18        Just -- as I said, our objection is simply

19        that we're creating some confusion here, and

20        I think -- it's to the form of the question,

21        and he can answer if --

22                MS. FRICK:  That's fine.  And the

23        objection is noted, so --

24   BY MS. FRICK:

25        Q        Okay.  Mr. Redden, we just talked

93

1   about this fourth one minute and eight-second clip.

2          A        Uh-huh.

3          Q        The next sentence talks about:  The

4   last one-minute clip is Ms. Langen chasing after

5   Mr. Redden from the driveway to the back door.

6   Ms. Langen tried to get her phone from Redden who was

7   standing in the sliding glass black door -- back door.

8   Mr. Redden is seen pushing Ms. Langen down and

9   continuing to not give back the phone.  Ms. Langen is

10  yelling back at him that she wants her phone.

11                 Now, previously you testified that

12  you believe there because a video that showed this

13  portion of the incident.  And I understand you may not

14  agree with the -- the interpretation of the video, but

15  is that the portion of the video that you have been

16  referencing as the video you believe that exists?  If

17  you know.

18         A        Yes, where she's trying to force

19  her way into the back door.  This says that I was seen

20  pushing Mrs. Langen down.  I mean, I don't -- I don't

21  know.  When did that -- where did that occur?  It seen

22  me pushing Mrs. Langen down?  I never saw that video.

23         Q        Okay.

24         A        There's not a video of me pushing

25  Bridget Langen.

94

1          Q          Okay.  Now, on the date of the

2     incident, did you ever provide or were you ever asked

3     to provide a written statement?

4          A          No.  I was never asked to provide a

5     written statement, but I would have asked him about

6     body cam, and he said he don't have it.  But, yeah, I

7     didn't ask him about -- no, there was never a written

8     statement, no.

9          Q          Okay.  But --

10         A          I was in handcuffs.  I was in

11    handcuffs in the back of the car.

12         Q          Okay.  But Officer Baird did speak

13    with you, and it's documented in this report that he

14    spoke with you; is that fair?

15         A          Yeah, he spoke to me.

16         Q          Okay.  Now, just because of the

17    concerns raised by your attorney, I can represent to

18    you because I don't have them on this laptop.

19                    All right.  Now that I plugged my

20    computer into my phone.  Here we go.

21                    For purpose of the record, what's

22    been provided to us is a 16-second video of Ms. Langen

23    at the neighbors, a 10-second video showing -- these

24    are approximate times.  But 10-second video showing

25    the two of you sort of arguing in the driveway.  A

95

1   three-second video of the two of you running in the

2   street.  Slightly over a minute video at the back

3   door.  And another one-minute, eight-second video

4   showing some shouting and incidents at the back door.

5   So that's what's been produced to us, five videos,

6   okay?

7           A       Okay.

8           Q       Mr. Redden, did you ever see

9   photos --

10              MR. ENGEL:  Hold on.  I -- I don't

11          think that's right.  I think there's six

12          videos that were produced to you.  And let

13          me -- let's do this so that we're all on the

14          same page.  I'm going to share my --

15              MS. FRICK:  Well, let me see what

16          we've got.  How about that?

17              MR. ENGEL:  Yeah, let me share the

18          screen here.  I'll create this as a -- we'll

19          mark it as Exhibit A.  Am I using letters?

20              MS. FRICK:  Why are we marking this

21          as an exhibit if we're just talking about

22          what was produced?  I'm not asking -- we're

23          not asking him about it.  It's my deposition

24          right now.

25              MR. ENGEL:  That's fine.  When I

96

1          get to cross-examining -- I mean, I can --
2          we're creating a record about what was
3          produced, and so I think it would be helpful
4          to have.  Let me pull it up here.
5                    MS. FRICK:  Steven, how many videos
6          do we have?  I mean, I'm not going to dispute
7          with you what we have.  If I only counted
8          five -- like I said, I am not connected to
9          the Internet, so I can't -- or connected to
10         my computer, so I can't see.
11                   MR. ENGEL:  Yeah, so let's do
12         this --
13                   MS. FRICK:  Steven, how many do we
14         show that we have?
15                   MR. RIGGS:  I'm only showing the
16         five that we have.  I could go back.  I think
17         we got a drive.  I could go back.  I have
18         access on my computer.  I'll go look to see
19         if there's something that was in the drive
20         that did not get put into our file.
21                   MR. ENGEL:  Here I'm sharing my
22         screen here.  There's a doc -- there's a
23         Video No. 1.  I'm showing the documents that
24         were shared with you called Filter-1 which is
25         a minute -- which is, I'm sorry, 16 seconds

1          long.  The second video is Filter-2 which is

2          10 seconds long.  The third video is called

3          Filter-3 which is three seconds long.  The

4          fourth video is --

5                    MS. FRICK:  We have that one.

6                    MR. ENGEL:  -- also named Filter-3

7          without parentheses, and it's one minute

8          long.

9                    MS. FRICK:  We have that one.

10                    MR. ENGEL:  There's one called

11          IMG_2607 which is a minute and eight seconds

12          long.

13                    MS. FRICK:  Sure.  We have that

14          one.

15                    MR. ENGEL:  And then the last one

16          is something called, PW forcing way into

17          home, which is 16 seconds long.

18                    So looking at the screen here,

19          that's one, two, three, four, five -- six

20          videos that were produced to you.

21                    MS. FRICK:  All right.  Maybe we --

22          maybe somehow we've missed one on our saving

23          it.  If not, we'll just confirm that.  Again,

24          I don't think for --

25                    If I can just have a minute, I

98

1      think I'm about done.  Just have a minute to
2      look at my notes.  So we can just take a
3      five-minute break.
4                     (Deposition stood in recess at
5                     11:40 a.m.)
6                     (Deposition reconvened at
7                     11:46 a.m.)
8                     MS. FRICK:  Okay.  And just for the
9      record for you, Josh, we do show six clips.
10     I think the confusion is, at least from our
11     perspective, and I didn't look at them real
12     closely again today, but two of them seem to
13     be of the same thing.  And I think that's
14     where our confusion was.  But they're labeled
15     something different, but they seem to be of
16     the same thing.
17                     I apologize if you think that I was
18     indicating that you've withheld anything.
19     That was not my intent.  My question was I
20     was a little confused by Mr. Redden's
21     testimony and was simply trying to clarify
22     the nature of the videos.  It's not that I'm
23     thinking you're withholding anything from us.
24                     MR. ENGEL:  No, I appreciate that,
25     and I did not take it in any way that there

1    was a suggestion that we were withholding.  I

2    just think it's always useful because as you

3    said, the names are confusing, the lengths

4    are confusing, to go over and make sure we're

5    all on the same page with what we have.

6              But we will go back and make a

7    further inquiry into anything else that might

8    exist.  And even if they're duplicative,

9    we'll make sure you get copies of everything

10   because everyone should have everything,

11   so --

12             MS. FRICK:  Okay.

13             MR. ENGEL:  So we're good.

14             MS. FRICK:  Okay.  All right.

15             MR. ENGEL:  What -- let me --

16   before you go on, let me do this.  Let me --

17   I will put on -- we'll mark as Exhibit A just

18   a screenshot of the drive that I shared there

19   so that -- so that we have a clean record of

20   that.

21             MS. FRICK:  Okay.

22             MR. ENGEL:  And I'll send that to

23   Pam and everybody.

24             MS. FRICK:  And then for the

25   record, because I don't think I said it on

100

1          the record, I will indicate that the police

2          report will be Exhibit 1, and I will send

3          that since we did -- since I did question him

4          about it.

5                    (Exhibit A marked for

6                    identification.)

7                    (Exhibit 1 marked for

8                    identification.)

9    BY MS. FRICK:

10          Q          Mr. Redden, just a couple other

11   follow-ups and then we'll be done here.

12                    Have we talked about generally all

13   of the ways in which this -- the arrest has affected

14   your life?

15          A          I think we covered -- yeah, you

16   pretty much asked me.

17          Q          Okay.  Is there anything else about

18   the incident that we haven't talked about that you

19   think I should know?

20          A          I don't think so.  I just don't

21   think that she -- when she was here that day and I

22   took that phone, there was just violence.  Like she

23   just wanted to resort to violence.  There was no

24   talking.  I mean, she didn't say, Why are you taking

25   that phone from me?  Like you know I don't have a new

1  one yet.  There wasn't any of that.  I mean, I took a

2  phone, and she chased me.  It was instant violence, so

3  I wasn't violent.  Like I'm not a violent person.

4          Q          Do you think, had you not taken the

5  phone, this incident even would have occurred?

6          A          No, I don't think so.  I think

7  there was something in that phone that she didn't want

8  me to see or something, so she flipped out.  I think

9  that's exactly what happened here.  What?  I don't

10  know.

11          Q          Okay.

12          A          Like I said, that phone was on my

13  account.  Like I watched where -- I watched where it

14  was going.  Like I saw things that I told her -- like

15  why are you -- why are you across from a drunk hotel?

16  I mean, there was just things.  I didn't want -- the

17  phone -- like I felt like she was at a point where I

18  wanted the phone back.  I didn't want to be included

19  in anything she did.

20                      She could have had the number.  I

21  just said, Go buy a phone and let me have that one

22  back.  And she just wouldn't do it.

23                      MS. FRICK:  Okay.  That's all the

24          questions I have.  Thank you.

25                      MR. ENGEL:  Okay.  I'll -- we'll

102

1        withhold questions for trial.  We'll read and

2        sign.

3                Other than that, I think we are

4        good from our end.  Thank you.

5

6              _____

                   MICHAEL KENNETH REDDEN, JR.

7

8        (DEPOSITION CONCLUDED AT 11:50 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

STATE OF OHIO       :
                              SS:
COUNTY OF BUTLER    :

     I, Pamela L. Jackson, a duly qualified and

commissioned notary public in and for the State of

Ohio, do hereby certify that prior to the giving of

his deposition, the within named MICHAEL REDDEN, was

by me first duly sworn to testify to the truth, the

whole truth, and nothing but the truth; that the

foregoing pages constitute a true and correct

transcript of testimony given at said time and place

by said deponent; that said deposition was taken by me

in stenotypy and transcribed under my supervision;

that I am neither a relative of nor attorney for any

of the parties to this litigation, nor relative of nor

employee of any of their counsel, have no interest

whatsoever in the result of this litigation, and am

not, nor is the court reporting firm for which I am

affiliated, under a contract as defined in Civil Rule

28(D).

            IN WITNESS WHEREOF, I hereunto set my

hand and official seal of office at Hamilton, Ohio,

this 27th day of May, 2025.

_____

                    Commission Expires 11/17/28

DECLARATION

I, Brenda Whitney, declare under penalty of perjury, that the following is true and correct. On April 14, 2025, Pamela Jackson, passed away prior to being able to transcribe the attached transcript for the deposition of Michael Redden. Based upon stenographic record I received in order to transcribe this deposition, prior to the giving of his deposition, the within named MICHAEL REDDEN, was by Pamela Jackson first duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing pages constitute a true and correct transcript of testimony given at said time and place by said deponent; that said deposition was taken by Pamela Jackson in stenotypy and transcribed by me; that I am neither a relative of nor attorney for any of the parties to this litigation, nor relative of nor employee of any of their counsel, have no interest whatsoever in the result of this litigation, and am not, nor is the court reporting firm for which I am affiliated, under a contract as defined in Civil Rule 28(D).

Executed on this __11th__ day of September, 2025.

_Brenda Whitny_
Brenda Whitney

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

**[**

**[sic] (1)**
66:7

**A**

**ability (1)**
7:8
**able (8)**
25:7,13;37:3;41:17;
46:2,15;80:15;82:17
**abuse (1)**
68:7
**access (1)**
96:18
**account (3)**
26:6,10;101:13
**accurate (10)**
6:17,18;12:17,22,
22;13:21;34:6;82:12;
85:24;87:16
**across (1)**
101:15
**act (1)**
68:11
**actual (4)**
47:6;54:7;68:19;
83:12
**actually (8)**
17:16;26:19;29:12;
55:6;61:14;65:25;
67:21;90:14
**adapter (1)**
30:3
**additional (1)**
20:24
**address (4)**
8:6,10,14;17:9
**advised (2)**
65:18,20
**affected (7)**
45:17;75:17,18;
77:10;79:8,10;100:13
**again (13)**
13:14;22:21;31:22;
33:23;35:8;54:3;
64:21;67:17;77:3;
91:8,19;97:23;98:12
**against (5)**
62:21,24;66:10;
69:2;70:12
**age (1)**
5:2
**ages (1)**
8:23
**aggressor (1)**
63:10
**ago (3)**
12:18;76:2;88:25
**agree (2)**
91:9;93:14

**agreed (1)**
14:9
**agreement (1)**
14:1
**ahead (2)**
14:19;29:6
**ahold (2)**
40:20,21
**allow (2)**
5:23,24
**allowed (1)**
18:20
**almost (3)**
8:11;45:16;68:22
**altercation (1)**
87:11
**altercations (4)**
17:11;20:1,4,14
**always (6)**
17:7;39:1;42:13;
75:22,23;99:2
**anxiety (1)**
76:21
**anxious (1)**
75:22
**anymore (7)**
14:25;16:9;32:18;
41:23;76:11;79:21,23
**apologize (2)**
69:12;98:17
**apparel (2)**
11:7,8
**appeal (1)**
75:16
**appealed (1)**
75:8
**Appeals (2)**
68:15;75:11
**appreciate (2)**
89:11;98:24
**approximate (2)**
46:24;94:24
**approximately (7)**
13:1,4;21:12;25:23;
33:16;34:11;46:19
**April (2)**
13:3,8
**apt (1)**
67:12
**area (5)**
10:3,6,11;32:22;
41:2
**arguing (1)**
94:25
**argument (3)**
23:13,24;86:22
**arm (5)**
40:14;45:2,24;46:3;
47:13
**arms (5)**
39:11;40:24;41:6,
21;86:9
**around (13)**

12:20;31:6;34:4;
36:5;37:1;39:11;
40:24;41:6;47:14;
67:7,9;79:13;87:10
**arrangement (2)**
14:5;16:15
**arrangements (2)**
9:9;15:4
**arrest (2)**
66:11;100:13
**arrested (8)**
33:2;57:24;58:2;
61:4;63:6;64:23;
73:12;76:12
**arresting (1)**
64:2
**arrive (1)**
48:13
**arrived (7)**
21:13,23;23:2;
59:12,17;60:20;82:1
**assistance (1)**
86:3
**assume (1)**
7:4
**assumption (1)**
79:24
**attack (3)**
33:22;37:20;63:11
**attacked (4)**
33:20;38:14;59:9;
63:14
**attorney (3)**
5:17;72:5;94:17
**August (6)**
8:11;16:20,21,22;
67:15,25
**aware (4)**
21:5;36:6;68:25;
69:17
**away (3)**
33:21;61:7;77:4
**awesome (1)**
71:7

**B**

**back (65)**
7:23;14:22;23:20;
24:13,24;25:1;27:4,7,
13,15;28:4;30:16,23;
31:1;34:5,6,8,18,23;
35:17,17,24,25;36:11;
40:17;41:10;44:24;
55:15;60:1,15,17;
62:2;66:15,16;67:18;
68:10,14;69:4,5,7;
70:2,6;71:13,14,15;
72:2,11;76:4;78:9;
87:10;90:19;92:14;
93:5,7,9,10,19;94:11;
95:2,4;96:16,17;99:6;
101:18,22

**backseat (1)**
28:14
**Backyard (9)**
21:25;22:1,5,8;
23:9,17;30:18;31:22,
24
**bad (1)**
45:15
**baffled (2)**
62:5;64:1
**Baird (23)**
5:12;17:17;18:13;
49:17;50:7;51:19;
53:16;54:9,16;59:11,
17;60:12;62:21;
63:17,24;64:14;
73:16,19;82:6;87:21,
21,24;94:12
**ballpark (1)**
13:1
**bamboozled (1)**
77:17
**banging (4)**
35:21;36:11,15;
42:15
**barrel (1)**
43:19
**Based (5)**
12:7;19:19;79:25;
84:11;89:16
**Basically (11)**
11:6;17:20;18:24;
23:25;25:14;27:4,6;
59:19,24;60:17;70:9
**basis (2)**
12:2;92:2
**bear (5)**
40:3,11,12;41:5;
62:10
**beater (1)**
79:16
**became (1)**
10:19
**become (1)**
16:18
**began (1)**
26:22
**begin (1)**
15:3
**beginning (3)**
25:11,12;53:15
**begun (1)**
36:2
**behind (4)**
31:15;34:11;35:19;
37:15
**belong (1)**
62:13
**belongings (2)**
17:18;20:18
**bend (1)**

**backseat** ... 46:15
**best (3)**
5:23,24;76:10
**bet (1)**
69:9
**better (1)**
67:12
**birth (1)**
7:11
**birthday (2)**
25:24;74:16
**bit (18)**
5:19,22;24:15;25:5;
36:24;39:7;44:14,22,
22,24;45:2,7,14,21;
46:3,4;65:7;81:22
**bite (1)**
45:5
**biting (1)**
39:8
**black (1)**
93:7
**blew (1)**
47:22
**block (2)**
43:8,11
**body (3)**
43:7,10;94:6
**born (1)**
25:25
**both (6)**
41:12;52:25;70:22,
22,23;71:1
**bought (1)**
10:7
**Brad (1)**
52:22
**brain (1)**
78:11
**break (7)**
6:5,7;25:4;42:19;
49:4;55:9;98:3
**breaks (1)**
6:10
**Bridget (49)**
9:16;12:16;14:5;
15:18,22;17:6;20:1;
22:4,7,17,22;24:1,1,3,
8,20,21,24;27:17,25;
28:2,21;32:17,21;
33:13,14,19,24,25;
35:12;36:5,11;38:17;
42:6;60:10,14,17;
66:11;68:6;69:3;74:3;
75:5;76:2,8;77:17,17,
20;84:5;93:25
**Bridget's (3)**
69:1;76:8;77:22
**briefly (3)**
5:19;7:20;22:15
**bring (7)**
27:23,25;28:1;49:8,
8,9;69:2;70:11

**broke (8)**
24:21;25:21;26:1,6;
53:11;78:10,15,16
**broken (1)**
48:22
**brought (5)**
15:24;18:10;60:16;
69:7;77:6
**buckling (1)**
28:13
**Buddy (1)**
64:21
**building (2)**
69:24,25
**bully (1)**
58:8
**business (1)**
79:5
**Butler (4)**
16:25;63:25;73:13,
14
**buy (1)**
101:21

**C**

**call (11)**
56:15,21;57:20;
59:3;66:15,25;71:14,
17;76:7;86:11,21
**called (44)**
10:21;17:12,16;
18:2;20:8;33:15,18,
18,19;56:9,18,20,20;
57:10,11,13,13,14,14,
18,20,21,22,25;58:1,
3,12,13,15,25;59:2,4,
5,6;66:16;68:10;
71:13,15;73:14;
86:18;96:24;97:2,10,
16
**calling (1)**
86:10
**calls (1)**
66:21
**cam (1)**
94:6
**came (22)**
16:22;17:17;22:4,8;
23:14;31:22,23,25;
32:23,25;33:12,14,17,
21,21,22;46:12,12;
57:9;58:16;60:17;
73:9
**can (45)**
6:6;7:19,23;8:22;
13:14;14:17;20:11,
12;22:20,22;43:4;
52:12,12;55:7,10,22;
57:23;67:13;70:12;
72:3;76:1,3,5,8,14,14,
15,24;79:7,19;80:12,
24;88:6,6,8;89:4,14;

90:17;91:20;92:14,
21;94:17;96:1;97:25;
98:2
**Captain (6)**
67:21;68:20,21;
69:8,10;70:3
**car (26)**
22:17,18;23:3;24:7,
9;25:2;27:18,18,22,
23,25;28:1,1,2,3,11,
12,14,18;29:9,12;
30:2;60:18;61:15;
76:4;94:11
**care (4)**
66:10;67:13;70:8;
71:8
**career (2)**
11:2,21
**careful (1)**
54:1
**Carly (4)**
33:6,9,22;34:2
**carpet (1)**
41:9
**case (2)**
5:11;67:11
**cause (1)**
63:9
**causing (2)**
90:7,16
**caution (1)**
53:20
**cautioning (1)**
53:25
**cell (2)**
50:5,8
**certain (3)**
14:15;53:12;87:16
**certification (1)**
10:25
**certified (1)**
5:3
**chance (1)**
38:15
**change (1)**
11:21
**changed (3)**
52:10;69:9;75:19
**charged (3)**
60:1,2;62:3
**charger (4)**
29:23,25;30:1,2
**charges (7)**
18:9;66:10;69:2;
70:8,11,12,23
**chase (2)**
30:10,13
**chased (5)**
30:9,12,17;34:18;
101:2
**chasing (5)**
31:6;34:13,18;36:5;
93:4

**check (3)**
54:8;72:3;84:12
**child (5)**
48:21;49:17;68:6,7;
86:9
**children (10)**
8:15,16,17;14:8,10;
20:4;22:6;24:21;
25:14;77:11
**children's (1)**
25:24
**choices (5)**
59:25;60:6;61:17,
21;62:2
**chop (1)**
49:7
**cigarette (1)**
30:3
**claim (1)**
20:24
**claiming (1)**
12:13
**clarification (1)**
19:5
**clarify (3)**
26:9;31:5;98:21
**classes (1)**
10:20
**Claw (3)**
76:4,5,9
**clean (3)**
91:7,17;99:19
**cleaner (1)**
21:21
**cleans (1)**
21:21
**clear (10)**
6:22;45:6,19,20;
56:24;63:16;66:19;
80:3;90:22;91:9
**client (3)**
84:12;89:13;91:12
**client's (1)**
90:20
**clip (9)**
82:25;83:9,14;84:5;
86:1,8,20;93:1,4
**clips (9)**
83:4,16,22;84:1,4,
17;86:16;92:9;98:9
**close (5)**
32:20;35:1,10,20;
42:23
**closed (4)**
35:14;42:17;47:6,8
**closely (1)**
98:12
**clothes (2)**
18:5,7
**coincide (1)**
13:18
**com (1)**
47:22

**comfortable (1)**
57:16
**coming (8)**
21:5,16;43:8,11;
58:21;87:10,10,25
**comment (1)**
69:10
**commission (2)**
12:1,8
**commission-based (1)**
12:9
**committed (4)**
66:12,13;70:13,13
**communicates (2)**
77:16,19
**communication (1)**
25:15
**communications (2)**
53:21;55:25
**company (3)**
11:14,15,18
**complaint (13)**
62:21,24;63:2;65:3,
4,19,21,23;66:4;
72:14,20,24,24
**complaints (1)**
72:15
**completely (3)**
14:21,21;77:17
**computer (3)**
94:20;96:10,18
**concern (2)**
63:4;89:12
**concerned (2)**
66:16;68:11
**concerns (2)**
76:22;94:17
**confirm (2)**
50:25;97:23
**confuse (1)**
89:25
**confused (7)**
51:25;68:21;87:19;
89:24,25;90:2;98:20
**confusing (2)**
99:3,4
**confusion (10)**
78:22;89:8;90:7,17;
91:6,16;92:1,19;
98:10,14
**connected (2)**
96:8,9
**consistently (1)**
13:8
**constructor (1)**
10:20
**contact (11)**
16:9;24:20;25:7,13;
67:16,23;68:1,2,3,4,5
**contacted (1)**
64:21
**continue (1)**
92:16

**continuing (1)**
93:9
**control (1)**
40:22
**conversation (8)**
23:13,16;24:3;60:8;
66:6;88:25;90:12;
91:24
**conversations (3)**
73:7,18;92:8
**convicted (2)**
73:5;74:21
**conviction (8)**
67:18;68:5,16,25;
69:17;75:8,12,15
**copies (3)**
71:22;72:4;99:9
**copy (1)**
71:25
**costs (2)**
39:4;47:21
**couch (3)**
22:9;23:20,21
**Counsel (2)**
50:16;56:1
**counseling (2)**
76:21;77:2
**counted (1)**
96:7
**counter (3)**
34:21;35:1,15
**county (6)**
16:24,25;51:22;
63:25;73:13,14
**couple (5)**
5:17;68:13;80:18;
88:24;100:10
**court (12)**
5:21;9:13;19:4;
21:2;29:8,21;49:7;
51:23;53:3;68:15;
75:11;84:6
**cover (1)**
73:4
**covered (1)**
100:15
**create (4)**
88:8;90:23;91:5;
95:18
**created (2)**
84:7;92:4
**creating (2)**
92:19;96:2
**crimes (4)**
66:12,13;70:13,15
**criminal (8)**
52:22;53:2,8,18;
54:4,11,23;70:16
**CROSS-EXAMINATION (1)**
5:5
**cross-examining (1)**
96:1
**crouched (2)**

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

46:7,8
**curious (1)**
  28:8
**current (1)**
  8:6
**currently (3)**
  8:13;11:3;16:11
**custodial (2)**
  16:17,19
**custody (5)**
  14:1;15:1;16:11,25;
  52:23
**cut (3)**
  49:13;52:6,9

## D

**damage (1)**
  86:23
**damaged (1)**
  77:12
**damaging (1)**
  70:16
**date (4)**
  7:11;13:20;20:17;
  94:1
**dates (2)**
  13:9;72:13
**daughter (20)**
  25:7;49:20,25;50:1;
  51:17;54:9,9,16;61:2,
  6,10,24;75:1;82:16;
  83:8,15;84:13;85:12;
  86:21;87:24
**daughters (2)**
  8:20;9:9
**daughter's (5)**
  50:5,8;51:5,14;
  88:25
**Dawn (1)**
  5:11
**day (23)**
  20:16;21:4;22:25;
  27:11,16;50:8;51:9;
  53:16;54:18;56:25;
  63:24;66:13;67:19,
  20;71:6;72:10,12;
  78:10;83:13;88:2,2;
  89:19;100:21
**daycare (2)**
  15:17,18
**days (4)**
  14:10;65:16;73:22;
  76:16
**dealing (1)**
  77:4
**decision (1)**
  63:9
**Defendants (1)**
  5:11
**defense (1)**
  53:8
**defensive (1)**

43:5
**deleted (2)**
  49:15;51:14
**department (3)**
  71:24;72:18;81:7
**depends (1)**
  27:24
**deposed (1)**
  5:4
**deposition (9)**
  5:14;55:11,13,19;
  90:18;91:4;95:23;
  98:4,6
**deputy's (1)**
  64:5
**describe (3)**
  13:11;17:5;75:17
**describing (2)**
  90:12;91:24
**determine (1)**
  40:10
**determined (1)**
  37:25
**Difference (1)**
  13:18
**different (8)**
  14:22;26:9;28:20;
  67:1;79:16;91:13;
  92:12;98:15
**differently (1)**
  13:17
**diffuse (1)**
  18:16
**disclose (1)**
  53:20
**discuss (3)**
  55:25;77:7;78:12
**discussed (4)**
  5:18;78:6;79:5;
  80:8
**discussing (4)**
  23:23,25;60:13;
  61:11
**discussion (2)**
  23:10;72:25
**discussions (1)**
  81:21
**dispute (4)**
  82:19;86:14,15;
  96:6
**distance (1)**
  32:17
**District (2)**
  67:18;69:1
**doc (1)**
  96:22
**doctor (1)**
  76:25
**document (1)**
  80:13
**documented (1)**
  94:13
**documents (4)**

7:17;56:4;88:10;
  96:23
**domestic (8)**
  60:2;62:3;63:9;
  70:18;73:10;74:18,
  22,22
**done (6)**
  11:22;48:24;69:2;
  88:7;98:1;100:11
**door (73)**
  18:25;19:6,11;28:2,
  17;29:15,18;30:16;
  31:16;32:13;34:6,18,
  22;35:2,6,10,13,18,
  18,20,24,25;36:10,12,
  16,22,23;37:2,8,10,
  13,15,22,25;38:1,3,4,
  5,13,17,18,19,21,23,
  24;39:1,15,15;40:5,
  22;41:3,10,16,19;
  42:9,16,23;43:2,16,
  17;44:1,5,23;46:10,
  14;86:2,6;93:5,7,7,19;
  95:3,4
**doorway (6)**
  38:6;39:8,23;40:19;
  42:22;46:8
**down (19)**
  25:4;30:12,14;34:4;
  46:7,8,11,15;48:22;
  53:3,8;56:18;58:16;
  64:24,25;79:21;93:8,
  20,22
**downloaded (1)**
  54:6
**dragging (1)**
  84:5
**drank (1)**
  13:19
**Drinking (1)**
  13:19
**Drive (7)**
  8:7;13:2;55:4,6;
  96:17,19;99:18
**driver's (8)**
  28:21,21,25;29:3,
  10,11,18,22
**driveway (7)**
  24:7;27:19;30:16;
  76:8;82:7;93:5;94:25
**drop (1)**
  15:8
**dropoff (1)**
  28:3
**dropped (1)**
  66:10
**drunk (1)**
  101:15
**duly (1)**
  5:2
**dumbfounded (2)**
  62:7,8
**duplicative (1)**

99:8
**during (6)**
  14:6;24:15;58:15;
  73:19;78:24;79:2

## E

**earlier (1)**
  56:8
**easier (1)**
  6:16
**easy (2)**
  29:17;91:7
**edge (1)**
  76:13
**education (3)**
  10:17,21,23
**eight (3)**
  87:8,14;97:11
**eight-second (2)**
  93:1;95:3
**either (4)**
  10:17;28:16;64:10;
  71:13
**elbow (3)**
  45:14,14,17
**Elder (2)**
  10:13,16
**elevator (2)**
  10:19,20
**Elevators (1)**
  10:22
**else (11)**
  18:19;32:22;40:15,
  15;55:22;60:6;61:3;
  62:16;80:9;99:7;
  100:17
**email (5)**
  54:12,25;55:2,3,5
**emailed (1)**
  54:16
**emotion (1)**
  47:22
**employed (2)**
  11:3;78:24
**employment (1)**
  11:25
**empty (2)**
  76:3,5
**enabled (1)**
  45:2
**end (3)**
  10:24;24:6;89:19
**ended (3)**
  30:23;48:25;62:20
**ENGEL (40)**
  7:16;15:11;50:16,
  22;52:11;53:19,25;
  55:23;80:19,23;81:2;
  84:15,19,24;85:7,14;
  88:4,13,16,18,23;
  89:4,19;90:5,15;
  91:14;92:17;95:10,

17,25;96:11,21;97:6,
  10,15;98:24;99:13,15,
  22;101:25
**enough (1)**
  35:9;46:9,11
**ensuing (1)**
  86:22
**entire (1)**
  70:7
**entirely (1)**
  87:16
**estimate (2)**
  42:5;46:20
**even (27)**
  5:21;15:17;18:17;
  28:1,4;40:18,18;
  41:24,24;44:2;48:16,
  17;49:19;62:22,22;
  64:19;76:9,11;79:9,
  12,13,14,21;83:10;
  87:22;99:8;101:5
**evening (1)**
  22:25
**eventually (3)**
  10:19;47:24;59:11
**everybody (4)**
  9:6;53:15;73:3;
  99:23
**Everyone (4)**
  21:25;22:2;58:9;
  99:10
**everything's (1)**
  11:20
**evidence (4)**
  54:19;63:8;87:21;
  90:6
**exactly (8)**
  15:1;32:7;34:17;
  35:15;56:19;59:10;
  90:24;101:9
**examined (1)**
  5:3
**except (1)**
  9:12
**excuse (1)**
  5:12
**Exhibit (6)**
  95:19,21;99:17;
  100:2,5,7
**exist (4)**
  84:21;89:2;91:22;
  99:8
**exists (1)**
  93:16
**expect (3)**
  6:3;21:9;89:14
**explain (3)**
  13:16;14:12;44:19

## F

**face (6)**
  36:25;45:4,5;47:7,

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

9,23

**fact (1)**
32:23

**fair (9)**
6:1,2;7:5,6;25:18;
31:4;67:14;85:8;
94:14

**Fairly (1)**
42:8

**falls (1)**
34:4

**family (4)**
33:19;66:17;76:10,
17

**far (5)**
6:12;12:11;33:21;
34:11;44:2

**fast (1)**
87:13

**faster (1)**
34:17

**feel (4)**
53:10;73:5;76:24;
77:12

**feet (6)**
34:14,14;35:24,25;
41:3;43:20

**fell (1)**
30:12

**felony (1)**
60:1

**felt (3)**
19:7;57:16;101:17

**few (1)**
48:22

**fiance (1)**
12:23

**figure (2)**
57:23;85:20

**figured (2)**
19:2;49:19

**file (6)**
65:3,19,20;69:22,
23;96:20

**filed (9)**
62:24;63:2;65:4,22;
67:19;68:18;71:23;
72:14,15

**filing (1)**
62:20

**fill (1)**
66:3

**filled (6)**
68:19;69:6;70:1;
72:10,15,19

**Filter-1 (1)**
96:24

**Filter-2 (1)**
97:1

**Filter-3 (2)**
97:3,6

**Finally (1)**
6:24

**find (1)**
52:7

**fine (10)**
7:16,18;15:15;23:9,
13;31:2;50:24;92:17,
22;95:25

**finish (8)**
5:24,25;6:9;11:1;
88:23;89:21,22,22

**first (17)**
5:2;12:15;23:2;
24:21;31:1;34:4,19;
36:24;57:14;59:4;
60:19;64:18;68:24;
69:16;72:23;81:18;
82:24

**fist (4)**
42:16,17;47:6,8

**five (5)**
9:1;95:5;96:8,16;
97:19

**five-minute (2)**
55:9;98:3

**fix (1)**
71:12

**flash (2)**
55:4,6

**flipped (1)**
101:8

**floor (2)**
40:24;41:8

**floral (1)**
57:2

**Florida (4)**
23:10,12,14,23

**follow (5)**
24:9;31:10;66:18,
20,23

**followed (2)**
60:17;68:10

**follows (2)**
5:4;34:8

**follow-ups (1)**
100:11

**foot (1)**
43:25

**footage (3)**
82:15,17,21

**force (8)**
36:23;39:3,4;41:17;
43:18;44:6;56:21;
93:18

**forced (4)**
32:4;44:7;62:12;
63:14

**forcing (5)**
38:11,11;40:23;
43:5;97:16

**forearm (6)**
45:8,12,13,16,21,22

**forever (2)**
75:19;77:12

**form (6)**

52:11;68:19;90:9;
91:16;92:3,20

**formal (2)**
10:17;14:1

**forward (1)**
46:14

**found (2)**
74:18;76:4

**four (4)**
22:9;73:22;76:16;
97:19

**fourth (3)**
86:19;93:1;97:4

**frank (1)**
92:7

**free (1)**
90:18

**FRICK (55)**
5:6,11;7:13,19,23;
8:4;50:19;51:2,3;
53:24;55:7,15,17;
56:2,3;74:25;80:12,
16,21,25;81:3,4;
84:10,17,23;85:3,19,
22;88:12,15,17,22;
89:3,11,21;90:14;
91:8;92:6,22,24;
95:15,20;96:5,13;
97:5,9,13,21;98:8;
99:12,14,21,24;100:9;
101:23

**Friday (2)**
14:23;73:24

**front (9)**
30:11,12,15,17;
31:6;32:13;34:4;41:3;
81:6

**froze (1)**
74:23

**full (3)**
5:8;47:22,22

**fully (2)**
40:1;43:24

**further (2)**
41:1;99:7

## G

**garage (8)**
17:15;18:5,21,25;
19:3,8,10,11

**gave (9)**
26:3,15;59:25;60:5,
22;67:21;69:23;71:6;
87:24

**generally (3)**
21:9;27:21;100:12

**get-go (1)**
59:20

**gets (4)**
7:2;39:19;47:24,24

**given (3)**
15:7;60:3;84:19

**glass (8)**
34:22;35:2;36:12,
16;37:21;39:15;
40:20;93:7

**Good (6)**
5:7;14:12;80:24;
92:4,5;99:13

**Gotcha (1)**
26:21

**grabbed (4)**
28:24;29:14,16,20

**graduate (1)**
10:12

**graduating (1)**
10:16

**Groene (1)**
52:22

**ground (8)**
5:17;26:17;41:7,12,
13,18;44:4,8

**guess (3)**
32:25;37:4;49:7

**guilty (2)**
59:19;74:18,21

**guy (1)**
75:23

## H

**half (2)**
8:16;81:8

**Hamilton (9)**
8:7;10:3,6;17:1,2;
51:22,22;53:3;64:9

**hand (1)**
43:13

**handcuffs (2)**
94:10,11

**handle (2)**
67:12;76:24

**handled (3)**
63:1,5,7

**hands (4)**
40:18;43:12;44:21,
22

**happened (32)**
15:10;16:10;21:3;
22:19;23:4;30:8;32:1,
2;33:22;37:3;40:15,
15;44:20;45:5;46:4;
54:10,20;59:22;
60:20;61:3,21;63:14;
64:20,22;65:6;78:10;
82:23;86:15;87:13,
18;88:3;101:9

**happens (2)**
7:1;36:20

**hard (2)**
36:19,19

**Harrison (1)**
68:7

**hear (3)**
7:3;24:2;69:21

**heard (1)**
24:1

**hearsay (1)**
85:10

**heels (1)**
43:6

**height (1)**
46:14

**held (2)**
43:15;74:6

**help (3)**
58:13;71:9;76:21

**helped (1)**
57:17

**helpful (2)**
88:9;96:3

**helping (1)**
58:4

**herein (1)**
5:2

**hereinafter (1)**
5:3

**Hey (2)**
33:19;76:8

**hi (1)**
79:22

**high (2)**
10:12,13

**Hill (4)**
10:10;30:13,15;
34:5

**hinders (1)**
7:8

**hire (1)**
52:20

**hit (3)**
37:2;47:3;84:1

**hitting (1)**
41:23

**hold (6)**
11:20;38:8;40:3,13,
17;95:10

**holding (8)**
36:1;40:5,19;42:9,
10;44:23;46:1;86:9

**hollering (1)**
32:13

**home (23)**
10:7;15:23;18:20;
19:21;20:18,25;21:6,
24;22:11;32:12;
33:17;39:4,6;40:1,7;
42:23;43:24;56:22;
59:12;62:12,14;
63:15;97:17

**honest (1)**
52:1

**honestly (3)**
15:19;16:2;28:15

**hotel (1)**
101:15

**hour (2)**
6:6;55:8

Case: 1:24-cv-00342-MWM Doc #: 18 Filed: 09/11/25 Page: 110 of 116 PAGEID #: 522
Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

**house (56)**
15:5;17:19;18:23;
19:1,6,9,10,12;24:24;
30:17,18,20;32:4,19;
33:12;34:4,5,19,20,
23,25;35:10;36:14,
21;37:4,7;38:25;
39:20,23;40:5,17,25;
41:4,22,23;42:2,11,
14,15;43:19;44:7,10,
18,25;45:3,3;47:25;
48:2,8;50:9;60:17;
76:3,18;78:20;79:13;
87:11
**houses (1)**
21:22
**How's (2)**
58:10,11
**hug (4)**
40:11,12;41:5;
62:10
**hurt (2)**
47:16,20
**husband (1)**
60:11
**Hustle (3)**
11:15,17,23

**I**

**idea (2)**
17:3;64:9
**identification (2)**
100:6,8
**ignored (1)**
71:16
**imagine (2)**
15:24;80:1
**IMG_2607 (1)**
97:11
**Imhoff (3)**
9:23;20:9,14
**I-M-H-O-F-F (1)**
9:24
**incident (39)**
9:10;12:11;13:20;
16:5,7,8;17:4,14,22;
19:24;20:17;21:3;
23:1;32:1,2;36:3,7;
45:15;48:14;52:19;
62:25;64:19;65:9;
66:17;67:25;72:16;
74:2;75:16;77:23;
78:18;79:25;80:5;
82:10;84:2;87:9;
93:13;94:2;100:18;
101:5
**incidents (3)**
17:11;20:7;95:4
**included (3)**
49:15;85:2;101:18
**includes (1)**
90:25

**income (1)**
12:13
**indicate (2)**
73:7;100:1
**indicated (4)**
44:13;60:5,5;78:2
**indicates (3)**
82:6,9,14
**indicating (2)**
85:5;98:18
**Industries (1)**
10:22
**information (2)**
90:10,21
**Initially (1)**
26:11
**initiated (1)**
23:12
**inquiry (1)**
99:7
**inside (5)**
19:1,15;37:2;45:24;
62:11
**insinuated (1)**
59:18
**instant (1)**
101:2
**instead (2)**
88:19;91:22
**instruction (1)**
15:12
**intent (1)**
98:19
**intentional (1)**
47:15
**intentionally (1)**
90:20
**interact (1)**
79:14
**interacted (1)**
68:9
**interactions (1)**
19:19
**interest (1)**
76:10
**Interesting (1)**
28:9
**Internet (2)**
7:2;96:9
**interpretation (1)**
93:14
**into (60)**
12:11;13:1;22:8;
24:7;28:1,11,13,18;
30:3,11,17,18,18;
32:4;34:5,18,20,23,
25;35:9,13;36:13,23;
37:7;39:4,6,19;40:1,
19;41:4;42:11,14,15;
43:24;44:1,6,7,17,25;
45:2,3;48:22;49:1,4;
52:6;53:3,11;56:21;
62:12;63:14;67:19;

70:2;72:11;76:25;
88:21;93:19;94:20;
96:20;97:16;99:7
**Investigative (1)**
81:7
**involved (4)**
51:20;52:24,25;
55:5
**involving (2)**
20:4;82:11
**issues (1)**
17:7

**J**

**jail (5)**
65:10;73:14,21;
74:6;76:15
**January (1)**
68:5
**job (1)**
5:21
**John (1)**
52:23
**Josh (7)**
7:14;81:18,21;
84:11;89:11;91:9;
98:9
**Joshua (1)**
7:13
**JR (2)**
5:1,9
**judge (2)**
74:7,18
**judgment (1)**
76:6
**July (15)**
9:10;13:21,23,24,
25;16:21;17:5,21;
19:24;20:16,22;21:4;
27:16;73:24;74:2
**just- (1)**
88:8

**K**

**keep (9)**
26:14;32:19;39:9,
13;40:7,16;43:20;
68:6;71:22
**keeping (2)**
40:4;83:2
**KENNETH (2)**
5:1,9
**kept (7)**
32:17;36:21,22;
38:7,7,7,11
**kid (2)**
58:8,8
**kids (11)**
22:3;37:11,14,19,
20,22;57:17;58:4,7,
11,11

**kind (26)**
7:2;10:18;11:8;
14:1;19:9;22:16,18;
25:4;26:8;28:2,3,19;
30:1;35:8;37:5,15;
40:21;43:1;46:7,8;
56:17;57:2;64:19;
75:17;85:10;87:19
**kinds (1)**
79:11
**knees (1)**
46:9
**knew (2)**
58:4;63:19
**knocking (2)**
86:2,6
**knowledge (9)**
17:13;20:10,19,23;
21:1,16;49:24;54:20;
72:21
**knows (5)**
78:5,8,9,10,13
**KR (1)**
82:16
**Kylee (21)**
8:25;9:20;22:6,13;
23:11;32:22;35:22;
36:1,2,6;38:14;48:13;
60:9;75:1;78:2,4;
82:17,21;83:17;84:1;
87:20

**L**

**labeled (1)**
98:14
**landed (1)**
44:7
**Langen (27)**
9:17;12:16,25;17:6,
8;20:1,5,18;21:5,9,20,
23;57:6;82:11;86:1,9,
10,11,20;93:4,6,8,9,
20,22,25;94:22
**Langen's (1)**
83:2
**laptop (1)**
94:18
**last (6)**
9:5,6;22:20;33:10;
93:4;97:15
**lasted (1)**
71:11;78:11
**later (1)**
88:6
**law (2)**
51:20;52:20
**lawful (1)**
5:2
**lawsuit (1)**
77:6
**lawyer (7)**
15:12;51:18;52:23;

53:18,21;54:13;55:24
**lawyers (10)**
48:24;49:3;51:19;
52:14,18,18,21;53:1;
54:5,23
**lead (3)**
67:11;71:20,21
**leaned (2)**
46:13;76:5
**leaning (1)**
28:15
**least (4)**
25:16;39:15;66:11;
98:10
**leave (4)**
13:5;50:9;66:25;
89:10
**leaves (1)**
48:2
**leaving (2)**
24:6;25:9
**led (1)**
23:1
**left (16)**
11:1;18:14;19:2;
24:2,4,24;25:8;31:13;
33:13;42:3;45:17;
48:11;51:13;67:22;
69:24,25
**legal (1)**
63:15
**leggings (1)**
57:7
**length (4)**
66:2;7;91:1,1
**lengths (1)**
99:3
**lengthy (2)**
84:25;85:1
**letters (1)**
95:19
**letting (1)**
81:1
**levels (1)**
85:10
**lie (1)**
84:9
**life (5)**
69:9;75:19;79:8,10;
100:14
**lift (2)**
37:4;42:1
**lighter (1)**
30:3
**limbo (1)**
11:19
**line (2)**
25:14;88:7
**little (27)**
5:19,22;24:15;25:5;
51:25;57:13,15,20,25;
59:4;60:18;64:18,21,
25;65:7,9;67:8,10;

70:21;71:1,3,4,5,17;
73:8;81:22;98:20
**live (3)**
9:3;13:7;76:19
**lived (3)**
8:9;13:13;17:8
**lives (1)**
8:13
**living (1)**
9:9
**load (1)**
28:1
**loaded (1)**
24:7
**loading (2)**
28:16,18
**lock (3)**
19:11;35:6,10
**locked (9)**
18:25;19:6,10;
35:14,36:10;37:15;
69:12,20;76:15
**long (25)**
6:4;8:9;10:5;11:22;
12:18;42:5;48:19,21;
49:3,5,6;50:21;52:4,
8;65:14;73:11,21;
85:4,6;97:1,2,3,8,12,
17
**longer (5)**
11:17,17;13:5,12;
91:1
**look (8)**
48:17;50:12;84:16;
85:8,15;96:18;98:2,
11
**looked (3)**
50:12;64:1;65:2
**looking (4)**
31:13;57:3;84:18;
97:18
**Lori (4)**
9:23;20:9,11,14
**lost (4)**
12:13,13;40:22;
47:21
**lot (6)**
13:19;51:21;52:24;
68:8,9;89:8
**low (5)**
41:16,16;46:9,11,
11
**lower (1)**
41:18

**M**

**ma'am (11)**
5:15;18:11;20:2,6;
48:6,9;51:7;56:12;
59:15;65:13;82:4
**mad (1)**
24:3

**main (1)**
87:4
**mainly (1)**
27:24
**Maisley (39)**
9:1,4,12;14:2,6,9;
15:8,9,16,23;16:12;
21:6;22:7;23:12,23;
24:5,6,7,8;27:17,21,
23;28:1,10,11,13,17,
18;32:15,22;35:22;
36:1;48:7,11;60:10;
74:3;76:3;77:22;78:7
**Maisley's (1)**
9:16
**makes (3)**
5:21;6:16,19
**man (5)**
64:2;68:2;71:8,11;
79:16
**many (7)**
8:17;16:10;27:12;
48:25;67:2;96:5,13
**March (11)**
13:3;67:17;68:2,4,
14,23;69:5;70:1,4,5;
72:13
**mark (2)**
95:19;99:17
**marked (2)**
100:5,7
**marking (1)**
95:20
**married (1)**
9:25
**math (1)**
25:25
**may (16)**
5:17;11:21;13:6,8,
25;17:10;20:20,21;
25:8;27:2;54:16;59:2;
81:21;89:23;90:2;
93:13
**maybe (6)**
11:16;42:3;46:21;
51:23;97:21,22
**mean (40)**
11:19;20:11;22:3;
32:14;37:12;38:12;
40:3,6;48:16,24;51:7;
52:24;57:16;60:12;
61:14;62:13;63:6,19;
66:14;67:16;68:22;
70:21;72:1,12;77:1;
79:10;83:6;84:16;
85:4,7,11;87:18;
88:18;89:7;93:20;
96:1,6;100:24;101:1,
16
**meant (1)**
30:25
**meantime (2)**
57:15,21

**meat (1)**
46:2
**medical (2)**
76:21;80:9
**medication (1)**
7:8
**meet (1)**
12:15
**mentioned (1)**
16:3
**mess (1)**
77:18
**messages (1)**
66:25
**met (2)**
55:24;82:6
**MICHAEL (2)**
5:1,9
**might (14)**
19:20;57:13,20,21;
59:4,4;72:1;81:14,17;
84:21;85:12;88:21,
24;99:7
**mind (1)**
80:11
**mine (9)**
24:24,25;26:13,15,
18,19;62:6,12;90:4
**minute (13)**
69:13;85:4;86:19;
87:4,8;91:2;93:1;
95:2;96:25;97:7,11,
25;98:1
**minute-long (1)**
85:1
**minutes (8)**
32:24;33:16;42:7;
58:24,25;71:6,7,11
**minutes' (1)**
49:9
**misdemeanor (2)**
60:2;62:3
**missed (2)**
69:15;97:22
**missing (1)**
78:9
**molding (1)**
43:15
**mom (2)**
33:18,21
**Mommy (3)**
78:10,15,16
**Monday (1)**
73:25
**month (3)**
17:25;18:1;72:15
**months (1)**
16:22
**more (4)**
42:7;68:2;84:21;
91:5
**morning (1)**
5:7

**mother (3)**
9:16,19,22
**Mothers (2)**
9:20,22
**motion (2)**
43:14;45:1
**move (2)**
13:1;76:18
**moved (7)**
13:12,16;15:4;
20:20;21:2;27:2,3
**moving (1)**
17:10
**Mrs (2)**
93:20,22
**much (11)**
6:16;9:1,2;11:9;
15:4,10;40:5;43:24;
46:19;59:18;100:16
**multiple (12)**
48:20;49:4,11,12;
67:23;83:15,22;84:1;
86:22;88:1;90:2,16
**Myself (3)**
8:15;12:6;76:24

**N**

**name (10)**
5:8,10;9:5,6,23;
11:14;33:3,5,10;64:5
**named (1)**
97:6
**names (2)**
8:22;99:3
**narrative (2)**
81:22;82:5
**National (1)**
10:22
**nature (1)**
98:22
**near (2)**
61:8;74:16
**necessarily (1)**
53:6
**necessary (2)**
6:10;91:6
**need (3)**
6:5;40:9;65:2
**needed (2)**
37:14;53:12
**NEIEP (2)**
10:21,22
**N-E-I-E-P (1)**
10:22
**neighbor (2)**
30:25;31:2
**neighborhood (2)**
79:14,22
**neighbors (9)**
31:8,11,19,22;32:1,
5;56:19;76:11;94:23
**neighbors' (2)**

31:16;86:2
**neighbor's (1)**
30:20
**new (7)**
5:25;26:10;69:23,
23;70:1;78:16;100:25
**next (3)**
30:8;36:20;93:3
**nice (1)**
69:11
**night (1)**
64:22
**nobody's (1)**
80:4
**noes (1)**
6:14
**none (4)**
15:18;68:9,10;83:9
**note (2)**
55:23;90:8
**noted (1)**
92:23
**notes (2)**
14:14;98:2
**number (5)**
7:15;8:2;27:5;
58:12;101:20
**nutshell (1)**
66:8

**O**

**Object (1)**
52:11
**objecting (1)**
91:16
**objection (4)**
90:8;92:2,18,23
**obviously (3)**
55:24;84:20;85:16
**occasion (1)**
7:2
**occasions (1)**
27:20
**occur (2)**
44:16;93:21
**occurred (2)**
60:23;101:5
**occurring (1)**
17:4
**odd (2)**
28:2,3
**off (14)**
7:14,19,22;8:2;
15:8;25:2;29:9,24;
31:3;32:3;53:10;70:4;
74:24;78:9
**office (3)**
54:14;70:2;72:11
**officer (26)**
17:16,17;18:13;
50:7;57:13,15,17,20,
25;58:6;59:5,11,17;

63:17,24;64:9,13,14;
66:9;70:10;73:8,16,
19;82:6;89:1;94:12
**officers (1)**
63:23
**official (2)**
13:6;16:21
**officially (2)**
9:13;20:20
**Ohio (1)**
8:8
**older (2)**
14:8,10
**once (11)**
23:22;30:14;36:10;
57:22;58:14,19;66:9;
69:1;70:11;77:21;
81:11
**one (63)**
5:23;6:1;14:23;
17:14,14;32:12;40:3;
42:19;48:19,23;49:3;
50:20;52:4,4,8;53:2,
16;54:12,13;55:2,5;
58:8;60:12;64:12,13;
65:1;66:12;67:6;70:3,
16,16,17,18,19;71:6,
15;72:22;82:25;83:3,
8,11,16,22;84:8,13;
85:6,13;86:19;87:5,
14,19,23;93:1;97:5,7,
9,10,14,15,19,22;
101:1,21
**one-minute (2)**
93:4;95:3
**ones (1)**
57:4
**one's (1)**
80:6
**ongoing (1)**
68:3
**only (11)**
37:1;42:14;46:23;
60:12;64:12,13;70:6;
84:3,8;96:7,15
**onto (1)**
54:6
**open (5)**
29:16,18;38:3,13;
39:15
**opened (2)**
38:4,23
**operate (1)**
11:13
**opinion (1)**
83:16
**opportunity (3)**
25:2;56:20;91:17
**opposite (1)**
15:2
**options (1)**
60:3
**Order (3)**

15:25;16:4;37:6
**original (1)**
25:10
**originally (2)**
10:2,8
**otherwise (1)**
7:3
**out (55)**
13:12,16;15:4,18;
17:10,18;18:5,20;
19:3,8,9,10;20:20;
21:2;22:6,7,8,17;27:2,
3,21;28:3;32:19;
36:21;37:4;38:8;
39:10,13;40:4,7,17;
41:24;42:1;43:2,21;
44:2,10,12;47:24;
49:19;52:7;57:24;
58:4,17;60:11,11;
66:3;68:19;69:6;70:1;
72:10,15,19;85:20;
101:8
**outcome (1)**
18:6
**outside (5)**
22:9;23:21;38:9;
39:22;87:12
**over (17)**
5:16,18,22;17:18;
27:6;30:19;31:13;
32:15;41:9;44:23;
46:5;56:18;58:21;
86:23;87:20;95:2;
99:4
**overturned (4)**
68:15,25;69:18;
75:11
**own (8)**
9:2;22:16,18;23:3;
26:2,16;42:4;89:17

## P

**page (4)**
83:20;88:14;95:14;
99:5
**paid (3)**
12:1,4;24:25
**palm (2)**
45:22;57:4
**Pam (2)**
80:13;99:23
**paper (1)**
69:6
**papers (2)**
29:8,21
**paperwork (1)**
66:4
**parade (1)**
60:18
**paragraph (1)**
81:25
**parent (2)**

16:17,19
**parentheses (1)**
97:7
**parenting (3)**
13:18;14:6;16:15
**parked (1)**
27:18
**Parks (1)**
33:10
**P-A-R-K-S (1)**
33:11
**part (3)**
25:17;81:10;86:3
**partially (3)**
39:15,22,22
**particularly (1)**
5:22
**passenger's (1)**
28:16
**past (1)**
27:20
**patio (3)**
22:10;23:20;78:9
**pending (1)**
6:9
**people (8)**
32:25;33:20;51:21;
52:24;60:9;68:9;
79:15,22
**percent (1)**
78:4
**perfect (1)**
76:1
**period (2)**
14:7,15
**person (3)**
18:24;19:23;63:7;
67:6;101:3
**personal (1)**
24:23
**perspective (1)**
98:11
**phone (91)**
22:18,22;23:3,5,6,7,
8;24:12,14,16,17,19,
22,22,23,23;25:6,10,
16,21;26:1,2,4,5,10,
13,15,15,16,18,19,20;
27:1,4,6,7,11,13;
28:24;29:3,4,9,14,16,
23;30:4,5,24;31:3,5,
23;34:21;35:1,14;
47:19,20,21;50:5,8;
51:5,14;54:6,14;55:6;
58:12;59:23,25;62:2,
6,67:6;71:4,4,6;72:2;
83:2;84:1;86:21,23;
93:6,9,10;94:20;
100:22,25;101:2,5,7,
12,17,18,21
**phonecall (1)**
71:10
**phones (1)**

26:18
**photos (2)**
72:4;95:9
**physical (3)**
19:25;20:3,13
**physically (5)**
26:19;47:16,20;
54:5;61:14
**pick (6)**
15:9,22,25;21:6;
27:21;76:3
**picture (1)**
72:8
**pictures (1)**
72:1
**piece (2)**
86:10,18
**pieces (1)**
53:12
**place (6)**
9:11;14:2;16:4;
40:9,13;42:6
**plain (1)**
63:13
**Plaintiff (1)**
5:2
**please (4)**
5:7;7:3;8:23;72:4
**plugged (3)**
30:3,4;94:19
**pm (3)**
21:14,15;74:1
**point (36)**
6:4;12:23,25;18:21;
22:16,19;23:2;24:15;
25:21;26:3;30:19;
31:7,8,9;33:24;35:23;
36:2;38:2;40:3;41:14;
42:10,20,21;43:23;
44:13;46:6;48:12;
49:2;51:16;55:2;56:9;
58:8;60:15;61:24;
92:14;101:17
**pointing (1)**
45:7
**points (1)**
39:21
**police (32)**
17:12;18:2;20:8;
33:15,16,25;34:1;
48:13;54:19,19;56:9,
16;57:10;58:17,21;
59:5;61:15;63:3;64:9;
67:19;70:10;71:23;
72:18;75:25;76:7;
81:6,12;86:11,22;
89:1;90:11;100:1
**porch (1)**
34:23
**portion (2)**
93:13,15
**portions (3)**
49:14,14;87:1

**position (1)**
85:24
**positive (3)**
45:16;49:25;54:13
**possession (1)**
88:11
**possible (2)**
83:10,15
**prepare (2)**
55:19,22
**present (4)**
71:2;90:13;91:25;
92:8
**pretty (11)**
9:1,2;11:9;15:4;
40:5;43:24;59:18;
68:22;69:11;87:13;
100:16
**prevent (2)**
40:1;42:23
**previously (2)**
25:5;93:11
**Price (1)**
10:10
**prior (7)**
16:4;17:4,9;19:20,
24;25:9;74:2
**probably (14)**
7:17;18:1;34:13;
40:6;47:1;51:18;
54:24;57:8;59:9;68:1;
70:18;77:22,22;87:12
**problems (2)**
79:11,11
**proceedings (1)**
16:25
**process (4)**
31:9;33:18;36:23;
58:16
**produce (1)**
85:16
**produced (9)**
88:10;90:22,24;
91:10;95:5,12,22;
96:3;97:20
**program (2)**
10:18,23
**property (3)**
13:1,5;24:25
**protect (1)**
37:14
**protecting (2)**
62:14;76:16
**Protection (1)**
15:25
**Protective (1)**
16:4
**provide (9)**
8:1;51:17;53:17;
54:4;72:4;82:15;94:2,
3,4
**provided (3)**
25:13;51:19;94:22

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

**provider (1)**
80:9
**pull (1)**
96:4
**pulled (2)**
28:24;32:3
**pulling (1)**
39:1
**punch (3)**
45:5;47:10,15
**punched (6)**
36:24;39:7;45:4;
47:4,5,8
**punches (1)**
47:6
**punching (1)**
39:8
**purchased (3)**
24:19;25:6,10
**purpose (1)**
94:21
**purposes (1)**
7:25
**push (6)**
41:4,18;42:11,13,
15;43:2
**Pushing (6)**
39:8;44:17;93:8,20,
22,24
**put (7)**
26:5;34:21;35:1,14;
62:10;96:20;99:17
**PW (1)**
97:16

## Q

**quick (4)**
6:6;42:8;55:10;
80:18

## R

**raised (2)**
13:17;94:17
**ran (3)**
30:11,14,15
**rather (1)**
22:24
**reached (6)**
29:13,15,16,19,21,
22
**reactions (1)**
37:14
**read (1)**
29:7
**real (2)**
55:10;98:11
**realize (1)**
79:9
**really (17)**
12:21;37:1;38:8;
42:4,18;43:13;44:11;

49:11;52:15;57:16;
62:18;71:8,8,11;
76:23;79:12;91:7
**reason (4)**
7:1;19:19;52:9;
84:3
**reasons (1)**
13:12
**recall (9)**
21:12;28:6;42:3;
43:4;48:25;57:5;
73:20;81:14;82:7
**recalling (1)**
40:21
**receive (1)**
50:25
**received (1)**
15:1
**recently (2)**
81:15,18
**recess (2)**
55:11;98:4
**recollection (5)**
28:20;32:8;44:9;
83:3;86:12
**reconvened (2)**
55:13;98:6
**record (25)**
5:8;6:17;7:14,20,
22,24;8:1,3;9:16;
55:16;56:23;74:24;
83:15;84:1;88:8;89:8;
90:24;91:3;92:4;
94:21;96:2;98:9;
99:19,25;100:1
**recorded (4)**
48:14;83:11,16;
84:2
**record's (2)**
45:6,20
**Red (1)**
5:12
**REDDEN (25)**
5:1,9,10;8:5,24,25;
9:5,7;33:9;40:8;52:1;
55:18,24;81:5;82:7,
10,14;83:1;86:10;
92:25;93:5,6,8;95:8;
100:10
**Redden's (1)**
98:20
**referencing (2)**
92:10;93:16
**referring (1)**
52:18
**reflect (1)**
87:2
**reflected (1)**
91:11
**regarding (1)**
31:18
**related (3)**
14:2;20:8;62:24

**relationship (6)**
17:6;24:16;25:12,
12,18;77:11
**relaxed (1)**
55:21
**released (4)**
65:10;73:23,24;
74:6
**remained (1)**
51:4
**remember (19)**
7:9;15:14;20:11,12;
40:25;41:20,24,25;
44:11,21,24;49:25;
55:2,20;57:19;59:7,
10;78:7;84:4
**removed (1)**
20:20
**repeat (1)**
22:23
**repeated (1)**
6:25
**rephrase (1)**
78:21
**rephrased (1)**
7:1
**replaced (1)**
26:16
**report (25)**
67:20,21;68:18,22;
69:8,22,23,23;70:1,4;
72:9,13;81:7,13,23;
83:13;84:9;87:22;
88:2;89:16;90:11;
91:11,23;94:13;100:2
**REPORTER (1)**
7:21;19:4;80:14
**reporter's (1)**
5:21
**represent (2)**
5:11;94:17
**representing (1)**
92:13
**residence (4)**
13:5,13;82:11;86:2
**resort (1)**
100:23
**resource (1)**
58:6
**respect (1)**
14:5
**responses (2)**
6:13,14
**restrained (2)**
39:13;41:21
**restraining (2)**
39:12;40:2
**result (2)**
12:11;74:17
**return (2)**
60:2;66:20
**reversed (3)**
66:11;67:18;68:5

**review (5)**
56:4,6,24;61:9;
92:14
**reviewed (1)**
81:12
**RIGGS (1)**
96:15
**right (43)**
6:12;15:4;16:8;
19:17;30:4;31:13;
35:19;41:2,9;44:24;
45:12,13,16,21,22,23;
47:6,11,12;50:18;
55:10;60:3;62:10;
63:13,18;67:18;
71:12;72:11;74:16;
75:12,24,25;76:14,16;
77:9;78:23;82:22;
85:11;94:19;95:11,
24;97:21;99:14
**ripping (1)**
53:9
**Roberts (5)**
66:7;67:21;68:21;
69:8;70:3
**Roberts' (1)**
69:10
**Rogers (22)**
63:3;64:17;65:2,3,
4,19,21,23;66:1,8,15;
67:3,10,12,20,22;
68:24;69:14,16;70:7,
21;71:1
**rolling (1)**
41:9
**Ross (5)**
10:6;64:12;75:25;
76:7;81:6
**rude (1)**
6:21
**rug (1)**
73:4
**rules (1)**
5:17
**ruling (1)**
16:22
**run (2)**
40:25;41:22
**running (5)**
34:3;41:23;83:1;
87:9;95:1
**rushed (1)**
35:13
**Rylee (8)**
8:24;9:1,20;22:11,
13;77:16,19,24

## S

**sales (1)**
11:11
**same (18)**
14:10;17:16;40:22;

54:11;63:17;64:1;
67:7,9,19;70:21,22;
71:1;83:20;88:14;
95:14;98:13,16;99:5
**saving (1)**
97:22
**saw (7)**
61:9,11;62:22;
68:23;83:13;93:22;
101:14
**saying (6)**
66:21;71:20;83:13;
85:11;86:17;91:12
**scary (1)**
37:16
**scenario (1)**
76:2
**scene (2)**
62:16;82:1
**schedule (2)**
14:9,17
**school (7)**
10:12,13;57:17;
58:5,7;64:25;65:9
**screen (3)**
95:18;96:22;97:18
**screenshot (1)**
99:18
**search (1)**
89:6
**seat (14)**
25:2;28:22;29:1,3,
5,7,9,10,11,23,23,25;
30:4;31:3
**second (9)**
14:24;24:22;26:13,
15,17,18;72:9;85:25;
97:1
**seconds (8)**
49:10,10;87:12;
96:25;97:2,3,11,17
**Security (1)**
7:15;8:2
**seeking (1)**
86:2
**seem (2)**
98:12,15
**seems (1)**
84:9
**sees (1)**
38:22
**Self-employed (2)**
11:4;79:1
**sell (2)**
12:7;76:18
**send (4)**
54:18,18;99:22;
100:2
**sense (1)**
6:19
**sent (3)**
54:9,24;87:21
**sentence (2)**

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

22:20;93:3
**separate (1)**
86:16
**September (4)**
7:12;67:15,25;
74:13
**Sergeant (15)**
63:3;64:17;65:1,3,
4,21,23;66:1,7,8,15;
67:3,10;68:24;70:7
**service (2)**
24:19;25:6
**sets (1)**
52:20
**settings (1)**
80:20
**settled (1)**
56:17
**seven (1)**
8:12
**several (6)**
21:2;27:14;50:19;
66:22;67:1;71:4
**shaking (1)**
6:15
**share (3)**
80:12;95:14,17
**shared (3)**
16:14;96:24;99:18
**Sharing (2)**
80:21;96:21
**shattered (1)**
26:2
**Sheriff (1)**
63:25
**sheriff's (1)**
64:4
**shirt (1)**
57:8
**shit (2)**
86:10,18
**short (1)**
90:25
**shouting (1)**
95:4
**shove (1)**
43:2
**show (4)**
80:17;82:17;96:14;
98:9
**showed (6)**
50:3;76:2;82:21;
83:17;84:2;93:12
**showing (5)**
94:23,24;95:4;
96:15,23
**shown (1)**
84:6
**shows (2)**
34:16;86:4
**shrink (2)**
52:15;53:3
**shrunk (1)**

53:8
**shut (1)**
35:14
**sic (2)**
13:9;53:1
**side (9)**
10:10;28:16,18;
29:10,11;36:24;
45:22;47:11,12
**sidewalk (2)**
26:2;30:15
**signed (1)**
70:4
**similar (2)**
9:8,9
**similarly (1)**
54:22
**simple (1)**
63:13
**simply (2)**
92:18;98:21
**sister (12)**
32:23;33:1,17,21;
60:11;62:17,18,20;
65:5;66:5;72:17,25
**sister's (2)**
33:3,5
**sit (2)**
76:17;87:15
**sits (1)**
27:25
**sitting (6)**
22:8,9;23:9,20;
28:21;30:4
**situated (1)**
70:11
**situation (8)**
18:16;31:1;37:16;
38:15;63:7;68:11;
77:1;78:5
**situations (1)**
53:12
**six (4)**
27:14;95:11;97:19;
98:9
**slammed (1)**
35:13
**sleeping (2)**
79:11;80:8
**sliding (3)**
34:22;35:2;93:7
**Slightly (1)**
95:2
**small (1)**
48:20
**smaller (2)**
49:14;52:7
**smashing (2)**
42:16,18
**Social (2)**
7:15;8:2
**somebody (1)**
52:6

**somehow (1)**
97:22
**someone (7)**
13:15;18:19;49:6;
58:8,21,24;84:4
**sometime (1)**
67:15
**sometimes (4)**
6:5;27:22;68:21;
81:11
**somewhere (3)**
15:9,25;88:24
**soon (1)**
56:17
**sorry (8)**
11:8;14:13;29:5;
35:5;44:3;56:14;81:2;
96:25
**sort (4)**
14:4;45:21;81:10;
94:25
**sought (1)**
76:20
**sound (3)**
13:21;74:13;82:11
**speak (7)**
49:11;65:17,25;
72:17;83:7;87:6;
94:12
**speaking (1)**
5:22
**specific (2)**
14:8;19:19
**specifically (1)**
80:4
**speculate (1)**
15:12
**spoke (9)**
62:15;64:17,18;
71:3,4,5;72:22;94:14,
15
**spoken (1)**
61:24
**sports (1)**
11:6
**Stable (1)**
17:7
**stand (2)**
32:13;69:24
**standing (7)**
31:15;32:15;38:16;
41:11;46:5;86:1;93:7
**stands (1)**
58:9
**start (2)**
5:25;23:1
**started (6)**
23:23,24;30:16;
35:20;36:5;37:6
**state (1)**
5:8
**stated (1)**
82:10

**statement (3)**
94:3,5,8
**station (8)**
33:15;34:1,1;58:17,
21;63:3;67:19;70:10
**stay (1)**
24:20
**stayed (2)**
41:2;51:13
**steal (3)**
19:3,7,20
**steps (3)**
46:10,10,13
**Steven (2)**
96:5,13
**still (17)**
16:14;20:18,24;
27:1,11;37:24;48:7;
49:5,6;51:6;60:9,10,
10;76:14,15;77:16,19
**stole (1)**
19:2
**stolen (1)**
19:9
**stood (2)**
55:11;98:4
**stop (2)**
46:15;67:24
**stopped (1)**
58:10
**story (1)**
22:21
**street (2)**
83:1;95:2
**struggle (1)**
42:6
**struggling (1)**
36:22
**stuck (1)**
78:11
**stuff (2)**
18:20;79:12
**subsequently (1)**
75:15
**suggest (1)**
88:5
**suggestion (1)**
99:1
**summer (1)**
8:12
**Sunday (1)**
14:23
**Sunglasses (2)**
57:8,9
**super (1)**
6:4
**supervising (1)**
32:16
**supplied (1)**
49:17
**supply (1)**
24:22
**supposed (1)**

71:14
**sure (35)**
6:13,21;12:19,21;
13:15;14:19;22:24;
33:1;36:8;37:11;
38:10;43:14;49:1,5;
50:17,23;53:13;56:2,
19;57:12;59:6;61:19;
67:5;68:22,24;69:15;
72:2,21;80:20;83:20;
85:3;91:14;97:13;
99:4,9
**sweep (1)**
73:4
**Swimming (1)**
57:1
**swing (3)**
39:12;40:14;41:21
**swinging (2)**
32:18;47:14
**switched (1)**
14:21
**sworn (1)**
5:3

**T**

**talk (19)**
12:12;24:14;27:22;
61:5;64:11,24,25;
65:8,18;67:1,2;74:5;
76:11;77:2,3;79:20,
20,21;89:1
**talked (14)**
27:16;47:2;58:10,
18,18;67:8,20;70:20,
20,25;80:1;92:25;
100:12,18
**talking (5)**
23:11;52:21;70:22;
95:21;100:24
**talks (2)**
82:24;93:3
**tall (1)**
46:22
**team (2)**
11:9;53:8
**teams (5)**
11:6;51:20;52:20,
24,25
**technically (1)**
9:3
**telephone (1)**
25:13
**television (1)**
86:23
**telling (2)**
53:5;70:9
**ten-second (2)**
83:14;84:4
**terms (2)**
17:19,20;75:18
**testified (7)**

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

50:20;52:3;56:8;
74:9;75:1,5;93:11
**testify (1)**
73:7
**testifying (1)**
85:5
**testimony (11)**
38:23;42:12;49:2;
52:15;84:11;89:12,
17,18;90:3,6;98:21
**Thanks (1)**
55:10
**theft (1)**
60:1
**thinking (2)**
35:8;98:23
**third (3)**
70:18;86:8;97:2
**though (6)**
33:24;44:19;53:14;
58:14;62:9;85:4
**thought (8)**
37:12;42:19;62:13;
63:12;64:20;71:11;
73:2;87:5
**threatened (1)**
74:3
**three (19)**
8:19,19;9:9;41:3;
51:19,20;52:20;
66:11,13;67:4,5;
70:12,13,14;77:22;
85:10;87:25;97:3,19
**three-second (5)**
82:25;83:6,9,14;
95:1
**throughout (1)**
25:17
**Thursday (1)**
71:14
**Tim (2)**
5:12,12
**timeline (1)**
35:9
**times (8)**
21:2;27:12;66:22;
67:2;71:5;77:23;
86:22;94:24
**titled (1)**
81:6
**today (7)**
5:13,19;12:12;
55:19;85:5;87:15;
98:12
**together (3)**
11:20;13:7;17:9
**told (13)**
58:16,20;61:1,12;
65:1;66:13;69:1,22;
70:7;71:5;74:12;
79:17;101:14
**took (31)**
9:11;15:18;16:22;

24:8;25:3;27:17;
28:10;29:24;30:6;
31:3,5;32:24;33:16;
42:6;48:15,16;50:7,9;
53:10,11;54:13;
58:23,25;68:21;69:5,
8;72:10;83:1;84:4;
100:22;101:1
**top (1)**
81:8
**touch (2)**
62:6,9
**tougher (1)**
5:22
**town (1)**
10:10
**Township (2)**
10:6;81:6
**training (1)**
10:18
**transcribes (1)**
6:15
**transcript (1)**
92:15
**transfer (1)**
27:6
**transmit (2)**
48:23;55:3
**transport (1)**
73:19
**transported (1)**
73:15
**trap (2)**
88:20;89:24
**trapping (1)**
88:22
**tree (1)**
57:4
**Treleven (2)**
52:23;53:4
**trespassing (1)**
70:17
**trial (11)**
71:18,19;73:1,6,10;
74:6,9,17;75:2,5,15
**tried (3)**
38:9;55:20;93:6
**tropical (1)**
57:2
**trouble (1)**
80:8
**true (1)**
29:22
**trunks (1)**
57:1
**trust (4)**
18:23,24;76:9;
77:14
**truthfully (1)**
7:9
**try (4)**
39:5,7;40:7;42:23;
43:2;67:11

**trying (43)**
6:21;11:20;30:13;
32:14,19;36:13,23;
38:5,7,7,8,25;39:3,4,
13,14,16;40:10,13,16,
17;41:15,16;42:10,13,
15,22;43:3,18,18;
47:16,17,20;51:24;
52:7;56:21;58:8;73:3;
88:20;89:13,24;
93:18;98:21
**turned (1)**
80:22
**tussle (1)**
45:18
**TV (8)**
32:3;53:10;78:9,10,
15,16,16;84:5
**twice (3)**
57:21;58:14,19
**twins (1)**
22:13
**two (24)**
18:1;26:8;41:3;
42:7;44:1;46:10,10,
13;49:9;52:23;59:25;
60:3,6;61:17;62:2,8;
67:5;76:2;77:5;90:25;
94:25;95:1;97:19;
98:12
**type (3)**
7:7;21:19;76:20
**typed (1)**
45:20
**types (1)**
6:16

### U

**Ultimately (1)**
62:20
**Um-hum (2)**
48:1;82:18
**under (2)**
11:13;73:4
**understood (4)**
7:4;63:17;77:7,8
**unfortunately (1)**
81:10
**unh-unh (1)**
6:15
**uniforms (2)**
11:9,10
**university (1)**
10:18
**unless (1)**
51:14
**unlock (6)**
37:10,25;38:1,17,
18,22
**unlocked (1)**
37:7
**unplugged (1)**

30:5
**unpredictable (2)**
19:22,23
**up (46)**
6:9,16;15:9,23,25;
21:6;22:16,19;23:1,2,
14;24:2,4,6,8;27:21;
30:15,15,23;37:4;
42:1;44:22;45:20;
47:22;48:25;49:7,13;
52:6,9;58:9;62:20;
66:18,20,23;68:10;
69:13,21;73:4,9;76:2,
3,15;87:10;91:7,18;
96:4
**upgrade (2)**
26:14,20
**upset (1)**
27:17
**use (9)**
9:4;13:5;24:20;
26:4,6,10,16;40:18;
43:20
**used (4)**
25:16;26:19;79:15,
22
**useful (1)**
99:2
**using (7)**
26:22;27:1,11;43:7,
10;81:10;95:19
**usual (1)**
15:11

### V

**verbal (2)**
6:14;86:22
**version (1)**
60:23
**versus (1)**
6:14
**via (2)**
54:24;55:1
**video (64)**
31:18;34:16;36:9;
48:19,21;49:3,6,6,9,
13,15;50:21;52:4,4,8,
10;53:9,9;54:9,18,24;
61:1,13,13,18;63:13;
82:15;83:4,6,11,22;
84:8,13,25;85:1,6,13,
25;86:3,5,16;87:1,3,4,
4,5,14,23;92:3;12,14,
15,16,22,24;94:22,23,
24;95:1,2,3;96:23;
97:1,2,4
**videoed (1)**
63:20
**videos (65)**
48:1,3,17,17,20,25;
49:4,7,11,17,18,18,
21;50:1,17,19;51:4,

13,17,22,22,23;52:7,
9,21;53:3,4,7,14,15,
17;54:5,6,7,16,24;
56:6,24;61:9;63:18;
82:25;83:8,9;84:7;
87:7,18,20,25;88:1,
10,21,24;89:2,5,6,14;
90:2,25;91:1,21,22;
95:5,12;96:5;97:20;
98:22
**videotaping (3)**
36:3,5,7
**view (1)**
48:13
**viewed (3)**
49:21;63:17;83:7
**violence (10)**
60:3;62:3;63:9;
70:18;73:10;74:18,
22;100:22,23;101:2
**violent (3)**
18:24;101:3,3
**visitation (1)**
16:16
**visiting (1)**
14:6

### W

**wages (1)**
12:13
**Wagon (4)**
8:7;13:2;17:9;82:1
**walk (3)**
67:1;79:13,21
**walked (3)**
18:22;28:11;68:23
**wall (9)**
32:4;40:22;42:10,
22;43:15,15,17;46:2;
53:10
**wants (2)**
75:23;93:10
**watched (3)**
32:12;61:2,12,17;
63:20;76:12;101:13,
13
**way (29)**
7:9;28:20;30:18;
32:4;36:23;37:19;
38:11,11;39:3,4;40:2,
23;41:17;42:11,14,
14;43:18;44:6,7,17;
55:4;56:21;62:12;
63:14;75:21;83:5;
93:19;97:16;98:25
**ways (4)**
67:1;79:7;90:16;
100:13
**wearing (2)**
56:25;57:6
**Wednesday (5)**
14:20,22,23;15:8,

Michael Redden v.
Tim Baird, et al.

Michael Redden
March 27, 2025

23
**week (4)**
14:16,23,24;76:2
**weekly (1)**
77:2
**weighed (1)**
46:20
**weight (1)**
46:25
**weren't (1)**
31:15
**west (1)**
10:10
**What's (7)**
7:11;8:5;33:3,5;
91:10;94:21;95:5
**Wheel (4)**
8:7;13:2;17:9;82:1
**White (3)**
76:4,5,9
**whole (21)**
22:25,25;32:1,2;
38:21;43:5,6;47:17;
61:3;62:7;63:7;64:13;
70:7,10;73:3;75:16;
83:11;85:6;87:5,9,14
**willing (1)**
90:23
**window (4)**
29:14,21;42:18,19
**withheld (1)**
98:18
**withholding (3)**
90:20;98:23;99:1
**within (1)**
41:2
**without (2)**
12:10;97:7
**witness (4)**
53:20;74:23;85:13;
88:20
**woman (1)**
79:16
**wonky (1)**
7:2
**words (4)**
22:16,18;23:4;
74:20
**work (6)**
11:6;12:1;21:17,19;
57:8;78:19
**working (3)**
57:19;78:17,25
**world (1)**
63:8
**worth (1)**
49:9
**wrapped (1)**
41:6
**wrapping (1)**
40:24
**wrestled (1)**
37:1

**write (2)**
90:11;91:24
**written (5)**
82:6;87:23;94:3,5,7
**wrong (8)**
29:8;59:19;62:7;
63:6,7;66:9;70:11;
73:4
**wrote (1)**
83:13

**Y**

**yanked (1)**
46:3
**yanking (2)**
44:24;45:2
**yard (6)**
30:11,12,17;31:6;
36:1;87:10
**years (5)**
8:12;26:1;62:8;
77:5;88:24
**yelling (2)**
86:20;93:10
**yeses (1)**
6:14

**Z**

**Zoom (2)**
5:20;81:10

**1**

**1 (3)**
96:23;100:2,7
**10 (2)**
88:1;97:2
**10:37 (1)**
55:12
**10:46 (1)**
55:14
**100 (1)**
78:4
**10-second (3)**
86:8;94:23,24
**11:40 (1)**
98:5
**11:46 (1)**
98:7
**120 (1)**
46:21
**125 (1)**
46:21
**12th (2)**
67:17;69:1
**13th (1)**
74:13
**16 (4)**
26:1;88:1;96:25;
97:17
**165 (1)**

47:1
**16-second (2)**
86:1;94:22
**16th (1)**
25:24
**17 (1)**
8:24
**18 (3)**
8:25,25;16:22
**1977 (1)**
7:12
**1995 (1)**
10:15
**19th (1)**
7:12
**1st (2)**
16:20,22

**2**

**2:00 (1)**
74:1
**20 (3)**
35:24,25;87:12
**2000 (1)**
26:23
**2006 (1)**
25:25
**2018 (3)**
8:11;10:7;11:24
**2019 (3)**
13:3,3,8
**2020 (1)**
12:20
**2022 (1)**
26:1
**2023 (13)**
13:6,21,23,25;17:5,
10;20:17;21:5;25:9;
27:16;67:15;73:24;
74:13
**2023rd (1)**
13:8
**2024 (9)**
16:21,22;67:17;
68:15,23;69:5;70:1,4,
5
**2025 (1)**
70:5
**2043 (2)**
8:7;82:1
**22 (2)**
26:24,25
**23 (2)**
9:10;27:2
**23rd (4)**
13:6,25;20:20,21
**24th (1)**
70:4
**25 (1)**
35:25
**25th (5)**
68:23;69:5;70:1,5;

72:13

**3**

**30 (3)**
49:10,10;65:15

**4**

**4 (1)**
34:14
**45 (7)**
32:24;33:16;58:24,
25;71:6,7,11
**45013 (1)**
8:8
**45-minute (1)**
71:17

**5**

**5 (2)**
34:14;46:17
**5:00 (2)**
21:14,14
**5'2 (1)**
46:17
**5'4 (3)**
46:13,16,23

**6**

**6:00 (1)**
21:15
**60 (1)**
65:16

**7**

**7/7 (2)**
84:8,8
**7th (12)**
13:21,23,24,25;
17:5;19:24;20:16,22;
21:4;27:16;73:24;
74:2

**8**

**8-second (2)**
86:20;87:4

**9**

**9/19/77 (1)**
7:12
**911 (8)**
57:11,13,14,20;
59:2,3,6,8