Positive

As of: September 9, 2025 3:25 PM Z

# *Bringman v. Fredericktown*

United States District Court for the Southern District of Ohio, Eastern Division

October 13, 2016, Decided; October 13, 2016, Filed

Case No. 2:15-cv-628

**Reporter**

2016 U.S. Dist. LEXIS 142173 *

WILLIAM PAUL BRINGMAN, Plaintiff, v. VILLAGE OF FREDERICKTOWN, OHIO, et. al., Defendants.

**Subsequent History:** Affirmed by *Bringman v. Vill. of Fredericktown, 2017 U.S. App. LEXIS 23731 (6th Cir. Ohio, June 29, 2017)*

**Prior History:** *Bringman v. Village of Fredericktown, 2015 U.S. Dist. LEXIS 105283 (S.D. Ohio, Aug. 11, 2015)*

## Core Terms

arrest, probable cause, domestic violence, summary judgment motion, police officer, probability, state law claim, Sheriff, kitchen, shoved

**Counsel:** **[*1]** William Paul Bringman, Plaintiff, Pro se, Worthington, OH.

For Village of Fredericktown, Ohio, A Municipal Corporation, Jerry Day, Former Police Chief of the Village of Fredericktown, Ohio, Kyle Johnson, Police Officer of the Village of Fredericktown, Ohio, Roger Brown, Police Chief of the Village of Fredericktown, Ohio, Defendants: Michael Joseph Valentine, LEAD ATTORNEY, Reminger Co., L.P.A., Columbus, OH.

For Board of Commissioners of Knox County, Kevin Durbin, Deputy Sheriff of Knox County, Defendants: Charles Terrence McConville, LEAD ATTORNEY, Knox County Prosecutor, Mt. Vernon, OH; Angelica Jarmusz, Fishel Hass Kim Albrecht LLP, Columbus, OH.

**Judges:** EDMUND A. SARGUS, JR., CHIEF JUDGE UNITED STATES DISTRICT JUDGE. Magistrate Judge Kimberly A. Jolson.

**Opinion by:** EDMUND A. SARGUS, JR.

## Opinion

### OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Summary Judgment of Police Officer Kyle Johnson ("Officer Johnson") and Police Chief Roger Brown ("Chief Brown") (ECF No. 39); and the Motion for Summary Judgment of Deputy Sheriff Kevin Durbin ("Deputy Durbin") and the Board of Commissioners of Knox County, Ohio ("Commissioners") (ECF No. 42). Plaintiff has filed memoranda in opposition **[*2]** to each (ECF Nos. 43, 46), and Officer Johnson and Chief Brown have filed a reply memorandum (ECF No. 45). For the reasons that follow, the Court **GRANTS** the motions.

## I. Background

On February 27, 2013, William Paul Bringman ("Plaintiff"), was arrested for domestic violence related to an incident involving his then-wife, Barbara Jean Bringman. (Compl. ¶ 9; ECF No. 1.) The arresting officers were Officer Johnson, a Village of Fredericktown police officer, and Deputy Durbin, a Knox County deputy sheriff. (*Id.*) After being placed under arrest, Plaintiff was taken to the Knox County Jail. He was released later that same day. (*Id.* ¶ 15.) On February 18, 2015, Plaintiff filed a complaint against Johnson, Durbin, and the following additional defendants: the Village of Fredericktown ("Fredericktown"); Jerry Day, the former Fredericktown Police Chief; Roger Brown, the current Fredericktown Police Chief; the Board of Commissioners of Knox County, Ohio; John Doe I, the Knox County Sheriff; and John Doe II, a Knox County Deputy Sheriff. (Compl. ECF No. 1.) Plaintiff asserts claims under *42 U.S.C. § 1983*, claiming that he was falsely arrested and imprisoned in violation of the *Fourth* and *Fourteenth Amendments*. The parties have completed briefing **[*3]** on the motions, which are ripe for disposition.

The following facts are not in dispute. On February 27, 2013, Plaintiff woke up around 3:30 a.m. He "was not sleeping well" and decided to get dressed and go to his office before court.[1] As he tried to leave, his wife, Barbara Bringman, "would not get out of the way." According to Mr. Bringman, she "grabbed at his testicles" and he "shoved her out of the way of the door" and she fell to the kitchen floor. Mrs. Bringman's daughter, Andrea Weller, "heard the fall," and came in and yelled at him to leave. (*See* Pl's Statement; ECF No. 43.) Officer Johnson was on patrol that morning, and received a dispatch call regarding a 911 call reporting a domestic disturbance. (Tr. Trans. at p. 20; Officer Johnson Aff. at ¶ 2; ECF No. 39, Exh. A.)[2] The dispatcher relayed that a distraught woman called, that someone was on the floor, and that the husband had left the house. (*Id.* at 20-21.) When Officer Johnson arrived at the residence, he was met by Mrs. Bringman, and her daughter, Ms. Weller. (*Id.* at 22.) Deputy Durbin also heard the dispatch, and arrived while Officer Johnson was talking with Mrs. Bringman. (*Id.* at 57.) Mrs. Bringman was visibly upset and crying, and she appeared to **[*4]** be afraid. She told Officer Johnson that she regretted calling the police because she was going to be in trouble with her husband. (*Id.* at 23; Officer Johnson Aff. ¶¶ 4, 5.)

Mrs. Bringman stated that she had confronted Plaintiff with her suspicions that he was having an affair, and they had an altercation. (*Id.* at 22.) She told the officers that during the altercation, Plaintiff shoved her in the back, causing her to fall to the ground. (*Id.* at 22-23; Officer Johnson Aff. ¶ 3.) Mrs. Bringman showed Officer Johnson and Deputy Durbin a cut on her left elbow, and stated that her left wrist was also injured in the fall. (*Id.* at 22-23; Officer Johnson Aff. ¶ 4.) Officer Johnson observed that Mrs. Bringman was walking with a limp, and she said it was caused by the physical confrontation with Plaintiff. (*Id.* at 30-31.) Ms. Weller told Officer Johnson that she heard "yelling and a commotion" in the kitchen, but did not see it. However, she came into the kitchen and saw her mother lying on the floor, and **[*5]** her stepfather standing over her mother. When Ms. Weller said she was calling the police, Plaintiff left the house. (*Id.*. at 31-32.) Officer Johnson obtained written statements from Mrs. Bringman and Ms. Weller that accused Plaintiff of causing Mrs. Bringman physical harm. (*Id.* at 32; Officer Johnson Aff. at ¶¶ 6-7.) Officer Johnson decided to investigate further by talking to Plaintiff. (*Id.* at 32.)

Officer Johnson and Deputy Durbin met with Plaintiff in his office, and Plaintiff acknowledged that he had a physical altercation with Mrs. Bringman in their home that morning. (Tr. Transcript at 33, 37.) Plaintiff said he was trying to exit the home through the kitchen door, but Mrs. Bringman blocked the door way. (*Id.* at 33.) Plaintiff claimed that he did not intend to hurt Mrs. Bringman, but acknowledged that he knowingly shoved her. (*Id.* at 34-35, 151-152.) Plaintiff wrote a detailed statement for Officer Johnson, describing the escalation of the interaction, including Mrs. Bringman's actions in "grabbing his testicles" and trying to block him from the door way, and admitting that he "shoved her out of the way " and she "fell down on her left side on the kitchen floor in front of the sink." (Pl. Statement; ECF No. 43.) After hearing Plaintiff's **[*6]** version of the events, Officer Johnson determined that, based

---

[1] Plaintiff, an attorney, is representing himself in this case *prose*.

[2] Exhibit A is the transcript of the trial proceedings in the Mount Vernon Municipal Court, Ohio, Case No. 12CRB206, *State of Ohio v. William Bringman.* Mr. Bringman was acquitted.

on the totality of the circumstances, an offense of domestic violence was probably committed by Plaintiff, and he made the decision to place Plaintiff under arrest for that offense. (*Id.* at 47; Officer Johnson Aff. ¶ 10.) Chief Brown agreed with Officer Johnson's decision to make the arrest. (Ex. B, Chief Brown Aff. ¶ 4.) Deputy Durbin did not participate in the decision to make the arrest, but transported Plaintiff to the Knox County Jail in his cruiser, where he turned Plaintiff over to the custody of jail deputies. (Compl. ¶¶ 13, 14; ECF No. 1; Tr. Transcript, at 61.) Plaintiff was released on bond around noon on the same day. (*Id.* ¶ 15.)

Plaintiff filed the instant Complaint on February 18, 2015, alleging that his arrest violated the *Fourth* and *Fourteenth Amendments of the Constitution*, and was done maliciously, in violation of *42 U.S.C. § 1983*. (Compl., ECF No. 1.)[3] Plaintiff also sued the Board of Knox County Commissioners. (Compl. ¶ 6; ECF No. 1.) The three Knox County Commissioners aver that they were not involved in or cognizant of Plaintiff's arrest, nor did they "consent to, approve or ratify the actions of any law enforcement official concerning Mr. Bringman's arrest or detention." **[*7]** (*See* Aff. Comm'r Teresa Bemiller, Exh. B ¶3; Aff. Comm'r Thorn Collier, Exh. C ¶3; Aff. Comm'r Roger Reed, Exh. D ¶; ECF No. 42.) The plaintiff has produced no evidence to the contrary.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388-89 (6th Cir. 1993)*. In deciding a summary judgment motion, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The judge is not to determine the truth of the matter, but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether **[*8]** it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

## III. ANALYSIS

Plaintiff brings this civil rights action under *42 U.S.C. § 1983*. *Section 1983* provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

In order to recover under a *Section 1983* claim, a plaintiff must prove that the defendant, while acting under the color of state law, violated rights secured to the plaintiff by the Constitution **[*9]** or laws of the United States. *Adickes v. S.H Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. Plaintiff specifically alleges that his arrest for domestic violence violated the *Fourth Amendment of the U.S. Constitution*. The *Fourth Amendment* states, in pertinent part, that "no Warrants shall issue, but upon probable cause, supported by Oath or

---

[3] Plaintiff also included a claim that the Village of Fredericktown; former Fredericktown Police Chief Jerry Day; and current Fredericktown Police Chief Brown failed to properly train and supervise the officers. The Court dismissed this claim on November 30, 2015. (Opinion; ECF No. 37.)

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. Amend. IV*. "[I]t is well established that any arrest without probable cause violates the *Fourth Amendment*. " *Crockett v. Cumberland Coll., 316 F.3d 571, 580 (6th Cir. 2003)*. Thus, the central issue in the case is whether Officer Johnson had probable cause to arrest Plaintiff.

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010)*. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *United States v. Pearce, 531 F.3d 374, 380-81 (6th Cir. 2008)*. Plaintiff contends that the issue of probable cause is a jury question. The Sixth Circuit has held that the existence of probable cause is generally a jury question unless there is only one reasonable determination possible. *Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995)*.

In *Scott v. City of Bexley, 11 Fed. App'x 514 (6th Cir. 2001)*, a case cited by Plaintiff and Defendants, the Sixth Circuit examined the question of probable cause in a case involving Ohio's domestic violence statute. **[*10]** In affirming the District Court's grant of summary judgment, the Sixth Circuit explained the assessment of probable cause in these terms:

> [W]e start with a few general principles. The most important of these is that the *Fourth Amendment* does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect. *See United States v. Barrett, 890 F.2d 855, 861 (6th Cir. 1989)*. The *Fourth Amendment*, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the 'factual and practical considerations of everyday life' that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. *See Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)*. There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence **[*11]** sufficient to establish guilt beyond a reasonable doubt. *See, e.g., United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)*.

> The real question, then, is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause? In many respects, this raises a difficult epistemological problem. As Descartes famously observed, to the skeptic, any proposition - no matter how seemingly certain - carries with it a degree of doubt. But judges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the 'factual and practical considerations of everyday life,' could lead a reasonable person to believe that an illegal act occurred or is about to occur. *See Gates, 462 U.S. at 231, 103 S.Ct. 2317*.

*Scott v. City of Bexley, 11 Fed. App'x 514, 518*, citing *United States v. Strickland, 144 F.3d 412, 415-16 (6th Cir. 1998)*.

When a *Section 1983* claim is predicated on an allegation of false arrest, false imprisonment, or malicious prosecution, the claim must fail if probable cause for the arrest existed. *Id. at 516*, citing *Hansel v. Bisard, 30 F.Supp.2d 981, 985-86 (E.D. Mich. 1998)*. To determine whether an officer had probable cause to arrest an individual for a violation of a state statute, courts first look to the **[*12]** state law defining the offense. *Michigan v. DeFillippo, 443 U.S. 31, 36, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979)*. The arrest at issue in the case *sub judice* was for domestic violence, in violation of *Ohio Rev. Code § 2919.25(A)*.

The Sixth Circuit addressed the issue of probable cause for arrest for a violation of Ohio's domestic violence statute in *Thacker v. City of Columbus, 328 F.3d 244 (6th Cir. 2003)*. In *Thacker*, as in this case, the Plaintiff was arrested

for domestic violence pursuant to *Ohio Revised Code § 2919.25(A)*, which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Under that statute, a "household member" includes a "spouse, a person living as a spouse, or a former spouse of the offender." *Ohio Rev. Code § 2919.25(E)*. As the Court explained, Ohio has a "preferred arrest" policy in domestic violence matters:

> Ohio has a preferred arrest policy in domestic violence situations. In particular, Ohio law provides that where a peace officer has 'reasonable grounds to believe the offense of domestic violence ... has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person. *Ohio Rev. Code § 2935.03(B)(3)(b)*; *see Scott v. City of Bexley, 11 Fed. Appx. 514, 517, 2001 WL 599711 (6th Cir. 2000)* (unpub'd.)

> 'The *Fourth Amendment* does not require that a police officer *know* a crime occurred at the time the officer arrests or **[*13]** searches a suspect.... The *Fourth Amendment*, after all, necessitates an inquiry into probabilities, not certainty.' *United States v. Strickland, 144 F.3d 412, 415 (6th Cir. 1998)*. Thus, for probable cause to arrest Thacker to exist here, the officers would not have to have proof of each element of a domestic violence offense, but would have to believe that a probability existed that he committed the offense.

*Thacker, 328 F.3d at 256*.

In this case, as in *Thacker*, the statement of the alleged victim, Mrs. Bringman, that Plaintiff had abused her "is sufficient to establish probable cause." *Id. at 257*, citing *Klein v. Long, 275 F.3d 544, 551-52 (6th Cir. 2001)* (explaining officers need not interview an alleged offender where a victim claims that she was abused if such an interview would, at most, produce an exculpatory denial of wrongdoing). Here, Officer Johnson relied on more than just Mrs. Bringman's statement in this case he also relied on Plaintiff's admission that he shoved his wife during a domestic altercation, and Ms. Weller's statement corroborating Mrs. Bringman's account. In addition to these statements, Officer Johnson observed injuries to Mrs. Bringman's left elbow and wrist. (Officer Johnson Aff. ¶ 4.) In assessing whether Officer Johnson had sufficient information to believe that a probability existed that Plaintiff committed the offense, **[*14]** the Court also takes into account Ohio's preferred arrest policy in domestic violence matters. Based on the totality of the circumstances presented to Officer Johnson in this case, Officer Johnson had reasonable grounds to determine that probable cause existed to arrest Plaintiff. Taking as true all of the facts as professed by Plaintiff, the evidence is insufficient for a reasonable jury to find that Officer Johnson lacked probable cause for the arrest.

The finding of probable cause defeats any *Section 1983* claim for false arrest, false imprisonment, and/or malicious prosecution. *Scott, 11 Fed. App'x at 516 (6th Cir. 2001)*. Where there is no constitutional violation, the derivative claims based upon false arrest must also fail. *Id. at 516, 519*. Therefore, the Defendants ' Motions for Summary Judgment are **GRANTED**.

While this Court may, in its discretion, retain supplemental jurisdiction over pendent state law claims after the federal claims have been dismissed, such state law claims usually should also be dismissed. *See Musson Theatrical, Inc. v. Fed. Express Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996)*. Because the Court in this Opinion and Order disposes of all of the Plaintiffs federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims pursuant to *28 U.S.C. § 1367(c)(3)*. Consequently, Plaintiffs remaining state law **[*15]** claims are dismissed.


## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Police Officer Kyle Johnson ("Officer Johnson") and Police Chief Roger Brown ("Chief Brown") (ECF No. 39); and the Motion for Summary Judgment of Deputy Sheriff Kevin Durbin ("Deputy Durbin") and the Board of Commissioners of Knox County, Ohio ("Commissioners") (ECF No. 42) are **GRANTED**. Further, the Court declines to exercise supplemental jurisdiction over Plaintiffs state law claims, which are dismissed without prejudice. The Clerk is directed to close this case.

2016 U.S. Dist. LEXIS 142173, *15

**IT IS SO ORDERED**.

10-13-2016

**DATE**

/s/ Edmiind A. Sargus, Jr.

**EDMIIND A. SARGUS, JR.**

**UNTED STATES DISTRICT JUDGE**

---

**End of Document**

 Cited
As of: September 9, 2025 3:21 PM Z

## *Ellison v. Martin*

United States District Court for the Southern District of Ohio, Western Division

November 30, 2020, Filed

Case No. 1:17-cv-689

**Reporter**
2020 U.S. Dist. LEXIS 223539 *; 2020 WL 7028454

Solomon Ellison, Plaintiff, v. Trooper Jeffrey Martin, Defendant.

# Core Terms

Video, arrest, qualified immunity, probable cause, traffic stop, driver, disorderly conduct, driving, drinking, questions, summary judgment, retaliatory, impaired, reasonable suspicion, signal, field sobriety test, traffic violation, probable cause to arrest, odor of alcohol, police officer, exit, constitutional right, quotation, violating, fighting, alcohol, profane, traffic, rights, ticket

# Case Summary

### Overview

HOLDINGS: [1]-The officer had qualified immunity on plaintiff's claim under the *Fourth Amendment to the United States Constitution* to the extent that plaintiff alleged that the officer unlawfully extended the traffic stop and attempted to conduct a field sobriety test; the facts, that the officer witnessed plaintiff commit several traffic violations in just over one minute, plaintiff did not answer standard questions, and plaintiff refused repeated commands to exit the vehicle before finally cooperating, made it reasonable for the officer to extend the traffic stop in order to conduct a field sobriety test; [2]-The officer was entitled to qualified immunity on the claim for false arrest because the officer had probable cause to arrest plaintiff for disorderly conduct; consequently, plaintiff could not establish a retaliatory arrest claim as a matter of law.

### Outcome
Officer's motion for summary judgment granted.

# LexisNexis® Headnotes

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Justin Marks

2020 U.S. Dist. LEXIS 223539, *223539

**HN1** **Summary Judgment, Burdens of Proof**

*Fed. R. Civ. P. 56(a)* provides that summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

**HN2** **Entitlement as Matter of Law, Appropriateness**

In reviewing a summary judgment motion, courts are required to view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. In the qualified immunity context, that usually means adopting the plaintiff's version of the facts, unless the plaintiff's version is blatantly contradicted by the record, so that no reasonable jury could believe it.

Civil Rights Law > ... > Section 1983 Actions > Elements > Protected Rights

**HN3** **Elements, Protected Rights**

*42 U.S.C.S. § 1983* creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Section 1983* has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Political Speech

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

**HN4** **Freedom of Speech, Political Speech**

The *First Amendment to the United States Constitution* protects freedom of speech. *U.S. Const. amend. I*.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

**HN5** **Search & Seizure, Scope of Protection**

The *Fourth Amendment to the United States Constitution* protects people from unreasonable searches and seizures. *U.S. Const. amend. IV*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

### *HN6* Affirmative Defenses, Immunity

Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. To determine whether a government official is entitled to qualified immunity, a court considers the two-part test described in Saucier, which asks whether a constitutional right would have been violated on the facts alleged and, if so, whether the right was clearly established. The court is free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Evidence > Burdens of Proof > Allocation

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

### *HN7* Affirmative Defenses, Immunity

Qualified immunity is applicable unless an official's conduct violated a clearly established constitutional right. A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. The plaintiff bears the burden of proving both elements of the Saucier test. Although qualified immunity is an affirmative defense that must be raised by a defendant, once an official raises the defense the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity. Where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

### *HN8* Search & Seizure, Probable Cause

The *Fourth Amendment to the United States Constitution* prohibits traffic stops without probable cause that a traffic violation occurred, and it prohibits the continuation of a traffic stop to conduct a field sobriety test without reasonable suspicion that the driver was impaired.

Transportation Law > Private Vehicles > Traffic Regulation > Turn Signals

*HN9* **Traffic Regulation, Turn Signals**

*Ohio Rev. Code Ann. § 4511.39* requires that a driver signal before changing lanes or making a turn.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Investigative Stops

*HN10* **Search & Seizure, Scope of Protection**

As part of an initial traffic stop, an officer has authority to check the driver's license, determine whether are outstanding warrants against the driver, and inspect the automobile's registration and proof of insurance. The checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. Additionally, the officer is lawfully permitted to ask "traffic-related questions" and questions about the driver's identity, business, and travel plans.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Investigative Stops

*HN11* **Search & Seizure, Scope of Protection**

An officer has the right to order a driver to get out of a vehicle without violating the proscription of unreasonable searches and seizures in the *Fourth Amendment to the United States Constitution*. An officer does not need separate justification to remove the driver from the vehicle.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN12* **Search & Seizure, Scope of Protection**

Although less demanding than the probable-cause standard, the reasonable-suspicion standard still requires more than a mere hunch. It requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. In conducting a reasonable-suspicion analysis, reviewing courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing, while bearing in mind that officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. The totality-of-the-circumstances inquiry requires courts to determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.

Criminal Law & Procedure > ... > Vehicular Crimes > Driving Under the Influence > Blood Alcohol & Field Sobriety Testing

Evidence > ... > Scientific Evidence > Bodily Evidence > Sobriety Tests

*HN13* **Driving Under the Influence, Blood Alcohol & Field Sobriety Testing**

Ohio courts identify numerous factors an officer can consider in making the decision to conduct a field sobriety test, including the time and day of the stop, the location of the stop, erratic driving, bloodshot eyes, the odor of alcohol, the suspect's demeanor, and any admission of drinking.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

*HN14* **Immunity From Liability, Defenses**

A government official will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law. Qualified immunity therefore limits success in such suits to only those situations in which no reasonable officer, of all the universe of reasonable officers, would make a given decision.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN15* **Immunity From Liability, Defenses**

Probable cause exists if the facts and circumstances known to an arresting officer justify a prudent man in believing that a crime has been committed. Whether an officer had probable cause is analyzed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. An arresting agent is entitled to qualified immunity if he or she could reasonably have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent. The focus is on the facts the officer knew at the time of the arrest, but his subjective state of mind is irrelevant. An arresting officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. An officer cannot be liable for a violation of the *Fourth Amendment to the United States Constitution* so long as there was probable cause to make an arrest for any offense, even if not on the offense charged by the officer.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

*HN16* **Jury Trials, Province of Court & Jury**

The existence of probable cause is generally a question for a jury, but a court still must examine whether there is only one reasonable determination possible based on the evidence produced by the parties. Probable cause is a

legal question for the court if the facts are not in dispute. The right to be free from arrest without probable cause is clearly established for purposes of a qualified immunity analysis.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Fighting Words

Criminal Law & Procedure > ... > Disruptive Conduct > Disorderly Conduct & Disturbing the Peace > Elements

*HN17* **Freedom of Speech, Fighting Words**

A person cannot be convicted for disorderly conduct based on their speech alone unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace. Fighting words are those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. Vulgar or profane language about the situation generally, as opposed to vulgar or profane language directed to a police officer, is not likely to be considered fighting words. Profanity and verbal abuse of police officers, standing alone, is not sufficient to justify an arrest.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Fighting Words

Criminal Law & Procedure > ... > Disruptive Conduct > Disorderly Conduct & Disturbing the Peace > Elements

*HN18* **Freedom of Speech, Fighting Words**

Vulgar language, when accompanied by aggressive behavior, can be sufficient for a disorderly conduct conviction based on turbulent behavior. The word "turbulent," in the context of Ohio's disorderly conduct statute, *Ohio Rev. Code Ann. § 2917.11*, refers to tumultuous behavior or unruly conduct characterized by violent disturbance or commotion.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

*HN19* **Affirmative Defenses, Immunity**

Law enforcement officials who reasonably, but mistakenly, conclude that probable cause is present are entitled to immunity.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Fighting Words

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

*HN20* **Freedom of Speech, Fighting Words**

The *First Amendment to the United States Constitution* protects a significant amount of verbal criticism and challenge directed at police officers. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which a free nation is distinguished from a police state. Non-aggressive questioning of police officers is constitutionally protected so long as the conduct does not cross the line into fighting words or disorderly conduct.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests

Evidence > Inferences & Presumptions > Inferences

*HN21* **Commencement of Criminal Proceedings, Arrests**

A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two, that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. A motivating factor is a but for cause. Proximity in time can support an inference of a causal link.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Torts > Intentional Torts > False Arrest > Elements

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests

*HN22* **Search & Seizure, Probable Cause**

A plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.

Constitutional Law > ... > Fundamental Freedoms > Freedom of Speech > Scope

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

*HN23* **Fundamental Freedoms, Freedom of Speech**

The no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.

**Counsel:** **[*1]** For Solomon Ellison, Plaintiff: Alphonse Adam Gerhardstein, Jennifer Lynn Branch, Gerhardstein & Branch Co. LPA, Cincinnati, OH.

For Jeffrey Martin, Defendant: Peter L. Jamison, LEAD ATTORNEY, Ohio Attorney General's Office, Executive Agencies, Columbus, OH; Keith L O'Korn, Attorney General of Ohio, Executive Agencies, Columbus, OH.

**Judges:** Michael R. Barrett, United States District Judge.

**Opinion by:** Michael R. Barrett

# Opinion

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant Trooper Jeffrey Martin's Motion for Summary Judgment (Doc. 31). Plaintiff Solomon Ellison filed a Memorandum in Opposition (Doc. 37), to which Trooper Martin filed a Reply (Doc.

2020 U.S. Dist. LEXIS 223539, *1

42). In this civil rights case arising from a lawful traffic stop, Ellison alleges Trooper Martin detained him longer than necessary and then arrested him without probable cause. For the reasons that follow, the Court disagrees and will **GRANT** the Motion for Summary Judgment.

## I. Background

### A. Facts Underlying the Claims

Just after 1:00 a.m. in the morning on July 10, 2016 in Mason, Ohio, Ellison was driving home from a movie with his fianceé, Sheena Davis. (Doc. 31-1, PageID 242.) Trooper Martin, an officer with the Ohio Highway Patrol, **[*2]** was driving in the area. When Trooper Martin turned on to Irwin Simpson Road, he saw the vehicle in front of him change lanes without signaling. (Video 1:04:09.) The vehicle next turned right onto Mason Montgomery Road without signaling. (Video 1:04:38.) The vehicle then weaved right over the white-striped line and weaved left at least touching the yellow left lane line, before the driver finally signaled right and changed lanes. (Video 1:04:59, 1:05:05.) Trooper Martin pulled over the vehicle on Mason Montgomery Road for the traffic violations. (Video 1:05:21; Doc. 31-2, PageID 406-407.) The driver of the vehicle, Plaintiff Ellison, appropriately pulled to the side of the road and parked.

Ellison believed on the night of the incident that Trooper Martin initiated the traffic stop because he is African American. However, after watching the video of the traffic stop, he conceded that he turned right onto Mason Montgomery Road without using his turn signal. (Doc. 31-1, PageID 273.) He further conceded that Trooper Martin could not have known his race while he was driving and that the traffic stop was not racially motivated. (*Id.*, PageID 273-275, 304-305.) Nonetheless, Ellison's concern **[*3]** on the night of the incident that the traffic stop was racially motivated permeated the encounter between Ellison and Trooper Martin.

At the beginning of the stop, Ellison rolled down his window, and Trooper Martin politely requested his driver's license, proof of insurance, and registration. (Video 1:05:48.) Ellison immediately provided the documents, but his identification fell to the ground as he attempted to hand it to Trooper Martin. (Video 1:06:07.) Troop Martin later testified that he detected "a strong odor of an alcoholic beverage coming from the vehicle" which was a "sweet, fruity smell." (Doc. 31-2, PageID 407, 464.) Ellison and Davis denied that there was any odor of alcohol on Ellison or in the car. (Doc. 35, PageID 1074; Doc. 31-3, PageID 685-687.)

When asked, Trooper Martin told Ellison that he stopped him for not using a turn signal and for marked lane violations. (Video 1:06:34.) Ellison expressed his belief—later proven to be incorrect—that Trooper Martin followed him when he left the movie theater. (Video 1:06:43.) When Trooper Martin asked where he was headed, Ellison continued to discuss the traffic violation. Ellison said "let's get with it" and "may I have my ticket?" **[*4]** (Video 1:07:03.) Ellison repeated his request for the ticket when Trooper Martin next asked his how much he had to drink. (Video 1:07:09.)

At this point, Trooper Martin asked Ellison to step out of his vehicle. (Video 1:07:13.) Ellison responded that he did not want to step out of the vehicle and asked Trooper Martin call his supervisor. (Video 1:07:14.) Trooper Martin then opened the driver's side vehicle door. (Video 1:07:16.) At some Trooper Martin grabbed his taser with his right hand after he opened the vehicle door. (Doc. 31-2, PageID 423.) His right arm was bent at a right angle and pointed towards Ellison as they continued to talk, but the video does not show where his hand or the taser is pointed. Ellison testified at his deposition that he could not recall whether the taser was pointed at him. (Doc. 35, PageID 1088-1089.)

Nonetheless, Ellison told Trooper Martin that he did not feel comfortable, he stated that he did not have a gun, and he requested multiple times that Trooper Martin call his supervisor. (Video 1:07:17.) Trooper Martin denied that he had to call his supervisor. (Video 1:07:24.) Ellison again denied that he had been drinking. (Video 1:07:27.) Trooper Martin **[*5]** and Ellison continued to go back and forth with Trooper Martin stating that he wanted Ellison to step out

of the car and Ellison stating that he did not "feel safe or comfortable." (Video 1:07:28.) Ellison told his fiancée, Sheena Davis, that she should call 911. (Video 1:07:33.) Trooper Martin stated that he was the one "in control right here," but he agreed that Davis could call 911. (Video 1:07:34.) While Ellison continued to request a supervisor and state that he did not feel comfortable, Trooper Martin told Ellison that he "could exit the vehicle" or Trooper Martin "would pull [him] out of the vehicle." (Video 1:07:42.)[1]

The two men then began to talk over each other at a faster pace for the next twenty-five seconds or so. (Video 1:07:46.) Trooper Martin ordered Ellison to exit the vehicle at least five times. Ellison did not comply, but instead he stated that he did not want to be shot or tased. Trooper Martin reached in to undo the seat belt buckle after Ellison verified that he did not have a gun. (Video 1:08:02; Doc. 31-2, PageID 430.) As Ellison then stepped out of the vehicle, Davis can be heard telling the 911 operator their location. (Video 1:08:07.) Trooper Martin patted **[*6]** down Ellison with his consent after Ellison again denied having a weapon. (Video 1:08:26.) When Ellison suggested that Davis "get out of the car," Trooper Martin instructed her to stay in the vehicle. (Video 1:08:48.) Ellison continued to ask Trooper Martin to call a supervisor and gestured with his hands as he spoke. (Video 1:09:07.)

Trooper Martin then asked Ellison to face him so he could "take a look at your eyes and make sure [he] could drive." (Video 1:09:20.) Ellison responded with a raised voice in frustration:

I haven't been fucking drinking, man. I haven't had one fucking drink. Call the supervisor. I asked you that three times. I asked you nicely.

(Video 1:09:21.) Ellison gestured up and down with both arms, and then moved his left arm (from the elbow) up and down rapidly as he yelled, "I asked you that three times." (*Id.*) Davis told Ellison to "calm down" at that time because he "sound[ed] agitated." (Doc. 31-3, PageID 618.) She was concerned for Ellison's safety and did not "want the officer to do anything to him" because Ellison was agitated. (*Id.*)

Trooper Martin arrested Ellison and placed him in handcuffs after his outburst. (Video 1:09:33.) Ellison did not resist the arrest, **[*7]** but he continued to verbally argue with Trooper Martin for more than one minute. (Video 1:09:34.) Trooper Martin placed Ellison, who was handcuffed, in his cruiser. (Video 1:11:20.) Trooper Martin testified that he arrested Ellison for disorderly conduct at that time because Ellison was displaying "signs of aggression[,]" "being loud[,]" and "impeding [his] investigation." (Doc. 31-2, PageID 409-411.)

Deputies from the Warren County Sheriff's Office arrived at the scene in response to the 911 call around the time that Trooper Martin placed Ellison in his cruiser. Trooper Martin then spoke to Davis in the vehicle. He asked her if she or Ellison had been drinking. (Video 1:13:46.) Davis stated that neither of them had anything to drink. (Video 1:13:54.) Trooper Martin told Davis that Ellison had been arrested for disorderly conduct and driving while intoxicated because, in part, Trooper Martin smelled alcohol in the vehicle and on Ellison's breathe. (Video 1:14:02.) He asked if Davis would take a portable breathalyzer test so he could be sure she was safe to drive the vehicle. (Video 1:14:19.) The test results indicated that she had not had anything to drink. (Video 1:16:45.) Trooper **[*8]** Martin requested Ellison to take a portable breathalyzer test, he consented, and his test also confirmed that he had not been drinking alcohol. (Video 1:18:33, 1:19:30.)

Trooper Martin released Ellison without charging him after the negative tests and after he learned there was no room for Ellison at the Warren County jail. (Video 1:17:41, 1:24:06; Doc. 31-2, PageID 512.) When Trooper Martin asked why he had "made a big deal" about getting out of the vehicle, Ellison responded that he had a "intrinsic fear" of police based on previously "being brutalized" by police officers. (Video 1:23:18.)

## B. Procedural Posture

---

[1] Ellison believed based on conversations he had had with officers from the Hamilton County Sheriff's Office that a law enforcement officer had to call a supervisor if he requested it. (Doc. 31-1, PageID 284-285.) He requested the presence of supervisor, or other officers via the 911 call, because he wanted to deescalate the situation and reduce the threat he felt from Trooper Martin. (*Id.*, PageID 294-296.)

2020 U.S. Dist. LEXIS 223539, *8

Ellison filed this suit against Trooper Martin on October 13, 2017. (Doc. 1.) He asserted a claim for violation of his *First* and *Fourth Amendment* rights pursuant to *42 U.S.C. § 1983*. (*Id.*) Trooper Martin filed a timely Answer. (Doc. 6.) Following discovery, Trooper Martin filed the pending Motion for Summary Judgment arguing that he is entitled to judgment as a matter of law on the basis of qualified immunity. The Motion is fully briefed and ready for adjudication.

## II. Summary Judgment Standard

**HN1** *Federal Rule of Civil Procedure 56(a)* provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and **[*9]** the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Once the moving party has met its burden of production, the nonmoving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

**HN2** In reviewing a summary judgment motion, courts are required to view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)* (citing *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962))*. In the qualified immunity context, "'this usually means adopting ... the plaintiff's version of the facts,' unless the plaintiff's version is 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Stoudemire v. Mich. Dep't of Corr., 705 F.3d 560, 565 (6th Cir. 2013)* (quoting *Scott, 550 U.S. at 378, 380)*.

## III. Analysis

### A. *Section 1983* and Qualified Immunity Standards

**HN3** *Section 1983* creates no substantive rights, but merely provides remedies for deprivations of rights established elsewhere. *Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)*. "*Section 1983* has two basic requirements: (1) state action that (2) deprived an individual of federal statutory or constitutional rights." *Flint v. Ky. Dep't of Corr., 270 F.3d 340, 351 (6th Cir. 2001)*. In this case, Ellison alleges a violation of his *First* and *Fourth Amendment* rights. **HN4** The *First Amendment* protects "freedom of speech." *U.S. Const. amend. I.* **HN5** The *Fourth Amendment* **[*10]** protects people from "unreasonable searches and seizures." *U.S. Const. amend. IV.*

Trooper Martin asserts the defense of qualified immunity. **HN6** Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. The Sixth Circuit has explained:

> To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established." *533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)*. We are free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)*.

*Occupy Nashville v. Haslam, 769 F.3d 434, 442 (6th Cir. 2014)* (footnote omitted).

*HN7* "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson, 555 U.S. at 232*. "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently **[*11]** definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard, 572 U.S. 765, 778-779, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014)*; *see also Durham v. Nu'Man, 97 F.3d 862, 866 (6th Cir. 1996)* ("A right is not considered clearly established unless it has been authoritatively decided by the United States Supreme Court, the Court of Appeals, or the highest court of the state in which the alleged constitutional violation occurred."). The plaintiff bears the burden of proving both elements of the *Saucier* test. Although qualified immunity is an affirmative defense that must be raised by a defendant, once an official raises the defense "the burden is on the plaintiff to demonstrate that the official [is] not entitled to qualified immunity." *Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)*. "[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Williams v. City of Flint, 814 Fed. Appx. 973, 980 (6th Cir. 2020)* (citation omitted).

### B. *Fourth Amendment* Claims

#### 1. Traffic Stop Detention and the Field Sobriety Test

Ellison makes the preliminary argument that Trooper Martin did not have a reasonable suspicion to detain him longer than was necessary to issue the citation for the traffic infractions. *HN8* The *Fourth Amendment* prohibits traffic stops without probable cause that a traffic violation occurred, and it prohibits **[*12]** the continuation of a traffic stop to conduct a field sobriety test without reasonable suspicion that the driver was impaired. *Throckmorton, 681 F.3d at 860*. Ellison concedes that the traffic stop was justified because he turned onto Mason Montgomery Road at a traffic light without signaling. *HN9 Ohio Revised Code § 4511.39* requires that a driver signal before changing lanes or making a turn. Ellison disputes, however, the length of the traffic stop and whether Trooper Martin had reasonable suspicion to conclude that he was driving while impaired.

*HN10* As part of the initial traffic stop, Trooper Martin had authority to "check[] the driver's license, determin[e] whether there [were] outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Rodriguez v. United States, 575 U.S. 348, 355, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)*. "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* Additionally, he was lawfully permitted to ask "traffic-related questions" and questions about Ellison's "identity, business and travel plans." *United States v. Potts, No. 97-6000, 1999 U.S. App. LEXIS 1625, 1999 WL 96756, at *4 (6th Cir. Feb. 2, 1999)*; *see also United States v. Ellis, 497 F.3d 606, 613-614 (6th 2007)* ("Trooper Topp was justified in asking the occupants general questions of who, what, where, and why regarding their 3:23 a.m. travel.") Finally, *HN11* Trooper Martin **[*13]** had the right to "order the driver to get out of the vehicle without violating the *Fourth Amendment's* proscription of unreasonable searches and seizures." *Arizona v. Johnson, 555 U.S. 323, 331, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009)* (quoting *Pennsylvania v. Mimms, 98 S. Ct. 330, 54 L. Ed. 2d 331, 434 U.S. 106, 111, n. 6 (1977))*.[2] An officer does not need separate justification to remove the driver from the vehicle. *United States v. Pacheco, 841 F.3d 384, 390 (6th Cir. 2016)*.

Although Trooper Martin had the authority to order Ellison out of his vehicle as part of the traffic stop, Trooper Martin could not continue the detention of Ellison to conduct a field sobriety test without reasonable suspicion that

---

[2] Ellison argues that Trooper Martin ordered him out of the car, not as part and parcel of the traffic stop, but in order to effectuate the field sobriety test without reasonable suspicion. This argument fails legally. Supreme Court caselaw "foreclose[s] any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved." *Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996)*. Trooper Martin's subjective intentions are irrelevant to the *Fourth Amendment* analysis. *See, e.g., Scheffler v. Lee, 752 F. App'x 239, 244 (6th Cir. 2018)* (stating that it did not matter if an officer subjectively believed he had probable cause); *United States v. Parks, 414 F.Supp.3d 1044, 1049 (N.D. Ohio 2019)* (stating that the subjective intention of the officer completing the pat-down of a driver is irrelevant).

he was driving under the influence of alcohol. In fact, Trooper Martin acknowledged at his deposition that he did not have to give Ellison a field sobriety test in order to issue a ticket to Ellison for the traffic violations. (Doc. 31-2, PageID 506.) The Sixth Circuit has explained the reasonable suspicion standard as follows:

> *HN12* Although less demanding than the probable-cause standard, the reasonable-suspicion standard still requires more than a mere hunch. It requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. In conducting a reasonable-suspicion analysis, reviewing courts must look at **[*14]** the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing, while bearing in mind that officers are permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. This totality-of-the-circumstances inquiry requires courts to determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.

*Green, 681 F.3d at 860-861* (cleaned up). Therefore, the Court must examine whether there were specific, objective facts giving rise to reasonable suspicion.

Ellison points out that he pulled over upon seeing the cruiser lights and immediately provided the requested identification documents. He directly answered Trooper Martin's initial questions. He did not dispute issuance of a traffic violation ticket for not signaling before he turned. He asserts that the video demonstrates that he understood Trooper Martin's questions and did not slur his speech in responding to those questions. He also cooperated and **[*15]** followed directions after he exited the vehicle by allowing Trooper Martin to pat him down.[3]

On the other hand, Trooper Martin points to factors that support a finding of reasonable suspicion including the time and day of the stop, the location of the stop, erratic driving, the odor of alcohol, Ellison's demeanor and coordination. The traffic stop took place around 1:00 a.m. on the weekend in a commercial area. Ellison admits that he failed to signal a turn, and the video shows that he made other marked lane violations, all in the span of about one minute. Trooper Martin testified that he smelled the odor of alcohol, and consistent with that, he asked Ellison how much he had to drink as part of his opening set of questions. Trooper Martin testified that Ellison dropped his identification as he was handing it to him to review. Finally, Ellison refused to directly answer some questions posed to him, was argumentative and incorrect about his purported right to have a supervisor at the scene, and refused multiple requests to exit the vehicle.

On summary judgment, the Court must resolve all factual disputes in favor of the non-moving part, **[*16]** Ellison, so long as the dispute is not conclusively resolved by the video. The video does not show if Ellison or Trooper Martin is responsible for allowing Ellison's identification to fall to the ground. The video also is not probative as to whether there was an odor of alcohol emanating from Ellison or his vehicle. On this latter issue, Ellison and Davis both deny drinking or that the there was an odor of alcohol in the vehicle. The Sixth Circuit has instructed that "an officer's unsupported and contested observations regarding a driver's signs of impairment are called into question when a subsequent blood or urine test shows that the driver was not actually impaired." *Green, 681 F.3d at 863*. Here,

---

[3] Ellison also relies on the conclusion of his expert, Michael Lyman, Ph.D., who opined that the "common violation" of failure to use a turn signal did not standing alone provide suspicion that the driver was impaired. (Doc. 36, PageID 1141.) However, Lyman's opinion on whether Trooper Martin had reasonable suspicion is not admissible. It is the role of the Court to define a legal term such as reasonable suspicion and the role of the factfinder to determine if the facts satisfy the definition. *See Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994)* ("It is the responsibility of the court, not testifying witnesses, to define legal terms."); *Morgan v. Westhoff, No. 05-73583, 2006 U.S. Dist. LEXIS 58155, 2006 WL 2474010, at *2 (E.D. Mich. Aug. 18, 2006)* (not allowing experts to testify as to whether an officer had probable cause). In at least two prior cases, Dr. Lyman was precluded from testifying about the reasonableness of an officer's conduct because that determination is the ultimate legal determination for a jury. *See Gough v. Louisville Jefferson Cnty. Metro Gov't, No. 3:12-cv-849, 2016 U.S. Dist. LEXIS 116078, 2016 WL 4535663, at *2 (W.D. Ky. Aug. 30, 2016)*; *Alvarado v. Oakland Cnty., 809 F. Supp. 2d 680, 689-691 (E.D. Mich. 2011)*.

Trooper Martin's credibility in testifying that he smelled alcohol is called into question in light of the undisputed fact that Ellison and Davis both tested 0.00 on the breathalyzer test.

Nonetheless, based on the remaining undisputed facts, it was reasonable for Trooper Martin to conclude that he had at least a reasonable suspicion that Ellison was impaired. *HN13* Ohio court have identified numerous factors an officer can consider in making the decision to conduct a field sobriety test including the time and day **[*17]** of the stop, the location of the stop, erratic driving, bloodshot eyes, the odor of alcohol, the suspect's demeanor, and any admission of drinking. *Ohio v. Evans, 127 Ohio App. 3d 56, 711 N.E.2d 761, 766 n.2 (1998)*; *see also* *Bradley v. Reno, No. 4:12CV00890, 2014 U.S. Dist. LEXIS 139803, 2014 WL 4955948, at *5 (N.D. Ohio Sept. 30, 2014)* (quoting *Evans*), *aff'd*, *632 F. App'x 807 (6th Cir. 2015)*. Several of these factors were present. Trooper Martin witnessed Ellison commit several traffic violations in just over one minute during the overnight hours in an area with multiple alcohol-serving restaurants. Ellison did not answer standard questions such as where he was headed and whether he had been drinking. He stated that Trooper Martin should "get with it" and asked for his ticket. He was argumentative by repeatedly insisting that Trooper Martin call a supervisor after Trooper Martin declined to do so. Finally, he refused repeated commands to exit the vehicle before finally cooperating. These specific, articulable facts made it reasonable for Trooper Martin to extend the traffic stop in order to conduct a field sobriety test. That Trooper Martin's reasonable suspicion that Ellison was impaired was proven to be incorrect is not relevant. *HN14* A government official "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." **[*18]** *Hicks v. Scott, 958 F.3d 421, 433 (6th Cir. 2020)* (quotation omitted). "Qualified immunity therefore limits success in such suits to only those situations in which no reasonable officer, of all the universe of reasonable officers, would make a given decision." *Henry, 814 F. App'x at 979*.

Finally, this case is distinguishable from the primary case relied upon by Ellison, *Green v. Throckmorton*. There, the judge denied qualified immunity to the police officer on the basis that a jury could find facts under which the officer's suspicion of driver impairment was "plainly incompetent." *681 F.3d at 864*. The driver there committed two minor traffic infractions—a lane violation and failure to dim high beams in the face of oncoming traffic—but it was a wet night with poor visibility, she was driving on unfamiliar roads, and she gave a rational explanation for why she had improperly used her high beams while driving. *Id.* The driver in *Green* also did not fail to answer the officer's questions, was not argumentative, and did not refuse a command. *Id. at 856-857* (explaining the driver's cooperation). Conversely, Ellison seemed unaware that he made several traffic violations, he made them on a night without visibility problems, and his demeanor was argumentative throughout most of the traffic stop. **[*19]** Trooper Martin's suspicion of driver impairment was not plainly incompetent.

For these reasons, the Court concludes that Trooper Martin has qualified immunity on the Ellison's *Fourth Amendment* claim to the extent Ellison alleged that Trooper Martin unlawfully extended the traffic stop and attempted to conduct a field sobriety test.

## 2. Probable Cause Determination

Next, Ellison argues that he was arrested without probable cause in violation of the *Fourth Amendment*. *See* *Williams ex rel. Allen v. Cambridge Bd. of Educ., 370 F.3d 630, 636 (6th Cir. 2004)* ("A law enforcement officer may not seize an individual except after establishing probable cause that the individual has committed, or is about to commit, a crime."); *Crockett v. Cumberland Coll., 316 F.3d 571, 580 (6th Cir. 2003)* ("[A]ny arrest without probable cause violates the *Fourth Amendment*."). Trooper Martin arrested Ellison for disorderly conduct and impaired driving, before deciding to release him without charges. In moving for summary judgment, Trooper Martin argues that is entitled to qualified immunity because he had probable cause to arrest Ellison for those two offenses, plus for obstruction of official business or failure to comply with a lawful order.

*HN15* "Probable cause exists if the facts and circumstances known to the arresting officer justify a prudent man in believing that a crime has been committed." *Logsdon v. Hains, 492 F.3d 334, 341 (6th Cir. 2007)* (citation **[*20]** omitted). Whether an officer had probable cause is analyzed "from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls, 395 F.3d 291, 302 (6th Cir. 2005)* (citation omitted). "[A]n arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008)*. The focus is on the facts the officer knew at the time of the arrest, but his subjective state of mind is irrelevant. *See Devenpeck v. Alford, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)*. In fact, "an arresting officer's 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.'" *United States v. Harness, 453 F.3d 752, 755 (6th Cir. 2006)* (quoting *Devenpeck, 543 U.S. at 153*). An officer cannot be liable for a *Fourth Amendment* violation so long as there was probable cause to make an arrest for any offense, even if not on the offense charged by the officer.

*HN16* The existence of probable cause is generally a question for the jury, but the Court still must examine whether "there is only one reasonable determination possible based on the evidence produced by the parties." *Snyder v. Kohl's Dep't Stores, Inc., 580 F. App'x. 458, 462 (6th Cir. 2014)* (quotation omitted). Probable cause is a legal question for the Court if the facts **[*21]** are not in dispute. *Penn v. Bergtold, 803 F. App'x 900, 903 (6th Cir. 2020)* (citing, in part, *Hale v. Kart, 396 F.3d 721, 728 (6th Cir. 2005))*. The right to be free from arrest without probable cause was clearly established in 2016 for purposes of a qualified immunity analysis. *See, e.g., Radvansky v. City of Olmsted Falls, 395 F.3d at 311* (establishing that the *Fourth Amendment* prohibits "a law enforcement officer may not seize an individual except after establishing probable cause") (citation omitted).

The Court starts by examining whether Trooper Martin had probable cause to arrest Ellison for disorderly conduct. The disorderly conduct statute in Ohio states as follows:

> (A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
> (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior; [or]
> (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person; . . . .

*Ohio Rev. Code § 2917.11*.

Trooper Martin arrested Ellison for disorderly conduct after Ellison's outburst when Trooper Martin attempted to examine his eyes as part of a field sobriety test. Ellison became angry, used profane language, raised his voice to a scream, and waived his arms directly in front of Trooper Martin. Ellison **[*22]** argues that Trooper Martin lacked probable cause to arrest him for disorderly conduct because he did not use fighting words. *HN17* A person cannot be convicted for disorderly conduct based on their speech alone "unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *Ohio v. Hoffman, 57 Ohio St. 2d 129, 387 N.E.2d 239, 242 (1979)*. "Fighting words are those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Ohio v. Thompson, 95 Ohio St. 3d 264, 2002- Ohio 2124, 767 N.E.2d 251, 255 (2002)* (internal quotation and citation omitted). Vulgar or profane language about the situation generally, as opposed to vulgar or profane language directed to the police officer, is not likely to be considered fighting words. *Middletown v. Carpenter, 2006-Ohio-3625, at ¶¶ 15-16, 2006 WL 1972061, at *2 (Ohio App. 2006)*. The Sixth Circuit confirmed this year that "profanity and verbal abuse" of police officers, standing alone, is not sufficient to justify an arrest. *Henry, 814 F. App'x at 981*.

The problem with Ellison's argument is that the arrest for disorderly conduct was not based on vulgar language alone. *HN18* "[V]ulgar language, when accompanied by aggressive behavior, can be sufficient for a disorderly conduct conviction based on 'turbulent behavior.'" *Middletown v. Carpenter, 2006-Ohio-3625, ¶ 17, 2006 WL 1972061, at *3 (Ohio App. 2006)*. "The word, 'turbulent,' in **[*23]** the context of Ohio's disorderly conduct statute, refers to tumultuous behavior or unruly conduct characterized by violent disturbance or commotion." *Carr v. Bradley, No. CIV.A. 2:07-CV-01053, 2009 U.S. Dist. LEXIS 27065, 2009 WL 937145, at *8 (S.D. Ohio Apr. 2, 2009)* (quoting *Ohio v. Reeder, 18 Ohio St. 3d 25, 27, 18 Ohio B. 21, 479 N.E.2d 280 (1985))*.

Trooper Martin faced a situation which had escalated from a routine traffic stop to an agitated confrontation. Ellison initially did not directly respond to routine questions about where he was going and whether he had been drinking. He next refused repeated requests, then commands, to exit his vehicle before he finally complied. He repeatedly challenged, in an increasingly quarrelsome manner, Trooper Martin's authority to conduct the traffic stop without a supervisor. Finally, when Trooper Martin attempted to use the flashlight to check his eyes, Ellison became aggressive, using profane language, shouting, and gesturing with his arms in close proximity to Trooper Martin. Ellison's outburst prompted Davis to tell him to "calm down."[4] Even Ellison testified during his deposition that he was "angry" at that moment and that "someone looking at that behavior would consider it to [have been] aggressive or in some way threatening." (Doc. 31-1, PageID 318.)

Although these facts present a close [*24] question, the Court concludes as a matter of law that Trooper Ellison had probable cause to arrest Ellison for disorderly conduct. It was reasonable for Trooper Martin to believe that Ellison was engaged in turbulent behavior that recklessly caused annoyance or alarm to another. Because Trooper Martin had probable cause to arrest Ellison for disorderly conduct, the Court need not and does not consider whether Trooper Martin also had probable cause to arrest Ellison for impaired driving, obstruction, or failure to comply with an order.

It follows that Trooper Martin is entitled to qualified immunity on the *Fourth Amendment* claim for false arrest. Moreover, even if Trooper Ellison lacked probable cause, he still would be entitled to qualified immunity for his reasonable belief that he had probable cause. *HN19* "[L]aw enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991)* (internal quotation and citation omitted); *see also Goodwin v. City of Painesville, 781 F.3d 314, 333 (6th Cir. 2015)* ("The qualified immunity doctrine requires that probable cause determinations, even if wrong, are not actionable as long as such determinations pass the test of reasonableness.") (internal quotation and citation omitted); *[*25] Slusher v. Delhi Twp., Ohio, No. 1:08-cv-273, 2009 U.S. Dist. LEXIS 59971, 2009 WL 2145608, at *10-11 (S.D. Ohio July 14, 2009)* (finding qualified immunity even though officers lacked probable cause to make disorderly conduct arrest). Ellison has not met his burden of proof, and Trooper Martin is entitled to qualified immunity.

## C. *First Amendment* Claim

Ellison also argues that Trooper Martin arrested him in retaliation for his protected speech and in violation of the *First Amendment*. *HN20* "[T]he *First Amendment* protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill, 482 U.S. 451, 461, 107 S. Ct. 2502, 96 L. Ed. 2d 398*. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id. at 462-463*. The "right to be free from retaliatory arrest after insulting an officer was clearly established" before Ellison's arrest in 2016. *See Kennedy v. City of Villa Hills, Ky., 635 F.3d 210, 219 (6th Cir. 2011)*. "Nonaggressive questioning of police officers is constitutionally protected" so long as the conduct does "not cross the line into fighting words or disorderly conduct." *Patrizi v. Huff, 690 F.3d 459, 467 (6th Cir. 2012)*.

A plaintiff seeking to prove retaliatory arrest must prove three elements:

> *HN21* A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken **[*26]** against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two— that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

---

[4] To be clear, Davis was supportive of her fiancé in her testimony and critical of Trooper Martin. It is fair to say that she was concerned that Trooper Martin would overreact to Ellison's outburst. (Doc. 31-3, PageID 618.) That does not change that fact that Trooper Martin could have reasonably believed based on Davis's comment that she was disturbed by Ellison's outburst.

*Kennedy, 635 F.3d at 217*. A motivating factor is a "but for" cause. *Id.* "Proximity in time can support an inference of a causal link." *Scheffler v. Lee, 752 F. App'x 239, 253 (6th Cir. 2018)*.

In 2019, the Supreme Court settled a dispute in existing case law and held that "[t]he plaintiff pressing **HN22** a retaliatory arrest claim [also] must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett, 139 S. Ct. 1715, 1724, 204 L. Ed. 2d 1 (2019)*; *see also Hartman v. Thompson, 931 F.3d 471, 484 (6th Cir. 2019)* (following *Nieves*).[5] It is not necessary to wade deeply into the weeds on the interplay between probable cause and retaliatory motives for an arrest before *Nieves*. It suffices to explain that the Supreme Court instructed in 2012 that because the law was "not clearly established that an arrest supported by probable cause could give rise to a *First Amendment* violation[,]" then officers who made an arrest with probable cause were entitled to qualified immunity on a retaliatory arrest claim. *Reichle v. Howards, 566 U.S. 658, 670, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)*. The Sixth Circuit has followed and applied *Reichle* by granting qualified immunity to officers accused of retaliatory [*27] arrests when probable cause was proven. *See*, *e.g.*, *Novak v. City of Parma, 932 F.3d 421, 429 (6th Cir. 2019)* ("If the officers did have probable cause, . . . they are entitled to qualified immunity."); *Phillips v. Blair, 786 F. App'x 519, 529 (6th Cir. 2019)* ("Without controlling authority clearly establishing a *First Amendment* right to be free from a retaliatory arrest otherwise supported by probable cause, we also reverse the denial of qualified immunity on this claim."); *Marshall v. City of Farmington Hills, 693 F. App'x 417, 426-427 (6th Cir. 2017)* (finding that officers who had probable cause were entitled to qualified immunity on a retaliatory arrest claim).

The Court concluded above that Trooper Martin had probable cause to arrest Ellison for disorderly conduct. As such, Ellison cannot establish a retaliatory arrest claim as a matter of law, and Trooper Martin is entitled to qualified immunity.

## IV. Conclusion

In light of the foregoing, it is hereby **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 31) is **GRANTED**.

**IT IS SO ORDERED**.

*/s/ Michael R. Barrett*

Michael R. Barrett, Judge

United States District Court

---

**End of Document**

---

[5] The Supreme Court added a narrow caveat not applicable here for "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id. at 1727*. **HN23** "[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Ellison makes the bald argument that the *Nieves* exception applies here, but the Court does not find the argument compelling in the absence of persuasive reasoning.

 Positive

As of: September 9, 2025 3:28 PM Z

## *State v. Davis*

Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County

July 8, 2021, Released; July 8, 2021, Journalized

No. 109890

**Reporter**

2021-Ohio-2311 *; 2021 Ohio App. LEXIS 2288 **; 2021 WL 2838407

STATE OF OHIO, Plaintiff-Appellee, v. MICHAEL DAVIS, Defendant-Appellant.

**Prior History: [**1]** Criminal Appeal from the Cuyahoga County Court of Common Pleas. Case No. CR-17-619133-A.

**Disposition:** AFFIRMED.

## Core Terms

mistrial, trial court, self-defense, declare, plain error, gun, flight instruction, manifest necessity, contends, firearm, scene, felony assault, aggravated, discharged, jeopardy, invited, double, flight, wished, instruction of a jury, jury instructions, assigned error, proceed pro se, jury trial, unequivocally, deliberate, colloquy, waived

## Case Summary

### Overview

HOLDINGS: [1]-Even if the trial court erred in declaring a mistrial, it was apparent that defendant's actions and assertions were the precipitating events that caused the mistrial, and it could be viewed as invited error, *Crim.R. 52*; the record demonstrated that he was unequivocal in his request to dismiss his attorneys during trial and represent himself, and some of his protestations occurred in the presence of the jury, which could have tainted their perspective and led to an unfair trial; [2]-The trial court did not abuse its discretion in denying defendant's request for a jury instruction on self-defense; as defendant did not admit that he committed the offense of felonious assault or aggravated menacing, the defense of self-defense was not available to him.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Double Jeopardy

Criminal Law & Procedure > Trials > Motions for Mistrial

Constitutional Law > Bill of Rights > State Application

*HN1* **Procedural Due Process, Double Jeopardy**

Justin Marks

2021-Ohio-2311, *2021-Ohio-2311; 2021 Ohio App. LEXIS 2288, **1

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from multiple prosecutions for the same offense. The Double Jeopardy Clause does not, however, bar re-prosecution in every case. Generally, retrial is permitted whenever a mistrial is declared at the request of or with the consent of the defendant, or the trial court sua sponte declares a mistrial, unless the request is precipitated by prosecutorial misconduct intended to provoke a defendant into seeking a mistrial.

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Definition of Plain Error

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Harmless Error

Criminal Law & Procedure > ... > Appeals > Standards of Review > Plain Error

_HN2_ **Plain Error, Definition of Plain Error**

Pursuant to Crim.R. 52(B), plain errors or defects that affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court. To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.

Criminal Law & Procedure > Trials > Motions for Mistrial

_HN3_ **Trials, Motions for Mistrial**

Double jeopardy will not bar a retrial if (1) there was a manifest necessity or high degree of necessity for ordering a mistrial; or (2) the ends of public justice would otherwise be defeated. "Manifest necessity" means a high degree of necessity must exist before a mistrial may properly be declared. However, it does not require a showing that a mistrial was absolutely necessary or that there was no other alternative but to declare a mistrial. There is no mechanical formula for determining what constitutes a manifest necessity for a mistrial. The manifest-necessity standard abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial.

Criminal Law & Procedure > Trials > Motions for Mistrial

_HN4_ **Trials, Motions for Mistrial**

What constitutes a manifest necessity for a mistrial is left to the discretion of the trial court to be decided on a case-by-case basis, considering all the relevant circumstances. This approach is in recognition of the fact that the trial judge is in the best position to determine whether the situation in his or her courtroom warrants the declaration of a mistrial, but should be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.

Criminal Law & Procedure > Trials > Motions for Mistrial

_HN5_ **Trials, Motions for Mistrial**

In determining whether a mistrial is necessary, the trial court should (1) allow both parties to state their positions on the issue, (2) consider their competing interests, and (3) explore reasonable alternatives, if any, before declaring a mistrial. A trial court must act rationally, responsibly, and deliberately in determining whether to declare a mistrial.

Criminal Law & Procedure > ... > Standards of Review > Harmless & Invited Error > Definition of Harmless & Invited Error

*HN6* **Harmless & Invited Error, Definition of Harmless & Invited Error**

Under the invited error doctrine, a party is not entitled to take advantage of an alleged error that the party induced or invited the court to make. A litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible. The doctrine precludes a litigant from making an affirmative and apparent strategic decision at trial and then complaining on appeal that the result of that decision constitutes reversible error. The invited error doctrine has been applied in the context of motions for mistrials.

Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion

Criminal Law & Procedure > Trials > Judicial Discretion

*HN7* **Standards of Review, Abuse of Discretion**

The giving of jury instructions is typically within the sound discretion of the trial court, and the appellate court reviews it for an abuse of discretion.

Criminal Law & Procedure > ... > Reviewability > Preservation for Review > Failure to Object

Criminal Law & Procedure > ... > Reviewability > Waiver > Jury Instructions

Criminal Law & Procedure > ... > Reviewability > Waiver > Triggers of Waivers

*HN8* **Preservation for Review, Failure to Object**

Failure to object to the trial court's jury instructions waives the issue on appeal.

Criminal Law & Procedure > ... > Resisting Arrest > Fleeing & Eluding > Consciousness of Guilt

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Jury Instructions

*HN9* **Fleeing & Eluding, Consciousness of Guilt**

An improper or erroneous jury instruction does not constitute plain error under Crim.R. 52(B) unless, but for the error, the outcome of the trial would clearly have been different. The Court of Appeals of Ohio has repeatedly held that a mere departure from the scene of the crime is not to be confused with deliberate flight from the area in which the suspect is normally to be found.

2021-Ohio-2311, *2021-Ohio-2311; 2021 Ohio App. LEXIS 2288, **1

Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion

Criminal Law & Procedure > Trials > Jury Instructions > Requests to Charge

*HN10* **Standards of Review, Abuse of Discretion**

When reviewing a refusal to give a requested jury instruction, an appellate court considers whether the trial court's refusal was an abuse of discretion under the facts and circumstances of the case. Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder.

Criminal Law & Procedure > Trials > Jury Instructions > Requests to Charge

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN11* **Jury Instructions, Requests to Charge**

Trial courts should ordinarily give a requested jury instruction if it is a correct statement of law, if it is applicable to the facts of the case, and if reasonable minds might reach the conclusion sought by the requested instruction. In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered.

Criminal Law & Procedure > Defenses > Self-Defense

*HN12* **Defenses, Self-Defense**

A defendant claiming self-defense concedes he had the purpose to commit the act, but asserts that he was justified in his actions. Self-defense presumes intentional, willful use of force to repel force or escape force. Thus, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense.

Criminal Law & Procedure > Defenses > Self-Defense

*HN13* **Defenses, Self-Defense**

Self-defense presumes that the facts of the crime, as alleged in the indictment or complaint, are true, but asserts that there are further facts that justify the defendant's actions and exempt him or her from liability.

**Counsel:** Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Christine M. Vacha, for appellee.

Jerome Emoff, for appellant.

**Judges:** KATHLEEN ANN KEOUGH, JUDGE. MARY J. BOYLE, A.J., and EILEEN A. GALLAGHER, J., CONCUR.

**Opinion by:** KATHLEEN ANN KEOUGH

# Opinion

JOURNAL ENTRY AND OPINION

KATHLEEN ANN KEOUGH, J.:

 **[*P1]** Defendant-appellant, Michael Davis, appeals his convictions following a jury trial. Finding no merit to the appeal, we affirm.

 **[*P2]** In 2017, Davis was named in an eight-count indictment charging him with attempted murder, aggravated robbery, discharge of a firearm, having weapons while under disability, and two counts each of felonious assault and aggravated menacing. The charges stemmed from an altercation that occurred on East 137th Street and Kinsman Road in Cleveland, between Davis and Dion Watson ("Watson"), Ketara Jewell ("Jewell"), and Sharon Maddox ("Maddox"), where according to the state, Davis exited a vehicle with a gun drawn, and ultimately engaged in a physical confrontation with Watson, causing him serious injury. It was alleged that Davis discharged the firearm during the incident.

 **[*P3]** A jury trial commenced **[**2]** in July 2018. However, after the jury was empaneled and the first witness testified, the trial court sua sponte declared a mistrial out of manifest necessity based on Davis's repeated protestations that he wanted to proceed pro se at trial.

 **[*P4]** In January 2020, a second jury trial commenced where Davis represented himself. The jury found Davis not guilty of attempted murder and one count of felonious assault (use of a deadly weapon), but guilty of felonious assault (causing serious physical harm), aggravated robbery, discharge of a firearm, having weapons while under disability, and both counts of aggravated menacing. The trial court sentenced Davis to 24 years in prison.

 **[*P5]** Davis now appeals, raising three assignments of error. Because Davis does not challenge on appeal the sufficiency or manifest weight of the evidence, this court will only set forth the facts as they pertain to each assignment of error.

### I. Mistrial

 **[*P6]** In his first assignment of error, Davis contends that the trial court abused its discretion in sua sponte declaring a mistrial.

 **[*P7]** Prior to the start of the July 16, 2018 jury trial, Davis expressed reservations about whether his trial attorneys had spent sufficient time with him **[**3]** to prepare for trial. During one of the exchanges with the trial court, Davis indicated that he wished to represent himself. (Tr. 22-24.) After a lengthy discussion between the court, Davis, and his attorneys, the court assured Davis that he was represented by competent and experienced attorneys who were prepared to go forward with trial.

 **[*P8]** After the jury was empaneled and Watson testified, Davis addressed the court requesting to represent himself. (Tr. 415.) According to Davis, his attorney did not ask Watson the questions that he wanted her to ask and they had a conflict of interest. (Tr. 415-420.) The court engaged in a long colloquy with Davis, at first denying his request to proceed pro se because they were "thick into this right now." (Tr. 420.) Additional discussion occurred regarding the amount of time Davis's attorneys spent with him preparing for trial. (Tr. 422-428.) After further discussion regarding the interplay between what Davis wished his attorney had asked during examination and what was asked, and the rules of evidence, the court took a recess and spoke with counsel off the record. (Tr. 428-430.)

 **[*P9]** The trial court then again discussed with Davis his concerns regarding **[**4]** his attorneys' representation. Davis assured the court that his mental health diagnosis was not impacting his decision-making, and that he was fully compliant with his medications. (Tr. 431-436.) Thereafter, the court stated:

> Okay. So, with that being said, I think that at this point, the Court has no choice but to declare a mistrial in this case for the manifest necessity.

2021-Ohio-2311, *2021-Ohio-2311; 2021 Ohio App. LEXIS 2288, **4

The basis, of course, is that the defendant has exerted very clearly the idea that he wishes to represent himself in this matter. And that, frankly, there is a significant amount of discovery which has been reviewed by counsel only and would require the defendant certainly to, at the very least, review that information before proceeding. Additionally, while the Court has not gone through the entire colloquy with the defendant on self[-]representation, it's very clear that he is competent and of clear mind today and very affirmatively expressing his position. However, I do still have to go over that colloquy with you before we begin —

(Tr. 437.)

 **[*P10]** The trial court then noted that that the state "strenuously object[ed] to the court granting a mistrial." (Tr. 438.) The court expressed its justification:

And certainly I have **[**5]** taken into consideration the State's perspective, but in the interests of justice, the Court has to make decisions which are in the interests of justice.

Therefore, strenuous objection is noted and I should also note that this is the second time in ten years that I've declared a mistrial, so it's not something that the Court either takes lightly or takes an aspersion to.

I certainly have reviewed a number of cases along with the case law that is applicable to the decision that I have just made.

(Tr. 438.) The court again noted, in relevant part,

So, this is a mistrial necessitated by the defendant just so that the record is clear.

And once again, I am obviously significantly concerned about the timing of all of this and recognize that it is suspect from that perspective.

(Tr. 441.) Davis did not object at any time regarding the trial court's decision to declare a mistrial. On July 18, 2018, the trial court formally issued a journal entry ordering a mistrial, while noting the state's objection.

 **[*P11]** On October 17, 2018, Davis appeared in court with newly appointed counsel, who advised the court that Davis still wished to represent himself. After a thorough colloquy, Davis unequivocally stated **[**6]** "[i]f I'm competent enough to stand trial, I should be competent enough to represent myself." (Tr. 456.) Out of concern, the trial court ordered Davis to undergo a competency evaluation at Northcoast Behavioral Health before allowing him to proceed without counsel. In November 2018, the court received a report from Northcoast indicating that Davis was uncooperative with the evaluation. As a result, the court ordered Davis to undergo further evaluation at Northcoast regarding competency.

 **[*P12]** In December 2018, the court received a report from Northcoast opining that Davis was competent to stand trial and competent to waive his right to counsel. After the parties stipulated to the report, Davis once again unequivocally stated that he wished to represent himself. (Tr. 465.)

 **[*P13]** In February 2019, the trial court engaged in an extensive discussion with Davis about his desire to represent himself. Following this discussion, the trial court engaged in the requisite *Crim.R 44* advisements on waiving his right to counsel and proceeding pro se, and Davis executed the appropriate waiver. (Tr. 508, 541-542, 554, 571.)

 **[*P14]** In July 2019, the trial court considered Davis's multiple motions to dismiss — none of which asked **[**7]** the court to dismiss the indictment based on double jeopardy grounds. During the motion hearing, the trial court further explained her justification for declaring a mistrial:

I'm going to note for the record that we were, in fact, engaged in trial. We had selected a jury. In fact, we had gone through several days of jury selection and begun opening statements and the presentation of witnesses wherein Mr. Davis at the time seemed to feel uncomfortable and unhappy with the way that the proceedings were going.

He appeared to the Court to be angry with [his attorneys], and at a time told the Court that he absolutely, unequivocally fired both of his counsel while we were in the middle of trial and was not going to accept them as his counsel anymore. And he made those motions partially in front of the jurors, so it was a rather tenuous situation.

I did grant the defendant's — I did grant a motion for a mistrial at that point against the objection — over the objection of the State of Ohio. I should note that in 11 years as a Common Pleas Court Judge, I have only had two mistrials. This would be the second.

(Tr. 579-580.)

**[*P15]** The second jury trial began on January 27, 2020, without objection or any **[**8]** declaration that Davis's constitutional rights against double jeopardy were violated because of the retrial. Although Davis proceeded pro se, he had standby counsel assisting him with courtroom procedure.

**[*P16]** On appeal, Davis contends that the trial court abused its discretion when it assumed manifest necessity and declared a mistrial, thus violating his constitutional right against double jeopardy. He contends that neither he nor the state requested a mistrial and that his request to proceed pro se was untimely and, thus, should not have been a basis for granting a mistrial. Davis's arguments are without merit.

**[*P17]** *HN1* The *Double Jeopardy Clause of the Fifth Amendment to the United States Constitution*, made applicable to the states through the *Fourteenth Amendment*, protects a criminal defendant from multiple prosecutions for the same offense. *State v. Truhlar*, 8th Dist. Cuyahoga No. 103312, 2016-Ohio-5338, ¶ 33, citing *Oregon v. Kennedy, 456 U.S. 667, 671, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)*. The *Double Jeopardy Clause* does not, however, bar re-prosecution in every case. *Truhlar* at ¶ 34. Generally, retrial is permitted whenever a mistrial is declared at the request of or with the consent of the defendant, or the trial court sua sponte declares a mistrial, unless the request is precipitated by prosecutorial misconduct intended to provoke a defendant into seeking a mistrial. *Id.*, citing *N. Olmsted v. Himes*, 8th Dist. Cuyahoga Nos. 84076 and 84078, 2004-Ohio-4241, ¶ 36-37; *State v. Bogan*, 8th Dist. Cuyahoga No. 106183, 2018-Ohio-4211, ¶ 22; *see also State v. Truhlar*, 8th Dist. Cuyahoga No. 105835, 2017-Ohio-9018, ¶ 7.

**[*P18]** In this case, there is no allegation of prosecutorial misconduct. **[**9]** And according to Davis, he did not request or consent to a mistrial and thus the court should not have declared a mistrial. Specifically, he directs this court to a single sentence wherein he told the court that his desire to represent himself was not "to postpone this or none of this because I believe the facts of this case will set me free." (Tr. 427.) Despite this isolated and out-of-context statement, we find that the record demonstrates that Davis's request to proceed pro se and his actions during the first trial caused the mistrial. Moreover, Davis neither filed a motion to dismiss the charges on double jeopardy grounds nor asserted a violation of his *Fifth Amendment* protection against double jeopardy in the trial court. Accordingly, he has waived all but plain error and, arguably, he invited any error.

**[*P19]** *HN2* Pursuant to *Crim.R. 52(B)*, plain errors or defects that affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court. To constitute plain error, there must be (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "Notice of plain error **[**10]** under *Crim.R. 52(B)* is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978)*, paragraph three of the syllabus.

**[*P20]** *HN3* Assuming that Davis did not consent to the mistrial, double jeopardy will not bar a retrial if (1) there was a manifest necessity or high degree of necessity for ordering a mistrial; or (2) the ends of public justice would otherwise be defeated. *State v. Widner, 68 Ohio St.2d 188, 189, 429 N.E.2d 1065 (1981)*, citing *Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978)*. "'Manifest necessity' means a 'high degree' of necessity must exist before a mistrial may properly be declared. However, it does not require a showing that a mistrial was 'absolutely necessary' or that there was no other alternative but to declare a mistrial." *State v. Marshall*, 2014-Ohio-4677, 22 N.E.3d 207, ¶ 21 (8th Dist.), citing *Washington at 511*.

There is no "mechanical formula" for determining what constitutes a "manifest necessity" for a mistrial: "[T]he manifest-necessity standard 'abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial.'"

2021-Ohio-2311, *2021-Ohio-2311; 2021 Ohio App. LEXIS 2288, **10

*Marshall* at ¶ 22, quoting *State v. Gunnell*, 132 Ohio St.3d 442, 2012-Ohio-3236, 973 N.E.2d 243, ¶ 27, quoting *Illinois v. Somerville, 410 U.S. 458, 462, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973)*.

[*P21] *HN4* What constitutes a manifest necessity for a mistrial is, therefore, left to the discretion of the trial court to be decided on a case-by-case [**11] basis, considering all the relevant circumstances. *Marshall* at *id.* This approach is "in recognition of the fact that the trial judge is in the best position to determine whether the situation in his [or her] courtroom warrants the declaration of a mistrial," *State v. Glover, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988)*, but should be used with the "'greatest caution, under urgent circumstances, and for very plain and obvious causes.'" *Gunnell* at ¶ 26, quoting *U.S. v. Perez, 22 U.S. 579, 580, 6 L.Ed. 165 (1824)*.

[*P22] *HN5* In determining whether a mistrial is necessary, the trial court should (1) allow both parties to state their positions on the issue, (2) consider their competing interests, and (3) explore reasonable alternatives, if any, before declaring a mistrial. *Himes*, 8th Dist. Cuyahoga Nos. 84076 and 84078, 2004-Ohio-4241, at ¶ 44. "A trial court must act 'rationally, responsibly, and deliberately' in determining whether to declare a mistrial." *Marshall* at ¶ 25, quoting *Gunnell* at ¶ 33.

[*P23] In this case, we find no abuse of discretion, and thus no plain error. The record reflects that prior to trial, Davis was concerned about proceeding with his attorneys and thus requested to represent himself. After trial commenced, Davis again expressed dissatisfaction with his attorneys, contending that they did not spend enough time with him preparing for trial, and did not ask the questions he wanted them to ask, and he felt [**12] that he could represent himself more effectively. The court later noted that some of these protestations and disruptions occurred in the presence of the jury. *See* tr. 579-580; 1508 (following Davis's testimony during the second trial, the court noted that Davis "fired [his attorney] in the middle of trial, claiming that [he] found her to be incompetent, and [he] did not like her representation of [him] at all. And [he] made it clear in front of the last jury that that is how [he] felt").

[*P24] Following a lengthy colloquy with Davis and counsel — both on and off the record — the trial court declared a mistrial, finding it to be a manifest necessity on the basis that Davis unequivocally wished to represent himself. Although the state objected and the trial court did not consider any alternatives to a mistrial on the record, this is not a case in which the parties were afforded no opportunity to state their respective positions or where an adequate alternative remedy was readily apparent, other than to deny Davis's request for self-representation and require him to proceed with current counsel, which of course the court could have done. However, based on the circumstances of the case and Davis's [**13] outward attitude toward his attorneys, we find no abuse of discretion by the trial court. The record reflects sufficient justification to conclude that the court acted rationally, responsibly, and deliberately in its decision to grant Davis's motion to proceed pro se and ultimately declare a mistrial. We further find that the trial court's actions did not amount to such a manifest miscarriage of justice for this court to recognize plain error.

[*P25] Moreover, Davis arguably invited the error upon which he now relies on appeal. *HN6* Under the invited error doctrine, a party is not entitled to take advantage of an alleged error that the party induced or invited the court to make. *State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359, 1994-Ohio-302, 626 N.E.2d 950 (1994). "[A] litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible." *Lester v. Leuck, 142 Ohio St. 91, 93, 50 N.E.2d 145 (1943)*. The doctrine precludes a litigant from making "an affirmative and apparent strategic decision at trial" and then complaining on appeal that the result of that decision constitutes reversible error. *State v. Doss*, 8th Dist. Cuyahoga No. 84433, 2005-Ohio-775, ¶ 7, quoting *United States v. Jernigan, 341 F.3d 1273 (11th Cir.2003)*. The invited error doctrine has been applied in the context of motions for mistrials. [**14] *See State v. Osley*, 6th Dist. Lucas No. L-17-1025, 2018-Ohio-437, ¶ 21-26 (discussing cases related to defendants' outbursts during trial).

[*P26] In this case, even if we were to find that the trial court erred in declaring a mistrial, it is apparent that Davis's actions and assertions were the precipitating events that caused the mistrial; thus, it could be viewed as invited error. The record demonstrates that Davis was unequivocal in his request to dismiss his attorneys during

trial and represent himself. The court noted that some of his protestations occurred in the presence of the jury, which could have tainted their perspective and led to an unfair trial. Davis cannot take advantage of the error that he in fact induced. Accordingly, Davis's first assignment of error is overruled.


## II. Jury Instructions

 **[*P27]** In his second and third assignments of error, Davis contends that the trial court erred in its instructions to the jury. Specially, he contends that a flight instruction was not appropriate and that the court should have instructed the jury on self-defense.


## A. Flight Instruction

 **[*P28]** At the request of the state, the trial court gave the jury the following instruction on flight:

> Now, ladies and gentlemen of the jury, testimony has been admitted indicating the defendant **[**15]** fled the scene. You are instructed that the fact that the defendant fled the scene does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt. If you find that the facts do not support that the defendant fled the scene, or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support the defendant engaged in such conduct, and if you decide the defendant was motivated by a consciousness of guilt, you may, but are not required to consider that evidence in deciding whether the defendant is guilty of any of the crimes charged. You alone will determine what weight, if any to give to this evidence.

(Tr. 1613.)

 **[*P29]** *HN7* The giving of jury instructions is typically within the sound discretion of the trial court, and we review it for an abuse of discretion. *State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35, citing *State v. Martens, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993)*. However, Davis failed to object to the trial court's decision to instruct the jury on flight and, therefore, has waived all but plain error on appeal. *State v. Lott, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990)*; *State v. Burns*, 8th Dist. Cuyahoga No. 95465, 2011-Ohio-4230; *Crim.R. 52(B)*; *Crim.R. 30(A)* (*HN8* failure to object to the trial court's jury instructions **[**16]** waives issue on appeal).

 **[*P30]** *HN9* An improper or erroneous jury instruction does not constitute plain error under *Crim.R. 52(B)* unless, but for the error, the outcome of the trial would clearly have been different. *State v. Cooperrider, 4 Ohio St.3d 226, 4 Ohio B. 580, 448 N.E.2d 452 (1983)*. This court has repeatedly held that "'[a] mere departure from the scene of the crime is not to be confused with deliberate flight from the area in which the suspect is normally to be found.'" *State v. Santiago*, 8th Dist. Cuyahoga No. 95516, 2011-Ohio-3058, ¶ 30, quoting *State v. Norwood, 11th Dist. Lake Nos. 96-L-089 and 96-L-090, 1997 Ohio App. LEXIS 4420 (Sept. 30, 1997)*.

 **[*P31]** In *State v. Jackson*, 8th Dist. Cuyahoga No. 100125, 2014-Ohio-3583, ¶ 48, and *State v. Johnson*, 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2638, ¶ 110, the court held that the defendant's conduct of leaving the scene of the crime did not warrant a flight instruction because there was no evidence of deliberate flight in the sense of evading police. *See also State v. Wesley*, 8th Dist. Cuyahoga No. 80684, 2002-Ohio-4429 (flight instruction not warranted based on insufficient evidence).

 **[*P32]** In this case, there was no evidence of Davis's deliberate flight in the sense of evading police. Nevertheless, the state requested a flight instruction, and the trial court granted the request. Despite this court's repeated decisions on when a flight instruction is proper and when it is not, the state continues to request the instruction and trial courts continue to grant this request when clearly the instruction is not appropriate and contrary to the controlling case law in the Eighth District. The misapplication **[**17]** of the flight instruction is extremely troubling to

this court, and we strongly encourage that the flight instruction should only be requested and given when the facts of the case permit.

[*P33]  Despite the trial court's error, we cannot say, nor has Davis demonstrated, that the error was prejudicial such that a manifest miscarriage of justice has occurred. Reviewing the instruction as a whole, it allowed the jury to reach its own conclusions on the issue of flight, including whether Davis actually fled the scene, and Davis's motivation for leaving the scene. Under similar circumstances, this court has declined to find plain error. *See, e.g.,* *Jackson* and *Johnson.* We likewise decline to find plain error here. Davis's second assignment of error is overruled.

## B. Self-Defense

[*P34]  Davis requested that the trial court instruct the jury on self-defense. The state objected, contending that Davis's innocence defense or alternative theory that the firearm accidentally discharged were contrary to his claim of self-defense. Following an extensive and thorough discussion, and a review of the relevant case law, the trial court denied Davis's request for a self-defense jury instruction.

[*P35]  *HN10* When reviewing a refusal [**18]  to give a requested jury instruction, an appellate court considers whether the trial court's refusal was an abuse of discretion under the facts and circumstances of the case. *State v. Wolons, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989).* Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder. *State v. Stephens*, 2016-Ohio-384, 59 N.E.3d 612, ¶ 17 (8th Dist.), citing *State v. Comen, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990)*, paragraph two of the syllabus. *HN11* Trial courts should ordinarily give a requested jury instruction if it is a correct statement of law, if it is applicable to the facts of the case, and if reasonable minds might reach the conclusion sought by the requested instruction. *State v. Jacinto*, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 42 (8th Dist.), citing *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 240; *see also Goldfuss v. Davidson*, 79 Ohio St.3d 116, 124, 1997-Ohio-01, 679 N.E.2d 1099 (1997). In deciding whether to give a self-defense instruction, the trial court must view the evidence in favor of the defendant, and the question of credibility is not to be considered. *Jacinto* at *id.*; *State v. Robinson, 47 Ohio St.2d 103, 110-113, 351 N.E.2d 88 (1976)*.

[*P36]  Davis contends that his testimony was sufficient to support a conclusion that he acted in self-defense in relation to Counts 3, 7, and 8 of the indictment. Count 3 charged Davis with felonious assault in violation of *R.C. 2903.11(A)(1)*, which alleged that Davis caused or attempted to cause serious physical harm to Watson. The state claimed that Davis caused Watson [**19]  actual injury, i.e., a bite to his arm and injury to his head requiring staples. Counts 7 and 8 each charged Davis with aggravated menacing in violation of *R.C. 2903.21(A)*, alleging that Davis knowingly caused Watson and Jewell to believe that he would cause them serious physical harm. The state claimed that Watson and Jewell each feared for their safety when Davis exited the vehicle with a gun drawn and when the fight over the firearm ensued.

[*P37]  At trial, Davis testified that he exited his friend's vehicle and walked in the direction where his other friend was waiting, which happened to be the same direction that Maddox was walking. Davis stated that Maddox reached into her purse, turned around, and pointed a gun at him. He stated that out of fear, he dropped his cell phone and cigar and placed his hands in the air. Davis testified that he threw his keys and money on the ground, which distracted Maddox, allowing him to grab her arm and take the gun from her. He said he placed it behind his back, but turned around when Watson yelled out. Davis stated that Watson charged at him and grabbed the gun. He stated that the two were tussling on the ground when the gun discharged. According to Davis, he stopped [**20]  wrestling with Watson and attempted to diffuse the situation by stating they should just "move on." Davis testified that Watson then head-butted him, which caused him to become dizzy. He said he saw Watson and one of the other females assaulting his friend, but left out of fear because he was on parole. He denied that he threatened anyone with a gun, fired the gun at anyone, or assaulted anyone. He claimed the gun discharged during the tussle with Watson.

**[*P38]** We find that the trial court did not abuse its discretion in denying Davis's request for a jury instruction on self-defense. *HN12* A defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in his actions." *State v. Talley*, 8th Dist. Cuyahoga No. 87143, 2006-Ohio-5322, ¶ 45. Self-defense "presumes intentional, willful use of force to repel force or escape force." *State v. Champion, 109 Ohio St. 281, 286-87, 2 Ohio Law Abs. 68, 2 Ohio Law Abs. 87, 142 N.E. 141 (1924)*. "Thus, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense." *State v. Hubbard*, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 54.

**[*P39]** In this case, Davis denied that he created the situation or committed any offense. Accordingly, a claim of self-defense is contradictory to his defense of actual innocence. *See State v. Kramer*, 7th Dist. Mahoning No. 01-C.A.-107, 2002-Ohio-4176, ¶ 53. *HN13* Self-defense presumes that the facts of the crime, as alleged in **[**21]** the indictment or complaint, are true, but asserts that there are further facts that justify the defendant's actions and exempt him or her from liability. *State v. Poole, 33 Ohio St.2d 18-20, 294 N.E.2d 888 (1973)*. Davis did not admit that he committed the offense of felonious assault or aggravated menacing; accordingly, the defense of self-defense was not available to him.

**[*P40]** Moreover, any claim that the gun accidentally discharged is also contrary to a theory of self-defense. *See State v. Johnson*, 10th Dist. Franklin No. 06AP-878, 2007-Ohio-2792, ¶42-43 (defendant's testimony that the firearm discharged as a result of a struggle for the firearm and not as a result of his intentional and willful act contradicted the application of self-defense). We note that the jury found Davis not guilty of attempted murder and felonious assault with a deadly weapon. Accordingly, insofar as the self-defense instruction was requested involving the discharge of the firearm, the denial of the instruction was not prejudicial. Davis's third assignment of error is overruled.

**[*P41]** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment **[**22]** into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to *Rule 27 of the Rules of Appellate Procedure*.

/s/ Kathleen Ann Keough

KATHLEEN ANN KEOUGH, JUDGE

MARY J. BOYLE, A.J., and

EILEEN A. GALLAGHER, J., CONCUR

---

**End of Document**

 Neutral
As of: September 9, 2025 3:23 PM Z

# *State v. Gipp*

Court of Appeals of Ohio, Second Appellate District, Montgomery County

March 22, 2024, Rendered

C.A. No. 29983

**Reporter**
2024-Ohio-1076 *; 2024 Ohio App. LEXIS 1000 **; 2024 WL 1235456

STATE OF OHIO, Appellant v. STEVEN GIPP, JR., Appellee

**Subsequent History:** Discretionary appeal not allowed by *State v. Gipp, 2024-Ohio-2718, 2024 Ohio LEXIS 1509 (Ohio, July 23, 2024)*

**Prior History:** **[**1] Criminal Appeal from Municipal Court. Trial Court Case No. 23 CRB 2642.

## Core Terms

arrest, domestic violence, probable cause, hit, reasonable ground, motion to suppress, suppression, trial court, detain, threats, resisting arrest, peace officer, obstructed, asserts, packet, commission of the offense, written statement, reasonable cause, good faith, circumstances, corroborated, threatening, violence, videos

## Case Summary

### Overview
HOLDINGS: [1]-Defendant's evidence should not have been suppressed because the police officers had a reasonable belief under R.C. 2935.03, which equated to probable cause, that defendant had committed domestic violence when they arrested him. The victim had reported that defendant had threatened to strike her and, pursuant to the collective knowledge doctrine, the other officers made the arrest based upon their communication with the officer who had spoken to the victim.

### Outcome
Judgment reversed and remanded.

## LexisNexis® Headnotes

Criminal Law & Procedure > Trials > Witnesses > Credibility

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Motions to Suppress

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Suppression of Evidence

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Motions to Suppress

Criminal Law & Procedure > ... > Standards of Review > Clearly Erroneous Review > Findings of Fact

*HN1* **Witnesses, Credibility**

Appellate review of a motion to suppress presents a mixed question of law and fact. At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. The application of the law to the trial court's findings of fact is subject to a de novo standard of review.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Criminal Law & Procedure > ... > Warrantless Searches > Stop & Frisk > Detention

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Investigative Stops

*HN2* **Search & Seizure, Probable Cause**

Generally speaking, probable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense. If an arrest is made without probable cause, the arrest is constitutionally invalid. Whether a law enforcement officer possessed probable cause or reasonable suspicion to detain an individual must be examined in light of the totality of the circumstances viewed from the standpoint of an objectively reasonable police officer. This typically requires a showing that the officer making the stop or arrest was personally aware of sufficient facts to justify it.

Governments > Local Governments > Employees & Officials

*HN3* **Local Governments, Employees & Officials**

The Ohio Revised Code specifically requires local police departments to adopt procedures and policies related to officer responses to alleged domestic violence pursuant to R.C. 2935.03. R.C. 2935.032(A).

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > Elements

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN4* **Domestic Assault, Elements**

R.C. 2935.03(B)(3)(b) sets forth Ohio's preferred arrest policy in domestic violence cases: If a peace officer has reasonable grounds to believe that the offense of domestic violence has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person pursuant to division R.C. 2935.03((B)(1) until a warrant can be obtained. Not only does R.C. 2935.03(B)(3)(b) state that a warrantless arrest is the preferred course of action in

domestic violence offenses, but R.C. 2935.03(B)(3)(c) also requires an officer who does not comply with the preferred arrest policy to articulate in the written report of the incident a clear statement of the officer's reasons for not arresting and detaining that person until a warrant can be obtained.

Criminal Law & Procedure > ... > Search Warrants > Probable Cause > Collective & Imputed Knowledge

*HN5* **Probable Cause, Collective & Imputed Knowledge**

Law-enforcement officers cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime. Specifically, vertical collective knowledge involves situations in which one officer has probable cause or reasonable suspicion and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

*HN6* **Search & Seizure, Probable Cause**

Although an arrest without probable cause is constitutionally invalid, reasonable grounds and reasonable cause under R.C. 2935.03 equate to probable cause.

**Counsel:** MARC T. ROSS, Attorney for Appellant.

KAILA L. MCCLELLAN, Attorney for Appellee.

**Judges:** HUFFMAN, J. TUCKER, J. and LEWIS, J., concur.

**Opinion by:** HUFFMAN

# Opinion

HUFFMAN, J.

 **[*P1]** The State appeals from the trial court's order granting Steven Gipp Jr.'s motion to suppress evidence. Because we conclude that police officers had a reasonable belief that Gipp had committed domestic violence when they arrested him, the trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

## FACTS AND PROCEDURAL HISTORY

 **[*P2]** On July 17, 2023, Gipp was charged by complaint with obstructing official business and resisting arrest. The events giving rise to Gipp's arrest occurred earlier that day when J.S., Gipp's former girlfriend and the mother of his child, reported that Gipp had committed domestic violence against her at his home on Hamilton Avenue. After Officer Green met with J.S. at a different location, he instructed Officers Lyons and Moreland, who were on patrol close to Gipp's residence, to arrest Gipp for "domestic violence/threats." Gipp did not cooperate when the officers attempted to arrest him, which led to the charges of obstructing **[**2]** official business and resisting arrest.

**[*P3]** The matter was scheduled for trial on September 11, 2023, and then reset for September 18, 2023. On September 12, 2023, Gipp filed a motion to suppress the evidence related to obstructing and resisting arrest on the basis that his arrest had been "based on neither probable cause nor a duly executed arrest warrant." A hearing on the motion to suppress occurred on September 18, 2023; the three officers involved in Gipp's arrest testified. The court granted Gipp's motion to suppress on November 22, 2023, concluding that the officers had lacked probable cause to arrest him.

**[*P4]** The State appeals.


## ASSIGNMENT OF ERROR AND ANALYSIS

**[*P5]** The State asserts the following assignment of error:
THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION TO SUPPRESS EVIDENCE.

**[*P6]** According to the State, the trial court failed to follow _R.C. 2953.03(B)_ in sustaining Gipp's motion to suppress. The State asserts that the trial court's findings of fact were against the manifest weight of the evidence based upon improper inferences and conclusions "beyond the actual evidence introduced" at the suppression hearing.

**[*P7]** Gipp responds that the trial court did not err in granting his motion to suppress. He **[**3]** asserts that _R.C. 2935.03_, which allows a law enforcement officer to arrest and detain a person found violating a law until a warrant can be obtained, does not lower the constitutional standard of probable cause for arrest. He also asserts that the officers' alleged good faith in this case should not lower the probable cause requirement. Gipp argues that _R.C. 2935.03_ "does not nullify the _Fourth Amendment_" and that the General Assembly does not have the authority to override constitutions protections.

**[*P8]** According to Gipp, J.S.'s version of events was difficult to follow and unverified at the time of his arrest, and the Constitution requires more than "unreliable, uncorroborated allegations" before a citizen can be deprived of his or her liberty. Gipp emphasizes that an arrest without probable cause is per se unreasonable under the _Fourth Amendment_. Gipp further asserts that the good faith exception only applies to an officer's reliance on a warrant issued by a judge or magistrate; "it does not apply to the reliance of a statute [sic], and it does not apply to warrantless arrests."

**[*P9]** In reply, the State asserts that the "reasonable ground" to arrest and detain for an offense of violence referenced under _R.C. 2935.03(B)_ must mean something different than probable **[**4]** cause "or else the legislature simply would have used the words 'probable cause.' " The State cites _State v. O'Neill, 2015-Ohio-815, 29 N.E.3d 365 (3d Dist.)_, a domestic violence case, which held that the "reasonable grounds" enumerated in _R.C. 2935.03(B)(3)(a)(i)_ and _(ii)_ expressly permit an officer to find probable cause in circumstances where the officer may not have witnessed the suspect committing a domestic violence offense. Regarding the good faith exception, the State argues that courts have applied it to cases in which officers reasonably relied in good faith on statutes to make arrests and such statutes were later found to be unconstitutional. According to the State, the officers in this case "reasonably relied in good faith on _R.C. 2935.03(B)_ and department policy" in effectuating Gipp's arrest, and "any evidence obtained in effectuating that arrest, including testimony and evidence that [Gipp] resisted or obstructed," should not have been suppressed.

**[*P10]** At the hearing on the motion to suppress, the State initially argued that Gipp's motion to suppress was untimely and also that the basis for the motion, namely that there had not been probable cause for his arrest, was an issue for trial. The State further asserted that there was no evidence obtained as a result of the arrest **[**5]** that was subject to suppression. Gipp's attorney responded that if the arrest was "bad," then any evidence obtained as a result of it should be suppressed, including the testimony of the officers who were involved and any evidence that Gipp had resisted arrest or obstructed official business.

**[*P11]** The trial court concluded that, although the motion to suppress was untimely filed less than seven days before trial, it would hear the motion "in the interest of justice."

**[*P12]** The evidence at the suppression hearing was as follows.

**[*P13]** Dayton Police Officer William Green testified that on July 17, 2023, he was dispatched on a domestic violence call involving Gipp. The complainant was Gipp's former girlfriend and the mother of his child, J.S., who was at an address on Valerie Arms Drive, and Green met her there. J.S. reported to Green that Gipp had threatened to harm her at his home on Hamilton Avenue, where he lived with his mother. J.S. advised Green that Gipp told her, "Come on out here so I can hit you in your s***," and that he picked up a plastic child's basketball hoop and made a motion like he was going to swing it at her before his mother interrupted him.

**[*P14]** After speaking with J.S., Green contacted **[**6]** Officers Moreland and Lyons, who were closer to the Hamilton Avenue address than Green was. Green informed the other officers that he had "a domestic violence/threats charge" on Gipp. Green gave them the Hamilton Avenue address and asked them to speak with Gipp, get his side of the story, "and make an arrest" for "domestic violence/threats." Green then completed the domestic violence victim's packet with J.S. per department policy. According to Green, because J.S. and Gipp had a child in common, "it would count as a domestic violence charge," and Gipp had threatened to strike J.S., which she took "as a legitimate threat." Green testified that J.S. had believed Gipp was trying to hit her with the basketball hoop and had been afraid he would do so. He further stated that the domestic violence victim's packet includes a written witness statement; J.S. "filled out a few lines of her own experience" and signed it. Pursuant to department policy, Green advised J.S. to speak to the prosecutor the following day and then proceeded to the Hamilton Avenue address with the packet to see what the other officers had done.

**[*P15]** When Green arrived at the Hamilton Avenue address, Moreland and Lyons had already **[**7]** arrested Gipp and placed him in their cruiser; the officers advised Green that Gipp had resisted arrest. According to Green, pursuant to department policy, if officers have reasonable grounds to believe "that domestic violence has occurred against a person, then we make an arrest." Green indicated that he had contacted the other officers to effectuate Gipp's arrest because they were closer to Gipp's location and it was "best to do it in as an expedient manner as possible."

**[*P16]** On cross-examination, Green acknowledged that J.S. had advised him that she went to Gipp's address to confront him prior to the incident which resulted in Gipp's arrest and also that his report mentioned that J.S.'s story had been difficult to follow. Green also testified that the domestic violence packet used with J.S. included a domestic violence checklist for his observations and a lethality screen, in addition to the section for a witness statement. Green acknowledged that he had recorded negative responses on the domestic violence checklist, indicating that he made no physical or behavioral observations, no emotional observations (such as crying), and reported no injuries, signs of physical abuse, or signs of **[**8]** alcohol or drug use. When Green completed the lethality screen with J.S., she indicated that there was nothing that concerned her about her safety other than what had already transpired with Gipp. On redirect examination, Green clarified that, on the lethality screen, J.S. answered affirmatively that she felt Gipp might try to kill her, that she had left him after living with him, that Gipp was violently or constantly jealous or monitored her daily activities, that he followed her or left her threatening messages, and that he was unemployed.

**[*P17]** Officer Robert Lyons testified that, on the day in question, Green advised him that he had "a good domestic violence/threats charge" on Gipp and asked if he and his partner would try to find Gipp. Lyons testified that he did not specifically discuss with Green whether Green had completed a domestic violence packet but that they "trust each other" on such issues. Lyons then met Gipp and his mother at the Hamilton Avenue address and told Gipp that he wanted to gather some information about "a situation" between Gipp and J.S., without telling Gipp "right then and there" that he was under arrest. According to Lyons, without prompting, Gipp's first **[**9]** statement was that he "didn't * * * even hit" J.S. Lyons and Moreland told Gipp that J.S. alleged that he had threatened to harm her and that he was going to be under arrest for the threats. Gipp then obstructed official business and resisted arrest,

as demonstrated by Lyons's body camera video, which was played for the court. According to Lyons, Gipp denied putting his hands on J.S. but he did not deny or admit to threatening her.

**[\*P18]** On cross-examination, Lyons stated that Gipp's arrest had been based upon instructions he received from Green; Lyons indicated that Green had advised that "we would have what's called a broadcast put out for [Gipp] * * * for his arrest * * * which means, if he was going to be putting that out that it would be a good arrest going forward." Lyons was asked by the court whether the officers would have arrested Gipp regardless of his side of the story or anything Gipp's mother told them; he responded that they were going to arrest him based on Ohios' being a "preferred [arrest] State" and J.S. being the one who called the police, but he also stated that if Gipp had presented the officers "with evidence and not just verbal statements" stating that he had not **[\*\*10]** done it, the officers would have reconsidered and conferred with Green about how to move forward. According to Lyons, "once we put hands on him, he was under arrest and maybe a little bit prior to that."

**[\*P19]** Officer Eli Moreland testified that Green had advised him and Lyons that Gipp had "actually threatened [J.S.'s] life or threatened physical harm towards her." Moreland's body camera video was also played for the court. As he approached Gipp after advising him that he was going to be taken to jail, Gipp stood up, made a motion toward his mom, and then grabbed onto her. Moreland explained that, under state law as well as Dayton Police Department Policy, it is the "preferred action" that if officers have reasonable grounds that domestic violence has actually occurred, "it is our duty to make that arrest." According to Moreland, Gipp repeatedly denied hitting J.S., and that "raised some red flags" for Moreland, because Gipp did not deny threatening J.S.

**[\*P20]** The trial court sustained Gipp's motion to suppress. The court discussed the evidence in the body camera videos of Officers Lyons and Moreland as follows:

> The videos show [Gipp] telling the Officers that he gets his son every Friday, [J.S.] **[\*\*11]** came to his house and said she needed to go to work, he told her to go to work, and then she hit him. He yelled downstairs to his mother that [J.S.] just hit him on the back of his neck, and he was not about to do this with her because he already knew where they would send him. [J.S.] then said that she was going to call the police on him because he hit her. The Officers inform [Gipp] that [J.S.] was not claiming that he hit her, she was claiming that he made threats towards her. [Gipp] responded by saying that he asked [J.S.] why she came to his house and hit him and told her that he could hit her back if he wanted to but did not because he knew the consequences, where he would go, and he did not want to do that. He then tells the Officers that [J.S.] said that she was going to see him go to jail. [Gipp's] mother corroborated what he told the officers.

**[\*P21]** The court noted that Gipp was not advised that he was under arrest or of the charge, but that the officers told him that Ohio was a "preferred arrest state, and it was violent threats." The court noted that Gipp denied touching J.S. and that his mother agreed that he did not do so. It was significant to the court that Green testified **[\*\*12]** that he did not complete the domestic violence packet with J.S. until after he had sent the other officers to make contact with Gipp and that J.S.'s written statement "was not consistent with the threat [J.S.] had conveyed to him." The court also noted that Green did not share with the other officers the original threat alleged by J.S. or her written domestic violence witness statement and he did not tell them that parts of her story were "difficult to follow and inconsistent." The arresting officers also did not share with Officer Green Gipp's version of the encounter or his mother's corroboration of this, or anything else they were told about the incident.

**[\*P22]** The court concluded:

> A single witness' unreliable accusation is insufficient to create probable cause to arrest for domestic violence without further corroboration when that witness is also suspected of domestic violence. * * * While it provides reasonable suspicion of criminal activity justifying further investigation, the totality of the circumstances must be considered, including both inculpatory and exculpatory evidence. An officer can fail to reasonably formulate probable cause to arrest by refusing to consider potentially exculpatory **[\*\*13]** evidence from a witness's explanation of an incident.

2024-Ohio-1076, *P11; 2024 Ohio App. LEXIS 1000, **13

Here, the Court finds that the arresting Officers had reasonable grounds to investigate [Gipp] for domestic violence but not to arrest him. The Officers were not supplied with the alleged threat or the written statement before they made their arrest. By the time Officer Green visited the arrest scene, there were indications that [J.S.'s] allegation and statement were not consistent or reasonably trustworthy. However, Officer Green did not share this with Officers Moreland and Lyons. When Officers Moreland and Lyons questioned [Gipp], they learned that [J.S.] was also a suspect. They had no other witness corroborating [J.S.'s] version of events, while [Gipp's] mother corroborated his version. The Officers based their decision to arrest on [Gipp's] failure to deny threatening [J.S.] when the evidence shows that he denied hitting or threatening her. [Gipp] and his mother supplied the arresting Officers with inculpatory and exculpatory evidence that the Officers chose to disregard without further investigation.

Based on the totality of the circumstances, Officers Green, Moreland, and Lyons together did not possess facts adding up to probable **[**14]** cause to detain and arrest [Gipp]. The Court finds that [Gipp] was unlawfully detained when the Officers put their hands on him and advised that they were going to take him to jail.

Based on these conclusions, the court suppressed "[e]verything that occurred as a result of [Gipp's] unlawful detention."

**[*P23]** *HN1* "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.* At a suppression hearing, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (2d Dist.1996),* quoting *State v. Venham, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994).* " 'Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *State v. Brown, 2016-Ohio-4973, 67 N.E.3d 1278 ¶ 7 (2d Dist.),* quoting *Burnside at ¶ 8.* "The application of the law to the trial court's findings of fact is subject to a de novo standard of review." *Id.*

**[*P24]** *HN2* Generally speaking, "[p]robable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant **[**15]** a reasonable belief that the suspect is committing or has committed an offense. * * * If an arrest is made without probable cause, the arrest is constitutionally invalid." *State v. Steele, 138 Ohio St.3d 1, 2013-Ohio-2470, 3 N.E.3d 135, ¶26.* "Whether a law enforcement officer possessed probable cause or reasonable suspicion to detain an individual must be examined in light of the totality of the circumstances viewed from the standpoint of an objectively reasonable police officer." *State v. Hammer, 2023-Ohio-1307, 213 N.E.3d 238, ¶ 23 (2d Dist.).* This typically requires a showing that the officer making the stop or arrest was personally aware of sufficient facts to justify it. *State v. Pickett, 2017-Ohio-5830, 94 N.E.3d 1046, ¶ 9 (2d Dist.),* quoting *City of Maumee v. Weisner, 87 Ohio St.3d 295, 297, 1999- Ohio 68, 720 N.E.2d 507 (1999).*

**[*P25]** *R.C. 2919.25,* which proscribes domestic violence, states: "*(C)* No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." *HN3* The Ohio Revised Code specifically requires local police departments to adopt procedures and policies related to officer responses to alleged domestic violence pursuant to *R.C. 2935.03.* See *R.C. 2935.032(A).*

**[*P26]** *HN4* *R.C. 2935.03(B)(3)(b)* sets forth Ohio's preferred arrest policy in domestic violence cases: "If * * * a peace officer has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe **[**16]** that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person pursuant to *division (B)(1)* of this section until a warrant can be obtained." As noted in *O'Neill, 2015-Ohio-815, 29 N.E.3d 365,* "not only does *R.C. 2935.03(B)(3)(b)* state that a warrantless arrest is 'the preferred course of action' in domestic violence offenses, but *R.C. 2935.03(B)(3)(c)* also *requires* an officer who does not comply with the preferred arrest policy to 'articulate in

the written report of the incident * * * a clear statement of the officer's reasons *for not arresting and detaining that person* until a warrant can be obtained.' " *Id. at ¶ 28*.

 **[*P27]**  *R.C. 2935.03* states:

 (B)(1) When there is reasonable ground to believe that * * * the offense of domestic violence as defined in *section 2919.25 of the Revised Code* * * * has been committed * * * a peace officer described in division (A) of this section may arrest and detain until a warrant can be obtained any person who the peace officer has reasonable cause to believe is guilty of the violation.
 * * *

 (3)(a) For purposes of division (B)(1) of this section, a peace officer described in division (A) of this section has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable **[**17]** cause to believe that a particular person is guilty of committing the offense if any of the following occurs:
 (i) A person executes a written statement alleging that the person in question has committed the offense of domestic violence * * * against the person who executes the statement * * *.
 * * *

 (ii) No written statement of the type described in *division (B)(3)(a)(i)* of this section is executed, but the peace officer, based upon * * * any other information, including, but not limited to, any reasonably trustworthy information given to the peace officer by the alleged victim of the alleged incident of the offense * * * concludes that there are reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that the person in question is guilty of committing the offense.

 **[*P28]**  Finally, regarding Lyons and Moreland's authority to arrest Gipp when Green was the one who spoke with J.S. directly, we point out the "collective knowledge doctrine" or the "fellow officer rule," by which the knowledge of one law enforcement officer may be imputed to other officers. *State v. Muldrow, 2016-Ohio-4774, 68 N.E.3d 260, ¶18 (10th Dist.)*, citing *State v. Ojezua, 2d Dist., 2016-Ohio-2659, 50 N.E.3d 14, ¶ 30*. **HN5** "[L]aw-enforcement officers cooperating in an investigation are entitled to rely upon **[**18]** each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime." *State v. Stewart, 193 Ohio App.3d 716, 719, 2011-Ohio-2910, 953 N.E.2d 886 (8th Dist.)*, citing *United States v. Hensley, 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)*. Specifically, " 'vertical collective knowledge' * * * involves situations [in which] one officer has probable cause [or reasonable suspicion] and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action." *Ojezua at ¶ 32*, quoting *United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008)*.

 **[*P29]**  In our view, Green had reasonable grounds to believe that Gipp had committed domestic violence against J.S. after speaking with her. Although he asked Lyons and Moreland to arrest Gipp prior to the execution of J.S.'s written statement, the request flowed from his conclusion that J.S. had provided reasonably trustworthy information regarding Gipp's conduct. As noted above, Green testified that J.S. reported that Gipp had threatened to strike her, which she took as a legitimate threat; she believed he had been trying to hit her with a basketball hoop, and she had been afraid he would do so. Green advised the other officers to arrest Gipp and, in response, they executed the "preferred course of action," which was not to commence an investigation but to make an **[**19]** arrest. Pursuant to the collective knowledge doctrine, Lyons and Moreland made the arrest based upon their communication with Green. The officers' body camera videos revealed that Gipp denied striking J.S. but admitted that they had had an "altercation." To interpret *R.C. 2935.03(B)(3)(b)* to require further investigation would ignore the "preferred course of action" in such a situation, where Green had a reasonable belief that Gipp had committed domestic violence. **HN6** Although an arrest without probable cause is constitutionally invalid, we conclude that reasonable grounds and reasonable cause under *R.C. 2935.03* equate to probable cause, and that the arrest in this case was permissible.

 **[*P30]**  The State's assignment of error is sustained.

**[*P31]** The judgment of the trial court is reversed, and the matter is remanded for further proceedings.

TUCKER, J. and LEWIS, J., concur.

---

**End of Document**

 Neutral

As of: September 9, 2025 3:30 PM Z

## *State v. Grayson*

Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County

December 9, 2021, Released; December 9, 2021, Journalized

No. 110388

**Reporter**

2021-Ohio-4312 *; 2021 Ohio App. LEXIS 4216 **; 2021 WL 5833066

STATE OF OHIO, Plaintiff-Appellee, v. JANET GRAYSON, Defendant-Appellant.

**Prior History: [**1]** Criminal Appeal from the Cuyahoga County Court of Common Pleas. Case No. CR-19-645962-A.

*State v. Grayson, 2021 Ohio Misc. LEXIS 4783 (Ohio C.P., Mar. 2, 2021)*

**Disposition:** AFFIRMED.

## Core Terms

self-defense, street, beer bottle, hit, deadly weapon, manifest, bottle, arm, beyond a reasonable doubt, credibility, fight, felony assault, trial court, drink, landlord, woman, weight of the evidence, present evidence, intoxicate, inflict, broken, fianc, glass, assigned error, bench trial, bodily harm, sentence, fault, walk, yell

## Case Summary

### Overview

HOLDINGS: [1]-In a conviction for felonious assault, the trial court did not err in finding that defendant was not acting in self-defense because multiple witnesses testified that defendant slammed her fist into the side of the victim's car and began shouting threats and obscenities at her. The defendant was at fault in creating the situation giving rise to the affray in which the force was used; [2]-The state presented sufficient evidence to support all elements of felonious assault pursuant to *R.C. 2903.11(A)* as evidence was presented at trial that defendant was belligerent and immediately started shouting threats and obscenities at the victim. Evidence was also presented that defendant bent down and smashed her beer bottle on the ground before striking the victim multiple times with the bottle.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > Defenses > Defense of Others

2021-Ohio-4312, *2021-Ohio-4312; 2021 Ohio App. LEXIS 4216, **1

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

*HN1* Under Ohio law, a person is permitted to act in self-defense. Self-defense claims are generally an issue of credibility. If evidence presented at trial tends to support the conclusion that the defendant used force against another in self-defense or in defense of another, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense or defense of another.

Criminal Law & Procedure > Defenses > Self-Defense

*HN2* A defendant claiming self-defense concedes that he had the purpose to commit the act, but asserts that he was justified in his actions. Because self-defense presumes an intentional, willful use of force, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense.

Criminal Law & Procedure > Defenses > Self-Defense

Evidence > Relevance > Relevant Evidence

*HN3* Generally, where a defendant does not admit to the relevant charged conduct, the defense of self-defense is not available to them.

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

*HN4* To establish that the affirmative defense of self-defense does not apply, the state must prove at least one of the following elements beyond a reasonable doubt: (1) that the defendant was at fault in creating the situation giving rise to the affray in which the force was used or (2) the defendant did not have reasonable grounds to believe or an honest belief that he or she was in imminent danger of bodily harm or (3) the defendant used more force than was reasonably necessary to defend against the imminent danger of bodily harm.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Burdens of Proof > Proof Beyond Reasonable Doubt

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

Evidence > Weight & Sufficiency

*HN5* A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

Criminal Law & Procedure > Criminal Offenses > Weapons Offenses > Definitions

*HN6* The test for whether something is a deadly weapon is not whether it in fact inflicted a fatal injury, but whether it is capable of doing so.

Evidence > Weight & Sufficiency

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Verdicts

Evidence > Inferences & Presumptions > Inferences

Criminal Law & Procedure > Trials > Witnesses > Credibility

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN7* Unlike a challenge to the sufficiency of the evidence, a manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. In the appellate court's manifest weight review of a bench trial verdict, the appellate court recognizes that the trial court is serving as the factfinder. Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

**Counsel:** Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Alicia Harrison, Assistant Prosecuting Attorney, for appellee.

Judith M. Kowalski, for appellant.

**Judges:** MARY EILEEN KILBANE, JUDGE. MICHELLE J. SHEEHAN, P.J., and EMANUELLA D. GROVES, J., CONCUR.

**Opinion by:** MARY EILEEN KILBANE

# Opinion

JOURNAL ENTRY AND OPINION

MARY EILEEN KILBANE, J.:

 **[*P1]** Defendant-appellant Janet Grayson ("Grayson") appeals from her conviction for felonious assault. For the reasons that follow, we affirm.

**Factual and Procedural History**

 **[*P2]** This case arose from an incident that took place on July 29, 2019. As a result of this incident, on December 3, 2019, a Cuyahoga County Grand Jury indicted Grayson on one count of felonious assault in violation of *R.C. 2903.11(A)(1)* and one count of felonious assault in violation of *R.C. 2903.11(A)(2)*. Grayson pleaded not guilty to both counts and waived her right to a jury trial, and the case proceeded to a bench trial on December 29, 2020. At trial, the state called three witnesses and the defense called two witnesses.

 **[*P3]** The victim in this case, Kelly Ellison ("Ellison"), suffered an injury to her arm requiring 22 staples and an injury to her face **[**2]** requiring 13 stitches. Ellison testified that at around 7 p.m. on July 29, 2019, she was driving home from visiting her mother in the hospital. Ellison lives on West 93rd Street in Cleveland, Ohio. As she was driving down her street, Ellison came upon a man and a woman standing in the middle of the street. Initially, Ellison did not recognize either of the individuals. Ellison honked her horn so that they would move out of the road and she could proceed. Ellison testified that as soon as she honked her horn, the woman started yelling profanities at Ellison, threatening Ellison, and ultimately striking Ellison's car with her hand.

 **[*P4]**  After the woman hit Ellison's car, Ellison stopped the car and got out of her car. At that point, Ellison realized that the man standing in the road was her mother's ex-husband, Michael Schneider ("Schneider"). Ellison testified that she weighed approximately 300 pounds. At trial, Ellison identified Grayson as the woman who was standing in the middle of the road with Schneider.

 **[*P5]**  Ellison testified that she addressed Schneider in an attempt to defuse the situation and told them to get out of the road. According to Ellison, Schneider and Grayson both became irate **[**3]**  and told Ellison that she had nothing to do with their disagreement. Ellison's aunt, Sharon Tawney ("Tawney"), also lived on West 93rd Street, and when Ellison came upon Schneider and Grayson, Tawney had been outside in her front yard. Ellison testified that while she and Schneider became involved in a verbal altercation, Grayson bent down and broke the beer bottle she was holding on the pavement. As Grayson stood up, she swung at Ellison and cut the back of Ellison's arm. Ellison ultimately needed 22 staples in her arm as a result of this injury.

 **[*P6]**  Ellison testified that Schneider then attempted to hold Grayson back from Ellison, and Ellison started to get back in her car. When Grayson continued to insult and threaten Ellison, Ellison went back to where Grayson was. At that time, Grayson sliced Ellison's face with the broken beer bottle, resulting in a laceration from Ellison's brow to the underside of her jaw. Ellison ultimately needed 13 stitches on her face as a result of this injury. In response to getting cut in the face with a beer bottle, Ellison hit Grayson in the face. Ellison testified that at no point before this had she touched or hit Grayson. Ellison testified that she **[**4]**  did not observe any injuries on Grayson. Both of Ellison's injuries left permanent scars.

 **[*P7]**  According to Ellison, Schneider was instigating the fight between Grayson and Ellison, at one point saying "let them fight." The women continued to physically fight after Ellison hit Grayson. Ellison testified that the altercation eventually ended when her cousin reached the group and pulled Grayson and Ellison apart. Ellison called 911 and was taken to Fairview Hospital to be treated for her injuries. Ellison testified that Schneider and Grayson were both intoxicated. Ellison explained that because she had known Schneider for years and had seen him drunk many times before, she could tell that he was intoxicated during this incident. Ellison testified that she had never met Grayson before this incident and therefore could not say whether the behavior she exhibited was normal or was because she was intoxicated, but she assumed that Grayson was intoxicated because she smelled of alcohol and Grayson was holding the beer bottle for the duration of their interaction.

 **[*P8]**  Ellison also testified that Grayson attempted to reach out to her in October 2019 and sent her messages on Facebook. Ellison read the **[**5]**  messages aloud at trial; Grayson apologized but also stated that she defended herself.

 **[*P9]**  Tawney, Ellison's aunt, also testified at trial. She testified that she lived on West 93rd Street and that her brother, her niece Ellison, another niece, and additional family also lived on the street. Tawney testified that on the date of the incident, her landlord, who also lived on West 93rd Street, came to her house with Schneider and Grayson to fix something. Tawney identified Grayson at trial. Tawney explained that she knew Schneider because he was her ex-brother-in-law, but she had not seen or met Grayson before that day. Tawney testified that she was not sure why Schneider and Grayson were with her landlord when he came to her house, but they all had beers in their hands and were drinking. Tawney explained that it was common for her landlord to drink when he came over to her house. Tawney testified that she had seen Schneider drunk in the past and it was clear that he was drunk that day because he was staggering and slurring his words.

 **[*P10]**  Tawney also testified that Grayson started talking to Tawney's fiancé, making derogatory remarks about his military service. Tawney's fiancé asked the landlord **[**6]**  to get Schneider and Grayson off of the property, and the landlord instructed them to go to the landlord's house several doors down. At that point, Schneider and Grayson went out into the road, where Grayson started screaming and yelling, threatening Tawney because Tawney and her fiancé asked her to leave. Tawney then told Schneider to leave. According to Tawney, at no point was her or her fiancé's interaction with Grayson physical.

**[*P11]**  Tawney testified that it was at this point that Ellison drove down the street. Tawney's testimony of the interaction between Ellison and Grayson largely corroborates Ellison's testimony. Tawney instructed her children, who had been playing in the front yard, to go inside. Tawney testified that she had an unobstructed view of Ellison, Ellison's car, Grayson, and Schneider. Tawney saw Grayson smack the side of Ellison's car and begin screaming threats and profanities at Ellison. Tawney testified that when Ellison got out of the car, she did not shove or otherwise touch Grayson; she only asked Grayson why she was in the street. According to Tawney, Grayson told Ellison, "[T]his has nothing to do with you, get back in the car," to which Ellison replied, "[Y]ou **[**7]** hit my car, you made it something to do with me." Tawney testified that at that point, Grayson smashed her beer bottle on the ground and "went after" Ellison, running towards her and cutting Ellison's arm. According to Tawney, the group then began to walk down the street towards Ellison's sister's house, at which point Ellison began fighting with Grayson. At that point, Grayson "tried to swing" and slashed Ellison's face with the beer bottle. Tawney reiterated that Schneider made no attempt to break up the women and was instead instigating the fight, and she testified that Grayson and Schneider were drinking throughout the altercation. Tawney and Ellison both testified that they did not see Grayson sustain any injuries; Tawney testified that Grayson's shirt was ripped but that Grayson had done that.

**[*P12]**  Cleveland police officer Tara French ("Officer French") testified that she responded to a call for a felonious assault. Officer French testified that she met Ellison and observed that she had lacerations on her face and one of her arms and that the lacerations were bleeding. Ellison told Officer French that a woman had struck Ellison with a broken glass bottle, and Officer French testified **[**8]** that the injuries she observed on Ellison were consistent with Ellison's story. Officer French also spoke with Tawney and subsequently prepared a written report. Officer French stated that she was unable to speak with Grayson because Grayson had left the scene. Officer French did not speak to anyone else on the scene who gave her a different story than what she was told by Ellison and Tawney.

**[*P13]**  Following Officer French's testimony, the state moved to admit photographs of Ellison's injuries, Ellison's medical records, the photo lineup of Grayson, and the Facebook messages from Grayson into evidence, before resting its case. Defense counsel then made a *Crim.R. 29* motion for acquittal, which the court denied. Grayson and Schneider testified as witnesses for the defense.

**[*P14]**  Grayson testified that at the time of the incident in this case, she was dating Schneider. Grayson lived in Mansfield, Ohio, and on the date of the incident, she and Schneider went to West 93rd Street to see some of his friends who lived there, including Tawney's landlord. Grayson testified that she and Schneider were drinking and that she had about three beers that afternoon. According to Grayson, she was standing in a driveway talking **[**9]** to one of Schneider's friends — Tawney's fiancé — about cars when a woman came out of the house and told Grayson to get off of her property immediately. Grayson testified that she walked out into the street and was talking to Tawney, who at that point was in the yard. At that point, according to Grayson, a car came down the street, tried to hit her, and parked about 40 feet from where Grayson and Schneider were standing in the street. A woman — Ellison — jumped out of the car, leaving the door open and the engine running. According to Grayson, a tall man approached them and hit Schneider. At this point, Grayson testified that she and Tawney were yelling at each other. Grayson testified that she and Schneider both had beer bottles in their hands and that Schneider was more intoxicated than she was at the time. According to Grayson, Schneider had been drinking for about 48 hours straight and had not gone to sleep the night before.

**[*P15]**  Grayson testified that she weighed approximately 150 pounds. According to Grayson, the tall man who had hit Schneider then proceeded to charge her, shoving her so hard that she allegedly flew 15 feet through the air and landed in a lawn across the street. As **[**10]** a result of this, Grayson injured her back on the ground. According to Grayson, this also resulted in her beer bottle breaking. Grayson testified that Schneider helped her up and they proceeded to walk back to Schneider's friend's house. At this point, Grayson testified that Ellison charged her, "coming at [her] like a rhino," yelling and flailing her arms. Ultimately, Ellison struck the side of Grayson's head and then shoved her, knocking her down and sitting on top of her. It was at this point, according to Grayson, when Ellison was sitting on top of her, that Grayson lashed out at Ellison with the broken beer bottle. Grayson testified that as a result of a genetic disorder, she had two lung surgeries prior to this incident. She testified that when Ellison was sitting on top of her, she could not breathe and was terrified. Grayson lashed out in attempt to get out from Ellison. Grayson admitted that this was likely when Ellison sustained the injury to her arm, but Ellison

continued to hit her. Grayson testified that she was not sure where any other injuries to Ellison occurred. Grayson sustained an injury to her hand as a result of wielding the broken beer bottle.

[*P16]  Grayson testified [**11]  that when someone finally pulled Ellison off of her, she got in her car and drove back to Mansfield with Schneider. Grayson testified that she did not contact the police after this incident. Grayson testified that her relationship with Schneider lasted until December 6, 2019, and she has not seen him since then.

[*P17]  Defense counsel also called Schneider as a witness at trial. Schneider testified that he had been married to Ellison's mother, but was separated from her at the time of the incident in this case. He identified Grayson at trial and testified that they were dating at the time of this incident and had driven to West 93rd Street to drink with friends. Schneider testified that he and Grayson were talking to Tawney's fiancé outside of her house when Tawney came out of the house yelling at them. According to Schneider, he and Grayson then left and started to walk back to another friend's house down the street. At this point, Ellison came driving down the street, almost hit him and Grayson, and jumped out of her car and started screaming at them. Schneider testified that Ellison's brother also got out of the car and attempted to push Schneider but did not.[1] According to Schneider, Ellison's [**12]  brother did not push Grayson or throw her through the air.

[*P18]  Schneider confirmed that he and Grayson had both been drinking throughout the day before the incident. Schneider also testified that Grayson had had about eight beers that day.

[*P19]  Schneider testified that Grayson and Ellison began wrestling and fighting with each other. He further testified that he did not want to get involved in the fight, saying "let them fight." At one point, Schneider heard glass break and assumed that it was the beer bottle Grayson had been holding. Schneider testified that he did not see Grayson hit Ellison with the beer bottle, but he did see the cut on her arm and assumed that Ellison had fallen on top of Grayson's beer bottle. According to Schneider, Ellison threw the first punch and was the aggressor in the situation. After the fight stopped, Schneider testified that he and Grayson got back in Grayson's car and left.

[*P20]  Following this testimony, defense counsel renewed its *Crim.R. 29* motion for acquittal, which the court denied.

[*P21]  On January 5, 2021, the court found Grayson guilty of both counts of felonious assault and referred her to the probation department for preparation of a presentence investigation and report. [**13]

[*P22]  On February 9, 2021, the court held a sentencing hearing. The court heard from defense counsel, three of Grayson's family members, Grayson herself, and the assistant prosecuting attorney. The court stated that it had reviewed the presentence investigation report. The parties agreed that the two counts of felonious assault were allied offenses, and the state elected to proceed with sentencing on Count 2. After engaging Grayson in a conversation about her alleged medical conditions, the court continued the matter to allow Grayson to submit relevant medical records.

[*P23]  On March 2, 2021, the court reconvened for the continued sentencing hearing. The court reviewed Grayson's medical records, showing that Grayson has a chronic obstructive lung disease. The court sentenced Grayson to 90 days in jail, six months of home detention, and five years of community control. On March 22, 2021, Grayson appealed. Grayson raises three assignments of error for our review:

I. The trial court erred to the prejudice of the defendant in finding that the defendant did not act in self-defense.

II. The state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt. [**14]

---

[1] Schneider was the only witness to testify that Ellison's brother had been in the car with her. Ellison testified that her brother had been in the neighborhood at the time of the altercation and eventually came over to move her car. Grayson testified that an unidentified tall man approached her and Schneider at the start of the altercation, but the record is unclear as to whether this man was Ellison's brother or another unidentified person.

III. Appellant's conviction was against the manifest weight of the evidence.

**Legal Analysis**

**I. Self-Defense**

 **[\*P24]**  In her first assignment of error, Grayson argues that the court erred to her prejudice by finding that Grayson was not acting in self-defense. _HN1_ Under Ohio law, a person is permitted to act in self-defense. "Self-defense claims are generally an issue of credibility." _State v. Walker_, 8th Dist. Cuyahoga No. 109328, 2021-Ohio-2037, ¶ 13. "If evidence presented at trial tends to support the conclusion 'that the defendant used force against another in self-defense or in defense of another, the state must prove beyond a reasonable doubt that the defendant did not use the force in self-defense or defense of another.'" _Id._, quoting _State v. Smith_, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 49, citing _R.C. 2901.05(B)(1)_.

 **[\*P25]**  As an initial matter, we acknowledge that it is not clear from the record whether the defense of self-defense should have been available to Grayson at trial. _HN2_ "A defendant claiming self-defense 'concedes that he had the purpose to commit the act, but asserts that he was justified in his actions.'" _State v. Davis_, 8th Dist. Cuyahoga No. 109890, 2021-Ohio-2311, ¶ 38, quoting _State v. Talley_, 8th Dist. Cuyahoga No. 87413, 2006-Ohio-5322, ¶ 45. Because self-defense presumes an intentional, willful use of force, "'when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense.'" _Id. [\*\*15]_, quoting _State v. Hubbard_, 10th Dist. Franklin No. 11AP-945, 2013-Ohio-2735, ¶ 54.

 **[\*P26]**  Here, Grayson was charged with two counts of felonious assault. Count 1 alleged that Grayson "did knowingly cause serious physical harm to Kelly Ellison" in violation of _R.C. 2903.11(A)(1)_. Count 2 alleged that Grayson "did knowingly cause or attempt to cause physical harm to Kelly Ellison by means of a deadly weapon or dangerous ordnance, to wit: a broken glass bottle" in violation of _R.C. 2903.11(A)(2)_. Grayson's trial testimony was inconsistent with respect to whether she injured Ellison at all, let alone whether the injuries she inflicted on Ellison were an intentional use of force or she intended to cause Ellison harm.

 **[\*P27]**  Grayson testified that she swung at Ellison while Ellison was sitting on her chest. Despite testifying at various points that she "[could] not move at all" and "could barely even move [her] arms," Grayson testified that she "was swinging at [Ellison] with the bottle * * * trying to get her off of me." Grayson testified that she could not breathe and was terrified and that was when she lashed out and cut Ellison on the arm. She went on to testify that because of the way Ellison was positioned on top of her, Grayson could not see where or whether Ellison sustained any injuries. At one point, **[\*\*16]**  Grayson testified that she was "not sure what injuries [she] caused." At a different point in her testimony, Grayson testified that she "didn't get a chance to hit [Ellison]" and that she "didn't hit her with the bottle." Therefore, Grayson did not testify that she intended to hit Ellison in the arm with the broken bottle. With respect to the laceration Ellison sustained to her face and neck, Grayson's testimony contained no reference to this injury, let alone any indication that Grayson intended to cause Ellison harm in this way. Viewed in its totality, Grayson's testimony does not contain an admission that she committed the offense of felonious assault as charged in Count 1 and Count 2. _HN3_ Generally, where a defendant does not admit to the relevant charged conduct, the defense of self-defense is not available to them. _Davis_ at ¶ 40.

 **[\*P28]**  Notwithstanding this weakness in Grayson's self-defense theory, our review of the record supports a conclusion that the trial court did not err in finding that Grayson was not acting in self-defense.

---

[2] In addition to these inconsistencies in her testimony, Grayson's theory of self-defense is undermined by her sufficiency-of-the-evidence argument presented in her second assignment of error.

[*P29]  *HN4* To establish that the affirmative defense of self-defense does not apply, the state must prove at least one of the following elements beyond a reasonable doubt: (1) that [**17] the defendant was at fault in creating the situation giving rise to the affray in which the force was used or (2) the defendant did not have reasonable grounds to believe or an honest belief that he or she was in imminent danger of bodily harm or (3) the defendant used more force than was reasonably necessary to defend against the imminent danger of bodily harm. *State v. Jacinto, 2020-Ohio-3722, 155 N.E.3d 1056, ¶ 46 (8th Dist.).*

[*P30]  Grayson argues that the evidence presented at trial shows that she was not at fault in creating the situation giving rise to the affray in which force was used. We disagree. The evidence presented at trial was that Grayson and Schneider were standing in the middle of the road when Ellison approached them in her car and honked her horn for them to get out of the road. All eyewitnesses testified that Schneider and Grayson were standing in the middle of the road when they were approached by Ellison's vehicle. Multiple witnesses testified that not only did Grayson fail to get out of the middle of the road, she slammed her fist into the side of Ellison's car and began shouting threats and obscenities at Ellison. While Grayson disputes hitting Ellison's car, her brief concedes that she was "verbally aggressive," and the evidence [**18] presented at trial suggested that Grayson was belligerent. Grayson's own testimony at trial was that she had been drinking. These actions gave rise to the physical altercation that ensued between the women. Therefore, Grayson was at fault in creating the situation giving rise to the affray in which the force was used. Because this finding is sufficient to conclude that Grayson was not acting in self-defense, we will not address the other two elements outlined in *Jacinto*: whether Grayson had a reasonable belief that she was at risk of bodily harm or whether she used more force than was reasonably necessary.

[*P31]  Because the state established that Grayson was at fault in creating the situation, the trial court did not err in finding that Grayson was not acting in self-defense. Therefore, we overrule Grayson's first assignment of error.

## II. Sufficiency of the Evidence

[*P32]  In Grayson's second assignment of error, she argues that the state failed to present sufficient evidence of each and every element of the offenses beyond a reasonable doubt. Specifically, Grayson argues that the state failed to establish that the broken beer bottle constitutes a deadly weapon or dangerous ordnance. Grayson also argues [**19] that she was lashing out to free herself from Ellison, not to knowingly cause Ellison harm.

[*P33]  *HN5* A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins, 78 Ohio St.3d 380, 387, 1997- Ohio 52, 678 N.E.2d 541 (1997).* The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991),* citing *Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).*

[*P34]  Count 2 required the state to prove that Grayson knowingly caused or attempted to cause Ellison physical harm by means of a deadly weapon or dangerous ordnance in the form of a broken glass bottle in violation of *R.C. 2903.11(A)(2). R.C. 2923.11(A)* defines "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Grayson argues that the broken bottle in this case cannot constitute a deadly weapon because, although the cut to Ellison's face and neck was close to her jugular, Ellison's jugular was not actually injured. This argument ignores [**20] the definition of a "deadly weapon" in *R.C. 2923.11(A),* is at odds with case law from this and other Ohio courts, and defies logic. *HN6* The test for whether something is a deadly weapon is not whether it in fact inflicted a fatal injury, but whether it is capable of doing so. A firearm does not become a deadly weapon only when someone suffers a fatal gunshot wound; its capability of inflicting death renders it a deadly weapon. Further, glass bottles and mugs have repeatedly been found to constitute a deadly weapon. *State v. Melendez,* 8th Dist. Cuyahoga No. 97175, 2012-Ohio-2385, ¶ 15, citing *State v. Chappell, 8th Dist. Cuyahoga No. 79589, 2002-Ohio-*

*676, 2002 Ohio App. LEXIS 702 (Feb. 21, 2002)*; *State v. Blaine*, 8th Dist. Cuyahoga No. 85131, 2005-Ohio-3831; *State v. Chancey, 8th Dist. Cuyahoga Nos. 75633 and 76277, 2000 Ohio App. LEXIS 575 (Feb. 17, 2000)*. We are not persuaded by Grayson's argument. We find that the state established beyond a reasonable doubt that Grayson wielded a deadly weapon.

 **[*P35]**  With respect to Grayson's argument that she did not act knowingly, we are similarly unpersuaded. Evidence was presented at trial that Grayson was belligerent and immediately started shouting threats and obscenities at the victim in this case. Evidence was also presented that Grayson bent down and smashed her beer bottle on the ground before striking Ellison multiple times with the bottle. This evidence, viewed in the light most favorable to the prosecution, is sufficient to establish beyond a reasonable doubt that Ellison acted knowingly **[**21]** when she struck Ellison with a glass bottle. For these reasons, we find that the state presented sufficient evidence to support all elements of both counts of felonious assault. Therefore, Grayson's second assignment of error is overruled.

### III. Manifest Weight

 **[*P36]**  In her third and final assignment of error, Grayson argues that her convictions were against the manifest weight of the evidence. In support of this argument, Grayson reiterates that various conflicts in the evidence should have been resolved in her favor. Specifically, she asserts that Ellison was the aggressor in this situation, and that Grayson only struck Ellison with the broken bottle because she was fighting for her life. We disagree.

 **[*P37]**  *HN7* Unlike a challenge to the sufficiency of the evidence, a manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. In our manifest weight review of a bench trial verdict, we recognize that the trial court is serving as the factfinder.

> Accordingly, to warrant reversal from a bench trial under a manifest weight of the evidence claim, this court must review the entire record, weigh the evidence and all reasonable **[**22]** inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*State v. Bell*, 8th Dist. Cuyahoga No. 106842, 2019-Ohio-340, ¶ 41, quoting *State v. Strickland*, 183 Ohio App.3d 602, 2009-Ohio-3906, 918 N.E.2d 170, ¶ 25 (8th Dist.), quoting *Cleveland v. Welms*, 169 Ohio App.3d 600, 2006-Ohio-6441, 863 N.E.2d 1125 (8th Dist.), citing *Thompkins at 390*.

 **[*P38]**  Grayson's version of events suggesting that Ellison was the aggressor in the situation was not entirely credible. She described being thrown 15 feet through the air, after which she calmly got up and began to walk away. According to Grayson, the beer bottle she was holding broke when she was thrown through the air. Miraculously, she maintained her grip on the bottle throughout the duration of this incident, even when she was subsequently shoved to the ground by Ellison.

 **[*P39]**  As discussed in the foregoing analysis of Grayson's first assignment of error, her testimony contained significant inconsistencies with respect to whether she was acting in self-defense, and even whether she was aware of the injuries she inflicted on Ellison. These inconsistencies alone could have supported the trial court's credibility determination. These inconsistencies, together with Grayson's far-fetched version of events, and **[**23]** testimony from Grayson and others that she was at a minimum intoxicated, if not belligerent, support the trial court's conclusion that Grayson was the aggressor in the situation. Therefore, we cannot conclude that the trial court clearly lost its way and created a manifest miscarriage of justice. For these reasons, we overrule Grayson's third assignment of error.

 **[*P40]**  Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

2021-Ohio-4312, *P29; 2021 Ohio App. LEXIS 4216, **23

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to *Rule 27 of the Rules of Appellate Procedure.*

MARY EILEEN KILBANE, JUDGE

MICHELLE J. SHEEHAN, P.J., and EMANUELLA D. GROVES, J., CONCUR

---

**End of Document**

 Positive
As of: September 9, 2025 3:31 PM Z

# *State v. Hubbard*

 At Risk

Court of Appeals of Ohio, Tenth Appellate District, Franklin County

June 27, 2013, Rendered

No. 11AP-945

**Reporter**
2013-Ohio-2735 *; 2013 Ohio App. LEXIS 2757 **; 2013 WL 3341171

State of Ohio, Plaintiff-Appellee, v. Dawntwai M. Hubbard, Defendant-Appellant.

**Subsequent History:** Discretionary appeal not allowed by *State v. Hubbard, 137 Ohio St. 3d 1422, 2013-Ohio-5285, 998 N.E.2d 1177, 2013 Ohio LEXIS 2840 (2013)*

Reopening denied by *State v. Hubbard, 2014-Ohio-122, 2014 Ohio App. LEXIS 109 (Ohio Ct. App., Franklin County, Jan. 16, 2014)*

Sentence imposed by *State v. Hubbard, 2014 Ohio Misc. LEXIS 3462 (Ohio C.P., Apr. 7, 2014)*

**Prior History:** [**1] APPEAL from the Franklin County Court of Common Pleas. (C.P.C. No. 10CR-09-5694).

**Disposition:** Judgment affirmed in part and reversed in part; cause remanded.

## Core Terms

trial court, fired, gun, self-defense, assigned error, offender, murder, shots, firearm, shooting, convictions, homicide, offenses, consecutive sentences, sentence, witnesses, manifest, street, specifications, front, felony, weight of the evidence, bullet, felony assault, reckless, asserts, window, walked, fail to instruct, prison term

## Case Summary

### Procedural Posture

Following a jury trial, the Franklin County Court of Common Pleas (Ohio) convicted defendant of murder, under *R.C. 2903.02*, attempted murder, under *R.C. 2923.02* and *R.C. 2903.02*, and felonious assault, under *R.C. 2903.11*, all with firearm specifications pursuant to *R.C. 2941.145*. He was sentenced to a total of 28 years to life in prison. Defendant appealed.

### Overview

Defendant argued that the evidence did not support the convictions. The appellate court held that the evidence was sufficient to allow the jury to infer that defendant acted with the intention of causing death when he fired his gun into a crowd of people standing down the street from his house. Such evidence also supported the inference that defendant knowingly attempted to cause physical harm to another by firing his weapon into the crowd. A neighbor stated that defendant held his arm straight out in front as he pulled the trigger, directing the shots down the street into the group of people. Further, there was no error in any of the jury instructions because the evidence did not warrant an instruction on the lesser-included offense of reckless homicide or instructions on self-defense, accident, duress, mistake of fact, or transferred intent. Also, because he harmed two separate individuals by his conduct, the

Justin Marks

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

murder and attempted murder convictions were of dissimilar import, and the trial court properly refused to merge those convictions. However, the trial court failed to make any of the findings required by _R.C. 2929.14(C)(4)_ before imposing consecutive sentences.

**Outcome**
The imposition of consecutive sentences was reversed, defendant's sentence was vacated, and the case was remanded for resentencing. In all other respects, the judgment of the trial court was affirmed.

# LexisNexis® Headnotes

Criminal Law & Procedure > Trials > Motions for Acquittal

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

**_HN1_ Trials, Motions for Acquittal**

Pursuant to _Crim.R. 29(A)_, a court shall order the entry of a judgment of acquittal of one or more offenses if the evidence is insufficient to sustain a conviction of such offense or offenses. Because a _Crim.R. 29_ motion questions the sufficiency of the evidence, an appellate court applies the same standard of review to _Crim.R. 29_ motions as an appellate court use in reviewing the sufficiency of the evidence.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Burdens of Proof > Proof Beyond Reasonable Doubt

**_HN2_ Substantial Evidence, Sufficiency of Evidence**

Whether evidence is legally sufficient to sustain a verdict is a question of law. Sufficiency is a test of adequacy. The evidence is construed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. When reviewing the sufficiency of the evidence the court does not weigh the credibility of the witnesses.

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Credibility of Witnesses

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Weight of Evidence

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Verdicts

**_HN3_ Province of Court & Jury, Credibility of Witnesses**

Sufficiency of the evidence and manifest weight of the evidence are distinct concepts; they are quantitatively and qualitatively different. When presented with a manifest weight argument, an appellate court engage in a limited weighing of evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. In the manifest weight analysis the appellate court considers the credibility of

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

the witnesses and determines whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The jury may take note of any inconsistencies and resolve them accordingly, believing all, part or none of a witness's testimony.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Verdicts

### *HN4* Substantial Evidence, Verdicts

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.

Criminal Law & Procedure > ... > Murder > Attempted Murder > Elements

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Purpose

### *HN5* Attempted Murder, Elements

To prove attempted murder, the State has to demonstrate that defendant purposely engaged in conduct which, if successful, would have caused the victim's death. *R.C. 2903.02(A)* and *R.C. 2923.02(A)*. A person acts purposely when it is his or her specific intention to cause a certain result. *R.C. 2901.22(A)*.

Criminal Law & Procedure > ... > Assault & Battery > Aggravated Offenses > Elements

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

### *HN6* Aggravated Offenses, Elements

Felonious assault under *R.C. 2903.11* prohibits any person from either knowingly causing serious physical harm to another, or causing or attempting to cause physical harm to another by a means of a deadly weapon. A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. *R.C. 2901.22(B)*.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

### *HN7* Sentencing Guidelines, Adjustments & Enhancements

*R.C. 2941.145* provides for a three-year mandatory prison term if the offender had a firearm on or about the offender's person while committing the offense and displayed the firearm or used it to facilitate the offense.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Murder > General Overview

Evidence > Inferences & Presumptions > Inferences

Criminal Law & Procedure > ... > Assault & Battery > Aggravated Offenses > General Overview

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Specific Intent

*HN8* **Homicide, Manslaughter & Murder, Murder**

A person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts. A firearm is an inherently dangerous instrumentality, the use of which is likely to produce death. When a person fires a gun into a group of people, one can infer intent to cause death.

Criminal Law & Procedure > Trials > Witnesses > Credibility

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Verdicts

*HN9* **Witnesses, Credibility**

Although, under a manifest weight of the evidence analysis, an appellate court is able to consider the credibility of the witnesses, in conducting its review, the appellate court is guided by the presumption that the jury, is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Confrontation

*HN10* **Criminal Process, Right to Confrontation**

The *Sixth Amendment to the United States Constitution*, in its Confrontation Clause, provides that, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. The Confrontation Clause bars admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination. Thus, if the hearsay evidence sought to be admitted comprises testimony from an absent witness, who cannot be cross-examined or observed face-to-face by the trier of fact, the Confrontation Clause limits the admission of that hearsay evidence. The Confrontation Clause does not apply to nontestimonial hearsay.

Criminal Law & Procedure > Appeals > Procedural Matters > Briefs

*HN11* **Procedural Matters, Briefs**

An appellant must support their assignments of error with an argument, which includes citation to legal authority. *App.R. 16(A)(7)*. An appellant bears the burden of affirmatively demonstrating error on appeal. It is not the duty of an appellate court to construct legal arguments in support of an appellant's appeal. Indeed, appellate courts may not construct legal arguments in support of an appellant's appeal. Under *App.R. 12(A)(2)*, an appellate court may choose to disregard any assignment of error that an appellant fails to separately argue.

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Judicial Discretion

Criminal Law & Procedure > Trials > Jury Instructions > Objections

*HN12* **Plain Error, Judicial Discretion**

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

Absent plain error, a party forfeits error concerning jury instructions if the party fails to object before the jury retires. *Crim.R. 30(A)*. However, where the failure to request a jury instruction is the result of a deliberate, tactical decision on the part of trial counsel, it is not plain error.

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Definition of Plain Error

### *HN13* Plain Error, Definition of Plain Error

According to the plain error doctrine, enunciated in *Crim.R. 52(B)*, plain errors or defects affecting substantial rights may be noticed even though they were not brought to the attention of the court. The rule places three limitations on a reviewing court's decision to correct the error, despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. Second, the error must be plain. To be "plain" within the meaning of *Crim.R. 52(B)*, the error must be an "obvious" defect in the proceedings. And third, the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. Even if a forfeited error satisfies these three prongs, however, *Crim.R. 52(B)* does not demand that an appellate court correct it. *Crim.R. 52(B)* states only that a reviewing court "may" notice plain forfeited errors. Courts have been admonished to notice plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.

Criminal Law & Procedure > Criminal Offenses > Lesser Included Offenses > Elements

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

### *HN14* Lesser Included Offenses, Elements

An offense is a lesser-included offense of another where: (1) the offense carries a lesser penalty; (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove commission of the lesser offense. The jury instruction on a lesser included offense must be given when sufficient evidence is presented which would allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included offense. Thus, a jury instruction on a lesser-included offense is not required unless the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense. In making this determination, the court must view the evidence in the light most favorable to the defendant.

Criminal Law & Procedure > ... > Assault & Battery > Aggravated Offenses > Elements

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > Elements

Criminal Law & Procedure > ... > Murder > Third-Degree Murder > Elements

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Recklessness

### *HN15* Aggravated Offenses, Elements

The offense of reckless homicide provides that no person shall recklessly cause the death of another. *R.C. 2903.041(A)*. A person acts recklessly when, with heedless indifference to the consequences, he perversely

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. *R.C. 2901.22(C)*. Felony murder under *R.C. 2903.02(B)* premised on felonious assault in violation of *R.C. 2903.11* requires that the defendant act knowingly.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > Elements

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Murder > General Overview

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Recklessness

### *HN16* Involuntary Manslaughter, Elements

Pursuant to the Deem test, reckless homicide is a lesser included offense of felony murder because: (1) a felony murder conviction carries a prison term of 15 years to life, while reckless homicide, a third degree felony, carries a maximum prison sentence of three years, *R.C. 2903.041(B)*, *R.C. 2929.14(D)(3)(b)* and *R.C. 2929.02(B)(1)*; (2) one cannot knowingly cause the death of another as the result of committing or attempting to commit a felonious assault without also recklessly causing the death of another; and (3) in order to prove reckless homicide the State need not establish that the defendant acted knowingly.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Murder > General Overview

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Specific Intent

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

### *HN17* Homicide, Manslaughter & Murder, Murder

A defendant's own testimony that he did not intend to kill his victim does not entitle him to a lesser-included offense instruction. Even when the defendant's own testimony constitutes some evidence supporting a lesser offense, if the evidence on whole does not reasonably support an acquittal on the murder offense and a conviction on a lesser offense, the court should not instruct on the lesser offense. To require an instruction to be given to the jury every time "some evidence," however minute, is presented going to a lesser included offense would mean that no trial judge could ever refuse to give an instruction on a lesser included offense.

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

Evidence > Inferences & Presumptions > Inferences

### *HN18* Mens Rea, Knowledge

Shooting a gun in a place where one or more persons risk injury supports an inference that a defendant acted knowingly.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

Criminal Law & Procedure > Trials > Jury Instructions > Requests to Charge

### HN19 Standards of Review, Abuse of Discretion

Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the fact finder. A defendant in a criminal case is entitled only to have the law stated correctly by the trial court, not to have his proposed jury instructions presented to the jury. Where requested jury instructions are correct statements of the law as applied to the facts of the case, they should generally be given. A court reviewing a trial court's refusal to submit to the jury a requested instruction must determine whether the trial court's decision constituted an abuse of discretion under the facts and circumstances of the case.

Criminal Law & Procedure > Defenses > Burdens of Proof

Criminal Law & Procedure > Defenses > Self-Defense

### HN20 Defenses, Burdens of Proof

Self-defense is an affirmative defense which the accused has the burden to prove by a preponderance of the evidence. _R.C. 2901.05(A)._ To establish self-defense through the use of deadly force, a defendant must prove that: (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force, and (3) he must not have violated any duty to retreat or avoid the danger. A defendant may only use as much force as is reasonably necessary to repel the attack. The elements of self-defense are cumulative, such that, if the defendant fails to prove any one of these elements he has failed to demonstrate that he acted in self-defense.

Criminal Law & Procedure > Defenses > Defense of Others

Criminal Law & Procedure > Defenses > Self-Defense

### HN21 Defenses, Defense of Others

Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault. One who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense. In most circumstances, a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation. When a person is attacked in their home, however, they have no duty to retreat before using force in self-defense. _R.C. 2901.09(B)._ Commonly referred to as the castle doctrine, this exception to the duty to retreat derives from the doctrine that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack.

Criminal Law & Procedure > Defenses > Self-Defense

### HN22 Defenses, Self-Defense

The Ohio General Assembly has expanded the reach of the castle doctrine by creating a presumption that a person has acted in self-defense when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of or has unlawfully and without

privilege to do so entered, the residence of the defendant. *R.C. 2901.05(B)(1)*. Thus, in Ohio a person is presumed to have acted in self-defense, and may use deadly force, when attempting to expel or expelling another from their home who is unlawfully present.


Criminal Law & Procedure > Defenses > Self-Defense

### *HN23* Defenses, Self-Defense

By its terms, self-defense presumes intentional, willful use of force to repel force or to escape force. A defendant claiming self-defense concedes he had the purpose to commit the act, but asserts that he was justified in his actions. Thus, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense.


Criminal Law & Procedure > Defenses > Self-Defense

### *HN24* Defenses, Self-Defense

*R.C. 2901.05* creates a rebuttable presumption that a defendant acted in self-defense when someone is in the process of unlawfully entering, or has unlawfully entered, the residence of the defendant. *R.C. 2901.05(B)(1)*. A "residence" means a building or conveyance of any kind that has a roof over it, and includes an attached porch. *R.C. 2901.05(D)(2)*.


Criminal Law & Procedure > Defenses > Accident

### *HN25* Defenses, Accident

Accident and self-defense are generally inconsistent by definition, as self-defense presumes intentional, willful use of force to repel force or escape force, while accident is exactly the contrary, wholly unintentional and unwillful. "Accident" is not an affirmative defense, but a factual defense that denies that the accused acted with the degree of culpability or mens rea required for the offense.


Criminal Law & Procedure > Appeals > Standards of Review > General Overview

Criminal Law & Procedure > Trials > Jury Instructions > Requests to Charge

### *HN26* Appeals, Standards of Review

A trial court does not commit prejudicial error in a criminal case when it fails to give a proposed instruction that is covered in the court's general charge to the jury.


Criminal Law & Procedure > Defenses > Coercion & Duress

### *HN27* Defenses, Coercion & Duress

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **1

Duress consists of any conduct which overpowers a person's will and coerces or constrains his performance of an act which he otherwise would not have performed. Consequently, one who, under the pressure of a threat from another person, commits what would otherwise be a crime may, under certain circumstances, be justified in committing the act and not be guilty of the crime.

Criminal Law & Procedure > Defenses > Coercion & Duress

*HN28* **Defenses, Coercion & Duress**

Duress consists of any conduct which overpowers a person's will and coerces or constrains his performance of an act which he otherwise would not have performed. Consequently, one who, under the pressure of a threat from another person, commits what would otherwise be a crime may, under certain circumstances, be justified in committing the act and not be guilty of the crime.

Criminal Law & Procedure > Defenses > Ignorance & Mistake of Fact

*HN29* **Defenses, Ignorance & Mistake of Fact**

Generally, mistake of fact is a defense if it negates a mental state required to establish an element of a crime, except that if the defendant would be guilty of a crime under facts as he believed them, then he may be convicted of that offense. Mistake of fact is widely recognized as a defense to specific intent crimes such as theft since, when the defendant has an honest purpose, such a purpose provides an excuse for an act that would otherwise be deemed criminal. Mistake of fact can, in an appropriate circumstance, negate either "knowingly" or "purposely."

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Murder > Transferred Intent

*HN30* **Murder, Transferred Intent**

The doctrine of transferred intent indicates that, where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting harm is held criminally liable as if he both intended to harm and did harm the same person.

Criminal Law & Procedure > Trials > Jury Instructions > General Overview

*HN31* **Trials, Jury Instructions**

*Crim.R. 30(A)* provides that the court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record.

Criminal Law & Procedure > Appeals > Procedural Matters > Briefs

*HN32* **Procedural Matters, Briefs**

Pursuant to *App.R. 12(A)(1)(b)*, appellate courts must determine an appeal on its merits on the assignments of error set forth in the briefs under *App. R. 16*. Thus, appellate courts rule on assignments of error, not mere arguments.

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Tests for Prosecutorial Misconduct

### *HN33* Prosecutorial Misconduct, Tests for Prosecutorial Misconduct

When reviewing allegations of prosecutorial misconduct, the test for appellate courts is whether the prosecutor's conduct was improper and, if so, whether that conduct prejudicially affected the substantial rights of the accused. The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Accordingly, prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial.

Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Prohibition Against Improper Statements

Criminal Law & Procedure > ... > Standards of Review > Plain Error > Prosecutorial Misconduct

### *HN34* Closing Arguments, Fair Comment & Fair Response

A prosecutor is afforded wide latitude in closing argument, which must be reviewed in its entirety in order to determine whether the challenged remarks prejudiced the defendant. During closing argument, the State can summarize the evidence and draw conclusions as to what the evidence shows. Because defense counsel did not object to the prosecutor's comment during closing argument, an appellate court reviews for plain error, asking whether the defendant would not have been convicted in the absence of the improper conduct.

Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response

### *HN35* Closing Arguments, Fair Comment & Fair Response

Where a defendant, through his testimony, indicates a possible self-defense argument, the prosecutor is entitled to comment on such evidence during closing.

Criminal Law & Procedure > ... > Common Characteristics > Merger of Offenses > Tests for Merger

### *HN36* Merger of Offenses, Tests for Merger

*R.C. 2941.25(A)* provides that, where a defendant's same conduct can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one. Where, however, the defendant's conduct constitutes two or more offenses of dissimilar import or results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them. *R.C. 2941.25(B)*. When determining whether two offenses are allied offenses of similar import subject to merger under *R.C. 2941.25*, the conduct of the accused must be considered. If the offenses are of similar import because the defendant committed them through the same conduct, the court then must ask whether the offenses were committed separately or with a separate animus. Where a defendant harms

multiple individuals through the same course of conduct, and each offense charged is defined in terms of conduct toward another, the offenses are of dissimilar import.

Criminal Law & Procedure > ... > Murder > Felony Murder > Elements

Criminal Law & Procedure > ... > Murder > Attempted Murder > Elements

### *HN37* Felony Murder, Elements

The crimes of felony murder and attempted murder are both defined in terms of conduct towards another: they prohibit a defendant from causing or attempting to cause the death of another.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > Sentencing > Merger

### *HN38* Sentencing Guidelines, Adjustments & Enhancements

When an offender is convicted of a felony and a firearm specification under *R.C. 2941.145*, *R.C. 2929.14(B)(1)(a)(ii)* requires the trial court to impose a three-year prison term on the offender. *R.C. 2929.14(B)(1)(b)* states that except as provided in *R.C. 2929.14(B)(1)(g)*, a court shall not impose more than one prison term on an offender under *R.C. 2929.14(B)(1)(a)* for felonies committed as part of the same act or transaction.

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > Sentencing > Merger

### *HN39* Sentencing Guidelines, Adjustments & Enhancements

See *R.C. 2929.14(B)(1)(g)*.

Criminal Law & Procedure > Sentencing > Consecutive Sentences

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Factors

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Findings

### *HN40* Sentencing, Consecutive Sentences

See *R.C. 2929.14(C)(4)* (2011).

Criminal Law & Procedure > Sentencing > Consecutive Sentences

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Findings

### *HN41* Sentencing, Consecutive Sentences

Passed as part of Am. Sub. H.B. 86, Gen. Assem. (Ohio 2011), *R.C. 2929.14(C)(4)* now requires a sentencing judge to make certain findings before imposing consecutive sentences.

Criminal Law & Procedure > Sentencing > Consecutive Sentences

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Findings

*HN42* **Sentencing, Consecutive Sentences**

In Am. Sub. H.B. 86, Gen. Assem. (Ohio 2011), the Ohio General Assembly first repealed the former consecutive sentencing statute, *R.C. 2929.14(E)(4)*, and then revived the requirement that trial judges make certain findings prior to imposing consecutive sentences in *R.C. 2929.14(C)(4)*.

Criminal Law & Procedure > Sentencing > Consecutive Sentences

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Findings

*HN43* **Sentencing, Consecutive Sentences**

*R.C. 2929.14(C)(4)* now requires the trial court to make three findings before imposing consecutive sentences: (1) that consecutive sentences are necessary to protect the public from the future crime or to punish the offender; (2) that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the subsections (a), (b), or (c) apply. The trial court is not required to give reasons explaining these findings, nor is the court required to recite any "magic" or "talismanic" words when imposing consecutive sentences. Nevertheless, the record must reflect that the court made the findings required by the statute.

**Counsel:** Ron O'Brien, Prosecuting Attorney, and Laura R. Swisher, for appellee.

John H. Pettorini, for appellant.

**Judges:** CONNOR, J. KLATT, P.J, and DORRIAN, J., concur.

**Opinion by:** CONNOR

## Opinion

(REGULAR CALENDAR)

DECISION

CONNOR, J.

 **[\*P1]** Defendant-appellant, Dawntwai M. Hubbard ("defendant"), appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict of one count of murder in violation of *R.C. 2903.02*, one count of attempted murder in violation of *R.C. 2923.02* as it relates to *R.C. 2903.02*, and one count of felonious assault in violation of *R.C. 2903.11*, all with firearm specifications. Because: (1) sufficient evidence and the manifest weight of the evidence support defendant's convictions, (2) plaintiff-appellee, the State of Ohio ("State"), did not violate defendant's right to confront the witnesses against him, (3) the trial court did not plainly err by failing to instruct the jury on the lesser-included offense of reckless homicide, (4) the trial court did not abuse its

discretion by refusing to instruct the jury on defendant's [**2] requested jury instructions, (5) no prejudicial prosecutorial misconduct occurred, and (6) the trial court properly refused defendant's request to merge the convictions, but failed to make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences, we affirm in part and reverse in part, remanding the case for resentencing.

## I. FACTS AND PROCEDURAL HISTORY

[*P2] On September 27, 2010, the State indicted defendant on one count of aggravated murder, an unclassified felony, one count of attempted murder, a first degree felony, one count of murder, an unclassified felony, and one count of felonious assault, a second degree felony, all with firearm specifications in accordance with R.C. 2941.145. The events giving rise to the indictment occurred on September 18, 2010, on the near east side of Columbus, Ohio.

[*P3] Throughout the daytime hours on September 18, 2010, defendant's 19-year-old neighbor, Ravenna Bronaugh, and her group of friends had numerous verbal and physical altercations with defendant's 14-year-old daughter and her group of friends. Defendant and his daughter lived at 422 Morrison Avenue, while Bronaugh lived at 396 Morrison Avenue, five houses north from defendant's [**3] house on the same side of the street. The police responded to several calls from the area throughout the day to break up the fighting between the two groups. As a neighbor explained, the day "appear[ed] to be a series of escalat[ing] arguments and tempers were getting hotter and hotter." (Tr. 274.)

[*P4] Around 8:00 p.m., the fighting between the two groups had died down, defendant's daughter and her friends were inside defendant's home, and Bronaugh and her friends were on Bronaugh's front porch. At that time, Lavada McCurdy, Bronaugh's good friend, and Bronaugh left the group at 396 Morrison Avenue and walked down the street to defendant's house. McCurdy picked up a cement block on the walk and, while standing in defendant's front yard, she "threw it at [defendant's front] window and busted it." (Tr. 348.) The group standing on Bronaugh's porch walked out to the sidewalk to see what had happened. McCurdy and Bronaugh started to walk back to 396 Morrison Avenue, stopping to talk to another individual on the street, when suddenly they "started hearing shots." (Tr. 352.)

[*P5] The witnesses from 396 Morrison Avenue explained that, after McCurdy and Bronaugh broke defendant's window, defendant came [**4] out "on the porch and start[ed] shooting." (Tr. 546.) McCurdy stated that, as she was running, she turned around and "noticed it was [defendant]" shooting. (Tr. 352.) Another witness explained that the shots were coming "down Morrison from [the direction] which [McCurdy] and [Bronaugh] were walking from." (Tr. 602.) As the shots were being fired, Teddy McGrapth and Candace Keys, who had arrived at 396 Morrison Avenue minutes before the shooting, started yelling that they had been shot. McGrapth walked back from the sidewalk to the steps in front of 396 Morrison Avenue, sat down and started taking "deep breathe[s] and blood started coming out." (Tr. 353.) McGrapth died from the gunshot wound to his torso.

[*P6] There were several individuals inside defendant's house when the cement block came crashing through the window. The witnesses from inside defendant's house testified to hearing two gun shots either immediately before or immediately after the brick came through the window. Other witnesses for the State, however, testified that the only gunshots they heard that evening were the shots fired from defendant's gun. Defendant's daughter testified that, after she heard the gunshots and the [**5] cement block crash through the window, her father entered from the "rear of the house" and instructed everyone to "go upstairs." (Tr. 852.) Defendant's daughter "got on the ground and * * * climbed up the stairs," and then heard gunshots, approximately "four or five." (Tr. 852, 867.)

[*P7] Defendant testified at trial. He explained that when he returned home around 8:00 p.m. from a brief outing with a friend, he saw a "group of people carousing and gathering," on Morrison Avenue. (Tr. 1183.) Defendant stated that he entered his house through the back door, heard approximately two gunshots followed by a terrifying crash, retrieved the gun which he had placed behind the mantel earlier in the day, and walked out onto his front porch. Defendant saw people approaching "from [his] yard coming closer" and, because he "didn't want to harm no one," he grabbed the pillar on the side of his porch, and shot "to the side and down to warn them, back, just back up." (Tr. 1195-96; 1199-1200.) Defendant explained that he fired his gun "down towards the ground" in the direction

of the abandoned house immediately north from his house and in the vicinity of a green trash can sitting in front of the abandoned **[**6]** house. (Tr. 1202-03.) Defendant explained that he did not intend to kill or harm anyone when he shot his gun.

**[*P8]** Allison Fife, defendant's neighbor at 430 Morrison Avenue, witnessed the shooting. Fife explained that at approximately 8:00 p.m. she saw a group of people standing down the street from her house and saw someone from the group run towards defendant's house and throw something that "went through the window." (Tr. 220.) About a minute after the window broke, defendant walked out onto his front porch, grabbed a hold of the brick pillar, and fired four or five shots in rapid succession while pointing his gun "[t]owards the group" standing down the street. (Tr. 223.) Fife, and other witnesses from 396 Morrison Avenue, stated that when defendant fired his gun, there was no one standing in front of his house.

**[*P9]** Police arrived shortly after the shooting. Detective Gregory Sheppard stated that "[s]everal of the witnesses stated that the person that actually committed the shooting was [defendant] and that he lived at 422 Morrison." (Tr. 878.) Police entered defendant's home and, as they proceeded to the second floor of the house, they heard "like steps or some creaking in another level **[**7]** of the house" and told whoever was upstairs to come down. (Tr. 656.) Defendant came down the stairs and officers noted that, while defendant was "sweating from his forehead," his shirt "was very dry" causing the officers to "believe that maybe [defendant] just changed his shirt or something like that." (Tr. 657.) Witnesses from the scene told officers that defendant had "ran and changed his clothes," as defendant wore a white "wife beater" undershirt during the day, but had on a yellow T-shirt when police found him. (Tr. 287, 354.)

**[*P10]** Police recovered five spent Winchester 45-automatic shell casings on and around defendant's front porch. Inside defendant's house, in a large box underneath a bed, police found a "handgun and some ammunition along with a gun box." (Tr. 681-82.) The ammunition was Winchester 45-automatic ammunition. The gun box was for a Hi-Point firearm, and contained a receipt from Vance's gun shop, evidencing the sale of a Hi-Point 45-automatic firearm to defendant on October 12, 2007. The gun was not inside the gun box, rather it was "stuck down in" the larger box. (Tr. 513.) The magazine had eight live rounds in it.

**[*P11]** Forensic testing revealed that the five spent shell **[**8]** casings from defendant's front porch were fired from the Hi-Point firearm. The bullet which caused McGrapth's death was also fired from the Hi-Point firearm. Samples taken from defendant's hands on the night of the incident revealed gunshot primer residue, indicating that defendant had fired a gun that day.

**[*P12]** Defendant's trial concluded on October 4, 2011. The jury found defendant guilty of attempted murder and felonious assault relative to Keys, found defendant guilty of murder regarding McGrapth, and found defendant guilty of the firearm specifications for each crime. The jury was unable to reach a verdict on the aggravated homicide charge and a nolle prosequi was entered as to Count 1 of the indictment. The court sentenced defendant to a prison term of 15 years to life on the murder charge, 7 years on the attempted murder charge, and 3 years on each firearm specification. The court ordered that the sentences be served consecutively, for a total prison term of 28 years to life.

## II. ASSIGNMENTS OF ERROR

**[*P13]** Defendant appeals, assigning the following errors:

[I.] Hubbard's convictions are against the manifest weight of the evidence.

[II.] Mr. Hubbard was denied due process of law and a fair **[**9]** trial, when the trial court failed to instruct the jury regarding the affirmative defense of 'self defense and/or defense of another', including a 'Castle Doctrine' instruction (effective September 9, 2008), because this jury instruction was appropriate and required, in light of both 'sufficiency' and 'manifest' weight of evidence produced at trial.

2013-Ohio-2735, *2013-Ohio-2735; 2013 Ohio App. LEXIS 2757, **9

[III.] Mr. Hubbard was denied due process of law and a fair trial, when the trial court failed to instruct the jury regarding "self-defense or defense of another", including a statutory required "Castle Doctrine" instruction (after September, 2008), when predicated upon this trial evidence, to wit: During the evening of September 18, 2010, Hubbard, in order to protect persons under attack in his home, from apparently armed would-be home invaders, rapidly fired five warning shots from his front porch, to dissuade and repel those invaders, seconds after they fired two shots in front of his home, and hurled a concrete block through his front porch window; however, one or more shot(s) he fired downward into the ground of an abandoned lot north of his home, strayed and/or ricocheted, struck and killed an unseen victim, Mr. McGrapth and may have **[**10]** also hit unseen victim, Ms. Keys' foot, while both were located in close proximity to each other, out near the darkened street, more than sixty (60) yards northwest of Hubbard's porch.

[IV.] Mr. Hubbard was denied due process of law and a fair trial, when the trial court failed to instruct the jury upon defenses of "duress", "mistake", "accident", and also failed to instruct upon the doctrine of "transferred intent", under sufficient weight of evidence at trial, that one (or more) of five gunshots Hubbard fired north, in a downward direction toward an abandoned lot next to his home accidently ricocheted and/or strayed, striking unseen individuals standing in close proximity to each other in the dark, near the street, more than sixty (60) yards northwest of his front porch.

[V.] Mr. Hubbard was denied due process of law and a fair trial, when the trial court, after conclusion of all evidence established at trial, failed to instruct the jury regarding the lesser included offenses of (1) voluntary manslaughter, (2) involuntary manslaughter, (3) reckless homicide, (4) negligent homicide, and (5) aggravated assault.

[VI.] Mr. Hubbard was denied due process of law and a fair trial when the **[**11]** trial court failed to instruct the jury that they should consider whether or not evidence of daylight escalation of street violence outside Hubbard's home, evening gunshots heard outside his home and a hurled concrete block crashing through the front window of his home, was relevant to the jury's ultimate determination of whether Hubbard's claim of "self defense and/or defense of others" and/or a "Castle Doctrine" presumption, had been rebutted by greater weight of evidence offered by the State of Ohio.

[VII.] The trial court erred in denying Hubbard's motion for judgment of acquittal (*Ohio Criminal Rule 29*) at the conclusion of the State's case, since manifest weight of the evidence established that McGrapth's Homicide was accidental, and that the State's failure to compel Candace Keys to testify with respect to the State's burden of proof regarding Counts Two, Three and Four of the Indictment, all of which were predicated upon the State's underlying establishment of evidence that Hubbard knowingly committed felonious assault upon Keys, thus deprived Hubbard of his constitutional right, to confront and cross examine his accuser; face to face and in open court, regarding the exact nature, **[**12]** extent and cause of Keys' alleged "injury", and regarding her reasons for traveling with McGrapth from their west side apartments into an east side neighborhood she knew was filled with street gang violence and guns.

[VIII.] Mr. Hubbard was denied due process of law and a fair trial, when the trial court erroneously permitted the trial prosecutor to engage in prosecutorial misconduct during his closing argument by usurping the trial court's sole function to instruct the jury on the law which they 'should and/or should-not' apply to findings of fact, in determining the weight or sufficiency of evidence, to reach their verdicts regarding the indictment.

[IX.] Mr. Hubbard was denied due process of law and a fair trial, when the trial court erroneously provided the jury with redacted written copies of the court's orally delivered jury instruction and failed to advise the jury, upon reported inability to reach a verdict, that all further requests for jury instruction were, because of the court's previous instruction, prohibiting all written jury notes, to be strictly limited to oral jury re-instruction from the court.

[X.] **[**13]** The trial court erred in its imposition of sentence, upon the convictions.

**[*P14]** For ease of discussion, we will address defendant's assignments of error out of order.

### III. FIRST AND SEVENTH ASSIGNMENTS OF ERROR—SUFFICIENCY, MANIFEST WEIGHT, AND CONFRONTATION CLAUSE

**[\*P15]** Defendant's first assignment of error asserts that his convictions are against the manifest weight of the evidence presented at trial. Defendant fails to separately argue his first assignment of error, instead presenting one argument to support his first, second, third, fourth, fifth, and sixth assignments of error, in violation of *App.R. 16(A)(7)* and *12(A)(2)*. Although, pursuant to *App.R. 12(A)(2)*, we may choose to disregard any assignment of error that an appellant fails to separately argue, in the interest of justice, we have thoroughly reviewed the record before us and conclude that the manifest weight of the evidence supports defendant's convictions. Defendant's seventh assignment of error asserts the trial court erred in overruling his *Crim.R. 29* motion for acquittal, made at the close of the State's evidence, and that the State violated his *Sixth Amendment* right to confront the witnesses against him.

A. *Sufficiency & Manifest* **[\*\*14]** *Weight*

**[\*P16]** *HN1* Pursuant to *Crim.R. 29(A)*, a court "shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Because a *Crim.R. 29* motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to *Crim.R. 29* motions as we use in reviewing the sufficiency of the evidence." *State v. Hernandez, 10th Dist. No. 09AP-125, 2009 Ohio 5128, ¶ 6*; *State v. Tenace, 109 Ohio St.3d 255, 2006 Ohio 2417, ¶ 37, 847 N.E.2d 386*.

**[\*P17]** *HN2* Whether evidence is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins, 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1997)*. Sufficiency is a test of adequacy. *Id.* The evidence is construed in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus*; *State v. Conley, 10th Dist. No. 93AP387, 1993 Ohio App. LEXIS 6050 (Dec. 16, 1993)*. When reviewing the sufficiency of the evidence the court does not weigh the credibility of the witnesses. *State v. Yarbrough, 95 Ohio St.3d 227, 2002 Ohio 2126, ¶ 79, 767 N.E.2d 216*.

**[\*P18]** **[\*\*15]** *HN3* Sufficiency of the evidence and manifest weight of the evidence are distinct concepts; they are "quantitatively and qualitatively different." *Thompkins at 386*. When presented with a manifest weight argument, we engage in a limited weighing of evidence to determine whether sufficient competent, credible evidence permits reasonable minds to find guilt beyond a reasonable doubt. *Conley, Thompkins at 387* (noting that *HN4* "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"). In the manifest weight analysis the appellate court considers the credibility of the witnesses and determines whether the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*, quoting *State v. Martin, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1983)*. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. *State v. DeHass, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus*. The jury may take **[\*\*16]** note of any inconsistencies and resolve them accordingly, "believ[ing] all, part or none of a witness's testimony." *State v. Raver, 10th Dist. No. 02AP-604, 2003 Ohio 958, ¶ 21*, citing *State v. Antill, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964)*.

**[\*P19]** The jury found defendant guilty of attempted murder. *HN5* To prove attempted murder, the State had to demonstrate that defendant purposely engaged in conduct which, if successful, would have caused Keys' death. *R.C. 2903.02(A)* and *2923.02(A)*. A person acts purposely when it is his or her specific intention to cause a certain result. *R.C. 2901.22(A)*.

**[\*P20]** The jury also found defendant guilty of murder, finding defendant caused McGrath's death as a proximate result of committing or attempting to commit a felonious assault. *See R.C. 2903.02(B)*. *HN6* Felonious assault under *R.C. 2903.11* prohibits any person from either knowingly causing serious physical harm to another, or

causing or attempting to cause physical harm to another by a means of a deadly weapon. A person acts knowingly, regardless of his purpose, when "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." *R.C. 2901.22(B)*.

 **[*P21]**  The jury also found defendant guilty  **[**17]** of the firearm specifications relative to each crime. *HN7* *R.C. 2941.145* provides for a three-year mandatory prison term if the offender "had a firearm on or about the offender's person * * * while committing the offense and displayed the firearm * * * or used it to facilitate the offense."

 **[*P22]**  The State's evidence indicated that, after McCurdy threw the cement block through defendant's window, defendant stepped out onto his porch with a Hi-Point 45- automatic pistol, pointed his firearm "[t]owards the group" of people congregating in front of 396 Morrison Avenue, and fired five shots in rapid succession. (Tr. 224.) Fife stated that defendant held his arm "straight out in front" as he pulled the trigger, directing the shots "[d]own the street into [the] group" of people. (Tr. 226-27, 246.) Fife affirmed that defendant "was not pointing the gun down" or "up in the sky" when he pulled the trigger. (Tr. 307-08.) One of the bullets from defendant's gun hit McGrapth in the back, causing his death. When defendant was shooting his gun, Keys "start[ed] screaming that she got shot in the foot." (Tr. 546-47.) Detective Stephen Glasure went to the hospital after the incident and spoke with Keys, observing  **[**18]** that Keys "had been shot in the foot." (Tr. 679.)

 **[*P23]**  *HN8* "A person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts." *State v. Carter, 72 Ohio St.3d 545, 554, 1995 Ohio 104, 651 N.E.2d 965 (1995)*. *See also* *State v. Robinson, 161 Ohio St. 213, 118 N.E.2d 517 (1954), paragraph five of the syllabus*. "'[A] firearm is an inherently dangerous instrumentality, the use of which is likely to produce death.'" *State v. Seiber, 56 Ohio St.3d 4, 14, 564 N.E.2d 408 (1990)*, quoting *State v. Widner, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982)*. When a person fires a gun into a group of people, one can infer intent to cause death. *See State v. Turner, 10th Dist. No. 97AP-709, 1997 Ohio App. LEXIS 6021 (Dec. 30, 1997)*, quoting *State v. Brown, 8th Dist. No. 68761, 1996 Ohio App. LEXIS 801 (Feb. 29, 1996)* (finding sufficient evidence of intent to kill when defendant fired a gun from an automobile at a group of individuals because "[t]he act of pointing a firearm and firing it in the direction of another human being is an act with death as a natural and probable consequence"); *State v. Hill, 8th Dist. No. 87645, 2006 Ohio 6425, ¶ 16* (finding the defendant acted purposely because "[w]hen a  **[**19]** person shoots into a retreating crowd of people, it can be inferred that he intended to cause a certain result"); *State v. Ivory, 8th Dist. No. 83170, 2004 Ohio 2968, ¶ 6*, quoting *State v. Jordan, 8th Dist. No. 73364, 1998 Ohio App. LEXIS 5571 (Nov. 25, 1998)* (noting that "'[f]iring a gun in a person's direction is sufficient evidence of felonious assault,'" and that "'[e]ven firing a weapon randomly at victims arguably within range of the shooter is sufficient to demonstrate actual intent to cause physical harm'").

 **[*P24]**  Construing the evidence in favor of the State, we conclude the evidence was sufficient to allow the jury to infer that defendant acted with the intention of causing death when he fired his gun into a crowd of people standing down the street from his house. Such evidence also supports the inference that defendant knowingly attempted to cause physical harm to another by firing his weapon into the crowd. As such, the trial court properly overruled defendant's *Crim.R. 29* motion.

 **[*P25]**  The manifest weight of the evidence also supported defendant's convictions. The witness from 396 Morrison Avenue testified that defendant was the shooter and Fife testified that defendant held his arm straight out and fired towards  **[**20]** the group. Defendant testified that he fired warning shots "to the side and down," towards the abandoned house next door, explaining that he had "no intentions of [any] one getting hurt" and was not "counting on a ricochet." (Tr. 1200, 1203.) The jury was under no obligation to accept defendant's testimony as truthful. *See Carter at 554*.

 **[*P26]**  The trial court evidence provided the jurors with reasons to find defendant's testimony less than credible. Immediately after the shooting, defendant went upstairs to the top level of his house and changed his clothes. During defendant's video recorded interview with detectives from the night of the incident, which the State played for the jury, defendant steadfastly denied any involvement in the shooting. Defendant stated he was not present when the shooting occurred, explaining that "by the time [he] got in the house, the police had already, you know,

showed up." (Tr. 901.) The detectives suggested to defendant that the shooting could have occurred in self-defense, but defendant remained adamant that he "didn't shoot nobody," that he "didn't fire a pistol." (Tr. 912.) Even when detectives told defendant that they had swabbed his hands for gunshot **[\*\*21]** primer residue, defendant still stated that he had not fired a gun that day. The detectives asked defendant where the gun was located in his house and defendant told the detectives there was no gun in his house. When defendant took the stand at trial he admitted to lying to the detectives during his interview. The jury was entitled to infer consciousness of guilt from defendant's lies. *State v. Williams, 99 Ohio St.3d 493, 2003 Ohio 4396, ¶ 54, 794 N.E.2d 27*, citing *State v. Johnson, 46 Ohio St.3d 96, 100, 545 N.E.2d 636 (1989)*.

**[\*P27]** *HN9* Although, under a manifest weight of the evidence analysis, we are able to consider the credibility of the witnesses, "in conducting our review, we are guided by the presumption that the jury, * * * is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Tatum, 10th Dist. No. 10AP-626, 2011 Ohio 907, ¶ 5*, citing *Seasons Coal Co., Inc. v. Cleveland, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984)*. Engaging in the limited weighing of the evidence which we are permitted, we cannot say the jury clearly lost its way when it found defendant guilty of murder and attempted murder, and **[\*\*22]** the attendant firearm specifications, beyond a reasonable doubt. Accordingly, we find that the manifest weight of the evidence supports defendant's convictions.

B. *Confrontation Clause*

**[\*P28]** Defendant also asserts under his seventh assignment of error that the State deprived him of his constitutional right to confront the witnesses against him by failing to compel Keys to testify. Defendant contends that, although Keys was "subpoenaed and served by both sides in this case," because the State did not call her to testify, she was "'unavailable' for the Defense to cross examine." (Appellant's brief, 26.)

**[\*P29]** *HN10* The *Sixth Amendment to the United States Constitution*, in its *Confrontation Clause*, provides that: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The *Confrontation Clause* bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)*. Thus, if the hearsay evidence sought to be admitted comprises testimony from an absent witness, who cannot be cross-examined **[\*\*23]** or observed face-to-face by the trier of fact, the *Confrontation Clause* limits the admission of that hearsay evidence. *State v. Keairns, 9 Ohio St.3d 228, 229, 9 Ohio B. 569, 460 N.E.2d 245 (1984)*. The *Confrontation Clause* does not apply to nontestimonial hearsay. *State v. Cassell, 10th Dist. No. 08AP-1093, 2010 Ohio 1881, ¶ 24*, citing *Crawford at 68*.

**[\*P30]** Defendant contends that Keys' "'out of court assertions' were continuously allowed into the trial record, via illicit hearsay from other witnesses." (Appellant's brief, 27.) Defendant does not provide a citation to the transcript to support this assertion, does not indicate what hearsay statements were allowed into the record, and fails to allege that such statements were testimonial. Because the State did not seek to introduce testimonial hearsay statements from Keys, the State did not violate defendant's *Sixth Amendment* right to confront the witnesses against him. Defendant's contentions regarding the *Confrontation Clause* lack merit.

**[\*P31]** Based on the foregoing, defendant's first and seventh assignments of error are overruled.


## IV. SECOND, THIRD, FOURTH, FIFTH, SIXTH, AND NINTH ASSIGNMENTS OF ERROR—JURY INSTRUCTIONS

**[\*P32]** Defendant's second, third, fourth, fifth, and sixth assignments **[\*\*24]** of error collectively assert that the trial court erred in failing to instruct the jury on self-defense, defense of others, the castle doctrine, duress, mistake, accident, transferred intent, and the potential lesser included offenses of voluntary manslaughter, involuntary manslaughter, reckless homicide, negligent homicide, and aggravated assault. Defendant's ninth assignment of

error asserts that the trial court erred when it provided the jury with redacted written copies of the court's orally delivered jury instruction.

[*P33] Defendant's sole argument in support of his first through sixth assignments of error focuses on the trial court's failure to instruct the jury on self-defense. Defendant does not present an argument to support his fifth assignment of error, regarding the various lesser-included offenses, noting only that the trial court plainly erred in refusing "to instruct on lesser included offenses." (Appellant's brief, 25.)

[*P34] *HN11* An appellant must support their assignments of error with an argument, which includes citation to legal authority. *App.R. 16(A)(7).* "An appellant bears the burden of affirmatively demonstrating error on appeal. * * * It is not the duty of this court to construct [**25] legal arguments in support of an appellant's appeal." *Camp v. Star Leasing Co., 10th Dist. No. 11AP-977, 2012 Ohio 3650, ¶ 67.* Indeed, appellate courts may not construct legal arguments in support of an appellant's appeal. *Reid v. Plainsboro Partners, III, 10th Dist. No. 09AP-442, 2010 Ohio 4373, ¶ 22,* citing *State ex rel. Petro v. Gold, 166 Ohio App.3d 371, 2006 Ohio 943, ¶ 94, 850 N.E.2d 1218 (10th Dist.).* Under *App.R. 12(A)(2),* we may choose to disregard any assignment of error that an appellant fails to separately argue. *See Summit Cty. Children Servs. Bd. v. State Personnel Bd. of Rev., 10th Dist. No. 10AP-780, 2011 Ohio 2543, ¶ 28.* Although defendant fails to present an argument to support his fifth assignment of error in his brief, at oral argument, this court encouraged both parties to present arguments regarding the trial court's failure to instruct the jury on the lesser-included offense of reckless homicide. As such, in the interest of justice, we will address defendant's fifth assignment of error only as it relates to reckless homicide. Pursuant to *App.R. 12(A)(2),* we summarily overrule the remainder of defendant's fifth assignment of error, which defendant fails to support with an argument [**26] in his brief.

A. *Reckless Homicide*

[*P35] Defendant failed to timely request an instruction on any lesser-included offense in the trial court. *HN12* Absent plain error, a party forfeits error concerning jury instructions if the party fails to object before the jury retires. *State v. Jackson, 92 Ohio St.3d 436, 444, 2001 Ohio 1266, 751 N.E.2d 946 (2001)*; *Crim.R. 30(A).* However, where the failure to request a jury instruction is the result of a deliberate, tactical decision on the part of trial counsel, it is not plain error. *State v. McDowell, 10th Dist. No. 10AP-509, 2011 Ohio 6815,* citing *State v. Clayton, 62 Ohio St.2d 45, 47-48, 402 N.E.2d 1189 (1980).*

[*P36] *HN13* According to the plain error doctrine, enunciated in *Crim.R. 52(B),* plain errors or defects affecting substantial rights may be noticed even though they were not brought to the attention of the court. The rule places three limitations on a reviewing court's decision to correct the error, despite the absence of a timely objection at trial. *State v. Barnes, 94 Ohio St.3d 21, 27, 2002 Ohio 68, 759 N.E.2d 1240 (2002).* First, there must be an error, i.e., a deviation from a legal rule. *Id.* Second, the error must be plain. To be "plain" within the meaning of *Crim.R. 52(B),* the error must be an "obvious" defect in the proceedings. [**27] *Id.* And third, the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *Id.* "Even if a forfeited error satisfies these three prongs, however, *Crim.R. 52(B)* does not demand that an appellate court correct it. *Crim.R. 52(B)* states only that a reviewing court 'may' notice plain forfeited errors." *Id.* The Supreme Court of Ohio has admonished courts "to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.,* quoting *State v. Long, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.*

[*P37] *HN14* An offense is a lesser-included offense of another where: (1) the offense carries a lesser penalty; (2) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (3) some element of the greater offense is not required to prove commission of the lesser offense. *State v. Deem, 40 Ohio St.3d 205, 209, 533 N.E.2d 294 (1988).* The jury instruction on a lesser included offense must be given when "sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find [**28] the defendant guilty on a lesser included * * * offense." (Emphasis sic.) *State v. Shane, 63 Ohio St.3d 630, 632-33, 590 N.E.2d 272 (1992).* Thus, a jury instruction on a lesser-included offense is not required unless the evidence presented at trial would reasonably support both an acquittal on the crime charged

and a conviction on the lesser-included offense. *State v. Freeman, 10th Dist. No. 07AP-337, 2007 Ohio 6859, ¶ 14*, citing *State v. Carter, 89 Ohio St.3d 593, 2000 Ohio 172, 734 N.E.2d 345 (2000)*. In making this determination, "[t]he court must view the evidence in the light most favorable to the defendant." *State v. Campbell, 69 Ohio St.3d 38, 47-48, 1994 Ohio 492, 630 N.E.2d 339 (1994)*; *State v. Wilkins, 64 Ohio St.2d 382, 388, 415 N.E.2d 303 (1980)*.

[*P38] *HN15* The offense of reckless homicide provides that "[n]o person shall recklessly cause the death of another." *R.C. 2903.041(A)*. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." *R.C. 2901.22(C)*. Felony murder premised on felonious assault, as defined above, requires that the defendant act knowingly.

[*P39] *HN16* Pursuant to the *Deem* test, reckless homicide is a lesser included offense [**29] of felony murder because: (1) a felony murder conviction carries a prison term of 15 years to life, while reckless homicide, a third degree felony, carries a maximum prison sentence of three years, *see R.C. 2903.041(B)*, *2929.14(D)(3)(b)* and *2929.02(B)(1)*; (2) one cannot knowingly cause the death of another as the result of committing or attempting to commit a felonious assault without also recklessly causing the death of another; and (3) in order to prove reckless homicide the state need not establish that the defendant acted knowingly. *See also State v. Colvin, 9th Dist. No. 26063, 2012 Ohio 4914, ¶ 17*.

[*P40] Defendant explained that he fired five warning shots down towards the ground because he had "a burst of adrenaline, scared, * * * it was just a rapid bah, bah, bah, just, you all stop, back up." (Tr. 1206-07.) Defendant repeatedly stated during his testimony that he did not intend to harm or shoot anyone when he fired his gun.

[*P41] "However, *HN17* a defendant's own testimony that he did not intend to kill his victim does not entitle him to a lesser-included offense instruction." *State v. Grube, 4th Dist. No. 12CA7, 2013 Ohio 692, ¶ 38, 987 N.E.2d 287*, citing *State v. Wright, 4th Dist. No. 01CA2781, 2002 Ohio 1462*. [**30] Even though the defendant's own testimony may constitute some evidence supporting a lesser offense, if the evidence on whole does not reasonably support an acquittal on the murder offense and a conviction on a lesser offense, the court should not instruct on the lesser offense. *Id*., citing *Campbell at 47*; *Shane at 632-33*; *Wright*. "To require an instruction to be given to the jury every time 'some evidence,' however minute, is presented going to a lesser included * * * offense would mean that no trial judge could ever refuse to give an instruction on a lesser included * * * offense." *Shane at 633*.

[*P42] In *Wright*, the court found the trial court had abused its discretion by refusing to instruct the jury on the lesser-included offense of reckless homicide. The defendant in *Wright* testified that, when his uncle and family friend began to fight, he "shot warning shots toward the embankment" separating the alley from the yard, in an attempt to stop the fight, explaining that he "did not intend to shoot or kill anyone." *Id. at ¶ 8, 14, 35*. The defendant's testimony, however, "was [not] the only evidence of a lesser intent" because "[a]n [**31] independent witness * * * supported [defendant's] testimony" that defendant "was aiming at an embankment when he fired the gun." *Id. at ¶ 35, 37*. The court also found that "the distance between the recovered bullets and the fact that two to four bullets were never recovered may support an inference that [defendant's] shots were not directed at" the defendant's uncle and friend, who were fighting on the ground. *Id. at ¶ 37*. The court concluded that the record contained "testimony and physical evidence from which a jury could reasonably conclude that Wright acted recklessly, but not purposely." *Id. at ¶ 37*. *See also Grube at ¶ 42*.

[*P43] Unlike *Wright*, in this case, there is no independent testimony or physical evidence to corroborate defendant's statements that he fired warning shots towards the ground. Fife, the only individual who could see defendant's arm as he was shooting, stated that defendant held his arm straight out in front as he fired towards the group standing in front of 396 Morrison Avenue. Defendant fired five shots from his gun, and the only bullet recovered by police was the one lodged inside McGrath's body. Detective Sheppard stated that he instructed the other detectives [**32] to search the area between 422 and 396 Morrison Avenue in a "grid search" fashion, but the detectives did not discover any other spent bullets. (Tr. 978.) The fact that police were unable to recover another bullet from the scene supports the inference that defendant fired towards the group at 396 Morrison Avenue

because, if defendant had fired down towards the ground, presumably officers would have found spent bullets in the vicinity of defendant's house or the abandoned house next door.

**[\*P44]** The coroner testified that the bullet entered McGrapth's body travelling "slightly upward" and fractured McGrapth's second rib and collarbone. (Tr. 801.) The bullet recovered from McGrapth's body was deformed, and on cross-examination, defense counsel asked the coroner if the bullet could have become deformed "from perhaps a ricochet?" (Tr. 814.) The coroner responded "[i]t would be deformed from hitting a bone," but on further questioning stated it was "possible" that the bullet became deformed by "striking an object before it entered the body." (Tr. 814.) Such equivocal testimony, however, does not support defendant's statement that he was firing at the ground where the evidence demonstrated that **[\*\*33]** defendant fired towards the group of people.

**[\*P45]** The neighborhood surrounding Morrison Avenue was a populated, urban neighborhood where individuals had been outside fighting with one another throughout the night. In response to defense counsel's questions, defendant stated that he did not see Bronaugh, McGrapth, or Keys when he fired his weapon. Defendant admitted, however, that when he returned home only moments before the shooting, he saw "a group of people carousing and gathering," on Morrison Avenue, stating "it was a few walking up the street and there was a few in front of my home." (Tr. 1183.) Fife, who lived at 430 Morrison Avenue, stated that from her "vantage point" she saw "more than eight" people standing in the general vicinity of "either 408 and 412 or 402 and 406" Morrison Avenue. (Tr. 291.) As Fife could see the group of people standing down the street, and defendant admitted to seeing people out on the street, the jury could only reasonably conclude that defendant would have been able to see the group standing in front of 396 Morrison Avenue when he fired his gun. The photographs of the incident also indicate that, even if defendant fired in the vicinity of the green trash **[\*\*34]** can in front of the abandoned property next door, defendant was admittedly firing in the direction of the individuals standing in front of 396 Morrison Avenue. (State's exhibit Nos. 86, 33, 34.) *HN18* "Shooting a gun in a place where one or more persons risk injury supports an inference defendant acted knowingly." *State v. Whatley, 10th Dist. No. 95APA10-1375, 1996 Ohio App. LEXIS 1952 (May 14, 1996). See also State v. Rawlins, 4th Dist. No. 97CA2539, 1998 Ohio App. LEXIS 6388 (Dec. 24, 1998).* As such, although defendant's testimony constituted some evidence which could support a conviction on reckless homicide, viewing the totality of the evidence presented at trial, we conclude that the jury could not reasonably have acquitted defendant on the felony murder charge.

**[\*P46]** The evidence in the case revealed that defendant fired five shots in the direction of a group of people standing down the street from his house, and hit two individuals in the group. On such facts, the trial court's failure to instruct the jury on reckless homicide did not create a manifest miscarriage of justice, and thus did not rise to the level of plain error.

B. *Self-Defense/Castle Doctrine*

**[\*P47]** Defendant filed a request in the trial court for additional and/or supplemental jury **[\*\*35]** instructions regarding self-defense, the castle doctrine, accident, mistake of fact, and transferred intent. The trial court denied defendant's request for supplemental jury instructions, noting that the evidence presented at trial did not support a self-defense instruction.

**[\*P48]** *HN19* Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the fact finder. *State v. Comen, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus; Columbus v. Aleshire, 187 Ohio App.3d 660, 2010 Ohio 2773, ¶ 6, 933 N.E.2d 317 (10th Dist.).* A defendant in a criminal case is entitled only to have the law stated correctly by the trial court, not to have his proposed jury instructions presented to the jury. *Columbus v. Harbuck, 10th Dist. No. 99AP-1420, 2000 Ohio App. LEXIS 5543 (Nov. 30, 2000),* citing *State v. Snowden, 7 Ohio App.3d 358, 363, 7 Ohio B. 458, 455 N.E.2d 1058 (10th Dist.1982).* Where requested jury instructions are correct statements of the law as applied to the facts of the case, they should generally be given. *Id.,* citing *Murphy v. Carrollton Mfg. Co., 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991).* A court reviewing a trial court's refusal to submit to the jury a requested instruction **[\*\*36]** must determine whether the trial court's decision constituted "an abuse of discretion under the facts and circumstances of the case." *State v. Wolons, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989).*

[*P49] HN20 Self-defense is an affirmative defense which the accused has the burden to prove by a preponderance of the evidence. *R.C. 2901.05(A)*; *State v. Smith, 10th Dist. No. 04AP-189, 2004 Ohio 6608, ¶ 16.* To establish self-defense through the use of deadly force, a defendant must prove that: (1) he was not at fault in creating the situation giving rise to the affray, (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force, and (3) he must not have violated any duty to retreat or avoid the danger. *State v. Robbins, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.* A defendant may only use as much force as is reasonably necessary to repel the attack. *State v. Harrison, 10th Dist. No. 06AP-827, 2007 Ohio 2872, ¶25*, citing *State v. Jackson, 22 Ohio St.3d 281, 22 Ohio B. 452, 490 N.E.2d 893 (1986)*. The elements of self-defense are cumulative, such that, "[i]f the defendant fails to prove *any one* of these elements * * * he has failed [**37] to demonstrate that he acted in self-defense." (Emphasis sic.) *Id. at 284*.

[*P50] HN21 "Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault." *State v. Moss, 10th Dist. No. 05AP-610, 2006 Ohio 1647, ¶ 13*. See *State v. Wenger, 58 Ohio St.2d 336, 340, 390 N.E.2d 801 (1979)*. One who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense. *Moss at ¶ 13*.

[*P51] In most circumstances, "a person may not kill in self-defense if he has available a reasonable means of retreat from the confrontation." *State v. Williford, 49 Ohio St.3d 247, 250, 551 N.E.2d 1279 (1990)*, citing *Jackson at 283-84*. When a person is attacked in their home, however, they have no duty to retreat before using force in self-defense. *R.C. 2901.09(B)*. Commonly referred to as the castle doctrine, this exception to the duty to retreat "derives from the doctrine that one's home is one's castle and one has a right to protect it and those within it from intrusion or attack." *State v. Thomas, 77 Ohio St.3d 323, 327, 1997 Ohio 269, 673 N.E.2d 1339 (1997)*, citing Annotation, Homicide: Duty to Retreat Where Assailant is Social Guest on Premises, 100 A.L.R.3d 532, 533 (1980).

[*P52] [**38] Effective September 9, 2008, HN22 the Ohio General Assembly further expanded the reach of the castle doctrine by creating a presumption that a person has acted in self-defense "when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of * * * or has unlawfully and without privilege to do so entered, the residence" of the defendant. *R.C. 2901.05(B)(1)*. Thus, in Ohio "a person is presumed to have acted in self-defense," and may use deadly force, "when attempting to expel or expelling another from their home who is unlawfully present." *State v. Johnson, 8th Dist. No. 92310, 2010 Ohio 145, ¶ 18*.

[*P53] Defendant's testimony demonstrated that he was not entitled to an instruction on self-defense. Defendant stated that he grabbed his gun from behind the mantle, walked out onto his front porch where he saw people approaching him from his yard, and fired his gun "to the side and down to warn them, back, just back up." (Tr. 1199-1200.) Defendant stated that he did not intend to hurt or kill anyone, emphasizing that, if he did intend to harm someone, "the people in [his] yard would have been [**39] hurt." (Tr. 1200.)

[*P54] HN23 "'By its terms, self-defense presumes intentional, willful use of force to repel force or to escape force.'" *State v. Johnson, 10th Dist. No. 06AP-878, 2007 Ohio 2792, ¶ 41* ("Johnson I"), quoting *State v. Williams, 1st Dist. No. C810450, 1982 Ohio App. LEXIS 12824 (July 28, 1982)*, citing *State v. Champion, 109 Ohio St. 281, 2 Ohio Law Abs. 68, 2 Ohio Law Abs. 87, 142 N.E. 141 (1924)*. A defendant claiming self-defense "concedes he had the purpose to commit the act, but asserts that he was justified in his actions." *State v. Barnd, 85 Ohio App.3d 254, 260, 619 N.E.2d 518 (3d Dist.1993)*. Thus, when an individual testifies that they did not intend to cause harm, such testimony prevents the individual from claiming self-defense. *See Johnson I at ¶ 42-43* (where the defendant claimed that "the firearm discharged as a result of a struggle for the firearm and not as a result of appellant's intentional and willful act of discharging the firearm" the defendant's "own testimony * * * belie[d] the application of self-defense to the shooting of [the victim]"); *State v. Herrington, 9th Dist. No. 25150, 2010 Ohio 6426, ¶ 13* (because the defendant testified that "he did not have the intent to shoot or kill during the incident," such testimony "was inconsistent with a claim of [**40] self-defense"). Defendant's testimony that he did not fire his gun with the

intention of harming anyone prevented defendant from claiming that he shot his gun in an attempt to repel force with force.

**[*P55]** Similarly, defendant was not entitled to the presumption of self-defense in *R.C. 2901.05(B)(2)*. Defendant claimed that, when he fired his gun, there were people approaching him from his "yard coming closer," that there was "a small mob, a mass of people right here in my front yard," that these individuals were "not on the city concrete * * * they [were] * * * in our grass, and up our sidewalk." (Tr. 1195-96, 1203.) *HN24* *R.C. 2901.05* creates a rebuttable presumption that a defendant acted in self-defense when someone is "in the process of unlawfully * * * entering, or has unlawfully * * * entered, the residence" of the defendant. *R.C. 2901.05(B)(1)*. A residence means a "building or conveyance of any kind that has a roof over it," and includes "an attached porch." *R.C. 2901.05(D)(2)*. Although defendant testified that people were in his yard, there was no evidence presented at trial to establish that anyone was in the process of unlawfully entering onto defendant's porch when defendant shot **[**41]** his gun. *Compare State v. Darby, 10th Dist. No. 10AP-416, 2011 Ohio 3816, ¶ 37-38* (finding the evidence did not "support an instruction under *R.C. 2901.05(B)(1)* * * * because there was no evidence presented to establish that [the victim] was in the process of unlawfully * * * entering [the defendant's] residence," where the defendant's testimony "establishe[d] that [the victim] was neither in appellant's residence, nor on the stoop, nor even at the base of the stairs leading to the stoop" as the victim was "on the sidewalk outside appellant's residence"); *State v. Clark, 6th Dist. No. F-10-025, 2011 Ohio 6310, ¶ 27* (defendant was not entitled to an instruction on the presumption of self-defense under *R.C. 2901.05(B)* because the altercation "occurred on the patio and not in the residence or dwelling as defined by the statute"). Because there was no evidence that anyone was attempting to unlawfully enter defendant's residence when he fired his gun, the facts did not support an instruction on the presumption of self-defense in *R.C. 2901.05(B)(1)*.

**[*P56]** Defendant asserts that the instant case is similar to *State v. Kozlosky, 195 Ohio App.3d 343, 2011 Ohio 4814, 959 N.E.2d 1097 (8th Dist.)*. In *Kozlosky*, the court **[**42]** concluded that the defendant satisfied the elements of self-defense, as altered by the castle doctrine, where the evidence showed that the victim entered the defendant's "home * * * without permission," "ignored all demands to leave," started beating the defendant's female tenant, and the defendant shot the victim after the victim reached back for his gun. *Id. at ¶ 16-29*. Here, there was no evidence that anyone entered defendant's home and defendant did not shoot at anyone who was invading his home. While defendant asserts that "entry was accomplished by an apparently armed assailant breaking out a portion of the occupants, in order to facilitate forced entry and felonious assault of those inside," there was no evidence to establish that either McCurdy or Bronaugh were armed or that they broke defendant's window in an attempt to gain entry to the house. (Appellant's brief, 21.) Rather, the women ran back down the street towards 396 Morrison Avenue after breaking defendant's window. While the witnesses inside defendant's house testified to hearing two gunshots when the cement block came through the window, there was no evidence that those shots were directed towards defendant's house. **[**43]** Detective Sheppard did not observe "any bullet strikes or anything on the house," and defense witness Latoya Danielle Bradley, explained that, in the area surrounding Morrison Avenue, "there is gunfire all the time." (Tr. 977-78; 1061.)

**[*P57]** Because the evidence presented at trial was insufficient to support a jury instruction on self-defense, defense of others, or the castle doctrine, the trial court did not abuse its discretion in failing to so instruct the jury.

C. *Other Requested Instructions*

1. Accident

**[*P58]** Defendant claims the trial court erred by refusing to instruct the jury on the defense of accident. At oral argument, defense counsel asserted that an instruction on accident was appropriate in this case because defendant intended to shoot into the ground, rendering McGrapth's death and Keys' injury accidents.

**[*P59]** *HN25* Accident and self-defense are generally "inconsistent by definition," as self-defense presumes intentional, willful use of force to repel force or escape force, while accident is "exactly the contrary, wholly unintentional and unwillful." *Barnd at 260*; *Champion at 286-87*. "Accident" is not an affirmative defense, but "a factual defense that denies that the accused acted with the **[**44]** degree of culpability or mens rea required for the

offense." *State v. Vance, 5th Dist. No. 2007-COA-035, 2008 Ohio 4763, ¶ 98*, citing *State v. Bayes, 2d Dist. No. 00CA0032, 2000 Ohio App. LEXIS 6180 (Dec. 29, 2000)*. *See also State v. Atterberry, 119 Ohio App.3d 443, 447, 695 N.E.2d 789 (8th Dist.1997)* (accident "is an argument that supports a conclusion that the state has failed to prove the trial element of the crime beyond a reasonable doubt").

 **[*P60]** Although defendant claimed that he fired his gun toward the ground without the intention of harming anyone, the evidence indicated that he retrieved the gun which he had placed behind his mantel earlier in the day, walked out onto his porch, and fired the gun in the direction of a group of people. Such evidence does not support an accident instruction which requires evidence that the defendant acted wholly unintentionally. *Compare State v. Johnson, 10th Dist. No. 08AP-652, 2009 Ohio 3383, ¶ 40* (finding an accident instruction appropriate where the defendant testified "that the gun accidently went off as he struggled with" the victim); *State v. Levonyak, 7th Dist. No. 05 MA 227, 2007 Ohio 5044, ¶ 101*.

 **[*P61]** Moreover, **HN26** a trial court does not commit prejudicial error in a criminal case when **[**45]** it fails to give a proposed instruction that is covered in the court's general charge to the jury. *State v. Sneed, 63 Ohio St.3d 3, 9-10, 584 N.E.2d 1160 (1992)*. Because the trial court properly instructed the jury regarding the elements of "knowingly" and "purposefully," if the jury had credited defendant's argument that an accident occurred, the jury would "'have been required to find [the defendant] not guilty * * * pursuant to the court's general instruction." *Johnson I at ¶ 63*, quoting *State v. Manbevers, 4th Dist. No. 93CA23, 1994 Ohio App. LEXIS 4523 (Sept. 28, 1994)*. *See State v. Fogler, 9th Dist. No. 08CA0004-M, 2008 Ohio 5927, ¶ 16*. As such, defendant has failed to establish any prejudice resulting from the trial court's refusal to instruct the jury on accident.

2. Duress

 **[*P62]** Defendant asserts the trial court failed to instruct the jury regarding duress. Defendant, however, did not request a duress instruction in the trial court and, accordingly, we review for plain error. **HN27 HN28** "Duress consists of any conduct which overpowers a person's will and coerces or constrains his performance of an act which he otherwise would not have performed." *State v. Grinnell, 112 Ohio App.3d 124, 144-45, 678 N.E.2d 231 (10th Dist.1996)*. "Consequently, one who, **[**46]** under the pressure of a threat from another person, commits what would otherwise be a crime may, under certain circumstances, be justified in committing the act and not be guilty of the crime." *Id.*

 **[*P63]** Although defendant testified that he felt "extreme duress" when he stepped out onto his porch with his gun, there was no evidence that another individual was using force to compel defendant to fire his gun. (Tr. 1198.) Defendant stated that he "stepped to that porch to protect [his] home and [his] family" because he was the "man of this home." (Tr. 1194.) Thus, defendant walked out onto his porch and fired his gun based on his own will and desire, and not as the result of a threat from someone else.

3. Mistake of Fact

 **[*P64]** Although defendant requested an instruction on mistake of fact in the trial court, defendant did not explain why he was requesting the instruction, and fails to present an argument to support this instruction on appeal. **HN29** Generally, mistake of fact is a defense if it negates a mental state required to establish an element of a crime, except that if the defendant would be guilty of a crime under facts as he believed them, then he may be convicted of that offense. *State v. Cooper, 10th Dist. No. 09AP-511, 2009 Ohio 6275, ¶ 9* **[**47]** , citing *State v. Pecora, 87 Ohio App.3d 687, 690, 622 N.E.2d 1142 (9th Dist.1993)*. Mistake of fact is widely recognized as a defense to specific intent crimes such as theft since, when the defendant has an honest purpose, such a purpose provides an excuse for an act that would otherwise be deemed criminal. *Id.*, citing *Farrell v. State, 32 Ohio St. 456 (1877)*. "Mistake of fact can, in an appropriate circumstance, negate either 'knowingly' or 'purposely.'" *Id.*, quoting *Snowden at 363*.

 **[*P65]** Based on our analysis of the case, the trial court did not abuse its discretion in failing to instruct the jury on mistake of fact, as the evidence did not demonstrate that defendant was mistaken about any fact when he fired his gun towards a crowd of people standing down the street from his house.

4. Transferred Intent

[*P66]  Defendant asserts the trial court erred in failing to instruct the jury regarding the doctrine of transferred intent. *HN30* The doctrine of transferred intent indicates that, where an individual is attempting to harm one person and as a result accidentally harms another, the intent to harm the first person is transferred to the second person and the individual attempting  [**48] harm is held criminally liable as if he both intended to harm and did harm the same person. *State v. Mullins, 76 Ohio App.3d 633, 636, 602 N.E.2d 769 (10th Dist.1992).* Defendant testified that he did not intend to harm anyone. Accordingly, the doctrine of transferred intent was inapplicable to this case and the trial court did not err in refusing to instruct the jury regarding transferred intent.

D. *Written Jury Instructions*

[*P67]  Defendant's ninth assignment of error states that the trial court erred when it provided the jury with redacted written copies of the court's orally delivered jury instruction. Defendant does not present an argument in his brief to support this assignment of error as required by *App.R. 16(A)(7)* and *12(A)(2).* The trial court initially instructed the jury orally, but following a request from the jurors for a definition of the crimes charged, the court stated it would give the jury a "copy of the jury instructions on the four counts." (Tr. 1315.)

[*P68]  *HN31* *Crim.R. 30(A)* provides that "[t]he court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury  [**49] for use during deliberations, and preserve those instructions for the record." Accordingly, the trial court did not err when it reduced its final instructions to writing and provided the jury with a copy.

[*P69]  Based on the foregoing, defendant's second, third, fourth, fifth, sixth, and ninth assignments of error are overruled.


## V. EIGHTH ASSIGNMENT OF ERROR—PROSECUTORIAL MISCONDUCT

[*P70]  Defendant's eighth assignment of error asserts the prosecutor engaged in prosecutorial misconduct during closing argument. Although defendant also notes in his brief a perceived "aura of judicial animosity toward the defense in this trial," alleging that the trial judge "closed his eyes and was incessantly 'humming' to himself during the entire trial," defendant's contentions regarding the judge's conduct do not correlate with any of defendant's assigned errors. (Appellant's brief, 29-30.) *HN32* Pursuant to *App.R. 12(A)(1)(b),* appellate courts must "[d]etermine [an] appeal on its merits on the assignments of error set forth in the briefs under *App. R. 16.*" Thus, appellate courts rule on assignments of error, not mere arguments. *Thompson v. Thompson, 196 Ohio App.3d 764, 2011 Ohio 6286, ¶ 65, 965 N.E.2d 377 (10th Dist.).* Accordingly,  [**50] we will not address defendant's arguments regarding the trial judge's conduct.

[*P71]  Regarding prosecutorial misconduct, defendant asserts, citing to pages 1251 and 1256 of the transcript, that the prosecutor "usurp[ed] the court's sole function at trial by 'pre-instructing' the jury (prior to the court's own instruction), as to what law they 'would, should, could' or 'would-not, should-not, could-not' consider during their deliberations." (Appellant's brief, 32.) During closing argument, the State noted that the case did not concern "a justifiable homicide," stating: "This is not a self-defense issue. It would be in the jury instruction if it [was]. So even though there is a whole line and series of questioning about that, that's not for your consideration." (Tr. 1251.) Defendant did not object to this statement. Defense counsel noted during closing argument that defendant stepped out onto his porch and fired his weapon because "[h]e thought his family was in danger," adding: "And you know what, the law doesn't require in these cases that you be correct." (Tr. 1256.) The State objected, noting defense counsel was "arguing self-defense," and the court sustained the objection. (Tr. 1256.)

[*P72]  [**51] *HN33* When reviewing allegations of prosecutorial misconduct, the test for appellate courts is whether the prosecutor's conduct was improper and, if so, whether that conduct prejudicially affected the substantial rights of the accused. *State v. Pilgrim, 184 Ohio App.3d 675, 2009 Ohio 5357, ¶ 57, 922 N.E.2d 248*

*(10th Dist.)* "'[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Wilkerson, 10th Dist. No. 01AP-1127, 2002 Ohio 5416, ¶ 38*, quoting *Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)*. Accordingly, prosecutorial misconduct will not be grounds for reversal unless the defendant has been denied a fair trial. *State v. Maurer, 15 Ohio St.3d 239, 266, 15 Ohio B. 379, 473 N.E.2d 768 (1984)*.

[*P73] *HN34* A prosecutor is afforded wide latitude in closing argument, which must be reviewed in its entirety in order to determine whether the challenged remarks prejudiced the defendant. *State v. Hill, 75 Ohio St.3d 195, 204, 1996 Ohio 222, 661 N.E.2d 1068 (1996)*. During closing argument, the State can summarize the evidence and draw conclusions as to what the evidence shows. *State v. Hand, 107 Ohio St.3d 378, 2006 Ohio 18, ¶ 116, 840 N.E.2d 151*. Because defense counsel did not object to the prosecutor's [**52] comment during closing argument, we review for plain error, asking whether "defendant would not have been convicted in the absence of the improper conduct." *State v. Saleh, 10th Dist. No. 07AP-431, 2009 Ohio 1542, ¶ 68*.

[*P74] Defendant made several comments during his testimony indicating a possible self-defense defense, noting that he "felt it was deadly force placed against me and my family," that there was "imminent danger right there," and that the individuals in his yard were "posing imminent danger with deadly force." (Tr. 1195, 1198, 1206.) *HN35* Where a defendant, through his testimony, indicates a possible self-defense argument, the prosecutor is entitled to comment on such evidence during closing. See *State v. Horn, 5th Dist. No. 2010 CA 0078, 2011 Ohio 2168, ¶ 39-43* (noting that although the defendant did not specifically raise self-defense, "because Appellant's own testimony was that he was scared and feared for his life," and that he thought the victim "was going to do something to [him]," the prosecutor's comments during closing argument "in contravention of self-defense" were not improper). Accordingly, the prosecutor's comment highlighting the absence of a self-defense instruction [**53] was not improper where defendant repeatedly tried to present a self-defense theory. Moreover, as our above analysis of the evidence indicates, defendant would have been convicted even in the absence of the prosecutor's comment.

[*P75] The prosecutor's comment during closing argument did not rise to the level of plain error. Defendant's eighth assignment of error is overruled.


## VI. TENTH ASSIGNMENT OF ERROR—SENTENCING

[*P76] Defendant's tenth assignment of error asserts that the trial court erred in its imposition of sentence. Defendant contends the trial court erred "by making *ORC 2929.14(E)(4)* findings, both as to the consecutive gun specifications and as to imposition of consecutive sentences." (Appellant's brief, 33.) Defendant further asserts that the trial court was obligated to merge "counts and/or gun specifications," because the "State had not met its burden of establishing a second or distinctly separate gunshot wound fired from [defendant's] firearm to the body of Candace Keys and/or to the body of Teddy McGrapth." (Appellant's brief, 33.)

A. *Merger*

[*P77] The jury found defendant guilty for the murder of McGrapth and found defendant guilty of felonious assault and attempted murder relative to Keys. [**54] Pursuant to the State's election, the court merged the felonious assault conviction into the attempted murder conviction. Defense counsel argued that the murder and attempted murder convictions, as well as the firearm specifications, should also merge because the bullet could have "passed through the foot of the victim, Candace Keys, and struck the pavement and ricocheted up and took the life of Mr. McGrapth." (Tr. 1341.) The court refused to merge the remaining convictions, noting that defendant's ricochet theory was "nothing more than speculation." (Tr. 1341.)

[*P78] *HN36* *R.C. 2941.25(A)* provides that, where a defendant's same conduct "can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." Where, however, "the defendant's conduct constitutes two or more offenses of dissimilar import" or "results in two or more offenses of the same or similar kind committed

separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." *R.C. 2941.25(B)*. When determining **[**55]** whether two offenses "are allied offenses of similar import subject to merger under *R.C. 2941.25*, the conduct of the accused must be considered." *State v. Johnson, 128 Ohio St.3d 153, 2010 Ohio 6314, 942 N.E.2d 1061, syllabus* ("*Johnson II*"). If the offenses are of similar import because the defendant committed them through the same conduct, the court then must ask whether the offenses were committed separately or with a separate animus. *Id. at ¶ 49-51*.

[*P79] Where a defendant harms multiple individuals through the same course of conduct, and each offense charged is defined in terms of conduct toward another, the offenses are of dissimilar import. *See State v. Jones, 18 Ohio St.3d 116, 118, 18 Ohio B. 148, 480 N.E.2d 408 (1985)* (finding the defendant could be sentenced for two counts of aggravated vehicular homicide, although both counts arose from one accident where two individuals died, because the charges were of "dissimilar import-the 'import' under *R.C. 2903.06* being each person killed"); *State v. Franklin, 97 Ohio St.3d 1, 2002 Ohio 5304, ¶ 48, 776 N.E.2d 26* (noting that, as arson is defined in terms of creating a substantial risk of harm to another, the defendant "caused six offenses of dissimilar import because six different people were placed **[**56]** at risk" when defendant set one structure on fire); *State v. Phillips, 8th Dist. No. 98487, 2013 Ohio 1443, ¶ 10* (noting that "by firing multiple shots at an occupied vehicle, * * * appellant attempted to purposely cause the death of each victim" thus the "offenses at issue [were] not allied offenses of similar import"). *See also Johnson II at ¶ 15*, quoting 1973 Legislative Service Commission comments to 1972 Am.Sub.H.B. No. 511.

[*P80] *HN37* The crimes of felony murder and attempted murder are both defined in terms of conduct towards another: they prohibit a defendant from causing or attempting to cause the death of another. Accordingly, because defendant harmed two separate individuals by his conduct, the murder and attempted murder convictions were of dissimilar import, and the trial court properly refused to merge these convictions.

[*P81] Defendant also contends that the trial court erred in failing to merge the firearm specifications. *HN38* When an offender is convicted of a felony and a firearm specification under *R.C. 2941.145*, *R.C. 2929.14(B)(1)(a)(ii)* requires the trial court to impose a three-year prison term on the offender. *R.C. 2929.14(B)(1)(b)* states that "[e]xcept as provided in division (B)(1)(g) **[**57]** of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction." *R.C. 2929.14(B)(1)(g)* provides:

> *HN39* If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

[*P82] Because defendant was sentenced for the crimes of murder and attempted murder, *R.C. 2929.14(B)(1)(g)* required the trial court to sentence defendant on the two most serious specifications. **[**58]** *See State v. Isreal, 12th Dist. No. CA2011-11-115, 2012 Ohio 4876, ¶ 71*. Accordingly, the trial court did not err in refusing to merge the firearm specifications.

B. *Consecutive Sentences*

[*P83] *R.C. 2929.14(C)(4)*, effective September 30, 2011, provides:

> *HN40* (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is

necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to *section 2929.16*, *2929.17*, or *2929.18 of the Revised Code*, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great **[**59]** or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**[*P84]** *HN41* Passed as part of 2011 Am.Sub.H.B. No. 86 ("H.B. 86"), *R.C. 2929.14(C)(4)* now requires a sentencing judge to make certain findings before imposing consecutive sentences. Section 11 of H.B. 86 acknowledges that the Supreme Court of Ohio in *State v. Foster, 109 Ohio St.3d 1, 2006 Ohio 856, 845 N.E.2d 470*, severed the former identical statute, concluding that judicial fact-finding which increased a defendant's total punishment through consecutive sentences violated a defendant's *Sixth Amendment* right to trial by jury. *See id. at ¶ 67*. The Supreme Court later concluded in *State v. Hodge, 128 Ohio St.3d 1, 2010 Ohio 6320, 941 N.E.2d 768*, that its decision in *Foster* was incorrect in light of the United States Supreme Court decision in *Oregon v. Ice, 555 U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009)*. The *Hodge* court found that *Ice* did not revive Ohio's former consecutive-sentencing statutory provisions in *R.C. 2929.14(E)(4)* **[**60]** and *2929.41(A)*, which were held unconstitutional in *Foster*. The court concluded that trial court judges were "not obligated to engage in judicial fact-finding prior to imposing consecutive sentences unless the General Assembly enacts new legislation requiring that findings be made." *Hodge at paragraph three of the syllabus*.

**[*P85]** Thus, *HN42* in H.B. 86, the General Assembly first repealed the former consecutive sentencing statute, *R.C. 2929.14(E)(4)*, and then revived the requirement that trial judges make certain findings prior to imposing consecutive sentences in *R.C. 2929.14(C)(4)*. *See* Sections 2, 11, and 12 of H.B. 86. H.B. 86 applies here because the court sentenced defendant on October 4, 2011, four days after the effective date of H.B. 86. *See State v. Wilson, 10th Dist. No. 12AP-551, 2013 Ohio 1520, ¶ 17*; *State v. Schirmer, 2d Dist. No. 25147, 2012 Ohio 5543, ¶ 10* (noting that H.B. 86 applied to defendant "because he was sentenced after its effective date").

**[*P86]** *HN43* *R.C. 2929.14(C)(4)* now requires the trial court to make three findings before imposing consecutive sentences: (1) that consecutive sentences are necessary to protect the public from the future crime or to punish the offender; (2) that **[**61]** consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the *subsections (a)*, *(b)*, or *(c)* apply. *See State v. Farnsworth, 7th Dist. No. 12 CO 10, 2013 Ohio 1275, ¶ 8*. The trial court is not required to give reasons explaining these findings, nor is the court required to recite any "magic" or "talismanic" words when imposing consecutive sentences. *Id.*, citing *State v. Frasca, 11th Dist. No. 2011-T-0108, 2012 Ohio 3746, ¶ 57*; *State v. Murrin, 8th Dist. No. 83714, 2004 Ohio 3962, ¶ 12*. Nevertheless, the record must reflect that the court made the findings required by the statute. *Id.*

**[*P87]** The trial court did not make any of the findings required by *R.C. 2929.14(C)(4)* before imposing consecutive sentences. The court simply announced the sentence, stating that defendant would serve all of the terms consecutively, "making the total sentence 28-years-to-life." (Tr. 1350.) Because the trial court failed to comply with *R.C. 2929.14(C)(4)*, by failing to make any of the required findings on the record before imposing consecutive sentences, we must vacate defendant's sentence and remand the case **[**62]** for resentencing. *See State v. Smith, 8th Dist. No. 98280, 2013 Ohio 576, ¶ 74* (trial court properly vacated the defendant's sentence and remanded for resentencing where the trial court "failed to comply with the mandate of H.B. 86 before imposing consecutive

sentences," because the trial court "failed to make a single finding on the record" merely stating "the term of the sentence on the record"); *Farnsworth at ¶ 10*.

 **[*P88]**  Based on the foregoing, defendant's tenth assignment of error is overruled as it relates to merger, but sustained as it relates to the imposition of consecutive sentences.


## VII. CONCLUSION

 **[*P89]**  Having overruled defendant's first, second, third, fourth, fifth, sixth, seventh, eighth, and ninth assignments of error, but having overruled in part and sustained in part defendant's tenth assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas in part, but vacate defendant's sentence and remand the case for resentencing. On remand, the trial court must determine whether consecutive sentences are appropriate under *R.C. 2929.14(C)(4)* and enter the proper findings on the record.

*Judgment affirmed in part and reversed in part; cause remanded*.

KLATT, P.J,  **[**63]** and DORRIAN, J., concur.

---

**End of Document**

## *State v. Lampe*

Court of Appeals of Ohio, First Appellate District, Hamilton County

June 13, 2003, Date of Judgment Entry on Appeal

APPEAL NO. C-020708

**Reporter**
2003-Ohio-3059 *; 2003 Ohio App. LEXIS 2732 **

STATE OF OHIO, Plaintiff-Appellee, vs. NEIL LAMPE, Defendant-Appellant.

**Notice: [**1]** THESE ARE NOT OFFICIAL HEADNOTES OR SYLLABI AND ARE NEITHER APPROVED IN ADVANCE NOR ENDORSED BY THE COURT. PLEASE REVIEW THE CASE IN FULL.

**Prior History:** Criminal Appeal From: Hamilton County Municipal Court. TRIAL NO. C-02CRB-30307.

**Disposition:** Trial court's judgment was affirmed.

# Core Terms

arrest, domestic violence, credibility, commission of the offense, weight of the evidence, reasonable ground, reasonable cause, telephone, arrive, van

# Case Summary

### Procedural Posture

The Hamilton County Municipal Court (Ohio) convicted defendant of domestic violence, in violation of *Ohio Rev. Code Ann. § 2919.25*. Defendant appealed.

### Overview

Defendant challenged his convictions, contending that: (1) it was against the manifest weight of the evidence; (2) the trial court erred by admitting hearsay evidence; and (3) the sheriff's department's mandatory-arrest policy in domestic-violence cases was unconstitutional. The appeals court disagreed. First, the credibility of the victim was for the trial court to decide. Even though it did not believe all of what the victim had said, it was not required to completely discount her testimony. It also believed that the officer's testimony corroborated the victim's. Second, evidence supported admission of the victim's excited utterances made when she called for emergency assistance immediately after she had been assaulted. She stayed on the telephone with the emergency operator until an officer arrived. The officer even testified that he had his cruiser's siren and lights activated, and was traveling 90 miles per hour to get to the scene because the incident sounded urgent. Third, defendant's constitutionality claims were not raised before the trial court, thus they were not addressed on appeal.

### Outcome
The judgment was affirmed.

# LexisNexis® Headnotes

Criminal Law & Procedure > Appeals > Standards of Review > General Overview

Evidence > Weight & Sufficiency

*HN1* When confronted with a challenge to the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all inferences, considers the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. To reverse on this basis, the appeals court must disagree with the factfinder's resolution of the conflicting evidence. Because the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact, the appeals court may exercise our power to grant a new trial only in exceptional cases.

Evidence > ... > Exceptions > Spontaneous Statements > General Overview

Evidence > ... > Exceptions > Spontaneous Statements > Criminal Proceedings

Evidence > ... > Exceptions > Spontaneous Statements > Excited Utterances

Evidence > ... > Hearsay > Rule Components > Statements

*HN2* The trial court's decision to admit a declaration as an excited utterance should not be disturbed on appeal if it was reasonable, because the determination reflects a factual finding about whether the declarant was sufficiently startled. There is also a temporal element to be met before a declarant's hearsay statement may be admitted under the excited-utterance exception found in *Ohio R. Evid. 803(2)*. The statement must be made while the declarant is still under the stress of the event and the statement may not be the result of reflective thought.

Criminal Law & Procedure > ... > Crimes Against Persons > Domestic Offenses > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

Criminal Law & Procedure > ... > Warrantless Searches > Stop & Frisk > Reasonable Suspicion

*HN3* *Ohio Rev. Code Ann. § 2935.03(B)* allows an arrest for domestic violence when the arresting officer has reasonable grounds to believe that the offense has been committed and reasonable cause to believe that a particular person has committed the offense. *Ohio Rev. Code Ann. § 2935.03(B)(3)(a)*. A written statement alleging that a certain person has committed domestic violence against the maker of the statement, or the arresting officer's personal knowledge and observations of the circumstances surrounding the alleged domestic violence, including any trustworthy information provided to the officer by the victim, constitutes reasonable grounds to believe that the offense has been committed and reasonable cause to believe that the accused person has committed the offense. Where reasonable grounds to believe that the offense has been committed and reasonable cause to believe that a certain person has committed the offense exist, the preferred course of action is to arrest and detain the person without a warrant. *Ohio Rev. Code Ann. § 2935.03(B)(3)(b)*. The language of *Ohio Rev. Code Ann. § 2935.03(B)* articulates the traditional standards of probable cause to arrest and applies such standards to the offense of domestic violence.

## Headnotes/Summary

**Headnotes**

EVIDENCE - CONSTITUTIONAL LAW/CRIM.

## Syllabus

In a prosecution for domestic violence, the trial court properly admitted the victim's statements as excited utterances, where the evidence showed that the victim remained under the stress of an assault and had not had time for reflective thought: she had called for emergency assistance immediately after she claimed that she had been assaulted, she had stayed on the telephone with the emergency operator until help arrived, and the responding officer testified that he had traveled to the scene at 90 miles per hour because the incident sounded urgent.

A mandatory-arrest policy for domestic violence was not unconstitutional as applied to the defendant, where there were reasonable grounds to believe that the offense had been committed and reasonable cause to believe that the defendant had committed the offense.

**Counsel:** Michael K. Allen, Hamilton County Prosecuting Attorney, and Philip R. Cummings, Assistant Prosecuting Attorney, for Appellee.

Schuh **[**2]**  & Goldberg and Richard Goldberg, and Santen & Hughes, Elizabeth Robertson Murray, and Fanon A. Rucker, for Appellant.

**Judges:** PAINTER, Judge. DOAN, P.J., and HILDEBRANDT, J., concur.

**Opinion by:** PAINTER

# Opinion

DECISION.

PAINTER, Judge.

 **[*P1]**  Appellant Neil Lampe appeals his conviction for domestic violence in violation of _R.C. 2919.25_. He raises the following three assignments of error: (1) his conviction was against the manifest weight of the evidence; (2) the trial court erred by admitting hearsay evidence; and (3) the Hamilton County Sheriff's Department's mandatory- arrest policy in domestic-violence cases is unconstitutional.

 **[*P2]**  At the time of this incident, Lampe and his spouse, Alicia Lampe, were separated and were battling for custody of their five children. Alicia brought the children to Neil's house for court-ordered visitation after leaving him an angry telephone message about his incompetence.

 **[*P3]**  According to Alicia, Neil met her in his driveway, angry that the children had not been at her house when he had arrived to pick them up. Alicia and Neil exchanged insults, while Alicia sat in her van. Neil lunged through the van's window **[**3]**  and grabbed and pulled Alicia's hair, causing her shoulder to hit the frame of the van's window. He then pushed her back, causing Alicia to tear or bend her fingernail. Neil entered the house; Alicia stepped into the yard and called for emergency assistance. Neil returned, grabbed the keys from the van's ignition, and took them into the house. He returned again and threw the keys onto the front seat of the van. Alicia continued talking with the emergency operator until Timothy Taylor, a patrol officer for the Hamilton County Sheriff's Department, arrived. Alicia testified that her shoulder had later displayed a bruise, that she had suffered pain in her head over several days, and that she had lost some hair.

 **[*P4]**  According to Neil, he had not listened to Alicia's angry telephone message before she arrived with the children. When he approached the car, Alicia asked where he had been and started calling him names. Neil asked her to leave and threatened to call their attorneys because the children had been delivered late. In return, Alicia threatened to have Neil arrested. She brought out her telephone and began taunting him with it, stating that she

2003-Ohio-3059, *2003-Ohio-3059; 2003 Ohio App. LEXIS 2732, **3

could have him arrested with **[\*\*4]** one call. Neil tried to grab it, but touched neither Alicia nor the telephone. When Neil returned from checking on the children, Alicia smiled at him while she told someone on the telephone that she was really frightened. Neil asked her to leave again. He went to the van and took the keys, telling her that she had to leave. He then put the keys in the driver's seat and had returned to the house when the police arrived.

**[\*P5]** Officer Taylor stated that when he arrived Alicia was acting "in kind of a hysterical manner." He described her as crying, nervous, and angry. He stated that her hair was in disarray. She told him that her husband had assaulted her. He then testified to the details of the assault as related by Alicia. She showed him her bent fingernail. It was not bleeding. She told Taylor that Neil had grabbed her neck, but there were no marks there. When Neil came outdoors, he told Taylor that his wife and children were not supposed to be on the property.

**[\*P6]** Taylor testified that when called to the scene of a potential domestic-violence incident, he was required to arrest the person that he determined was the primary aggressor. In this situation, he determined **[\*\*5]** that Neil was the primary aggressor based on what he saw and on Alicia's comments and conduct.

**[\*P7]** In his first assignment of error, Neil challenges the weight of the evidence supporting his conviction. He argues that Alicia was not credible because she lied under oath and because her testimony and her affidavit were inconsistent, as was her behavior at the time of the incident and her supposed fear. Neil also points out the trial court's struggle with whom to believe. The trial court explained that even though it did not believe all that Alicia had said, it was not required to "completely discount her testimony." It also believed that Taylor's testimony corroborated Alicia's story.

**[\*P8]** *HN1* When confronted with a challenge to the weight of the evidence, we review the entire record, weigh the evidence and all inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. [1] To reverse on this basis, we must "disagree with the factfinder's resolution of the conflicting evidence." [2] Because "the weight to be given the evidence and the **[\*\*6]** credibility of the witnesses are primarily for the trier of fact," we may exercise our power to grant a new trial only in exceptional cases. [3]

**[\*P9]** Neil's argument in support of this assignment is premised on Alicia's lack of credibility, including the trial court's statements concerning its struggle with her credibility. But as the trial court explained, it was free to believe all, part, or none of the testimony of each witness. [4] It obviously believed a part of Alicia's testimony. Having reviewed the record under the appropriate standard, we overrule Neil's first assignment.

**[\*P10] [\*\*7]** In his second assignment, Neil contends that the trial court erroneously admitted into evidence Alicia's statements to Taylor as excited utterances under *Evid.R. 803(2)*. He argues that the statements were inadmissible because there was no testimony as to the time between the incident and Alicia's statements to Taylor. *HN2* The trial court's decision to admit a declaration as an excited utterance "should not be disturbed on appeal if it was reasonable," because the determination "reflects a factual finding about whether the declarant was sufficiently startled." [5]

**[\*P11]** There is also a temporal element to be met before a declarant's hearsay statement may be admitted under the excited-utterance exception found in *Evid. R. 803(2)*. The statement "must be made while the declarant is still

[1] See *State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717*.

[2] *State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541*.

[3] See *State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212*, paragraph one of the syllabus.

[4] See *State v. Antill (1964), 176 Ohio St. 61, 197 N.E.2d 548*.

[5] *State v. Whitfield, 1st Dist. No. C-020241, 2002 Ohio 5984, P7*.

2003-Ohio-3059, *2003-Ohio-3059; 2003 Ohio App. LEXIS 2732, **7

under the stress of the event and the statement may *not* be the result of reflective thought." [6] The evidence in this case was that Alicia called [**8] for emergency assistance immediately after she had been assaulted, and that she "was in shock." She stayed on the telephone with the emergency operator until Taylor arrived. Taylor responded to the call, "running a Code 3." He testified that he had his cruiser's siren and lights activated, and was traveling 90 miles per hour to get to the scene because the incident sounded urgent. The trial court's decision to admit the statements was reasonable under the facts. We overrule Neil's second assignment.

[*P12]  In his last assignment, Neil claims that the Hamilton County Sheriff's Department's policy mandating an arrest in any case of domestic violence was unconstitutional as applied to him, because Alicia's appearance at his house violated a restraining order, and because she had refused to leave. We first note that this issue was not raised below. Thus, we need not address it. [7] But we choose to do so in the exercise of our [**9] discretion.

[*P13]  Taylor agreed that there was a mandatory arrest policy for potential domestic- violence situations and that he was required to arrest one of the parties if he was able to determine which party was the primary aggressor. He stated that Alicia had signed an affidavit and that he had determined that Neil was the primary aggressor based on Alicia's statements to him and the injuries he saw--the broken nail and the disheveled hair (presumably indicating hair-pulling).

[*P14]  *HN3* *R.C. 2935.03(B)* allows an arrest for domestic violence when the arresting officer has reasonable grounds to believe that the offense has been committed and reasonable cause to believe that a particular person has committed the offense. A written statement alleging that a certain person has committed domestic violence against [**10] the maker of the statement, or the arresting officer's personal knowledge and observations of the circumstances surrounding the alleged domestic violence, including any trustworthy information provided to the officer by the victim, constitutes reasonable grounds to believe that the offense has been committed and reasonable cause to believe that the accused person has committed the offense. [8] Where reasonable grounds to believe that the offense has been committed and reasonable cause to believe that a certain person has committed the offense exist, the preferred course of action is to arrest and detain the person without a warrant. [9] The language of *R.C. 2935.03(B)* "articulates the traditional standards of probable cause to arrest and applies such standards to the offense of domestic violence." [10]

[*P15]  [**11]  Because the standards of *R.C. 2935.03* were satisfied in this case, we conclude that Neil has failed to demonstrate that the mandatory-arrest policy, as it applied to the facts of this case, was unconstitutional. We overrule Neil's third assignment.

[*P16]  Therefore, we affirm the trial court's judgment.

Judgment affirmed.

**DOAN, P.J.,** and **HILDEBRANDT, J.,** concur.

---

End of Document

[6] *State v. Taylor (1993), 66 Ohio St.3d 295, 303, 612 N.E.2d 316*.

[7] See *State v. Awan (1986), 22 Ohio St.3d 120, 22 Ohio B. 199, 489 N.E.2d 277*, syllabus; *In re M.D. (1988), 38 Ohio St.3d 149, 527 N.E.2d 286*, syllabus.

[8] See *R.C. 2935.03(B)(3)(a)*.

[9] *R.C. 2935.03(B)(3)(b)*.

[10] *State v. Carbone (Dec. 19, 1997), 11th Dist. No. 96-T-5390, 1997 Ohio App. LEXIS 5748*.

 Caution
As of: September 9, 2025 3:27 PM Z

# *State v. Loyed*

Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County

July 29, 2004, Date of Announcement of Decision

NO. 83075

**Reporter**
2004-Ohio-3961 *; 2004 Ohio App. LEXIS 3610 **

STATE OF OHIO, Plaintiff-Appellee vs. TYRONE LOYED, Defendant-Appellant

**Subsequent History:** Motion granted by *State v. Loyed, 104 Ohio St. 3d 1407, 2004-Ohio-6364, 818 N.E.2d 709, 2004 Ohio LEXIS 2768 (Dec. 1, 2004)*

Discretionary appeal not allowed by *State v. Loyed, 105 Ohio St. 3d 1463, 2005-Ohio-1024, 824 N.E.2d 91, 2005 Ohio LEXIS 511 (Mar. 16, 2005)*

Reopening denied by *State v. Loyed, 2005-Ohio-1965, 2005 Ohio App. LEXIS 1937 (Ohio Ct. App., Cuyahoga County, Apr. 27, 2005)*

Post-conviction relief granted at, in part, Post-conviction relief denied at, in part *State v. Loyed, 2014-Ohio-5141, 2014 Ohio App. LEXIS 4992 (Ohio Ct. App., Cuyahoga County, Nov. 20, 2014)*

Decision reached on appeal by, Remanded by *State v. Loyed, 2019-Ohio-5346, 2019 Ohio App. LEXIS 5420 (Ohio Ct. App., Cuyahoga County, Dec. 26, 2019)*

**Prior History: [**1]** CHARACTER OF PROCEEDING: Criminal appeal from Common Pleas Court. Case No. CR-430383.

**Disposition:** Judgment of the Court of Common Pleas affirmed.

## Core Terms

self-defense, stepdaughter, girl friend, voluntary manslaughter, fit of rage, sudden passion, bedroom, murder, lesser included offense, character evidence, closing argument, reputation, relevant evidence, court of appeals, character trait, involuntary manslaughter, prosecutorial misconduct, court's decision, emotional, sentence, maximum, sexual, shoot

## Case Summary

**Procedural Posture**
The Common Pleas Court of Cuyahoga County (Ohio) convicted defendant of aggravated murder and having a weapon while under a disability. Defendant appealed his conviction. He contended that the trial court should have given a lesser-included offense jury instruction, that it had improperly excluded evidence from his trial, and that the prosecutor had engaged in misconduct during his closing argument to the jury.

**Overview**

Justin Marks

2004-Ohio-3961, *2004-Ohio-3961; 2004 Ohio App. LEXIS 3610, **1

Defendant claimed that he shot the victim in self-defense. The trial court refused to admit evidence concerning the victim's alleged reputation for violence; it also excluded evidence concerning an eyewitness's sexual past. During his closing argument, the prosecutor pointed out that, unlike the eyewitnesses, defendant had shed no tears for the victim. Defendant contended that the jury should have been given a lesser-included offense instruction, that the excluded evidence should have been admitted, and that the prosecutor had improperly asked the jury to consider victim impact evidence. The court noted that although voluntary manslaughter was a lesser-included offense of murder, *Ohio Rev. Code Ann. § 2903.03(A)* required proof that defendant had acted under the influence of a sudden passion or in a sudden fit of rage. To succeed on his self-defense claim, however, defendant had to show that he had acted out of fear. The two legal theories were incompatible. The challenged evidence was properly excluded; *Ohio R. Evid. 405(B)* precluded defendant from presenting character evidence to prove that the victim was the initial aggressor in the shooting. The jury argument was not improper.

**Outcome**

The court affirmed the judgment of conviction. It ordered defendant to pay costs. The court also ordered that a special mandate should issue out of the court directing the trial court to carry the judgment into execution. It terminated defendant's bail and remanded the case to the trial court for execution of defendant's sentence.

# LexisNexis® Headnotes

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > General Overview

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > Elements

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Murder > General Overview

Criminal Law & Procedure > Criminal Offenses > Lesser Included Offenses > General Overview

Criminal Law & Procedure > Defenses > General Overview

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > General Overview

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN1* Involuntary manslaughter is a lesser included offense of murder.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > General Overview

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > Elements

*HN2* Actions taken under the influence of sudden passion or in a sudden fit of rage meet the very definition of voluntary manslaughter. *Ohio Rev. Code Ann. § 2903.03(A)*.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > General Overview

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Involuntary Manslaughter > Elements

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

*HN3* Involuntary manslaughter is committed when a person causes the death of another as a proximate result of committing or attempting to commit a felony. *Ohio Rev. Code Ann. § 2903.03(A)*.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > General Overview

Criminal Law & Procedure > Criminal Offenses > Lesser Included Offenses > Homicide

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN4* Instruction on a lesser-included offense of voluntary manslaughter is incompatible with a murder defendant's theory of self-defense.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > General Overview

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > Elements

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN5* Voluntary manslaughter requires that the defendant be under the influence of sudden passion or a fit of rage. Evidence supporting the privilege of self-defense, i.e., that the defendant feared for his own and other's personal safety, does not constitute sudden passion or fit of rage as contemplated by the voluntary manslaughter statute, *Ohio Rev. Code Ann. § 2903.03(A)*. Testimony that the defendant was dazed, confused, and scared is insufficient to show sudden passion or fit of rage. Self-defense requires a showing of fear, whereas voluntary manslaughter requires rage.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > General Overview

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > Elements

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Theory of Defense

*HN6* Given that voluntary manslaughter now requires that the defendant be under the influence of a sudden passion or a fit of rage, the position that fear for one's own safety is sufficient to warrant a voluntary manslaughter instruction cannot be presently maintained. Simply put, fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.

Criminal Law & Procedure > ... > Jury Instructions > Particular Instructions > Lesser Included Offenses

*HN7* A jury instruction on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > General Overview

Criminal Law & Procedure > ... > Homicide, Manslaughter & Murder > Voluntary Manslaughter > Elements

2004-Ohio-3961, *2004-Ohio-3961; 2004 Ohio App. LEXIS 3610, **1

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > Defenses > Self-Defense

*HN8* Self-defense requires that the defendant show evidence of fear, while voluntary manslaughter requires that the defendant show evidence of sudden passion or fit of rage. It must be one or the other. A trial court does not err by finding that a defendant can not assert both.

Evidence > Relevance > Preservation of Relevant Evidence > Exclusion & Preservation by Prosecutors

Evidence > Relevance > General Overview

Evidence > Relevance > Exclusion of Relevant Evidence > Confusion, Prejudice & Waste of Time

Evidence > Relevance > Relevant Evidence

*HN9* All relevant evidence is admissible, except as otherwise provided by the rules of evidence. *Ohio R. Evid. 402.* The term, relevant evidence, is defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence. *Ohio R. Evid. 401.* However, *Ohio R. Evid. 403(A)* provides that, although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

Criminal Law & Procedure > Trials > Judicial Discretion

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Evidence > Relevance > Preservation of Relevant Evidence > Exclusion & Preservation by Prosecutors

*HN10* The trial court retains sole discretion in admitting evidence, and the Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County, cannot overturn the court's decision in that regard absent an abuse of discretion.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Evidence > Relevance > Preservation of Relevant Evidence > Exclusion & Preservation by Prosecutors

Evidence > ... > Testimony > Examination > General Overview

Evidence > ... > Examination > Cross-Examinations > General Overview

*HN11* A trial court has the authority to control the presentation of evidence to prevent undue embarrassment to witnesses. *Ohio R. Evid. 611(A).*

Evidence > Admissibility > Character Evidence

Evidence > ... > Impeachment > Bad Character for Truthfulness > General Overview

*HN12* *Ohio R. Evid. 404(A)* specifies when character evidence is admissible.

2004-Ohio-3961, *2004-Ohio-3961; 2004 Ohio App. LEXIS 3610, **1

Evidence > Admissibility > Character Evidence

Evidence > ... > Impeachment > Bad Character for Truthfulness > General Overview

*HN13* See *Ohio R. Evid. 404(A).*

Evidence > ... > Exceptions > Reputation > General Overview

Evidence > Admissibility > Character Evidence

Evidence > ... > Impeachment > Bad Character for Truthfulness > Specific Instances

*HN14* *Ohio R. Evid. 405* states that when evidence of character or trait of character is admissible, proof can be made by testimony as to reputation.

Criminal Law & Procedure > Defenses > Self-Defense

Evidence > ... > Exceptions > Reputation > General Overview

Evidence > Admissibility > Character Evidence

*HN15* A defendant can introduce character evidence by reputation or opinion testimony under *Ohio R. Evid. 405(A).* But *Ohio R. Evid. 405(B)* is more narrowly drawn. If the proof or failure of proof of the victim's character would not be dispositive of an element of self-defense, then it is not an essential component of the defense and falls outside the limited scope of R. 405(B).

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > Defenses > General Overview

Criminal Law & Procedure > Defenses > Self-Defense

Evidence > Admissibility > Character Evidence

*HN16* To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. Although a victim's violent propensity may be pertinent to proving that he acted in a way such that a defendant's responsive conduct satisfied the elements of self-defense, no element requires proof of the victim's character or character traits. A defendant may successfully assert self-defense without resort to proving any aspect of a victim's character. Therefore, *Ohio R. Evid. 405(B)* precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor.

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

Governments > Courts > Judicial Precedent

*HN17* As a lower court the Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County, is bound by a decision of the Ohio Supreme Court.

Criminal Law & Procedure > Trials > Closing Arguments > General Overview

Criminal Law & Procedure > Trials > Closing Arguments > Inflammatory Statements

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > General Overview

Criminal Law & Procedure > Appeals > Prosecutorial Misconduct > Tests for Prosecutorial Misconduct

Legal Ethics > Prosecutorial Conduct

*HN18* The test for prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. When applying this test, the Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County, considers the effect the misconduct had on the jury in the context of the entire trial.

Criminal Law & Procedure > Trials > Closing Arguments > General Overview

Criminal Law & Procedure > Trials > Closing Arguments > Fair Comment & Fair Response

Criminal Law & Procedure > Trials > Closing Arguments > Inflammatory Statements

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Victim Statements

*HN19* Victim impact evidence is excluded from closing arguments because it is irrelevant and immaterial to the guilt or innocence of the accused--it principally serves to inflame the passion of the jury. Nevertheless, the prosecution is given a great deal of latitude during closing arguments. Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence. The prosecutor's reference to a defendant's lack of remorse may be intended to question his credibility.

Criminal Law & Procedure > ... > Defendant's Rights > Right to Jury Trial > General Overview

Criminal Law & Procedure > Sentencing > Capital Punishment > General Overview

Criminal Law & Procedure > Sentencing > Capital Punishment > Aggravating Circumstances

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > ... > Adjustments & Enhancements > Criminal History > General Overview

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Statutory Maximums

*HN20* The constitutional due-process and jury-trial guarantees require that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. Where a state law authorizes the death penalty only if an aggravating factor is present, the existence of such a factor is required to be proved to a jury rather than to a judge.

Criminal Law & Procedure > Defenses > General Overview

Criminal Law & Procedure > Defenses > Self-Defense

Criminal Law & Procedure > ... > Sentencing Guidelines > Adjustments & Enhancements > General Overview

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Findings

Criminal Law & Procedure > Sentencing > Imposition of Sentence > Statutory Maximums

2004-Ohio-3961, *2004-Ohio-3961; 2004 Ohio App. LEXIS 3610, **1

_HN21_ Ohio's self-defense statute, _Ohio Rev. Code Ann. § 2901.05(A)_, does not increase the penalty beyond the maximum. Indeed, as an affirmative defense, self-defense is an admission of all essential elements of the charged crime, but with the legal recognition that the accused's actions were justified under the circumstances.

Constitutional Law > Supremacy Clause > General Overview

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > Defenses > Burdens of Proof

Criminal Law & Procedure > Defenses > Self-Defense

Governments > Courts > Judicial Precedent

_HN22_ The Court of Appeals of Ohio, Eighth Appellate District, Cuyahoga County, is bound the _Supremacy Clause of the United States Constitution_ to follow all decisions of the United States Supreme Court. The United States Supreme Court has held that placing the burden of proving self-defense upon the accused does not violate due process. Until such time as the United States Supreme Court retracts its opinion, the Ohio appeals court is bound to follow it.

**Counsel:** For plaintiff-appellee: William D. Mason, Esq. Cuyahoga County Prosecutor, George Rukovena, Esq., Assistant County Prosecutor, Cleveland, Ohio.

For defendant-appellant: David L. Doughten, Esq., John P. Parker, Esq., Cleveland, Ohio.

**Judges:** MICHAEL J. CORRIGAN, ADMINISTRATIVE JUDGE. PATRICIA A. BLACKMON, J., and KENNETH A. ROCCO, J., CONCUR.

**Opinion by:** MICHAEL J. CORRIGAN

## Opinion

JOURNAL ENTRY and OPINION

MICHAEL J. CORRIGAN, A.J.

 **[*P1]**  A jury found defendant Tyrone Loyed guilty of one count of aggravated murder and one count of having a weapon while under a disability. The charges stemmed from the shooting death of Clifford Ford. Loyed admitted to shooting Ford, but argued that he did so in self-defense. The four assignments of error raised in this appeal make challenges to the jury instructions, the admission of evidence, and prosecutorial misconduct.

 **[*P2]**  Loyed did not dispute the evidence concerning the events leading up to the shooting. Ford and his girlfriend lived in a small apartment with the girlfriend's stepdaughter. Loyed supplied drugs to the girlfriend. On the evening **[**2]** of the murder, Loyed stopped by to deliver drugs to the girlfriend. The girlfriend suggested that the stepdaughter go out for drinks with Loyed. After Loyed arrived at the apartment, he and the girlfriend went into the bedroom. They came out a short time later and Loyed and the stepdaughter left. They reached the elevator before receiving a cell phone call asking them to return - Loyed had taken the girlfriend's cigarettes and she wanted them back. When they went back into the apartment, the girlfriend seemed upset to the stepdaughter. They went into the bedroom to talk. The stepdaughter learned that Ford had been angry about something. As they spoke, they heard thumping noises. They exited the bedroom to find Ford and Loyed fighting. Ford had pinned Loyed to the ground before the women could separate them.

2004-Ohio-3961, *P3; 2004 Ohio App. LEXIS 3610, **2

**[*P3]** After stopping the fight, Loyed and the stepdaughter left the apartment so that Loyed could make the rounds with his other drug customers. During the course of these rounds, the stepdaughter called the girlfriend to make sure that everything had been resolved. Loyed took the phone and spoke to the girlfriend, apologizing to her for fighting. Loyed then asked if he could **[**3]** speak with Ford. Ford hung up on Loyed.

**[*P4]** When Loyed and the stepdaughter returned to the apartment, Loyed went to the bedroom that Ford shared with the girlfriend; the stepdaughter went to the kitchen. The stepdaughter could hear arguing from the bedroom, and then heard the click of a semi-automatic gun. The girlfriend said that Loyed entered the bedroom and said to Ford, "who's the bitch now?" Ford grabbed his girlfriend and held her between him and Loyed. Ford backed out of the bedroom, using the girlfriend as a human shield. Loyed walked forward with a gun aimed at Ford and the girlfriend. Loyed mocked Ford for hiding behind a woman, telling the girlfriend that Ford was a "bitch-ass man." Loyed told Ford to let the girlfriend go, but Ford refused. The girlfriend pleaded to be released, telling Ford that Loyed would not shoot him. Ford released the girlfriend and she headed for the bathroom. The stepdaughter was in the kitchen. Both the girlfriend and stepdaughter heard gunshots, with the girlfriend recalling that Ford said, "Man, you shot me."

**[*P5]** The stepdaughter looked to see Loyed standing over Ford pointing the gun at him. She ran over and tried to help Ford **[**4]** to his feet, then ran into the bedroom and out onto a balcony. Ford followed the stepdaughter into the bedroom and dove behind the bed. Loyed entered the bedroom. The stepdaughter heard more gunshots and then heard what sounded like the gun being beaten against something.

**[*P6]** The forensic evidence showed that Loyed shot Ford six times. Four of the shots were fired into Ford's trunk; the other two struck a forearm and thigh. The most serious of the shots struck the chest and perforated Ford's lung.

**[*P7]** After the shooting, Loyed told the girlfriend to "clean this shit up" and had the stepdaughter help him take the still- breathing Ford to the stairwell where Loyed dragged Ford seven floors to the ground level. A resident in the building heard a commotion in the stairwell and heard someone say, "I should have cut his F'ing heart out of him." Loyed put Ford in the trunk of his car and told the stepdaughter to get in the car. He took her to the home of a friend where she called the police and reported what happened.

**[*P8]** The following day, police officers unwittingly tried to pull over Loyed's car for the purpose of issuing him a traffic citation. In making a routine **[**5]** record check of the vehicle, they discovered that he had an outstanding murder warrant. When they moved to stop him, Loyed tried to escape. After a short pursuit, Loyed "bailed" out of his car and ran until the police cornered him. They returned Loyed to the zone car and found Ford's body in the trunk of Loyed's car. Loyed told the police that he disposed of the victim's clothing and weapon in a dumpster, but the police found that the dumpster had been emptied before they could retrieve that evidence.

I

**[*P9]** At trial, Loyed claimed self-defense and the court instructed the jury on that defense. Nevertheless, Loyed asked the court to instruct the jury on the lesser included offense of voluntary manslaughter. The court refused the instruction. Both parties agree that **HN1** involuntary manslaughter is a lesser included offense of murder, see *State v. Tyler (1990), 50 Ohio St.3d 24, 36, 553 N.E.2d 576*, so the issue is whether the evidence would have reasonably supported the charge.

**[*P10]** We preface our discussion of this assignment of error by noting that Loyed mistakenly refers to "involuntary" manslaughter, even though his argument leaves no doubt that he wanted a "voluntary" **[**6]** manslaughter instruction. Loyed argues facts which suggest that he **HN2** acted "under the influence of sudden passion or in a sudden fit of rage" - the very definition of voluntary manslaughter. See *R.C. 2903.03(A)*. **HN3** Involuntary manslaughter is committed when a person causes the death of another as a proximate result of committing or attempting to commit a felony. See *R.C. 2903.04(A)*.

**[*P11]** Despite the incorrect nomenclature, we find that the court did not err by refusing to instruct on the lesser included offense of voluntary manslaughter because the requested *HN4* instruction was incompatible with Loyed's theory of self-defense. In *State v. Harris (1998), 129 Ohio App.3d 527, 534-535, 718 N.E.2d 488*, the court of appeals stated:

**[*P12]** "Appellant incorrectly contends that the same evidence that supported his claim of self-defense and defense of others also supported his request for an instruction on voluntary manslaughter. As noted above, *HN5* voluntary manslaughter requires that the defendant be under the influence of sudden passion or a fit of rage. Thus, this court has held that evidence supporting the privilege of self-defense, **[**7]** i.e., that the defendant feared for his own and other's personal safety, does not constitute sudden passion or fit of rage as contemplated by the voluntary manslaughter statute. See *State v. Tantarelli, 1995 Ohio App. LEXIS 2186 (May 23, 1995), Franklin App. No. 94APA11-1618*, unreported (1995 Opinions 2144, 2151) (testimony that defendant was dazed, confused, and scared was insufficient to show sudden passion or fit of rage); *State v. Thompson, 1993 Ohio App. LEXIS 1198 (Feb. 23, 1993), Franklin App. No. 92AP-112*4, unreported (1993 Opinions 485, 489) ('Self defense on the one hand requires a showing of fear, whereas voluntary manslaughter requires rage.').

**[*P13]** "While appellant relies extensively on this court's decision in *State v. Roddy, 1981 Ohio App. LEXIS 10292 (Nov. 17, 1981), Franklin App. No. 81AP-499*, unreported (1981 Opinions 3706), for the proposition that fear for one's own safety is sufficient to warrant a voluntary manslaughter instruction, such reliance is misplaced. At the time *Roddy* was decided, the voluntary manslaughter statute only required that the defendant establish **[**8]** that he was 'under extreme emotional stress.' See *id. at 3708*. However, *HN6* given that voluntary manslaughter now requires that the defendant be under the influence of 'sudden passion or fit of rage,' the position advanced by appellant and supported by *Roddy* cannot be presently maintained. *** Simply put, 'fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.' *State v. Mack (1998), 82 Ohio St.3d 198, 201, 1998 Ohio 375, 694 N.E.2d 1328* (upholding refusal to grant an aggravated assault instruction when defendant testified that he acted out of self-defense)." (Citation omitted).

**[*P14]** *HN7* A jury instruction on a lesser included offense "is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286*, paragraph two of syllabus. As *Harris* makes clear, *HN8* self-defense requires that the defendant show evidence of fear, while voluntary manslaughter requires that the defendant show evidence of sudden passion or fit of rage. It must be one **[**9]** or the other. The court did not err by finding that Loyed could not assert both.

II

**[*P15]** To bolster his case of self-defense, Loyed attempted to show that he returned to the apartment with the stepdaughter because he wanted to have sex with her. This, he believed, would show his state of mind in returning to the apartment and would refute the state's allegation that he returned to the apartment with prior calculation and design to kill Ford. The court refused to let Loyed testify to his intentions towards the stepdaughter, and Loyed now complains that the court abused its discretion by limiting his testimony.

A

**[*P16]** *HN9* All relevant evidence is admissible, except as otherwise provided by the Rules of Evidence. *Evid.R. 402*. The term "relevant evidence" is also defined as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Evid.R. 401*. However, *Evid.R. 403(A)* provides that, although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, **[**10]** or of misleading the jury. *HN10* The court retains sole discretion in admitting evidence, and we cannot overturn the court's decision in that regard absent an abuse of discretion. *State v. Sage (1987), 31 Ohio St.3d 173, 31 Ohio B. 375, 510 N.E.2d 343*.

 **[*P17]**  The court did not abuse its discretion by refusing to allow Loyed to testify about specific instances of the stepdaughter's sexual past in order to explain his reasons for returning to the apartment. Loyed had fully conveyed to the jury his desire to return to the apartment with the intention of pursuing sexual relations with the stepdaughter. He did not need to bring in hearsay statements about the stepdaughter's past to underscore that desire. And more to the point, evidence relating to the stepdaughter's proclivity for sexual relations did nothing to give further explanation to his reasons for returning to the apartment. Statements about the stepdaughter's sexual history would thus have been purely cumulative and would only have served to embarrass the stepdaughter. *HN11* The court has the authority to control the presentation of evidence to prevent undue embarrassment to witnesses. See *Evid.R. 611(A).*

B

 **[*P18]**  Likewise, the court did **[**11]**  not abuse its discretion by refusing to permit Loyed to give hearsay testimony relating to Ford's reputation for violence. *Evid.R. 404(A) HN12* specifies when character evidence is admissible and provides:

 **[*P19]**  *HN13* "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:

 **[*P20]**  "****

 **[*P21]**  "(2) Character of the victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; however, in prosecutions for rape, gross sexual imposition, and prostitution, the exceptions provided by statute enacted by the General Assembly are applicable."

 **[*P22]**  *Evid.R. 405 HN14* states that when evidence of character or trait of character is admissible, proof can be made by testimony as to reputation.

 **[*P23]**  In  *State v. Barnes, 94 Ohio St.3d 21, 24, 2002 Ohio 68, 759 N.E.2d 1240*, the **[**12]**  Supreme Court dealt with the same issue raised here - Barnes asserted that he acted in self-defense and wished to introduce evidence of the victim's reputation for violence. The court stated:

 **[*P24]**  "It is undisputed that *HN15* a defendant can introduce character evidence by reputation or opinion testimony under *Evid.R. 405(A).* See, e.g., *State v. Baker (1993), 88 Ohio App.3d 204, 210-211, 623 N.E.2d 672, 676.* But *Evid.R. 405(B)* is more narrowly drawn. Thus, the relevant inquiry in this case is whether a victim's character or character trait is an essential element of self-defense. If the proof or failure of proof of the victim's character would not be dispositive of an element of self-defense, then it is not an essential component of the defense and falls outside the limited scope of *Evid.R. 405(B).*

 **[*P25]**  *HN16* "To establish self-defense, a defendant must prove the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and **[**13]**  (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Robbins (1979), 58 Ohio St.2d 74, 12 Ohio Op. 3d 84, 388 N.E.2d 755*, paragraph two of the syllabus. Although a victim's violent propensity may be pertinent to proving that he acted in a way such that a defendant's responsive conduct satisfied the elements of self-defense, no element requires proof of the victim's character or character traits. A defendant may successfully assert self-defense without resort to proving any aspect of a victim's character. Therefore, *Evid.R. 405(B)* precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor. *State v. Cuttiford (1994), 93 Ohio App.3d 546, 555, 639 N.E.2d 472, 478*; *State v. Baker, 88 Ohio App.3d at 210-211, 623 N.E.2d at 676*; *State v. Carlson (1986), 31 Ohio App.3d 72, 74, 31 Ohio B. Rep. 112, 115, 508 N.E.2d 999, 1001.*" (Footnote omitted.)

**[\*P26]** Loyed argues, in essence, that *Barnes* is incorrect. Regardless what Loyed believes, *HN17* as a lower court we are bound by a decision of the Ohio Supreme Court. We **[\*\*14]** must adhere to *Barnes* and find that the court did not abuse its discretion by refusing to permit Loyed to testify to Ford's reputation for violence.

III

**[\*P27]** During closing argument, the state told the jury that "if this was an accident, if this was an act of self-defense, if this was a mistake, he [Loyed] should have been balling his eyes out. The victim's family has been in the back of the room and \*\*\*. The two people who witnessed the murder, other than the defendant, are upset. They are crying \*\*\*. They witnessed a cold-blooded murder. \*\*\* But he wants you to think that he thinks about this, not only everyday, but every hour. And he wishes he could take it all back if he could have, he would have taken it back a long time ago. But did you see any emotion." Loyed argues that this statement constituted prosecutorial misconduct because it improperly addressed victim-impact considerations.

**[\*P28]** *HN18* The test for prosecutorial misconduct in closing arguments is "'whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler, 90 Ohio St.3d 108, 125, 2000 Ohio 30, 734 N.E.2d 1237, State v. Smith (1984), 14 Ohio St.3d 13, 14, 14 Ohio B. 317, 470 N.E.2d 883.* **[\*\*15]** When applying this test, we consider "the effect the misconduct had on the jury in the context of the entire trial." *State v. Keenan (1993), 66 Ohio St.3d 402, 410, 613 N.E.2d 203.*

**[\*P29]** *HN19* Victim impact evidence is excluded because it is irrelevant and immaterial to the guilt or innocence of the accused - it principally serves to inflame the passion of the jury. See *State v. White (1968), 15 Ohio St.2d 146, 239 N.E.2d 65.* Nevertheless, the prosecution is given a great deal of latitude during closing arguments. See *State v. Bies (1996), 74 Ohio St.3d 320, 326, 1996 Ohio 276, 658 N.E.2d 754.* In *State v. Smith, 80 Ohio St.3d 89, 111, 1997 Ohio 355, 684 N.E.2d 668*, the supreme court stated, "prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence. The prosecutor's reference to defendant's lack of remorse may have been intended to question his credibility." (Citations omitted.)

**[\*P30]** The context of the state's closing argument leaves us no doubt that it was intended as a comment on Loyed's credibility. The state told the jury that Loyed wished he could take back his actions, but his lack of emotion suggested **[\*\*16]** otherwise. It noted that the girlfriend and stepdaughter comported themselves in a manner consistent with having witnessed a murder. This was not meant as a direct comment on the impact the murder had on the witnesses, but as a comment on Loyed's believability. Viewed as such, the state's comment was not error and no case of prosecutorial misconduct has been shown.

IV

**[\*P31]** In his final argument, Loyed maintains that Ohio's self- defense statute is unconstitutional because it places the burden of proof upon the accused. See *R.C. 2901.05(A).* He bases this argument on two United States Supreme Court cases: *Apprendi v. New Jersey (2000), 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348* and *Ring v. Arizona (2002), 536 U.S. 584, 153 L. Ed. 2d 556, 122 S. Ct. 2428.* In *Apprendi*, the court interpreted *HN20* the constitutional due-process and jury-trial guarantees to require that, "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi, 530 U.S. at 490.* In *Ring*, the court applied the **[\*\*17]** *Apprendi* principle to a death sentence imposed under a state of Arizona sentencing scheme. The court concluded that, because Arizona law authorized the death penalty only if an aggravating factor was present, *Apprendi* required the existence of such a factor to be proved to a jury rather than to a judge. *Ring, 536 U.S. at 603-609.* Loyed argues that Ohio requires the accused to disprove an element of the offense, thus shifting the burden of persuasion to the accused. Because of this, he maintains that we should view self- defense as an element of the offense.

**[\*P32]** Loyed's citation to *Apprendi* and *Ring* is not on point. Both cases dealt with situations where state statutes permitted the trial judge to make findings of fact that could increase a sentence beyond the statutory maximum. The United States Supreme Court held that this type of sentencing scheme violated the right to a jury trial because the

accused had the *Sixth Amendment* right to have issues of fact determined by a jury. In contrast, *HN21* Ohio's self-defense statute does not increase the penalty beyond the maximum. Indeed, as an affirmative defense, self-defense is an admission of all essential **[**18]** elements of the charged crime, but with the legal recognition that the accused's actions were justified under the circumstances.

 **[*P33]** But any further discussion of this assignment of error would be pointless as *HN22* we are bound the *Supremacy Clause of the United States Constitution* to follow all decisions of the United States Supreme Court. See *State v. Burnett, 93 Ohio St.3d 419, 422, 2001 Ohio 1581, 755 N.E.2d 857*. In *Martin v. Ohio (1987), 480 U.S. 228, 94 L. Ed. 2d 267, 107 S. Ct. 1098*, the United States Supreme Court held that placing the burden of proving self-defense upon the accused did not violate due process. Until such time as the United States Supreme Court retracts its opinion in *Martin*, we are bound to follow it.

Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified **[**19]** copy of this entry shall constitute the mandate pursuant to *Rule 27 of the Rules of Appellate Procedure.*MICHAEL J. CORRIGAN

ADMINISTRATIVE JUDGE


PATRICIA A. BLACKMON, J., and


KENNETH A. ROCCO, J., CONCUR.

N.B. This entry is an announcement of the court's decision. See *App.R. 22(B), 22(D) and 26(A)*; *Loc.App.R. 22*. This decision will be journalized and will become the judgment and order of the court pursuant to *App.R.22(E)* unless a motion for reconsideration with supporting brief, per *App.R. 26(A)*, is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per *App.R. 22(E)*. See, also, S. Ct. Prac.R. II, Section 2(A)(1).

---

**End of Document**

 Caution
As of: September 9, 2025 3:24 PM Z

## *State v. O'Neill*

Court of Appeals of Ohio, Third Appellate District, Allen County

March 9, 2015, Date of Decision

CASE NO. 1-14-21

**Reporter**
2015-Ohio-815 *; 29 N.E.3d 365 **; 2015 Ohio App. LEXIS 763 ***

STATE OF OHIO, PLAINTIFF-APPELLEE, v. JESSE A. O'NEILL, DEFENDANT-APPELLANT.

**Subsequent History:** Discretionary appeal not allowed by *State v. O'Neill, 143 Ohio St. 3d 1464, 2015-Ohio-3733, 2015 Ohio LEXIS 2450, 37 N.E.3d 1249 (2015)*

Motion denied by *State v. O'Neill, 2015-Ohio-4633, 2015 Ohio LEXIS 3009 (Ohio, Nov. 10, 2015)*

**Prior History:** [***1] Appeal from Allen County Common Pleas Court. Trial Court No. CR 2013 0215.

**Disposition:** Judgment Affirmed.

## Core Terms

arrest, domestic violence, trial court, scene, warrantless arrest, impound, peace officer, cocaine, inventory search, motion to suppress, reasonable ground, probable cause, misdemeanor, offenses, detain, commission of the offense, suppression, limits, assigned error, provisions, arrival, pursuit, arresting officer, written statement, reasonable cause, parking lot, circumstances, articulated, violence, felony

## Case Summary

### Overview

HOLDINGS: [1]-The trial court's decision overruling defendant's motion to suppress were affirmed, as the trial court did not err in determining that defendant's arrest was supported by probable cause, and his claim that an officer had no legal authority to arrest him under the statutory scheme set forth in *R.C. 2935.03* failed; *R.C. 2935.03(B)(3)(g)* did not operate to revoke an officer's legal authority to make a warrantless arrest in cases involving domestic violence, and an officer had reasonable grounds to believe that defendant committed a domestic violence offense based upon his observations that corroborated the victim's statements that defendant had thrown a beer can at her, shoved her to the floor, and dragged her by her hair; [2]-The trial court did not err in determining that defendant's vehicle was properly impounded and subject to an inventory search.

### Outcome
Judgment affirmed.

## LexisNexis® Headnotes

2015-Ohio-815, *2015-Ohio-815; 29 N.E.3d 365, **365; 2015 Ohio App. LEXIS 763, ***1

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Conclusions of Law

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Suppression of Evidence

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > Motions to Suppress

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > General Overview

Criminal Law & Procedure > Trials > Witnesses > Credibility

### *HN1* De Novo Review, Conclusions of Law

A review of the denial of a motion to suppress involves mixed questions of law and fact. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. With respect to the trial court's conclusions of law, however, the appellate court's standard of review is de novo; and, therefore, it must decide whether the facts satisfy the applicable legal standard.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

### *HN2* Domestic Offenses, Domestic Assault

See *R.C. 2935.03(B)(1)*.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

### *HN3* Domestic Offenses, Domestic Assault

*R.C. 2935.03(B)(3)* specifically refers to domestic violence and defines "reasonable grounds" in the following manner: A peace officer has reasonable grounds to believe that the offense of domestic violence has been committed and reasonable cause to believe that a particular person is guilty of committing the offense if any of the following occurs: (i) A person executes a written statement alleging that the person in question has committed the offense of domestic violence against the person who executes the statement or against a child of the person who executes the statement. (ii) No written statement of the type described in *R.C. 2935.03(B)(3)(a)(i)* is executed, but the peace officer, based upon the peace officer's own knowledge and observation of the facts and circumstances of the alleged incident of the offense of domestic violence or based upon any other information, including, but not limited to, any reasonably trustworthy information given to the peace officer by the alleged victim of the alleged incident of the offense or any witness of the alleged incident of the offense, concludes that there are reasonable grounds to believe that the offense of domestic violence has been committed and reasonable cause to believe that the person in question is guilty of committing the offense.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN4* **Domestic Offenses, Domestic Assault**

*R.C. 2935.03(B)(3)* specifically refers to domestic violence and defines "reasonable grounds" in the following manner: A peace officer has reasonable grounds to believe that the offense of domestic violence has been committed and reasonable cause to believe that a particular person is guilty of committing the offense if any of the following occurs: (iii) No written statement of the type described in *R.C. 2935.03(B)(3)(a)(i)* is executed, but the peace officer witnessed the person in question commit the offense of domestic violence or the offense of violating a protection order. *R.C. 2935.03(B)(3)(a)*.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN5* **Domestic Offenses, Domestic Assault**

Specifically, with regard to domestic violence offenses, the Ohio General Assembly has articulated a "preferred arrest policy." *R.C. 2935.03(B)(3)(b)* states: If a peace officer has reasonable grounds to believe that the offense of domestic violence has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in Ohio that the officer arrest and detain that person until a warrant can be obtained. Notably, the Ohio Revised Code also requires that local police departments adopt procedures and policies relating to officer response to an alleged incident of domestic violence according to the provisions of *R.C. 2935.03*. *R.C. 2935.032(A)*.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrants

*HN6* **Domestic Offenses, Domestic Assault**

See *R.C. 2935.03(B)(3)(g)*.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

Criminal Law & Procedure > Criminal Offenses > Classification of Offenses > Misdemeanors

*HN7* **Domestic Offenses, Domestic Assault**

The provisions of *R.C. 2935.03(B)(3)(a)(i)-(iii)* permit an officer to formulate probable cause to make a warrantless arrest based upon certain defined "reasonable grounds." It is notable that the "reasonable grounds" enumerated in *R.C. 2935.03(B)(3)(i)* and *(ii)* expressly permit an officer to find probable cause in circumstances where the officer may not have witnessed the suspect committing the domestic violence offense, even if only a misdemeanor, and therefore also provide for the specific scenario where the suspect is not present at the scene. Nowhere in this

provision is the officer's ability to make a probable cause determination on these enumerated grounds qualified or otherwise limited by whether the suspect is present at the scene.


Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN8* **Domestic Offenses, Domestic Assault**

Not only does *R.C. 2935.03(B)(3)(b)* state that a warrantless arrest is the preferred course of action in domestic violence offenses, but *R.C. 2935.03(B)(3)(c)* also requires an officer who does not comply with the preferred arrest policy to articulate in the written report of the incident a clear statement of the officer's reasons for not arresting and detaining that person until a warrant can be obtained. In reviewing these provisions, there is no qualification that these arrest procedures are only applicable to instances in which the suspect is present at the scene.


Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN9* **Arrests, Warrantless Arrests**

See *R.C. 2935.03(D)*.


Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN10* **Arrests, Warrantless Arrests**

*R.C. 2935.03(D)*, authorizing an officer's pursuit of a suspect, can only be applicable to cases in which the suspect is not present at the scene because the suspect has fled or recently left the scene. Moreover, *R.C. 2935.03(D)* expressly authorizes an officer to pursue, arrest, and detain that person until a warrant can be obtained.


Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN11* **Domestic Offenses, Domestic Assault**

The language in *R.C. 2935.03(D)* explicitly incorporates the authority granted to an officer to arrest and detain a person whom the officer has reasonable cause to believe is guilty of an "offense of violence" referred to in *R.C. 2935.03(B)(1)*, which includes domestic violence.


Governments > Legislation > Interpretation

*HN12* **Legislation, Interpretation**

2015-Ohio-815, *2015-Ohio-815; 29 N.E.3d 365, **365; 2015 Ohio App. LEXIS 763, ***1

In construing statutory provisions together, a court must give them a reasonable construction as to give proper force and effect to each and all such statutes. In addition, the interpretation and application of statutes must be viewed in a manner to carry out the legislative intent of the sections.

Criminal Law & Procedure > Criminal Offenses > Classification of Offenses > Misdemeanors

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN13* **Classification of Offenses, Misdemeanors**

As a general rule, an officer may not make a warrantless arrest for a misdemeanor unless the offense is committed in the officer's presence.

Criminal Law & Procedure > Criminal Offenses > Classification of Offenses > Felonies

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Criminal Offenses > Classification of Offenses > Misdemeanors

*HN14* **Classification of Offenses, Felonies**

*R.C. 2935.03(B)(3)(a)(i)* and *(ii)* specifically permit an officer to make a probable cause determination without the officer witnessing the person commit the offense. The "reasonable grounds" listed in *R.C. 2935.03(B)(3)(a)* apply to all domestic violence offenses, regardless of whether the offense constitutes a misdemeanor or a felony. Moreover, *R.C. 2935.03(B)* has been well recognized by courts to be an exception to the so-called officer "presence requirement" in misdemeanor offenses. *R.C. 2935.03(B)(3)*.

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

*HN15* **Domestic Offenses, Domestic Assault**

*R.C. 2935.03(B)(3)(g)* does not operate to revoke an officer's legal authority to make a warrantless arrest in cases involving domestic violence. To the contrary, when viewed in context with the related provisions in *R.C. 2935.03(B)* and *(D)*, the language "promptly shall seek a warrant for the arrest of the person" is far more reasonably construed to compel an officer to expediently continue the investigation and not postpone or delay the pursuit, detention and arrest of a domestic violence suspect simply because the suspect has recently left the scene prior to law enforcement's arrival. This interpretation is more consistent with the overall statutory scheme articulated by the legislature in *R.C. 2935.03*.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Warrantless Arrests

2015-Ohio-815, *2015-Ohio-815; 29 N.E.3d 365, **365; 2015 Ohio App. LEXIS 763, ***1

### *HN16* Arrests, Warrantless Arrests

See *R.C. 2935.07*.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

### *HN17* Arrests, Probable Cause

A police officer has reasonable or probable cause to arrest when the events leading up to the arrest, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause. Moreover, probable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense.

Criminal Law & Procedure > ... > Warrantless Searches > Vehicle Searches > Impounded Vehicles

Criminal Law & Procedure > Search & Seizure > Warrantless Searches > Inventory Searches

### *HN18* Vehicle Searches, Impounded Vehicles

Generally, a vehicle may be impounded when it is evidence in a criminal case, used to commit a crime, obtained with funds derived from criminal activities, or unlawfully parked or obstructing traffic; or if the occupant of the vehicle is arrested; or when impoundment is otherwise authorized by statute or municipal ordinance. Discretion as to impoundment is permissible so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. Moreover, an inventory search is a well-defined exception to the warrant requirement. An inventory search is conducted pursuant to administrative procedures to protect an individual's property while it is in police custody, protect police against claims of lost, stolen, or vandalized property, and protect police from dangerous instrumentalities.

**Counsel:** Kenneth J. Rexford, for Appellant.

Jana A. Emerick, for Appellee.

**Judges:** SHAW, J. PRESTON, J., concurs. ROGERS, P.J., concurs in Judgment Only.

**Opinion by:** SHAW

## Opinion

[**366] SHAW, J.

[*P1] Defendant-appellant, Jesse A. O'Neill ("O'Neill") appeals the June 12, 2014 judgment of the Allen County Court of Common Pleas journalizing his conviction [**367] for possession of cocaine and sentencing him to four years in prison. O'Neill assigns as error the trial court decisions overruling his two motions to suppress.

[*P2] On August 15, 2013, the Allen County Grand Jury indicted O'Neill on one count of domestic violence in violation of *R.C. 2919.25(A)*, *(D)(3)*, a felony of the fourth degree, and one count of possession of cocaine in violation of *R.C. 2925.11(A)*, *(C)(4)(e)*, a felony of the first degree. The charges stemmed from O'Neill's arrest for domestic violence, at which time a large quantity of cocaine was found in his vehicle pursuant to an impound inventory search conducted by the Lima Police Department. O'Neill entered a plea of not guilty to the charges.

2015-Ohio-815, *P3; 29 N.E.3d 365, **367; 2015 Ohio App. LEXIS 763, ***1

**[*P3]** On September 23, 2013, O'Neill filed a motion to suppress the evidence arguing that the warrantless search of his vehicle, which resulted in **[***2]** the discovery of the cocaine, was unlawful. O'Neill also filed a motion to sever the counts, requesting that each charge be tried at separate trials.

**[*P4]** On October 15, 2013, the trial court held a hearing on O'Neill's motion to suppress where the arresting officer and the officer who searched O'Neill's vehicle during the impound inventory search each provided testimony.

**[*P5]** On October 23, 2013, the trial court issued a judgment entry overruling O'Neill's motion to suppress. Specifically, the trial court found that under the circumstances the officers were warranted in impounding O'Neill's vehicle and that the inventory search was conducted in accordance with the police department's policy governing the procedure. Therefore, the trial court concluded that the warrantless search of O'Neill's vehicle was indeed lawful. The trial court also granted O'Neill's motion to sever the counts for trial.

**[*P6]** On December 9, 2013, O'Neill filed a notice of substitution of counsel on his behalf. On the same day, O'Neill's new counsel filed a second motion to suppress the cocaine found in O'Neill's vehicle. In this motion, O'Neill asserted that his arrest was unlawful because it violated the specific directives **[***3]** stated in *R.C. 2935.03(B)*, which governs the authority of law enforcement to make warrantless arrests in domestic violence offenses. O'Neill also argued that the arresting officer failed to comply with *R.C. 2935.07*, which requires the officer to inform him in a timely manner of the cause of arrest and the authority to make the warrantless arrest. O'Neill claimed that these violations rendered his arrest unlawful under both the Ohio and Federal Constitutions.

**[*P7]** On January 13, 2014, the trial court conducted a hearing on O'Neill's second motion to suppress where the arresting officer provided testimony pertinent to the issues raised regarding his authority to arrest O'Neill pursuant to the statutory scheme articulated in *R.C. 2935.03*.

**[*P8]** On January 21, 2014, the trial court issued a judgment entry overruling O'Neill's second motion to suppress. Specifically, the trial court found that the arresting officer complied with *R.C. 2935.03* and concluded that O'Neill's warrantless arrest was constitutionally permissible.

**[*P9]** On January 28, 2014, O'Neill pled no contest to the possession of cocaine charge.

**[*P10]** On May 7, 2014, a jury acquitted O'Neill of the domestic violence charge.

**[*P11]** On June 12, 2014, the trial court sentenced O'Neill to four years in prison **[***4]** for his first degree felony possession of cocaine.

**[*P12]** O'Neill filed this appeal, asserting the following assignments of error.

**[**368] ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED IN NOT SUPPRESSING THE FRUITS OF THE WARRANTLESS ARREST OF MR. O'NEILL, INCLUDING THE COCAINE FOUND THEREBY**.

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED IN NOT SUPPRESSING THE FRUITS OF THE ARREST OF MR. O'NEILL, INCLUDING THE COCAINE FOUND THEREBY, BECAUSE THERE WAS NO PROBABLE CAUSE TO SUPPORT THE ARREST**.

*The First Assignment of Error*

2015-Ohio-815, *P13; 29 N.E.3d 365, **368; 2015 Ohio App. LEXIS 763, ***4

**[*P13]** In his first assignment of error, O'Neill claims that the arresting officer was not authorized to arrest him without first obtaining a warrant. Specifically, O'Neill argues that Officer Boss was prohibited from making a warrantless arrest under _R.C. 2935.03(B)(3)(g)_ because O'Neill was not present at the scene when law enforcement arrived. As a result, O'Neill asserts the trial court should have suppressed the cocaine found in his vehicle under the exclusionary rule.

**[*P14]** _HN1_ A review of the denial of a motion to suppress involves mixed questions of law and fact. _State v. Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8, 797 N.E.2d 71_. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the **[***5]** credibility of witnesses. See _State v. Carter, 72 Ohio St.3d 545, 552, 1995 Ohio 104, 651 N.E.2d 965 (1995)_. When reviewing a ruling on a motion to suppress, deference is given to the trial court's findings of fact so long as they are supported by competent, credible evidence. _Burnside at ¶ 8_. With respect to the trial court's conclusions of law, however, our standard of review is de novo; and, therefore, we must decide whether the facts satisfy the applicable legal standard. _State v. McNamara, 124 Ohio App.3d 706, 710, 707 N.E.2d 539 (4th Dist.1997)_.

**[*P15]** The following evidence was admitted at the hearings held on O'Neill's motions to suppress.

**[*P16]** On June 23, 2013, at approximately 11:30 a.m., Officers Boss and Elchert of the Lima Police Department responded to a dispatch call regarding a domestic violence incident at 703 W. Wayne Street in Lima, Ohio. The officers were informed that the suspect had left or was getting ready to leave the home. Upon arriving at the scene, the victim, April Yoakum, told the officers that O'Neill, her live-in boyfriend, had assaulted her and left the house. The officers searched the residence and found that O'Neill was no longer present at the scene.

**[*P17]** The officers sat down with Yoakum to discuss what had transpired. Yoakum explained that she and O'Neill had been dating for two years and had been living together **[***6]** for approximately 30 days. Yoakum stated that she came home from work to find O'Neill drinking. She described an argument that ensued which culminated in O'Neill assaulting her. Specifically, Yoakum stated that O'Neill threw a beer can at her, shoved her to the ground and attempted to drag her around the home by her hair. Officer Boss testified that he observed physical evidence at the scene to corroborate Yoakum's statements. In particular, Officer Boss noticed that a beer can and other items had been thrown about the apartment. Officer Boss could not recall if Yoakum had any visible physical injuries, but the record indicates that she later sought medical attention for a fractured thumb. Yoakum informed Officer Boss that O'Neill had left in a four-door **[**369]** blue Mazda Protege and gave him the license plate number of the vehicle.

**[*P18]** Officer Boss left the scene to look for O'Neill while Officer Elchert remained with Yoakum as she completed a written statement. When asked at the suppression hearing why he pursued O'Neill, Officer Boss stated that "we attempt to locate all suspects in every case." (Doc. No. 52 at 23). He testified that he visited O'Neill's last known address where O'Neill's **[***7]** mother and another family member resided, which was located in a neighboring jurisdiction. O'Neill's mother informed Officer Boss that she had not seen O'Neill and did not know of his whereabouts. Based upon the information given by Yoakum that O'Neill had been drinking, Officer Boss decided to check the parking lots of some of the local bars to see if he could locate O'Neill's vehicle.

**[*P19]** Approximately a half an hour to an hour after he began his investigation, Officer Boss located a vehicle matching the description of O'Neill's in the parking lot of Lombardo's bar in Lima. Officer Boss ran the license plate of the vehicle and verified that it was registered to O'Neill. At that time, he was also able to view the photograph of O'Neill associated with the information on his Operator's License. Officer Boss then waited in an adjacent parking lot for backup to arrive before going into the bar to arrest O'Neill for domestic violence.

**[*P20]** Shortly thereafter, Officer Boss observed O'Neill leave the bar and get into his vehicle with an unknown female. Officer Boss followed O'Neill in his patrol cruiser. Once his back-up arrived, Officer Boss initiated a traffic stop with the intent to arrest O'Neill **[***8]** for domestic violence. O'Neill pulled his vehicle into the parking lot of a carry-out. Officer Boss testified that he asked O'Neill to step out of the vehicle and placed him under arrest for domestic violence. Officer Boss explained to O'Neill the reason for the stop—specifically that he was a suspect for

2015-Ohio-815, *P13; 29 N.E.3d 365, **369; 2015 Ohio App. LEXIS 763, ***8

domestic violence—and asked O'Neill what had transpired during the incident with Yoakum. O'Neill informed Officer Boss that he and Yoakum argued and then he left.

 **[*P21]** During his interactions with O'Neill, Officer Boss observed O'Neill to be intoxicated, which lead to Officer Boss also placing O'Neill under arrest for OVI. Officer Boss explained that he made the decision to impound O'Neill's vehicle because O'Neill was in custody and unable to move the vehicle. Specifically, Officer Boss testified that O'Neill would be in custody for another 24 hours due to his arrest for domestic violence and the location of the vehicle would have impeded the business traffic in the narrow parking lot of the carry-out if it were to remain parked in that location.

 **[*P22]** Officer Ludeke conducted the inventory search of O'Neill's impounded vehicle. Officer Ludeke testified that he performed the search in accordance **[***9]** with the Lima Police Department's impound procedure, which states that "[t]he contents of any unlocked trunk, glove box, other vehicle compartment or container in the vehicle will be inventoried." (State's Ex. 2). Officer Ludeke explained that one of the purposes of this policy is to remove any valuables left in the vehicle for safekeeping until the owner can retrieve them. Officer Ludeke recalled locating a book bag on the back seat behind the driver's seat. Inside the bag, he found two plastic baggies filled with a white powdery substance and a scale. The substance later tested positive for cocaine.

 **[*P23]** On appeal, O'Neill argues that Officer Boss had no legal authority to arrest him under the statutory scheme set forth in *R.C. 2935.03*, which generally governs **[**370]** a police officer's authority to make a warrantless arrest. *Section 2935.03(B)(1) of the Ohio Revised Code* specifically refers to "offenses of violence," including domestic violence, and states the following:

> *HN2* **(B)(1) When there is reasonable ground to believe that an offense of violence * * * the offense of domestic violence as defined in *section 2919.25 of the Revised Code* * * * has been committed within the limits of the political subdivision * * * or within the limits of the territorial jurisdiction of the peace officer, a peace [***10] officer * * * may arrest and detain until a warrant can be obtained any person who the peace officer has reasonable cause to believe is guilty of the violation**.

 **[*P24]** *HN3* *Section 2935.03(B)(3) of the Ohio Revised Code* specifically refers to domestic violence and defines "reasonable grounds" in the following manner:

> **[A] peace officer * * * has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that a particular person is guilty of committing the offense if any of the following occurs**:

> **(i) A person executes a written statement alleging that the person in question has committed the offense of domestic violence * * * against the person who executes the statement or against a child of the person who executes the statement**.

> **(ii) No written statement of the type described in division (B)(3)(a)(i) of this section is executed, but the peace officer, based upon the peace officer's own knowledge and observation of the facts and circumstances of the alleged incident of the offense of domestic violence * * * or based upon any other information, including, but not limited to, any reasonably trustworthy information given to the peace officer by the alleged victim of the alleged incident [***11] of the offense or any witness of the alleged incident of the offense, concludes that there are reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that the person in question is guilty of committing the offense**.

> *HN4* **(iii) No written statement of the type described in division (B)(3)(a)(i) of this section is executed, but the peace officer witnessed the person in question commit the offense of domestic violence or the offense of violating a protection order**.

2015-Ohio-815, *P13; 29 N.E.3d 365, **370; 2015 Ohio App. LEXIS 763, ***11

*R.C. 2935.03(B)(3)(a)*. **HN5** Specifically, with regard to domestic violence offenses, the Ohio General Assembly has articulated a "preferred arrest policy." *See City of Cleveland v. Morales, 8th Dist. Cuyahoga No. 81083, 2002-Ohio-5862, ¶ 16*. *Section 2935.03(B)(3)(b) of the Ohio Revised Code* states:

> **If * * * a peace officer has reasonable grounds to believe that the offense of domestic violence * * * has been committed and reasonable cause to believe that a particular person is guilty of**
>
> **committing the offense, *it is the preferred course of action in this state that the officer arrest and detain that person * * * until a warrant can be obtained*.**

(Emphasis added). Notably, the Ohio Revised Code also requires that local police departments adopt procedures and policies relating to officer response to an alleged incident of [***12] domestic violence according to the provisions of *R.C. 2935.03*. *See R.C. 2935.032(A)*. Thus, it is within these parameters that we review O'Neill's first assignment of error.

**[*P25] [**371]** O'Neill's contention that his arrest was constitutionally infirm rests upon the effect of *R.C 2935.03(B)(3)(g)* on an officer's authority to make a warrantless arrest of a domestic violence suspect. *Section 2935.03(B)(3)(g) of the Ohio Revised Code* states as follows:

> **HN6 If a peace officer * * * intends pursuant to divisions (B)(3)(a) to (g) of this section to arrest a person pursuant to division (B)(1) of this section and if the officer is unable to do so because the person is not present, the officer promptly shall seek a warrant for the arrest of the person**.

**[*P26]** O'Neill asserts on appeal that *R.C. 2935.03(B)(3)(g)* mandates a police officer obtain a warrant *prior* to arresting a domestic violence suspect when the suspect is not present at the scene. O'Neill contends that *R.C. 2935.03(B)(3)(g)* operates to automatically *revoke* the authority expressly conferred upon an officer in *R.C. 2935.03(B)(1)* to "arrest and detain" a domestic violence suspect "until a warrant can be obtained" simply because the suspect has left the scene prior to law enforcement's arrival. Thus, regardless of how compelling the evidence at the scene may be to demonstrate that the suspect has committed a domestic [***13] violence offense, under O'Neill's interpretation, the officer is not authorized to take any further action except to promptly seek an arrest warrant for that suspect. Moreover, any apprehension or detention of a suspect prior to obtaining an arrest warrant would be invalid under the statute.

**[*P27]** Initially, we note that O'Neill's argument obviates **HN7** the provisions of *R.C. 2935.03(B)(3)(a)(i)-(iii)*, which permit an officer to formulate probable cause to make a warrantless arrest based upon certain defined "reasonable grounds." It is notable that the "reasonable grounds" enumerated in *R.C. 2935.03(B)(3)(a)(i)* and *(ii)*, which are also the provisions implicated by the facts in this case, expressly permit an officer to find probable cause in circumstances where the officer may not have witnessed the suspect committing the domestic violence offense, even if only a misdemeanor, and therefore also provide for the specific scenario where the suspect is not present at the scene. Nowhere in this provision is the officer's ability to make a probable cause determination on these enumerated grounds qualified or otherwise limited by whether the suspect is present at the scene.

**[*P28]** O'Neill's position regarding *R.C. 2935.03(B)(3)(g)* further proves to be untenable when considering the preferred [***14] arrest policy with respect to domestic violence offenses. Specifically, **HN8** not only does *R.C. 2935.03(B)(3)(b)* state that a warrantless arrest is "the preferred course of action" in domestic violence offenses, but *R.C. 2935.03(B)(3)(c)* also *requires* an officer who does not comply with the preferred arrest policy to "articulate in the written report of the incident * * * a clear statement of the officer's reasons *for not arresting and detaining that person* until a warrant can be obtained." Again, in reviewing these provisions, there is no qualification that these arrest procedures are only applicable to instances in which the suspect is present at the scene.

**[*P29]** Even looking to other subsections of the statute, we do not find support for O'Neill's position on appeal. Most notably, *R.C. 2935.03(D)* governs an officer's authority to pursue a suspect who is clearly contemplated to no longer be present at the scene, and states as follows:

**HN9 If a * * * municipal police officer * * * is authorized by division (A) or (B) of this section to arrest and detain, within the limits of the political subdivision * * * or within the limits of the territorial jurisdiction of the [**372] peace officer, a person until a warrant can be obtained, the peace officer, outside the [***15] limits of that territory, *may pursue, arrest, and detain that person until a warrant can be obtained* if all of the following apply:**

**(1) The pursuit takes place without unreasonable delay after the offense is committed;**

**(2) The pursuit is initiated within the limits of the political subdivision * * * or within the limits of the territorial jurisdiction of the peace officer;**

**(3) The offense involved is a felony, a misdemeanor of the first degree or a substantially equivalent municipal ordinance, a misdemeanor of the second degree or a substantially equivalent municipal ordinance, or any offense for which points are chargeable pursuant to *section 4510.036 of the Revised Code*.**

(Emphasis added). **HN10** This provision authorizing an officer's pursuit of a suspect can only be applicable to cases in which the suspect is not present at the scene because the suspect has fled or recently left the scene.[1] Moreover, *R.C. 2935.03(D)* expressly authorizes an officer to "pursue, arrest, and detain that person until a warrant can be obtained." O'Neill's argument that *R.C. 2935.03(B)(3)(g)* operates to automatically deprive an officer of the authority to make a warrantless arrest when the suspect is not present at the scene would have the effect of rendering *R.C. 2935.03(D)* inapplicable to domestic [***16] violence offenses. Clearly, this is contrary to **HN11** the language in *R.C. 2935.03(D)* which explicitly incorporates the authority granted to an officer to arrest and detain a person whom the officer has reasonable cause to believe is guilty of an "offense of violence" referred to in *R.C. 2935.03(B)(1)*, which includes domestic violence.

**[*P30] HN12** In construing statutory provisions together, a court must give them "a reasonable construction as to give proper force and effect to each and all such statutes." *State v. Patterson, 81 Ohio St.3d 524, 525-26, 1998 Ohio 611, 692 N.E.2d 593 (1998)*. In addition, the interpretation and application of statutes must be viewed in a manner to carry out the legislative intent of the sections. *Johnson's Markets, Inc. v. New Carlisle Dep't of Health, 58 Ohio St. 3d 28, 35, 567 N.E.2d 1018 (1991)*. O'Neill's position with respect to the operation of *R.C. 2935.03(B)(3)(g)* simply does not comport with these fundamental tenets of statutory construction.

**[*P31]** O'Neill also claims that it was unlawful for Officer Boss to make a warrantless arrest for a misdemeanor offense that he did not observe. **[***17] HN13** "As a general rule, an officer may not make a warrantless arrest for a misdemeanor unless the offense is committed in the officer's presence." *State v. Henderson, 51 Ohio St. 3d 54, 56, 554 N.E.2d 104 (1990)*, citing, *State v. Lewis, 50 Ohio St. 179, 33 N.E. 405 (1893) syllabus* (holding that "a police officer could not make a warrantless arrest for a misdemeanor which was not committed in his presence based on the statements of witnesses to the crime").

**[*P32]** However, as previously discussed, O'Neill's argument is undermined by the fact that **HN14** *R.C. 2935.03(B)(3)(a)(i)* and *(ii)* specifically permit an officer to make a probable cause determination without the officer witnessing the person commit the offense. The "reasonable grounds" listed [**373] in *R.C. 2935.03(B)(3)(a)* apply to all domestic violence offenses, regardless of whether the offense constitutes a misdemeanor or a felony. Moreover, *R.C. 2935.03(B)* has been well recognized by courts to be an exception to the so-called officer "presence requirement" in misdemeanor offenses. *See e.g., State v. Benner, 3d Dist. Seneca No. 13—05—14, 2005-Ohio-5374, ¶ 12; State v. Miller, 91 Ohio App. 3d 270, 275, 632 N.E.2d 569 (3d Dist.1993); State v. Martin, 12th Dist. Madison No. CA2004—07—026, 2005-Ohio-3511, ¶ 9; State v. Norris, 2d Dist. Montgomery No. 17689, at *2, 1999*

---

[1] O'Neill argues that *R.C. 2935.03(D)* is limited to circumstances in which the officer is in "hot pursuit" of the suspect and where the officer makes an extra-territorial arrest. However, we find no support for this restrictive application in the statutory language nor has O'Neill cited any authority establishing this position on appeal.

*Ohio App. LEXIS 5206 (Nov. 5, 1999)*; *City of Cleveland v. Murad, 84 Ohio App. 3d 317, 320, 616 N.E.2d 1116 (8th Dist.1992)*; *R.C. 2935.03(B)(3)*.

[*P33*]  In sum, we conclude that *HN15* *R.C. 2935.03(B)(3)(g)* does not operate to revoke an officer's legal authority to make a warrantless arrest in cases involving domestic violence. To the [***18]  contrary, we find that when viewed in context with the related provisions in *R.C. 2935.03(B)* and *(D)*, the language "promptly shall seek a warrant for the arrest of the person" is far more reasonably construed to compel an officer to *expediently continue* the investigation and *not postpone or delay* the pursuit, detention and arrest of a domestic violence suspect simply because the suspect has recently left the scene prior to law enforcement's arrival. We conclude that this interpretation is more consistent with the overall statutory scheme articulated by the legislature in *R.C. 2935.03* and decline to adopt O'Neill's position on appeal.

[*P34*]  Turning to the facts in the instant case, the record establishes that Officer Boss had "reasonable grounds" to believe that O'Neill committed a domestic violence offense based upon his observations at the scene which corroborated Yoakum's statements that O'Neill had thrown a beer can at her, shoved her to the floor and dragged her by her hair. *See* *R.C. 2935.03(B)(3)(a)(ii)*. We also note that the record reflects that Yoakum completed a written statement alleging that O'Neill committed domestic violence against her.[2]

[*P35*]  Once Officer Boss acquired "reasonable grounds" to believe O'Neill had committed a domestic violence offense against Yoakum, he was then authorized by the statute to "pursue, arrest and detain [O'Neill] until a warrant can be obtained" because all three of the criteria under *R.C. 2935.03(D)* were met. Specifically, the record demonstrates that Officer Boss' pursuit of O'Neill took place without reasonable delay after the offense was committed, the pursuit was initiated within Officer Boss' jurisdiction, and at the time Officer Boss believed O'Neill to be guilty of a misdemeanor of the first degree.[3] Based on these facts, we conclude that the trial court did not err in overruling O'Neill's motion to suppress on the basis that O'Neill's warrantless arrest complied with *R.C. 2935.03(B)* and did not violate his constitutional rights.[4]

[*P36*] [**374]    Finally, we also note that O'Neill contends that his arrest was deficient under *R.C. 2935.07*. *Section 2935.07 of the Ohio Revised Code* states: *HN16* "When an arrest is made without a warrant by an officer, he shall inform the person arrested of such officer's authority to make the arrest and the cause of the arrest." Our review of the record reveals that Officer Boss informed O'Neill that he was being arrested for domestic violence at the time of his arrest and that there was no violation of this statute. Accordingly, the first assignment of error is overruled.

*The Second Assignment of Error*

[*P37*]  In his second assignment of error, O'Neill maintains that his arrest was not supported by probable cause and that the impoundment and search of his vehicle was unlawful. First, with respect to probable cause, *R.C. 2935.03(B)(3)(a)* articulates the standards of probable cause to make a warrantless arrest in domestic violence offenses and the record demonstrates that two of the enumerated grounds were [***21]  established in this case.

---

[2] Although we do not rely upon this provision in the case b efore us, it is interesting note [***19]  that a written statement alone constitutes "reasonable grounds" under *R.C. 2935.03(B)(3)(a)(i)*.

[3] O'Neill had a prior domestic violence conviction which elevated the offense to a felony of the fourth degree. However, the record indicates that Officer Boss was unaware of this prior conviction at the time he initiated his pursuit of O'Neill.

[4] We note that even assuming *arguendo* that O'Neill's arrest did not comply with [***20]  *R.C. 2935.03*, O'Neill has failed to show that suppression is the appropriate remedy for a violation of the statute. It is well-established that statutory violations falling short of constitutional violations do not trigger the exclusionary rule, unless the legislation requires suppression. *State v. Wilmoth, 22 Ohio St. 3d 251, 262, 22 Ohio B. 427, 490 N.E.2d 1236 (1986)*

2015-Ohio-815, *P38; 29 N.E.3d 365, **374; 2015 Ohio App. LEXIS 763, ***20

**[*P38]** Notwithstanding this fact, the relevant case law establishes that _HN17_ a police officer has reasonable or probable cause to arrest when the events leading up to the arrest, "viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. _Ornelas v. United States, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996)_. Moreover, probable cause exists when there are facts and circumstances within the police officer's knowledge that are sufficient to warrant a reasonable belief that the suspect is committing or has committed an offense. _Beck v. Ohio, 379 U.S. 89, 96, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)_. Based upon our previous discussion of the record, we find that the facts and circumstances within Officer Boss' knowledge were sufficient to warrant a reasonable belief that O'Neill had committed a domestic violence offense. Therefore, we find O'Neill's argument that his arrest was not supported by probable cause to be without merit.

**[*P39]** Next, O'Neill argues that Officer Boss' decision to impound his vehicle, which led to the discovery of the large quantity of cocaine during an inventory search by law enforcement, was improper due to the fact that the vehicle was "lawfully parked." (Appt. Brief at 21). _HN18_ Generally, a vehicle may be impounded when "'it is evidence in a criminal case, **[***22]** used to commit a crime, obtained with funds derived from criminal activities, or unlawfully parked or obstructing traffic; or _if the occupant of the vehicle is arrested;_ or when impoundment is otherwise authorized by statute or municipal ordinance.'" _State v. Taylor, 114 Ohio App. 3d 416, 422, 683 N.E.2d 367 (1996)_, quoting Katz, Ohio Arrest, Search and Seizure 224-225 (1996) (emphasis added). Discretion as to impoundment is permissible "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." _Colorado v. Bertine, 479 U.S. 367, 375-376, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987)_.

**[*P40]** Moreover, an inventory search is a well-defined exception to the warrant requirement. _State v. Mesa, 87 Ohio St.3d 105, 108, 1999-Ohio-253, 717 N.E.2d 329_, citing _Bertine at 367_. An inventory search is conducted pursuant to administrative procedures to protect an individual's property while it is in police custody, protect police against claims of lost, stolen, or vandalized property, and protect police from dangerous instrumentalities. _Mesa at 109_, **[**375]** citing _South Dakota v. Opperman, 428 U.S. at 369 (1976)_.

**[*P41]** Here, Officer Boss' testimony revealed that the decision to tow O'Neill's vehicle had no relation to a suspicion of criminal activity, but instead was based upon the fact that the vehicle would be left for a significant period of time due to O'Neill's arrest for domestic violence and **[***23]** OVI. Officer Boss also testified that the location of O'Neill's vehicle hindered the commercial traffic of the private business where the vehicle was parked. In addition, Officer Boss stated that O'Neill's passenger was also intoxicated and therefore was not available to move O'Neill's vehicle. Officer Boss further explained that the police department contracted with a company who would tow O'Neill's vehicle to their private lot and it was necessary to conduct an inventory search to itemize and secure any valuables left in the vehicle until O'Neill could retrieve them upon his release. Officer Ludeke also provided testimony that the inventory search was conducted in accordance with standard department procedure and a copy of the policy was admitted as an exhibit at the suppression hearing. Notably, the trial court accepted each of these reasons as legitimate justification for the impoundment and inventory search. Moreover, the authority cited by O'Neill in support of his contention that the impoundment and subsequent search of his vehicle was unlawful is distinguishable from the facts in the instant case.[5]

**[*P42]** For all these reasons, we conclude that the trial court did not err in determining that O'Neill's arrest was supported by probable cause and that his vehicle was properly impounded and subject to an inventory search. Accordingly, O'Neill's second assignment of error is overruled and the judgment of the trial court is affirmed.

---

[5] In his brief, O'Neill cites _Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)_ to support his position that the impoundment of any **[***24]** "legally parked" vehicle is unlawful. However, the Court in _Gant_ only addressed the search incident to arrest exception and did not discuss the inventory search exception to the warrant requirement. _See Cleveland v. Cunningham, 8th Dist. No. 95267, 2011-Ohio-2276, ¶ 20_ (stating that the "inventory search" exception to the warrant requirement of the _Fourth Amendment_ was left unaffected by _Gant_). O'Neill also cites _State v. Myrick, 2d Dist. Montgomery No. 21287, 2006-Ohio-580_, which again is distinguishable because the person arrested in _Myrick_ was not an occupant of the vehicle towed and impounded. The record clearly establishes that O'Neill was an occupant of the vehicle at the time of his arrest.

2015-Ohio-815, *P38; 29 N.E.3d 365, **375; 2015 Ohio App. LEXIS 763, ***24

***Judgment Affirmed***

**PRESTON, J., concurs**.

**ROGERS, P.J., concurs in Judgment Only**.

---

**End of Document**

 Neutral
As of: September 9, 2025 3:26 PM Z

## *State v. Perez*

Court of Appeals of Ohio, Seventh Appellate District, Mahoning County

June 25, 2010, Decided

CASE NO. 09 MA 30

**Reporter**
2010-Ohio-3168 *; 2010 Ohio App. LEXIS 2652 **; 2010 WL 2676911

STATE OF OHIO, PLAINTIFF-APPELLEE VS. LUIS PEREZ, DEFENDANT-APPELLANT

**Subsequent History:** Discretionary appeal not allowed by *State v. Perez, 2010 Ohio 5762, 2010 Ohio LEXIS 2921 (Ohio, Dec. 1, 2010)*

**Prior History:** **[**1]** CHARACTER OF PROCEEDINGS: Criminal Appeal from the Campbell Municipal Court of Mahoning County, Ohio. Case No. 08 CRB 891.

**Disposition:** Affirmed.

## Core Terms

self-defense, street, assault, walked, damaging, sentence, bat, trial court, trespasser, imminent, affray, driver, theft, jail, affirmative defense, believes, cousin, parked, fault

## Case Summary

**Procedural Posture**
Defendant sought review of the judgment of the Campbell Municipal Court of Mahoning County, Ohio, which convicted him of assault and criminal damaging. Defendant contended that the trial court erred in rejecting his defense of defense of others or defense of property.

**Overview**
Defendant used a baseball bat to smash the driver's side window of a car, damaging the car and injuring the driver. The incident occurred near defendant's home and across the street from his sister's house. At trial, defendant contended that he acted in defense of others and defense of property, asserting that he acted to protect a 4-year-old child who was sleeping in the house and that he acted to defend his sister's home. The court held that the trial court did not err in rejecting defendant's affirmative defenses. With respect to the defense of others defense, the evidence showed that defendant initiated the assault by approaching the victim in his vehicle that was parked away from the persons and property he was allegedly protecting. The victim was sitting in his car preparing to leave when defendant attacked him, and there was no evidence that the victim, a 16-year-old boy, presented any type of threat to anyone when he was assaulted. Regarding the argument that defendant was defending property, there was no evidence that the victim was on defendant's property when the assault occurred.

**Outcome**
The court affirmed the judgment of the trial court.

## LexisNexis® Headnotes

Criminal Law & Procedure > Defenses > Defense of Others

Criminal Law & Procedure > Defenses > Self-Defense

*HN1* **Defenses, Defense of Others**

Under Ohio law, self-defense, defense of others, and defense of property are affirmative defenses. In order for a defendant to assert the affirmative defense of defense of others, it must be shown that he was protecting another person from immediate danger of bodily harm from an assailant and that the other person could assert the defense himself A defendant invoking the "defense of others" is only entitled to use as much force as the person being defended would be permitted to use.

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > Defenses > Defense of Others

Criminal Law & Procedure > Defenses > Self-Defense

*HN2* **Burdens of Proof, Defense**

To establish self-defense or defense of others, the defendant must show that: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of force; and (3) he must not have violated any duty to retreat or avoid the danger. The defendant is privileged to use only that force which is reasonably necessary to repel the attack.

Criminal Law & Procedure > Trials > Burdens of Proof > Defense

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Defense Issues

Criminal Law & Procedure > Defenses > Defense of Others

Criminal Law & Procedure > Defenses > Self-Defense

*HN3* **Burdens of Proof, Defense**

The defendant must prove all three elements of self-defense by a preponderance of the evidence, and failure of any one of the elements defeats the affirmative defense. Proving self-defense does not negate an element of the offense; rather, it acts as a defense for committing the elements of the offense. It is for the trier of fact to determine the credibility of the evidence supporting the defenses of self-defense or defense of others.

Criminal Law & Procedure > Defenses > Defense of Others

Criminal Law & Procedure > Defenses > Self-Defense

*HN4* **Defenses, Defense of Others**

Defense of property is related to self-defense and defense of others. A landowner may use such force as is reasonably necessary in defense of his property. A trespasser who intends to steal and is about to enter a building to commit a theft is not entitled to any affirmative notice warning him that the landowner may use reasonable force to prevent the theft and the trespasser assumes that risk. The landowner may use such force as he in good faith reasonably believes will be necessary to prevent the theft and repel the trespasser. The landowner's right to use reasonable force extends only to the right to prevent the theft; that is, once the threat of the theft ceases, the right to use reasonable force to prevent the theft also ceases. In determining whether there are reasonable grounds for believing there was an imminent threat of bodily harm, the court can consider whether the defendant received prior threats or encountered prior trespassers.

Criminal Law & Procedure > Defenses > Self-Defense

*HN5* **Defenses, Self-Defense**

The defendant's state of mind is an important factor in establishing self-defense. There must be both reasonable and objective grounds to believe that harm is imminent, and there must be an honest and subjective belief that harm is imminent. In determining whether there are reasonable grounds for believing there was an imminent threat of great bodily harm, the court may consider whether the defendant received prior threats or encountered prior trespassers. Nevertheless, the defense of self-defense does not permit the alleged victim to become the aggressor once the affray has ended, or before an affray has even taken place. "The "not at fault" requirement means that the defendant must not have been the first aggressor in the incident.

Criminal Law & Procedure > Defenses > Self-Defense

*HN6* **Defenses, Self-Defense**

The privilege to use force to repel an intruder does not permit a defendant to leave the sanctuary of his home to go after an anticipated intruder.

Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Defense Issues

Criminal Law & Procedure > Defenses > Self-Defense

*HN7* **Province of Court & Jury, Defense Issues**

Whether the evidence establishes the elements of self-defense is left to the trier of fact to decide.

**Counsel:** For Plaintiff-Appellee: Atty. Mark J. Kolmacic, Director of Law, Youngstown, Ohio.

For Defendant-Appellant: Atty. Rhys B. Cartwright-Jones, Youngstown, Ohio.

**Judges:** Hon. Cheryl L. Waite, Hon. Gene Donofrio, Hon. Joseph J. Vukovich. Donofrio, J., concurs. Vukovich, P.J., concurs.

**Opinion by:** Cheryl L. Waite

2010-Ohio-3168, *2010-Ohio-3168; 2010 Ohio App. LEXIS 2652, **1

# Opinion

WAITE, J.

 **[*P1]**  Appellant Luis Samuel Perez contends that he presented evidence of self-defense in response to charges of assault and criminal damaging. He seeks to reverse his conviction and 12-day jail sentence in Campbell Municipal Court. Appellant used a baseball bat to smash the driver's side window of a car, damaging the car and injuring the driver. The incident occurred near Appellant's home and across the street from his sister's house. The driver of the car was a 16-year old minor child J.R., who had just dropped off a friend at Appellant's sister's residence. J.R. was sitting in his parked car across the street from the house, when Appellant approached and struck it with a baseball bat. J.R. exited the car and told Appellant that he was only there to drop off a friend and  **[**2]**  use the bathroom. J.R. reentered the car and shortly afterward ran the car into a nearby house.

 **[*P2]**  On April 15, 2008, Appellant was charged with one count of assault, a first degree misdemeanor under Campbell City Code 131.03, and one count of criminal damaging, a second degree misdemeanor under Campbell City Code 134.02. The court held a bench trial on January 20, 2009. The victim and Appellant both testified at trial, along with the victim's mother and a cousin of Appellant. At the conclusion of the trial, the court found Appellant guilty of both counts and sentenced him to 180 days in jail on count one, with 168 days suspended, and 90 days on count two, with 78 days suspended, to be served concurrently. This appeal followed.

 **[*P3]**  Appellant argues that he proved the affirmative defenses of defense of others and defense of property. Appellant contends that there was a 4-year old child sleeping in the house and that he acted to defend the child and to defend his sister's home. To prove self-defense or defense of others, a defendant must show that he was not at fault in creating the situation giving rise to the affray. The evidence shows, however, that Appellant initiated the assault by approaching  **[**3]**  J.R. in his vehicle that was parked away from the persons and property he was allegedly protecting. Further, defense of others is an affirmative defense. The trial court, as the trier of fact, did not believe Appellant's evidence and ruled accordingly. There is no error of law or fact in the verdict, and the judgment of the trial court is affirmed.

 **[*P4]**  On December 28, 2009, the state filed a notice that it would not be filing a brief and would stand on the record.

 **[*P5]**  The record indicates that on April 12, 2008, at approximately 2:30 a.m., J.R., a 16-year old juvenile, drove to 10 Monette Street in Campbell, Ohio, to drop off his friend. He parked his car on the street and walked his friend to the house. J.R. entered the residence to use the restroom, and then returned to his car. Appellant observed this activity from his mother's house at 221 Gladstone Street, which is the next street to the north of Monette Street. Appellant was concerned about the residence at 10 Monette Street because it is owned by his sister. Appellant took a baseball bat, walked to J.R.'s car and hit the driver's side window with the bat, thereby damaging the car and injuring J.R. Appellant ordered J.R. to get out of  **[**4]**  the car, which he did. After an exchange of words, J.R. reentered the car and, shaken up by the incident, drove the car into a nearby house. Appellant was later charged with assault and criminal damaging, and the case proceeded to a bench trial on January 20, 2009, in Campbell Municipal Court.

 **[*P6]**  Appellant testified that he was 33 years old and living in his mother's home at the time of the crime. He was periodically checking on his sister's house at 10 Monette Street because his sister was away in Sandusky. He testified that one of his cousins was staying in the house, along with his 15-year old niece. There was also testimony from Santos Mercado (another cousin of Appellant) that his 4-year old child was asleep in the house when the crime occurred. At 11:00 p.m. on April 11, 2008, Appellant visited his sister's house and could not find his niece or his cousin (whose name is not in the record). He assumed that the cousin had passed out or was sleeping, and he did not know where his niece was. He left and locked the door behind him.

**[\*P7]**  At 2:30 a.m., Appellant saw a young man leaving his sister's house and enter a car that was parked on the street. Appellant grabbed a bat and ran to the car.  **[\*\*5]** The car was not turned on or moving. The young man was talking on his cellular phone inside the car. Appellant testified that he hit the car with his bat and walked away. He testified that the young man exited the car. They exchanged a few words, and Appellant turned and walked back to his mother's house.

**[\*P8]**  J.R. testified that he was a 16-year old student at Campbell Memorial High School. He testified that he was not romantically involved with J. and that they were just friends. On the morning of the crime, he had picked J. up from another friend's house and drove her to her home on Monette Street. He parked his car across the street from her house and walked her to the house. To his knowledge there was no one at home at the time. He entered the house to use the bathroom, and then walked back to his car. He did not see anyone else in the house other than J., and saw no one as he walked back to his car. He entered his car and had not yet started the engine when he saw Appellant hit the driver's side window with a baseball bat. The window shattered, and his back and shoulder were injured by the pieces of glass. Appellant told J.R. to get out of the car. Appellant asked, "[w]hat are you  **[\*\*6]** doing here?" and J.R. answered "I'm only 16, I'm not doing anything here with your niece or nothing, I'm just using the restroom." (1/20/09 Tr., p. 12.) Appellant told him to leave, so he got back into the car and started driving. He stopped at a stop sign and thought Appellant was following him. He testified that he was scared, and as he started driving again, he swerved and drove his car into a house. He testified that the car was later repaired by his father and with insurance proceeds, but that there was a $ 500 deductible on the insurance policy.

**[\*P9]**  The court found Appellant guilty of assault and criminal damaging. The court sentenced Appellant to 180 days in jail for assault, with 168 suspended, and a $ 250 fine plus court costs. The court also sentenced him to 90 days in jail for criminal damaging, with 78 days suspended, a $ 100 fine, court costs, and ordered restitution to the victim's father in the amount of $ 500. The two jail sentences were to run concurrently, with a total of 12 days of actual jail time to be served. The court also ordered six months of probation. The judgment entry was filed on January 20, 2009, and this timely appeal followed on February 2, 2009. The trial  **[\*\*7]** court issued a stay of execution of sentence on February 10, 2009.


ASSIGNMENT OF ERROR

**[\*P10]**  "The trial court erred in convicting Mr. Perez, who presented a complete case of defense of another and/or of defense of property."

**[\*P11]**  Appellant argues that he should not have been convicted because the court should have believed his evidence that he was acting either in defense of another or in defense of property. *HN1* Under Ohio law, self-defense, defense of others, and defense of property are affirmative defenses. *State v. Martin (1986), 21 Ohio St.3d 91, 21 OBR 386, 488 N.E.2d 166*, affirmed *Martin v. Ohio (1987), 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267*. In order for a defendant to assert the affirmative defense of defense of others, it must be shown that he was protecting another person from immediate danger of bodily harm from an assailant and that the other person could assert the defense himself. *State v. Wenger (1979), 58 Ohio St.2d 336, 390 N.E.2d 801*. A defendant invoking the "defense of others" is only entitled to use as much force as the person being defended would be permitted to use. *State v. Wenger (1979), 58 Ohio St.2d 336, 340, 12 O.O.3d 309, 390 N.E.2d 801*.

**[\*P12]**  *HN2* To establish self-defense  **[\*\*8]** or defense of others, the defendant must show that: (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of force; and (3) he must not have violated any duty to retreat or avoid the danger. *State v. Robbins (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755*, paragraph two of the syllabus; *State v. Cooper, 170 Ohio App.3d 418, 2007 Ohio 1186, 867 N.E.2d 493, P18*. The defendant is privileged to use only that force which is reasonably necessary to repel the attack. *State v. McLeod (1948), 82 Ohio App. 155, 157, 80 N.E.2d 699, 37 Ohio Op. 522, 50 Ohio Law Abs. 475*.

[*P13]  *HN3* The defendant must prove all three elements of self-defense by a preponderance of the evidence, and failure of any one of the elements defeats the affirmative defense. *State v. Jackson (1986), 22 Ohio St.3d 281, 284, 22 OBR 452, 490 N.E.2d 893*, certiorari denied *(1987), 480 U.S. 917, 107 S. Ct. 1370, 94 L. Ed. 2d 686*. Proving self-defense does not negate an element of the offense; rather, it acts as a defense for committing the elements of the offense.  [**9]  *State v. Harrison, 10th Dist. No. 06AP-827, 2007 Ohio 2872, P23*. It is for the trier of fact to determine the credibility of the evidence supporting the defenses of self-defense or defense of others. *State v. Griffin, 175 Ohio App.3d 325, 2008 Ohio 702, 886 N.E.2d 921, P31*.

[*P14]  *HN4* Defense of property is related to self-defense and defense of others. "[A] landowner may use such force as is reasonably necessary in defense of his property. A trespasser who intends to steal and is about to enter a building to commit a theft is not entitled to any affirmative notice warning him that the landowner may use reasonable force to prevent the theft and the trespasser assumes that risk. The landowner may use such force as he in good faith reasonably believes will be necessary to prevent the theft and repel the trespasser. The landowner's right to use reasonable force extends only to the right to prevent the theft; that is, once the threat of the theft ceases, the right to use reasonable force to prevent the theft also ceases." *Goldfuss v. Davidson, (1997), 79 Ohio St.3d 116, 124, 1997 Ohio 401, 679 N.E.2d 1099*.

[*P15]  In determining whether there are reasonable grounds for believing there was an imminent threat of bodily harm, the  [**10]  court can consider whether the defendant received prior threats or encountered prior trespassers. *State v. Fields (1992), 84 Ohio App.3d 423, 428, 616 N.E.2d 1185*.

[*P16]  The record on appeal does not establish defense of others or defense of property. First and foremost, there is no evidence that the person or persons that Appellant was allegedly defending could assert the defense of self-defense. The record indicates that J.R. was invited into the house to use the bathroom by his friend J. He then left the house and walked back to his car. There is no indication that J.R. trespassed on any property (since he was invited into the home), or that he was threatening anyone at J.'s home, while he walked to his car, or while he sat in his car. It is clear from the record that J.R. was simply preparing to drive away when Appellant attacked. It is apparent that Appellant was not privileged to use any force against J.R. because no one in the vicinity of the attack was in imminent danger of being attacked by J.R. or believed they were going to be attacked by J.R.

[*P17]  Appellant believes that he had a legitimate reason to be afraid of J.R. because his mother's house had been previously robbed. It is true [**11] that *HN5* the defendant's state of mind is an important factor in establishing self-defense. *State v. Moore, 3d Dist. Nos. 1-06-89, 1-06-96, 2007 Ohio 3600, P59*. There must be both reasonable and objective grounds to believe that harm is imminent, and there must be an honest and subjective belief that harm is imminent. *State v. Thomas (1997), 77 Ohio St.3d 323, 330, 1997 Ohio 269, 673 N.E.2d 1339*. It is also true that, in determining whether there are reasonable grounds for believing there was an imminent threat of great bodily harm, the court may consider whether the defendant received prior threats or encountered prior trespassers. *State v. Fields (1992), 84 Ohio App.3d 423, 428, 616 N.E.2d 1185*. Nevertheless, the defense of self-defense does not permit the alleged victim to become the aggressor once the affray has ended, or before an affray has even taken place. "The 'not at fault' requirement * * * means that the defendant must not have been the first aggressor in the incident." *State v. Turner, 171 Ohio App.3d 82, 2007 Ohio 1346, 869 N.E.2d 708, P23*. See also, *State v. Kershaw (1999), 132 Ohio App.3d 243, 249, 724 N.E.2d 1176* (defendant is at fault in creating the affray when he threatens victim,  [**12]  leaves to obtain a firearm, and pursues the victim off of his property); *State v. Pecora (1993), 87 Ohio App.3d 687, 690-691, 622 N.E.2d 1142* (one who believes that a driver is intending to hit him with a car is not privileged to shoot at the car after it has already driven by).

[*P18]  Appellant was obviously at fault in creating the affray because J.R. was sitting in his car preparing to leave when Appellant attacked him. There is no evidence that J.R., a 16-year old boy, presented any type of threat to anyone when he was assaulted.

[*P19]  Regarding the argument that Appellant was defending his property, there is no evidence that J.R. was on Appellant's property when the assault occurred. Appellant was parked on the street in his car. *HN6* "The privilege to

use force to repel an intruder does not permit a defendant to leave the sanctuary of his home to go after an anticipated intruder." *State v. Walton (Aug. 2, 1995), 9th Dist. No. 94CA005940, 1995 Ohio App. LEXIS 3216 at *12*.

 **[*P20]** Finally, even if Appellant had presented evidence supporting the elements of self-defense or defense of property, the trial court, as the trier-of-fact was not required to believe that evidence. *HN7* Whether the evidence establishes the elements of self-defense **[**13]** is left to the trier of fact to decide. *State v. Morton, 147 Ohio App.3d 43, 2002 Ohio 813, 768 N.E.2d 730, P52*.

 **[*P21]** Appellant did not present sufficient evidence to prove defense of others or defense of property. Even if Appellant had presented evidence to support these defenses, the trial court, as the trier of fact, was not required to believe the evidence. Appellant's arguments are not supported by the record, and his conviction and sentence for assault and criminal damaging are hereby affirmed.

Donofrio, J., concurs.

Vukovich, P.J., concurs.

---

**End of Document**

ℹ️ Cited
As of: September 9, 2025 3:32 PM Z

# *State v. Redden*

Court of Appeals of Ohio, Twelfth Appellate District, Butler County

March 25, 2024, Decided

CASE NO. CA2023-09-106

**Reporter**

2024-Ohio-1088 *; 238 N.E.3d 277 **; 2024 Ohio App. LEXIS 1019 ***; 2024 WL 1253077

STATE OF OHIO, Appellee, - vs - MICHAEL K. REDDEN, Appellant.

**Prior History:** **[***1]** CRIMINAL APPEAL FROM HAMILTON MUNICIPAL COURT. Case No. CRB2301790.

## Core Terms

domestic violence, glass door, assigned error, trial court, physical harm, door, way inside, sliding

## Case Summary

### Overview

HOLDINGS: [1]-The trial court erred in convicting defendant of domestic violence under *R.C. 2919.25(A)*, as there was insufficient evidence to prove that defendant knowingly caused the complainant physical harm because, when viewed in a light most favorable to the prosecution, the evidence established that defendant's only intent on the day of the incident was to keep a determined and angry complainant from entering the house and, once inside, to prevent her from breaking things or hitting him.

### Outcome
Judgment reversed.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Weight & Sufficiency

Evidence > Burdens of Proof > Proof Beyond Reasonable Doubt

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

*HN1* A sufficiency of the evidence argument disputes whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would support a conviction. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Proof beyond a reasonable doubt is proof of

2024-Ohio-1088, *2024-Ohio-1088; 238 N.E.3d 277, **277; 2024 Ohio App. LEXIS 1019, ***1

such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs. _R.C. 2901.05(E)_. A reversal based on insufficient evidence leads to an acquittal that bars a retrial.

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

Criminal Law & Procedure > ... > Domestic Offenses > Domestic Assault > Elements

_HN2_ Based on the definition of knowingly, the state is not required to prove the defendant intended to cause physical injuries to support a conviction for domestic violence. When determining whether a defendant acted knowingly, it is the defendant's state of mind and perception that are measured, not an objective reasonable expectation. Whether a defendant acts knowingly can be determined from all the surrounding facts and circumstances, including the doing of the act itself.

**Counsel:** Laura R. Gibson, City of Hamilton Assistant Prosecuting Attorney, for appellee.

Luftman, Heck & Associates, LLP, and Juliea S. Crumes, for appellant.

**Judges:** M. POWELL, J. S. POWELL, P.J., and PIPER, J., concur.

**Opinion by:** M. POWELL

# Opinion

**[**278] M. POWELL, J.**

[*P1] Appellant, Michael Redden, appeals his conviction in the Hamilton Municipal Court for domestic violence.

[*P2] Redden and Bridget Langen are the unmarried parents of a young child. Redden and Langen resided together until May 23, 2023, when Langen moved out. On July 7, 2023, Langen drove to Redden's home to pick up their child. As Langen sat in her car buckling the child's seatbelt, Redden leaned into the driver-side window and grabbed Langen's cellphone. Redden claimed the cellphone belonged to him as he had paid for it and Langen had refused his many requests to return it. Upset, Langen got out of her car and chased Redden around the yard. Redden ran to the back of his home and entered his home through a sliding glass door to get away from Langen. Angry, Langen tore Redden's outdoor television from the patio wall. Redden returned to the back door to see if his children, who remained outside, were in danger. [***2] As Redden stood at the sliding glass door, he and Langen yelled at each other. Langen punched the glass door, Redden opened the door to prevent further banging, and Langen tried to push her way inside. She was eventually successful. During their scuffle inside the house, Redden held Langen in a bear hug to prevent her from swinging at him or breaking things; Langen bit and punched [**279] Redden. Langen eventually left the home on her own and reported the incident to the Ross Police Department. Langen suffered a bruise and scrape on her right arm, a scrape on her left knee, and bruises on the back of a leg.

[*P3] Redden was charged with domestic violence in violation of _R.C. 2919.25_, a first-degree misdemeanor. Redden pled not guilty and the matter proceeded to a bench trial before Attorney Harry Zornow, a magistrate/acting judge. A police officer and Langen testified on behalf of the state; Redden moved the trial court for acquittal at the close of the state's case-in-chief. The trial court denied Redden's motion for acquittal; Redden and his teenage daughter then testified on his behalf. The trial court found Redden guilty of domestic violence and sentenced him to 30 days in jail with 23 days suspended and [***3] credit for 3 days served, two years of community control, anger management and domestic violence classes, and no contact with Langen. Although the case was heard by Attorney Zornow as magistrate/acting judge, the sentencing entry was signed by Judge Daniel Gattermeyer. The entry also incorrectly stated that Redden pled guilty to domestic violence.

[*P4] Redden now appeals, raising three assignments of error.

[*P5] Assignment of Error No. 1:

[*P6] MR. REDDEN'S DOMESTIC VIOLENCE CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

[*P7] Redden challenges his domestic violence conviction, arguing there was insufficient evidence he *knowingly* caused Langen physical harm.

[*P8] *HN1* "A sufficiency of the evidence argument disputes whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Armstrong-Carter, 2d Dist. Montgomery Nos. 28571 and 28576, 2021-Ohio-1110, ¶ 37*, citing *State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541*. When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would support a conviction. *State v. Krieger, 12th Dist. Warren No. CA2017-12-167, 2018-Ohio-4483, ¶ 13*. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of [***4] fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.; State v. Jenks, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.* "'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs." *R.C. 2901.05(E)*. "[A] reversal based on insufficient evidence leads to an acquittal that bars a retrial." *State v. Gideon, 165 Ohio St.3d 156, 2020-Ohio-6961, ¶ 27*.

[*P9] Redden was convicted of domestic violence in violation of *R.C. 2919.25(A)*, which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

[*P10] "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. *HN2* A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *R.C. 2901.22(B)*. Based on the definition of "knowingly," the state is not required to prove the defendant intended to [**280] cause physical injuries to support a conviction for domestic violence. *State v. Agnew, 12th Dist. Butler No. CA2022-12-118, 2024-Ohio-295, ¶ 43*. When determining whether a defendant acted knowingly, it is the defendant's state of mind and perception that are measured, not an objective reasonable expectation. *Krieger, 2018-Ohio-4483 at ¶ 15*. Whether a defendant [***5] acts knowingly can be determined from all the surrounding facts and circumstances, including the doing of the act itself. *State v. Robinson, 12th Dist. Fayette No. CA2005-11-029, 2007-Ohio-354, ¶ 18*.

[*P11] After reviewing the record, we find that the trial court erred in convicting Redden of domestic violence because there is insufficient evidence to prove that Redden knowingly caused Langen physical harm.

[*P12] The evidence at trial shows that Langen repeatedly tried to push her way inside the house, eventually becoming successful, while Redden tried to keep her out. A video recording of a portion of the incident shows Langen trying to crawl sideways inside the house past Redden as the sliding door is partially open and Redden is standing in the doorway. Langen never disputed that she persistently tried to force her way inside the house. The evidence at trial indicates that Langen sustained bruises on the back of her leg and the bruise and scrape on her right arm during the parties' scuffle at the sliding glass door when she was trying to force her way inside the house and Redden was trying to keep her out of the house and close the door. As Langen explained, "my arm just kind of slid across [the lock on the sliding glass door] as it was being shut." The evidence further [***6] indicates she sustained a scrape on her knee when she fell in the yard chasing Redden.

[*P13] The record demonstrates that Redden came into physical contact with Langen when she persistently tried to push her way inside the house and he tried to block her from entering the house and close the door, and that Redden's actions were solely motivated by his need to keep Langen out of the house. The state presented no evidence that Redden tried to block Langen or held her in a bear hug once inside the house to cause or attempt to

cause her physical harm or that Redden was subjectively aware that harming Langen was probable based on the way he tried to block her or held her in a bear hug.

 **[*P14]**  The evidence, even when viewed in a light most favorable to the prosecution, establishes that Redden's only intent on the day of the incident was to keep a determined and angry Langen from entering the house, and once inside, to prevent her from breaking things or hitting him. Redden did not, however, knowingly cause or attempt to cause Langen physical harm. As such, Redden's conviction is not supported by sufficient evidence, and his first assignment of error is sustained. Redden's conviction is reversed, his **[***7]** sentence is vacated, and he is discharged accordingly.

 **[*P15]**  Assignment of Error No. 2:

 **[*P16]**  THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF DOMESTIC VIOLENCE BECAUSE SAID CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

 **[*P17]**  Assignment of Error No. 3:

 **[*P18]**  THE TRIAL COURT ERRED WHEN DEFENSE COUNSEL WAS NOT MADE AWARE OF THE TITLE OF THE TRIER OF FACT.

 **[*P19]**  In his second assignment of error, Redden argues his conviction for domestic violence is against the manifest **[**281]** weight of the evidence because the state failed to prove he knowingly caused Langen physical harm. In his third assignment of error, Redden argues that the trial court erred in allowing Zornow, an attorney, to hear the case as either a magistrate or acting judge without requiring the necessary waivers. Because of our resolution of Redden's first assignment of error, his second and third assignments of error are moot and need not be considered. *App.R. 12(A)(1)(c)*; *Goebel v. Hopkins, 12th Dist. Warren No. CA2023-06-044, 2024-Ohio-194, ¶ 30*.

 **[*P20]**  Judgment reversed, and Redden is discharged.

S. POWELL, P.J., and PIPER, J., concur.

---

**End of Document**

 Positive
As of: September 9, 2025 3:25 PM Z

## *White v. Roch*

Court of Appeals of Ohio, Ninth Appellate District, Summit County

March 16, 2005, Decided

C. A. No. 22239

**Reporter**
2005-Ohio-1127 *; 2005 Ohio App. LEXIS 1126 **

PEGGY A. WHITE, Appellant v. CHRISTOPHER ROCH, et al., Appellees

**Subsequent History:** Discretionary appeal not allowed by *White v. Roch, 2005 Ohio 3978, 2005 Ohio LEXIS 1770 (Ohio, Aug. 10, 2005)*

**Prior History:** **[**1]** APPEAL FROM JUDGMENT ENTERED IN THE COURT OF COMMON PLEAS, COUNTY OF SUMMIT, OHIO. CASE No. CV 2004 04 2190.

**Disposition:** Judgment of the Court of Common Pleas affirmed.

## Core Terms

domestic violence, criminal prosecution, trial court, motion to dismiss, assigned error, false arrest, malicious, written statement, leave to amend, probable cause to arrest, probable cause, arrest, amend

## Case Summary

**Procedural Posture**
Appellant individual appealed a judgment by the Summit County Court of Common Pleas (Ohio) that dismissed her false arrest and malicious prosecution claims against appellees, police officers and the city.

**Overview**

The trial court determined that the individual's complaint made no reference to any violation of federal statutes or the United States Constitution. In addition, she did not attempt to amend her complaint under *Ohio R. Civ. P. 15(A)* before the city and the police officers had filed their motions to dismiss. The appellate court held that the trial court did not abuse its discretion by not granting the individual leave to amend her complaint. Because the individual's son had executed a written statement that the individual had hit him, the police officer's had probable cause to arrest her for domestic violence under *Ohio Rev. Code Ann. § 2935.03(B)(3)(a)(i)*. Therefore, the individual's false arrest and malicious prosecution claims were defeated. Consequently, the trial court properly granted the *Ohio R. Civ. P. 12(B)(6)* motions to dismiss.

**Outcome**
The judgment was affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Torts > Public Entity Liability > Immunities > General Overview

Civil Procedure > Pleading & Practice > Motion Practice > General Overview

Civil Procedure > Pleading & Practice > Motion Practice > Opposing Memoranda

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

*HN1* **Amendment of Pleadings, Leave of Court**

The immunity conferred by *Ohio Rev. Code Ann. § 2744.02* does not extend to claims alleging violations of federal statutes or the United States Constitution. *Ohio Rev. Code Ann. § 2744.09(E)*.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

*HN2* **Amendment of Pleadings, Leave of Court**

*Ohio R. Civ. P. 15(A)* provides that a party may amend its pleading only by leave of court or by written consent of the adverse party when the opposing party has already filed its responsive pleading in a case.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

*HN3* **Amendment of Pleadings, Leave of Court**

When a party files a motion for leave to file an amended pleading with a trial court, leave of court shall be freely given when justice so requires.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > ... > Pleadings > Amendment of Pleadings > General Overview

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Leave of Court

*HN4* **Standards of Review, Abuse of Discretion**

An appellate court reviews a trial court's decision on a motion for leave to file an amended pleading under an abuse of discretion standard. An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable.

Civil Procedure > Appeals > Standards of Review > De Novo Review

2005-Ohio-1127, *2005-Ohio-1127; 2005 Ohio App. LEXIS 1126, **1

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims

*HN5* **Standards of Review, De Novo Review**

Appellate courts review de novo a trial court's disposition of an *Ohio R. Civ. P. 12(B)(6)* motion to dismiss for failure to state a claim upon which relief can be granted.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

*HN6* **Motions to Dismiss, Failure to State Claim**

Dismissal is appropriately granted if all the factual allegations of a complaint are presumed true, all reasonable inferences are made in favor of a nonmoving party, and it appears beyond doubt that the nonmoving party cannot prove any set of facts entitling him to the requested relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN7* **Motions to Dismiss, Failure to State Claim**

While courts may not rely upon evidence outside of a complaint when resolving an *Ohio R. Civ. P. 12(B)(6)* motion, material incorporated in a complaint may be considered part of the complaint for purposes of determining a *Rule 12(B)(6)* motion to dismiss.

Evidence > Burdens of Proof > General Overview

Torts > ... > False Imprisonment > Defenses > Justifications & Privileges

Torts > Intentional Torts > False Imprisonment > General Overview

*HN8* **Evidence, Burdens of Proof**

False arrest is the unlawful restraint by one person of the physical liberty of another. A plaintiff is not required to prove that the defendant had no probable cause to arrest. However, the existence of probable cause to arrest defeats a false arrest claim.

Evidence > Burdens of Proof > General Overview

Torts > Intentional Torts > Malicious Prosecution > General Overview

**HN9** **Evidence, Burdens of Proof**

The elements of the tort of malicious criminal prosecution are: (1) malice in instituting or continuing a criminal prosecution; (2) lack of probable cause to support that prosecution; and (3) termination of the prosecution in favor of the accused. If a plaintiff cannot show lack of probable cause, the claim for malicious criminal prosecution fails as a matter of law.

Criminal Law & Procedure > ... > Crimes Against Persons > Domestic Offenses > General Overview

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

**HN10** **Crimes Against Persons, Domestic Offenses**

*Ohio Rev. Code Ann. § 2935.03(B)(3)(a)(i)* provides, in pertinent part, that a peace officer has reasonable cause to believe a person is guilty of domestic violence if the alleged victim executes a written statement alleging that the person in question has committed the offense of domestic violence against them.

Criminal Law & Procedure > ... > Crimes Against Persons > Domestic Offenses > General Overview

**HN11** **Crimes Against Persons, Domestic Offenses**

The offense of domestic violence encompasses knowingly causing or attempting to cause physical harm to a family member. *Ohio Rev. Code Ann. § 2919.25(A)*.

Criminal Law & Procedure > ... > Crimes Against Persons > Domestic Offenses > General Overview

**HN12** **Crimes Against Persons, Domestic Offenses**

See *Ohio Rev. Code Ann. § 2901.01(A)(3)*.

Criminal Law & Procedure > Commencement of Criminal Proceedings > Arrests > Probable Cause

**HN13** **Arrests, Probable Cause**

Probable cause to institute a criminal prosecution is a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged.

**Counsel:** DEAN S. HOOVER, Attorney at Law, Hudson, Ohio, for Appellant.

CHARLES T. RIEHL, R. TODD HUNT, and SARAH L. IDDINGS, Attorneys at Law, Cleveland, Ohio, for Appellees.

**Judges:** CARLA MOORE. SLABY, P. J., WHITMORE, J. CONCUR.

**Opinion by:** CARLA MOORE

# Opinion

DECISION AND JOURNAL ENTRY

This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:

MOORE, Judge.

 **[*P1]**  Appellant, Peggy A. White, has appealed from a judgment of the Summit County Court of Common Pleas, which dismissed her claims against Appellees, Officer Christopher Roch, Sergeant Michael Wilmot, and the City of Hudson. We affirm.

I.

 **[*P2]**  On April 13, 2004, Appellant filed a complaint against Appellees, alleging claims of false arrest, abuse of process, and malicious prosecution. The claims arose from the January 26, 2004 arrest and subsequent criminal prosecution of Appellant for domestic violence. Appellees Officer Roch and Sergeant Wilmot are the police officers who arrested Appellant. They are employed by the **[**2]** third Appellee, the City of Hudson.

 **[*P3]**  On June 9, 2004, Officer Roch and Sergeant Wilmot filed a joint motion to dismiss pursuant to *Civ.R. 12(B)(6)*. That same day, the City of Hudson filed its own motion to dismiss pursuant to *Civ.R. 12(B)(6)*. Roch and Wilmot argued that Appellant's false arrest and malicious prosecution claims failed as a matter of law because there was probable cause for her arrest and criminal prosecution, and that her abuse of process claim failed as a matter of law because she did not allege that the proceedings against her were "properly initiated to achieve an improper purpose." In its motion to dismiss, the City of Hudson argued that it was immune from liability pursuant to *R.C. 2744.02*.

 **[*P4]**  The Summit County Court of Common Pleas granted both motions on July 8, 2004. Appellant timely appealed, raising two assignments of error for our review.

II.

**Assignment of Error No. 1**

"THE TRIAL COURT ERRED IN DENYING APPELLANT'S REQUEST FOR LEAVE TO AMEND AND DISMISSING HER COMPLAINT AGAINST APPELLEE CITY FOR FAILURE TO STATE A CLAIM."

 **[*P5]**  In her first assignment of error, Appellant maintains that the trial court erred by denying **[**3]** her request to amend her complaint to assert a federal civil rights claim. We disagree.

 **[*P6]**  *HN1* The immunity conferred by *R.C. 2744.02* does not extend to claims alleging violations of federal statutes or the United States Constitution. *R.C. 2744.09(E)*. In her brief opposing the City of Hudson's motion to dismiss, Appellant argued that the facts alleged in her complaint amount to a *42 U.S.C. 1983* claim from which the City of Hudson would not be immune. Also in her brief, Appellant requested, in the alternative, leave to amend her complaint to include a federal civil rights claim. Appellant never filed a motion seeking leave to amend her complaint. In its final order, the trial court determined that *R.C. 2744.09(E)* was inapplicable, because Appellant's complaint made no reference to any violation of federal statutes or the United States Constitution. The court did not address Appellant's informal request for leave to amend her complaint.

 **[*P7]**  *HN2* *Civ.R. 15(A)* provides that a party may amend its pleading "only by leave of court or by written consent of the adverse party" when the opposing party has already filed its responsive pleading in the case. *HN3* When a **[**4]** party files a motion for leave to file an amended pleading with the trial court, "leave of court shall be freely

given when justice so requires." Id. *HN4* An appellate court reviews a trial court's decision on a motion for leave to file an amended pleading under an abuse of discretion standard. *Wilmington Steel Products, Inc. v. Cleve. Elec. Illum. Co. (1991), 60 Ohio St.3d 120, 122, 573 N.E.2d 622.* An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. *State v. Myers, 97 Ohio St. 3d 335, 2002 Ohio 6658, at P75, 780 N.E.2d 186*, citing *State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144*.

**[\*P8]** Appellant did not attempt to amend her complaint before Appellees had filed their motions to dismiss. Neither did she file a formal motion with the court seeking leave to amend, but rather made a passing request for leave to amend in her brief opposing the City of Hudson's motion to dismiss. In light of her failure to file a motion requesting leave to amend, we find that the trial court did not abuse its discretion by not granting Appellant leave to amend her complaint. **[\*\*5]** Accord, *Moore v. Rickenbacker (May 3, 2001), 10th Dist. No. 00AP-1259, 2001 Ohio App. LEXIS 1973*; *Priestly v. Cannon (Dec. 16, 1982), 8th Dist. No. 44614, 1982 Ohio App. LEXIS 11685*.

**[\*P9]** Appellant's first assignment of error is overruled.

### Assignment of Error No. 2

"THE TRIAL COURT ERRED IN DISMISSING [APPELLANT'S] FALSE ARREST CLAIMS AND MALICIOUS PROSECUTION CLAIMS AGAINST APPELLEES ROCH AND WILMOT FOR FAILURE TO STATE A CLAIM."

**[\*P10]** In her second assignment of error, Appellant maintains that the trial court erred by dismissing her false arrest and malicious prosecution claims against Officer Roch and Sergeant Wilmot. We disagree.

**[\*P11]** *HN5* We review de novo a trial court's disposition of a *Civ.R. 12(B)(6)* motion to dismiss for failure to state a claim upon which relief can be granted. *Hunt v. Marksman Prods. (1995), 101 Ohio App. 3d 760, 762, 656 N.E.2d 726.* *HN6* Dismissal is appropriately granted if all the factual allegations of the complaint are presumed true, all reasonable inferences are made in favor of the nonmoving party, and it appears beyond doubt that the nonmoving party cannot prove any set of facts entitling him to the requested relief. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs. (1992), 65 Ohio St.3d 545, 548, 1992 Ohio 73, 605 N.E.2d 378.* **[\*\*6]** *HN7* While courts may not rely upon evidence outside of the complaint when resolving a *Civ.R. 12(B)(6)* motion, "material incorporated in a complaint may be considered part of the complaint for purposes of determining a *Civ.R. 12(B)(6)* motion to dismiss." *State ex rel. Crabtree v. Franklin Cty. Bd. of Health (1997), 77 Ohio St.3d 247, 249, fn. 1, 1997 Ohio 274, 673 N.E.2d 1281.*

**[\*P12]** *HN8* False arrest is the "unlawful restraint by one person of the physical liberty of another." *Rogers v. Barbera (1960), 170 Ohio St. 241, 243, 164 N.E.2d 162*, quoting 22 American Jurisprudence 353, False Imprisonment, Sections 2-3. The plaintiff is not required to prove that the defendant had no probable cause to arrest. *Harvey v. Horn (1986), 33 Ohio App.3d 24, 27, 514 N.E.2d 452.* However, the existence of probable cause to arrest defeats a false arrest claim. *Weible v. Akron (May 8, 1991), 9th Dist. No. 14878, at 4, 1991 Ohio App. LEXIS 2179*, citing *Bertram v. Richards (1974), 49 Ohio App.2d 3, 5-6, 358 N.E.2d 1372*.

**[\*P13]** *HN9* The elements of the tort of malicious criminal prosecution are: (1) malice in instituting or continuing a criminal prosecution; (2) lack of probable cause to support that prosecution; and (3) termination of the prosecution **[\*\*7]** in favor of the accused. *Trussell v. General Motors Corp. (1990), 53 Ohio St.3d 142, 559 N.E.2d 732*, syllabus. If the plaintiff cannot show lack of probable cause, the claim for malicious criminal prosecution fails as a matter of law. *Iacono v. Sawyer (Jan. 13, 1988), 9th Dist. No. 13059, at 11, 1988 Ohio App. LEXIS 55*.

**[\*P14]** We have reviewed Appellant's complaint, including the exhibits attached to and referenced by the complaint. Presuming all of the factual allegations contained in those materials to be true, and making all reasonable inferences in favor of Appellant, we conclude that Officer Roch and Sergeant Wilmot had probable cause to arrest Appellant for domestic violence and to institute the criminal prosecution against her.

2005-Ohio-1127, *P15; 2005 Ohio App. LEXIS 1126, **7

**[\*P15]**  We first address the issue of probable cause to arrest. The General Assembly has "articulated the traditional standards of probable cause to arrest and applied such standards to the offense of domestic violence," in *R.C. 2935.03(B)*. *State v. Carbone (Dec. 19, 1997), 11th Dist. No. 96-T-5390, 1997 Ohio App. LEXIS 5748.* **HN10** *R.C. 2935.03(B)* provides, in pertinent part, that a peace officer has reasonable cause to believe a person is guilty of domestic violence if the alleged victim **[\*\*8]** "executes a written statement alleging that the person in question has committed the offense of domestic violence" against them. *R.C. 2935.03(B)(3)(a)(i).* **HN11** The offense of domestic violence encompasses "knowingly causing or attempting to cause physical harm to a family *** member." *R.C. 2919.25(A).* "Physical harm" to persons is defined by statute as **HN12** "any injury, illness, or other physiological impairment, regardless of its gravity or duration." *R.C. 2901.01(A)(3).*

**[\*P16]**  Included among the exhibits attached to and referenced by Appellant's complaint is a written statement drafted by Appellant's son and witnessed by Officer Roch. In that statement, Appellant's son alleged that Appellant had hit him on the arm hard enough to make him cry. Appellant acknowledged this accusation in her complaint, stating that "[Appellant's] son ultimately accused [Appellant] of striking him on the arm[.]" In sum, Appellant has presented, in her complaint, a written statement executed by the alleged victim accusing the Appellant of committing acts constituting domestic violence. Moreover, Appellant has admitted in her complaint that this accusation was made.

**[\*P17]**  Under Ohio law, the written **[\*\*9]** statement provided Officer Roch and Sergeant Wilmot with probable cause to arrest Appellant for domestic violence. [1] This written statement also provided Officer Roch and Sergeant Wilmot with probable cause to institute the criminal prosecution against Appellant.

**[\*P18]**  **HN13** Probable cause to institute a criminal prosecution is "[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Melanowski v. Judy (1921), 102 Ohio St. 153, 156, 131 N.E. 360, 19 Ohio L. Rep. 6,* **[\*\*10]** quoting *Ash v. Marlow (1851), 20 Ohio 119,* paragraph one of the syllabus. As discussed above, Appellant's son executed a written statement accusing Appellant of committing an act constituting domestic violence. We conclude that, as a matter of law, this statement provided sufficient ground to warrant "a cautious man in the belief" that Appellant had committed the crime of domestic violence as defined by *R.C. 2919.25(A).*

**[\*P19]**  Because factual allegations contained in Appellant's complaint establish that Officer Roch and Sergeant Wilmot had probable cause to arrest Appellant and to institute the criminal prosecution against Appellant, Appellant's false arrest and malicious prosecution claims were defeated, and she could not prove any set of facts entitling her to the relief requested on those claims. Therefore, the Summit County Court of Common Pleas properly granted Roch and Wilmot's *Civ.R. 12(B)(6)* motion to dismiss those claims. Appellant's second assignment of error is overruled.

III.

**[\*P20]**  Appellant's two assignments of errors are overruled, and the judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

The Court finds **[\*\*11]** that there were reasonable grounds for this appeal.

---

[1] Appellant has raised two constitutional challenges to *R.C. 2935.03* and *R.C. 2919.25(A).* Appellant has also argued that *R.C. 2935.03* and *R.C. 2919.25(A),* as applied, are inconsistent with *R.C. 2919.22.* Because Appellant did not present these arguments to the trial court, she has waived them on appeal. See *Robinson v. Springfield Local School Dist. Bd. of Edn. (Mar. 27, 2002), 9th Dist. No. 20606, at 11, 2002 Ohio 1382.*

2005-Ohio-1127, *P15; 2005 Ohio App. LEXIS 1126, **11

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to *App.R. 27.*

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. *App.R. 22(E).* The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to *App.R. 30.*

Costs taxed to Appellant.

Exceptions.

CARLA MOORE

FOR THE COURT

SLABY, P. J.

WHITMORE, J.

<u>CONCUR</u>

---

**End of Document**

 Positive

As of: September 9, 2025 3:21 PM Z

# *Wolfe v. Hocking Cnty. Sheriff's Dep't*

United States District Court for the Southern District of Ohio, Eastern Division

February 10, 2025, Decided; February 10, 2025, Filed

Case No. 2:24-cv-535

**Reporter**

2025 U.S. Dist. LEXIS 71921 *; 2025 LX 201732; 2025 WL 1032000

ROBERT L. WOLFE, Plaintiff, vs. HOCKING COUNTY SHERIFF'S DEPARTMENT, et al., Defendants.

## Core Terms

arrest, obstruct, recommend, official business, excessive force, probable cause, door, assault, discovery, firearm, quotation, porch, arm, gun

**Counsel:** **[*1]** Robert L. Wolfe, Plaintiff, Pro se, Murray City, OH.

For Chief Deputy Caleb Moritz, Defendant: Daniel T Downey, LEAD ATTORNEY, Fishel Downey Albrecht & Riepenhoff LLP, New Albany, OH; Makenzie Elizabeth McAfee, LEAD ATTORNEY, Fishel Downey Albrecht Riepenhoff, New Albany, OH.

For Deputy Craig Johnson, Deputy Kyle Arnett, Deputy Carl Wilderman, Defendants: Cassaundra L. Sark, LEAD ATTORNEY, Ironton, OH.

**Judges:** KIMBERLY A. JOLSON, UNITED STATES MAGISTRATE JUDGE. District Judge Algenon L. Marbley.

**Opinion by:** KIMBERLY A. JOLSON

## Opinion

**SUPPLEMENTAL ORDER AND REPORT AND RECOMMENDATION**

This matter is before the Court on Defendants' Motions for Judgment on the Pleadings, (Docs. 25, 31); the Undersigned's November 18, 2024, Order and Report and Recommendation on those Motions, (Doc. 38); and Plaintiff's Resubmission of Complaint and More, (Doc. 45). The Undersigned **RECOMMENDS** that Defendants' Motions be **GRANTED in part** and **DENIED in part**. The Undersigned further **RECOMMENDS** that Defendant Johnson be dismissed from this action. Finally, the Undersigned **SETS** a case schedule.

### I. BACKGROUND

Previously, the Court summarized the events giving rise to this action. (Doc. 38 at 1-3). Briefly, Plaintiff sues Defendants under *42 U.S.C. § 1983* for alleged **[*2]** violations of his constitutional rights. (Doc. 11 at 4 (stating which claims are proceeding in this action)). On February 22, 2023, the Athens County Court of Common Pleas issued a civil protection order ("CPO") that prohibited Plaintiff from having contact with Hocking County detective J. Thomas McKnight. (Doc. 29 at 6-8). The next day, Defendants, former and current deputies with the Hocking County Sheriff's Department, went to Plaintiff's home to serve that CPO. (Doc. 12 at 4). Defendants approached Plaintiff on his front porch and served him with the CPO. (*Id.*). Then, Defendant Moritz said they intended to seize

Justin Marks

Plaintiff's firearms under the CPO. (*Id.*). After that, Defendant Moritz assaulted Plaintiff, causing lasting injuries to Plaintiff's shoulder. (*Id.* at 5). And Defendants subsequently entered Plaintiff's home and seized his firearms. (*Id.* at 4, 7). Once the search and seizure ended, Plaintiff claims Defendant Johnson filed a "false charge of Obstructing Official Business" against Plaintiff, which was "dismissed due to lack of evidence." (*Id.* at 4). Plaintiff also says Defendant Moritz unconstitutionally arrested him for assault. (*Id.*).

On February 8, 2024, Plaintiff filed **[*3]** this lawsuit. (Doc. 1). After performing an initial screen under *28 U.S.C. § 1915(e)*, the Undersigned allowed Plaintiff to proceed against Defendants on claims under the Second, Fourth, and *Sixth Amendments*. (Doc. 11 at 3-4; *see also* Doc. 4 at 7). Soon after, Defendants filed motions for judgment on the pleadings, seeking to dismiss Plaintiff's Amended Complaint outright. (Docs. 25, 31).

The Undersigned partially ruled on those motions and recommended that Plaintiff's *Second Amendment*, *Sixth Amendment*, *Fourth Amendment* search-and-seizure, and *Fourth Amendment* malicious prosecution claims be dismissed. (Doc. 38 at 7-11, 18-21). Additionally, the Undersigned found that Plaintiff's *Fourth Amendment* excessive force claim against Defendant Moritz should proceed. (*Id.* at 16). But the Undersigned held other parts of the Motions in abeyance. To fix certain deficiencies, the Undersigned granted Plaintiff leave to amend his *Fourth Amendment* unconstitutional arrest claim and his excessive force claim. (*Id.* at 14, 17, 22).

As ordered, Plaintiff filed his "Resubmission of Complaint and More," (Doc. 45), which the Court construes as his amended complaint.

## II. STANDARD

*Federal Rule of Civil Procedure 12(c)* provides that, "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." *Fed. R. Civ. P. 12(c)*. In evaluating such a motion, the Court **[*4]** uses the same standard of review applied to a *Rule 12(b)(6)* motion to dismiss for failure to state a claim. *Mixon v. State of Ohio, 193 F.3d 389, 399-400 (6th Cir. 1999)*. Specifically, the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop v. Lucent Techs., Inc., 520 F.3d 516, 519 (6th Cir. 2008)* (citing *Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005)*). Although this standard does not require "detailed factual allegations, . . . [a] pleading that offers labels and conclusions" is insufficient. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (internal quotation and quotation marks removed).

This standard is like that used upon on an initial screen performed under *28 U.S.C. § 1915(e)(2)*. Because Plaintiff is proceeding *in forma pauperis*, the Court must dismiss the his amended complaint, or any portion of it, that is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant who is immune from such relief. *28 U.S.C. § 1915(e)(2)*. At bottom, Plaintiff must offer "a short and plain statement of the claim showing that [he] is entitled to relief," *see Fed. R. Civ. P. 8(a)(2)*, and provide Defendants with "fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)* (internal quotation omitted). **[*5]** While complaints by *pro se* litigants like Plaintiff are construed liberally, *Martin v. Overton, 391 F.3d 710, 712 (6th Cir. 2004)*, "basic pleading essentials" are still required, *Wells v. Brown, 891 F.2d 591, 594 (6th Cir. 1989)*.

## III. DISCUSSION

The Court begins with two matters concerning Plaintiff's "Resubmission of Complaint and More," (Doc. 45), which the Undersigned construes as Plaintiff's amendment. First, this document is not a model of proper formatting. (*See id.*); *Fed. R. Civ. P. 10* (outlining the requirements for pleadings). Construed liberally, the beginning pages appear to be objections to the Undersigned's November 18, 2024, Order and Report and Recommendation. (*Id.* at 1-3 (discussing Plaintiff's *Second Amendment* claim and court proceedings related to the CPO)). The remaining pages

contain amended allegations to support Plaintiff's unconstitutional arrest and excessive force claims. (*Id.* at 3-6; *see also* Doc. 46 at 1; Doc. 47 at 1 (describing, in Defendants' Answers, Plaintiff's filing in the same way)). Therefore, the Clerk is **DIRECTED** to separate pages one through three and pages three through six of Document No. 45 into separate filings. The Clerk is **DIRECTED** to file the former on the docket as Plaintiff's objections to the November 18 Order and Report and Recommendation, (Doc. 38). As to the latter, **[*6]** the Clerk is **DIRECTED** to combine pages three through six with Document No. 12 and to file that new document on the docket as Plaintiff's "Second Amended Complaint."

Second, Plaintiff now says that he "was misled in identifying defendants in this action by the filing of a charge of obstructing official business by [Defendant] Johnson." (Doc. 45 at 2 (cleaned up)). Ultimately, Plaintiff seeks to dismiss Defendant Johnson from this action "without prejudice." (*Id.* at 2-3). Therefore, the Undersigned **RECOMMENDS** that all of Plaintiff's claims against Defendant Johnson be dismissed and that he be terminated from this action.

Given Plaintiff's request to dismiss Defendant Johnson, the Undersigned now considers only his amended allegations against Defendants Moritz, Wilderman, and Arnett. In doing so, the Court **INCORPORATES** the November 18, 2024, Order and Report and Recommendation, (Doc. 38), and **SUPPLEMENTS** it with the following.

## A. *Fourth Amendment* Claims Against the Remaining Defendants

Though this case was filed nearly a year ago, it still is in its beginning stages. The parties have conducted no discovery, (Doc. 41 at 1), and this action has not moved past the pleadings. While the Court's analysis may change **[*7]** with a more developed factual record—for now—the Court must accept Plaintiff's well-pled allegations and cannot take Defendants' version of events as true. *See Osberry v. Slusher, 750 F. App'x 385, 389 (6th Cir. 2018)*.

Briefly summarizing Plaintiff's previous complaint, for his unconstitutional arrest claim, Plaintiff said only that Defendant Moritz falsely arrested him and detained him on his porch. (Doc. 38 at 12 (citing Doc. 12 at 3-4)). The Undersigned found these statements too conclusory to plead a *Fourth Amendment* unconstitutional arrest claim. (*Id.* at 13). But the Undersigned also acknowledged that Plaintiff provided more detail in the briefing on Defendants' motions. (*Id.* at 14 (discussing additional evidence Plaintiff sent to the Court in response to Defendant Moritz's motion)). As such, the Undersigned granted him leave to amend this claim to add those allegations. (*Id.*).

In contrast, the Undersigned found that Plaintiff pled enough to state a *Fourth Amendment* excessive force claim against Defendant Moritz. (*Id.* at 14-16). The same was not true for Defendants Wilderman and Arnett. In fact, Plaintiff's previous complaint did not allege that they used any force at all. (*Id.* at 17). But again, in the briefing on Defendants' motions, Plaintiff suggested that they, **[*8]** too, injured him. (*Id.* (citing Doc. 33 at 5)). So, the Undersigned granted him leave to amend this claim as well. (*Id.*).

Now, in his Second Amended Complaint, Plaintiff provides more detail for both claims. The Undersigned analyzes each in turn.

### 1. Unconstitutional Arrest Claim Against Defendant Moritz

Arrests made without probable cause violate the *Fourth Amendment*. *Thacker v. City of Columbus, 328 F.3d 244, 255 (6th Cir. 2003)*. To succeed on such a claim, Plaintiff must allege enough facts to plausibly show his arrest was "unsupported by probable cause." *Wesley v. Campbell, 779 F.3d 421, 429 (6th Cir. 2015)*. Probable cause exists when there are "facts and circumstances within [a police] officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett v. Cumberland Coll., 316 F.3d 571, 580 (6th Cir. 2003)*

(internal quotation omitted). Generally, the question of probable cause is one for a jury, "unless there is only one reasonable" determination. *Thacker, 328 F.3d at 255*.

For the events of February 23, Plaintiff alleges that Defendant Moritz arrested him first for assault, though he was later charged with obstructing official business. (Doc. 45 at 5; Doc. 12 at 3-4). So long as Defendants had probable cause for "some crime," they could **[*9]** lawfully arrest him. *See D.D. v. Scheeler, 645 F. App'x 418, 424 (6th Cir. 2016)*.

The Court begins with whether Defendant Moritz had probable cause to arrest Plaintiff for assault. Neither party specifies the exact assault charge for which Plaintiff was initially detained. (*See generally* Docs. 12, 31, 35, 45); *but see Palshook v. Jarrett, 120 F.Supp.2d 641, 649 (N.D. Ohio 2000)* (discussing that criminal assault in Ohio requires a person to "knowingly cause or attempt to cause physical harm to another"). For his part, Defendant Moritz explains the arrest by claiming Plaintiff "struck [him] numerous times in the head while Plaintiff was attempting to improperly flee into his home." (Doc. 35 at 9).

But Plaintiff's Second Amended Complaint paints a different picture. First, Plaintiff says that Defendant Moritz's face hit a door frame after Defendants Wilderman and Arnett pulled Plaintiff's right arm hard enough to jostle Defendant Moritz, who was holding onto Plaintiff's left arm. (Doc. 45 at 4). Second, Plaintiff says his left pinky finger unintentionally made contact with Defendant Moritz's right ear when Defendants Wilderman and Arnett pulled him. (*Id.*). Further, he says Defendant Moritz had control of Plaintiff's left hand when this contact occurred. (*Id.*). Taking Plaintiff's story as true, these **[*10]** representations are enough to allege that he did not knowingly harm Defendant Moritz and that Defendant Moritz lacked probable cause to arrest Plaintiff for assault. *See, e.g., Cheatham v. Cedar Fair L.P., No. 1:14-cv-388, 2015 U.S. Dist. LEXIS 91258, 2015 WL 4273266, at *6 (S.D. Ohio July 14, 2015)* (allowing an unconstitutional arrest claim to proceed where some evidence in the record suggested the physical contact underlying the assault charge was unintentional); *Thacker, 328 F.3d at 255* (stating probable cause determinations are left to juries unless there is only one possible and reasonable determination).

That leaves the charge of obstructing official business. A conviction on this charge requires "(1) the performance of an unprivileged act (2) with the purpose of preventing, obstructing or delaying the performance by a public official of an authorized act within his official capacity (3) which hampers or impedes the public official in the performance of his duties." *Lyons v. City of Xenia, 417 F.3d 565, 573 (6th Cir. 2005)* (discussing *Ohio Revised Code § 2921.31*).

The first element requires "an affirmative act that interrupts police business." *Wright v. City of Euclid, 962 F.3d 852, 873 (6th Cir. 2020)*. "The act must actually impede the officer in the performance of his duties, and there must be some substantial stoppage of the officer's progress." *Id.* (internal quotations omitted). For that reason, noncompliance with an officer's request is not enough. *Jones v. City of Elyria, 947 F.3d 905, 915 (6th Cir. 2020)*. Neither **[*11]** are words alone. For instance, courts have found that arguing with or questioning officers is not obstruction, unless the speech is hostile or the individual takes other affirmative actions to disrupt the officer's mission. *See Lyons, 417 F.3d at 574* ("[H]ostile or abusive speech that obstructs officers from fulfilling their duties may amount to a sufficient affirmative act to sustain a charge of obstructing official business.") (collecting cases); *Smith v. City of Wyoming, 821 F.3d 697, 716 (6th Cir. 2016)* (discussing that speech alone is not enough for a conviction for obstructing official business); *Patrizi v. Huff, 690 F.3d 459, 464-65 (6th Cir. 2012)* (noting obstruction convictions based on speech can be maintained only if the individual yelled, cursed, took other aggressive actions, or persistently disrupted officers).

The second element focuses on the individual's intent during his or her interactions with officers. For this element, "a person acts purposely when it is his specific intention to cause a certain result." *Wright, 962 F.3d at 873*. Said another way, to sustain an obstruction conviction, an individual must have acted with the "purpose . . . to hamper or impede" the officers' official business. *See Patrizi, 690 F.3d at 466*.

Turning to this case's particulars, Defendants approached Plaintiff on his porch, at which time Defendant Moritz informed **[*12]** Plaintiff that they intended to seize his firearms pursuant to the CPO. (Doc. 31 at 2-3; Doc. 45 at 3-

2025 U.S. Dist. LEXIS 71921, *12

4). Then, the parties present differing accounts of what happened. Defendant Moritz claims that Plaintiff obstructed official business by fleeing from Defendants and trying to enter his home. (*See* Doc. 35 at 8-9). Meanwhile, Plaintiff denies running from Defendants. Instead, Plaintiff asserts that, after Defendant Moritz said they were taking his guns, he said, "We're not going to do that!" (Doc. 45 at 3). Notably though, Plaintiff suggests that this statement was made partially in response to Defendants Wilderman and Arnett's efforts to approach him, which Plaintiff interpreted as an attempt to arrest him. (*Id.*). After that, Plaintiff claims he took three steps away from the officers to close his front door. (*Id.* at 4). Once he closed the door, Plaintiff says he intended to take the CPO back from Defendants to read it more thoroughly. (*Id.*).

On the whole, Plaintiff sufficiently alleges Defendant Moritz lacked probable cause to arrest him for obstruction. To start, the Court cannot say that Plaintiff's conduct constitutes the sort of affirmative, obstructive act required under the statute. **[*13]** True, Plaintiff's initial statement to Defendants could appear argumentative. (Doc. 45 at 4 (discussing that Plaintiff said, "We're not going to do that," after Defendant Moritz said Defendants intended to take his firearms)). But these words are not enough. *See Osberry, 750 F. App'x at 393* (stating that only "fighting words" can establish probable cause); *Lyons, 417 F.3d at 574* (collecting obstruction cases involving hostile and abusive speech against officers).

Additionally, Plaintiff does not allege any further interference with Defendants' business. Besides this comment, the only conduct Plaintiff alleges are his movements to close his door. (*Id.*). But at this time, the Court cannot conclude that these slight actions impeded Defendants' efforts to seize Plaintiff's firearms or serve the CPO. *See, e.g., Wright, 962 F.3d at 873* (finding a triable issue on probable cause where the plaintiff moved his arm to help officers remove him from a car, even though the officers could have believed the movement was intended to prevent his arrest); *cf. State v. Easterling, 2019- Ohio 2470, 139 N.E.3d 497, 507-09 (Ohio Ct. App. 2019)* (affirming a conviction for obstructing official business where the defendant disobeyed an officer's order to stop, retreated into his home, and attempted to push the door closed to prevent officers from entering); **[*14]** *State v. Hawkins*, No. L-22-1286, 2024 WL 4182855, at *4-5 (Ohio Ct. App. Sept. 13, 2024) (affirming a conviction for obstructing official business where the defendant tried to close the door on officers to prevent service of an order, told officers she would not hand over her children, informed them they "would have to kill her to get them," and subsequently resisted arrest).

Even more, Plaintiff suggests he intended to remain on the porch with Defendants, not that he meant to flee into his home. (Doc. 45 at 4 (explaining he wanted to close his door, take back the CPO, and read it)). Without a purposeful effort to obstruct or delay Defendants, probable cause cannot be found. *See D.D., 645 F. App'x at 426* (finding probable cause did not exist for an obstructing official business charge where the plaintiff lacked the purpose of obstructing the official).

Lastly, although Defendant Moritz raises statutory immunity for Plaintiff's false arrest claim, he fails to raise qualified immunity for the alleged constitutional violations. (*See* Doc. 31 at 12-13). Consequently, the Court declines to consider whether Defendant Moritz is shielded by qualified immunity right now. *See Thomas v. Plummer, 489 F. App'x 116, 120 n.5 (6th Cir. 2012)* (discussing that the district court likely erred when it assumed a defendant intended to raise qualified immunity for a *Fourth Amendment* claim where **[*15]** the defendant briefed state law immunity issues only). The Undersigned therefore **RECOMMENDS** that Defendant Mortiz's request to dismiss this claim be **DENIED**.


*2. Excessive Force Claim Against Defendants Arnett and Johnson*

Last are Plaintiff's allegations that Defendants Wilderman and Arnett used excessive force against him. These types of claims are analyzed under the *Fourth Amendment's* reasonableness standard. *See Graham v. Connor, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)* (stating claims involving force during arrests or detentions fall under the *Fourth Amendment*). To determine if an officer's force was excessive, the Court must determine "whether his actions are 'objectively reasonable in light of the facts and circumstances confronting him"

at the moment force is used, "without regard to his underlying intent or motivation." *Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013)* (quoting *Graham, 490 U.S. at 388*). To do so, the Court analyzes "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, or whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham, 490 U.S. at 396-97*. Though ultimately, the Court must weigh the "totality of the circumstances." *Saalim v. Walmart, Inc., 97 F.4th 995, 1004 (6th Cir. 2024)*.

In his Second Amended Complaint, Plaintiff says after Defendants approached him on his porch, Defendant Moritz "quickly handed **[*16]** [him] the [CPO]" but immediately took it back. (Doc. 45 at 3). Then, Defendants Arnett and Wilderman approached Plaintiff, and Defendant Moritz told Plaintiff they "had to take [his] guns" pursuant to the CPO. (*Id.*). Plaintiff "took three steps towards the door." (*Id.* at 4). At that point, Defendants Mortiz, Wilderman, and Arnett "started yelling" at Plaintiff. (*Id.*). Defendant Moritz grabbed Plaintiff's left arm while Defendants Wilderman and Arnett pointed their guns at him. (*Id.*). After they "holstered their weapons," Defendants Wilderman and Arnett grabbed Plaintiff's right arm and pulled it, dislocating his right sternoclavicular joint. (*Id.*). Defendants then forced Plaintiff to the ground and twisted him, causing him to incur more scratches and bruises. (*Id.*). Plaintiff says he continues to suffer from shoulder issues due to Defendants' use of force. (*Id.* at 4-5; Doc. 12 at 5).

With these new allegations, the Undersigned finds Plaintiff sufficiently pleads a *Fourth Amendment* excessive force claim against Defendants Wilderman and Arnett. As discussed in the Undersigned's previous Order and Report and Recommendation, Plaintiff's eventual charge of obstructing official business was not a serious **[*17]** one—a fact that weighs in favor of Defendants "of using less force" during their encounter with him. (Doc. 38 at 16 (citing *Thacker v. Lawrence Cnty., 182 F.App'x 464, 472 (6th Cir. 2006)*)). But Defendants Wilderman and Arnett allegedly pointed guns at him and used enough force to dislocate his joint. (Doc. 45 at 4). Plus, Plaintiff claims this use-of-force occurred before Defendants arrested or detained him. (*Id.*). This fact, too, supports Plaintiff's claim of excessive force, since officers cannot use force "on a detainee who . . . has been subdued, is not told he is under arrest, or is not resisting arrest." *Saalim, 97 F.4th at 1005* (quoting *Grawey v. Drury, 567 F.3d 302, 314 (6th Cir. 2009)*); *Wright, 962 F.3d at 869-70* (discussing that pointing a gun at an unarmed, compliant individual can rise to the level of excessive force under the *Fourth Amendment*).

Even so, Defendants Wilderman and Arnett justify their actions by suggesting that Plaintiff's movements to enter his home caused them to fear for their safety. (Doc. 25 at 3 (saying that Plaintiff had firearms in his home)). Undoubtedly, whether Plaintiff "posed an immediate threat to the safety of [Defendants]" is relevant as to whether they used excessive force against him. *Saalim, 97 F.4th at 1004*; *see also Graham, 490 U.S. at 396-97* (stating courts must consider whether suspects posed a threat to the arresting officers). Yet fatal to Defendants' arguments, **[*18]** the parties present different factual accounts of their interactions: Defendants say Plaintiff tried to flee into his home, while Plaintiff alleges he moved away to close his front door. (*Compare* Doc. 25 *with* Doc. 45 at 4). At this stage, the Court is required to accept Plaintiff's version "as true." *Bishop, 520 F.3d at 519*. Because his allegations do not suggest that he posed a threat to their safety, Defendants' arguments are better left to a later stage in litigation when the factual record is more developed.

In sum, Plaintiff has alleged enough for his *Fourth Amendment* excessive force claims to proceed against Defendants Wilderman and Arnett. As such, the Undersigned **RECOMMENDS** that Defendants' Motion (Doc. 25) concerning these claims be **DENIED**.


**B. Case Schedule**

To give Plaintiff time to submit his Second Amended Complaint, the Court previously stayed all discovery and dispositive motion deadlines. (Doc. 42 at 2). Now, since the Court has addressed Defendants' motions and screened Plaintiff's new complaint, the case may proceed. As such, the Court **SETS** the following case schedule:
- Joint Status Report on Discovery Due     May 6, 2025
- Discovery Due     August 11, 2025
- Dispositive Motions Due     September 12, 2025

2025 U.S. Dist. LEXIS 71921, *18

**IV. [\*19] CONCLUSION**

The Undersigned **SUPPLEMENTS** and **INCORPORATES** the November 18 Order and Report and Recommendation, (Doc. 38). In doing so, the Undersigned **RECOMMENDS** that Defendants' Motions (Docs. 25, 31) be **GRANTED in part and DENIED in part**. Only Plaintiff's *Fourth Amendment* unconstitutional arrest claim against Defendant Moritz and his *Fourth Amendment* excessive force claims against Defendants Moritz, Wilderman, and Arnett should proceed. Plaintiff's other claims should be **DISMISSED**. The Undersigned further **RECOMMENDS** that Defendant Johnson be **DISMISSED** from this action.

The Court **SETS** the deadline for discovery to August 11, 2025, and the deadline for dispositive motions to September 12, 2025. The parties are **ORDERED** to file a joint status report on their discovery progress **on or before May 6, 2025**.

IT IS SO ORDERED.

Date: February 10, 2025

/s/ Kimberly A. Jolson

KIMBERLY A. JOLSON

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**