Page 1

HAMILTON MUNICIPAL COURT

BUTLER COUNTY, OHIO

— — —

STATE OF OHIO,              :

        Plaintiff,      :

                     :

        -VS-              :  CASE NO. CRB 23 01790

                     :

MICHAEL REDDEN,            :

        Defendant.      :

— — —

        Audiotaped proceedings heard before the Hamilton Municipal Cour on the 13th day of September, 2023.

— — —

Laura Gibson, Esq. - For the State of Ohio

Juliea S. Crumes, Esq. - For the Defendant

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 2

```
 1                     I N D E X

 2

 3   WITNESS:           DIRECT    CROSS    REDIRECT    RECROSS

 4   Officer Baird         4         9        --          --

 5   Bridget Langen       14        32        --          --

 6   Kylee Redden         47        50        --          --

 7   Michael Redden       58        59        79          --

 8                          _ _ _
```

```
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 3

1                    MS. GIBSON:  Michael Redden.

2                    MS. CRUMES:  Good afternoon, Your Honor.

3   Juliea Crumes here on behalf of Mr. Redden.

4                    THE COURT:  Good afternoon, Counselor.

5   All right.  This case is set for trial?

6                    MS. GIBSON:  That's correct, Your Honor.

7                    THE COURT:  Is Counsel ready to proceed?

8                    MS. GIBSON:  Yes, Your Honor.

9                    THE COURT:  Counsel ready to proceed?

10                    MS. CRUMES:  Yes, Your Honor.

11                    THE COURT:  All those who are about to

12  testify, please raise your right hand.  Do you swear or

13  affirm to tell the truth, the whole truth, nothing but the

14  truth, under penalty of perjury?  You must say I do.

15                    UNIDENTIFIED SPEAKER:  I do.

16                    THE COURT:  Did you say I do?  All right.

17  Okay.  Everybody have a seat.  Ms. Gibson, you can please

18  call your first witness.

19                    MS. GIBSON:  We request a separation of

20  witnesses, Your Honor.

21                    THE COURT:  Okay.  So, all right.  We

22  have a victim and a police officer, right?  And the police

23  officer is the Complainant?

24                    MS. GIBSON:  Yes.

25                    THE COURT:  All right.  All right.

Electronically signed by Jane Fitch (401-380-425-5745)                                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 4

```
 1                    MS. GIBSON:  Also the State did want to
 2    modify the Complaint, it has a reversal of the code section.
 3    It is written 2925.19, when it is really 2919.25.
 4                    THE COURT:  Okay.
 5                    MS. GIBSON:  So we would ask that that be
 6    amended to reflect the correct code section.
 7                    THE COURT:  The Court finds that's a
 8    clerical --  unless there is any objection, we find there is
 9    a clerical error.
10                    MS. CRUMES:  No, Your Honor.  No
11    objection.
12                    THE COURT:  It's not like it's a
13    completely different section of the code.  So --
14                    MS. GIBSON:  Okay.  Call Officer Baird.
15                      DIRECT EXAMINATION
16    BY MS. GIBSON:
17         Q        Would you please state your name and
18    occupation?
19         A        Officer Timothy Baird.  I'm a police
20    officer for Ross Township Police Department, Butler County,
21    Ohio.
22         Q        How long have you been employed there?
23         A        About ten months.
24         Q        And were you so employed on July 7th then
25    of 2023?
```

FITCH REPORTING, INC.
(800) 569-7888

Page 5

```
 1            A        Yes.

 2            Q        And on that date, did you have contact

 3   with a Michael Redden?

 4            A        Yes.

 5            Q        And is he in the courtroom today?

 6            A        Yes.

 7            Q        Could you please identify him?

 8            A        He is in the white shirt with the

 9   checkerboard color tie at the defense table.

10            Q        And where was it that you had contact

11   with him?

12            A        I had contact with him at his residence

13   at 2043 Wagon Wheel Drive.

14            Q        And that's in Ross Township in Butler

15   County, Ohio?

16            A        That is correct.

17            Q        And what was the reason for your contact?

18            A        Before I made contact with him, I

19   responded to my -- the lobby of my Police Department to speak

20   with the victim for a report of a domestic violence.

21                     I made contact with her.  She was visibly

22   upset, crying, stated that she wanted to report an incident

23   that had occurred at the residence, at that 2043 Wagon Wheel

24   Drive.

25                     She stated that she went there to pick up
```

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 6

1   her juvenile daughter from the biological father, Mr. Redden,

2   when there was a verbal and a physical altercation that had

3   occurred.  It should be noted that they both lived prior at

4   the residence.  Were never married, but do have a child in

5   common.

6                    She stated that while she was there, she

7   was placing her child that they share in common inside of the

8   vehicle that she drove to pick up the child.  At that time

9   Mr. Redden had reached in to the side of her vehicle and

10  stole her cell phone that was in the front seat area of her

11  vehicle.

12                   She stated after he had stolen the phone,

13  that he began running around, taunting her, telling her that

14  he was going to take the child and that the phone was -- was

15  his.

16                   At some point during the altercation, she

17  tried to make contact with a neighbor, being that she did --

18  no longer had access to her telephone, that she had tried to

19  make contact with a neighbor and have somebody call 911 for

20  her, but she was unsuccessful in doing so.

21                   MS. CRUMES:  Objection.

22                   THE COURT:  Basis?

23                   MS. CRUMES:  Hearsay, Your Honor.

24                   THE COURT:  Any response?

25                   MS. GIBSON:  No, Your Honor.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 7

1                    THE COURT:  Unless you can establish a

2       foundation for one of the exceptions under hearsay, the Court

3       agrees that the rules state that anything that the victim

4       says is hearsay.

5                    MS. GIBSON:  Okay.  The initial statement

6       would have been excited utterance.  Beyond that, she was

7       emotional and crying.

8                    THE COURT:  Okay.  Well, I didn't hear an

9       objection to that part of it.

10                   MS. GIBSON:  That's what I'm saying, you

11      said anything that the victim stated.  I just wanted to

12      clarify.

13                   THE COURT:  Okay.  Okay.  We're going to

14      -- we're going to allow it, yes.

15      BY MS. GIBSON:

16          Q       And the victim, is that a Bridget Langen?

17          A       That's correct.

18          Q       And when she was at the Police

19      Department, did she show you any injuries on her person?

20          A       Yes, she did.

21          Q       And what were those?

22          A       She had a pretty rather large scratch on

23      her arm and then I believe there was an injury to her knee, I

24      think.

25          Q       And did you -- you said you responded out

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 8

1   to the address on Wagon Wheel Drive?

2           A       That is correct.

3           Q       And was the Defendant there when you

4   arrived?

5           A       Yes.

6           Q       And did you speak with him about this

7   incident as well?

8           A       I did, yes.

9           Q       And what did he say to you about it?

10          A       When I interviewed the Defendant in the

11  case, sorry, he had stated that she had came over -- hang on

12  one second.  Oh, he said that he allowed her to come over to

13  the residence to pick up the child.

14                  That he -- he agreed upon and stated that

15  had he not taken the phone from Ms. Langen's vehicle, that

16  the entire incident wouldn't have occurred.  He stated that

17  during the course of the relationship he gave the phone to

18  her to use to be able to contact with her and their juvenile

19  daughter that they have in common.

20                  And that he continued to allow her to use

21  the phone after the termination of the relationship so that

22  that could -- that could continue.

23          Q       Did you ask him specifically about the

24  injuries that she received?

25          A       I did, but I don't -- I don't remember

FITCH REPORTING, INC.
(800) 569-7888

```
                                                      Page 9
 1    his response.  I'm sorry.
 2                    MS. GIBSON:  I've got no other questions.
 3    Thanks.
 4                    THE COURT:  Any questions, Counselor?
 5                    MS. CRUMES:  Just a few.
 6                    CROSS-EXAMINATION
 7    BY MS. CRUMES:
 8         Q        When you arrived on the scene, did you --
 9    well, you did, you asked Mr. Redden what happened and he
10    stated what he stated.  Could you repeat that for me?
11         A        He stated that she was over there to get
12    the phone -- or I'm sorry -- to get the child.  That he
13    stated that he had reached inside the vehicle to get the
14    phone.
15                    He did state that he gave her the phone
16    during the course of their relationship before he had moved
17    out -- or before she had moved out and that he allowed her to
18    continue to use the phone so that they could have contact
19    with not only her, but the juvenile daughter as well.
20         Q        Do you remember Mr. Redden telling you
21    that he had asked for the phone back?
22         A        Yes.  That is correct.
23         Q        Okay.
24         A        Not at that incident.  He did not tell me
25    that he had asked for it back at that specific date at that
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 10

1    time.  It was prior to the events that occurred on 7/7 of

2    2023.

3           Q        Right.  But he had shared with you that

4    he had previously asked for that phone back?

5           A        That is correct.

6           Q        Okay.  Did you see any property damage or

7    any injuries on Mr. Redden when you arrived?

8           A        I did.  I saw property damage.  There was

9    a TV that was affixed to the back of the wall that was no

10   longer affixed to the back of the wall.  It was damaged and

11   on the ground.

12                   And then I do believe that I saw a bite

13   mark on his forearm and an elbow -- or a scratch on his

14   elbow.  Sorry.

15          Q        Okay.  And did Mr. Redden ask you what he

16   could do about that property damage or if he could press

17   charges for any of the property damage?

18          A        Yes, he did.

19          Q        And what was your response?

20          A        My response was that they -- I was called

21   there to investigate a domestic violence complaint and that

22   the damage that was caused was in course of the domestic

23   violence.

24          Q        So did you say that he wasn't able to

25   press charges?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 11

1          A          At the time I was not going -- I was

2     entertaining and taking a report for the domestic violence

3     part.

4          Q          Okay.  So do you know what is required to

5     charge someone with domestic violence?

6          A          Probable cause.

7          Q          Probable cause?  Do you know what exactly

8     the statute states as to what domestic violence indicates?

9          A          Cause, attempt to cause physical harm to

10    a family member or household member, significant -- or

11    spouse.

12         Q          And you testified when Ms. Gibson was

13    asking you questions about, inquiring about Ms. Langen's

14    injuries, you did not -- did you inquire about exactly where

15    she got them from?

16         A          Yes.  She told me that she got them while

17    she was trying to get her phone back from -- after he had

18    stolen it from her.

19         Q          Okay.  You state in your report that Mr.

20    Redden admitted to starting all of this and that's why you

21    arrested him for domestic violence?

22         A          No.  I stated that he admitted to

23    stealing the phone from her car and asked him had this not --

24    had he not stolen the phone, would this event have occurred

25    and his answer was yes.

FITCH REPORTING, INC.
(800) 569-7888

Page 12

```
 1            Q          Okay.  Did you watch a video pertaining

 2   to the incident that day?

 3            A          Yes, I did.

 4            Q          Okay.  And when you -- when you saw the

 5   videos, what did you see on the videos?

 6            A          The --

 7                       MS. GIBSON:  I would object.  The

 8   question is about a video that is not in evidence.

 9                       THE COURT:  That is correct.  So,

10   Ms. Gibson has cited the right ruling, it would be the best

11   evidence rule.  So the objection is sustained.

12   BY MS. CRUMES:

13            Q          Other than viewing the injuries on

14   Ms. Langen, did you use anything else to come to your

15   conclusions to charge Mr. Redden with domestic violence?

16            A          Yes.  The videos and his statement that

17   he made.

18            Q          So you referenced videos that you used,

19   right?

20            A          Yes.

21            Q          You viewed the injuries and videos,

22   correct?

23            A          Yes.

24            Q          Did Mr. Redden have a right to keep

25   Ms. Langen out of his home?
```

Electronically signed by Jane Fitch (401-380-425-5745)

19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 13

1                    MS. GIBSON:  I would object.  Calls for a
2     conclusion.
3                    THE COURT:  No, I would say it's more
4     argumentative.  So if you could rephrase the question,
5     Counselor, it might be more acceptable.
6     BY MS. CRUMES:
7          Q        Okay.  So you said that you used videos
8     to come to your conclusion to file charges against Mr. Redden
9     for domestic violence.
10                   In those videos, what did you --
11                   THE COURT:  You can't --
12                   MS. CRUMES:  You're right.  You're right.
13                   THE COURT:  You can produce -- if we have
14    videos, the Court will watch the video.
15    BY MS. CRUMES:
16         Q        So prior to arriving to Mr. Redden's home
17    when you saw his injuries and he asked to -- if he could
18    press charges or do anything, your response was he could not
19    at the time?
20         A        Correct, for the TV, that is correct.
21         Q        For the TV?
22         A        Yes.
23         Q        Right.
24         A        I was there investigating the domestic
25    violence, which was because of the injuries that were

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 14

1   sustained to the victim.

2          Q       Did you see any other damage when you got

3   to Mr. Redden's home?

4          A       I don't recall.  Just the TV is all I

5   saw.

6                  MS. CRUMES:  No further questions, Your

7   Honor.

8                  THE COURT:  Any redirect?

9                  MS. GIBSON:  No.

10                 THE COURT:  Thank you, Officer.  You may

11  step down.

12                 THE WITNESS:  Thank you, Judge.  You have

13  a blessed day.

14                 THE COURT:  Thank you.

15                 MS. GIBSON:  I call Bridget Langen.

16                 DIRECT EXAMINATION

17  BY MS. GIBSON:

18         Q       Would you please state your name for the

19  record?

20         A       Bridget Diane Langen.

21         Q       Would you please spell your last name?

22         A       L-A-N-G-E-N.

23         Q       And, Ms. Langen, do you know a Michael

24  Redden?

25         A       Yes, I do.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 15

1          Q          And what is your relationship to Mr.

2    Redden?

3          A          He is my ex-fiancee and father of my

4    child.

5          Q          So you do have a child together?

6          A          Yes.  She will be four in December.

7          Q          And did you go to his residence on July

8    7th of 2023?

9          A          Yes, Ma'am, I did, at 7:00 p.m.

10         Q          And that's at 2043 Wagon Wheel Drive?

11         A          Yes, Ma'am.

12         Q          And what was the reason that you were

13   there?

14         A          Just picking her up after work.  It was

15   like the second week of our agreeing drop-off for her because

16   we had no agreeance (sic).  We lived together before then.

17   So it was our second week at trying to have -- switch off

18   parenting.

19         Q          And her, you're referring to the child --

20         A          Yes.

21         Q          -- that you had?

22         A          Yes.  We were like sharing.  He has

23   custody with his older twins where he gets half the week, so

24   I was trying to compensate and let her see her sister and her

25   dad at the same time, so they could be together.

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 16

1           Q        And on that date, was he expecting you to

2    come pick up your daughter?

3           A        Yes.

4           Q        You said that was around 7:00 o'clock?

5           A        Yes, Ma'am.

6           Q        And what happened when you got there?

7           A        When I got there, I originally was just

8    going to pull at the bottom of the driveway like I had the

9    week before and let him bring her down, but I seen my

10   stepdaughter, which was the one here, who left the courtroom,

11   and I hadn't seen her in a while, I missed her.

12                   So I got out and said hi, hello, I miss

13   you, and gave her a hug and a kiss.  And as I was leaving, I

14   got back into the car, strapped my daughter in and he reached

15   through the window and stole my phone.

16          Q        You said you were just going to stay in

17   the car, is that what you were saying?

18          A        The week prior, the first week that we

19   tried, I just stayed safely in my car at the bottom of the

20   driveway.  The second week, this day, my stepdaughter was

21   there, who I hadn't seen, and it enticed me to want to get

22   out and say hi.

23          Q        Was your car at the bottom of the

24   driveway location on this date, too?

25          A        No, I pulled up and --

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 17

```
 1          Q          Okay.  You had already pulled up in the

 2   driveway?

 3          A          Yes.  Not all the way in, but halfway.

 4          Q          And you got out to speak with her?

 5          A          Yes, I just got out and gave her a hug

 6   and said I love you and miss you.  I think it kind of ticked

 7   him off.

 8          Q          And was your daughter being put in the

 9   car at that time?

10          A          After I said my goodbyes, I put her in

11   her car seat and got in my car and was leaving, strapped the

12   seatbelt on, straps on.

13          Q          And which side of the car was her car

14   seat?

15          A          She is the opposite of me in the back on

16   the right, yep, so I can see her when I turn around.

17          Q          So the back passenger side?

18          A          Yes, Ma'am, and --

19          Q          Did you walk around the car and put her

20   in?

21          A          No.  She is big enough now, I can just

22   open my door and she gets back there and she is a good girl.

23          Q          So she had climbed in through the

24   driver's door?

25          A          Right.  Yes.
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 18

```
 1          Q          And had gotten in her car seat?

 2          A          And then I reach back and I strap her in,

 3    that's how we do it.

 4          Q          Okay.  Had you closed your door --

 5          A          Yes.

 6          Q          -- to leave?  Okay.

 7          A          Yes.

 8          Q          And had you put the vehicle in reverse to

 9    pull out?

10          A          Yes.  I was in reverse.  I was pulling

11    out.  Yes, I was.

12          Q          And as you were backing out, what

13    happened?

14          A          It was just barely moving, like barely

15    moving and he reached in.  There was like this much space in

16    the window, just enough to get his arm in.

17          Q          And where was the phone?

18          A          Right in my middle console, steering

19    wheel, middle console, window.  He just (indicating),

20    straight shot.

21          Q          So was it like a --

22          A          Quick.

23          Q          -- cell phone holder?

24          A          No.  Just the little --

25          Q          In the cup holder?
```

Electronically signed by Jane Fitch (401-380-425-5745)    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 19

```
 1          A          -- where you would have your little

 2   change, like underneath your radio.

 3          Q          Okay.

 4          A          It just sits right there on my charge --

 5   on the charger.

 6          Q          And he reached in past you and --

 7          A          Yes.

 8          Q          -- got that?

 9          A          Yes.  That fast and that, you know,

10   aggressive.

11          Q          And what kind of vehicle do you have?

12          A          A Kia Forte.

13          Q          Okay.

14          A          Just a little black sedan, nothing

15   special.

16          Q          Black sedan?  Okay.  And you demonstrated

17   the window was only open --

18          A          Just enough about to get your arm in, so,

19   yeah.

20          Q          Okay.

21          A          Yeah.  I didn't even feel safe to have my

22   window down.  So I even had my window cracked, just tells you

23   of the --

24          Q          And after he pulled the phone out, what

25   did you do?
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 20

1        A        I -- I immediately just felt so violated

2   and just like attacked.  It was the last straw for me.  Like

3   I just got so upset that I got out and was like chasing him

4   trying to get it.

5        Q        So --

6        A        He was running around the yard and I just

7   chased him around the yard.

8        Q        He takes the phone out.  Did you put the

9   vehicle back in park --

10       A        Yes.

11       Q        -- and then get out?

12       A        Yes.  I parked my vehicle and got out and

13  was crying and running after him asking for my phone back.

14       Q        Did you also turn the vehicle off or just

15  put it back in park?

16       A        No.  I put it in neutral, because my car

17  is a stick shift and with the emergency brake on.

18       Q        And you said you chased -- chased him

19  around the yard?

20       A        I ran around the yard, one time in the

21  front.

22       Q        Okay.

23       A        Ran around the back, I think.

24       Q        And do you recall anything that he was

25  saying to you at the time?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 21

```
 1          A          Yeah.  He said he was going to take my

 2   kid, take me down, I was going to go to jail.  I was going to

 3   lose my kids like I'd -- like my last kids.  I'm a piece of

 4   shit.  I mean, all of the same kind of things.

 5          Q          And what, if anything, were you saying to

 6   him as you were running after him?

 7          A          Give me my phone.  I can only imagine,

 8   just probably like screaming in despair, help me, call the

 9   cops.  I remember screaming call the cops, but like none of

10   the -- the neighbors were too scared to come out.

11          Q          Okay.  And what -- how about after

12   running around?

13          A          Running around, we ended up meeting at

14   the back door, having like a shuffle, of me trying to get in

15   and him trying to shut the door on me.

16                      And us like wrestling and having his arm

17   around my neck, me like biting him, because he is holding my

18   arm, like all of this shuffles and --

19          Q          And you ended up at the back door?

20          A          Yeah.  He --

21          Q          What kind of door is it?

22          A          It's like a sliding glass door in the

23   back.

24          Q          Okay.  And where were both of you?

25          A          Right there at the --
```

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 22

```
 1           Q        Inside, outside?

 2           A        Both of us with the door open, shuffling,

 3   right there at the open sliding glass doors.

 4           Q        So outside the door?

 5           A        He -- I was outside.  He was inside.  I

 6   was inside.  He was -- we were like just tossing back and

 7   forth.  There was a moment when I was in -- we were in the

 8   living room.  There was a moment we were on the steps.  There

 9   was a moment we were right in the middle of the glass sliding

10   doors.

11           Q        And is the living room right inside of

12   the --

13           A        Yes.

14           Q        -- sliding glass doors?

15           A        Yes.

16           Q        Okay.  So that's when you're saying in

17   the living room --

18           A        Steps, door.

19           Q        You were through the doors?

20           A        Yes.

21           Q        So --

22           A        I had just moved from there.  I left him

23   on May -- on May 29th.

24           Q        And slow down for me what happened.

25   You're at the door?
```

Electronically signed by Jane Fitch (401-380-425-5745)        19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 23

```
 1          A         Uh-huh.

 2          Q         At first he is inside and you're outside?

 3          A         No.  We were both outside and he ran up

 4    to the door, like with my phone trying to get me to come to

 5    the door to get it.

 6          Q         Okay.

 7          A         So I went --

 8          Q         And?

 9          A         --- to the door trying to get my phone.

10          Q         Then did he open the door?

11          A         He opened the door and then tried to shut

12    it, yeah, as I got closer.

13          Q         Opened the door?  And did he enter and

14    try to shut it or did he --

15          A         Yeah.  He like would -- I would get close

16    and he like back up and try to shut it and then I would back

17    up and he would come back out, kind of like a cat and mouse

18    kind of game.

19          Q         Okay.

20          A         That's what it was, a game.

21          Q         And you said at some point his arm was

22    around you?

23          A         Yeah, he had his arm around my face like

24    this.

25          Q         Where were you physically at that time?
```

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 24

1          A          I was on the carpet in the living room

2    floor with it -- like he had me like choked up as I was on

3    the floor.  Like I guess trying to like pick me up and throw

4    me out.  I don't know what his intention was.

5          Q          How did you end up on the floor?

6          A          Just his body weight pushing me, like

7    pushing me down.  We were scuffling together.  He was trying

8    to wrestle me.  He was on top of me.  I don't -- I don't know

9    how I ended up on the ground honestly.  I guess he --

10          Q          You ended up inside and on the ground?

11          A          Yes.

12          Q          Okay.  But you don't recall how?

13          A          Just wrestling with someone in the

14    moment, it is kind of hard to know what happened, like what

15    exactly happened to get me on the ground, but I'm assuming

16    it's just more body weight than mine pushing me down.

17          Q          Okay.  And were you able to then get back

18    out or what did you do after?

19          A          Yes.  I -- I actually, when he had his

20    arm around my face like this, I wasn't sure if he was like

21    choking me or what, so I bit him like that and that got him

22    to let go of it, let go of his arm.

23          Q          And when he let go, what did you do?

24          A          I believe I left after that and I was

25    exhausted, physically, mentally, emotionally.  I could barely

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 25

1    stand, walk, talk.  I went straight to the police station.

2           Q        Okay.  So you went to the Police

3    Department because you didn't have your phone to call them;

4    is that why?

5           A        That's right.

6           Q        Okay.  And that's when you spoke to the

7    officer who testified here?

8           A        Yes.

9           Q        And I'm going to show you some

10   photographs we've marked as State's Exhibit A, B and C.

11   Defense counsel just saw them.  Right?

12          A        Yeah, that looks right.

13          Q        Could you please describe what is

14   contained in Picture A?

15          A        Picture A is where he shut the door on my

16   arm when I was trying to reach in.

17          Q        So there is a -- is it a scrape?  What is

18   that --

19          A        It's a bruise, scrape from the sliding

20   glass door.  Like if you know where the lock is on the

21   sliding glass door, my arm just kind of slid across that as

22   it was being shut.  I was trying to rip it out so my whole

23   arm didn't get shut.

24          Q        Okay.

25          A        So it just -- I barely escaped the,

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 26

1   getting shut in the door.

2          Q          And when was that picture taken?

3          A          This was the day, July 7th.

4          Q          The same day?

5          A          Yes.

6          Q          And did you take that picture?

7          A          I did.

8          Q          And is that picture an accurate depiction

9   of your arm on that day?

10         A          Yes, Ma'am.

11         Q          And could you please describe what is in

12  Picture B?

13         A          Picture B is when I was chasing him

14  around for my phone in the front yard.  The very first --

15  when he stole my phone out of the car, he ran in the front

16  yard around in a circle, I fell.

17         Q          Okay.  And what is it that that picture

18  shows, though?

19         A          The picture shows the scrape on my knee

20  where I fell in the road.

21         Q          Okay.  So again, was this taken that same

22  day?

23         A          Yes.

24         Q          Is it a true and accurate depiction --

25         A          Yes, Ma'am.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 27

1          Q          -- of that injury?

2          A          That evening.

3          Q          And then could you please describe what

4    is in Picture C?

5          A          Picture C wasn't taken until the next

6    day.  I didn't see it or know it was there.  I just knew my

7    leg was hurting and I took off my pants and looked at my leg.

8    It was the whole backside of my leg, so I didn't even see it

9    in the front.

10          Q          In that you're relating bruising on the

11    back of your leg?

12          A          Yes.

13          Q          Is that what that is showing?

14          A          Yes.  My whole leg was bruised from top

15    to bottom.

16          Q          And again, is it a true and accurate

17    depiction of it taken the day after?

18          A          Yes, Ma'am.

19          Q          Okay.  And these are dated, all of these

20    injuries came during the course of your interaction with the

21    Defendant?

22          A          Yes, but this one, the bruise, the purple

23    and the green didn't show -- I knew my leg hurt, but I didn't

24    see the bruise until the next day.

25          Q          Okay.  Now, the officer was asked some

Electronically signed by Jane Fitch (401-380-425-5745)                                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 28

1    questions about a television that was reported broken.  Do

2    you recall what happened with that?

3           A       Yes, I do.

4           Q       What was that?

5           A       I broke the television after he took my

6    phone.

7           Q       At what point did that happen during the

8    running around?

9           A       It was kind of my like, the straw that

10   broke the camel's back.  It was kind of like, oh, you're

11   going to take my -- it was a -- it was a jab back from me and

12   which was unnecessary.

13          Q       Was that after chasing him?

14          A       Yes.

15          Q       Or before chasing him?

16          A       It was when he ran, the first, when he

17   originally ran in the house with my phone and I knew he

18   wasn't going to give it back.

19                  And then I can't remember if it was right

20   after that or after the first scuffle at the door.  I'm not

21   sure.

22          Q       Okay.  So it was after you chased him

23   through the yard?

24          A       Yes.

25          Q       You went inside the house?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 29

```
 1          A          Yeah.  He went back and forth like three

 2   different times.  It -- it wasn't just a one thing.  He did

 3   it like three different times.  So I can't remember if it was

 4   after the first time or the second time.

 5          Q          And this television, was it outside the

 6   house?

 7          A          Uh-huh.  Yes, Ma'am.

 8          Q          Okay.  And how --

 9          A          Right outside the sliding doors.

10          Q          How did it get damaged, though?

11          A          I -- I broke it.

12          Q          How did you do that?

13          A          Just --

14          Q          Okay.  It was pulled down and it was

15   broken?

16          A          Yes.

17          Q          Okay.  You said you can't recall when in

18   the timeline?

19          A          I can't remember if it was the first time

20   window or the second time at the glass sliding doors.

21          Q          You explained the injury to your knee was

22   from being in the yard?

23          A          Uh-huh.

24          Q          Do you recall which time the arm scrape

25   from the door happened?
```

FITCH REPORTING, INC.
(800) 569-7888

Page 30

```
 1          A        Yes.  That's when I was trying to get in
 2   the sliding doors to get my phone inside the house.  That was
 3   the first time.
 4          Q        So --
 5          A        All the -- all the injuries happened at
 6   the first scuffle, I'm sure.
 7          Q        You said that there was another scuffle
 8   after that?
 9          A        Well, it just didn't -- it wasn't one
10   time.  He kept coming out, going back in, coming out, going
11   back in.  So I came up to the door like twice trying to get
12   my phone.
13                   And I can't remember if I got upset like
14   right after he stole my phone and we went back in the yard or
15   if it was after he came out and tried to taunt me again.
16                   Because there was a time when he came out
17   and had his oldest daughter take my daughter and lock her in
18   the house.  And I can't remember if it was after he took my
19   phone or after he took my phone and my daughter is when I had
20   the blow up when I ripped the TV off.
21          Q        But you are sure that the scrape happened
22   the --
23          A        Yes.
24          Q        -- first time?
25          A        The first time, yes.  Because I felt
```

Electronically signed by Jane Fitch (401-380-425-5745)                                          19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 31

1    that, it hurt, it woke me up, like what is, what was

2    happening.

3            Q        And when your arm was scraped by the

4    door, what was he doing with the door?

5            A        Trying to shut it on me, get me out of

6    the house and shut it on me.

7            Q        Was it just your arm inside at that time?

8            A        No, it was our whole bodies.  That's why

9    I have scrapes and bruises all over my body.

10           Q        Was it your left or your right arm that

11   had the --

12           A        My right arm.

13           Q        Right arm?  Okay.  So you were inside the

14   house trying to get the door open?

15           A        Like at the glass sliding doors, you're

16   in the house, but you're not.  You're like at the edge.  Then

17   there is steps and then there is like, we were just right

18   there at the glass sliding doors on the track of the glass

19   sliding doors.

20           Q        Okay.

21           A        That's where we were --

22           Q        You were both standing --

23           A        Yes.

24           Q        -- in the doorway?

25           A        Yes.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 32

1          Q         You say?  Okay.

2          A         Yes.  One would come out, one would go

3    in.  We would turn ways.  I would be in the living room, he

4    would be outside.  He would be in the living room, I would be

5    outside.  We were scuffling at the glass sliding doors.

6                    MS. GIBSON:  All right.  I've got no

7    other questions for you.  Just sit there so the defense

8    attorney can ask you some.  Okay.

9                    THE COURT:  Counsel, please come up here.

10                   CROSS-EXAMINATION

11   BY MS. CRUMES:

12         Q         I would like to call your attention to a

13   video of Defense's Exhibit 1.  I would just ask you a couple

14   of questions about it.

15                   (Whereupon the video was played)

16         A         Oh, that was after he took my daughter.

17         Q         Is that you in the video?

18         A         Yes.

19         Q         Ripping the TV down?

20         A         I was correct, it was after he took my

21   daughter as well, that's when I lost it.  That's when I got

22   mad about the TV.  He had taken my phone and my daughter at

23   this point.

24         Q         Okay.  So he had your daughter, in

25   this -- in this video he had your daughter?

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

```
                                                      Page 33

 1          A          I believe so.  I'm not -- I'm --

 2          Q          Okay.  So when you were -- I would like

 3   to direct your attention to another video.

 4                     (Whereupon the video was played)

 5          A          It is so sad.

 6          Q          Okay.

 7          A          Oh --

 8          Q          So --

 9          A          This is -- while I have this in my mind,

10   our daughter is at daycare right now and she has to be picked

11   up by 5:00 o'clock.

12          Q          Okay.

13          A          I told the attorneys.  I wasn't sure --

14          Q          So is that you in the video trying to get

15   into --

16          A          Yes.

17          Q          -- the home?

18          A          Yes, Ma'am.

19          Q          And do you live at that residence?

20          A          No longer.

21          Q          Okay.

22          A          Yes.

23          Q          Is it possible that the injury on the

24   back of your leg that you testified to came from -- you

25   stated that it came from the tussle in the door, the doorway?
```

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 34

1          A          Uh-huh.

2          Q          Is that correct?

3          A          I --

4          Q          At this particular one?

5          A          I believe I stated it is when he tried to

6     shut the door on my leg at the tussle at the doorway, yes.

7          Q          Okay.  Did you punch and bite Mr. Redden

8     when you were trying to get into the home?

9          A          When he had his arm and forearm around my

10    -- around my neck, yes, I believe I did bite him, yes.

11         Q          Okay.  And you stated that you no longer

12    live at the home, right?

13         A          No longer.

14         Q          Okay.  Did Mr. Redden ask you not to come

15    into his home?

16         A          I don't think so.  I don't recall that.

17         Q          Okay.  So on the video when he said

18    please stop, did you hear him say please stop, please stop?

19         A          Oh, I'm sure he said it after the fact,

20    yes.  But I asked him please not to touch my belongings, too,

21    so that shows you the kind of respect that we have for each

22    other.

23         Q          So did this incident arise -- this

24    incident arose from Mr. Redden --

25         A          Stealing my phone.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 35

1          Q          Him taking the phone?  Was that phone in

2    your name?

3          A          Yes, Ma'am, it's in my name.  I pay the

4    bill.

5          Q          You paid it?

6          A          Yes, Ma'am.  I have for a long time, yes.

7    It originally was his phone, but I have paid the bill for a

8    long time.  Yeah.

9                     Does he have evidence that he -- I know

10   he paid the bill the first half of the time when we were

11   together.

12         Q          Okay.

13         A          I took over the bill and now my name was

14   on it.

15         Q          When did you take over the bill?

16         A          I'm not sure.  It was at least like a few

17   months ago.

18         Q          Okay.

19         A          I took over my -- I paid off my -- no, I

20   didn't pay.  I put my name on his bill first so then I could

21   start paying it.  So it was still under his name, like his

22   account, but my name was on there, because he has Verizon.  I

23   had Spectrum at the house.

24                    So you're right, it was his Spectrum

25   bill, but it was my name and I was paying the bill, it had my

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 36

1  debit card on there.

2            Q         Okay.

3            A         So I just want to clarify that.

4            Q         I would like to walk this over to the

5  prosecutor so she can take a look at this.

6                      Did you -- you can look at this if you

7  want.  So you said a few months ago.  Do you know how long

8  ago that was?

9            A         No, I don't, hon.  There has been a lot

10 going on in my life relationship.  I've been a stay-at-home

11 mom for the past three and a half years, all of my attention

12 and focus has been on her.

13           Q         Okay.  So those, Defense Exhibit 2, the

14 text messages that I've shown you there for you, that's

15 marked -- that's dated maybe a week or two before the

16 incident.

17           A         Okay.  Like I said --

18           Q         They state, asking for the phone back, is

19 that -- what was your response?  What did you say at that

20 point?

21           A         Let's see, turn it off, sorry bastard,

22 stay away from me.  It was the last thing that he had to try

23 to control me, like my phone.

24           Q         At the time did you read what you said

25 then when he answered --

Electronically signed by Jane Fitch (401-380-425-5745)                                        19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 37

1      A          You ain't getting shit from me, fuck you.

2  You ain't, he ain't.

3      Q          Okay.

4      A          I mean, what does he want from me, my

5  life, my child, my phone, my two -- my two things that I do

6  on a daily basis.  I -- my phone is my way to support my

7  child and my child is my child.

8      Q          Okay.

9      A          Does he want a phone that was a gift four

10 years ago?  I don't know.  Does he want the phone that bad?

11     Q          So you -- you testified that the car was

12 moving, correct?

13     A          I --

14     Q          When she -- when --

15     A          So I can't --

16     Q          When the prosecutor asked you.

17     A          It's really hard for me to recall, but I

18 feel like I remember like I was pulling out when he -- when

19 he reached in the car, but I can't remember, because I was

20 parked and I got out to say hi to my stepdaughter.

21                So I can't, at this point in time I

22 can't -- I was too like dazzled to -- or frazzled, whatever

23 the word is, to remember if I was in park or if I wasn't.

24                Because my car is a stick shift, so all

25 the time if I'm sitting flat and I'm just sitting there

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 38

1    listening to music in my car, I'm in neutral with the brake

2    on.

3           Q        Okay.

4           A        Because you can't park in a stick shift

5    without a clutch.

6           Q        Okay.  So do you recall in your written

7    statement stating that you got out to get your daughter and

8    then he reached in to the -- through the window?

9           A        No.

10          Q        Do you recall writing that?

11          A        No.  She was in the car.  We were

12   strapped in when he reached in.  There is a video camera on

13   his garage door, he can show you.

14          Q        Okay.  I can show you your statement that

15   I will --

16          A        My statement, I was just kind of a little

17   under, a little amount of stress.

18          Q        Okay.  But could you read for me what you

19   stated right here?

20          A        Okay.  Say hi to my stepdaughter, when I

21   left, go to, go out, daughter in the car.  It's scribbled,

22   Ma'am, it looks like I didn't even know what I was saying at

23   this time, be civil and get out to say hi to my stepdaughter.

24                   When I left to go to get out my daughter

25   in the car and reached in.  It doesn't even make sense.  It

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 39

1    just shows you that I can barely write at that time.

2            Q        Okay.  No problem.

3            A        I don't know how you got anything legible

4    out of that.

5            Q        Also in your written statement you stated

6    that you guys are -- have a pending custody battle?

7            A        No, we do not.

8            Q        Or you have --  I'm sorry.  You said, we

9    are about to go to court for a custody.

10           A        Well, I thought --

11           Q        Do you remember writing that?

12           A        I thought he would file charges for

13   custody, but he hasn't.  He is not interested in seeing her.

14           Q        Okay.  So was the about to go to court

15   for custody, what you thought he was going to do --

16           A        I thought maybe, he said he was going to

17   go file and take my daughter, so I thought maybe he would go

18   file and --

19           Q        Okay.  So if he was convicted of domestic

20   violence today, that would potentially help your custody

21   dispute, correct, for you?

22           A        I don't know.  Like my mind doesn't think

23   like that.  I wouldn't think that would help me in any way.

24           Q        Okay.  Also in your statement you stated

25   that you bit him by mistake.  What do you mean?

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 40

1           A           I think that was my victim mindset,
2    automatically going to the police station and saying, I did
3    this, I did that; when I really did nothing.  I was the
4    victim.
5                       All I was trying to do was take my
6    daughter to see her dad.
7           Q           Okay.
8           A           So I think my -- me going in there and
9    saying I did this, I did that; I don't -- I don't know what I
10   did, we were scuffling.  I know that I bit him because he had
11   his arm around my mouth.  I do remember that.
12                      And I remember arms were flying, but it's
13   just too -- I didn't specifically go to hit him, no, Ma'am.
14   I didn't go there for violence.  I went there so my daughter
15   could be with her dad.
16                      I didn't have that.  My parents had been
17   gone, one for a very long time.  So out of all of this, I
18   just wanted the best thing out of it, which was for a
19   daughter to be able to still see her dad.
20                      I didn't go there for violence.  He had
21   that set up for me.  I walked into that.  That wasn't me.
22          Q           Okay.  So you ended up leaving the scene
23   to make the report, correct?
24          A           I had to, yeah.  I had no phone and he
25   had -- he took my daughter from me.

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 41

1          Q          So if you had believed that the phone was

2    yours, why didn't you go leave to go make a report about the

3    phone, instead of the following --

4          A          Because I -- I was upset.  I was standing

5    there trying to get my phone.  I didn't want to have to go to

6    the police station and do this.  It was Friday evening, I

7    just worked all week.  I wanted to get my daughter, go home,

8    make some dinner, maybe watch a movie, cuddle.

9                     I didn't want to have to go to the police

10   station battered and beat up and sad and say this or that.

11   Like I was just trying to resolve it between us.

12                    But now that I know, there will be no

13   interaction ever between us without a police or a mediator or

14   a lawyer.  There cannot and will not.  It is not safe for me

15   or any -- or him.

16                    We are not good to be around each other.

17   So I realize now that this is the kind of setting that we

18   need, just to even be able to sit and talk to each other.

19         Q          Okay.  So that -- the video that we

20   viewed earlier with you trying to get in the home, is it

21   possible that the injuries that you sustained was from when

22   you were trying to force your way into the home?

23         A          I'm sure a couple of them were trying to

24   force into the home, but him wrestling with me and trying to

25   pick me up and physically shove me out of the house, that's

Electronically signed by Jane Fitch (401-380-425-5745)                                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 42

1   where I sustained some of my injuries, too.

2           Q           Is that his home, is that his house?

3           A           It was our home.  I had just moved out,

4   yes.

5           Q           I understand.  But is that your address,

6   was that your address at the time?

7           A           I had just moved out.  I didn't have an

8   address.  My mail was still going there, to answer your

9   question, yes.

10          Q           Okay.

11          A           My belongings were still in the house and

12  my mother's ashes are still upstairs next to my bed.  Yes, it

13  was still my house.

14          Q           So on the witness statement, the 211

15  Lyness Avenue, that's not your address?

16          A           That's my address now, yes, Ma'am.

17          Q           Okay.  But that's what is on the report

18  that day.

19          A           Right.  Right.

20          Q           So then that was not your address then?

21          A           I didn't want to affiliate anything with

22  Mr. Redden after that time, absolutely not.

23          Q           I just need a yes or no.

24          A           Yes.

25          Q           Was that --

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 43

1       A       Yes.

2       Q       -- your address at the time or is it --

3       A       Which one?

4       Q       -- the 211 address --

5       A       Yes.

6       Q       -- that is on your --

7       A       Yes, the 211 is my address.

8       Q       And that was your address on the date of

9   this incident?

10                   THE COURT:  So, Counsel, I think what

11   you're trying to get at is --

12                   THE WITNESS:  I know.

13                   THE COURT:  Your residence.  You all keep

14   saying residence and --

15                   MS. CRUMES:  Yes, correct.  I'm sorry.

16   Yes.  So that was not your --

17                   THE COURT:  The code uses it for

18   residence.

19                   MS. CRUMES:  Residence, yes.  Yes.  Yes.

20   BY MS. CRUMES:

21       Q       So that was your -- that was not your

22   residence at the time?  The 211 Lyness Avenue was your

23   residence at the time?

24       A       I just moved there, yes.  But my mail was

25   still going to 2043.

Electronically signed by Jane Fitch (401-380-425-5745)          19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 44

```
 1           Q        I was --
 2           A        I was in the process of -- I was in the
 3    process of transferring my plates, my address, everything.
 4    So I can't really tell you if the address was --
 5           Q        I'm just going off of what you put on
 6    your statement.
 7           A        Yes.
 8           Q        The address.
 9           A        Right.
10           Q        It doesn't match --
11           A        I don't want to affiliate anything with
12    2043, yes.  211.
13           Q        And just one last question.  Mr. Redden
14    did ask you not to come into the home, correct?
15           A        I guess he said it if it's on the video.
16    I don't remember hearing that.
17           Q        No -- well, or he said please stop?
18           A        I said please, stop, too.
19           Q        Okay.  And when he shut the door at
20    his -- of the sliding glass door and you continued, did that
21    not, did that -- okay.
22                    When he shut the door, what did you think
23    was happening, when he shut the door?
24           A        That he was stealing my phone and not
25    going to give it back.
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 45

```
 1          Q        Okay.

 2          A        So I was going to have to go to the

 3   police at that point.

 4                   MS. CRUMES:  Okay.  No further questions.

 5                   THE COURT:  Any redirect, Ms. Gibson?

 6                   MS. GIBSON:  No, Your Honor.

 7                   THE COURT:  Thank you, Miss.  You may

 8   step down.

 9                   THE WITNESS:  Thank you.

10                   MS. GIBSON:  The State would ask that the

11   things marked City Exhibit A, B and C be admitted into

12   evidence.

13                   THE COURT:  Any objections?

14                   MS. CRUMES:  No, Your Honor.

15                   THE COURT:  A, B and C will be admitted

16   into evidence.  Any further exhibits or evidence, Ms. Gibson?

17                   MS. GIBSON:  No, Your Honor.

18                   THE COURT:  Do you rest at this time?

19                   MS. GIBSON:  Yes, Your Honor.

20                   THE COURT:  Counsel, do you wish to

21   proceed?

22                   MS. CRUMES:  Your Honor, I would like to

23   make a motion for a Rule 29, just on the grounds that there

24   has been no proof that my client actually caused, knowingly

25   caused any physical harm, recklessly caused any physical
```

Electronically signed by Jane Fitch (401-380-425-5745)    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 46

1   harm, nor by threat of force led Ms. Langen to believe that

2   imminent physical harm was -- that physical harm was

3   imminent.

4                    In fact, all that's been testified to

5   today was that Mr. Redden took a phone and then went into his

6   home and tried to keep Ms. Langen out of his home.

7                    And that was to her own testimony, as

8   well as the officer who stated that Ms. Langen wrote in her

9   statement that she was trying to get in his home to get her

10  phone.

11                   THE COURT:  Okay.  Just a second here.

12  Your response, Ms. Gibson?

13                   MS. GIBSON:  Thank you, Your Honor.  The

14  statute does read knowingly cause or attempt to cause

15  physical harm to a family or household member is not in

16  dispute.  As far as knowingly, it's when a person is aware

17  their conduct will probably cause a certain result or

18  probably be of a certain nature.

19                   Knowingly in here is that they were -- he

20  was closing the door, scraping her arm.  I believe that

21  injury was as a result of her and his interaction at the

22  door.

23                   He should be aware that by shutting a

24  door on someone's arm, it's probably going to cause an injury

25  to that person, and it, in fact, did cause an injury.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 47

1                    THE COURT:  I think the State has barely

2     made a case of domestic violence.  So I'm going to overrule

3     your motion, your Rule 29 motion at this time.

4                    So maybe -- again, if you want -- if you

5     don't want to present evidence, that's -- I understand, but

6     maybe if you present evidence, I might come to a different

7     conclusion at the end of your case.

8                    MS. CRUMES:  Yes, Your Honor.  I've got a

9     witness that I can call.

10                    THE COURT:  All right.  Who would that

11    be?

12                    MS. CRUMES:  If I could call Kylee

13    Redden.

14                    DIRECT EXAMINATION

15    BY MS. CRUMES:

16           Q       Hi, Kylee.

17           A       Good morning.

18           Q       If you could state your first and last

19    name for the record.

20           A       Kylee Redden.

21           Q       And who are you to the Defendant?

22           A       Daughter.

23           Q       Okay.  And on the date in question, you

24    witnessed the entire incident, correct?

25           A       Yes.

FITCH REPORTING, INC.
(800) 569-7888

Page 48

1          Q          You were actually the one who recorded

2     it, correct?

3          A          Yes.

4          Q          Did the officers ask for your videos at

5     the -- at the scene?

6          A          Yes.

7                     THE COURT:  Yes?

8          Q          Did you ever see -- on the date in

9     question, did you ever see your dad hit Ms. Langen?

10         A          No.

11                    THE COURT:  So, Counsel, you can keep

12    leading the witness, but that's going to affect my

13    credibility of her testimony.

14                    MS. CRUMES:  Understood.

15                    THE COURT:  Your choice.

16                    MS. CRUMES:  I got you.

17    BY MS. CRUMES:

18         Q          On the -- on the date -- on the day of

19    the incident, what did you see?

20         A          My dad took Bridget's phone and then he

21    went and they ran around and then he went and tried to put

22    her phone inside, and she went up to the door trying to get

23    in to get her phone.

24         Q          And when she went up to the door, what

25    did she do?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 49

1           A           She tried to force her way in.

2           Q           Okay.  In the report Ms. Langen stated

3    that she bit your dad by mistake or Mr. Redden by mistake.

4                       When you -- when you -- what you

5    witnessed, did anything look like a mistake?

6           A           No.

7           Q           You spoke to the officer on the date in

8    question, correct?

9           A           Yes.

10          Q           And what did you share with him?

11          A           I showed him the videos and -- I showed

12   all the videos and then I sent him the videos.  In the first

13   video of them running around, he said that they looked like

14   elementary kids running around.

15          Q           Oh, okay.  Were you afraid that day

16   for -- for anyone?

17          A           Not necessarily, because I didn't think

18   anything would really happen.

19                      MS. CRUMES:  Okay.  I have no further

20   questions.

21                      THE COURT:  Ms. Gibson, do you have

22   questions?

23                      MS. GIBSON:  Thank you.

24

25

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 50

```
 1                        CROSS-EXAMINATION
 2   BY MS. GIBSON:
 3           Q        Ms. Redden, I don't know if this was
 4   asked, but how old are you?
 5           A        Sixteen.
 6           Q        Okay.  Sixteen?  And you said you're
 7   Michael Redden's daughter?
 8           A        Yes.
 9           Q        And do you live with him at the 2043
10   Wagon Wheel address?
11           A        Yes.
12           Q        So you were there on July 7th, correct?
13           A        Yes.
14           Q        Okay.  So did you see Bridget come into
15   the driveway?
16           A        I did not see her pull into the driveway.
17           Q        Okay.  When did you first see her?
18           A        I saw her when my dad went -- or he went
19   to give my little sister to her, and I went around the corner
20   to the driveway.
21           Q        Okay.  So you saw your dad taking your
22   sister to the -- her car and you went over there, too?
23           A        Yes.
24           Q        Okay.  You said you saw your dad take the
25   phone from her?
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 51

1         A         Yes.

2         Q         Okay.  What exactly did you see?

3         A         I just saw him reach in the window and

4    grab the phone that was sitting there.

5         Q         Okay.  So he reached in and took the

6    phone and then they started running around?

7         A         Yes.

8         Q         Is that right?  Okay.  At some point did

9    you get your sister out of the car or were you holding her?

10        A         No.  Bridget got her out of the car and

11   when Bridget went over to the neighbor's house, I asked

12   Bridget if I could have her and she gave her to me.

13        Q         Okay.  At what point did Bridget go to

14   the neighbors?

15        A         After they were running around.

16        Q         So they were running around and then

17   Bridget leaves to go to a neighbor's house?

18        A         Yes.

19        Q         Okay.  How long before she came back?

20        A         Like a minute.  She wasn't there long.

21   She just knocked on the door and then came back.

22        Q         Okay.  After she came back what happened?

23        A         They went around to the back and then

24   that's when she was trying to get into the house.

25        Q         And where was your dad at the time she

Electronically signed by Jane Fitch (401-380-425-5745)                              19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 52

1   came back?

2            A         He was in the door of the back door.

3            Q         Okay.  So inside the doorway of the

4   sliding door?

5            A         Yeah.

6            Q         Okay.  So she comes back and he is

7   standing inside the doorway?

8            A         Uh-huh.

9            Q         Are you standing out there somewhere, is

10  it like a patio?

11           A         Yeah.

12           Q         Okay.  When she -- you first see her, did

13  she say anything to you or to him that you remember?

14           A         No.  I just saw her getting into the

15  house, and in one of the videos, when she was trying to get

16  into the house, she did ask me to call the cops.

17           Q         Okay.  So when she comes back and he is

18  in the doorway, you said she is trying to get in the house?

19           A         Yeah.

20           Q         Correct?  How is she doing that?

21           A         She was just trying to push her way

22  through to get into my dad and she was trying to like crawl

23  through the holes, like my dad's like legs.

24           Q         Did she try to get past him?

25           A         Yeah.

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 53

1          Q          To get her phone, is that what you

2    believe?

3          A          Yeah.

4          Q          Okay.  Did she say she was trying to get

5    her phone back?

6          A          Not that I remember.

7          Q          Okay.

8          A          No.

9          Q          You just knew that because they had been

10   running around --

11         A          Yeah.

12         Q          -- because of the phone?  Okay.  As she

13   is trying to get in, what do you remember your dad doing?

14         A          I just remember him standing in the

15   doorway telling her to stop trying to get into the house, and

16   he was just trying to close the door.

17         Q          So she is trying to get in and he was

18   doing -- he was trying to stop her --

19         A          Yeah.

20         Q          -- from coming in?  Okay.  Was he -- and

21   he was closing the door?

22         A          Well, he wasn't closing the door, but he

23   like had the door so it wouldn't push open anymore than what

24   it already was open.  So --

25         Q          So it wasn't open all the way?

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 54

1          A       No.

2          Q       It was part open, he is standing in what

3   is open?

4          A       Uh-huh.

5          Q       And she is trying to crawl past him?

6          A       Yeah.

7          Q       And he is trying to stop her from getting

8   in?

9          A       Yes.

10          Q       Do you remember anything he did to try to

11   keep her from coming in?

12          A       No.  I just remember him like standing

13   there, and he had his arm on the door so it wouldn't open

14   anymore.

15          Q       And do you remember her yelling anything?

16          A       I remember yelling, but I don't remember

17   what was said.

18          Q       Okay.  Is it possible he was yelling stop

19   or stop doing that, something along those lines?

20          A       Yes.

21          Q       Was Bridget able to get in the house?

22          A       No.

23          Q       So did she come back out or did he push

24   her out, do you remember?

25          A       I remember her coming out, but I don't --

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 55

1    I'm not sure how it happened or anything.

2         Q        Okay.

3         A        But I don't remember him pushing her, no.

4         Q        But she -- you said she was kind of

5    crawling past him?

6         A        Yeah.

7         Q        And then did she come back out that same

8    way backwards?

9         A        Yeah.

10        Q        Were they ever inside together all the

11   way in the house?

12        A        No.  I -- she was in like the house a

13   little bit, but they were never like both standing up in the

14   house.

15        Q        Okay.  So when they were in there, she

16   was on the -- was she on the ground?

17        A        Yeah.

18        Q        Okay.  And then she was back out, but you

19   don't know exactly how?

20        A        Uh-huh.

21        Q        Did she try to get back in again?

22        A        Not that I remember, no.

23        Q        So it was just one time that you saw him

24   at that doorway with her trying to get in?

25        A        Yes.

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 56

1                    MS. GIBSON:  I've got no other questions.

2    Thank you.

3                    THE COURT:  Any redirect?

4                    MS. CRUMES:  No, Your Honor.

5                    THE COURT:  All right.  The videos that

6    you showed, she testified that she took them.

7                    MS. CRUMES:  She did, Your Honor.

8                    (TAPE INAUDIBLE).

9                    MS. GIBSON:  You want to admit your --

10                   THE COURT:  You want to admit these into

11   evidence?

12                   MS. CRUMES:  Yes.

13                   THE COURT:  You want to admit the videos?

14                   MS. CRUMES:  I do want to admit the

15   videos, Your Honor.

16                   THE COURT:  With that, Ms. Gibson -- did

17   the Court see the entire video or just portions of the video?

18                   MS. CRUMES:  Those are, it was a

19   one-minute video.  I did get -- the Prosecutor has provided

20   me with snippets of the video.  So that was all in the video.

21   So I just provided it to the --

22                   THE COURT:  That is --

23                   MS. CRUMES:  That is not the entirety of

24   the video, Your Honor.  That is --

25                   THE COURT:  But you looked at it and the

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 57

1    Prosecutor looked at it and that's what you want to submit?

2                    MS. CRUMES:  Yes, Your Honor.

3                    THE COURT:  Okay.  That's fine.  All

4    right.  All right.  Thank you.  I'm sorry we had to come

5    back.

6                    MS. GIBSON:  No.  And I will -- she

7    didn't see the video, but the video that you see here, and I

8    agree that --

9                    THE COURT:  She testified that -- she

10   testified that she took the videos.

11                   MS. CRUMES:  Yes.

12                   MS. GIBSON:  I understood that.

13                   THE COURT:  Okay.  I apologize.

14                   MS. GIBSON:  It's just that we didn't --

15   we will agree to let it be admitted.

16                   THE COURT:  Okay.

17                   MS. GIBSON:  She wasn't shown the video

18   saying is this the video that you took.

19                   THE COURT:  (TAPE INAUDIBLE).  All right.

20   All right.  Thank you.  Thank you for testifying.  I

21   appreciate it.  You're free to go now.

22                   Anything else, Ms. Crumes?

23                   MS. CRUMES:  I just have one more

24   witness, Your Honor.  Mr. Redden, I would like to call Mr.

25   Redden.  I will keep it very brief, Your Honor.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 58

1                         THE COURT:  Okay.

2                          DIRECT EXAMINATION

3    BY MS. CRUMES:

4           Q        Did this all start because you asked for

5    your phone back?

6           A        It did.  Many times I asked for that

7    phone over the course --

8                         THE COURT:  Again, Counsel, you can lead

9    him as much as you want, but it's very impactful when I am

10   finding credibility.

11                        MS. CRUMES:  I will rephrase.

12   BY MS. CRUMES:

13          Q        Why do you believe this started, Mr.

14   Redden?

15          A        Because I wanted the phone back that I --

16   that's rightfully mine and I've paid for for four years.

17   That's basically why this all started.

18          Q        Okay.  When the police arrived, did you

19   ask about pressing charges for your injuries?

20          A        Yes.

21          Q        Or for your property?

22          A        Yes, I did.

23          Q        And what was the response of the officer?

24          A        You cannot press charges on Mrs. --

25   Ms. Langen because you incited her to do everything that she

Page 59

1   did here today.

2          Q       Okay.  And what was he -- did the officer

3   state in the report -- the officer states that you admitted

4   to starting all of this.  What did you admit to?

5          A       Taking my phone off of the seat of the

6   car.

7          Q       Okay.  And were you under the impression

8   that that was your phone?

9          A       I was told by a police officer that was

10  my phone.  That's the only reason I reached in that car to

11  get my phone out of the car, because it was rightfully mine.

12  It is my bill, it is my phone.

13                 MS. CRUMES:  Okay.  No further questions,

14  Your Honor.

15                 THE COURT:  Okay.  Your witness,

16  Ms. Gibson.

17                 MS. GIBSON:  Thank you, Your Honor.

18                 CROSS-EXAMINATION

19  BY MS. GIBSON:

20         Q       Mr. Redden, you stated just now that an

21  officer told you that the phone belonged to you; is that

22  correct?

23         A       Correct.

24         Q       Had you asked for it back previously from

25  Ms. Langen?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 60

1          A          Yes, many times.

2          Q          And you knew she didn't want to give it

3   back to you?

4          A          No.  She never said she wasn't going to

5   give it back to me.  She never did -- well, actually the last

6   message said, the cussing, yes, but for probably a month and

7   a half, she did not say that.

8                     On June 23rd she told me that she wasn't

9   going to give me that phone back.

10         Q          How long had you been asking for it back?

11         A          Since May 23rd when she left.

12         Q          Okay.  So you had been asking for the

13  phone for the month and she had not given it back to you?

14         A          Correct.

15         Q          You then received a message saying you're

16  not getting it back; is that correct?

17         A          Correct.

18         Q          Okay.  So when she came to your house on

19  July 7th, was that to pick up your shared daughter?

20         A          Yes.

21         Q          Okay.  Had -- did you know she was coming

22  at that time to pick her up?

23         A          I did.

24         Q          And when she got there, did you take your

25  daughter to the car?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 61

```
 1           A         No.

 2           Q         No?  Okay.  So did you walk over with

 3    your daughter?  Did your daughter head to the car?

 4           A         Bridget Langen came through my back gate.

 5    I have -- I have a patio back there.  Myself, I was sitting

 6    back there.  Kylee was back there.  Maisley was back there.

 7                     And Bridget came through my back gate

 8    to -- and she sat -- she gave my daughter Kylee a hug.  She

 9    sat down and was having a conversation, just everything

10    seemed fine.

11                     Then what happened next was, I basically

12    brought up a vacation that we were supposed to take, Kylee,

13    Riley, Maisley, we were all going on a big family vacation,

14    coming in days, and she was not going to allow me to take

15    Maisley to go on vacation, which I -- I take -- me and my

16    family take Maisley wherever we go.

17                     I mean, we've taken Maisley to Florida

18    before, but -- so all of a sudden she doesn't want me to take

19    Maisley to Florida with me.  So she spoke -- she steamed,

20    like storms out of the yard.  I didn't get to say bye to

21    Maisley or anything, she is like, I'm leaving.

22                     So she storms out of the yard and goes to

23    her car and I didn't get to say bye to Maisley.

24           Q         So, but she was coming to pick Maisley

25    up, right, that was the plan?
```

FITCH REPORTING, INC.
(800) 569-7888

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 62

1           A        Correct.

2           Q        And you said when you mentioned taking

3    her on a vacation, Bridget was not okay with that?

4           A        Bridget was not okay with it that day,

5    no.

6           Q        Okay.  Prior to that how long ago were

7    you living together?  Was it that day, date?  You said --

8           A        Bridget left -- Bridget left my home on

9    May 23rd and never returned.

10          Q        Okay.  You don't have any agreements

11   about Maisley at the time?

12          A        Verbal, basically saying that here, she

13   is going to bring Maisley to me Wednesday -- or I pick

14   Maisley up at daycare on Wednesday, and then she picks her up

15   on Sunday, and then when the next week, it's Wednesday

16   through Friday.  There is nothing, no court --

17          Q        Nothing legal through the courts, you

18   just had communicated with her?

19          A        Correct.

20          Q        Okay.

21          A        That had been going on for six weeks.

22   Well, she left May 23rd, this happened -- this happened July

23   7th.  We had that schedule going for six consecutive weeks.

24          Q        Okay.  So then Bridget walks away with

25   your daughter?

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 63

```
 1          A        Correct.

 2          Q        To the car?

 3          A        Correct.

 4          Q        Okay.  You said she didn't let you say

 5   goodbye, so you went after her --

 6          A        Yes.

 7          Q        -- at that time?

 8          A        I mean, I just walked, just casually to

 9   the car, just to say goodbye.

10          Q        Okay.  And did you go around to where

11   your daughter was in the car to say goodbye to her?

12          A        At first.  And then I came around the

13   other side of the car.  I walked to say goodbye to Maisley --

14          Q        Okay.

15          A        -- on that side and then I walked to the

16   other side.

17          Q        Okay.  And at that time is when you

18   reached in to take the phone?

19          A        Yes, when I was on the driver's side of

20   the car.

21          Q        Had you asked Bridget for it that day

22   while she was there?

23          A        Yes.

24          Q        Okay.  And what was her answer to you?

25          A        No.  I'm not getting -- I'm not getting
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 64

1   her phone.

2           Q        So then you decided to instead just take

3   it out of the car when you saw it?

4           A        Yes.

5           Q        And after that, did she go run after you?

6           A        She chased me through the front yard.

7           Q        Okay.  And your intention was to take the

8   phone inside and not give it back to her?

9           A        My intention was to take the phone in the

10  house.

11          Q        Okay.

12          A        Because it was my phone.

13          Q        Were you able to get the phone in the

14  house?

15          A        Yes.

16          Q        Where is Bridget at that time?

17          A        I'm not sure exactly where, because I ran

18  around the house and she was running.  I don't know.

19          Q        Okay.  So you left her and you --

20          A        Yeah, I ran around the house.

21          Q        Okay.  And then --

22          A        Went into the back door, put the phone on

23  the counter.  And then I made sure nothing -- I had my

24  daughters outside, so I was at the door making sure that she

25  wasn't doing anything that would jeopardize my daughters and

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 65

1    that kind of stuff.

2                    I was afraid for my daughters, so I was

3    standing at the door just to make sure everything was okay.

4          Q       Okay.  So you get the phone inside, and

5    then you -- like just like standing in the doorway?

6          A       I go to the sliding door of my house.  I

7    was at the back door of my house.

8          Q       Okay.  And you were standing there when

9    you saw her?

10         A       Correct.

11         Q       You didn't close the door or take your

12   daughters inside with you?

13         A       I couldn't.  She is in the way.  She --

14   as soon as I -- as soon as I came to that door, Bridget was

15   in my face.  As soon as I went to take that phone in the

16   house, as soon as I came back to that door, Bridget was in my

17   face.

18                    There was no way for me to get out to my

19   children at that point.

20         Q       You said you were standing there waiting

21   to make sure they were okay.

22         A       Correct.

23         Q       Okay.

24         A       In the doorway.  I wasn't outside.  I was

25   in my house.  Bridget was in here making -- Kylee and

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 66

1    Maisley, Maisley or -- Kylee was holding Maisley in the yard.

2    So she was about ten feet away.

3                    So, yes, I'm going to make sure that -- I

4    thought Bridget was going to attack Kylee eventually.  That's

5    what I thought.  So, yes, I'm going to keep my eyes outside

6    and make sure that didn't happen.

7            Q        You were standing there to keep her from

8    going in the house as well?

9            A        Everything.

10           Q        Okay.

11           A        I was standing in my back door because

12   that's my home.  I'm protecting my home.  I'm protecting my

13   children that are right there.  I'm protecting everything at

14   that point.

15           Q        So you're standing in the doorway and

16   Bridget comes to the doorway.  Did she say anything to you?

17           A        I don't even know, everything was said, I

18   don't remember anything but screaming and yelling.  I don't

19   think she said anything.

20                    She was just trying to push into my

21   house.  I think that's all she was trying to do was push her

22   way in.  I was trying to keep her out.

23           Q        Did you try to -- you demonstrated trying

24   to keep her out by pushing with your hands?

25           A        I never went outside of my home.  Like I

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 67

1    never went outside of my own home.  Bridget tried to push in

2    my home the entire time that phone was in my home.

3                        I had to keep her out of my home the

4    entire time.  That's all she kept doing was trying to come

5    into my home.  I'm having to keep her out.  That's all I was

6    doing, was keeping her out of my house.

7                        I mean, she bit me.  At first -- the

8    first time when she got to the door she bit me when she was

9    trying to get into the home.  The bite was first.  After she

10   pushed into my home, that's when the punch came on this side

11   of the face.

12                        I mean, I've got bit on this arm, because

13   I was holding her that way.  I got punched in this -- this

14   side of my face.  I mean, it was all me holding her out of my

15   house.  I didn't even do anything.  I couldn't even get out

16   of my house, not once.

17                        When the situation was going on, I was

18   keeping her from getting in.  I had another TV that I thought

19   she was going to go rip off of that wall.  I mean, I'm not

20   going to let her run around my house and ripping TVs off and

21   doing that.

22           Q        When during this did she rip the TV off?

23           A        She ripped the TV off before she tried to

24   get in my house.  She ripped the TV off because the phone was

25   in there.  She ripped the TV off first before she tried to

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 68

1    push into my home.

2           Q       You said you didn't have time to get in

3    your home because she was in your face as soon as you had set

4    the phone down.

5           A       No.  I said I never came out of my home.

6    I said I ran from the front into my home and never came out

7    of my home because Bridget came around.

8                   I never -- I went -- had the phone in my

9    hand and came all the way into the house, and I didn't come

10   out of the house.  She kept trying to push in.  I never went

11   out of that house.

12          Q       Right.  You also stated that you didn't

13   have a chance to shut the door and be in the home because she

14   was there pushing her way in as soon as you set the phone

15   down and came back to the door.

16          A       You can say that again.  I never had a

17   chance to shut the door?

18          Q       Yes.

19          A       No, I didn't say that at all.  I said I

20   came around my home.  I was -- I beat Bridget around my home

21   by probably five, ten seconds.  I definitely had time to shut

22   that door.

23                  And then she just whack, whack -- I'm --

24   I had it locked at first.  I think I even locked it so she

25   couldn't get in.  Then I hear boom, boom.  I mean, she was

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 69

1    trying to bust the glass, so I think I'm -- I think I just

2    slid it open just so she quit banging on the glass.

3                        And then she just tried to force her way

4    into my home.  The only thing I did was tried to keep my ex

5    out of my home.  That was it.

6              Q         I understand that's what you're

7    explaining.  I am trying to get a clear timeline of how

8    things are happening.

9              A         Okay.

10             Q         Okay.  So you say now you went in and

11   locked the door?

12             A         Uh-huh.

13             Q         And Bridget was banging on the door; is

14   that correct?

15             A         Uh-huh.

16             Q         Was it after that she then pulled the TV

17   down?

18             A         I can't remember exactly, but I think she

19   pulled that TV down first.  I think that was the first thing

20   she did when she came around that corner, was she pulled that

21   TV off that wall.

22                        And that's when I went, wow, and I

23   shut -- and I think I shut the door so she didn't rush in and

24   get the other TV.  Because that's exactly when I shut that

25   door.  When that TV came off that wall, I shut that door.

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 70

1                    I remember that, because I had to close

2  it, to make sure she didn't run in there.

3            Q        You shut and locked the door.  Are you on

4  the inside of it then?

5            A        I'm still inside.  I was inside.  I never

6  was outside.

7            Q        How did the door get opened again?

8            A        I probably opened it, or I unlocked it.

9            Q        Okay.  So, because you said you guys were

10  struggling in the doorway, right?

11           A        Uh-huh.  Correct.

12           Q        So you did open the door again?

13           A        Correct.

14           Q        Okay.  So you unlocked it and opened it

15  with her standing out there?

16           A        I would imagine she was standing there.

17           Q        Okay.  So you're trying to keep her out,

18  and you think --

19           A        Maybe not.  I will go back on that,

20  because at one point she did walk away, so she probably

21  walked away to the neighbor's house.  And I was just trying

22  to check on the kids, like make sure to keep it on video.

23                    Like I kept telling my daughter to keep

24  this video going, too.  I said keep going, keep going, do not

25  let this get off of video, because I knew it was all so

FITCH REPORTING, INC.
(800) 569-7888

Page 71

1    important to keep it all on video.

2         Q        So you instructed your daughter to take

3    the video, but not to come in the house to keep her safe?

4         A        No.  What -- my daughters came in the

5    house eventually.  When the situation diffused and Bridget

6    got away from the doorway, I did get both of my children and

7    bring them both in the house.

8                  But that was after Bridget got out of the

9    doorway and I don't -- I think that's when she went to the

10   neighbor's house at that point.  At one point Bridget finally

11   gave up trying to get in my house and she went away.

12                 And that's when I got the kids into the

13   house and that's when she went to the police station.  I had

14   the kids.  I mean, I felt safe then, because I had the

15   kids --

16        Q        Okay.

17        A        -- in the -- in the house.

18        Q        You said you unlocked the door when she

19   was not there, though, correct?

20        A        I can't recall when -- when I unlocked

21   the door.  I probably unlocked that door four or five times,

22   like ba, ba, ba, like what is happening here.

23        Q        Okay.  So she is trying to get in and you

24   are trying to keep her out, correct?

25        A        That's what happened.

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 72

```
 1           Q          What are you trying -- what are you doing
 2    to her?
 3           A          Holding her back.  I was holding her
 4    back, that was all I was doing.  She just bum rushed.  I
 5    think she was trying to tackle me.  So I'm just holding her
 6    back, like bear hug, like that was all I was doing.
 7                      I had -- I didn't have any arms around
 8    necks.  I don't -- I'm not a violent person.  Like I'm not
 9    going to hurt her.  I don't want her being hurt.  Like there
10    was no intention of any hurt at all.
11                      Keeping her out of my house is exactly
12    what I did.
13           Q          So you're describing a bear hug.  I mean,
14    both of your arms wrapped around her?
15           A          So she -- I'm just holding her still so
16    she can't swing at me.  She can't rip TVs off the wall.  She
17    can't break anything.  She can't do anything like that.
18                      I asked her to leave four or five times,
19    she wouldn't leave.  She just continually pushed into my
20    house.
21           Q          Was that the time when your arm was bit,
22    when your arms were around her?
23           A          My arms were bent?
24           Q          Bit.
25           A          No.  My arm was bit first before she even
```

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 73

1   got into the room.  That's what she did, because I went like

2   this, I remember, I went like that, that's how she was able

3   to get into the residence.

4                    The bite caused her to be able to get in,

5   because I pulled my arm back.  I remember it.

6          Q       So you're standing in the doorway with

7   your arms out and she walks up and bites your arm; is that

8   what you're saying?

9          A       She was -- she wasn't never full -- she

10  was never in my face, because I was up on the steps.  I feel

11  like she was just lunging trying to get up the steps.  Like I

12  was at the top of the steps.  There is two steps.

13                   So I was never at the same height as she

14  was at.  So my arms were down, my arms were down, and she was

15  trying to get in my house, because it was this arm.  So,

16  yeah, she -- and my arm was just down there and she bit one

17  of them.

18                   I remember yanking my arm back like this,

19  because it hurt.  I remember yanking it.

20         Q       You said she was down low, was she trying

21  to crawl past you then?

22         A       Trying to push in -- she was just -- I

23  don't think she was just -- her whole goal was to get in my

24  house.  I don't think she thought about anything.  She wasn't

25  -- no matter what was going to happen, she was getting in my

FITCH REPORTING, INC.
(800) 569-7888

Page 74

1   house.

2           Q           I understand that.  She is trying to get

3   in your house to get the phone back, right?

4           A           Right.

5           Q           That's what you know and she knows is

6   going on, is happening?

7           A           Right.

8           Q           So you're trying to keep her out?

9           A           Uh-huh.

10          Q           And she is down low trying to crawl in

11  past you; is that correct?

12          A           Yeah.  Correct.

13          Q           Okay.  So do you close the door on her?

14          A           I never closed the door on anyone.  I

15  couldn't, she was -- she kept the door open.  She pushed in

16  the door, there was no closing the door.  After she pushed in

17  that door, the door never got closed anymore.

18                      But she pushed in the door, the door

19  never got closed.

20          Q           Pushed in the door?  You mean like push

21  it all the way open?

22          A           After Bridget pushed her way into my

23  home, because the door obviously opened up further.  I don't

24  know exactly, I didn't take a measurement on how far the door

25  opened, but that door probably opened up a good three feet,

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 75

1    and then she was able to get into the house.

2                      And that's when the rest -- that's when

3    the punch came, when she was wrestling me on the floor and

4    the punch came, I just tried to keep her out of my home.

5    That's all I did.

6           Q       And when she was in the home, you're

7    saying you guys were wrestling around?

8           A       I wasn't wrestling anyone.  I don't

9    wrestle.  I was defending -- I was just basically being

10   wrestled around to keep her out of my house.  That's -- I

11   wasn't doing anything but holding her back.

12          Q       Okay.  So you're saying by being wrestled

13   around, what you mean is you're acting in a way to keep her

14   out, so any of your actions weren't wrestling, it was trying

15   to remove her?

16          A       No.

17          Q       No?  Okay.  How are you being wrestled?

18          A       She was picking up -- okay.  So it wasn't

19   -- did I not explain when she forced -- does everybody

20   understand she forced her way into my house?

21                      She forced her way into my house.  So

22   what happens when someone forces their way into your house,

23   like she probably -- I think she probably pushed me with her.

24                      So I'm on the floor with her.  I mean,

25   there was no way for me not to touch her.  She forced her way

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 76

1   into my home.  She pushed into me.  So where was I -- I don't

2   understand where I was going to go, like how could I not make

3   any contact?

4                   Like when someone forces their way into

5   your home, how do you not make contact?  What do you do?

6        Q        I didn't say you made contact.  You said

7   you were wrestled.  You were wrestled.  But you did make

8   contact with her on the ground?

9        A        There was tussling going around on the

10  floor.  I didn't do anything.  I mean, I'm trying to hold

11  someone out of my house.  That is it.  That is it, period.

12                  Like if I had my hands on her any way, it

13  was to refrain -- restrain her from getting in my home.  That

14  is it.

15       Q        That was the question I asked.  You said

16  you were trying to get her out, even once she --

17       A        And I never said I was trying to get

18  anyone out.  I said I was trying to keep her from getting in

19  my home.  I didn't aggressively shove her out of my house.

20       Q        But you said she got in your house,

21  right?

22       A        Forced her way in my house, yes.  I

23  didn't say, hey, welcome in, come on in.

24       Q        So she is in your house, what happened

25  then?

FITCH REPORTING, INC.
(800) 569-7888

Page 77

```
 1        A        I wasn't trying to get her out of my

 2   house.  I'm holding her.  I'm just holding her so she doesn't

 3   touch anything else, the TVs.  I got things in my house.  I

 4   did not try to push her out of my home.

 5                 Like she walked out of the home by

 6   herself.  I'm just holding her from doing anything.

 7        Q        So she pushes in?

 8        A        Correct.

 9        Q        And you got -- that's when you bear hug

10   her and hold her?

11        A        That's when I'm on the floor.  That's

12   when I'm -- I remember I'm holding her on the floor so she

13   didn't get at anything else.

14        Q        You're holding her so she can't get to

15   anything?

16        A        No.

17        Q        How was she able to walk out?

18        A        I -- we're right there by the floor, she

19   says -- I say stop, are you going to leave.  I mean, well,

20   why are you continuing to do this.  I actually said, you're

21   doing this in front of the kids, and she said good, screaming

22   and yelling.

23                 I mean, there was nothing for me to do

24   other than just let her do what she does.  Like do flying

25   around, like wrestle around on the floor.  Like what am I
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 78

1  going to do in that situation?

2                    The only thing I literally could have

3  done was cause violence, like hurt her to stop her from doing

4  what she is doing.  Like I'm holding her back from doing

5  those things.

6                    Like I'm thinking, hey, this is the

7  correct thing to do, like she is not going to damage anything

8  else.  She is not -- you're not going to hurt her.  She is

9  not going to hurt herself.

10                   So I mean, just kept her there.  I didn't

11  kept her -- I didn't keep her in the house.  As soon as she

12  made -- insinuated she was leaving, like as she made that

13  move towards the door, I just let her go.

14         Q        Okay.  So that's what I was trying to get

15  at.

16         A        I'm keeping mine -- I'm blocking her

17  from -- like I have -- I mean I can explain how this thing

18  works.  Like this door, there is a sliding door here.  My TV,

19  my 85-inch TV is here.

20                   So in this vicinity where we stayed, my

21  kitchen is here.  I wanted -- there is a couch here.  I

22  wanted Bridget in this little area so Bridget didn't harm

23  anything or anyone.

24                   If she gets out of that area who knows

25  what she is going to do, she is going to rip -- she is going

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 79

1    to rip that 85 TV off the wall?  She is going to do whatever

2    she did.  She already showed that she was going to be

3    violent.

4                    I didn't show -- I wasn't violent on

5    anything.  I didn't expect any violence ever.

6             Q       Okay.  So you're wrestling her, holding

7    her, whatever words we're going to use.  You're there with

8    her, you said as she goes towards the door, you let her go,

9    is that --

10            A       Correct.

11            Q       Okay.  So she makes a move like she is

12   heading out, you let go and she leaves?

13            A       She leaves.

14            Q       Okay.

15            A       Leaves the two -- leaves my child.

16            Q       There were no other interactions after

17   that time?

18            A       Nope.

19                    MS. GIBSON:  Okay.  All right.  I've got

20   no other questions.  Thank you.

21                    THE COURT:  Any redirect, Ms. Crumes?

22                    MS. CRUMES:  Two questions.  Two.

23                    REDIRECT EXAMINATION

24   BY MS. CRUMES:

25            Q       Did you ever hit Ms. Langen?

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 80

1          A          No, Ma'am.

2          Q          And the only time you came into contact

3    with her was when you were trying to keep her out of your

4    home?

5          A          Correct.

6                     MS. CRUMES:  No further questions.

7                     THE COURT:  Any recross, Ms. Gibson?

8                     MS. GIBSON:  No, Your Honor.  Thank you.

9                     THE COURT:  Thank you.  You may step

10   down.

11                    THE WITNESS:  Thank you.

12                    THE COURT:  Any other witnesses?

13                    MS. CRUMES:  No, Your Honor.

14                    THE COURT:  You had another Exhibit,

15   which were text messages?

16                    MS. CRUMES:  Yes.  We would ask that

17   those be admitted in, too.

18                    THE COURT:  Any objection?

19                    MS. GIBSON:  Yes, Your Honor.  Other than

20   the content of them was discussed, there was no

21   identification, that, yes, that was the text you sent, yes,

22   this is the date.  I didn't hear any questions about that.

23                    THE COURT:  I think that the victim, you

24   know, authenticated that, that she didn't dispute that those

25   were text messages.  That's my recollection.

Electronically signed by Jane Fitch (401-380-425-5745)          19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 81

1                    MS. CRUMES:  That's what --

2                    THE COURT:  If she did that, yes.  So,

3    I'm not sure what weight they have to what happened, but we

4    will admit those into evidence.  Okay.  So anything else?

5                    MS. CRUMES:  Nothing further, Your Honor.

6                    THE COURT:  Do either one of you wish to

7    argue?

8                    MS. GIBSON:  Thank you, Your Honor.  The

9    Court has heard the testimony from both parties involved in

10   this.  I think everyone agrees, it starts over a cell phone.

11                   An argument over a cell phone, who it

12   belongs to and frustrations that result in and disputes over

13   custody and all of the drama.

14                   But what the elements are, knowingly

15   cause or attempt to cause physical harm to a family or

16   household member.  Family or household member is established.

17   There is a child in common.

18                   Then back to his actions on that date.

19   He is acting the way that he is aware could causes her harm.

20   She testified that she sustained an injury from him holding

21   her out, using the door, it scrapes her arm.

22                   That he is using his force against her in

23   a way that resulted in those injuries to her leg and her arm.

24   Her knee was a result of the running and that injury, but the

25   others were in that doorway from his actions.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 82

1                    Mr. Redden continued to say it was simply

2    trying to keep her out, but he had opportunities to have the

3    door shut and locked and it was.  Then he chose to open it

4    again and interact with her and push her and try to keep her

5    out instead of leaving it shut, calling the police on his own

6    or doing something that would diffuse the situation.

7                    So he opened the door back up, aware of

8    the fact that she is upset.  At that time I believe he said

9    she pulled down a TV.  And now he is using his physical

10   actions to keep her out.

11                   He said they wrestled, but he was

12   wrestled, although wrestling takes two people to be

13   interacting with each other in that way.

14                   I believe that her testimony about how

15   she sustained the injuries is credible.  That his description

16   in trying to justify it by saying all he tried to do was keep

17   her out does not diminish the fact that he was aware by using

18   that kind of force against her, it was likely to cause an

19   injury and in fact did cause an injury.  Thank you.

20                   THE COURT:  Thank you, Ms. Gibson.  Ms.

21   Crumes.

22                   MS. CRUMES:  Briefly, Your Honor.  Mr.

23   Redden has a right to keep someone out of his home.  He did

24   admit that he tried to keep her out of his home and the

25   prosecuting witness admitted that she tried to force her way

Electronically signed by Jane Fitch (401-380-425-5745)                                      19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 83

1  into his home to obtain the cell phone.

2                    Your Honor, everyone has a right to

3  defend their home and defend themselves.  And it was admitted

4  that the injuries were sustained when trying to force her way

5  into the home.

6                    Ms. Langen agreed to that and the

7  Prosecutor even test -- even just closed with that, stating

8  that the injuries were sustained when she was trying to force

9  her way into the home.

10                   As I stated, Mr. Redden has every right

11 to defend his home and to defend himself, and we believe that

12 in defending himself, that does not cause -- he did not

13 knowingly cause any physical harm to Ms. Langen.

14                   THE COURT:  Okay.  Quick question for

15 you, Counselor.

16                   MS. CRUMES:  Yes, Your Honor.

17                   THE COURT:  Sorry to do this, you're

18 going to suffer a little.  So let's just say, let's give you,

19 let's pretend this is the Court of Appeals here; suppose --

20 suppose somebody shoplifts, takes an item out of the store.

21                   Does the store owner have a right to

22 pursue the suspect, try to get the item back?

23                   MS. CRUMES:  They do, Your Honor, within

24 a reasonable --

25                   THE COURT:  Right.  Let's say the suspect

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 84

1   gets -- gets into a car.  Do they have the right to approach

2   the car, try to get the item back?

3                    MS. CRUMES:  I don't believe so, Your

4   Honor.

5                    THE COURT:  You don't think so?

6                    MS. CRUMES:  I don't believe so.  To go

7   in their car and take them out of their car?

8                    THE COURT:  Well, how far does that go?

9                    MS. CRUMES:  I think that's beyond what

10  is -- what is allowed for that physical contact to be pulling

11  someone out of their car to retrieve merchandise.  I don't

12  believe that that's -- that's out of the scope.

13                    THE COURT:  Okay.  But there is no

14  dispute that she was in possession of the phone; is that

15  correct?

16                    MS. CRUMES:  There is no dispute that she

17  was in possession of the phone.  We're disputing that it was

18  her phone to begin with, her -- actually her phone.

19                    THE COURT:  But she was in possession of

20  the phone when he took the phone?

21                    MS. CRUMES:  Yes.

22                    THE COURT:  Okay.  Ms. Gibson, do you

23  wish to argue any further or --

24                    MS. GIBSON:  Your Honor, I just wanted to

25  address the fact that the thing that he was protecting

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 85

1    himself or protecting his home or protecting his property,

2    but this had been their home before this, even though they

3    had been apart a couple of months, but she wasn't a

4    trespasser when she got there.

5              She came there to get her child.  And she

6    was aware, he said they sat and talked and then she got upset

7    when a vacation was mentioned that she did not want her

8    daughter to go on.

9              So her presence there was not in a way

10   that he needed to use force to defend himself from a

11   trespasser.  He knew she was upset and going to, try to get

12   her phone back.  She chased him, very clearly she was wanting

13   that back and his actions of opening a door back open and

14   trying to keep her out and wrestling with her were not in

15   defense of himself.  Thank you.

16             THE COURT:  Thanks.  Okay.  So I find

17   everybody partially credible.  I do not find the victim's

18   statement about how her leg got injured, I'm not sure how

19   that occurred, but I do find the statements regarding the

20   bear hug or the hug, or the wrestling credible and the

21   scratch in the doorway credible.

22             So with some reluctance, but under the

23   statute, Mr. Redden, you are guilty of domestic violence.

24   And when I say that, this is not what I view -- by the way,

25   this is not my view of what domestic violence should be.

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 86

```
 1                    Okay.  I mean, I've heard a lot worse

 2   domestic violence than this involving knives, gunshots,

 3   whatever, being in the hospital.  And, you know, it's

 4   unfortunate that you try -- I don't know if you tried to

 5   resolve it.  You didn't -- did you try to resolve this case?

 6                    MS. CRUMES:  Yes.

 7                    THE COURT:  You did try to resolve this

 8   case?  Okay.

 9                    MS. GIBSON:  We were at opposite ends.

10                    THE COURT:  Opposite ends?  Also, this

11   phone thing, she had possession of the phone.  I don't know

12   who owned the phone.  She had possession of the phone.

13                    If she -- if he had not taken the phone,

14   you know, and then this all occurred after they left, then he

15   would not be -- you know, he would have a right to defend

16   that he took a phone.

17                    And by the way, I'm curious before I

18   impose sentence, what kind of phone was this that we're

19   talking about?

20                    MS. CRUMES:  It's an I-Phone, Your Honor.

21                    THE COURT:  What kind of I-Phone?

22                    MS. LANGEN:  An old one.

23                    THE COURT:  What version?

24                    MS. CRUMES:  An 8-plus.

25                    THE COURT:  It's an 8-plus.  Does it have
```

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 87

1    a cracked screen or is it --

2                        MS. LANGEN:  Yes, sir.  Cracked screen.

3                        THE COURT:  Cracked screen?  Okay.  And

4    in my limited -- I'm going to take judicial notice, I don't

5    think that's subject to the recent updates.

6                        I think you're stuck with -- does that

7    still work?

8                        MS. LANGEN:  Yes.

9                        THE COURT:  Okay.  Is it -- I don't know,

10   is it something -- I don't think you can update that, can

11   you?

12                       MS. LANGEN:  I don't think so, no.

13                       THE COURT:  You can't take it -- okay.

14                       MS. LANGEN:  It's not even worth anything

15   either.

16                       THE COURT:  Okay.  So, so before I impose

17   sentence -- thank you for telling me about the phone.  I was

18   curious about the phone the whole time.

19                       Can -- you know, what does the -- what

20   does the victim want to happen here?

21                       MS. GIBSON:  I mean, she can make a

22   statement.  I think my conversations with her were to

23   continue to use the word accountability.  It wasn't about

24   what the consequence was going to be.

25                       It's more about this wasn't okay behavior

Electronically signed by Jane Fitch (401-380-425-5745)                19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 88

1   and he needs to be accountable for that.

2                       THE COURT:  Okay.

3                       MS. LANGEN:  That he will never -- he

4   will never --

5                       THE COURT:  Do you really want -- and

6   again, again, I think it's unfortunate that you tried this

7   case.  Both of you.

8                       Do you really want him to be convicted of

9   domestic violence or do you care what the conviction is?

10                      MS. LANGEN:  Yes, I do want him to be

11  convicted (TAPE INAUDIBLE).

12                      THE COURT:  For domestic violence?

13                      MS. LANGEN:  There was enough violence

14  for four years, it's not all been always physical, but I have

15  -- but I am still --

16                      THE COURT:  We're not -- unfortunately I

17  cannot -- I understand that you're saying that there were

18  other things going on, but that's not -- that's not here

19  today.

20                      MS. GIBSON:  I think that's why she is

21  saying she is not okay with this being --

22                      THE COURT:  Being changed to another

23  offense?

24                      MS. GIBSON:  Yes.  That's right.

25                      THE COURT:  Okay.  That was one of my

Electronically signed by Jane Fitch (401-380-425-5745)                                        19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 89

1    questions.  And what do you want to happen today, if

2    anything?

3                    MS. LANGEN:  I want maybe to have anger

4    management classes, some things where he is going to have to

5    work on it weekly.  Yes, absolutely, stay away from me.  I

6    thought that was already on there.

7                    THE COURT:  Well, you don't want to have

8    any contact.

9                    MS. LANGEN:  I don't want to have any --

10   I want to be able to have a feeling of peace and serenity in

11   my mind that I can move on.  I can't do that when he harasses

12   me, he follows me, everyone I know.

13                   My Facebook, I've had to shut him and his

14   whole family down just to get a single peace of mind.

15                   THE COURT:  Okay.

16                   MS. LANGEN:  His sister has -- one of his

17   sisters is telling other people, my sisters got up and walked

18   out.

19                   THE COURT:  We're not going to get into

20   any --

21                   MS. LANGEN:  I'm just saying --

22                   THE COURT:  We don't -- we're not getting

23   into --

24                   MS. GIBSON:  A no contact order and anger

25   management classes.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 90

1                    MS. LANGEN:  Anger management classes,

2    maybe some class on domestic violence, like how to treat

3    women and children.

4                    MS. GIBSON:  I think that's a class --

5                    MS. LANGEN:  Yes, like how to be around a

6    woman and a child.  He has destroyed every relationship with

7    women in his life.  Even his oldest one.  She is not here in

8    court.  Have you seen that?

9                    THE COURT:  Okay.  Okay.  Anything else

10   you wish to say?  Counsel, do you wish to say anything?

11                   MS. CRUMES:  Just briefly in mitigation,

12   Your Honor.

13                   THE COURT:  You can say as much as you

14   want in mitigation.  Go ahead.

15                   MS. CRUMES:  Mr. Redden has no criminal

16   record as far as I am aware of.  He has been in constant

17   contact with me about this case.

18                   He was adamant that he -- I know what the

19   ruling is here today, but he was adamant that he didn't cause

20   any harm to Ms. Langen and was simply trying to keep her out

21   of the home.

22                   He was truly under the belief that that

23   was his phone and he had the right to take it.  Now should he

24   have gone about it a different way, maybe had a police

25   officer take the phone or be with a police officer, that is

Electronically signed by Jane Fitch (401-380-425-5745)                              19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 91

1    the --

2                    THE COURT:  Or --

3                    MS. CRUMES:  -- something that, you know,

4    I'm sure he regrets now and wishes he would have done after

5    having spoken to an officer and the officer telling him that

6    it was his phone.

7                    I imagine he wishes now that he would

8    have just went with an officer to get the phone.  But he has

9    expressed to me that there was never any intention of any --

10   to inflict any harm on Ms. Langen.

11                   He simply wanted his phone and was trying

12   to keep her out of the home on that date.

13                   THE COURT:  I understand.  So, neither

14   party addressed this issue, but is there any custody, any

15   occurring at this time?

16                   MS. LANGEN:  No.

17                   THE COURT:  Well, is there a custody

18   order by any court?

19                   MS. LANGEN:  No.

20                   THE COURT:  There is no custody?

21                   MS. CRUMES:  There is a coming custody

22   suit.  He is already, he has a custody attorney.  I don't

23   know that --

24                   THE COURT:  They're not married, right?

25                   MS. CRUMES:  Right.

Electronically signed by Jane Fitch (401-380-425-5745)                              19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 92

```
 1                      THE COURT:  Okay.  Okay.  All right.  So
 2   I'm going to put you on two years reporting probation.  I'm
 3   going to be honest with you, Mr. Redden, I don't like this
 4   offense and I have put people in jail for 60 days.
 5                      I'm going to be honest with you, I don't
 6   think what happened here is worthy of any kind of jail
 7   sentence.  And I say that because I frequently can put people
 8   in jail for this offense, but I don't think what happened is
 9   worthy of you going to jail.
10                      I've got to be honest with you, I don't
11   think either one of you acted appropriately.  I don't think
12   it was appropriate for you to take the phone.  And, Miss, I
13   understand you were upset, but it wasn't appropriate for you
14   to go -- to toss the TV and to keep going into the house.
15                      You know, and you're going to have this
16   relationship, whether you like it or not, whether you like it
17   or not, you have a kid in common, and you're going to have a
18   long-term relationship with each other in some fashion.
19                      And I'm just going to say what the
20   domestic -- whatever the Juvenile Court is going to say to
21   you, and I'm not saying you have to like one another, but
22   you're going to have to try to get along, because you do have
23   a kid together.
24                      And in my experience, it's not a good
25   idea to poison a kid one way or the other, because it doesn't
```

Electronically signed by Jane Fitch (401-380-425-5745)                                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 93

1    work.  I mean, it doesn't work.  But you're going to have

2    this relationship.

3              Being that said, I am going to -- I am

4    not going to give you 180 days.  I'm going to give you 30

5    days.  I'm going to find credit for no time served, 30 days

6    suspended.  I am going to give you a fine of 400 bucks plus

7    costs.

8              I'm also going to order anger management

9    and domestic violence classes and you're to follow through

10   with any treatment recommendations.  And if you complete

11   those to the satisfaction of your probation officer, then I

12   may not be here, but, and then you can make a motion to

13   terminate your reporting probation, as long as you -- as long

14   as you've done that and paid the fines and court costs off.

15             I'm also going to order no contact with

16   the victim.  I am going to put in my order, I don't know if

17   you can put this in here, that can be modified by any

18   subsequent Juvenile Court Order that may occur regarding

19   custody and visitation.

20             Okay.  This Court is not going to get

21   involved in any custody and visitation order.  Now, have

22   either one of you had contact after this incident?

23             MS. LANGEN:  No, sir.

24             THE COURT:  No?

25             THE DEFENDANT:  Nope.

Electronically signed by Jane Fitch (401-380-425-5745)        19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 94

1                    MS. LANGEN:  No way.  His mother is our

2    mediator, that's how I pick up my daughter.

3                    THE COURT:  Okay.  You do that by texting

4    or something, or how do you --

5                    MS. LANGEN:  Yes.

6                    THE COURT:  Okay.

7                    MS. LANGEN:  With the same phone that I

8    have here.  That's it.

9                    THE COURT:  Okay.  So, again, if a -- you

10   know, the Juvenile Court is going to have full authority to

11   arrange, you know, visitation and contact and this order is

12   subject to any subsequent Juvenile Court Order regarding

13   custody and visitation.

14                   So again, I think it's -- I think what

15   occurred was regrettable.  And only Mr. Redden was here

16   today.  Okay.  It easily, Miss, you could have been charged

17   as well.

18                   MS. LANGEN:  I regret my actions that

19   day, too.

20                   THE COURT:  And that's -- that's great.

21   I mean, I'm just saying, there could have been a

22   cross-complaint and you could have been charged with other

23   things, but that didn't happen today.

24                   So in reply, I hope both of you can act

25   better.  I hope you will act better.  Okay.

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 95

1                    MS. LANGEN:  Yes, sir.

2                    THE COURT:  And, Mr. Redden, again, I

3    think you're guilty -- maybe, you know, you're definitely

4    guilty of something.

5                    MS. LANGEN:  Uh-huh.

6                    THE COURT:  And you do meet the elements

7    of the statute.  And again, I'm not putting you in jail, but

8    I'm not even giving you 180 days, because what I think you

9    did was bad, I don't think it was really that bad, okay, to

10   warrant 180 days.  Okay.

11                   So I hope you cooperate with the

12   probation officer.  And I wish you and -- I wish you guys

13   would try to work it out, work something out for the benefit

14   of your daughter.  Okay.

15                   MS. LANGEN:  Yes, sir.

16                   THE COURT:  All right.

17                   MS. CRUMES:  Your Honor, we would like to

18   note that he did spend three days in jail.

19                   THE COURT:  Oh, he did spend three days

20   in jail?

21                   MS. CRUMES:  He did.

22                   THE COURT:  Okay.  Due to computer

23   issues, I did not know that.  So three days credit, 27 days

24   suspended.

25                   MS. CRUMES:  Thank you.

Electronically signed by Jane Fitch (401-380-425-5745)          19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 96

1                    THE COURT:  Okay.  All right.  That way,

2   one of you is going to leave first.

3                    MS. GIBSON:  Yes.

4                    THE COURT:  Let her go out the door

5   first.

6                    THE BAILIFF:  Right this way.

7                    THE COURT:  Can counsel approach?

8                    (Bench conference)

9

10                   (END OF AUDIOTAPED PROCEEDINGS)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by Jane Fitch (401-380-425-5745)                    19912ff4-a962-4194-acac-6e5cfb78fb3d

Page 97

1                    C E R T I F I C A T E

2

3           I, Jane Anne Fitch, RPR, a free-lance court

4   reporter and Notary Public within and for the State of Ohio,

5   do hereby certify that the preceding pages were taken down by

6   me stenographically from an audiotaped proceeding, and are a

7   true and accurate transcription to the best of my ability,

8   education, training and experience.

9           I further certify that I am not a relative or

10  employee of any of the parties involved in this action, and

11  have no interest or bias in the outcome of these proceedings.

12

13  _____

14  Jane Anne Fitch, RPR

15  My Commission Expires 4/30/26

16

17

18

19

20

21

22

23

24

25

FITCH REPORTING, INC.
(800) 569-7888