Positive

As of: November 6, 2025 6:35 PM Z

## *Al-Lamadani v. Vill. of Indian Hill*

United States District Court for the Southern District of Ohio, Western Division

August 14, 2014, Decided; August 14, 2014, Filed

No. 1:13-cv-00322

**Reporter**

2014 U.S. Dist. LEXIS 112828 *; 2014 WL 4073720

MUHAMMAD AL-LAMADANI, Plaintiff, vs. VILLAGE OF INDIAN HILL, et al., Defendants.

**Subsequent History:** Affirmed in part and appeal dismissed in part by *Al-Lamadani v. Lang, 2015 U.S. App. LEXIS 15235 (6th Cir. Ohio, Aug. 26, 2015)*

## Core Terms

handcuffed, handcuffs, summary judgment, weapons, seizure, arrival, hurt, probable cause, material fact, Deposition, restraining order, trier of fact, believes, training, genuine, excessive force, police officer, living room, circumstances, dispatched, non-movant, responded, immunity, evening, sitting, talking, detain, door

## Case Summary

### Overview

HOLDINGS: [1]-Where an officer went to a detainee's home in response to his wife's call to the police, the wife stated that there was a restraining order against the detainee, and the officer handcuffed the detainee, the detainee's *Fourth Amendment* unlawful seizure claim survived because there existed genuine issues of material fact with regard to whether the officer had probable cause to immediately detain the detainee since, inter alia, the detainee was sitting quietly, he may not have been served with the restraining order yet, and a trier of fact could conclude that he posed no threat; [2]-The detainee's excessive force claim survived because he complained that the handcuffs were too tight, the officer did nothing in response, and the detainee suffered a "red mark" on his left wrist that turned "a little blue"; [3]-The *42 U.S.C.S. § 1983* claim against the village survived.

### Outcome

Summary judgment motion granted in part and denied in part.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

### *HN1* **Entitlement as Matter of Law, Appropriateness**

Although a grant of summary judgment is not a substitute for trial, it is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(a)*.

Justin Marks

EXHIBIT A

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

## *HN2* Burdens of Proof, Movant Persuasion & Proof

The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. This burden may be satisfied, however, by the movant pointing out to the court that the non-moving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Scintilla Rule

## *HN3* Summary Judgment, Opposing Materials

Faced with a summary judgment motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. As the requirement of *Fed. R. Civ. P. 56* is that there be no genuine issue of material fact, the Supreme Court has made clear that only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Ancillary factual disputes, those that are irrelevant or unnecessary, will not be counted. Furthermore, the mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-movant. Instead, the opposing party must present "significant probative evidence" demonstrating that there is more than some metaphysical doubt as to the material facts to survive summary judgment and proceed to trial on the merits.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

## *HN4* Summary Judgment, Evidentiary Considerations

At the summary judgment stage, it is not the court's role to weigh the evidence and determine the truth of the matter but rather to determine whether there is a genuine issue for trial. In so doing, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. Adherence to this standard, however, does not permit the court to assess the credibility of witnesses.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

## *HN5* Search & Seizure, Scope of Protection

The *Fourth Amendment* guarantees the right to be free from unreasonable searches and seizures. A search may be of a person, a thing, or a place. So too a seizure may be of a person, a thing, or even a place. A search or a seizure may occur singly or in combination, and in differing sequence. In some cases the validity of one determines the

validity of the other. The instant case involves the search of a place and the seizure of a person. But where it is acknowledged that the search was lawful, it does not follow that the seizure was lawful as well.


Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

### *HN6* Search & Seizure, Probable Cause

It is well-settled that whether probable cause exists to detain (or arrest) is not a black and white test. The *Fourth Amendment*, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the "factual and practical considerations of everyday life" that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As the Supreme Court has consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt.


Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

### *HN7* Search & Seizure, Probable Cause

The real question is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause? To find probable cause, the law does not require that a court rule out every conceivable explanation other than a suspect's illegal conduct. Instead, the court need only consider whether there are facts that, given the "factual and practical considerations of everyday life," could lead a reasonable person to believe that an illegal act has occurred or is about to occur.


Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

### *HN8* Entitlement as Matter of Law, Appropriateness

Whether probable cause exists typically is a jury question unless there is only one reasonable determination possible.


Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

### *HN9* Law Enforcement Officials, Excessive Force

It is well-established in the Sixth Circuit that an individual can maintain a *Fourth Amendment* claim for unduly tight or excessively forceful handcuffing during the course of a seizure. A handcuffing claim survives summary judgment only when there is adequate evidence to create a material fact as to the following elements: (1) the plaintiff complained that the cuffs were too tight; (2) the defendant police officer ignored the complaint; and (3) the plaintiff

suffered "some physical injury" as a consequence. The court does not read Morrison to require a specific request to loosen the handcuffs as well as a complaint that they are too tight; the latter is sufficient.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Civil Rights Law > Protection of Rights > Section 1983 Actions > Scope

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

*HN10* **Immunity From Liability, Defenses**

The Supreme Court has reviewed and clarified the distinction between official- and personal (or individual)-capacity suits brought under *42 U.S.C.S. § 1983*. Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent. Personal-capacity suits, in contrast, seek to impose individual liability upon a government officer for actions taken under color of state law. Personal liability is established when the official, acting under color of state law, caused the deprivation of a federal right. Tie to a "policy or custom" need not be proved by a plaintiff, and an official sued in his personal capacity may assert personal immunity defenses such as objectively reasonable reliance on existing law.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN11* **Immunity From Liability, Defenses**

The doctrine of qualified immunity would protect an officer sued in his personal (or individual) capacity from liability for civil damages insofar as his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN12* **Immunity From Liability, Defenses**

Qualified immunity is an immunity from suit rather than a mere defense to liability. Prior to the Supreme Court's decision in Pearson, a two-tiered analysis was required, beginning with this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? If the answer to that initial inquiry is negative, immunity attaches. If not, and a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. Pearson ruled that following Saucier's "two-step protocol" is not mandatory, but remains permissible. A lower court, in its discretion, now may consider the second question first if it believes such a path will best facilitate the fair and efficient disposition of the case before it. The court still is at liberty, however, to follow the Saucier-prescribed sequence if the court finds it "worthwhile."

Civil Rights Law > ... > Scope > Law Enforcement Officials > Arrests

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

2014 U.S. Dist. LEXIS 112828, *112828

**HN13** **Law Enforcement Officials, Arrests**

It is clearly established that an arrest without probable cause violates the *Fourth Amendment*.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

**HN14** **Immunity From Liability, Defenses**

It is clearly established that the *Fourth Amendment* prohibits unduly tight or excessively forceful handcuffing.

Civil Procedure > ... > Pleadings > Service of Process > General Overview

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

**HN15** **Pleadings, Service of Process**

Proper service, of course, is a "bedrock" principle of due process. The requirement of proper service of process is not some mindless technicality.

Civil Rights Law > ... > Section 1983 Actions > Scope > Government Actions

**HN16** **Scope, Government Actions**

A plaintiff may not sue a municipality under *42 U.S.C.S. § 1983* under a theory of respondeat superior. However, if it is established that an agent of the municipality, such as a police officer, has violated an individual's constitutional rights, then, in certain circumstances, the municipality itself can be held liable if there was an actionable failure to train. To succeed, a plaintiff must prove that: (1) the training was inadequate for the task performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy either was closely related to, or actually caused, the injury. With regard to the second prong, the United States Court of Appeals for the Sixth Circuit has identified two situations that would justify a conclusion of deliberate indifference. One is a failure to act in response to repeated complaints of constitutional violations. The other is a failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction.

**Counsel:** **[*1]** For Muhammad Al-Lamadani, Plaintiff: Mark Joseph Byrne, Jacobs, Kleinman, Seibel & McNally - 1, Cincinnati, OH.

For Keith Lang, Indian Hill Village of, Defendants: Gary Edward Becker, LEAD ATTORNEY, Dinsmore & Shohl -1, Cincinnati, OH; Jessica Ashley Dipre, Dinsmore & Shohl, Cincinnati, OH.

**Judges:** S. Arthur Spiegel, Senior United States District Judge.

**Opinion by:** S. Arthur Spiegel

# Opinion

**OPINION AND ORDER**

This matter is before the Court on Defendants Village of Indian Hill and Officer Keith Lang's Motion for Summary Judgment (doc. 27), Plaintiff's response in opposition (doc. 33) and Defendants' reply (doc. 37). For the reasons that follow, Defendants' motion is **GRANTED IN PART AND DENIED IN PART**.

**I. Background**

The particulars of this cause of action are relatively straightforward, involving a single incident that occurred in the late evening of May 25, 2011. Plaintiff Muhammad Al-Lamadani was then (and remains) an executive with General Electric whose professional responsibilities require lengthy stays abroad.[1] In the two weeks or so prior to May 25th, he tried unsuccessfully to reach his wife of more than 30 years, Ruby Kathryn Al-Lamadani, by telephone "several times[]" (Deposition of Plaintiff Muhammad Al-Lamadani, **[*2]** doc. 22 at 40). Plaintiff became "pretty concerned and worried" especially when their adult daughter, Laila, confirmed that neither she nor her sister, Nadia, both of them now living in Florida, had spoken with their mother (Plaintiff's dep. at 18-19, 40-41). He even contacted Mrs. Al-Lamadani's son from her first marriage who lives in Springfield, Missouri, in the hopes that she might have been visiting there. With no explanation for her absence, Plaintiff booked a flight from London to Cincinnati. (Plaintiff's dep. at 41.) He landed at approximately 10:30 p.m. that particular evening, rented a car and then drove to his Indian Hill residence at 5605 Pamlico Lane, a home that he had shared with his wife since April 1986. (Plaintiff's dep. at 13-16, 45, 47.)

Upon arriving, Plaintiff attempted to enter his home through its front door. Supposing it must have been "locked from the inside[,]" he knocked—because **[*3]** their doorbell had never worked—to no avail. (Plaintiff's dep. at 47-49.) Plaintiff walked around to a back screen door that was unlatched. He entered his home, saw his wife (and the family cat) asleep on the couch in the living room and tried to wake her. When Mrs. Al-Lamadani awoke, she twice asked her husband what he was doing there. Thinking she was dreaming, he told her, "[I]t's me[.]" She then repeatedly told him to "[G]et out of here[!]" Plaintiff, quite confused, asked her, "[W]hat did I do?" (Plaintiff's dep. at 50-52.) Mrs. Al-Lamadani's responded that she was going to call the police. (Plaintiff's dep. at 52-54.) Plaintiff sat—in shock—on a chair in their living room next to a window; so positioned, he was visible to anyone approaching the front door. (Plaintiff's dep. at 74-76; Deposition of Defendant Keith Allen Lang, doc. 25 at 12, 17, 28; Deposition of Raymond Manning, doc. 26 at 22.) He observed his wife talking on the telephone, and she did not appear to him to be visibly shaken or upset; however, he could not hear any of the statements she made to the 911 operator because she was "not talking loud[]" (Plaintiff's dep. at 56, 69-70).

Defendant Keith Lang of the Indian Hill Rangers **[*4]** was dispatched to the Pamlico Lane residence at 11:23 p.m., arriving two minutes later. Officer Raymond Manning similarly was dispatched arriving three minutes after Officer Lang. (Lang dep. at 13-14; Manning dep. Exh. 4.) Mrs. Al-Lamadani met Officer Lang on the front stoop. She told him that she had awoken to her husband standing over her and was "mad" at herself for leaving the back door unlocked (Lang dep. at 15-16). She stated further that she had a restraining order against her husband, but she did not know if he had been served with it yet (Lang dep. at 18). Mrs. Al-Lamadani acknowledged that her husband had not harmed her that evening, but she advised Officer Lang that he had been violent toward her in the past (Lang dep. at 16-17).

Upon Officer Manning's arrival, Officer Lang entered the residence. He did not see any weapons (Lang dep. at 32, 52). Officer Lang ordered Plaintiff to "get up, get up, turn around, turn around" (Plaintiff's dep. at 80; Lang dep. at 23). Plaintiff complied, but asked "[W]hat did I do?" (Plaintiff's dep. at 80-82). Officer Lang then ordered Plaintiff to

---

[1] On May 25, 2011, Plaintiff was General Electric's Chief Executive of Sales and a Vice President in its International Division. Currently, he serves as its Vice President of International Trade in Europe and the Middle East. (Deposition of Plaintiff Muhammad Al-Lamadani, doc. 22 at 21.)

put his hands behind his back to be handcuffed. Again, Plaintiff complied, but asked, "What did I do?" **[\*5]** Officer Lang replied, "shut up, shut up, and turn around." He struck Plaintiff on the back of his head and on his back. He then handcuffed Plaintiff and emptied his pockets, told him to take off his shoes, patted him down and asked if he had any weapons on his person. Plaintiff responded that he "never owned a gun in [his] life." (Plaintiff's dep. at 71, 80-81.) Officer Lang then asked if there were any guns in the house. Plaintiff replied, "[W]e have never owned a gun, never have had a gun in the house. I have never ever used a weapon in my life." (Plaintiff's dep. at 88.)

In the process of placing the handcuffs on Plaintiff, Officer Lang remarked, "[Y]our hands seems to be very stiff[]" (Plaintiff's dep. at 84-88). Plaintiff again asked why he was being handcuffed, to which Officer Lang replied, "You people don't hear. You people don't understand." (Plaintiff's dep. at 94 (emphasis added).) According to Plaintiff, the degradation continued (Plaintiff's dep. at 94). Plaintiff was directed to sit back down in the chair where he had been previously sitting. When he complained that the handcuffs were hurting him, Officer Lang responded, "handcuffs always hurt," and did nothing to loosen them (Lang **[\*6]** dep. at 30-32).

Soon thereafter, Plaintiff was advised by Officer Manning— for the first time—that there was a restraining order against him. His reaction: "I said, show me. I said, I didn't know. I didn't know, what is a restraining order?" (Plaintiff's dep. at 97). Eventually Officer Manning showed Plaintiff a copy of the restraining order, to which he countered, "I've never seen this in my life[]" (Plaintiff's dep. at 99). Officer Manning called the Hamilton County Clerk of Court's 24-hour line to learn whether Plaintiff had been served with a copy of the restraining order. According to Officer Manning, "They could not find that it had been served or even issued. They couldn't find any paperwork on it at all[]" (Manning dep. at 39). Officer Manning so informed Officer Lang, who then removed the handcuffs (Manning dep. at 41-42). Plaintiff was then told to "get out of the house[]" (Plaintiff's dep. at 99). Officer Lang followed Plaintiff out to his rental car, pointed his finger at him "like [a] dog" and told him, "don't you ever come to this house again, you understand?" (Plaintiff's dep. at 99-100, 105-06.)

Plaintiff has sued the Village of Indian Hill and Officer Lang in his individual **[\*7]** capacity. He originally alleged two claims—brought pursuant to _42 U.S.C. §1983_—in violation of the _Fourth_ and _Fourteenth Amendments_, unlawful search (Count One) and use of excessive force (Count Two). As indicated, Defendants have moved for summary judgment, and the motion is ripe. Plaintiff concedes the merits of Defendants' argument with regard to his unlawful search claim and has abandoned it (see doc. 33 at 4-6). However, he opposes Defendants' motion as it relates to his unlawful seizure and excessive force claim. He maintains that he suffered a minor physical injury and continues to suffer emotional injury as a result of being handcuffed (Plaintiff's dep. at 109-22). Thus we proceed.


## II. Legal Standard

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." _Fed. R. Civ. P. 56(a)_. The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying **[\*8]** those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" _Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)_; see _LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993)_. This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." _Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993)_.

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. _Celotex, 477 U.S. at 331-32_. As "the requirement [of the Rule] is that there be no genuine issue of material fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." _Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)_ (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,]

will not be counted." Id. Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. Instead, the opposing party must present "significant **[*9]** probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Companies, Inc., 8 F.3d 335, 339-40 (6th Cir. 1993) (applying Anderson, 477 U.S. at 249-50; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

At this summary judgment stage, it is not our role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962))). Adherence to this standard, however, does not permit us to assess the credibility of witnesses. See Adams v. Metiva, 31 F.3d 375, 378 (6th Cir. 1994) (citing Anderson, 477 U.S. at 255)).

## III. Discussion

### A. The Right to Detain

Justice Kennedy begins the Supreme Court's analysis in Bailey v. United States with this abridged lesson in Fourth Amendment jurisprudence, an appropriate launch for our analysis of the circumstances at bar.

> The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. A search may be of a person, a thing, or a place. So too a seizure may be of a person, a thing, or even a place. A search or a seizure may occur singly or in combination, and in differing sequence. In some cases the validity of one determines the validity of the **[*10]** other. The instant case involves the search of a place . . . and the seizure of a person. But here, though it is acknowledged that the search was lawful, it does not follow that the seizure was lawful as well. The seizure of the person is quite in question.

133 S. Ct. 1031, 1035, 185 L. Ed. 2d 19 (2013) (emphasis added). As in Bailey, very much "in question" here is whether Officer Lang's seizure of Plaintiff in his living room was lawful. This Court has read cover-to-cover the transcripts of the depositions previously cited, and viewed in its entirety the video of Plaintiff's deposition, and listened multiple times to the audio of the 911 emergency call placed by Mrs. Al-Lamadani and the concomitant radio transmission/dispatch recordings. Without reservation we conclude that there exist genuine issues of material fact such that Defendants are not entitled to judgment as a matter of law on this issue.

It is well-settled that whether probable cause exists to detain (or arrest) is not a black and white test.

> The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing **[*11]** court is to take into account the "factual and practical considerations of everyday life" that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. See Illinois v. Gates, 462 U.S. 213, 231, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence sufficient to establish guilt beyond a reasonable doubt. See, e.g., United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).

The real question, then, is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause? . . . To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the "factual and practical considerations of everyday life," could lead a reasonable **[*12]** person to believe that an illegal act has occurred or is about to occur. See *Gates, 462 U.S. at 231*.

*Scott v. City of Bexley, 11 Fed. App'x 514, 518 (6th Cir. 2001)* (quoting *United States v. Strickland, 144 F.3d 412, 415-16 (6th Cir. 1998)* (footnotes omitted)) (emphasis added). And whether probable cause exists typically is a jury question "unless there is only one reasonable determination possible." *Scott, 11 Fed. App'x at 518* (citing *Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995))*. The facts adduced during discovery, now on record before this Court, categorically preclude Defendants from meeting this standard.

When asked to recite the factors that led him to handcuff Plaintiff, Officer Lang responded as follows:

A. 911 call from a person [Mrs. Al-Lamadani] stating that he [Plaintiff] was in violation of a protection order or restraining order. On arrival she was very upset and scared. She had advised he had been violent in the past and his actions at the time were very strange based on my experience, very strange for when police first come to the house. Right off the bat you could tell he wasn't in a -- he wasn't friendly, you know, in any means. He wasn't coming out to greet us or anything like that. Very strange. Sitting in the seat staring straight ahead.

Q. Those are the factors?

A. And the fact that we didn't know if he had any weapons. We didn't or she didn't know if he had any weapons on him so he **[*13]** had the possibility of being armed.

(Lang dep. at 50-51.) In the Court's view, a trier of fact easily could determine these reasons insufficient. Prior to his arrival, the 911 dispatcher advised Officer Lang that there was "not a lot of activity" going on at the residence, with the complainant stating that her husband was "just watching" her, "not saying or doing anything[]." Officer Lang also was advised that it was "<u>unknown</u> if the subject is armed[,]" not that the subject told his wife outright that he "had" a weapon, or that she believed he "might have" a weapon, or that his wife "knew he owned" a weapon, or that he "used a weapon against her on prior occasions[]." The difference, we believe, is more than semantics or nuance, as the picture Officer Lang attempts to paint is one of crisis.

Upon arrival, Mrs. Al-Lamadani told Officer Lang about the protection order <u>and</u> told him that her husband may not have yet been served with it. She explained that she thought he was in London and, while she had changed the locks on their residence, he obviously entered through the back screen doors that she, herself, had left unlatched. Thus, Plaintiff had not engaged in any destructive behavior **[*14]** in order to gain entrance to his home. Officer Lang testified that Mrs. Al-Lamadani told him she was afraid of her husband and that he had been violent in the past. He unconditionally took her at her word, asking for no details as to how or when Plaintiff had been abusive toward her on prior occasions. Yet Mrs. Al-Lamadani confirmed that Plaintiff had not harmed her thus far that evening. The entire time they were talking Officer Lang could see Plaintiff sitting quietly in the living room. That he found Plaintiff's demeanor to be "strange" or "weird" does not inescapably translate into "dangerous". Both Officer Lang and Officer Manning concede that there were no weapons in sight, either on Plaintiff's person or within his reach. Moreover, it was clear that Mrs. Al-Lamadani had the freedom to exit the house.

Officer Lang testified that he believes he saw a copy of the <u>ex parte</u> restraining order—faxed earlier that day to the Indian Hill Rangers by Mrs. Al-Lamadani's divorce attorney—at the beginning of his shift (Lang dep. at 18-19). He did not ask to see Mrs. Al-Lamadani's copy once on the premises, but he did "talk [with her] about I guess she just had filed it that morning[]" (Lang **[*15]** dep. at 18). Against this background, <u>knowing that Plaintiff had not been served</u> with the order, Officer Lang instructed him to "get up[,]" "turn around[,]" "shut up[,]" and be handcuffed. At no point prior to being handcuffed was Plaintiff told that he was in violation of a <u>civil</u> protection order. At no point prior to being handcuffed was Plaintiff asked <u>his</u> side of the story (<u>see, e.g.</u>, Manning dep. at 33).

2014 U.S. Dist. LEXIS 112828, *15

All these "factual and practical considerations" suggest that a reasonable person might find Officer Lang's actions to have been grounded purely on "mere suspicion" or, worse, even appearance and stereotype. Plaintiff testified that—once handcuffed—Officer Lang degraded him, beginning his taunts with "You people don't hear. You people don't understand." It will be up to the trier of fact to assess Plaintiff's credibility on this point and what, if anything, Officer Lang might have meant by such a pejorative label. The Court notes that Plaintiff is a native of the kingdom of Jordan (Plaintiff's dep. at 15). Further, having watched and listened to his deposition testimony, it is obvious that Plaintiff looks foreign-born and speaks with a pronounced accent, although with precision **[*16]** and clarity. Little in the record describes Mrs. Al-Lamadani's background, but a trier of fact listening to her voice on the 911 audio might conclude that she, unlike her ex-husband, is American-born. Additionally, the "Incident/Offense Report" on which Officer Frank Cogliano of the Indian Hill Rangers noted receipt of the protection order lists Mrs. Al-Lamadani's race as "W", which presumably is an abbreviation for "White" (Deposition of Frank Cogliano, doc. 35 Exh. 2 at 1). This Court acknowledges the precedent allowing a police officer to secure a situation that he reasonably believes places himself at risk or otherwise has the potential for violence. Yet it would be constitutionally impermissible for that police officer to assume, without more, that an individual with a "Middle Eastern" national origin—who is not "White"—is more likely to be aggressive. Thus, we determine that there exist genuine issues of material fact with regard to whether Officer Lang indeed had probable cause to immediately detain Plaintiff in order to contain a crisis or whether he unreasonably overreacted in violation of the *Fourth Amendment*.

## B. Use of Excessive Force with Handcuffs

It is well-established in this circuit **[*17]** that an individual can maintain a *Fourth Amendment* claim for "unduly tight or excessively forceful handcuffing during the course of a seizure." *Morrison v. Bd. of Trustees of Green Twp., 583 F.3d 394, 401 (6th Cir. 2009)* (citing *Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001)*). A handcuffing claim survives summary judgment only when there is adequate evidence to create a material fact as to the following elements: (1) the plaintiff complained that the cuffs were too tight; (2) the defendant police officer ignored the complaint; and (3) the plaintiff suffered "some physical injury" as a consequence. *Morrison, 583 F.3d at 401* (citing *Lyons v. City of Xenia, 417 F.3d 565, 575-76 (6th Cir. 2005)*). Plaintiff establishes all three. It is undisputed that Plaintiff protested.[2] Moreover, Officer Lang effectively conceded he did nothing in response:

    A. He talked about the handcuffs were hurting him and I said handcuffs always hurt. I think I told him - we've been handcuffed a lot during training, and, yeah it does hurt, but there's plenty of room in your cuffs.

    Q. When he told you the handcuffs were hurting, did you loosen them?

    A. I don't know if I checked them . . . .

    . . . .

    Q. You put them on originally, stuck your pinky in between his wrist between the edge of the cuff, found there was room and double-locked them?

    . . . .

    A. Yes.

    Q. And then afterwards he complained about the fact that they were too tight and hurt him? **[*18]**

    A. Yes.

    Q. What did you do in response?

    A. I don't know if I checked them, had him stand up to check them again or I just told him they were fine. I put them on. They're loose. It's just handcuffs hurt.

(Lang dep. at 30-32 (emphasis added).) Finally, in addition to discomfort, Plaintiff suffered a "red mark" on his left wrist that turned "a little blue" and was gone the next day (Plaintiff's dep. at 109-10), fundamentally the same injury

---

[2] This Court does not read Morrison to require a specific request to loosen the handcuffs as well as a complaint that they are too tight; the latter is sufficient.

experienced by Amanda Morrison. See *Morrison, 583 F.3d at 398*. That Plaintiff's injury wholly resolved the next day without the benefit of medical treatment is relevant to an award of damages, but not to a finding of liability, assuming, of course, a trier of fact credits his testimony.

## C. Qualified Immunity

In Hafer v. Melo, the Supreme Court reviewed and clarified the distinction between official- and personal (or individual)-capacity suits brought under *42 U.S.C. § 1983*. Official-capacity suits "''generally represent only another way of pleading an action against an entity of which an officer is an agent.'''" *502 U.S. 21, 25, 112 S. Ct. 358, 116 L. Ed. 2d 301* (quoting *Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)* (quoting *Monell v. New York City Dep't of Social Services, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978))).* Personal-capacity [*19] suits, in contrast, "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer, 502 U.S. at 25.* Personal liability is established when "'the official, acting under color of state law, caused the deprivation of a federal right.'" Id. (quoting *Graham, 473 U.S. at 166*). Tie to a "policy or custom" need not be proved by a plaintiff, and an official sued in his personal capacity may "assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer, 502 U.S. at 25* (citing *Graham, 473 U.S. at 166-67*).

The doctrine of qualified immunity thus would protect Officer Lang, as an Indian Hill Ranger sued in his personal (or individual) capacity (see doc. 1 ¶ 3), "'from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).* Qualified immunity is "'an immunity from suit rather than a mere defense to liability.'" Id. (quoting *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)* (emphasis original)). Prior to the Supreme Court's decision in Pearson, a two-tiered analysis was required, beginning with this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's [*20] conduct violated a constitutional right?" *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)* (citing *Siegert v. Gilley, 500 U.S. 226, 232, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)).* If the answer to that initial inquiry is negative, immunity attaches. If not, "[and] a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. Pearson ruled that following Saucier's "two-step protocol" is not mandatory, but remains permissible. *129 S. Ct. at 812.* A lower court, in its discretion, now may consider the second question first if it believes such a path "will best facilitate the fair and efficient disposition" of the case before it. We still are at liberty, however, to follow the Saucier-prescribed sequence if we find it "worthwhile." Id.

Officer Lang concedes, as he must, that it is clearly established that an arrest without probable cause violates the *Fourth Amendment*. He likewise concedes that it is clearly established that the *Fourth Amendment* prohibits unduly tight or excessively forceful handcuffing. Nonetheless, he urges that no reasonable officer in his position would have believed that handcuffing and detaining Plaintiff—in response to a 911 call in which is wife stated that he was in her home in breach of a protection order—was unlawful. The totality of [*21] the circumstances here prompt this Court to disagree, as we determine that whether Officer Lang acted reasonably depends on questions of fact which only a jury is privileged to resolve.

Officer Lang relies heavily on the well-founded concern of officer safety. Yet the 911 operator advised that there was "not a lot of activity going on" at the residence. Officer Lang arrived within two minutes of being dispatched; Plaintiff was in plain sight, sitting quietly in the living room. No weapons were in sight. A trier of fact might conclude that Plaintiff posed no threat, much less an immediate one, to either Mrs. Al-Lamadani or the first responders and that the precaution of handcuffing was not indicated. Officer Lang testified that he believes he saw the just-docketed civil protection order prior to beginning his shift that evening. He also testified that Mrs. Al-Lamadani told him— before he entered the residence and approached Plaintiff—that, because she thought her husband still was in London, he probably had not been served with the order that had been entered that very morning. Proper service,

of course, is a "bedrock" principle of due process. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 347, 351, 119 S. Ct. 1322, 143 L. Ed. 2d 448 (1999)*; see *Friedman v. Estate of Presser, 929 F.2d 1151, 1156 (6th Cir. 1991)* ("[T]he requirement of proper service **[*22]** of process 'is not some mindless technicality.'" (quoting *Del Raine v. Carlson, 826 F.2d 698, 704 (7th Cir. 1987))*. Officers Lang and Manning obviously were aware of this critical tenet of civil procedure as Plaintiff was instantly released once they confirmed with the Hamilton County Clerk that Plaintiff indeed had not yet been served. A trier of fact, therefore, might conclude that a reasonable officer, under the totality of these circumstances, would have proceeded differently in deference to Plaintiff's constitutional guarantees. Accordingly, summary judgment on the basis of qualified immunity is improper. See *Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007)*.


### D. Liability of Defendant Village of Indian Hill

Plaintiff may not sue the Village of Indian Hill under *Section 1983* under a theory of respondeat superior. *Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 692-94, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. However, if it is established that an agent of the municipality, such as a police officer, has violated an individual's constitutional rights, then, in certain circumstances, the municipality itself can be held liable if there was an actionable failure to train. See *Watkins v. City of Battle Creek, 273 F.3d 682, 687 (6th Cir. 2001)*. To succeed, a plaintiff must prove that: (1) the training was inadequate for the task performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy either was closely **[*23]** related to, or actually caused, the injury. *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006)*. With regard to the second prong, the Sixth Circuit has identified two situations that would justify a conclusion of deliberate indifference. One is a failure to act in response to repeated complaints of constitutional violations. *Brown v. Shaner, 172 F.3d 927, 931 (6th Cir. 1999)*. The other, argued here by Plaintiff, is a "failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction." Id. Specifically, it was predictable that the Indian Hill Rangers would violate the *Fourth Amendment* rights of individuals detained in their own homes by using excessive force in the application of handcuffs.

The Court believes this claim survives summary judgment under *Gregory v. City of Louisville, 444 F.3d 725, 753-54 (6th Cir. 2006)*, but barely. Officers Lang, Manning and Cogliano testified that there was no policy or procedure that dictated when to place handcuffs on an individual, whether involved in a domestic dispute or otherwise (Lang dep. at 23-24; Manning dep. at 31-32, 65; Cogliano dep. at 25-26). All three also testified that it boils down to an assessment of the totality of the circumstances, with officer safety being the primary concern (Lang dep. at 10, 24, 27; Manning dep. at 70-71; Cogliano dep. at 26-28, 31-32). **[*24]** Officer Cogliano made a passing reference to his "initial training with the Hamilton County Sheriff's Department" (Cogliano dep. at 31), but neither he nor Officers Manning or Lang testified about any training received at the behest of Indian Hill concerning excessive use of force in domestic matters, and it is seemingly absent from the list of courses attended by the Rangers in 2011 (see Manning dep. Exh. 5 at 5 (PAGEID#198)). On this record, then, the Court has no choice but to deny Defendant Indian Hill's motion at this stage of the litigation.


### IV. Conclusion

In summary, Defendants Village of Indian Hill and Officer Keith Lang's Motion for Summary Judgment is hereby **GRANTED as to COUNT ONE** (unlawful search) of the Complaint, but **DENIED as to COUNT TWO** (unlawful seizure and use of excessive force). Previously this Court vacated the final pretrial conference and trial settings pending our decision on the instant motion (see doc. 36). Accordingly, this matter is reset for a **final pretrial conference on September 18, 2014 at 2:00 p.m.**, with a **three-day jury trial scheduled for October 21, 2014**, on an on-deck basis.

SO ORDERED.

Dated: August 14, 2014

/s/ S. Arthur Spiegel

S. Arthur Spiegel **[*25]**

United States Senior District Judge

**End of Document**

 Positive
As of: November 6, 2025 6:42 PM Z

# *Baker v. Carnine*

United States District Court for the Southern District of Ohio, Western Division

August 17, 2021, Decided; August 18, 2021, Filed

Case No. 1:19-cv-0060

**Reporter**

2021 U.S. Dist. LEXIS 155604 *; 2021 WL 3660201

DAVID ADAM BAKER, Plaintiff, vs. JEFFREY CARNINE, et al., Defendants.

**Subsequent History:** Adopted by *Baker v. Carnine, 2022 U.S. Dist. LEXIS 37349 (S.D. Ohio, Mar. 3, 2022)*

**Prior History:** *Baker v. Carnine, 2020 U.S. Dist. LEXIS 8774 (S.D. Ohio, Jan. 17, 2020)*

## Core Terms

probable cause, arrest, alleges, qualified immunity, fentanyl, complaints, heroin, summary judgment, plaintiff's claim, false statement, arrest warrant, false arrest, prosecute, civilian, malicious prosecution, grand jury indictment, civil conspiracy, violations, reliable, warrants, charges, deprivation of liberty, municipal court, district court, investigate, municipal, omissions, acetyl, probable cause determination, malicious prosecution claim

**Counsel: [*1]** David Adam Baker, Plaintiff, Pro se, LONDON, OH.

For Jeffrey Carnine, Defendant: Jonathan Tehan Deters, LEAD ATTORNEY, Schroeder, maundrell, Barbiere, Mason, OH; Lawrence Edward Barbiere, LEAD ATTORNEY, Schroeder Mundrell Barbiere & Powers - 1, Mason, OH.

For Jacqueline Stachowiak, Matt Broo, David McLlwain, Defendants: Cooper D Bowen, James S. Sayre, LEAD ATTORNEYS, Hamilton County Prosecutor's Office, Cincinnati, OH.

**Judges:** Karen L. Litkovitz, United States Magistrate Judge. McFarland, J.

**Opinion by:** Karen L. Litkovitz

## Opinion

**REPORT AND RECOMMENDATION**

Plaintiff David Baker, proceeding pro se, brings this action alleging violations of his civil rights under *42 U.S.C. § 1983* and state claims under Ohio common law. (Doc. 18, Second Amended Complaint)[1] . Plaintiff brings claims against Jeffrey Carnine in his individual and official capacity for malicious prosecution under federal and state law (Count 1); civil conspiracy (Count 2); fabrication of evidence under federal and state law (Count 3); deprivation of liberty under federal and state law (Count 5); illegal seizure under federal and state law (Count 6); illegal search

---

[1] The undersigned issued a Report and Recommendation on June 15, 2021, recommending that plaintiff's motions for leave to further amend and supplement the complaint as amended (Docs. 64, 65) be denied. (Doc. 69). The Report and Recommendation is pending before the district judge. Thus, as of the date of this opinion, the second amended complaint (Doc. 18) is the operative complaint.

2021 U.S. Dist. LEXIS 155604, *1

under federal and state law (Count 7); and intentional and negligent infliction of emotional distress (Counts 8 **[*2]** and 9).[2] Plaintiff also brings a municipal liability claim against defendant Carnine in his official capacity under state and federal law (Count 11).[3] This matter is before the Court on Carnine's motion for summary judgment (Doc. 55), plaintiff's response in opposition (Doc. 60), and defendant's reply (Doc. 63).

## I. Facts

Defendant Carnine was an agent of the Hamilton County, Ohio Drug Abuse Reduction Taskforce (DART) during 2016.[4] (Carnine Aff., Doc. 55-1 at PAGEID 305). In February 2016, Carnine was working in conjunction with other members of DART and confidential informants (CIs) to conduct investigations related to seizing narcotics and drug enforcement. (*Id.*). Plaintiff was the subject of a criminal investigation involving DART. (*Id.*). Carnine participated in an operation with DART and an unnamed CI on February 1, 2016 to negotiate the purchase of heroin from plaintiff. (*Id.*). According to defendant, the CI met with plaintiff at the McDonald's restaurant located at 7142 Reading Road, Cincinnati, Ohio 45237, which is located within 1000 feet of Woodward High School. (*Id.*). Defendant states the CI purchased a quantity of heroin from plaintiff with government funds. (*Id.*). Defendant further **[*3]** asserts that after the CI provided the heroin to DART agents, the agents conducted mobile surveillance of plaintiff with the assistance of the Cincinnati Police Department. (*Id.* at PAGEID 306). When shown a photograph of plaintiff, the CI identified plaintiff as the individual who had sold him the heroin. (*Id.*).

The heroin was tested by the Hamilton County Crime Laboratory. (*Id.*; Doc. 55-1, Exh. C at PAGEID 309). Testing confirmed that it weighed 1.996 + .0005 grams and that it contained both fentanyl and acetyl fentanyl. (Doc. 55-1, Exh. C at PAGEID 309).

On August 15, 2016, defendant Carnine presented an affidavit to the Hamilton County Municipal Court (Case Nos. C16A22114A, C16A22114B) in which he swore that "on or about the 1st day of February, 2016, at Hamilton County, Ohio, David BAKER, did**knowingly sell Fentanyl and Acetyl Fentanyl to an agent of DART during a narcotics investigation." (*Id.*, Exh. A at PAGEID 307). The affidavit listed the location of the offense as 7142 Reading Road, Cincinnati, Ohio 45237. (*Id.*). On August 16, 2016, the Hamilton County Municipal "Clerk or Deputy Clerk" completed a "Probable Cause Checklist" on which they indicated that Carnine's affidavit met **[*4]** the following requirements:

- "Jurisdiction" because it contained "a statement of facts indicating the defendant violated the statute cited"
- "Identity" because "the complaint/affidavit indicate[d] how the complainant/officer obtained the facts recited," i.e., "from personal knowledge, knowledge gained from other officers, or knowledge gained from a reliable informant or citizen"
- "Facts" because "the complaint/affidavit containe[ed] a statement of facts indicating the defendant violated the statute cited"
- "Reason" because "the complaint/affidavit indicate[d] how the complainant/officer obtained the facts recited either from personal knowledge, knowledge gained from other officers, or knowledge gained from a reliable informant or citizen"
- "The complaint/affidavit contain[ed] the complainant/officer's answer to th[ese] question[s]: 'What makes you think the defendant committed the offense charged?'" and "Does the complaint/affidavit contain sufficient information to cause a reasonably prudent person to believe the named defendant committed the offense charged."

---

[2] Defendants Jacqueline Stachowiak, Matthew Broo, and David McIlwain have been dismissed from the lawsuit. (Doc. 51).

[3] Defendant Carnine is not named in Count 4 (failure to intervene), Count 10 (supervisory liability), and Count 12 (a malicious prosecution claim against other defendants).

[4] Carnine is no longer an agent of DART. (Doc. 55-1at PAGEID 305).

2021 U.S. Dist. LEXIS 155604, *4

(*Id.*, Exh. B at PAGEID 308, Case No. C/16/CRA/22114B). Hamilton County Municipal Court records show that warrants were issued **[*5]** for plaintiff's arrest on charges of Trafficking in Drugs in violation of *Ohio Rev. Code § 2925.03* based on complaints filed by Carnine on August 16, 2016 in Case Nos. C/16/CRA/22114A/B.[5] Plaintiff was arrested on August 28, 2016 and bond was set on each charge.

On September 6, 2016, the Grand Jury returned an indictment against plaintiff on two counts of aggravated trafficking in drugs in violation of *Ohio Rev. Code § 2925.03(A)(1)* for the knowing sale or offer to sell a Schedule I controlled substance, acetyl fentanyl and fentanyl, on February 1, 2016 in the vicinity of a school or a juvenile. (Doc. 55-2 at PAGEID 312-13). The Prosecuting Attorney for the Court of Common Pleas subsequently requested that an arrest warrant be issued upon indictment. (*Id.* at PAGEID 311). Plaintiff was held in the Hamilton County Justice Center on the charges from December 7, 2016, until the Hamilton County Court of Common Pleas dismissed the charges against plaintiff for want of prosecution on January 25, 2018. (Doc. 64-1, Exh. B at PAGEID 408). Hamilton County Assistant Prosecutor Matthew Broo, who assisted in the prosecution of plaintiff, states that the Prosecutor's Office sought dismissal of the criminal case against plaintiff because audio evidence **[*6]** against him had been corrupted; it was impractical to transport the CI, who was incarcerated in the Ohio Department of Corrections during the prosecution of plaintiff, to Hamilton County; and other criminal charges were pending against plaintiff. (Matthew Broo Aff., Doc. 63-1 at PAGEID 390-91).

Plaintiff denies that he was at the McDonald's restaurant located at 7142 Reading Road, Cincinnati, Ohio 45237 on February 1, 2016. (Plaintiff's Aff., Doc. 60, Exh. C at PAGEID 349). Plaintiff also alleges on information and belief that, "Carnine misrepresented a civilian witness as a[n] agent of Dart inside of his affidavit for [plaintiff's] arrest," and Carnine never witnessed a transaction between plaintiff and the alleged CI. (*Id.* at PAGEID 350). Plaintiff asserts that prosecutors stated at discovery hearings held in February through June 2017 that they had a civilian witness who was identified as David Mosley, but they had no CI. (*Id.* at PAGEID 349). Plaintiff alleges that "the civilian witness David Mosley" was in the Hamilton County Justice Center on the day trial was scheduled to begin in January 2018 as a result of the State subpoenaing him from prison; however, prosecutors stated in **[*7]** court that same day that they could not find the CI and did not plan on pursuing him further.[6] (*Id.* at PAGEID 349-50).

## II. Defendant Carnine's motion for summary judgment

Defendant Carnine moves for summary judgment on each of plaintiff's claims. Defendant argues that he is entitled to qualified immunity from liability and summary judgment as a matter of law on plaintiff's claims for malicious prosecution (Count 1), civil conspiracy (Count 2), and illegal search and seizure (Counts 6 and 7) because there was probable cause for plaintiff's arrest on August 30, 2016. (Doc. 55 at PAGEID 292-98). Defendant contends that plaintiff has not alleged a basis for his state law claims of negligent and intentional infliction of emotional distress (Counts 8 and 9). (*Id.* at PAGEID 298-302). Defendant also asserts that plaintiff's remaining claims (failure to intervene under federal and state law - Count 4; supervisory liability - Count 10; and malicious prosecution - Count 12) should all be dismissed because they do not mention Carnine. (*Id.*).

## A. Summary judgment standard

---

[5] https://www.courtclerk.org/. Federal courts may take judicial notice of proceedings in other courts of record. *Lyons v. Stovall, 188 F.3d 327, 333 (6th Cir. 1999)* (citing *Granader v. Public Bank, 417 F.2d 75, 82-83 (6th Cir. 1969)* (collecting cases); *Rodic v. Thistledown Racing Club, Inc., 615 F.2d 736, 738 (6th Cir. 1980)*).

[6] Hamilton County Common Pleas Court records show that subpoenas were issued to David Mosley to appear at trial and testify as a witness on behalf of the State in Case No. B1604890 on June 1, 2017 and November 13, 2017. The trial was continued several times, and the Common Pleas Court issued an "Entry Ordering Return of Inmate" at the Request of the State on January 17, 2018, ordering the Warden of Belmont Correctional Institution to deliver Mosley into the custody of the Hamilton County Sheriff to be transported to Hamilton County on or before January 25, 2018 to testify at trial.

2021 U.S. Dist. LEXIS 155604, *7

A motion for summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the **[\*8]** movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "A fact is 'material' only if its resolution will affect the outcome of the lawsuit." *Beans v. City of Massillon, No. 5:15-cv-1475, 2016 U.S. Dist. LEXIS 180335, 2016 WL 7492503, at \*5 (N.D. Ohio Dec. 30, 2016)*, aff'd, *No. 17-3088, 706 Fed. Appx. 295, 2017 WL 3726755 (6th Cir. Aug. 29, 2017)* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*). A grant of summary judgment is proper unless the nonmoving party "establish[es] genuinely disputed material facts by 'citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute.'" *United Specialty Ins. Co. v. Cole's Place, Inc., 936 F.3d 386, 403 (6th Cir. 2019)* (quoting *Fed. R. Civ. P. 56(c)(1)*). The materials a party can rely on to establish the absence of a genuine dispute include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers[.]" *Fed. R. Civ. P. 56(c)(1)(A)*. The movant can carry its burden by showing that the non-moving party lacks evidence to support an essential element of its case. *See Barnhart v. Pickrel, Shaeffer & Ebeling Co. L.P.A., 12 F.3d 1382, 1388-89 (6th Cir. 1993)*.

The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*). In determining if there is a genuine dispute as to a material **[\*9]** fact, all evidence in the record is viewed in the light most favorable to the nonmoving party, with all reasonable inferences drawn to that party's benefit. *Combs v. Int'l Ins. Co., 354 F.3d 568, 576-77 (6th Cir. 2004)* (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*). To make this determination, the court "need consider only the cited materials, but it may consider other materials in the record." *Fed. R. Civ. P. 56(c)(3)*.

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)*). In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987)* (citing *First Nat'l Bank of Arizona, 391 U.S. at 288-89*).

Because plaintiff is a pro se litigant, his filings are liberally construed. *Spotts v. United States, 429 F.3d 248, 250 (6th Cir. 2005)*; *Boswell v. Mayer, 169 F.3d 384, 387 (6th Cir. 1999)* (pro se plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings). However, a party's status as a pro se litigant does not alter the party's duty on a summary judgment motion to support his factual assertions with admissible evidence. *Maston v. Montgomery Cnty. Jail Med. Staff Pers., 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011)* (citing *Viergutz v. Lucent Techs., Inc., 375 F. App'x 482, 485 (6th Cir. 2010)*).

## B. Qualified immunity standard

Qualified immunity protects government **[\*10]** officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. Qualified immunity insulates government officials not only from individual liability for money damages, but it also shields them from the burdens and expenses of litigation and trial. *Saucier v. Katz, 533 U.S. 194, 200-201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*, overruled in part, *Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)*.

There are two steps to the qualified immunity analysis: (1) whether the officer's conduct violated a constitutional right, and (2) and if the first step is satisfied, whether the right was clearly established at the time of the injury.

*Saucier, 533 U.S. at 201*. In its discretion, the court may choose to address either question first given the particular circumstances of the case before it. *Pearson, 555 U.S. at 236*. Once a defendant raises the qualified immunity defense, plaintiff has the burden to demonstrate that the official is not entitled to qualified immunity. *Binay v. Bettendorf, 601 F.3d 640, 647 (6th Cir 2010)*. For the court to find that a constitutional right is clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002)* (quoting *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*).

**C. Defendant is entitled [*11] to qualified immunity on plaintiff's *Fourth Amendment* claims brought under *§ 1983***

To establish a cause of action under *§ 1983*, a plaintiff must show that he was (1) deprived of a right secured by the Constitution or laws of the United States, (2) by an individual acting under color of state law. *McQueen v. Beecher Cmmt'y Sch., 433 F.3d 460, 463 (6th Cir. 2006)*. Plaintiff alleges defendant Carnine violated his *Fourth Amendment* rights by performing an illegal search and seizure; fabricating evidence against plaintiff; and subjecting plaintiff to a malicious prosecution. Plaintiff claims that defendant Carnine "manufactured probable cause to seize, search, arrest, incarcerate and prosecute plaintiff." (Doc. 18, Amended Complaint, PAGEID 111). Plaintiff claims that Carnine knowingly made a false statement in his affidavit by stating that plaintiff knowingly sold "fentanyl and acetyl fentanyl to an agent of [DART] during a narcotics investigation on February 1, 2016 at 7142 Reading Road, Cincinnati, Ohio. (*Id.*; Exh. A, Carnine Aff.). Plaintiff alleges that Carnine (1) "failed to present the facts and evidence that lead (sic) him to believe that [plaintiff]" committed the offense, and (2) did not initially disclose that the agent of DART was "allegedly a civilian witness." (*Id.*, citing Exh. B)[7] . **[*12]** Plaintiff alleges that by "misrepresent[ing] a civilian witness as an Agent of Dart," Carnine "misled" the individual who reviewed Carnine's affidavit regarding the probable cause determination and prevented the individual from evaluating the civilian witness's credibility. (*Id.*). Plaintiff alleges that Carnine had no personal knowledge of a sale of fentanyl and acetyl fentanyl to plaintiff on the date alleged; Carnine had no "reliable evidence" identifying plaintiff as the person at the scene of the alleged sale; and plaintiff was not in the vicinity of the alleged sale and did not sell either substance to an agent of DART, a CI, a civilian witness, or "anyone else that 'Carnine' knows of." (*Id.* at PAGEID 112). Plaintiff alleges that Carnine's "false accusations" led to plaintiff "being unlawfully seized, search, arrested [and] incarcerated" for trafficking in drugs/ aggravated trafficking in drugs. *Id.*

Plaintiff further claims that Carnine "turned over his affidavit, complaint, warrant for [plaintiff's] arrest and a civilian witness" to the prosecuting attorney, Jacqueline Stachowiak, who "reviewed the evidence and determined that probable cause to prosecute [plaintiff] existed **[*13]** based in large part" on this evidence. (*Id.*). Plaintiff also alleges that Stachowiak initiated a prosecution against plaintiff by presenting that evidence to the Grand Jury, which in turn determined there was probable cause to issue an indictment against plaintiff on or about September 7, 2016. (*Id.*). Plaintiff alleges that the only evidence the State produced pursuant to his discovery requests was a fentanyl lab report; Carnine's affidavit, complaint, warrant for plaintiff's arrest, and an arrest report; the identity of the civilian witness; and a bill of particulars. (*Id.* at 113). Plaintiff contends that no "confidential informant was ever disclosed" even though "the state prosecution was initiated based upon the role of the alleged sale to a confidential informant," according to the bill of particulars. (*Id.* at PAGEID 113-114). Plaintiff alleges that "Carnine's misleading misrepresentations inside of a conclusory bare bones affidavit" led to plaintiff being "falsely seized searched, arrested, incarcerated and prosecuted . . . based upon an alleged sale of fentanyl and acetyl fentanyl from [plaintiff] to a nonexistent confidential informant. . . ." (*Id.* at PAGEID 117).

---

[7] Exhibit B includes the "State's Response to Defendant's Demand for Discovery" in plaintiff's criminal case (Doc. 18-1 at PAGEID 140-41) and the State's supplemental response (*Id.* at PAGEID 130). The response lists as witnesses "DART Agents, information unknown at this time" and "Confidential Informant." (*Id.* at PAGEID 141). The supplemental response states: "Civilian witness name and address provided separately and served in court on May 26th, 2017." (*Id.* at PAGEID 130).

Defendant Carnine **[\*14]** moves for summary judgment on plaintiff's *Fourth Amendment* claims for malicious prosecution (Count 1), civil conspiracy (Count 2), fabrication of evidence (Count 3), deprivation of liberty (Count 5), illegal search and seizure (Counts 6 and 7), which defendant contends encompasses plaintiff's claims that plaintiff was wrongfully investigated prosecuted, convicted, and incarcerated, and plaintiff's claim for municipal liability (Count 11). (Doc. 55 at PAGEID 292-293). Carnine argues that an arrest pursuant to a facially valid warrant is normally a complete defense to a federal constitutional claim for false arrest or false imprisonment, and that here the "Probable Cause Checklist" was completed by the Hamilton County Municipal Court Clerk or Deputy Clerk before arrest warrants were issued for plaintiff. (*Id.* at PAGEID 287-88). Carnine alleges that he and DART "possessed facts, circumstances and textual evidence to lead a reasonably prudent officer to believe" that plaintiff had committed the specific offense he was charged with, i.e., violations of *Ohio Rev. Code § 2925.03.* (*Id.* at PAGEID 293). Carnine argues that the probable cause determination and grand jury indictment together create a presumption of probable cause to **[\*15]** "investigate, arrest, and detain" plaintiff. (*Id.* at PAGEID 287). As such, Carnine argues that plaintiff has not created an issue of fact to overcome the presumption created by the probable cause determination and grand jury indictment. (*Id.*).

**1. Illegal search and seizure (False arrest)**

The *Fourth Amendment to the United States Constitution* "protects against unreasonable searches and seizures and requires that arrest warrants be issued only upon a showing of probable cause." *Robertson v. Lucas, 753 F.3d 606, 618 (6th Cir. 2014)* (citing *U.S. Const. amend. IV*). Plaintiff must "prove that the arresting officer lacked probable cause to arrest" him to establish a false arrest claim under the *Fourth Amendment. Id.* (quoting *Voyticky v. Vill. of Timberlake, 412 F.3d 669, 677 (6th Cir. 2005)*) (internal citation omitted).

"Probable cause" is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *Sykes v. Anderson, 625 F.3d 294, 306 (6th Cir. 2010)* (quoting *United States v. McClain, 444 F.3d 556, 562 (6th Cir. 2005)* (quoting in turn *United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993)* (en banc)). The probable cause inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford, 543 U.S. 146, 153, 125 S. Ct. 588, 160 L. Ed. 2d 537 (2004)*. There is probable cause for an arrest if at the time of the arrest "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had **[\*16]** committed or was committing an offense." *Courtright v. City of Battle Creek, 839 F.3d 513, 521 (6th Cir. 2016)* (alterations in original) (quoting *Beck v. Ohio, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)*). "In other words, probable cause exists only when the police officer 'discovers reasonably reliable information that the suspect has committed a crime.'" *Id.* (quoting *Gardenhire v. Schubert, 205 F.3d 303, 318 (6th Cir. 2000)* (citing *Beck, 379 U.S. at 91*). "A probable cause determination is based on the 'totality of the circumstances'" and must take into account "both the inculpatory *and* exculpatory evidence" within the arresting officer's knowledge at the time of the arrest. *Id.* (quoting *Wesley v. Campbell, 779 F.3d 421, 429 (6th Cir. 2015)*). Once probable cause is established, an officer is not obligated to further investigate or search for potentially exculpatory evidence. *Ahlers v. Schebil, 188 F.3d 365, 371 (6th Cir. 1999)* (citations omitted). *Cf. Radvansky v. City of Olmsted Falls, 395 F.3d 291, 308 (6th Cir. 2005)* (distinguishing a situation where the officers had "knowledge and possession of exculpatory evidence at the time of the arrest," which they may have failed to take into account prior to the arrest, from the situation in *Ahlers*, where the officer "failed to collect exculpatory evidence"). Similarly, a police officer is not bound "to give any credence to a suspect's story," and "a plausible explanation [should not] require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." **[\*17]** *Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988)*. "To hold otherwise would be to allow every suspect, guilty or innocent, to avoid arrest simply by claiming 'it wasn't me.'" *Id.* Finally, even if probable cause to arrest the plaintiff for a specific crime is lacking, a false arrest claim will not lie under *§ 1983* if there is probable cause for the plaintiff's arrest on a related offense. *Voyticky, 412 F.3d at 676*.

Plaintiff was arrested pursuant to arrest warrants issued upon an affidavit and two complaints sworn by Carnine and a "Probable Cause Checklist" completed by the Hamilton County Municipal Court "Clerk or Deputy Clerk." (Doc. 55-

2021 U.S. Dist. LEXIS 155604, *17

1, Exh. B at PAGEID 308). Carnine argues that the probable cause determination and grand jury indictment establish that there was probable cause to investigate, arrest, and detain plaintiff. (Doc. 55 at PAGEID 286-90). It is ordinarily "a complete defense" to a *Fourth Amendment* claim for false arrest that the arrest was "pursuant to a facially valid warrant." *Robertson, 753 F.3d at 618* (quoting *Voyticky, 412 F.3d at 677*). *See also OPW Fueling Components v. Works, No. 1:06-cv-187, 2007 U.S. Dist. LEXIS 34083, 2007 WL 1406956, at *9 (S.D. Ohio May 9, 2007)* (order) ("In general, an investigator or police officer is entitled "to rely on a judicially secured warrant for immunity from a *§ 1983* action for illegal search and seizure. . . ."). Under Ohio law, a clerk of court or a [*18] deputy clerk of court may make a probable cause determination and issue an arrest warrant. *Voyticky, 412 F.3d at 677*; *Sampson v. City of Xenia, 108 F. Supp. 2d 821, 836-38 (S.D. Ohio 1999)* (citing *Shadwick v. City of Tampa, 407 U.S. 345, 92 S. Ct. 2119, 32 L. Ed. 2d 783 (1972)*; Ohio. R. Crim. P. 4(A)).[8] Arrest warrants issued by court clerks in Ohio are typically considered facially valid such that an officer is entitled to qualified immunity when he relies on "the judicially secured warrant." *Fry v. Robinson, 678 F. App'x 313, 318 (6th Cir. 2017)* (citing *Hale v. Kart, 396 F.3d 721, 725 (6th Cir. 2005)*; *Sampson, 108 F. Supp. 2d at 836*). *See also Carrasquillo v. City of Cleveland, No. 1:10-cv-00219, 2011 U.S. Dist. LEXIS 97340, 2011 WL 3841995, at *3-5 (N.D. Ohio Aug. 30, 2011)* (expressing doubt as to "whether careful consideration is given probable cause determinations when a municipal court clerk or deputy clerk - in lieu of a judge or magistrate - registers a felony arrest warrant," but finding warrants were not facially invalid given that "Ohio law expressly permits a clerk of court to issue felony arrest warrants, trusting they will not merely rubber-stamp a police officer and prosecutor's probable cause findings" (citing *United States v. Master, 614 F.3d 236, 241 (6th Cir. 2010)* (states may determine who can approve warrants and what type of warrants an approved person is authorized to issue); *State v. Fairbanks, 32 Ohio St. 2d 34, 289 N.E.2d 352, 356-57 (Ohio 1972)* (clerk of courts allowed to issue felony arrest warrant (citing *Shadwick v. City of Tampa, 407 U.S. 345, 350, 92 S. Ct. 2119, 32 L. Ed. 2d 783 (1972)* (a municipal court clerk qualifies as "a neutral and detached judicial officer for purposes of issuing warrants for violations of municipal ordinances"); *Ohio Rev. Code § 2935.10(A)* (setting forth procedure upon [*19] filing of affidavit or complaint for a misdemeanor or felony offense); Ohio R. Crim. P. 4(a)(1)).

There are exceptions to the general rule that arrest warrants issued by municipal court clerks in Ohio are considered facially valid and entitle the arresting officers to qualified immunity. *Fry, 678 F. App'x at 318*. First, a warrant application that lacks "sufficient indicia of probable cause such that it is unreasonable to believe that probable cause was established" violates an individual's *Fourth Amendment* right "to be free from false arrest." *Id. at 318* (citing *Messerschmidt v. Millender, 565 U.S. 535, 132 S. Ct. 1235, 182 L. Ed. 2d 47 (2012)*; *Malley v. Briggs, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)*). Second, a warrant application violates an individual's *Fourth Amendment* right to be free from false arrest when there has been a "deliberate or reckless submission of false statements or omission of facts that are material to a probable cause [*20] determination." *Id.* (citing *Wesley v. Campbell, 779 F.3d 421, 428-29 (6th Cir. 2015)*; *Sykes, 625 F.3d at 305*. *See also Vakilian v. Shaw, 335 F.3d 509, 517 (6th Cir. 2003)* ("An investigator may be held liable under *§ 1983* for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest.") (citing *Ahlers, 188 F.3d at 373*). A warrant issued by a court clerk in Ohio does not shield arresting officers from liability for false arrest when the officer "responsible for bringing about an unlawful arrest knew that the arrest warrant had issued without probable cause" or "knew that those who obtained the warrant had deceived the authorizing body.'" *Robertson, 753 F.3d at 619* (quoting *Juriss v. McGowan, 957 F.2d 345, 350-51 (7th Cir. 1992)*). An officer "cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *OPW Fueling Components, 2007 U.S. Dist. LEXIS 34083, 2007 WL 1406956, at *9* (quoting *Vakilian, 335 F.3d at 517*).

---

[8] *Sampson* also cited three Ohio state court cases for this proposition. Ohio R. Crim. P. 4(A) provides:

If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed, and that the defendant has committed it, a warrant for the arrest of the defendant, or a summons in lieu of a warrant, shall be issued by a judge, magistrate, clerk of court, or officer of the court designated by the judge, to any law enforcement officer authorized by law to execute or serve it.

In determining whether a warrant was supported by "sufficient indicia of probable cause," the court's review is limited to "the four corners of the affidavit." *Fry, 678 F. App'x at 319* (citing *United States v. Rose, 714 F.3d 362, 367 (6th Cir. 2013)*). While affidavits do not have to be "perfect" and need not "provide every specific piece of information," *Hale, 396 F.3d at 725*), they "do require 'particularized facts' that show veracity, reliability, and a basis of knowledge that goes 'beyond **[*21]** bare conclusions and suppositions.'" *Fry, 678 F. App'x at 319* (quoting *Rose, 714 F.3d at 367*). Absent some identifiable basis for an officer's belief that an individual has engaged in unlawful activity, a complaint and affidavit are insufficient to establish probable cause. *Sampson v. City of Xenia, 108 F. Supp. 2d 821, 836-38 (S.D. Ohio 1999)* (citing *United States v. Fachini, 466 F.2d 53, 56 (6th Cir.1972)*) (noting that a complaint must provide an affiant's answer to the hypothetical question, "What makes you think that the defendant committed the offense charged?"). A judicial officer cannot find probable cause merely by ratifying "the bare conclusion of others." *Illinois v. Gates, 462 U.S. 213, 239, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)* (*quoted in United States v. Weaver, 99 F.3d 1372, 1377 (1996)*). "Affidavits containing only conclusory statements give the judicial officer 'no basis at all for making a judgment regarding probable cause.'" *U.S. v. Alfaro, No. 1:08-cr-37, 2008 U.S. Dist. LEXIS 105535, 2008 WL 5378363, at *5 (S.D. Ohio Dec. 24, 2008)* (quoting *Illinois v. Gates, 462 U.S. 213, 239, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)*).

"Where qualified immunity is asserted, the issue of probable cause is one for the court." *OPW Fueling Components, 2007 U.S. Dist. LEXIS 34083, 2007 WL 1406956, at *9* (quoting *Vakilian, 335 F.3d at 517*). An officer is not entitled to the "'shield of immunity' otherwise conferred by a warrant 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Messerschmidt, 565 U.S. at 547* (quoting *Leon, 468 U.S. at 923*) (internal quotation marks omitted). *See also Malley v. Briggs, 475 U.S. 335, 345-46, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)* (the defendant was not entitled to the immunity conferred by a judicially issued warrant because "a reasonably well-trained officer in [his] position **[*22]** would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant."). Further, a defendant is not entitled to the immunity afforded by a warrant based on the submission of false information if the plaintiff establishes: "(1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth, and (2) that the allegedly false or omitted information was material to the finding of probable cause." *OPW Fueling Components, 2007 U.S. Dist. LEXIS 34083, 2007 WL 1406956, at *9* (citing *Vakilian, 335 F.3d at 517*).

Courts have found warrants were not supported by probable cause and lacked facial validity in cases involving affidavits and complaints very similar to the affidavit and complaints at issue here. In *Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971)*, the Supreme Court held that a complaint filed by a sheriff that charged the defendant and another individual with breaking and entering a building was insufficient to support a warrrant where the complaint stated that:

I, C.W. Ogburn, do solemnly swear that on or about the 23 day of November, A.D.1964, in the County of Carbon and State of Wyoming, the said Harold Whiteley and Jack Daley, defendants did then and there unlawfully break and enter a locked and sealed building (describing **[*23]** the location and ownership of the building).

*Id. at 562-63*. The Supreme Court found that the "the sole support for the arrest warrant . . . was the complaint [which] consists of nothing more than the complainant's conclusion that the individuals named therein perpetrated the offense described in the complaint." *Id. at 565*. Although the actual basis for the complaint was "an informer's tip," the Court found that the complaint alone "could not support the independent judgment of a disinterested magistrate" because "that fact [and] every other operative fact [was] omitted from the complaint." *Id.*

In *Fry, 678 F. App'x at 319*, the Sixth Circuit found the complaints and affidavits submitted by the arresting officer were "plainly lacking in [] particularized facts" where they provided no "specific details of Fry's actions that constituted the violations and the basis for [the officer's] knowledge of the alleged offenses." *Id.* Instead, the only information provided was "the date the offenses occurred, the statutory language of the charged offense, and . . . a set of initials and a date of birth." *Id.* The court found that "[p]roviding the statutory language of the charged offense

without at least identifying the basis of knowledge for it **[\*24]** does not show probable cause." *Id.* (citing *Sampson, 108 F. Supp. 2d at 837* (citing *Whiteley, 401 U.S. at 565*)).

Similarly, in *Webb v. Greene County Sheriff's Office, 494 F. Supp. 2d 779 (S.D. Ohio 2007)*, a police officer investigating a criminal victim's claim swore to a "barebones" complaint and affidavit which contained "only a few conclusory statements" charging the suspect with two crimes. *Id. at 784, 792*. The district court found that complaints that recite "only the applicable statutory language, with the appropriate name, date and location inserted therein," are "insufficient to support a facially valid arrest warrant." *Id. at 789*.

Finally, in *Alfaro, 2008 U.S. Dist. LEXIS 105535, 2008 WL 5378363, at \*5-6*, the district court found a warrant relied upon by the arresting officers was likewise invalid where the complaints the agent swore to contained only "a single-line conclusory description, including the date and location of the alleged crimes, charging Alfaro with conspiracy to traffic narcotics and with the sale of heroin and cocaine"; the complaints did not include all the facts and details which, had they been included in an affidavit, would have been sufficient to support the issuance of a warrant, "including the numerous recorded conversations between the confidential informant and Alfaro and the details of the March 1, 2008 drug transaction"; the information was not included in the sworn **[\*25]** complaints filed by the officer; there was no evidence that the agent advised the judge who issued the warrant of that information; and there was no evidence that the judge relied upon anything other than the complaints in issuing the arrest warrants. *Id.*

Here, arrest warrants for plaintiff were issued after Carnine prepared an affidavit and two complaints, and the Hamilton County Municipal Court "Clerk or Deputy Clerk" completed a "Probable Cause Checklist." (Doc. 55-1, Exh. B at PAGEID 308). Plaintiff alleges that the warrants were lacking sufficient indicia of probable cause so as to render official belief in it entirely unreasonable because Carnine submitted a "barebones" affidavit; Carnine misled the issuing court with false statements and misrepresentations as to the civilian witness; and Carnine relied on information from an alleged CI of unproven reliability in preparing his affidavit and complaints. (Doc. 60 at PAGEID 333-35). The Court agrees that the warrants in this case lack sufficient particularity and indicia of reliability to create a presumption of probable cause.

As in the above cases, "the complaints and affidavits submitted by [Carnine] were plainly lacking in . . **[\*26]** . particularized facts. They excluded the specific details of [plaintiff's] actions that constituted the violations and the basis for [Carnine's] knowledge of the alleged offenses." *Fry, 678 F. App'x 313*. Carnine's affidavit and complaints filed with the Hamilton County Municipal Court in Case Nos. C16/CRA/22114A/B simply stated the date and location of the alleged offenses and the statutory language of the charged offenses. (Doc.55-1, Exh. A at PAGEID 307). The affidavit and complaints also state that plaintiff sold the substances "to an agent of DART during a narcotics investigation," but they do not identify the agent or set forth Carnine's basis of knowledge for this information. "Providing the statutory language of the charged offense without at least identifying the basis of knowledge for it does not show probable cause." *Fry, 678 F. App'x 313* (citing *Sampson, 108 F. Supp. 2d at 837*) (citing *Whiteley, 401 U.S. at 565*). There is no evidence that additional information other than that included in Carnine's affidavit and complaints was provided to the Clerk or Deputy Clerk. Thus, the affidavit and complaints alone "could not support the independent judgment of a disinterested [judicial officer]." *See Whiteley, 401 U.S. at 563-65*. *See also Webb, 494 F. Supp. 2d 779*. The warrants are facially insufficient to establish probable cause **[\*27]** for plaintiff's arrest. *See OPW Fueling Components, 2007 U.S. Dist. LEXIS 34083, 2007 WL 1406956, at \*10* (citing *Sampson, 108 F. Supp. 2d at 837*) (a complaint that alleges the requisite statutory elements and includes a "'bare bones' recitation of facts is sufficient to establish probable cause for arrest only when the complaint indicates a source or basis for the complainant's beliefs.") (citing *Fachini, 466 F.2d at 56* (noting that a complaint must provide an affiant's answer to the hypothetical question, "What makes you think that the defendant committed the offense charged?")).

However, this does not end the Court's inquiry into whether there was probable cause for plaintiff's arrest. The facial invalidity of the warrant "does not *ipso facto* establish a *Fourth Amendment* violation." *See Sampson, 108 F. Supp. 2d at 837*. Although plaintiff may not have been arrested pursuant to a valid warrant, no constitutional violation

occurred if probable cause existed at the time of his arrest. *Id. at 838* (citing *Criss v. City of Kent, 867 F.2d 259, 262 (6th Cir. 1988)*). If there is no valid warrant, "[t]he question becomes, viewing the facts in a light most favorable to [the defendant], whether the arresting officers were justified in their belief that [the defendant] had probably committed or was committing a crime." *Id.* (alterations in original) (quoting *Criss, 867 F.2d at 262*). Only "some probability of criminal activity" is required to establish probable **[*28]** cause. *Id.* (quoting *Criss, 867 F.2d at 262*).

Plaintiff has not produced evidence that creates a genuine issue of material fact as to whether defendant had probable cause to arrest him. Hamilton County Court records show that plaintiff was arrested for "Trafficking in Drugs" in violation of *Ohio Rev. Code § 2925.03* and *§ 2925.11*. As of the date Carnine swore out the affidavit and complaint, the evidence shows he was working with a "confidential informant" as part of an operation to negotiate a purchase of heroin from plaintiff; on February 1, 2016, the CI met with plaintiff at the location specified in the affidavit and complaint, which is within 1000 feet of Woodward High School; the CI purchased heroin from plaintiff "with pre-recorded government funds"; DART agents conducted mobile surveillance of plaintiff with the assistance of the Cincinnati Police Department after the CI provided the heroin to DART agents; the CI was shown a photograph of plaintiff and confirmed that plaintiff had sold him the heroin; and the heroin was tested by the Hamilton County Crime Lab, which concluded the heroin contained fentanyl and acetyl fentanyl. (Carnine Aff., Doc. 55-1 at PAGEID 305-06; Exh. C, PAGEID 309-10). A reasonably well-trained officer in Carnine's **[*29]** position would not have known that these facts failed to establish probable cause at the time of the arrest. *See Barton v. Martin, 949 F.3d 938, 950 (6th Cir. 2020)* (quoting *Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008)*).

Plaintiff nonetheless alleges there is no probable cause because Carnine made a false statement or omission either deliberately or with reckless disregard for the truth, which was material to the finding of probable cause. (Doc. 60 at PAGEID 335, citing *Vakilian, 335 F.3d at 517*; *Sykes, 625 F.3d at 305*). Plaintiff claims that Carnine made false statements about plaintiff selling fentanyl and acetyl fentanyl to an agent of DART and omitted facts that misrepresented an "alleged civilian witness . . . as an agent of [DART]." (*Id.* at PAGEID 335). Plaintiff alleges that because Carnine knew or possessed information that contradicted his sworn assertions, Carnine is not entitled to qualified immunity. (*Id.*, citing *Butler v. City of Detroit, 936 F.3d 410, 419 (6th Cir. 2019)*). Plaintiff alleges that when the false statements are set aside and the affidavit is considered absent those statements, the affidavit is not sufficient to show probable cause. Plaintiff further claims that "Carnine did not prove that the alleged confidential informant was reliable," such as by indicating Carnine had worked with the CI before or that the CI was searched before the alleged transaction **[*30]** to insure he had no drugs on money in his possession. (*Id.*). Plaintiff also alleges that the affidavit does not specify where in or near the McDonald's restaurant the meeting between plaintiff and the CI allegedly occurred; there is no audio or video recording of what transpired; and no heroin was ever recovered.[9] (*Id.*).

Plaintiff has failed to produce evidence demonstrating that Carnine knew at the time of plaintiff's arrest that probable cause for the arrest was lacking. *Robertson, 753 F.3d at 619*. At the time of the arrest, Carnine had particularized information showing that plaintiff had sold a controlled substance to an individual who was working with Carnine and other law enforcement personnel, including DART officers, as part of a drug trafficking investigation. (Carnine Aff., Doc. 55-1 at PAGEID 305). The purchase was made using pre-recorded government funds. (*Id.*). Law enforcement personnel, including DART agents who received the heroin that plaintiff had sold to the CI after the transaction, conducted mobile surveillance of plaintiff with the assistance of the Cincinnati Police Department after that point. (*Id.* at 306). The CI identified plaintiff as the individual who had sold him the heroin when shown **[*31]** a photograph of plaintiff. (*Id.*). The Hamilton County Crime Lab confirmed that the substance plaintiff sold to the CI contained fentanyl and acetate fentanyl. (*Id.*). Carnine was entitled to rely on the CI's identification of plaintiff as the individual who sold him the controlled substance to establish probable cause. *Ahlers, 188 F.3d at 370* ("A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest."); *Legenzoff v. Steckel, 564 F. App'x 136, 142 (6th Cir. 2014)* ("[A]n

---

[9] The evidence shows that an audio recording of the transaction was made. (Doc. 60, Exh. F at PAGEID 358). However, the recording was corrupted and was rendered unusable. (Matthew Broo Aff., Doc. 63-1 at PAGEID 390).

eye witness identification and accusation, by itself, is sufficient to establish probable cause."). The Sixth Circuit explained in *Ahlers*:

> An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.

*Ahlers, 188 F.3d at 370* (internal citations and quotations omitted). Plaintiff has not produced evidence **[*32]** that shows the identification the CI provided was not reliable or was mistaken and that Carnine knew this as of the date of plaintiff's arrest. Plaintiff has not shown that probable cause was lacking on this ground. Cf. *Radvansky, 395 F.3d at 291* (finding that arrest lacked probable clause where arresting officers considered only inculpatory evidence in their possession and ignored exculpatory evidence).

Plaintiff has also failed to present evidence that shows Carnine intentionally misrepresented material facts in his affidavit and complaints by stating it was a "CI" who allegedly purchased drugs from plaintiff. (Doc. 60 at PAGEID 350, citing Exh. F). Plaintiff asserts that the State represented to him during discovery proceedings in his criminal case that the alleged "agent" was either a CI or a civilian witness.[10] It is not clear from the record which of these is accurate. Further, evidence that Carnine referred to the purchaser as an "agent of DART" does not support a finding that Carnine intentionally misrepresented facts in his affidavit and complaints. A civilian who was not employed by DART but who was cooperating with DART personnel as part of an investigation could reasonably be characterized as "an agent **[*33]** of DART."

Plaintiff has not produced any other evidence that shows Carnine lacked probable cause for plaintiff's arrest. The "facts and circumstances within [Carnine's] knowledge [were] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that [plaintiff had] committed . . . an offense." *See Crockett v. Cumberland College, 316 F.3d 571, 580 (6th Cir. 2003)* (quoting *Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979)*). If the officer "could reasonably (even if erroneously) have believed that the arrest was lawful, in light of . . . the information possessed at the time by the arresting agent," then he is entitled to qualified immunity from liability for false arrest. *White v. City of Cleveland, No. 1:17-cv-01165, 2020 U.S. Dist. LEXIS 241429, 2020 WL 7640932, at *17 (N.D. Ohio Dec. 23, 2020)* (citing *Barton, 949 F.3d at 950*) (quoting *Harris, 513 F.3d at 511*). Defendant Carnine is therefore entitled to qualified immunity and summary judgment on plaintiff's false arrest claim under the *Fourth Amendment*.

## 2. Malicious prosecution

Plaintiff claims that Carnine violated his *Fourth Amendment* right to be free of malicious prosecution "when he submitted his unconstitutional affidavit that included false statements and misleading omissions to get [plaintiff] falsely arrested and prosecuted. . . ." (Doc. 60 at PAGEID 339). Plaintiff alleges that because Carnine made misleading omissions and false statements in his affidavit, the grand jury indictment **[*34]** does not establish probable cause for the prosecution. *Id.* (citing *King v. Harwood, 852 F.3d 568, 587-88 (6th Cir. 2017)*). Plaintiff also claims that the case was terminated in his favor because the state did not have evidence to move forward and there was no agreement or compromise between plaintiff and the State. (*Id.*).

---

[10] The "State's Response to Defendant's Demand for Discovery" filed in the state court criminal proceedings against plaintiff on September 26, 2016, listed as witnesses: Carnine; "PO Lewis - DART"; "DART agents, information unknown at this time"; "Cincinnati Police District 4 Officers, information unknown at this time"; "Confidential Informant"; and other Hamilton County employees. (Doc. 18-1 at PAGEID 141). In its "Supplemental Response to Defendant's Demand for Discovery" filed on May 30, 2017, the only information the State provided under "Witnesses" was: "Civilian witness name and address provided separately and served in court on May 26th, 2017." (*Id.* at 130).

Defendant contends he is entitled to qualified immunity and summary judgment on plaintiff's malicious prosecution claim under *§ 1983*. (Doc. 55 at PAGEID 292-93). Defendant argues that a reasonably prudent officer would have believed that plaintiff was involved in the sale and possession of drugs based on the information available to him. (*Id.* at PAGEID 291). Defendant contends there was probable cause for the arrest and for the prosecution, which is clearly established by the grand jury indictment. (*Id.* at PAGEID 293). In addition, defendant contends that the fourth element of a malicious prosecution claim - termination of the proceeding in the party's favor - is not satisfied because the State voluntarily dismissed the criminal proceedings against plaintiff. (*Id.*, citing Ohio cases).

The Sixth Circuit recognizes malicious prosecution as a separate constitutional claim under the *Fourth Amendment*, which "encompasses wrongful investigation, [*35] prosecution, conviction, and incarceration." *Sykes, 625 F.3d at 308* (citing *Wallace v. Kato, 549 U.S. 384, 390, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)*). "[T]he *Fourth Amendment* prohibits only those pretrial seizures (or prosecutions) that lack *probable cause*, and *§ 1983* grants qualified immunity to defendants who mistakenly but reasonably conclude that probable cause exists." *Lester, 986 F.3d at 607*. *See also Wright v. City of Euclid, Ohio, 962 F.3d 852, 877 (6th Cir. 2020)* ("A police officer violates a suspect's clearly established right to freedom from malicious prosecution under the *Fourth Amendment* 'only when his deliberate or reckless falsehood results in arrest and prosecution without probable cause.'") (quoting *Johnson v. Moseley, 790 F.3d 649, 655 (6th Cir. 2015)*). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard, 869 F.3d 473, 480 (6th Cir. 2017)*. "[A]n individual's 'continued detention without probable cause'" can also support a claim for malicious prosecution under *§ 1983*. *White, 2020 U.S. Dist. LEXIS 241429, 2020 WL 7640932, at *18* (quoting *Mills, 869 F.3d at 480*).

A malicious prosecution claim has four elements: "(1) the defendant 'made, influenced, or participated in the decision to prosecute'; (2) the government lacked probable cause; (3) the proceeding caused the plaintiff to suffer a deprivation of liberty; and (4) the prosecution ended in the plaintiff's favor." *Lester, 986 F.3d at 606* (citing *Jones v. Clark County, 959 F.3d 748, 756 (6th Cir. 2020)*). A "malicious prosecution claim differs from [a] false arrest claim [*36] because the review of probable cause includes all information known to the officer at the time of his actions and not just the information included in the arrest warrant application itself." *Fry, 678 F. App'x at 320*.

At a minimum, "whether an officer influenced or participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions." *Wright, 962 F.3d at 876* (quoting *Sykes, 625 F.3d at 311 n. 9*). "[T]here must be some element of blameworthiness or culpability in the participation"; "truthful participation in the prosecution is not actionable." *Johnson, 790 F.3d at 655* (citing *Sykes, 625 F.3d at 314*). The plaintiff can satisfy this prong by showing that the officer gave false testimony before a grand jury or by falsely prompting or urging a prosecutor's decision to bring charges in the first place. *Wright, 962 F.3d at 663, 666*.

A grand jury indictment creates a presumption of probable cause, *King, 852 F.3d at 586*, and confers absolute immunity on a grand jury witness "based on the witness' testimony . . . ." *Rehberg v. Paulk, 566 U.S. 356, 369, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012)*. *See also Higgason v. Stephens, 288 F.3d 868, 877 (6th Cir. 2002)* ("[T]he finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.") (quoting *Ex Parte United States, 287 U.S. 241, 250, 53 S. Ct. 129, 77 L. Ed. 283 (1932)*). A plaintiff may not circumvent the grant of absolute immunity [*37] to a grand jury witness by claiming "the witness conspired to present false testimony" or by using evidence of the witness' testimony to support a *§ 1983* claim regarding "the initiation or maintenance of a prosecution." *Rehberg, 566 U.S. at 369*. A law enforcement officer is not entitled to the presumption of probable cause created by a grand jury indictment where:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury). . . .

*King, 852 F.3d at 587-88*. In these circumstances, the presumption is not conclusive and is rebuttable. *Id.*

Here, assuming for purposes of the summary judgment motion that defendant Carnine "made, influenced, or participated in the decision to prosecute" plaintiff, Carnine **[\*38]** is nonetheless entitled to summary judgment on plaintiff's malicious prosecution claim. The grand jury indictment against plaintiff creates a presumption of probable cause. Plaintiff has not produced any evidence that rebuts the presumption. For the reasons discussed in connection with plaintiff's false arrest claim, there is no evidence that Carnine prepared an affidavit or complaint that included false statements that he knowingly or recklessly made, or that Carnine fabricated evidence which he included in the affidavit and complaints. Nor is there evidence that any alleged falsehoods, omissions, and fabricated evidence - and in particular Carnine's representation that the individual to whom plaintiff sold the heroin was an "agent of DART" - were material to the initiation or continuation of plaintiff's prosecution. The bill of particulars filed in Hamilton County Court of Common Pleas Criminal Case No. B1604890 included additional information that plaintiff Baker was "under constant police surveillance" when he sold an "acetyl fentanyl/fentanyl mixture to a confidential police informant" for $240.00. (Doc. 18-1 at PAGEID 142). The Hamilton County Prosecutor's Office eventually decided **[\*39]** to dismiss the charges not because evidence had been fabricated or because misrepresentations had been made, but instead because an audio recording of the transaction had been corrupted; the Hamilton County Prosecutor's Office decided "it was impractical to transport the confidential informant," who was incarcerated in the Ohio Department of Corrections during plaintiff's prosecution, to Hamilton County; and other criminal charges were pending against plaintiff. (*See* Broo Aff., Doc. 63-1). Plaintiff has not introduced any evidence that creates a genuine issue of fact as to whether these were not the true reasons the Prosecutor's Office decided not to pursue charges against plaintiff.

Thus, plaintiff has not carried his burden to show there is a genuine dispute as to whether an exception to the presumption of probable cause created by the grand jury indictment applies. Plaintiff has not produced evidence to show that Carnine falsified or fabricated evidence, or made misleading omissions from his affidavit and complaints, which were material to the decision to prosecute plaintiff. Defendant Carnine is entitled to qualified immunity on plaintiff's malicious prosecution claim under *§ 1983*.

### 3. [\*40] Civil conspiracy

"A civil conspiracy claim under *§ 1983* . . . lies where there is 'an agreement between two or more persons to injure another by unlawful action.'" *Robertson, 753 F.3d at 622* (quoting *Revis v. Meldrum, 489 F.3d 273, 290 (6th Cir. 2007)*). To prevail on a civil conspiracy claim, plaintiff must show that "'that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed' in furtherance of the conspiracy that caused the injury." *Id.* (quoting *Revis, 489 F.3d at 290*). A "conspiracy claim[] must be pled with some degree of specificity"; "vague and conclusory allegations" that are "unsupported by material facts" will not suffice. *Id.* (citing *Gutierrez v. Lynch, 826 F.2d 1534, 1538 (6th Cir. 1987)*).

Plaintiff has not produced evidence to support a civil conspiracy claim against Carnine. Plaintiff alleges in support of his conspiracy claim that Carnine and other officers "planned the investigation and prosecution" of plaintiff. (Doc. 60 at PAGEID 340). Plaintiff alleges it can be "implied" from the "false conclusory affidavit submitted" to the issuing judge and prosecutors that Carnine's "fellow officers knew of and conspired in all acts committed" to have plaintiff "falsely seized, search, arrested and prosecuted" because **[\*41]** the same officers participated as witnesses in the investigation and prosecution. (*Id.*). But even assuming, *arguendo*, that Carnine's affidavit was conclusory and was not accurate, the simple fact that the same officers were involved in both the investigation and prosecution of plaintiff is not sufficient to support an inference of wrongdoing and a civil conspiracy claim. Defendant Carnine is entitled to qualified immunity on plaintiff's civil conspiracy claim.

### 4. Fabrication of evidence

Defendant argues he is entitled to qualified immunity and summary judgment on plaintiff's fabrication of evidence claim. "The basis of a fabrication-of-evidence claim under *§ 1983* is an allegation that a defendant 'knowingly fabricated evidence against [a plaintiff], and [that] there is a reasonable likelihood that the false evidence could have affected the judgment of the jury.'" *Mills v. Barnard, 869 F.3d 473, 484 (6th Cir. 2017)* (quoting *Stemler v. City of Florence, 126 F.3d 856, 872 (6th Cir. 1997)*).

As discussed *supra*, there was probable cause for plaintiff's arrest and prosecution, and plaintiff has not produced evidence to overcome the presumption of probable cause created by the Grand Jury indictment. Plaintiff has not shown that defendant fabricated evidence and that there is a reasonable likelihood any allegedly **[*42]** false evidence was material to the decision to arrest or prosecute plaintiff. Defendant is entitled to qualified immunity on this claim.

### 5. Deprivation of Liberty

Plaintiff's fifth claim is a claim for deprivation of liberty. (Doc. 18 at PAGEID 123). Plaintiff has not addressed this claim in his response to defendant's motion for summary judgment. (Doc. 60). It is not clear from the complaint how this claim differs from plaintiff's claims for illegal search and seizure and malicious prosecution. In essence, plaintiff's deprivation of liberty claim is derivative of his false arrest claim insofar as plaintiff alleges there was no probable cause for his extended detention. *See Wright, 962 F.3d at 874* (the plaintiff's claim "for a violation of the *Fourth Amendment* based on his extended detention after he posted bond" was "in essence, derivative of his false-arrest claim-that is, his detention was unreasonably extended without probable cause."). Further, "deprivation of liberty beyond the initial seizure" is just one element of a malicious prosecution claim under the *Fourth Amendment*. *Id. at 875-77*. For the reasons set forth *supra* in connection with plaintiff's other *§ 1983* claims against Carnine, plaintiff has not produced evidence to show that Carnine violated **[*43]** plaintiff's constitutional rights by detaining him without probable cause or by wrongfully investigating, prosecuting, or incarcerating plaintiff. Thus, defendant is entitled to qualified immunity on plaintiff's claim for deprivation of liberty.

### 6. Municipal liability

Plaintiff brings a "municipal liability" claim against Carnine in his "official capacity." (Doc. 18 at PAGEID 124). A *§ 1983* claim against a municipal employee or agent for acts undertaken in an official capacity is tantamount to a claim against the municipality that the employee or agent represents. *Clemens v. Mt. Clemens Community Sch. Dist., 305 F. Supp. 3d 759, 768 (E.D. Mich. 2018)* (citing *Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*). A municipality may not be held liable under *§ 1983* based on the theory of *respondeat superior* for an injury inflicted solely by its employee. *Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)* (citing *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*). Instead, a plaintiff must show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Wright, 962 F.3d at 879-80* (quoting *Alman v. Reed, 703 F.3d 887, 903 (6th Cir. 2013)* (quoting *Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997)*). A plaintiff makes this showing by demonstrating "that the municipality had a 'policy or custom' that caused the violation of his rights. *Id. at 880* (quoting *Monell, 436 U.S. at 694*). Plaintiff must establish "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified **[*44]** illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance [of] or acquiescence [to] federal rights violations." *Burgess, 735 F.3d at 478*.

Assuming for summary judgment purposes that Carnine is a municipal employee, plaintiff has not produced any evidence to show that a municipal "policy of custom" caused the deprivation of plaintiff's constitutional rights. Defendant is entitled to summary judgment on plaintiff's municipal liability claim.

### 7. Remaining federal counts

The remaining counts of the amended complaint brought under *§ 1983* do not mention Carnine. These are Count 4 (failure to intervene under federal law) and Count 10 (supervisory liability claim against John Doe officers and DART agency policy makers). As plaintiff has not produced any evidence to support these *§ 1983* claims against Carnine, defendant Carnine is entitled to summary judgment on these federal claims.[11]

### III. State claims

Plaintiff brings claims under state law against defendant Carnine for malicious prosecution (Count 1), fabrication of evidence (Count 3), deprivation of liberty (Count 5), illegal seizure (Count 6), illegal search (Count 7), and intentional and negligent infliction **[*45]** of emotional distress (Counts 8, 9). Plaintiff does not specify whether he brings his civil conspiracy claim (Count 2) under state or federal law, so the Court assumes he brings the claim under both.

District courts "shall have supplemental jurisdiction over all other claims that . . . form part of the same case or controversy" as the claim over which the court has original jurisdiction. *28 U.S.C. § 1367(a)*. A court "may decline to exercise supplemental jurisdiction over a claim" in one of four situations:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

*Id. § 1367(c)*.

District courts may remand state-law claims under subsection (b)(2) when few or no federal claims remain. Once there are no longer any federal claims remaining in the case, the district court "should not ordinarily reach the plaintiff's state-law claims." *See Moon v. Harrison Piping Supply, 465 F.3d 719, 728 (6th Cir. 2006)*. Here, if the district court were to maintain supplemental jurisdiction, only Ohio law claims **[*46]** would be left to resolve. The Court should therefore decline to exercise its supplemental jurisdiction.

**IT IS THEREFORE RECOMMENDED THAT**:

1. Defendant Carnine's motion for summary judgment (Doc. 55) be **GRANTED** on all federal claims raised in the amended complaint under *42 U.S.C. § 1983* (Doc. 18), and plaintiff's *§ 1983* claims be **DISMISSED**.

2. The Court decline to exercise its supplemental jurisdiction over plaintiff's claims brought under state law.

3. The Court certify pursuant to *28 U.S.C. § 1915(a)* that for the foregoing reasons an appeal of any Order adopting this Report and Recommendation would not be taken in good faith and therefore deny plaintiff leave to appeal *in forma pauperis*. Plaintiff remains free to apply to proceed *in forma pauperis* in the Court of Appeals. *See Callihan v. Schneider, 178 F.3d 800, 803 (6th Cir. 1999)*, overruling in part *Floyd v. United States Postal Serv., 105 F.3d 274, 277 (6th Cir. 1997)*.

/s/ Karen L. Litkovitz

Karen L. Litkovitz

---

[11] Count 12, a malicious prosecution claim under federal and state law against defendants McIlwain and Broo, is no longer before the Court. Defendants McIlwain and Broo were dismissed from this case for want of prosecution and failure to obey a court order. (Doc. 51).

2021 U.S. Dist. LEXIS 155604, *46

United States Magistrate Judge

Date: 8/17/2021

---

**End of Document**

 Positive
As of: November 6, 2025 6:46 PM Z

## *Bringman v. Fredericktown*

United States District Court for the Southern District of Ohio, Eastern Division

October 13, 2016, Decided; October 13, 2016, Filed

Case No. 2:15-cv-628

**Reporter**
2016 U.S. Dist. LEXIS 142173 *

WILLIAM PAUL BRINGMAN, Plaintiff, v. VILLAGE OF FREDERICKTOWN, OHIO, et. al., Defendants.

**Subsequent History:** Affirmed by *Bringman v. Vill. of Fredericktown, 2017 U.S. App. LEXIS 23731 (6th Cir. Ohio, June 29, 2017)*

**Prior History:** *Bringman v. Village of Fredericktown, 2015 U.S. Dist. LEXIS 105283 (S.D. Ohio, Aug. 11, 2015)*

## Core Terms

arrest, probable cause, domestic violence, summary judgment motion, police officer, probability, state law claim, Sheriff, kitchen, shoved

**Counsel:**  **[*1]** William Paul Bringman, Plaintiff, Pro se, Worthington, OH.

For Village of Fredericktown, Ohio, A Municipal Corporation, Jerry Day, Former Police Chief of the Village of Fredericktown, Ohio, Kyle Johnson, Police Officer of the Village of Fredericktown, Ohio, Roger Brown, Police Chief of the Village of Fredericktown, Ohio, Defendants: Michael Joseph Valentine, LEAD ATTORNEY, Reminger Co., L.P.A., Columbus, OH.

For Board of Commissioners of Knox County, Kevin Durbin, Deputy Sheriff of Knox County, Defendants: Charles Terrence McConville, LEAD ATTORNEY, Knox County Prosecutor, Mt. Vernon, OH; Angelica Jarmusz, Fishel Hass Kim Albrecht LLP, Columbus, OH.

**Judges:** EDMUND A. SARGUS, JR., CHIEF JUDGE UNITED STATES DISTRICT JUDGE. Magistrate Judge Kimberly A. Jolson.

**Opinion by:** EDMUND A. SARGUS, JR.

## Opinion

### OPINION AND ORDER

This matter is before the Court for consideration of the Motion for Summary Judgment of Police Officer Kyle Johnson ("Officer Johnson") and Police Chief Roger Brown ("Chief Brown") (ECF No. 39); and the Motion for Summary Judgment of Deputy Sheriff Kevin Durbin ("Deputy Durbin") and the Board of Commissioners of Knox County, Ohio ("Commissioners") (ECF No. 42). Plaintiff has filed memoranda in opposition **[*2]** to each (ECF Nos. 43, 46), and Officer Johnson and Chief Brown have filed a reply memorandum (ECF No. 45). For the reasons that follow, the Court **GRANTS** the motions.

2016 U.S. Dist. LEXIS 142173, *2

## I. Background

On February 27, 2013, William Paul Bringman ("Plaintiff"), was arrested for domestic violence related to an incident involving his then-wife, Barbara Jean Bringman. (Compl. ¶ 9; ECF No. 1.) The arresting officers were Officer Johnson, a Village of Fredericktown police officer, and Deputy Durbin, a Knox County deputy sheriff. (Id.) After being placed under arrest, Plaintiff was taken to the Knox County Jail. He was released later that same day. (Id. ¶ 15.) On February 18, 2015, Plaintiff filed a complaint against Johnson, Durbin, and the following additional defendants: the Village of Fredericktown ("Fredericktown"); Jerry Day, the former Fredericktown Police Chief; Roger Brown, the current Fredericktown Police Chief; the Board of Commissioners of Knox County, Ohio; John Doe I, the Knox County Sheriff; and John Doe II, a Knox County Deputy Sheriff. (Compl. ECF No. 1.) Plaintiff asserts claims under 42 U.S.C. § 1983, claiming that he was falsely arrested and imprisoned in violation of the Fourth and Fourteenth Amendments. The parties have completed briefing **[*3]** on the motions, which are ripe for disposition.

The following facts are not in dispute. On February 27, 2013, Plaintiff woke up around 3:30 a.m. He "was not sleeping well" and decided to get dressed and go to his office before court.[1] As he tried to leave, his wife, Barbara Bringman, "would not get out of the way." According to Mr. Bringman, she "grabbed at his testicles" and he "shoved her out of the way of the door" and she fell to the kitchen floor. Mrs. Bringman's daughter, Andrea Weller, "heard the fall," and came in and yelled at him to leave. (See Pl's Statement; ECF No. 43.) Officer Johnson was on patrol that morning, and received a dispatch call regarding a 911 call reporting a domestic disturbance. (Tr. Trans. at p. 20; Officer Johnson Aff. at ¶ 2; ECF No. 39, Exh. A.)[2] The dispatcher relayed that a distraught woman called, that someone was on the floor, and that the husband had left the house. (Id. at 20-21.) When Officer Johnson arrived at the residence, he was met by Mrs. Bringman, and her daughter, Ms. Weller. (Id. at 22.) Deputy Durbin also heard the dispatch, and arrived while Officer Johnson was talking with Mrs. Bringman. (Id. at 57.) Mrs. Bringman was visibly upset and crying, and she appeared to **[*4]** be afraid. She told Officer Johnson that she regretted calling the police because she was going to be in trouble with her husband. (Id. at 23; Officer Johnson Aff. ¶¶ 4, 5.)

Mrs. Bringman stated that she had confronted Plaintiff with her suspicions that he was having an affair, and they had an altercation. (Id. at 22.) She told the officers that during the altercation, Plaintiff shoved her in the back, causing her to fall to the ground. (Id. at 22-23; Officer Johnson Aff. ¶ 3.) Mrs. Bringman showed Officer Johnson and Deputy Durbin a cut on her left elbow, and stated that her left wrist was also injured in the fall. (Id. at 22-23; Officer Johnson Aff. ¶ 4.) Officer Johnson observed that Mrs. Bringman was walking with a limp, and she said it was caused by the physical confrontation with Plaintiff. (Id. at 30-31.) Ms. Weller told Officer Johnson that she heard "yelling and a commotion" in the kitchen, but did not see it. However, she came into the kitchen and saw her mother lying on the floor, and **[*5]** her stepfather standing over her mother. When Ms. Weller said she was calling the police, Plaintiff left the house. (Id.. at 31-32.) Officer Johnson obtained written statements from Mrs. Bringman and Ms. Weller that accused Plaintiff of causing Mrs. Bringman physical harm. (Id. at 32; Officer Johnson Aff. at ¶¶ 6-7.) Officer Johnson decided to investigate further by talking to Plaintiff. (Id. at 32.)

Officer Johnson and Deputy Durbin met with Plaintiff in his office, and Plaintiff acknowledged that he had a physical altercation with Mrs. Bringman in their home that morning. (Tr. Transcript at 33, 37.) Plaintiff said he was trying to exit the home through the kitchen door, but Mrs. Bringman blocked the door way. (Id. at 33.) Plaintiff claimed that he did not intend to hurt Mrs. Bringman, but acknowledged that he knowingly shoved her. (Id. at 34-35, 151-152.) Plaintiff wrote a detailed statement for Officer Johnson, describing the escalation of the interaction, including Mrs. Bringman's actions in "grabbing his testicles" and trying to block him from the door way, and admitting that he "shoved her out of the way " and she "fell down on her left side on the kitchen floor in front of the sink." (Pl. Statement; ECF No. 43.) After hearing Plaintiff's **[*6]** version of the events, Officer Johnson determined that, based

---

[1] Plaintiff, an attorney, is representing himself in this case pro se.

[2] Exhibit A is the transcript of the trial proceedings in the Mount Vernon Municipal Court, Ohio, Case No. 12CRB206, State of Ohio v. William Bringman. Mr. Bringman was acquitted.

on the totality of the circumstances, an offense of domestic violence was probably committed by Plaintiff, and he made the decision to place Plaintiff under arrest for that offense. (*Id.* at 47; Officer Johnson Aff. ¶ 10.) Chief Brown agreed with Officer Johnson's decision to make the arrest. (Ex. B, Chief Brown Aff. ¶ 4.) Deputy Durbin did not participate in the decision to make the arrest, but transported Plaintiff to the Knox County Jail in his cruiser, where he turned Plaintiff over to the custody of jail deputies. (Compl. ¶¶ 13, 14; ECF No. 1; Tr. Transcript, at 61.) Plaintiff was released on bond around noon on the same day. (*Id.* ¶ 15.)

Plaintiff filed the instant Complaint on February 18, 2015, alleging that his arrest violated the *Fourth* and *Fourteenth Amendments of the Constitution*, and was done maliciously, in violation of *42 U.S.C. § 1983*. (Compl., ECF No. 1.)[3] Plaintiff also sued the Board of Knox County Commissioners. (Compl. ¶ 6; ECF No. 1.) The three Knox County Commissioners aver that they were not involved in or cognizant of Plaintiff's arrest, nor did they "consent to, approve or ratify the actions of any law enforcement official concerning Mr. Bringman's arrest or detention." **[*7]** (*See* Aff. Comm'r Teresa Bemiller, Exh. B ¶3; Aff. Comm'r Thorn Collier, Exh. C ¶3; Aff. Comm'r Roger Reed, Exh. D ¶; ECF No. 42.) The plaintiff has produced no evidence to the contrary.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382, 1388-89 (6th Cir. 1993)*. In deciding a summary judgment motion, a court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The judge is not to determine the truth of the matter, but to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether **[*8]** it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

## III. ANALYSIS

Plaintiff brings this civil rights action under *42 U.S.C. § 1983*. *Section 1983* provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

In order to recover under a *Section 1983* claim, a plaintiff must prove that the defendant, while acting under the color of state law, violated rights secured to the plaintiff by the Constitution **[*9]** or laws of the United States. *Adickes v. S.H Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*. Plaintiff specifically alleges that his arrest for domestic violence violated the *Fourth Amendment of the U.S. Constitution*. The *Fourth Amendment* states, in pertinent part, that "no Warrants shall issue, but upon probable cause, supported by Oath or

---

[3] Plaintiff also included a claim that the Village of Fredericktown; former Fredericktown Police Chief Jerry Day; and current Fredericktown Police Chief Brown failed to properly train and supervise the officers. The Court dismissed this claim on November 30, 2015. (Opinion; ECF No. 37.)

affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *U.S. Const. Amend. IV*. "[I]t is well established that any arrest without probable cause violates the *Fourth Amendment*. " *Crockett v. Cumberland Coll., 316 F.3d 571, 580 (6th Cir. 2003)*. Thus, the central issue in the case is whether Officer Johnson had probable cause to arrest Plaintiff.

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010)*. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *United States v. Pearce, 531 F.3d 374, 380-81 (6th Cir. 2008)*. Plaintiff contends that the issue of probable cause is a jury question. The Sixth Circuit has held that the existence of probable cause is generally a jury question unless there is only one reasonable determination possible. *Pyles v. Raisor, 60 F.3d 1211, 1215 (6th Cir. 1995)*.

In *Scott v. City of Bexley, 11 Fed. App'x 514 (6th Cir. 2001)*, a case cited by Plaintiff and Defendants, the Sixth Circuit examined the question of probable cause in a case involving Ohio's domestic violence statute. **[\*10]** In affirming the District Court's grant of summary judgment, the Sixth Circuit explained the assessment of probable cause in these terms:

> [W]e start with a few general principles. The most important of these is that the *Fourth Amendment* does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect. *See United States v. Barrett, 890 F.2d 855, 861 (6th Cir. 1989)*. The *Fourth Amendment*, after all, necessitates an inquiry into probabilities, not certainty. The Supreme Court has made clear that there is no precise formula for determining the existence or nonexistence of probable cause; rather, a reviewing court is to take into account the 'factual and practical considerations of everyday life' that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred or is about to occur. *See Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)*. There is, of course, a requirement that the officers be able to articulate concrete facts from which they infer a probability that illegality has occurred. As we have consistently emphasized, however, while officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence **[\*11]** sufficient to establish guilt beyond a reasonable doubt. *See, e.g., United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)*.

> The real question, then, is this: at what point does a body of evidence amassed by a police officer against a particular suspect cross the line from merely raising a suspicion to establishing probable cause? In many respects, this raises a difficult epistemological problem. As Descartes famously observed, to the skeptic, any proposition - no matter how seemingly certain - carries with it a degree of doubt. But judges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the 'factual and practical considerations of everyday life,' could lead a reasonable person to believe that an illegal act occurred or is about to occur. *See Gates, 462 U.S. at 231, 103 S.Ct. 2317*.

*Scott v. City of Bexley, 11 Fed. App'x 514, 518*, citing *United States v. Strickland, 144 F.3d 412, 415-16 (6th Cir. 1998)*.

When a *Section 1983* claim is predicated on an allegation of false arrest, false imprisonment, or malicious prosecution, the claim must fail if probable cause for the arrest existed. *Id. at 516*, citing *Hansel v. Bisard, 30 F.Supp.2d 981, 985-86 (E.D. Mich. 1998)*. To determine whether an officer had probable cause to arrest an individual for a violation of a state statute, courts first look to the **[\*12]** state law defining the offense. *Michigan v. DeFillippo, 443 U.S. 31, 36, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979)*. The arrest at issue in the case *sub judice* was for domestic violence, in violation of *Ohio Rev. Code § 2919.25(A)*.

The Sixth Circuit addressed the issue of probable cause for arrest for a violation of Ohio's domestic violence statute in *Thacker v. City of Columbus, 328 F.3d 244 (6th Cir. 2003)*. In *Thacker*, as in this case, the Plaintiff was arrested

2016 U.S. Dist. LEXIS 142173, *12

for domestic violence pursuant to *Ohio Revised Code § 2919.25(A)*, which states: "No person shall knowingly cause or attempt to cause physical harm to a family or household member." Under that statute, a "household member" includes a "spouse, a person living as a spouse, or a former spouse of the offender." *Ohio Rev. Code § 2919.25(E)*. As the Court explained, Ohio has a "preferred arrest" policy in domestic violence matters:

> Ohio has a preferred arrest policy in domestic violence situations. In particular, Ohio law provides that where a peace officer has 'reasonable grounds to believe the offense of domestic violence ... has been committed and reasonable cause to believe that a particular person is guilty of committing the offense, it is the preferred course of action in this state that the officer arrest and detain that person. *Ohio Rev. Code § 2935.03(B)(3)(b)*; *see Scott v. City of Bexley, 11 Fed. Appx. 514, 517, 2001 WL 599711 (6th Cir. 2000)* (unpub'd.)

> 'The *Fourth Amendment* does not require that a police officer *know* a crime occurred at the time the officer arrests or **[\*13]** searches a suspect.... The *Fourth Amendment*, after all, necessitates an inquiry into probabilities, not certainty.' *United States v. Strickland, 144 F.3d 412, 415 (6th Cir. 1998)*. Thus, for probable cause to arrest Thacker to exist here, the officers would not have to have proof of each element of a domestic violence offense, but would have to believe that a probability existed that he committed the offense.

*Thacker, 328 F.3d at 256*.

In this case, as in *Thacker*, the statement of the alleged victim, Mrs. Bringman, that Plaintiff had abused her "is sufficient to establish probable cause." *Id. at 257*, citing *Klein v. Long, 275 F.3d 544, 551-52 (6th Cir. 2001)* (explaining officers need not interview an alleged offender where a victim claims that she was abused if such an interview would, at most, produce an exculpatory denial of wrongdoing). Here, Officer Johnson relied on more than just Mrs. Bringman's statement in this case he also relied on Plaintiff's admission that he shoved his wife during a domestic altercation, and Ms. Weller's statement corroborating Mrs. Bringman's account. In addition to these statements, Officer Johnson observed injuries to Mrs. Bringman's left elbow and wrist. (Officer Johnson Aff. ¶ 4.) In assessing whether Officer Johnson had sufficient information to believe that a probability existed that Plaintiff committed the offense, **[\*14]** the Court also takes into account Ohio's preferred arrest policy in domestic violence matters. Based on the totality of the circumstances presented to Officer Johnson in this case, Officer Johnson had reasonable grounds to determine that probable cause existed to arrest Plaintiff. Taking as true all of the facts as professed by Plaintiff, the evidence is insufficient for a reasonable jury to find that Officer Johnson lacked probable cause for the arrest.

The finding of probable cause defeats any *Section 1983* claim for false arrest, false imprisonment, and/or malicious prosecution. *Scott, 11 Fed. App'x at 516 (6th Cir. 2001)*. Where there is no constitutional violation, the derivative claims based upon false arrest must also fail. *Id. at 516, 519*. Therefore, the Defendants ' Motions for Summary Judgment are **GRANTED**.

While this Court may, in its discretion, retain supplemental jurisdiction over pendent state law claims after the federal claims have been dismissed, such state law claims usually should also be dismissed. *See Musson Theatrical, Inc. v. Fed. Express Corp., 89 F.3d 1244, 1254-55 (6th Cir. 1996)*. Because the Court in this Opinion and Order disposes of all of the Plaintiffs federal claims, the Court declines to exercise supplemental jurisdiction over the state law claims pursuant to *28 U.S.C. § 1367(c)(3)*. Consequently, Plaintiffs remaining state law **[\*15]** claims are dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Police Officer Kyle Johnson ("Officer Johnson") and Police Chief Roger Brown ("Chief Brown") (ECF No. 39); and the Motion for Summary Judgment of Deputy Sheriff Kevin Durbin ("Deputy Durbin") and the Board of Commissioners of Knox County, Ohio ("Commissioners") (ECF No. 42) are **GRANTED**. Further, the Court declines to exercise supplemental jurisdiction over Plaintiffs state law claims, which are dismissed without prejudice. The Clerk is directed to close this case.

2016 U.S. Dist. LEXIS 142173, *15

**IT IS SO ORDERED**.

10-13-2016

**DATE**

/s/ Edmiind A. Sargus, Jr.

**EDMIIND A. SARGUS, JR.**

**UNTED STATES DISTRICT JUDGE**

---

**End of Document**

 Caution
As of: November 6, 2025 6:37 PM Z

## *Cameron v. City of Riverview*

United States District Court for the Eastern District of Michigan, Southern Division

July 26, 2011, Decided; July 26, 2011, Filed

Case No. 10-14098

**Reporter**
2011 U.S. Dist. LEXIS 89118 *; 2011 LX 16502; 2011 WL 3511497

DANIEL LAIDLAW CAMERON, Plaintiff, vs. CITY OF RIVERVIEW, et al., Defendants.

**Subsequent History:** Adopted by, Accepted by, Summary judgment granted by *Cameron v. City of Riverview, 2011 U.S. Dist. LEXIS 89091 ( E.D. Mich., Aug. 11, 2011)*

## Core Terms

probable cause, traffic stop, curb, arrest, illegal search and seizure, summary judgment motion, evidentiary hearing, amended complaint, summary judgment, invalid, drive, hit, false testimony, false arrest, discovery, recommend, median, malicious prosecution, police officer, deadline, sentence, deprive, genuine, tire, existence of probable cause, plaintiff's claim, traffic, heck

## Case Summary

**Overview**
**Key Legal Holdings**

• Plaintiff's *§1983* claims fail because he did not achieve favorable termination of the criminal prosecution.

• The officers had probable cause for the traffic stop and arrest.

• Plaintiff failed to provide evidence beyond conclusory statements that the officers' testimony was false.

**Material Facts**

• Plaintiff was stopped by police officers who claimed he made a wide turn, hit a median, and drove erratically.

• Plaintiff claims he made a normal left turn without any traffic violations.

• Plaintiff was arrested for OWI after failing field sobriety tests.

• Plaintiff was convicted at trial despite testimony from his expert witness.

**Controlling Law**

• Heck v. Humphrey doctrine - *§1983* claims require favorable termination of criminal prosecution.

• Probable cause standard for false arrest and malicious prosecution claims.

• Requirements for claim of prosecutor's failure to correct false testimony.

Justin Marks

**Court Rationale**

Plaintiff's *§1983* claims fail because his conviction was never overturned or invalidated as required by Heck v. Humphrey. The officers had probable cause based on their reasonable belief that a traffic offense occurred, even if they were mistaken about the facts. Plaintiff provided no evidence the officers knew their testimony was false or that it actually was false.

**Outcome**
**Procedural Outcome**

The magistrate judge recommended granting defendants' motion for summary judgment.

# LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN1* **Entitlement as Matter of Law, Appropriateness**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The standard for determining whether summary judgment is appropriate is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. Under *Fed. R. Civ. P. 56*, a party asserting a fact that cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declaration, stipulations, admission, interrogatory answers, or other materials; or a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact. *Fed. R. Civ. P. 56(c)(1)*.

Civil Rights Law > Protection of Rights > Procedural Matters > Claim Accrual

Torts > Intentional Torts > False Imprisonment > Remedies

*HN2* **Procedural Matters, Claim Accrual**

The Heck doctrine requires that in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a *42 U.S.C.S. 1983* plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called

into question by a federal court's issuance of a writ of habeas corpus. Actions premised on *42 U.S.C.S. 1983* require the final adjudication of the criminal proceeding to be decided in the favor of the accused in order to prevent the possibility of contradictory resolutions of a claimant from succeeding in a tort action, yet being convicted in the criminal action. Essentially, a claim of damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under *42 U.S.C.S. 1983*. The Heck doctrine requires that the *42 U.S.C.S. 1983* action must not be an attempt to invalidate the prior conviction whereby the court must look to the claims raised by the *42 U.S.C.S. 1983* action and the specific offenses for which the *42 U.S.C.S. 1983* claimant was convicted, and not to the set of comparable facts between the *42 U.S.C.S. 1983* claim and the conviction.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

### *HN3* Search & Seizure, Probable Cause

A police officer has probable cause when the facts and circumstances known to the officer warrant a prudent man in believing that an offense had been committed. Probable cause is a lower evidentiary hurdle than actually proving an alleged offense beyond a reasonable doubt because probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion. The existence of probable cause depends on the perception of the officer who is confronted with a set of circumstances from which the officer must reach a conclusion about whether an offense has been committed. Therefore, if an officer has a good faith belief that certain facts exist and would establish an offense, then probable cause exists, regardless of whether there is an ultimate conviction or if it is later determined that the officer was mistaken.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Arrests

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Torts > Intentional Torts > False Arrest > Defenses

Torts > Intentional Torts > False Arrest > Elements

### *HN4* Law Enforcement Officials, Arrests

A false arrest claim fails under federal law because it requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

### *HN5* Search & Seizure, Probable Cause

An illegal search and seizure claim fails because so long as probable cause exists to justify an automobile search, the constitution permits officers to conduct a search the scope of which is commensurate with the facts supporting the existence of probable cause.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

2011 U.S. Dist. LEXIS 89118, *89118

*HN6* **Procedural Due Process, Scope of Protection**

A claim for illegal search and seizure requires the plaintiff to be deprived of a right secured by the Federal Constitution or laws of the United States, the deprivation was caused by a person acting under color of state law, and the deprivation occurred without due process of the law.

**Counsel:** **[*1]** Daniel Laidlaw Cameron, Plaintiff, Pro se, Farmington Hills, MI.

For Riverview, City of, R Bemis, Officer, Eric Thome, Officer, Frank Mandernach, Officer, Don Ginestet, Chief of Police, Dean Workman, City Manager, Michael Hurley, City Prosecuting Attorney, Defendants: Holly S. Battersby, Margaret T. Debler, Johnson, Rosati, Farmington Hills, MI; Randall A. Pentiuk, Pentiuk, Couvreur, Wyandotte, MI.

**Judges:** Michael Hluchaniuk, United States Magistrate Judge. Bernard A. Friedman, United States District Judge.

**Opinion by:** Michael Hluchaniuk

# Opinion

**REPORT AND RECOMMENDATION DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt.16)**

**I. PROCEDURAL HISTORY**

In this case, plaintiff filed a complaint on October 12, 2010, pursuant to *42 U.S.C. § 1983*, against defendants, the City of Riverview, Michigan, located in Wayne County, Riverview's City Manager, Prosecutor, Chief of Police, and three city police officers, alleging an illegal search and seizure arising from a traffic stop at 1:30 a.m. on September 28, 2008 that resulted in a false arrest. (Dkt. 1). Plaintiff claims that in the resulting state district court trial, the defendants perjured themselves with false testimony and the defendants, in the face of a lack of evidence for probable **[*2]** cause, maliciously prosecuted the criminal case against him. (Dkt. 1). Plaintiff seeks damages for the defendants' violation of his constitutional rights. (Dkt. 1).

District Judge Bernard A. Friedman referred this matter to the undersigned for all pre-trial matters on October 25, 2010. (Dkt. 8). Plaintiff voluntarily dismissed defendant R. Bemis on October 26, 2010 and the remaining defendants filed an answer to the complaint on November 23, 2010. (Dkt. 9, 13). Defendants filed a motion for summary judgment on February 7, 2011. (Dkt. 16). Plaintiff then filed a motion to amend the complaint on February 23, 2011, which the court ordered would not be accepted until an amended complaint was submitted. (Dkt. 18, 20). Defendants filed a response to the plaintiff's motion to amend on March 15, 2011 and a reply to the plaintiff's response to defendants' motion for summary judgment on March 17, 2011. (Dkt. 22, 23). Plaintiff finally filed his response to defendants' motion for summary judgment on March 21, 2011 and the potential amended complaint on the same day. (Dkt. 24, 25). The Court ordered the defendants to file a response to the plaintiff's motion to amend the complaint and the defendant's **[*3]** filed the response on March 29, 2011. (Dkt. 26, 28). Plaintiff then replied to the response to the motion for an amended complaint on April 15, 2011 and filed a motion to extend the discovery deadline the same day. (Dkt. 29, 31). Defendants filed a response to plaintiff's motion to extend the discovery deadline on April 25, 2011. (Dkt. 32). Plaintiff then filed a motion for summary judgment on May 12, 2011. (Dkt. 33). Plaintiff filed an amended motion to extend the discovery deadline on May 18, 2011. (Dkt. 18). Finally, the defendants filed a response to the amended motion to extend the discovery deadline on May 19, 2011. (Dkt. 35).

For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **GRANTED.**

**II. FACTUAL BACKGROUND**

2011 U.S. Dist. LEXIS 89118, *3

Plaintiff limits his assertions in his complaint to the following violations of his constitutional rights occurring during the traffic stop at issue and the subsequent evidentiary hearing and jury trial: (1) that the officers' actions constituted an illegal search and seizure because there was no probable cause or reasonable suspicion to believe a crime had been committed when they pulled plaintiff over; (2) that the officers **[*4]** falsely arrested plaintiff because there was no probable cause; (3) that defendants submitted false testimony before and during the trial because they knew their version of the events surrounding the traffic stop were false; and (4) that there was a malicious prosecution by defendants in the face of no evidence for probable cause. (Dkt. 1, pp. 16-18).

Defendant's motion for summary judgment and plaintiff's complaint recount the events giving rise to the action. At approximately 1:30 a.m., Officer Frank Mandernach, a 10 year veteran of the Riverview Police Department, and Officer Eric Thome, a new hire to the department, were performing road patrol and stopped at a red light at the intersection of eastbound Sibley Road and Valleyview, near the Sportsmen's Den. (Dkt. 16). As the officers were waiting at the light, they observed a silver Hyundai, later determined to be driven by plaintiff, driving northbound out of the Sportsmen's Den. *Id.* Officer Mandernach gave the following testimony regarding what occurred next during an evidentiary hearing:

> We observed the [Hyundai] do a wide turn. There's a median that divides lanes of travel on Valleyview. The vehicle actually went past Sibley, partially **[*5]** striking the median; continued the wide turn, almost struck the westernmost curb of Valleyview; and then went westbound on Sibley Road.

*Id.* On cross-examination, the officer further testified that it was Plaintiff's back passenger tire that made contact with the median. *Id.* Officer Mandernach described plaintiff's driving as "extremely erratic" and testified that he had never seen a vehicle effectuate a turn that wide from the Sportsmen's Den. *Id.* Given the erratic driving he observed, Officer Mandernach felt there was a basis for a citation of driving without due care and caution or careless driving, and also suspected the operator of the vehicle may have been drinking. *Id.* Consequently, Officer Mandernach effectuated a traffic stop of plaintiff's vehicle. *Id.* Plaintiff alleges, however, that while driving northbound at the intersection of Sibley Road and Valleyview Street "as the traffic light was green, plaintiff initiated his left hand turn signal, made a normal turn and proceeded westbound on Sibley Road." (Dkt. 1, p. 4). Plaintiff claims that he was stopped shortly thereafter by Mandernach and Thome without them witnessing a traffic violation, probable cause for the stop, or with **[*6]** reasonable suspicion that the plaintiff had violated State law or was about to violate State law, thus, negating any constitutional reason for the traffic stop. *Id.*

Officer Mandernach approached plaintiff's vehicle and asked for his driver's license, registration and proof of insurance. (Dkt. 16). After a few minutes, plaintiff was able to produce the requested documents. *Id.* Officer Mandernach and Officer Thome testified they could smell the odor of intoxicants emanating from the vehicle and asked plaintiff if he had been drinking. *Id.* Plaintiff's speech was slurred and he admitted to consuming a couple of alcoholic beverages. *Id.* At that point, Officer Mandernach asked him to participate in a series of field sobriety tests. They also claimed that plaintiff was unable to recite his alphabet without stopping; was unable to follow the officer's instructions to count down from 100 to 88 and stop, without saying the number 91 (plaintiff continued to number 74); was unable to raise one leg six inches above the ground while keeping his arms at his side and pointing his foot straight out in front of him while counting aloud; and was unable to walk heel-to-toe in a straight line. *Id.* Noting **[*7]** that, in addition to failing all of these field sobriety tests, plaintiff's eyes were bloodshot and glassy, it was Officer Mandernach's belief that plaintiff's ability to operate a motor vehicle was impaired by his admitted consumption of intoxicants. *Id.*

Officer Mandernach read plaintiff his preliminary breath test rights and plaintiff consented to the test. *Id.* He registered a .141 BAC, well above the .08 legal limit to operate a vehicle in Michigan. *Id.* Officer Mandernach advised plaintiff that he was under arrest and transported him to the Riverview Police Department. *Id.* In the processing room of the police station, Officer Mandernach, a certified DataMaster operator, read plaintiff his chemical breath test rights. *Id.* Plaintiff consented to the test and registered two results of .12. *Id.* Mr. Hurley was acting as a prosecutor for the City when he authorized a warrant against plaintiff for the offense of Operating While Intoxicated (OWI) relating to the events of September 28, 2008. *Id.* Mr. Hurley represented the People of the City of Riverview at both the evidentiary hearing and State District Court trial on plaintiff's OWI charge.

2011 U.S. Dist. LEXIS 89118, *7

Plaintiff was represented by defense counsel, Bill **[*8]** Colovos, throughout the criminal proceedings. Mr. Colovos filed a motion to dismiss charges for failure of police to observe any illegal driving pattern or specific legal identifiable reason to warrant a stop of defendant and his vehicle on plaintiff's behalf in an effort to challenge the legality of the traffic stop by Officers Mandernach and Thome. *Id.* An evidentiary hearing was held before Judge Randy Kalmbach in the 27th District Court in Wyandotte on May 13, 2009. *Id.* Plaintiff attempted to prove to the court that the stop was pre-textual and illegal in an effort to have the associated OWI charge dismissed. During that hearing, Officer Mandernach testified as to what he observed plaintiff's vehicle doing just before the traffic stop, as described above, and plaintiff's counsel had full opportunity to cross-examine him regarding this testimony. *Id.*

Plaintiff's attorney maintained that Officer Mandernach could not have observed plaintiff's vehicle travel in the path he described. *Id.* He further argued that it was impossible that "Mr. Cameron was making a left hand turn . . . and made a U-turn prior to and struck that curb or rubbed up against the curb . . . and still continued making **[*9]** a left-hand turn and without striking the curb, coming close only . . . ." *Id.* The Court found plaintiff's attorney's argument unpersuasive and ruled that the traffic stop was valid, denying the motion to dismiss. *Id.*

A jury trial commenced on August 26, 2009. The prosecution called Officer Mandernach and Officer Thome to testify regarding the traffic stop, arrest and DataMaster results that was administered to plaintiff on September 28, 2008. *Id.* With regard to plaintiff's traffic violation, Officer Thome testified that he happened to view plaintiff's vehicle "appeared to strike the curb—or the—like a median island at Valleyview, and then it came back onto Sibley Road, almost striking the westernmost curb of Valleyview, and then proceeded westbound on Sibley Road." *Id.* Officer Mandernach testified consistently with the account he gave during the May 13, 2009 evidentiary hearing. *Id.*

Plaintiff testified in his own defense, disputing that he violated any traffic law on the evening in question, specifically disputing the testimony that his back wheel hit the curb of the median, and that there was anything unusual about the turn onto Sibley Road whatsoever. *Id.* Plaintiff also challenged **[*10]** that there was probable cause for his arrest, denying that he failed any of the field sobriety tests, except for reciting the alphabet. *Id.* He claimed that, although he did not volunteer information about his Attention Deficit Disorder and dyslexia to the officers, it affected his ability to perform the field sobriety tests. *Id.* He further alleged that he told officers that he had a sore knee from a thirty-five-year-old injury that affected his ability to perform the tests. *Id.* Plaintiff also challenged the way in which Officer Mandernach administered the DataMaster and the accuracy of the results. *Id.*

Plaintiff called Jonathan Crane, a civil engineering traffic expert, who told the jury that he drove plaintiff's Hyundai through the intersection where Officer Mandernach saw the rear wheel hit the curb of the median. *Id.* He testified that for the rear wheel of the vehicle to hit the curb in the manner that Officer Mandernach described, the front wheel would have had to first make contact. *Id.* Mr. Crane was emphatic that the event that led to plaintiff's traffic stop could not have happened as Officer Mandernach testified that it did. *Id.* Mr. Colovos reiterated this point for the jury **[*11]** during his closing argument at trial:

> An expert that says - an engineering expert that says it's physically impossible of what happened or what the officer says happened. It's absolutely impossible . . . The front tire never hits it, literally impossible and then turn and come back up here without touching any of these curbs.

*Id.* The jury deliberated for twenty-one minutes before finding plaintiff guilty of Operating While Intoxicated. *Id.*

In this case, plaintiff alleges that defendant officers falsified the police report by stating that he had made an "extremely wide turn" and the plaintiff claims that he did not in fact "cross the intersection," "bump the median," or "nearly made a u-turn to get back to Sibley Road." *Id.* at 8-11. Plaintiff claims that in the evidentiary hearing, the defendant-prosecutor Hurley also gave false testimony when he stated that he could imagine a situation in which only the back passenger rear tire could hit the curb. *Id.* at 8. Plaintiff claims that he was not afforded a "full and fair opportunity" to litigate his search and seizure claim at the evidentiary hearing when denied a second hearing to further rebut the evidence of him allegedly striking the curb. **[*12]** *Id.* at 9. In the amended complaint, the plaintiff adds a request of relief, in addition to the compensatory and punitive damages, for the court to reverse his conviction and remand this matter to state court. (Dkt. 25).

## III. ANALYSIS AND CONCLUSIONS

### A. Standard of Review

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *Kocak v. Community Health Partners of Ohio, Inc., 400 F.3d 466, 468 (6th Cir. 2005)*; *Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)*. The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan, 421 F.3d 433, 436 (6th Cir. 2005)*, quoting, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *see also Tucker v. Union of Needletrades Indus. & Textile Employees, 407 F.3d 784, 787 (6th Cir. 2005)*. The court must consider all pleadings, depositions, affidavits, and admissions on **[\*13]** file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Twin City Fire Ins. Co. v. Adkins, 400 F.3d 293, 296 (6th Cir. 2005)*. Under *Federal Rule of Civil Procedure 56*, a party asserting a fact that cannot be or is not genuinely disputed must support that assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declaration, stipulations, admission, interrogatory answers, or other materials; or a showing that the materials cited do not establish the absence or presence of a genuine dispute or that an adverse party cannot produce admissible evidence to support the fact. *Fed.R.Civ.P. 56(c)(1)*.[1]

### B. Favorable Determination Requirement for *§ 1983* Actions

Plaintiff's constitutional claims based on *42 U.S.C. § 1983* of illegal search and seizure, false arrest, and malicious prosecution against any or all of the defendants fails because plaintiff did not achieve favorable termination of the criminal prosecution. *Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010)*. The *Heck v. Humphrey* doctrine is applicable and requires the following:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence **[\*15]** invalid, a *§ 1983* plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Schreiber v. Moe, 596 F.3d 323, 334 (6th Cir. 2010)*, citing, *Heck v. Humphrey, 512 U.S. 477, 484, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994)*. In *Heck,* the Supreme Court stated that actions premised on *§ 1983* require the final adjudication of the criminal proceeding to be decided in the favor of the accused in order to prevent the possibility of contradictory resolutions of a claimant from succeeding in a tort action, yet being convicted in the criminal action. *Heck, 512 U.S. at 484*. Essentially, "a claim of damages bearing that relationship to a conviction or sentence [that] has not been so invalidated is not cognizable under *§ 1983*. *Id. at 487*. The *Heck* doctrine requires that the *§ 1983* action must not be an attempt to invalidate the prior conviction whereby the court must look to the claims raised by the *§ 1983* action and the specific offenses for which the *§ 1983* claimant was convicted, and not to the set of

---

[1] Formerly, "*Rule 56(e)* require[d] that sworn or certified copies of all papers referred to in an affidavit must be attached to or served with that affidavit ... To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of *Rule 56(e)* and the affiant must be a person through whom the exhibits could be admitted into evidence." *Johnson v. Memphis City Schools, 2010 U.S. Dist. LEXIS 47515, 2010 WL 1957267, \*2 (W.D. Tenn. 2010)*, **[\*14]** quoting, 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice & Procedure, § 2722, at 379-80 & 382-84 (1988). According to the Advisory Comments to the recent amendments, this specific requirement was omitted because as unnecessary given the requirement in *subdivision (c)(1)(A)* that a statement or dispute of fact be supported by materials in the record. Comments, 2010 Amendments to *Fed.R.Civ.P. 56, subdivision (c)*. Notably, the language changes have not changed the standard itself. *Id.* ("The standard for granting summary judgment remains unchanged.").

comparable facts between **[\*16]** the *§ 1983* claim and the conviction. *Schreiber, 596 F.3d at 334*, referencing, *Swiecicki v. Delgado, 463 F.3d 489, 493 (6th Cir. 2006)*.

In the instant case, plaintiff fails to establish, through the materials presented to the court that can be used to defend against a motion for summary judgment that the criminal conviction in state court, on which his *§ 1983* claim is premised, has been favorably terminated. In fact, plaintiff appears to have made no attempt to appeal that conviction to the requisite state appellate court at all since the conviction. Therefore, plaintiff's federal constitutional claims of illegal search and seizure, false arrest, and malicious prosecution against the City of Riverview, Michael Hurley, Frank Mandernach, and Eric Thome fail.

C. Probable Cause

Despite the preclusive effect that the prior criminal conviction places on the plaintiff, in addition, plaintiff's allegations of false arrest, malicious prosecution, and illegal search and seizure fail because the police officers had probable cause for the traffic stop and arrest. A police officer has probable cause when "the facts and circumstances known to the officer warrant a prudent man in believing that an offense **[\*17]** had been committed." *Miller v. Sanilac County, 606 F.3d 240, 248 (6th Cir. 2010)*, quoting, *Henry v. United States, 361 U.S. 98, 102, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959)*. Probable cause is a lower evidentiary hurdle than actually proving an alleged offense beyond a reasonable doubt because "probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair, 524 F3d 740, 748 (6th Cir. 2007)*. The existence of probable cause depends on the perception of the officer who is confronted with a set of circumstances from which the officer must reach a conclusion about whether an offense has been committed. Therefore, if an officer has a good faith belief that certain facts exist and would establish an offense, then probable cause exists, regardless of whether there is an ultimate conviction or if it is later determined that the officer was mistaken.

In this case, even if plaintiff's version of the turn in question is accepted, it is still Officer's Mandernach and Thome's good faith belief about what happened that establishes probable cause even if they were mistaken about whether the back tire hit the curb or not. Therefore, plaintiff's false arrest **[\*18]** claim fails under federal law because it requires "a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson, 625 F.3d 294, 305 (6th Cir. 2010)*, quoting, *Voyticky v. Village of Timberlake, Ohio, 412 F.3d 669, 677 (6th Cir. 2005)*. The malicious prosecution claims fails for the same reason. *Sykes, 625 F.3d at 305*. While the illegal search and seizure claim fails because "so long as probable cause exists to justify an automobile search, the constitution permits officers to conduct a search the scope of which is commensurate with the facts supporting the existence of probable cause. *United States v. Taylor, 955 F.Supp. 763, 770 (E.D. Mich. 1997)*. The blood alcohol testing was a reasonable response to the existing probable cause of possible impaired driving during the traffic stop. A claim for illegal search and seizure requires "[(a)] the plaintiff to be deprived of a right secured by the Federal Constitution or laws of the United States, [(b)] the deprivation was caused by a person acting under color of state law, and [(c)] the deprivation occurred without due process of the law" *O'Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir. 1994)*. **[\*19]** The existence of probable cause for the search of the plaintiff during the traffic stop negates these elements.

In accordance with the above reasoning, plaintiff's allegations of false arrest, malicious prosecution, and illegal search and seizure fail because the police officers had probable cause for the traffic stop and arrest; therefore, the allegations against the City of Riverview, Michael Hurley, Dean Workman, Don Ginestet, Frank Mandernach, and Erich Thome fail.

D. False Testimony

Plaintiff finally alleges that the officers gave false testimony during the state trial because it is allegedly impossible for the back tire of the car to hit the curb during the turn at issue. However, even taking the plaintiff's explanation at face value, the officers had no motive to fabricate their testimony nor is their apparent belief that the tire hit the curb inconsistent with their accounts of the traffic stop. Plaintiff's conclusory remarks that the officers have lied, without evidence to show the false character of their remarks, is not enough to survive a motion for summary judgment on this issue against the officers. *Arendale v. City of Memphis, 519 F.3d 587 (6th Cir. 2008)* ("Conclusory assertions,

[*20] supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment."); *Travelodge Hotels, Inc. v. Govan, 155 Fed.Appx. 235, 237 (6th Cir. 2005)* (holding that briefs which are "simply filled with conclusory allegations ... failed to present sufficient evidence" to withstand summary judgment). Moreover, plaintiff also fails to establish in any way the elements required for a claim that the prosecutor's failure to correct allegedly false testimony violated due process rights: (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *Rosencrantz v. Lafler, 568 F.3d 577, 583-84 (6th Cir. 2009)*. Plaintiff has proffered no evidence that the prosecution knew that what the police officer offered at the evidentiary hearing and trial were false, nor actual evidence beyond conclusory statements that the information proffered was false at all. Most significant of all is that the plaintiff was allowed to bring his expert witness during trial and his explanation was fully proffered to the jury who came back with a unanimous conviction after weighing the evidence and making a decision with the plaintiff's explanation of [*21] the turn in mind. Based on the foregoing, the false testimony allegations fails against Frank Mandernach, Eric Thome, Don Ginestet, Dean Workman, Michael Hurley and the City of Riverview must fail.

E. Insufficiency of Proposed Amended Complaint

Although there is no specific mention of claims against Don Ginestet and Dean Workman in both the original and proposed amended complaints, it was most likely the plaintiff's intention that paragraphs 79-92 of the proposed amended complaint apply to these two defendants. (Dkt. 25). However, plaintiff addresses the allegations against Ginestet and Workman in his answers to motion for summary judgment, which can be quickly addressed. (Dkt. 24). Since there was probable cause for the arrest and there is no constitutional violation associated with the traffic stop, therefore, the traffic stop cannot be used to show the acquiescence of these two defendants to a history of constitutional violations. Furthermore, there has been no evidence proffered by plaintiff leading to any indication of a poorly-run training program to combat against such alleged constitutional violations.

Plaintiff's amended complaint does not provide any substantial additions to [*22] the original submitted complaint, and thus does not solve the insufficiency of the plaintiff's evidence beyond conclusory statements in response to the motion for summary judgment. (Dkt. 25). The insufficiency of the evidence currently in the pleadings and the plaintiff's near-total lack of discovery since the agreed-on discovery deadline set during the telephonic scheduling conference on January 12, 2011 makes it hard to believe that an extension of that deadline will provide any additional relevant information in support of the plaintiff's allegations, and therefore, plaintiff's motion to extend discovery and motion to amend the complaint will be denied via separate order. (Dkt. 31).

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that the District Court **GRANT** defendant's motion for summary judgment.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in *Federal Rule of Civil Procedure 72(b)(2)* and *Local Rule 72.1(d)*. Failure to file specific objections constitutes a waiver of any right of appeal. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; [*23] *Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1981)*. Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir. 1991)*; *Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987)*. Pursuant to *Local Rule 72.1(d)(2)*, any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. *Fed.R.Civ.P. 72(b)(2)*, *Local Rule 72.1(d)*. The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

2011 U.S. Dist. LEXIS 89118, *23

Date: July 26, 2011

/s/  **[*24]** Michael Hluchaniuk

Michael Hluchaniuk

United States Magistrate Judge

---

**End of Document**

 Neutral

As of: November 6, 2025 6:36 PM Z

# *Cook v. Boss*

United States Court of Appeals for the Sixth Circuit

January 27, 2025, Filed

File Name: 25a0035n.06

Case No. 24-3350

**Reporter**

2025 U.S. App. LEXIS 1966 *; 2025 LX 276684; 2025 FED App. 0035N (6th Cir.); 2025 WL 304607

JOHN COOK, Plaintiff-Appellant, v. DAVID BOSS, et al., Defendants-Appellees.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

*Cook v. Boss, 2024 U.S. Dist. LEXIS 58816, 2024 WL 1347568 (N.D. Ohio, Mar. 30, 2024)*
*Cook v. Boss, 2024 U.S. Dist. LEXIS 58818 (N.D. Ohio, Mar. 30, 2024)*

## Core Terms

truck, steal, quotation, video, plate, probable cause, handcuffing, arrest, cuff, door, summary judgment, database, pull, seizure, qualified immunity, stair, license, implied consent, district court, nonmoving, theft, criminal activity, paperwork, caselaw, confirm, minute, radio, walk, gun, reasonable suspicion

## Case Summary

**Overview**
**Key Legal Holdings**

- Excluding the untimely submitted expert reports was appropriate because the plaintiff did not provide any excuse for the delay and failed to argue against the exclusion in the opening brief.

- The officers had reasonable suspicion to stop Cook based on the license plate check showing the truck as stolen, and they did not violate the *Fourth Amendment* in conducting the traffic stop and initially handcuffing him.

- Officer Romanin did not use excessive force when handcuffing Cook, as the video evidence showed Romanin acted reasonably in responding to Cook's complaints and adjusting the handcuffs.

- Cook failed to establish an unlawful entry claim based on Officers Boss and Vasas entering his home, as Cook's wife gave implied and then express consent for the officers to enter.

- Cook failed to show any clearly established law making the officers' conduct unconstitutional, so they were entitled to qualified immunity.

- Since there were no underlying constitutional violations by the officers, Cook's failure to intervene and municipal liability claims against the cities also failed.

Justin Marks

**Material Facts**

- Cook's truck was reported stolen a few months earlier, but he recovered it himself without properly reporting it to police for removal from the stolen vehicle database.
- Officer Boss randomly ran Cook's license plate and it came up stolen, so he stopped Cook and handcuffed him at gunpoint.
- Officers verified Cook's ownership by speaking with his wife at their home and seeing paperwork for his construction company.
- Cook complained about losing circulation and feeling in his hands from the handcuffs, and Officer Romanin promptly adjusted them each time.

**Controlling Law**

- *Fourth Amendment* principles for reasonable suspicion, probable cause, and reasonable use of force during a seizure.
- *42 U.S.C.S. § 1983* for civil rights violations by government officials.
- *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)* for municipal liability.
- Qualified immunity doctrine protecting government officials unless they violate clearly established law.

**Court Rationale**

The court agreed with excluding the untimely expert reports because Cook's opening brief did not argue against the exclusion, forfeiting the issue. On the traffic stop, the court found reasonable suspicion based on the license plate showing the truck stolen, and probable cause was met by the inference the driver stole it. The court rejected Cook's arguments that the officers should have known it was his truck. For the handcuffing, the video showed Officer Romanin acted reasonably in adjusting and removing the handcuffs when Cook complained. The court discredited Cook's excessive force allegations contradicted by the video. Cook's wife gave implied consent by opening the door and letting the officers follow her inside while talking, then express consent for the upstairs entry. The court distinguished cases where officers entered without permission. Cook failed to cite controlling precedent clearly establishing the unconstitutionality of the specific actions here, so qualified immunity applied. With no underlying constitutional violations, the other claims against the officers and cities necessarily failed.

**Outcome**
**Procedural Outcome**

The U.S. Court of Appeals for the Sixth Circuit affirmed the district court's grant of summary judgment in favor of the defendant officers and cities.

# LexisNexis® Headnotes

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Penalties

*HN1* **Larceny & Theft, Penalties**

2025 U.S. App. LEXIS 1966, *1

Vehicle theft in Ohio is a felony. *Ohio Rev. Code Ann. § 2913.02 (B)(5)*.

Civil Procedure > Appeals > Appellate Briefs

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN2* **Appeals, Appellate Briefs**

An appellate court treats an argument as forfeited when it was not raised in the opening brief.

Civil Procedure > Judgments > Summary Judgment > Burdens of Proof

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

Civil Procedure > Judgments > Summary Judgment > Entitlement as Matter of Law

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

*HN3* **Summary Judgment, Burdens of Proof**

District courts grant summary judgment when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56 (a)*. Appellate courts review these grants de novo, drawing all reasonable inferences for the nonmoving party. To avoid summary judgment, the nonmoving party cannot rely on mere conjecture or conclusory accusations. There must be significant probative evidence that puts the material facts in doubt.

Evidence > Inferences & Presumptions > Inferences

Evidence > ... > Demonstrative Evidence > Photographs > Visual Formats

*HN4* **Inferences & Presumptions, Inferences**

Though the nonmoving party gets the benefit of the doubt when the parties tell competing stories, courts do not credit factual claims utterly discredited by video evidence in the record like bodycamera footage. If videos show facts so clearly that a reasonable jury could view those facts in only one way, courts will not draw any inferences to the contrary.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

*HN5* **Immunity From Liability, Defenses**

Qualified immunity protects police officers from suits for damages when their acts did not violate clearly established constitutional rights. A plaintiff must show two things to prevail in a *42 U.S.C.S. 1983* suit. First, the plaintiff must

show that the officer violated constitutional rights. Second, the plaintiff must show the conduct was clearly established as unconstitutional at that time.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Torts > Public Entity Liability > Immunities > Qualified Immunity

Civil Rights Law > ... > Immunity From Liability > Local Officials > Individual Capacity

*HN6* **Immunity From Liability, Defenses**

A right is clearly established if every reasonable official would have understood that what the official is doing violates that right. Then-existing caselaw must put the officer's actions beyond the pale. Qualified immunity gives police officers breathing room for reasonable but mistaken judgments about open legal questions. Only the plainly incompetent or those who knowingly violate the law cannot claim the doctrine's protection.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN7* **Search & Seizure, Scope of Protection**

Traffic stops are seizures under the *U.S. Const. AMEND. 4*, so they must be reasonable. Brief investigative stops are reasonable when an officer has reasonable suspicion that criminal activity is occurring.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

*HN8* **Search & Seizure, Probable Cause**

To make an arrest without a warrant, an officer must have probable cause.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN9* **Search & Seizure, Scope of Protection**

Police may conduct Terry stops when they have a particularized and objective basis for suspecting the particular person stopped of criminal activity. During the stop, officers can only use means reasonably related to the basis for the stop. If the manner and length of the stop exceed that scope, the stop ripens into an arrest.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Probable Cause

*HN10* **Search & Seizure, Probable Cause**

Probable cause is what entitles an officer to stop a person and arrest him without a warrant. To have probable cause, the officer must perceive facts that would make a reasonable person suspect a probability or substantial chance of criminal activity.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN11* **Search & Seizure, Scope of Protection**

Ordering a person out of a car at gunpoint, briefly handcuffing him, and frisking him do not automatically make the stop an arrest if these actions are tailored to the needs of the circumstances, including the possible threat to officer safety and the severity of the suspected crime.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

Torts > Public Entity Liability > Excessive Force

*HN12* **Law Enforcement Officials, Excessive Force**

A claim that law-enforcement officers used excessive force to effect a seizure is governed by the *Fourth Amendment's* reasonableness standard.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Excessive Force

*HN13* **Law Enforcement Officials, Excessive Force**

To see whether officers acted reasonably in handcuffing a person, courts ask whether (1) the person complained of tightness or pain, (2) the officer ignored the complaints, and (3) the person suffered an injury from the handcuffs.

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN14* **Complaints, Requirements for Complaint**

If a complaint fails to make a claim, the plaintiff generally cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint. The court cannot generate claims either, constructively amending the complaint for the plaintiff.

Constitutional Law > ... > Fundamental Rights > Search & Seizure > Scope of Protection

*HN15* **Search & Seizure, Scope of Protection**

The *U.S. Const. AMEND. 4* generally bars warrantless entries of a person's home, but police can enter if someone validly consents to the entry. Either express or implied consent will work. A person can give consent in so many words but can also consent with gestures or conduct. Although a man's home is his castle, trumpets need not herald an invitation.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

Evidence > Burdens of Proof > Allocation

2025 U.S. App. LEXIS 1966, *1

Governments > Courts > Judicial Precedent

*HN16* **Immunity From Liability, Defenses**

A plaintiff seeking to overcome qualified immunity has the burden to prove that then-existing precedent put the constitutionality of an officer's conduct beyond debate. That requires on-point, in-circuit authority or an unmistakable consensus of persuasive caselaw that every reasonable officer would know prohibited the conduct.

Civil Rights Law > Protection of Rights > Immunity From Liability > Defenses

*HN17* **Immunity From Liability, Defenses**

Overcoming qualified immunity requires plaintiffs to point to precedent finding a *U.S. Const. AMEND. 4* violation in similar circumstances. Courts must define the right specifically, at a low level of generality.

**Counsel:** For JOHN COOK, Plaintiff - Appellant: Gary Cook, Gary Cook Attorney at Law, Shaker Heights, OH.

For DAVID BOSS, KELLY VASAS, JONATHON ROMANIN, JUSTIN BLATNICK, CITY OF LYNDHURST, OH, Defendant - Appellee: Jillian Leora Dinehart, Marshall Dennehey Warner Coleman & Goggin, Cleveland, OH.

For CITY OF CLEVELAND, OH, Defendant - Appellee: Michael Pike, William M. Menzalora, City of Cleveland, Cleveland, OH.

**Judges:** Before: THAPAR, NALBANDIAN, and RITZ, Circuit Judges.

**Opinion by:** NALBANDIAN

# Opinion

NALBANDIAN, Circuit Judge. Officer David Boss ran a random license plate check on John Cook's truck as he was driving it through Lyndhurst, Ohio. The police database listed it as stolen. So Boss pulled the truck over and handcuffed Cook. Only then did Boss learn that the truck was Cook's. It had been stolen from Cook in Cleveland a few months before, but he recovered it on his own. Cook never had a "call-off" report filed with police, though, so no one had removed the "stolen" tag in the database.

Cook sued Boss, other officers, and the cities of Lyndhurst and Cleveland for civil rights violations. The district court granted summary judgment **[*2]** for all defendants. Because we find that the officers acted lawfully, we affirm.

I.

John Cook made a career of public service. He served in the Army, the Cleveland Fire Department, and the Ohio Department of Rehabilitation and Corrections. And when not working for the government, he served his community in other ways, like working at a home for troubled youth and as a gun instructor at his local range. In the years before this case, Cook went full time as a construction contractor and had his own company, Jaden Construction Group. He also joined Midwest Medical Transport on the side as a medic.

In April 2020, someone stole one of Jaden Construction Group's trucks, a Dodge Ram 3500. Cook reported the theft to Cleveland police and a detective began investigating. But a few days later, Cook found the truck on his own and took it back.

What happened next is unclear. Cook claims that he received a call from the detective and let the detective know he'd gotten the truck back. Cook also claims that the detective was suspicious about Cook doing his own police

work, so when the conversation became heated, Cook hung up. In contrast, the detective states that Cook called him and left a voicemail **[*3]** explaining the recovery. The detective insists that he tried to call Cook back a few times, but never reached him and couldn't leave a return message because Cook's voicemail was full. But on either account, the upshot is clear—Cook didn't follow through and complete the proper procedures for the police to delist his truck from their stolen vehicle database.

Cleveland police have a vehicle recovery protocol. Under the department's General Police Order 6.2.13, before a recovered vehicle comes off the "stolen" list, law enforcement must personally inspect it for evidence that could help with their investigation, like missing parts or plates, vehicle damage, tampering with the vehicle identification number (VIN), and the like. After the inspection, officers must submit a report to the police intake unit. Only then do they remove a stolen vehicle entry from the database. (Order 6.2.13 even notes that when owners take back vehicles at the scene of recovery, officers must warn them that "they are subject to being stopped" until someone processes the report. R. 39-2, Bellanca Decl., p.16, PageID 511.) Without following these procedures, police would struggle to confirm that the legal owner **[*4]** had recovered a missing vehicle. Anyone—including the thief—could call in to say they had "recovered" the vehicle and wave off the investigation.

Cook didn't bring his truck in for inspection. On his account of the call with the detective, Cook felt that the detective was "a little short" with him after Cook relayed how he got his truck back, so Cook ended the call. R. 42-1, Cook Dep. v1, p.116, PageID 1368. He testified: "I just told him that my stuff had been returned and I no longer needed police assistance and that was it for me with the conversation." *Id.* He then disconnected his head set without the detective informing him of the recovery protocol. The detective claims that he tried again to get in touch with Cook, but with no success. The city prosecutor eventually closed the case, citing the uncooperative nature of the victim.

As a result, the truck remained listed as "stolen" in the database. And that's all Officer Boss saw when he checked its license plate while on patrol one night.

Vehicle theft in Ohio is a felony. *Ohio Rev. Code § 2913.02(B)(5)*. So Officer Boss, thinking he'd just found a felon, pulled Cook over as Cook pulled up to his home in Lyndhurst (near Cleveland) around 1:00 AM on July 30. Boss **[*5]** called for backup, and Officer Jonathan Romanin arrived on the scene. They turned on their body cameras and ordered Cook out of the truck at gunpoint.

Cook complied. He stepped out of the truck, walked slowly toward the officers, knelt in the road, and raised his hands. Officer Romanin then handcuffed him. After cuffing Cook's right hand and moving it toward his back, Romanin realized that the arm didn't move well and asked him: "This arm doesn't go back any further?" Romanin Video 2:31. Cook explained that he had a rotator cuff issue. *Id.* at 2:33. So Romanin pulled out another set of cuffs and linked the ends of the two pairs together, essentially forming one set of cuffs double the normal length, so that Cook's arms weren't drawn behind him so tightly. *Id.* at 2:47. Romanin and Cook then walked over to the police cars.

Romanin searched Cook's pockets while Cook tried to clarify the situation. He told the officers that the truck was his, that it wasn't stolen anymore, and that they were standing in front of his house, which had paperwork proving his ownership. After the search, Romanin opened the backseat door of his cruiser, and Cook—who is a tall, broad man—stated: "Oh, I ain't gonna **[*6]** be able to get back there," referencing a knee surgery he'd had. *Id.* at 5:47. So Romanin told him to simply lean back on the edge of the open car, still standing on the street. *Id.* at 5:49. Officer Boss, meanwhile, radioed back to headquarters to let them know that he may have stopped the legal owner of the truck and that he planned to confirm Cook's identification and, if it checked out, let him go.

By that time, two other Lyndhurst officers—Kelly Vasas[1] and Justin Blatnick—had arrived. The four officers then split up. Boss and Vasas went up to Cook's house, while Romanin and Blatnick stood with Cook at the police cars.

---

[1] Her name was Kelly Vasas at the time of the stop in July 2020, so that's what we'll call her here. She has since married and changed her name.

2025 U.S. App. LEXIS 1966, *6

Boss and Vasas walked up Cook's driveway, noticing on the way another car with vanity plates for "Jaden," Cook's construction company. Then they rang the doorbell and Cook's wife, Tonya McDade, answered. She told them that his truck had been stolen and recovered. Boss asked: "Do you have anything that shows that he owns it, any paperwork?" Boss Video 9:28. She replied that she was "trying to find it now." *Id.* at 9:30. At that point, McDade turned back into the house, leaving the door open. *Id.* Officer Boss took a step forward, though remaining outside, and reiterated **[*7]** that he was trying to confirm the truck's ownership to release Cook. *Id.* McDade kept speaking as she walked away, though her exact words are inaudible on the video, and she went up the stairs to the second floor. *Id.* at 9:32.

A few moments later, Boss took two steps into the foyer and called up the stairs: "What's the name of his company?" *Id.* at 9:54; Vasas Video 8:00. She shouted back that it was Jaden Construction. Boss Video 9:58. Boss stood there for about a minute, waiting, and then asked headquarters over the radio for the truck's registration. They radioed back that it was registered to Jaden Construction. Then, before McDade came back with paperwork, Boss turned around to Vasas and ordered Cook's release. Boss pointed to the car in the driveway: "I mean, it says 'Jaden' right there on the frickin' plate." *Id.* at 11:19. He radioed Officers Romanin and Blatnick to let Cook go, telling them that "it's gonna check okay." *Id.* at 11:28.

After another few seconds, Officer Boss stepped back in and called up the staircase to McDade, asking if she'd found paperwork and requesting permission to go up the stairs. *Id.* at 11:44; Vasas Video 9:50. She hollered back: "Yes, I don't care." Boss **[*8]** Video 11:50. Boss and Vasas then walked up the stairs into the bedroom, where she handed them company checks for Jaden Construction. *Id.* at 11:52. Boss told her that the checks confirmed Cook's story, explained once again that the truck came up as stolen in the database, and apologized multiple times for having detained him. *Id.* at 12:08. The officers then left the house. From the time McDade answered the door to when the officers left, about three and a half minutes passed.

Now rewind a bit. While Officers Romanin and Blatnick stood with Cook by the police cars, Cook asked to readjust the handcuffs twice. He brought it up the first time about a minute after the officers had him lean back against their car, stating that he was "losing circulation in [his] hand." Romanin Video 6:45. Romanin had his hands full searching Cook's wallet but acknowledged the statement right away. *Id.* at 6:47. He put the wallet back together, and then put it down. *Id.* He pulled on a pair of latex gloves, had Cook turn around, took off the offending cuff, and rearranged it. *Id.* at 7:00. The time that elapsed from Cook's comment to Romanin beginning to remove the cuff was just over thirty seconds.

The second **[*9]** request came a few minutes later. After Cook and the officers made some small talk, Cook mentioned again that the cuffs were bothering him. He told them that he "broke [his] thumb on the job" and that he was "losing feeling in it." *Id.* at 11:50. At the same time as he spoke, the radio call came in from Officer Boss to let Cook go. So Romanin immediately began taking the cuffs off. In twenty seconds, Cook had one hand free, and in another twenty seconds he had both free.

With things cleared up, Cook got back in his truck. The officers apologized for having to pull him over, thanked him for his cooperation, and told him to call Cleveland police again to have his truck removed from the database. Then they left. And as it turned out, Cook didn't even need to contact Cleveland police because they removed the truck from the database on their own that night after Lyndhurst dispatch called them.

Cook later sued the four Lyndhurst officers with *Fourth Amendment* claims under *42 U.S.C. § 1983*. He claimed that they wrongfully stopped him, used excessive force in handcuffing him, and unlawfully entered his home without consent. He also sued the cities of Lyndhurst and Cleveland for *Monell* violations. *See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. The district court granted **[*10]** summary judgment for the defendants based on qualified immunity. Cook appealed.

During the litigation, Cook tried to secure expert reports on the use of force, medical care, and economic damages, but repeatedly failed to meet his court-ordered deadlines. When he designated his experts and submitted the reports late, the district court found no good cause for the delay and excluded them as untimely. Cook appealed that ruling too.

**II**.

We first consider the expert reports. Cook submitted his expert reports well past the court's deadlines and provided no excuse, so the district court barred them. But while Cook has nominally appealed the exclusion, his opening brief makes no argument on why we should reverse. The brief makes a passing reference to the expert reports in the statements of jurisdiction and issues, but beyond that? Crickets. The argument section never speaks to it. Cook does not explain his delay, identify the relevant legal standard, apply any law to any facts, or spell out why we should reverse. He has thus forfeited the matter. *See Golden v. Comm'r, 548 F.3d 487, 493 (6th Cir. 2008)*.

Cook develops an argument in his reply brief. But that is "one brief too late." *Island Creek Coal Co. v. Wilkerson, 910 F.3d 254, 256 (6th Cir. 2018)*. Saving one's arguments for the reply brief unfairly deprives **[*11]** the opposing parties of the chance to respond. "Time, time, and time again, we have reminded litigants that we will treat an argument as forfeited when it was not raised in the opening brief." *Id.* (internal quotation marks omitted). So we decline to disturb the district court's ruling.

**III**.

We now consider summary judgment. District courts grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. We review these grants de novo, drawing all reasonable inferences for the nonmoving party. *Walden v. Gen. Elec. Int'l, Inc., 119 F.4th 1049, 1056 (6th Cir. 2024)*. But to avoid summary judgment, the nonmoving party cannot rely on mere "[c]onjecture" or "conclusory accusations." *Id.* (internal quotation marks omitted). There must be "significant probative evidence" that puts the material facts in doubt. *Green Genie, Inc. v. City of Detroit, 63 F.4th 521, 526 (6th Cir. 2023)* (internal quotation marks omitted).

Though the nonmovant gets the benefit of the doubt when the parties tell competing stories, we do not credit factual claims "utterly discredited" by video evidence in the record like bodycamera footage. *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)*. We have such evidence here. So if the videos "show facts so clearly that a reasonable jury could view those facts in only one way," we won't draw **[*12]** any inferences to the contrary. *Latits v. Phillips, 878 F.3d 541, 547 (6th Cir. 2017)*.

**IV**.

Qualified immunity protects police officers from suits for damages when their acts did not violate clearly established constitutional rights. *Crawford v. Tilley, 15 F.4th 752, 760 (6th Cir. 2021)*. So a plaintiff must show two things to prevail in a *§ 1983* suit. First, he must show that the officer violated his constitutional rights. And second, he must show the conduct was clearly established as unconstitutional as that time. *Id.*

We treat a right as clearly established if "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna, 577 U.S. 7, 11, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015)* (internal quotation marks omitted). Then-existing caselaw must put the officer's actions beyond the pale. *Id. at 11-13*. Qualified immunity thus gives police officers "breathing room" for "reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)*. Only the "plainly incompetent or those who knowingly violate the law" cannot claim the doctrine's protection. *Id.* (internal quotation marks omitted); *see also Smith v. City of Wyoming, 821 F.3d 697, 708 (6th Cir. 2016)*.

No. 24-3350, *Cook v. Boss*

**A**.

2025 U.S. App. LEXIS 1966, *12

Cook first claims that Officer Boss unlawfully pulled him over and arrested him. Traffic stops like this one are "seizures" under the *Fourth Amendment*, so they must be reasonable. *Navarette v. California, 572 U.S. 393, 396-97, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014)*. Under *Terry v. Ohio*, "brief investigative stops" are reasonable when an **[*13]** officer has "reasonable suspicion" that criminal activity is occurring. *Id.* (internal quotation marks omitted); *see Terry v. Ohio, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*. To make an arrest, though (assuming the officer has no warrant), an officer must have something more—"probable cause." *Navarette, 572 U.S. at 397*; *District of Columbia v. Wesby, 583 U.S. 48, 56, 138 S. Ct. 577, 199 L. Ed. 2d 453 (2018)*.

First, reasonable suspicion. Police may conduct *Terry* stops when they have a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette, 572 U.S. at 396* (internal quotation marks omitted); *see Terry, 392 U.S. at 21-22*. During the stop, officers can only use means "reasonably related" to the basis for the stop. *Brown v. Lewis, 779 F.3d 401, 412 (6th Cir. 2015)* (internal quotation marks omitted). If the manner and length of the stop exceed that scope, the stop "ripens into an arrest." *Id.*

Next, probable cause. "Probable cause" is what entitles an officer to stop a person and arrest him without a warrant. *Wesby, 583 U.S. at 56*. To have probable cause, the officer must perceive facts that would make a reasonable person suspect a "probability or substantial chance of criminal activity." *United States v. Moncivais, 401 F.3d 751, 756 (6th Cir. 2005)* (internal quotation marks omitted); *see Barton v. Martin, 949 F.3d 938, 950 (6th Cir. 2020)*.

At a minimum, Officer Boss had reasonable suspicion to stop Cook. On a random license plate check, the truck turned up as "stolen" in Officer Boss's police database. And auto theft is a felony. *Ohio Rev. Code § 2913.02(B)(5)*. **[*14]** So putting two and two together, Boss concluded—as any reasonable person would—that the driver might have committed a felony. That conclusion was no "mere hunch." *Navarette, 572 U.S. at 397* (internal quotation marks omitted). The truck's entry in the database gave Boss a "particularized and objective basis" for doing what he did. *Id. at 396* (internal quotation marks omitted); *see United States v. Sandridge, 385 F.3d 1032, 1036 (6th Cir. 2004)* (officer had reasonable suspicion to stop car after license plate check reported that driver did not have valid license); *cf. United States v. Henley, 469 U.S. 221, 230-31 (1985)* (officers may rely on properly issued flyers or bulletins from other law enforcement sources and jurisdictions). Even Cook thinks so. He testified that if the truck "was listed as stolen, [he] could have been pulled over." R. 42-2, Cook Dep. v2, p.24, PageID 1481. We agree.

We doubt that Cook's temporary detention ripened into arrest, so we doubt that the officers needed probable cause. Ordering a person out of a car at gunpoint, briefly handcuffing him, and frisking him do not automatically make the stop an arrest if these actions are tailored to the needs of the circumstances, including the possible threat to officer safety and the severity of the suspected crime. *Brown, 779 F.3d at 415*. The officers reasonably suspected Cook of felony **[*15]** auto theft during a traffic stop in the middle of the night. And auto thieves sometimes carry guns, presenting a possible threat to law enforcement. *See, e.g., State v. Lipkins, No. L-21-1046, 2021 Ohio 4343, 2021 WL 5861270, at *1 (Ohio Ct. App. Dec. 10, 2021)* (thief stole car from dealership with a gun and drove off); *State v. Drane, No. 28757, 2021 Ohio 730, 2021 WL 942921, at *1-3 (Ohio Ct. App. Mar. 12, 2021)* (thieves stole car and drove around at 2:00 AM shooting bystanders before crashing into someone's garage). So the officers had reason to have their guns at the ready until Cook was handcuffed and they realized he was unarmed (at which point they holstered their guns). *See Wright v. City of Euclid, 962 F.3d 852, 865 (6th Cir. 2020)* (officer may conduct *Terry* stop with gun drawn if he "reasonably fears for his safety"). And the officers had reason to handcuff Cook until they verified that he owned the truck (at which point they removed the cuffs). *See United States v. Jacob, 377 F.3d 573, 578-80 (6th Cir. 2004)* (officers' ordering drug trafficking suspect out of car at gunpoint, handcuffing him, and putting him in police car for about fifteen minutes was reasonable and did not ripen into an arrest "while the officers pursued their investigation in an attempt to confirm or dispel their suspicions").

But even if the officers' actions were an arrest, albeit a brief one, they had probable cause. Until they verified Cook's story, they had it on good authority that he was driving a stolen vehicle. **[*16]** A natural inference is that the driver of a stolen vehicle may have stolen the vehicle. There was a "substantial chance" that was true—enough to support probable cause. *Moncivais, 401 F.3d at 756* (internal quotation marks omitted); *see United States v. Conley, No. 21-1723, 2023 U.S. App. LEXIS 856, 2023 WL 165966, at *3-4 (6th Cir. Jan. 12, 2023)* (officer had probable cause

to make arrest after database check showed that driver lacked insurance or license). So on any theory, Cook's unlawful stop claim fails.

Cook tries to avoid this conclusion by questioning Officer Boss's basis for thinking that the truck was stolen. First, Cook stresses that he'd gotten new license plates after he recovered the truck, arguing that Boss couldn't have run a plate check of the old (stolen) ones that the truck no longer displayed. But even if Cook obtained and registered new *plates* with the Ohio Bureau of Motor Vehicles, the new plates still would have been tied to the same *vehicle*, which Ohio tracks or tags with other means, like the VIN. *See* R. 53-1, Ohio BMV Replacement Plate Form, p.2, PageID 1806 (requesting vehicle plate number, year, make, model, serial number, certificate of title number, and other information). So Cook's argument goes nowhere.

Second, he turns to arguing that Boss couldn't see the truck's VIN while driving. True **[*17]** enough, but no one thinks that's what happened. Boss didn't testify that he observed or checked a VIN. He testified that he put the license plate number into his database and that the vehicle came up stolen. And Cook admitted as much in his deposition. After listening to police dispatch calls made during the stop in which the dispatch officer confirmed that the truck was tagged as stolen, Cook was asked if he had "any reason to dispute that [police] pulled [him] over because [his] vehicle was listed as stolen." R. 42-2, Cook Dep. v2, p. 35, Page ID 1492. He answered "No." *Id.* Cook has put forth no evidence contradicting Boss's testimony or the dispatch call, or putting it in any doubt. His speculation that Boss couldn't have suspected that the truck was stolen is just that—speculation. That's not enough to defeat summary judgment. *See Walden, 119 F.4th at 1056.*

Finally, Cook claims that the officers knew him from prior meetings with Lyndhurst police, and that they should have known that the truck belonged to his construction company. But he appears to conflate other Lyndhurst officers he knew with Officer Boss, whom he did not know. In his deposition, Cook discussed a series of interactions with a Lieutenant **[*18]** Dubois and another officer that took place sometime before the truck theft; the officers asked Cook not to park a construction truck in his residential neighborhood. But Cook never asserted that he knew *Officer Boss*. And when asked if he'd ever met Boss, Cook answered "No." R. 42-1, Cook Dep. v1, p.155, PageID 1407. Officer Boss was the one who pulled him over, so Officer Boss's prior (non)relationship with Cook is the only one that would matter. Since nothing in the record even hints that Officer Boss knew Cook, Cook's argument falls flat.

We sympathize with Cook's plight. He testified that he "was in fear of [his] life," *id.*, and in his position, who wouldn't be? Cook had done nothing wrong and yet found himself with red and blue lights flashing as the police ordered him onto his knees in the street at gunpoint in the middle of the night. But the law looks at the officers' perspective, not Cook's. *See Baynes v. Cleland, 799 F.3d 600, 607-08 (6th Cir. 2015).* And it asks what they knew *at the time. Id.* Not what they found out later on. At the time of the stop, the officers had only two pieces of information—a certain Dodge Ram 3500 was identified as stolen, and that same Dodge Ram 3500 sat right in front of them. (And keep in mind that, **[*19]** if anything, Cook helped create the whole mishap by not bringing his recovered truck in for police to inspect.) Had the real thief been driving the truck, Cook would have wanted the officers to do exactly what they did.

The traffic stop did not violate the *Fourth Amendment*.


**B**.

Cook next claims that the officers used excessive force in handcuffing him.[2] "A claim that law-enforcement officers used excessive force to effect a seizure is governed by the *Fourth Amendment's* 'reasonableness' standard." *Plumhoff v. Rickard, 572 U.S. 765, 774, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014).* To see whether officers acted reasonably in handcuffing a person, we ask whether (1) the person complained of tightness or pain, (2) the officer

---

[2] Cook cites the fact that the officers had guns drawn in his excessive-force claim, too. For the reasons already discussed, the officers acted reasonably in having their guns drawn for a felony auto theft stop.

ignored the complaints, and (3) the person suffered an injury from the handcuffs. *Hughey v. Easlick, 3 F.4th 283, 289 (6th Cir. 2021)*.

Officer Romanin acted reasonably and did not use excessive force. When he first handcuffed Cook, he used two sets of attached cuffs, effectively creating one set of double-length cuffs that wouldn't pull Cook's arms so far back, giving him more freedom of movement. Later on, when Cook complained of pain from the handcuffs, each time Romanin responded in thirty seconds or less. At the first request, Romanin was in the middle of searching Cook's wallet. As the video shows, the officer took some thirty-odd **[*20]** seconds to put the wallet back together, put it away, and pull on gloves before adjusting the cuffs. At the second request, about five minutes later, the video shows that Romanin began working on the cuffs immediately and removed them altogether.[3] So at no time did Romanin "ignore[]" Cook's requests or give a "dismissive response." *Hughey, 3 F.4th at 289*; *Baynes, 799 F.3d at 609*.

Cook tries to sidestep the video with dramatic claims about the officers' conduct. In boilerplate fashion, he alleges that the officers "improperly, violently, excessively, and unnecessarily handcuffed" him, that they "failed and/or refused to respond and/or aid" him, and that their acts "were malicious and/or characterized by hatred, ill will and/or a spirit of revenge." Appellant Br. at 10-11; R. 1-2, Am. Compl., p.6-10, PageID 18-23. But the body-camera footage is clear as can be. There is no "he said, she said" for a factfinder to resolve. Officer Romanin was polite and professional, even friendly, and acted diligently to relieve Cook's discomfort. He repeatedly accommodated Cook when Cook mentioned his bad rotator cuff, knee surgery, and broken thumb. Because Cook's allegations are "blatantly contradicted" and "utterly discredited" by the video evidence, **[*21]** his excessive-force claim fails as a matter of law. *Scott, 550 U.S. at 380*.

The handcuffing did not violate the *Fourth Amendment*.


**C**.

Cook's third claim concerns the home entry. Or does it? Though his briefing discusses this "claim," we see nothing in his Amended Complaint asserting it or spelling out facts that would support it. While the Amended Complaint makes claims for an "unlawful and unconstitutional stop" and "excessive force," and alleges facts that, if true, could sustain these claims, nowhere does it allege that Officers Boss and Vasas unlawfully entered or searched his home.[4] R. 1-2, Am. Compl., p.5-12, PageID 18-25. And as far as facts go, Cook only states that the officers "escorted the Plaintiff's wife into the Plaintiff's home," where she "substantiated ownership of the Vehicle." *Id.* at p.7, PageID 20. That's it. Nothing about trespass, nonconsent, duress, or the like—no hint of alleged impropriety or any violation of the law.

Yes, Cook asserts a claim and spells out more facts in support in his briefs. But if a complaint fails to make a claim, the plaintiff generally "cannot cure the deficiency by inserting the missing allegations in a document that is not either a complaint or an amendment to a complaint." **[*22]** *Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 484 (6th Cir. 2020)* (internal quotation marks omitted). And the court can't generate claims either, constructively amending

---

[3] Officer Romanin's friendly and courteous conduct went well beyond the minimum the law required of him. While officers must handcuff suspects in a reasonable manner, and cannot ignore cries of pain, they need not drop everything right away, say, if they are securing a scene or addressing an active threat. (Nor must they remove cuffs entirely; they did so here only once Cook's story checked out.) Handcuffing is inherently uncomfortable. And sometimes "embarrassing." *Tarter v. Metro. Nashville Airport Auth., No. 22-5421, 2023 U.S. App. LEXIS 21765, 2023 WL 5322418, at *8 (6th Cir. Aug. 18, 2023)*. But it's a fact of life in police work. Here, the scene was secure, Cook was unarmed and cooperative, and, as the officers began to realize, he'd done nothing wrong. In a different case with different facts, "reasonable" measures might be different ones.

[4] To be sure, the Amended Complaint uses the word "search" when stating *Fourth Amendment* claims. But those passages refer to the search of Cook's person, out on the street, not to the separate home search. *See* R. 1-2, Am. Compl., p.7, PageID 20 ("The Defendants engaged in . . . [the] unconstitutional stop, search, seizure, detention, securing, and/or arrest of the Plaintiff.").

the complaint for the plaintiff. *See Brown v. Matauszak, 415 F. App'x 608, 613 (6th Cir. 2011)*. So it's not clear where Cook gets his unlawful entry "claim" from.

In any event, Cook fails on the merits. He has not carried his burden to overcome qualified immunity. First, he has established no rights violation. And second, he has done next to nothing—cited no caselaw, discussed no specifically defined rights—to show that what the officers did violated clearly established law.

The *Fourth Amendment* generally bars warrantless entries of a person's home, but police can enter if someone validly consents to the entry. *Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990)* (citing *Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)*). Either express or implied consent will work. *United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004)* (en banc). A person can give consent in so many words but can also consent with gestures or conduct. *Id.; see also United States v. Bowser, 505 F. App'x 522, 524-26 (6th Cir. 2012)* (finding implied consent via gestures even when officers did not expressly ask to search). "Although a man's home is his castle, trumpets need not herald an invitation." *Carter, 378 F.3d at 589*.

McDade first gave implied consent, and then gave express consent. Boss and Vasas rang the doorbell, and she opened the door. Boss and McDade spoke about finding paperwork for the truck. Then McDade stated that **[*23]** she was in the middle of looking for it, turned and walked back into the house with the door still open, and kept talking. She ascended the stairs, located just inside the open front door. After a few moments, Boss took two steps over the doorway to call another question up to her. And she answered. So by opening the door, speaking with Boss, and then heading back inside while still carrying on the conversation, McDade impliedly permitted Boss to continue the conversation and remain within earshot, even if that meant stepping through the open door to hear her from the bottom of the stairs. *See Bowser, 505 F. App'x at 524-26* (after speaking with officers, suspect gave implied consent to search his cooler by pushing it in their direction, even though they hadn't asked to search it); *Smith, 821 F.3d at 711-12* (finding that a child gave "objective indications" of consent to home entry by waiting for officers and opening door for them, even though she later claimed that she did not invite them in); *see also United States v. Reynolds, 646 F.3d 63, 73 (1st Cir. 2011)* (suspect gave implied consent to search bed by gesturing toward it even though officers hadn't asked to search it). Other circuits have let officials do more with even less. *See Gerald M. v. Conneely, 858 F.2d 378, 384-85 (7th Cir. 1988)* (homeowner gave officer implied consent to enter her home, **[*24]** even after she told him at the door "wait here," because she did not object to his following her into the home and she warned him to watch out for the puppy in the kitchen); *Artes-Roy v. City of Aspen, 31 F.3d 958, 960-62 (10th Cir. 1994)* (no *Fourth Amendment* violation when city building inspector and a police officer took a few steps inside the door to speak with construction workers, though homeowner wasn't there).

At that point, Boss briefly stepped back outside and spoke over the radio with Officer Romanin. He then stepped back into the entryway and called upstairs again to McDade to ask if she'd found the papers. And he asked for permission to go up the stairs. She shouted back that he could. And so he did. Because he had McDade's "voluntary, unequivocal, [and] specific" consent, this further entry satisfied the *Fourth Amendment*. *Bowser, 505 F. App'x at 525* (internal quotation marks omitted).

This case is not like *Smith v. City of Wyoming*, where a homeowner and her friend opened the door to police but repeatedly declined to speak with them before the police barged in. *821 F.3d at 710*. Nor is this a case like *United States v. Little*, where an officer accompanied a suspect into his house all the way to the bedroom and watched him get dressed, without ever asking. *431 F. App'x 417, 419-20 (6th Cir. 2011)*. Boss spoke with McDade at the door and both wanted to find paperwork to clear **[*25]** Cook as soon as possible. They spoke, and as she moved up the stairs, he stayed at the entryway but within earshot. Then, before he pressed any further into the house or up the stairs, he asked for and received express permission. Boss's actions were reasonable, and thus lawful under the *Fourth Amendment*.

Even if one finds the rights-violation question a close one, Cook has failed to show that any right was clearly established. It's his burden to prove that "then-existing precedent" put the constitutionality of Boss's conduct "beyond debate." *Wesby, 583 U.S. at 62-63* (internal quotation marks omitted). That requires on-point, in-circuit

authority or an unmistakable consensus of persuasive caselaw that every reasonable officer would know prohibited his conduct. *Id.*

Cook gives us nothing close to that. His brief cites a few cases for basic propositions of law (like "an officer may not enter a home absent a warrant or an exception to the warrant requirement" or that consent is one of those exceptions). And he then applies those rules to the facts of his case as follows: "In the instant matter, the Appellant clearly and unequivocally had a privacy right and Appellees [] clearly and unequivocally unconstitutionally invaded his **[\*26]** home." Appellant Br. at 42. That's it. No specific caselaw. No engagement with specific facts or circumstances. But overcoming qualified immunity requires much more than that. *See Ashford v. Raby, 951 F.3d 798, 801 (6th Cir. 2020)* (plaintiffs must "point to precedent finding a *Fourth Amendment* violation in similar circumstances"); *Wesby, 583 U.S. at 64* (stressing that we must define the right specifically, at a low level of generality). Cook cites no case with similar facts,[5] and we know of none, that would clearly establish Boss's conduct as unconstitutional.

**D**.

Cook also charges the officers with failing to intervene in each other's constitutional violations. Plaintiffs can do that under *§ 1983*, *see Chaney-Snell v. Young, 98 F.4th 699, 721-22 (6th Cir. 2024)*, but there must be an actual constitutional violation first. As discussed above, there were none. So the district court properly granted summary judgment.

**V**.

Finally, Cook seeks to hold the cities of Cleveland and Lyndhurst liable for their officers' constitutional violations. *See Monell, 436 U.S. 658*. But again, there must first be a constitutional violation. *Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014)*. Since we find none, this claim fails too. And that's even putting aside the fact that Cook hasn't identified any Cleveland officers involved here—Officers Boss, Vasas, Romanin, and Blatnick were Lyndhurst employees.

**VI**.

Cook has no evidence, let **[\*27]** alone "significant probative evidence," putting what happened here in any real doubt. *Green Genie, 63 F.4th at 526* (internal quotation marks omitted). We affirm summary judgment for the defendants.

---

**End of Document**

---

[5] The reply brief improves on the opening brief—it cites one case with superficially similar facts, in that certain officers spoke with a suspect at his door before entering. Reply Br. at 8 (citing *Cummings v. City of Akron, 418 F.3d 676 (6th Cir. 2005)*). Its facts have little bearing here, though, because the *Cummings* homeowner expressly denied an officer's request to enter his home, after which the officer stuck his foot in the door to prevent it from closing and then pushed his way in. *Cummings, 418 F.3d at 679*. None of that happened with Boss and McDade.

 Neutral
As of: November 6, 2025 6:45 PM Z

# *Laning v. Doyle*

 **At Risk**

United States District Court for the Southern District of Ohio, Western Division

February 18, 2015, Decided; February 18, 2015, Filed

Case No. 3:14-cv-24

**Reporter**

2015 U.S. Dist. LEXIS 19424 *; 2015 WL 710427

MARCIA L. LANING, et al., Plaintiffs, v. BRIAN DOYLE, et al., Defendants.

**Prior History:** *Laning v. Doyle, 2014 U.S. Dist. LEXIS 84496 (S.D. Ohio, June 20, 2014)*

## Core Terms

allegations, arrest, qualified immunity, police officer, probable cause, portions, Violations, municipal, pleadings, videotape, cruiser, elude, motion for judgment, parking lot, comparable, traffic, intentional infliction of emotional distress, retaliatory, malicious, rights, train, alleged violation, flee, constitutional violation, assault and battery, willfully, asserts, reasons, argues, punitive damages

**Counsel:  [\*1]** For Marcia L Laning, Franklin P Laning, Plaintiffs: Alan Dennis Gabel, LEAD ATTORNEY, Dayton, OH; Wayne Paul Stephan, Dayton, OH.

For Brian M Doyle, Individually and in his official capacity as a sworn police officer, Robert Schommer, Individually and in his official capacity as a sworn police officer, City of Huber Heights Ohio, Defendants: Jane Michele Lynch, LEAD ATTORNEY, Green & Green - 3, Dayton, OH; Jared A Wagner, Dayton, OH.

**Judges:** WALTER H. RICE, UNITED STATES DISTRICT JUDGE.

**Opinion by:** WALTER H. RICE

## Opinion

DECISION AND ENTRY SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. #23)

Plaintiffs, Marcia and Franklin Laning, filed suit against Officer Brian Doyle, Sergeant John Doe, Police Chief Robert Schommer, and the City of Huber Heights, Ohio, alleging various constitutional violations and state law claims arising out of Officer Doyle's arrest of Marcia Laning ("Laning"). This matter is currently before the Court on Defendants' Motion for Judgment on the Pleadings, Doc. #23. For the reasons set forth below, that motion is sustained in part and overruled in part.

### I. Background and Procedural History

According to the Amended Complaint, Doc. #19, Huber Heights **[\*2]**  police officer Brian Doyle arrested 63-year-old Marcia Laning on the afternoon of January 3, 2013. Officer Doyle followed Laning as she turned left out of a grocery store parking lot onto Brandt Pike, and then turned right, into the parking lot of a strip mall where her office is located. After she turned into the strip mall parking lot, he activated the lights on his police cruiser. She maintains

that she did not immediately realize that he was trying to pull her over. She continued slowly driving through the parking lot for a short distance, and then backed her car into a parking spot outside her office. As she got out of her car with her dog in her arms, Officer Doyle allegedly drew his taser, pointed it directly at her, and threatened to tase her.

At Officer Doyle's request, Laning put the dog back in the car. When she asked why she was being detained, he refused to provide an explanation. Instead, he allegedly yanked her off her feet, slammed her against the hood of the cruiser, pressed his weight against her, handcuffed her, and placed her in the back of the cruiser. Rather than let her call someone to pick up the dog, Officer Doyle arranged to have the dog sent to the pound because **[*3]** she hadn't "incentivized" him to do otherwise. He also had her car towed and impounded.

Laning states that, during the transport to the jail, she was terrified and crying. Officer Doyle allegedly drove erratically and did "donuts" in a fire station parking lot. She maintains that he repeatedly taunted her, making comments such as "You think that, just because you're an old lady, that means we have to be nice to you, trust me we don't," and telling her that her husband "was probably glad to get rid of her for a while because she was such a pain in the ass." When they arrived at the Montgomery County Jail, he allegedly told her, "I didn't search you *everywhere*, but they will." Doc. #19, PageID##1 64-65.

Officer Doyle charged Laning with Resisting Arrest, Failure to Comply with the Order of a Police Officer, and a traffic lane violation. She was released on bond several hours later. Laning pled not guilty to all of the charges. The prosecutor eventually dismissed the charges of Resisting Arrest, and Failure to Comply with the Order of a Police Officer. At trial, Laning was found not guilty of the traffic lane violation.

On December 23, 2013, Marcia and her husband, Franklin Laning, filed **[*4]** suit in the Montgomery County Court of Common Pleas. Defendants removed the case to federal court on the basis of federal question jurisdiction. The Amended Complaint, Doc. #19, asserts the following ten causes of action:

1. "*42 U.S.C. § 1983* - Unlawful Seizure, Detention, Search and Arrest (Violations of *First* and *Fourth Amendments to the United States Constitution* and comparable portions of the Ohio Constitution)";

2. "*42 U.S.C. § 1983* - Unreasonable and Excessive Force (Violations of the *Fourth Amendment to the United States Constitution*, as well as comparable portions of the Ohio Constitution)";

3. "Municipal and Supervisory Liability (*Section 1983*, the *Fourth Amendments to the United States Constitution* and the Constitutional and common law of the State [of] Ohio)";

4. "Malicious Prosecution (Violations of the *Fourth Amendment to the United States Constitution*, as well as comparable portions of the Ohio Constitution)";

5. "False Arrest (Violations of the *Fourth Amendment to the United States Constitution*, as well as comparable portions of the Ohio Constitution)";

6. "Retaliation in Violation of the *First Amendment* ([*42] U.S.C. Section 1983*)";

7. "Assault and Battery (*42 U.S.C. 1983*)";
8. "Assault and Battery (Pendent [Supplemental] claims of assault and battery under Ohio law)";
9. "Loss of Consortium (Pendent [Supplemental] claim under Ohio state law)"; and
10. "Intentional Infliction of Emotional Distress (Federal and State Claim)".

Plaintiffs seek compensatory and punitive damages, attorney fees and costs. Defendants have **[*5]** filed a Motion for Judgment on the Pleadings, Doc. #23, asking the Court to dismiss each of these claims under *Federal Rule of Civil Procedure 12(c)*.

## II. *Federal Rule of Civil Procedure 12(c)*

Motions for judgment on the pleadings under *Federal Rule of Civil Procedure 12(c)* are analyzed under the same standard as motions to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*. *See Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n, 623 F.3d 281, 284 (6th Cir. 2010)*. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget, 510 F.3d 577, 581 (6th Cir. 2007)* (quoting *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478, 480 (6th Cir. 1973))*. However, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id. at 582* (quoting *Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir. 1999))*.

To withstand a *Rule 12(c)* motion for judgment on the pleadings, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 336 (6th Cir. 2007)*. "The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, *i.e.*, more than merely possible." *Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009))*. A "legal conclusion couched as a factual allegation" need not be accepted as true, and a mere recitation of **[*6]** the elements of a cause of action is insufficient. *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*.


## III. Consideration of Police Cruiser Dash Cam Video

As an initial matter, the Court must determine whether, at this stage of the proceedings, it will consider the video of the January 3, 2013, encounter, as recorded by the dashboard camcorder mounted inside Officer Doyle's cruiser. Defendants submitted the video in support of their Motion for Judgment on the Pleadings. After the Court sustained Defendants' motion for leave to manually file the exhibit, Doc. #26, Plaintiffs filed objections, arguing that the Court should not consider the video in ruling on the pending motion. Doc. #27.

In determining the sufficiency of the allegations in a complaint, a court may consider exhibits attached to a motion for judgment on the pleadings, without converting it to a motion for summary judgment, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008)*.

In ruling on a motion to dismiss or a motion for judgment on the pleadings, a court may also take judicial notice of public records, including videotapes. *See Jones v. City of Cincinnati, 521 F.3d 555, 562 (6th Cir. 2008)*; *McGee v. City of Cincinnati Police Dep't, No. 1:06-cv-726, 2007 WL 1169374, at *1 n.2 (S.D. Ohio Apr. 18, 2007)*. However, unless the videotape "blatantly **[*7]** contradict[s]" the allegations in the complaint, the court must still accept those allegations as true. *See Garcia v. Does, 764 F.3d 170, 180 (2d Cir. 2014)* (citing *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007))*; *Bogie v. Rosenberg, 705 F.3d 603, 609 (7th Cir. 2013)* ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss").

Here, the Amended Complaint explicitly refers to the videotape of the incident, alleging that the video was widely distributed, and that Laning's clients questioned her about it. Doc. #19, PageID##166-67. Plaintiffs maintain, however, that because it is mentioned only briefly and is not central to Laning's claims, the Court should not consider it.

In the Court's view, regardless of whether the videotape is central to Laning's claims, there are other reasons why it should not be considered at this stage of the litigation. Defendants argue that the videotape conclusively contradicts

Plaintiffs' allegations that Laning did nothing to resist arrest, and that Officer Doyle drove erratically and did donuts in the fire station parking lot while transporting Laning to the jail. The Court disagrees.

As Plaintiffs note, the videotape does not fully depict the entire encounter. For example, because Laning is off camera when she first **[*8]** exits her car, it is not clear what might have prompted Officer Doyle to threaten to tase her. Then, although the videotape shows Officer Doyle placing her on the hood of the cruiser as he attempts to handcuff her, it is not clear whether Laning's feet are still on the ground. The Amended Complaint alleges that they were not. Therefore, although it looks as if Laning is struggling and resisting, it could also be that she was simply trying to maintain her balance. In addition, Plaintiffs correctly note that portions of the videotape appear to be missing, and the audio portion of the videotape is not always clear.

In *Jones v. City of Cincinnati*, the court held that, even though a videotape of a police encounter could be considered in connection with a motion to dismiss, the district court was not required to do so where the videotape "captures only part of the incident and would provide a distorted view of the events at issue." *521 F.3d at 562*. For the reasons cited above, the Court finds that it is inappropriate to consider the videotape in connection with the pending motion. It is better viewed in connection with a later-filed motion for summary judgment, once discovery has been completed.

## IV. Analysis [*9]

Defendants argue that if even the Court chooses not to consider the videotape at this stage of the litigation, it should grant their Motion for Judgment on the Pleadings, based on the insufficiency of the allegations in the Amended Complaint.

### A. Parties

Plaintiffs' Amended Complaint names four defendants: (1) Brian Doyle, in his individual and official capacity; (2) Sergeant John Doe, in his individual and official capacity; (3) Police Chief Robert Schommer, in his individual and official capacity; and (4) the City of Huber Heights, Ohio. As the Supreme Court explained in *Kentucky v, Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985)*, whereas an individual-capacity suit seeks to impose personal liability on a government official for actions taken under color of state law, an official-capacity suit is the equivalent of an action against the governmental entity of which the officer is an agent.

Here, because the City of Huber Heights is also a named defendant, the official-capacity claims against Doyle, Doe, and Schommer are duplicative, and will be dismissed on that basis. *See Thorpe ex rel. DT v. Breathitt Cnty. Bd. of Educ., 932 F. Supp. 2d 799, 802 (E.D. Ky. 2013)* ("when a *§ 1983* complaint asserts a claim against a municipal entity and a municipal official in his or her official capacity, federal courts will dismiss the official-capacity claim."). **[*10]** Plaintiffs concede that this is appropriate.

### B. Claims

Plaintiffs' Amended Complaint asserts ten causes of action but, as Defendants note, many of those counts include multiple claims against multiple defendants. Defendants have moved for judgment on the pleadings on all claims. For the sake of clarity, the Court will address Defendants' arguments on a count-by-count basis, rather than in the order presented in the motion.

**1. Count I: "*42 U.S.C. § 1983* - Unlawful Seizure, Detention, Search and Arrest (Violations of *First* and *Fourth Amendments to the United States Constitution* and comparable portions of the Ohio Constitution)"**

2015 U.S. Dist. LEXIS 19424, *10

Count I of the Amended Complaint asserts a claim under *42 U.S.C. § 1983* for alleged violations of Laning's *First* and *Fourth Amendment* rights under the United States Constitution, and comparable portions of the Ohio Constitution. *Section 1983* provides an avenue of recovery against state actors who subject individuals to the deprivation of federal rights. This statute "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)* (quoting *Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979))*. In order to recover under *§ 1983*, a plaintiff must prove that the defendant, while acting under color of state law, violated rights secured by the Constitution or laws of the United States. **[*11]**  See *Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)*.


**A. Scope of Claim Narrowed**

As an initial matter, the scope of this claim, as pled, can be narrowed in three respects. First, to the extent that Laning alleges that Officer Doyle violated her *First Amendment* right to freedom of speech by arresting her in retaliation for protesting that she had done nothing wrong and for asking why she was being detained, this claim is duplicative of Count VI. Therefore, the Court dismisses any allegations in Count I that implicate the *First Amendment*.

Second, although the Amended Complaint, Doc. #19, alleges that "Defendants were acting under the color of law," (¶ 98), that "Defendants" acted in a manner warranting the imposition of punitive damages (¶ 107), and that Plaintiffs suffered injury "[a]s the direct and proximate result of Defendants' actions," (¶ 108), the remainder of the allegations in Count I focus solely on Officer Doyle's conduct. Because there are no specific allegations of wrongdoing by the City of Huber Heights, by Sergeant Doe or by Chief Schommer, the Court construes Count I to assert a claim against only Officer Doyle.[1]

Third, without citing any specific provisions, Plaintiffs allege violations of "comparable portions of the Ohio Constitution." Plaintiffs, however, now concede that, because *§ 1983* offers "sufficiently broad and inclusive remedies" for the same alleged wrongs, there is no private remedy for alleged violations of the Ohio Constitution. *See Provens v. Stark Cnty. Bd. of Mental Retardation & Developmental Disabilities, 64 Ohio St. 3d 252, 261, 1992 Ohio 35, 594 N.E.2d 959, 966 (Ohio 1992)*. Accordingly, the Court dismisses those portions of Count I that are based on alleged violations of the Ohio Constitution.

This brings us to the heart of the claims alleged in Count I. Laning alleges that by "illegally stopping, seizing, detaining, and arresting" her, Officer Doyle violated her *Fourth Amendment* rights to be free from arrest without probable cause, and from unreasonable search and seizure.[2] Doc. #19, PageID#168.


**B. Qualified Immunity**

Officer Doyle maintains that **[*13]**  he is entitled to qualified immunity on this claim. Plaintiffs bear the burden of showing that Doyle is *not* entitled to qualified immunity. *Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006)*.

The doctrine of qualified immunity shields government officials from liability for civil damages for actions taken in the scope of their duties, unless their conduct violates "clearly established statutory or constitutional rights of which a

---

[1] The Court notes that Count III of the Amended Complaint asserts claims of supervisory liability against Chief Schommer and Sergeant Doe, and **[*12]**  municipal liability against the City.

[2] Although Count I also alleges that Doyle violated Laning's constitutional right to be free from "summary punishment," and from "arbitrary governmental activity that shocks the conscience of a civilized society," Doc. #19, PageID#169, Plaintiffs have now conceded that they "are not pursuing due process and cruel and unusual punishment claims." Doc. #31, PageID#287.

reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*. Rather than being a "mere defense to liability," it provides "an immunity from suit." *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*. The doctrine operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier v. Katz, 533 U.S. 194, 206, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and, "when properly applied, protects 'all but the plainly incompetent or those who knowingly violate the law .'" *Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)* (quoting *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986))*.

To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly **[*14]** established." *533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)*. We are free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)*.

*Occupy Nashville v. Haslam, 769 F.3d 434, 442 (6th Cir, 201 4)*.[3]


## 1. Constitutional Violation

"[A]n arrest without probable cause constitutes an unreasonable seizure in violation of the *Fourth Amendment*." *Ingram v. City of Columbus, 185 F.3d 579, 592-93 (6th Cir. 1999)*. "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979)*.

To determine whether an officer had probable cause to arrest someone for violation of a state statute, courts normally look to state law defining the offense. *Id. at 36* ("Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law"). *See also Ingram, 185 F.3d at 594* ("To determine **[*15]** whether officers had probable cause to arrest an individual, we must look to the law of the jurisdiction at the time of the occurrence.").

At issue here is whether Officer Doyle had probable cause to arrest Laning for failing to comply with an order or signal of a police officer.[4] Ohio law provides as follows:
> (A) No person shall fail to comply with any lawful order or direction of any police officer invested with authority to direct, control, or regulate traffic.
> (B) No person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle to a stop.
> (C)(1) Whoever violates this section is guilty of failure to comply with an order or signal of a police officer.

*Ohio Rev. Code § 2921.331*. The Court takes judicial notice that Laning was charged with a violation of *§ 2921.331(B)*, in Montgomery County Municipal Court Case No. 2013CRB00021.

---

[3] In this case, although the second question is dispositive with respect to Count I, the Court also addresses the first question, because the issue of probable cause is also relevant to other Counts asserted in the Amended Complaint.

[4] Laning was also charged with resisting arrest. However, because "lawful arrest" is an element of that crime, see *Ohio Revised Code § 2921.33(A)*, the threshold inquiry is whether Doyle had probable cause to arrest Laning for failing to comply with his order or signal.

The Amended Complaint alleges that Officer **[*16]** Doyle followed Laning into the strip mall parking lot and then activated the cruiser's overhead lights. Laning admits that after she saw the flashing lights, she continued driving through the parking lot "a short distance, at a low speed, to avoid impeding traffic or jeopardizing pedestrian safety." She then "backed her vehicle into a parking space very close to her office." She specifically denies making any attempt to flee or elude Officer Doyle, and maintains that he would not have reasonably interpreted her actions as such. Doc. #19, PageID#162.

The fact that Laning failed to stop immediately after Officer Doyle activated the lights on his cruiser is not determinative. Rather, _subsection (B)_ of the statute is violated only if the driver operates the vehicle "so as willfully to elude or flee" a police officer. See _City of Columbus v. Fantozzi, Nos. 80AP-737 through SOAP-740, 1981 Ohio App. LEXIS 10712, 1981 WL 3046, at *7 (Ohio Ct. App. Mar. 10, 1981)_ (Whiteside, J., concurring in part and dissenting in part) ("For whatever reason, the Legislature did not see fit to prohibit merely failing to stop after receiving a visible or audible signal from a police officer to do so.").

Laning's allegations do give rise to an inference that her conduct was "willful," given that she **[*17]** purposely kept driving even after she knew that Officer Doyle signaled her to stop. See _State v. Garrard, 170 Ohio App. 3d 487, 496, 2007 Ohio 1244, 867 N.E.2d 887, 893 (Ohio Ct. App. 2007)_ (holding that the term "willfully," as used in _§ 2921.331(B)_, means "purposely"). However, viewed in the light most favorable to Laning, the allegations do not support a finding that Officer Doyle had probable cause to believe that she was attempting to flee or to elude him.

The term "flee," as used in the statute, "is not dependent on duration or distance," _id, at 499, 867 N.E.2d at 896_, but it "does connote haste and swiftness." _State v. Donkers, 170 Ohio App. 3d 509, 537, 2007 Ohio 1557, 867 N.E.2d 903, 925 (Ohio Ct. App. 2007)_. Here, however, Laning alleges that she continued driving through the parking lot "at low speed." To "elude" a police officer is "to avoid slyly or adroitly (as by artifice, stratagem, or dexterity)." _Id._ (quoting Webster's Third New International Dictionary). Here, the incident in question took place in a strip mall parking lot. Laning maintains that she did not stop immediately because she did not want to impede traffic or jeopardize pedestrian safety. She instead continued driving a short distance through the parking lot to her office, where she backed into a parking space and then stepped out of the car. Although she may not have stopped her car as quickly as Officer Doyle would have liked, there is no indication **[*18]** that she was trying to "elude" him.

Viewing the allegations in the Amended Complaint in the light most favorable to Laning, it appears to the Court that Officer Doyle lacked probable cause to arrest her for a violation of _Ohio Revised Code § 2921.331 (B)._[5] The facts alleged do not support a finding that she was willfully attempting to elude Officer Doyle or flee from him. Because her _Fourth Amendment_ rights would have been violated on the facts alleged, the Court must then turn to the second prong of the qualified immunity test, and determine whether the right at issue was clearly established.


## 2. Clearly Established Law

Laning maintains that she had a clearly established right not to be arrested without probable cause. While undoubtedly **[*19]** true, this is not the relevant question. As the Supreme Court recently held, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." _Plumhoff v. Rickard, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014)_ (citing _Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083-84, 179 L. Ed. 2d 1149 (2011))_. An officer is entitled to qualified immunity unless existing precedent "'placed the statutory or

---

[5] The Court rejects Laning's argument that the fact that the prosecutor ultimately dismissed the charge proves that Officer Doyle lacked probable cause for the arrest. See _Williams ex ret. Alien v. Cambridge Bd. of Educ., 370 F.3d 630, 638 (6th Cir. 2004)_ ("An arrest grounded in probable cause does not become invalid merely because the State chooses not to prosecute the individual or a jury opts for acquittal."); _Marx v. Gumbinner, 905 F.2d 1503, 1507 (11th Cir. 1990)_ ("That a defendant is subsequently acquitted or charges are dropped against the defendant is of no consequence in determining the validity of the arrest itself.").

constitutional question' confronted by the official 'beyond debate.'" *Id.* The "crucial question" is "whether the official acted reasonably in the particular circumstances that he or she faced." *Id.*

In determining "whether an officer could reasonably conclude that probable cause exists under a given set of circumstances," the court imputes "knowledge of state-law definitions and state-court interpretations of a statute to police officers." *Pritchard v. Hamilton Twp. Bd. of Trs., 424 F. App'x 492, 506 (6th Cir. 2011).* *See also Hutten v. Knight, 3:10-cv-105, 2012 U.S. Dist. LEXIS 9029, 2012 WL 246302, at *7 (M.D. Tenn. Jan. 26, 2012)* ("to determine the extent to which the right is clearly established, courts will consider cases decided prior to the arrest that interpret the state law at issue").

In this case, because the contours of the right at issue were not clearly defined, a police officer could have reasonably **[*20]** believed that he had probable cause to arrest Laning for a violation of *Ohio Revised Code § 2921.331 (B)*. Ohio courts have adopted the ordinary dictionary definitions of "flee" and "elude." *See Donkers, 170 Ohio App. 3d at 537, 867 N.E.2d at 925*. However, application of these definitions to factual scenarios somewhat similar to Laning's has led to varied results.

There are very few cases on point. The most similar case is unreported, and therefore has little precedential value. In *State v. Jackson, 2d Dist. No. 21300, 2006-Ohio-1971, 2006 WL 1047468 (Ohio Ct. App. 2006)*, a police officer initiated a traffic stop by activating the lights on his cruiser. The driver saw the officer, but continued slowly driving two more blocks until he reached his house. When he exited his car, he was arrested for willfully eluding or fleeing a police officer in violation of *§ 2921.331(B)*, and it was discovered that he did not have a valid driver's license. The trial court granted his motion to suppress the evidence, a decision affirmed on appeal. This was based on a finding that there was no reasonable basis for the initial traffic stop, and no basis for suspecting that he was attempting to elude the officer or flee from him "as opposed to choosing a suitable spot to stop after proceeding a short distance at a reasonable speed." *2006-Ohio-1971, Id. WL at *4*.

In *Donkers*, the court rejected appellant's argument that **[*21]** there was insufficient evidence to support her conviction for willfully eluding the police. There, after the police ordered the appellant to pull over, she slowed down, but continued to drive for three miles before stopping. Although she claimed that she was simply looking for a safe place to pull off the road, the court held that a reasonable jury could have found that she was willfully eluding the police. *170 Ohio App. 3d at 537, 867 N.E.2d at 925*. *Donkers* is distinguishable in that the appellant was on the highway and drove much farther than Laning did before stopping her car.

Defendants rely heavily on *State v. Adams, 2d Dist. No. 24184, 2011-Ohio-4008, 2011 WL 3557842 (Ohio Ct. App. 2011)*. In *Adams*, another unreported case, .the police initiated a traffic stop by activating the cruiser's lights and siren. The driver did not immediately stop, but proceeded another block, where another vehicle stopped him from proceeding any further. He was arrested for a violation of *§ 2921.331(A)*. Heroin was found during the course of an inventory search of the car. The defendant moved to suppress the evidence, alleging that the officer lacked probable cause to stop him for a traffic violation. The trial court overruled the motion.

On appeal, the court held that, regardless of whether there was probable cause to stop the driver for the **[*22]** alleged traffic violation, the inventory search was proper because there was probable cause to arrest him for failing to comply with the order of a police officer. *2011-Ohio-4008, Id. WL at *4*. It is not clear why Adams was charged with a violation of *§ 2921.331 (A)* rather than *§ 2921.331(B)*. Nevertheless, because a different subsection of the statute is implicated, and Adams was not charged with willfully eluding or fleeing a police officer, this case is of limited precedential value.

In short, there are few, if any, reported cases that would have given Officer Doyle guidance in determining whether there was probable cause to believe that Laning's specific conduct violated *Ohio Revised Code § 2921.331(B)*. A police officer could have therefore reasonably believed that probable cause existed for the arrest. Because the legal contours of the right in question were not clearly established. Officer Doyle is entitled to qualified immunity on

Laning's *§ 1983* claims stemming from her alleged wrongful arrest and the inventory search conducted incident to that arrest. Count I of the Amended Complaint will therefore be dismissed with prejudice.


**2. Count II: "*42 U.S.C. § 1983* - Unreasonable and Excessive Force (Violations of the *Fourth Amendment to the United States Constitution*, as well as comparable portions of the Ohio Constitution)"**

Count II of the **[*23]** Amended Complaint alleges that Officer Doyle, acting under color of state law, used gratuitous, excessive and unreasonable force during the course of the arrest, in violation of the *Fourth Amendment* and comparable portions of the Ohio Constitution. For the same reasons discussed above, the Court dismisses with prejudice those portions of Count II that are based on alleged violations of the Ohio Constitution.

Likewise, although Laning again alleges that "Defendants" acted maliciously or with deliberate indifference to her constitutional rights, causing her to suffer injury and damages, Doc. #19, PageID#169, Count II contains no specific allegations of wrongdoing by Chief Schommer, Sergeant Doe, or the City of Huber Heights. The Court therefore construes this claim as one asserted only against Officer Doyle in his individual capacity.

Officer Doyle again argues that he is entitled to qualified immunity. He maintains that, because the amount of force he used was objectively reasonable under the circumstances, there is no *Fourth Amendment* violation. *See, e.g., Slusher v. Carson, 540 F.3d 449, 453-54 (6th Cir. 2008)*.

In *Graham v. Connor, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)*, the Supreme Court explained that "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances **[*24]** confronting them. *Id. at 397*. The reasonableness of the use of force must be gauged by the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id. at 396*.

Viewing the allegations of the Amended Complaint in the light most favorable to Laning, the Court finds that Laning's *Fourth Amendment* rights were likely implicated. Laning, age 63, was allegedly pulled over for a minor traffic violation. After Officer Doyle activated the lights on his cruiser, she drove a short distance through a parking lot at a slow speed, parked her car outside her office, and stepped out of the car. She maintains that she posed no safety risk to anyone. She alleges that Officer Doyle immediately began shouting commands at her. When she asked why he had pulled her over, he refused to answer. Instead, he drew his taser and pointed it directly at her. She alleges that, even though she stood motionless and offered no resistance, Officer Doyle "yanked her up off her feet, and slung her toward the cruiser, slamming her up against its hood with her feet still up off the ground." While handcuffing **[*25]** her, he allegedly "pressed his whole body weight up against" her. She alleges that she suffered damaged cartilage, bruising and serious physical injuries. Doc. #19, PageID#162-63. In the Court's view, these allegations state a plausible claim of excessive force.

Moreover, Laning had a clearly established right to be free from the use of gratuitous violence during the course of the arrest. *See Shreve v. Jessamine Cnty. Fiscal Court, 453 F.3d 681, 688 (6th Cir. 2006)* ("Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest").

For these reasons, the Court finds that Officer Doyle is not entitled to qualified immunity on Count II of the Amended Complaint.


**3. Count III: "Municipal and Supervisory Liability (*Section 1983*, the *Fourth Amendment*[] to the United States Constitution and the Constitutional and common law of the State of Ohio)"**

Count III of the Amended Complaint seeks to hold the City of Huber Heights, Chief Schommer and Sergeant Doe liable for damages Plaintiffs suffered as a result of Officer Doyle's alleged misconduct. Again, to the extent that

Plaintiffs' claim is based on alleged violations of the Ohio Constitution, that portion of the claim is dismissed for the reasons stated above.


[*26] **a. Claims against City**

To the extent that Plaintiffs assert any claims against the City of Huber Heights based on the common law of the State of Ohio, the City argues that it is entitled to statutory immunity pursuant to *Ohio Revised Code § 2744.02*. Plaintiffs have conceded that they no longer intend to pursue any such state law claims. Accordingly, this portion of Count III is also dismissed with prejudice.

The Court turns then to the *§ 1983* claims asserted against the City. A municipality cannot be held liable under *§ 1983* merely because it employs an individual who engages in unconstitutional conduct. Rather, plaintiffs must prove that a policy or custom of the municipality was the "moving force" behind the alleged constitutional violation. *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. Such a policy or custom may consist of: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005)*.

Here, Plaintiffs' allegations against the City are based on a policy of inadequate training or supervision, and a custom of tolerating federal civil rights violations. **[*27]** Plaintiffs allege that, although the City was aware that Officer Doyle and other officers engaged in a pattern of *First* and *Fourth Amendment* violations, it failed to adequately train, supervise and discipline them, and failed to adequately investigate complaints of constitutional violations.

Plaintiffs allege that the training provided to the police officers "was inadequate with respect to search, detention, arrest and use of force" and that this inadequacy was the result of deliberate indifference. Doc. #19, PageID#171. They further allege that the officers are inadequately trained concerning the right of citizens to question the police without retaliation. *Id.* at PageID#172. Defendants argue that these conclusory allegations are insufficient to state a claim against the City, particularly in light of the pleading standards set forth in *Iqbal* and *Twombly*.

In *Connick v. Thompson, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)*, the Supreme Court noted that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." The failure to train must amount to a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id. at 1359* (quoting *Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989))*.

Usually, a plaintiff must establish **[*28]** "deliberate indifference" by showing "[a] pattern of similar constitutional violations by untrained employees." *Id. at 1360*. *See also Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)* ("A failure-to-train claim . . . requires a showing of 'prior instances of unconstitutional conduct demonstrating that the [municipality] ha[d] ignored a history of abuse and was clearly on notice that training in this particular area was deficient and likely to cause injury.").[6] Plaintiffs must allege facts sufficient to show that there was a "clear and persistent pattern of unconstitutional conduct by municipal employees." *D'Ambrosio v. Marino, 747 F.3d 378, 387 (6th Cir. 2014)*. Likewise, in order to establish a custom of tolerance or acquiescence of federal rights violations, a plaintiff must show "that there was a pattern of inadequately investigating similar claims." *Burgess, 735 F.3d at 478*.

With respect to prior instances of unconstitutional conduct, the Amended Complaint alleges that the City knew of Officer Doyle's propensity to engage in unconstitutional conduct "because of internal complaints and at least one

---

[6] In very rare instances, when the need for training in a specific area is very obvious, the plaintiff may be able to establish deliberate indifference based on a single incident. *Connick, 131 S. Ct. at 1361*.

other lawsuit filed against Doyle." *Id.* at PageID#170. **[*29]** Plaintiffs, however, fail to cite to any specific internal complaints filed against Doyle, and say nothing of how those internal complaints were resolved.

Defendants argue that unsubstantiated accusations of wrongdoing, whether asserted in an internal complaint or a lawsuit, are generally insufficient to establish deliberate indifference. *See, e.g., Carter v. District of Columbia, 795 F.2d 116, 123, 254 U.S. App. D.C. 71 (D.C. Cir. 1986)* (holding that unsubstantiated allegations of wrongdoing cannot support a finding of municipal liability); *Owens v. City of Ft. Lauderdale, 174 F. Supp. 2d 1282, 1296-97 (S.D. Fla. 2001)* (holding that where complaints are wholly unsubstantiated, they are of "little value for purposes of establishing previous constitutional violations" on which municipal liability may be imposed).

Citing *Miller v. Delaware County Commissioners, No. 2:13-cv-501, 2014 U.S. Dist. LEXIS 13724, 2014 WL 457552 (S.D. Ohio Feb. 4, 2014)*, Defendants further argue that the doors to discovery are not opened by conclusory allegations. *2014 U.S. Dist. LEXIS 13724, [WL] at *9* (finding that *Iqbal* and *Twombly* preclude argument that, without the benefit of some discovery, plaintiffs could not be expected to provide more than conclusory allegations of a pattern of constitutional violations).[7]

Plaintiffs argue, however, that they should **[*30]** be entitled to conduct discovery to flesh out these claims of municipal liability. The Court agrees. Plaintiffs' allegations in this case go beyond conclusory allegations of inadequate training or a pattern of unconstitutional behavior. Plaintiffs have specifically alleged that Officer Doyle has been the subject of "internal complaints and at least one other lawsuit." Plaintiffs further allege that the City knew about these complaints, and yet failed to take any remedial action. Doc. #1 9, PageID##170-71. In the Court's view, these factual allegations satisfy the requirements of *Iqbal* and *Twombly*, and state a plausible claim against the City.

Whether Plaintiffs will be able to prevail on this claim, or even survive summary judgment, remains to be seen. However, the Court agrees that, at a minimum, Plaintiffs are entitled to discovery. In *Scott v. Giant Eagle, Inc., No. 1:12-cv-3074, 2013 U.S. Dist. LEXIS 63578, 2013 WL 1874853 (N.D. Ohio May 3, 2013)*, the court noted that "applying *Iqbal* too strictly in situations where knowledge of a custom, policy, or practice is unobtainable absent some preliminary discovery could lead to unfair results." *2013 U.S. Dist. LEXIS 63578, [WL] at *4* (citing *Hutchison v. Metropolitan Gov't of Nashville and Davidson County, 685 F. Supp. 2d 747, 751-52 (M.D. Tenn. 2010))*. This is particularly true when the evidence needed is within the exclusive, or almost exclusive, possession **[*31]** of the opposing party. Accordingly, the Court overrules Defendants' motion to dismiss the *§ 1983* claim asserted against the City of Huber Heights.


**b. Claims against Chief Schommer and Sergeant John Doe**

Defendant Robert Schommer is the Chief of Police for the City of Huber Heights, and Defendant Sergeant John Doe is Officer Doyle's direct supervisor.[8] Plaintiffs seek to hold Chief Schommer and Sergeant John Doe personally liable under *§ 1983* for their alleged roles in failing to adequately train, supervise, and discipline Officer Doyle. Plaintiffs allege that Schommer and Doe knew of Doyle's history of violating the constitutional rights of citizens within his jurisdiction, and failed to take any remedial action. They further allege that Schommer and Doe failed to adequately investigate Laning's complaint of Doyle's misconduct.

---

[7] In *Miller*, plaintiffs alleged only that inadequate training caused the "botched investigation" that led to the illegal arrest. *2014 U.S. Dist. LEXIS 13724, 2014 WL 457552, at *8*.

[8] *Federal Rule of Civil Procedure 4(m)* requires all defendants to be served within 120 days of filing the Complaint. Here, it appears that Plaintiffs have failed to identify the John Doe defendant, substitute him as a party, and serve him within the time allotted. Plaintiffs' claims against Sergeant Doe are subject to dismissal without prejudice on this basis. However, this is a moot point, since the claims are **[*32]** also subject to dismissal on qualified immunity grounds.

Defendants argue that they are entitled to qualified immunity on these claims, because a supervisor cannot be held liable unless he was actively and personally involved in the alleged constitutional violation. "Supervisory liability under _§ 1983_ cannot attach where the allegation of liability is based upon a mere failure to act. . . and cannot be based upon simple negligence." _Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999)_.

As the court explained in _McQueen v. Beecher Community Schools, 433 F.3d 460 (6th Cir. 2006)_:

> "a supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" _Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)_ (quoting _Hays v. Jefferson County, 668 F.2d 869, 874 (6th Cir. 1982)_). "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." _Id._ (quoting _Hays, 668 F.2d at 874_).

_McQueen, 433 F.3d at 470_. _See also Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006)_ ("Plaintiff must show that the supervisors somehow encouraged or condoned the actions of their inferiors"); _Phillips v. Roane Cnty., Tenn., 534 F.3d 531, 544 (6th Cir. 2008)_ ("While an individual supervisor may still be held liable under a failure-to-train theory, the [plaintiff] must point to a specific action of each individual supervisor to defeat **[*33]** a qualified immunity claim.").

In this case, Plaintiffs' Amended Complaint is devoid of any allegations that Chief Schommer or Sergeant John Doe directly participated in Laning's arrest, or in any way encouraged Doyle to engage in the alleged unconstitutional conduct. Although Plaintiffs allege that Sergeant Doe appeared at the scene following the arrest, they do not allege that he played an active part in it. Rather, they allege only that he "failed to investigate the circumstances of the stop." Doc. #19, PageID#164. Likewise, Plaintiffs allege that, although Schommer and Doe knew of Officer Doyle's propensity to engage in misconduct, they failed to take appropriate measures to avoid "foreseeable and highly predictable consequences." Doc. #19, PageID#1 70.

These allegations are insufficient as a matter of law to state a viable claim against them. So are the allegations that Schommer and Doe failed to adequately investigate Laning's complaint about Doyle. _See Turner v. City of Taylor, 412 F.3d 629, 649 (6th Cir. 2005)_ (holding that a claim that an officer's supervisor conducted an inadequate investigation into a complaint filed by plaintiff "may sound in negligence, but is not a constitutional tort."). Accordingly, the Court dismisses all claims **[*34]** asserted against Chief Schommer and Sergeant John Doe in their individual capacities.

## 4. Count IV: "Malicious Prosecution (Violations of the _Fourth Amendment to the United States Constitution_, as well as comparable portions of the Ohio Constitution)"

Count IV of the Amended Complaint asserts a claim of malicious prosecution against Officer Doyle. Again, Laning alleges violations of her federal and state constitutional rights but, because _§ 1983_ offers a sufficient remedy, the Court dismisses those portions of this claim that are based on alleged violations of the Ohio Constitution.

A _Fourth Amendment_ malicious prosecution claim "remedies detention accompanied, not by absence of legal process, but by _wrongful institution_ of legal process." _Wallace v. Kato, 549 U.S. 384, 390, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007)_ (emphasis original). In order to succeed on a malicious prosecution claim under _§ 1983_, Laning must prove that: (1) a criminal prosecution was initiated against her, and Doyle made or influenced the decision to prosecute; (2) there was no probable cause to support the criminal prosecution; (3) she suffered a deprivation of liberty, apart from the initial seizure; and (4) the criminal proceeding was resolved in her favor. _Sykes v. Anderson, 625 F.3d 294, 308-09 (6th Cir. 2010)_.

Officer Doyle asserts the defense of qualified immunity, again arguing that he had probable cause to arrest [*35] Laning for a violation of § 2921.331, and that there was no clearly established law indicating that prosecution for this crime would be improper.

The question of whether probable cause existed for an arrest is not exactly the same as the question of whether probable cause existed for a criminal prosecution. *See Sykes, 625 F.3d at 310-11* (distinguishing a § 1983 false arrest claim from a § 1983 malicious prosecution claim). Nevertheless, they are closely related.

As previously noted, because the law was not clearly established, a reasonable officer could have believed that probable cause existed to arrest Laning for a violation of *Ohio Revised Code § 2921.331 (B)*. For the same reasons, a reasonable officer could have believed that probable cause existed to prosecute her for this crime. *See id.* Accordingly, Officer Doyle is also entitled to qualified immunity on this claim, which will be dismissed with prejudice.[9]

### 5. Count V: "False Arrest (Violations of the *Fourth Amendment to the United States Constitution*, as well as comparable portions of the Ohio Constitution)"

Count V of the Amended Complaint is largely duplicative of Count I. it alleges that Officer Doyle arrested Laning without probable cause and confined her without justification, in violation of the *Fourth Amendment* and comparable portions of the Ohio Constitution. For reasons discussed above, the Court dismisses those portions of this claim that are based on alleged violations of the Ohio Constitution.

Officer Doyle argues that he is entitled to qualified immunity on the federal constitutional claim. Having previously determined that Officer Doyle's conduct in arresting Laning for a violation of § 2921.331(B) did not violate clearly established rights of which a reasonable officer would have known, the Court likewise finds that Officer Doyle is entitled [*37] to qualified immunity on this claim. Count V of the Amended Complaint is therefore dismissed with prejudice.

### 6. Count VI: "Retaliation in Violation of the *First Amendment* (*42 U.S.C. Section 1983*)"

Count VI of the Amended Complaint alleges that Officer Doyle violated Laning's *First Amendment* right to freedom of speech when he arrested her, detained her, bullied her, and intimidated her, in retaliation for questioning him about why he had stopped her. Doyle again contends that he is entitled to qualified immunity on this claim.

"A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999)* (en banc).

Viewed in the light most favorable to Laning, the allegations in the Amended Complaint support a finding that Officer Doyle violated her *First Amendment* rights. She engaged in constitutionally protected conduct when she

---

[9] The Court also notes that, according to the Amended Complaint, Laning was detained for just 6 hours, and released after she posted bond. The criminal charges were then dismissed, and she was acquitted of the traffic violation charge. Doc. #19, PageID#166. Based on these facts, the Court questions whether she has adequately alleged "a deprivation of liberty, [*36] apart from the initial seizure." *See Sykes, 625 F.3d at 308-09* (holding that, in order to satisfy the third element of a claim of malicious prosecution, "the plaintiff must show that as a *consequence of a legal proceeding*, the plaintiff suffered a deprivation of liberty, as understood in our *Fourth Amendment* jurisprudence, apart from the initial seizure") (internal quotations omitted) (emphasis added)).

questioned why he had pulled her over. *See McCurdy v. Montgomery Cnty., 240 F.3d 512, 520 (6th Cir. 2001)* ("freedom to express disagreement with [*38] state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the *First Amendment*"). Moreover, an arrest, particularly one accompanied by bullying behavior, would surely deter a reasonable person from exercising the right to verbally challenge the actions of a police officer. *See Center for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 822 (6th Cir. 2007).* Laning also alleges that Doyle's conduct was substantially motivated by her protected conduct. Although Doyle's true motivation will ultimately have to be decided by a jury, the facts alleged give rise to an inference that Laning's verbal challenges were a motivating factor in Doyle's decision to arrest and detain her, and to treat her the way he allegedly did.

As to the second prong of the qualified immunity analysis, the right to be free from retaliatory arrest after verbally challenging police action was clearly established at the time this incident took place. *See Kennedy v. City of Villa Hills, Ky., 635 F.3d 210, 219 (6th Cir. 201 1).*

The Court rejects Doyle's attempts to interject the issue of probable cause into the qualified immunity analysis on this *First Amendment* claim. Relying on *Barnes v. Wright, 449 F.3d 709, 719-20 (6th Cir. 2006),* Officer Doyle argues that because Laning's arrest was supported by probable cause, there can be no *First Amendment* violation and that he is, therefore, entitled to qualified immunity [*39] on this claim. Citing *Reichle v. Howards, 132 S. Ct. 2088, 2094, 182 L. Ed. 2d 985 (2012),* he further argues that, at the time of Laning's arrest, she did not have a clearly established right "to be free from a retaliatory arrest that is otherwise supported by probable cause."

Even momentarily setting aside the Court's previous finding that, viewing the facts in the light most favorable to Laning, Officer Doyle did *not* have probable cause to arrest her for a violation of *Ohio Revised Code § 2921.331 (B),* Doyle's arguments still lack merit. In *Hartman v. Moore, 547 U.S. 250, 126 S. Ct. 1695, 164 L. Ed. 2d 441 (2006),* the Supreme Court held that lack of probable cause was an element of a retaliatory *prosecution* claim. However, neither the Supreme Court nor the Sixth Circuit has yet held that lack of probable cause is a required element in a *First Amendment* claim of retaliatory *arrest*,[10] As explained in *Reichle,* retaliatory prosecution claims are distinguishable from retaliatory arrest claims because "the intervening decision of the third-party prosecutor widens the causal gap between the defendant's animus and the plaintiff's injury." *132 S. Ct. at 2095.*

In *Barnes,* the Sixth Circuit held that the plaintiff's *First Amendment* retaliation claim failed because the officers had probable cause to seek an indictment and arrest the plaintiff. However, that case is factually distinguishable because, as the court noted, "the officers themselves initiated the grand jury proceedings," and the plaintiff was arrested following the indictment. *449 F.3d at 720.*

In cases involving a "commonplace" claim of retaliatory arrest prior to prosecution, the Sixth Circuit has subsequently twice deferred resolution of the issue of whether lack of probable cause is a required element. *See Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007)* (finding probable cause to be relevant to causation, but not deciding whether *Hartman* "adds another element to every *First Amendment* claim"); *Kennedy v. City of Villa Hills, Ky., 635 F.3d 210, 217 n.4 (6th Cir. 2011)* (distinguishing *Barnes* and again deferring resolution of the issue).

In short, the lack of probable cause is not yet a recognized element of a *First Amendment* claim of retaliatory arrest. *See Somers v. Charter Twp. of Clayton Police Dep't, No. 10-11123, 2014 U.S. Dist. LEXIS 28494, 2014 WL 897353, at *7-8 (E.D. Mich. Mar. 6, 2014).* Moreover, the fact that the law concerning *this* particular issue is unsettled is largely irrelevant to the qualified immunity analysis. *See Hutten v. Knight, No. 3:10-cv-105, 2012 U.S. Dist. LEXIS 9029, 2012 WL 246302, at *8-9 (M.D. Tenn. Jan. 26, 2012).*

---

[10] Although the Supreme Court granted certiorari to consider that question in *Reichle,* it ultimately decided not to address it, instead holding only that qualified immunity was warranted because, at the time of the arrest in question, the law [*40] was not clearly established. *Reichle, 132 S. Ct. at 2093.*

Viewed in the light most favorable to Laning, the allegations in the **[*41]** Amended Complaint support a finding that Officer Doyle's conduct violated Laning's clearly established right to be free from retaliatory arrest for verbally challenging his conduct. Accordingly, Officer Doyle is not entitled to qualified immunity on the *First Amendment* claim of retaliatory arrest.

### 7. Count VII: "Assault and Battery (*42 U.S.C. 1983*)"

Count VII of the Amended Complaint asserts a claim of Assault and Battery against all Defendants under federal law. After Defendants argued that this tort claim is not cognizable under *§ 1983*, Plaintiffs voluntarily abandoned it. Accordingly, the Court dismisses Count VII with prejudice.

### 8. Count VIII: "Assault and Battery (Pendent [Supplemental] claims of assault and battery under Ohio law)"

Count VIII of the Amended Complaint alleges that Officer Doyle willfully threatened and attempted to harm and touch Laning without privilege to do so, and offensively and reasonably placed her in fear of such contact. It also alleges that Doyle actually did harm and touch her in such a manner, causing injury and damages.

Officer Doyle argues that he is entitled to statutory immunity under *Ohio Revised Code § 2744.03(A)(6)* because (1) his acts were not manifestly outside the scope of his employment; (2) civil liability is **[*42]** not expressly imposed by another section of the Revised Code; and (3) even though the Amended Complaint alleges that he acted maliciously, in bad faith, wantonly, or recklessly, the factual allegations support no such finding.

The Court disagrees. Laning alleges that as soon as she stepped out of the car, Officer Doyle drew his taser and pointed it directly at her, terrifying her. She further alleges that, without provocation, he charged toward her, forcibly jerked her arms behind her back, yanked her up off her feet and slammed her against the hood of the cruiser, pressing his whole body weight against hers, causing physical and emotional injury. These allegations, if believed, could support a finding that he acted maliciously, in bad faith, wantonly or recklessly. At this juncture, the allegations state a plausible basis for abrogating statutory immunity. Accordingly, the Court denies Defendants' motion as to Count VIII.

### 9. Count IX: "Loss of Consortium (Pendent [Supplemental] claim under Ohio state law)"

In Count IX of the Amended Complaint, Mr. Laning asserts a claim of loss of consortium under Ohio law. Defendants correctly note that this is a derivative claim, dependent on the viability **[*43]** of the primary claims. *Wang v. Goodyear Tire & Rubber Co., 68 Ohio App. 3d 13, 19, 587 N.E.2d 387, 391 (Ohio Ct. App. 1990)*. In this case, however, because some of Plaintiffs' primary claims survive Defendants' motion, this one does as well.

### 10. Count X: "Intentional Infliction of Emotional Distress (Federal and State Claim)"

Count X of the Amended Complaint asserts federal and state claims of intentional infliction of emotional distress against Officer Doyle. Doyle argues that the federal portion of this claim must be dismissed because there is no such common law claim under federal law. *FDIC v. Rusconi, 808 F. Supp. 30, 44 n.25 (D. Me. 1992)* ("Courts have held that no federal common law exists regarding claims for infliction of emotional distress; rather, such claims are based on state common law.").

Plaintiffs disagree, citing to a couple of cases in which courts have noted that a plaintiff threatened with physical injury may recover damages under *§ 1983* for mental distress in situations involving a malicious abuse of power that shocks the conscience. *See Checki v. Webb, 785 F.2d 534, 538 (5th Cir. 1986)* (noting that a police officer who terrorizes a citizen by brandishing a cocked gun in his face has "laid the building blocks for a *section 1983* claim

against him"); *White v. Rochford, 592 F.2d 381, 384-85 (7th Cir. 1979)* (holding that leaving children in abandoned car, subjecting them to inclement weather and great physical danger, could violate the *Due Process Clause*, **[\*44]** giving rise to a *§ 1983* claim).

*Checki*, however, involved a question of venue. The statement that the Plaintiffs pull out of context does not stand for the proposition that a federal common law claim of intentional infliction of emotional distress exists. *White* is predicated on alleged violations of the *Due Process Clause*. In contrast, the Lanings have expressly denied pursuit of any due process claim.

Moreover, the fact that a plaintiff alleging a due process violation may be able to recover damages for mental distress in the context of a *§ 1983* suit does not mean that a separate federal cause of action exists for intentional infliction of emotional distress. Because Plaintiffs have failed to cite to any authority recognizing such a federal cause of action, the Court sustains Defendants' motion for judgment on the pleadings with respect to the federal portion of Count X.

Plaintiffs also assert a claim of intentional infliction of emotional distress under Ohio common law. Officer Doyle argues that Plaintiffs' factual allegations are insufficient to state a claim upon which relief can be granted. In the alternative, he argues that he is entitled to statutory immunity under *Ohio Revised Code § 2744.03(A)(6)*. The Court rejects both of these arguments. **[\*45]**

"To establish a claim for intentional infliction of emotional distress, a plaintiff must show that: (1) the defendant intended to cause the plaintiff serious emotional distress; (2) the defendant's conduct was extreme and outrageous; and (3) the defendant's conduct was the proximate cause of plaintiff's serious emotional distress." *Tuleta v. Med. Mut. of Ohio, 2014-Ohio-396, 6 N.E.3d 106*, at f 52 (citing *Phung v. Waste Mgt. Inc., 71 Ohio St. 3d 408, 410, 1994 Ohio 389, 644 N.E.2d 286 (1994))*. Liability will be found only where "the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20, 6 Ohio St. 3d 369, 374, 6 Ohio B. 421, 453 N.E.2d 666 (Ohio 1983)*.

Not surprisingly, the parties disagree about whether Plaintiffs' allegations are sufficient to state a claim. Defendants cite to *Fannon v. Patterson, No. 3:13-cv-14, 2014 U.S. Dist. LEXIS 120899, 2014 WL 4273337, at \*7 (S.D. Ohio Aug. 29, 2014)*, in which the court held that "mere arrest, detention and prosecution" does not support a claim of intentional infliction of emotional distress.

But Laning's allegations are much more egregious. Laning, who was age 63 at the time, alleges that, although she was pulled over for a minor traffic violation, and did nothing to resist arrest, Officer Doyle threatened her with a taser, subjected her to excessive force during the course of the **[\*46]** arrest, transported her to a remote area after the stop, and subjected her to numerous obnoxious comments. She further alleges that as a result of this incident, she suffers from post-traumatic stress disorder, and is afraid to drive.

"Unreasonable and inappropriate actions [by a police officer] do not automatically equate to extreme and outrageous conduct." *Gill v. Kovach, 729 F. Supp. 2d 925, 941 (N.D. Ohio 2010)*. Nevertheless, at this stage of the proceedings, the Court finds that Laning's allegations are sufficient to render the claim plausible. Moreover, if Laning's testimony is credited, a jury could also find that Officer Doyle acted with malice, in bad faith, wantonly or recklessly, sufficient to abrogate statutory immunity under *Ohio Revised Code § 2744.03(A)(6)*. Accordingly, the Court overrules Defendants' motion to dismiss the Ohio common law claim of intentional infliction of emotional distress.

## 11. Punitive damages

In their prayer for relief, Plaintiffs request that punitive damages be awarded against Officer Doyle. Doyle maintains that the facts alleged are insufficient to support an award of punitive damages, because they do not demonstrate

that his conduct was motivated by malice or evil intent, or that he acted with reckless or callous indifference to Laning's [*47] federally protected rights. See *Smith v, Wade, 461 U.S. 30, 56, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983)*.

Plaintiffs, however, have alleged malice, and reckless and callous indifference in connection with several of the remaining claims. *See* Doc. # 19, PageID##169, 1 74, 176. For the same reasons set forth above, the Court cannot say that the factual allegations supporting the claim for punitive damages are insufficient as a matter of law. As such, the Court declines to dismiss Plaintiffs' claim for punitive damages at this juncture.

## V. Conclusion

For the reasons set forth above, Defendants' Motion for Judgment on the Pleadings, Doc. #23, is SUSTAINED IN PART and OVERRULED IN PART, as follows:
- All claims against Chief Schommer and Sergeant John Doe (Count III), and all claims brought against Officer Doyle in his official capacity, are DISMISSED WITH PREJUDICE;
- The following claims brought against Officer Doyle in his individual capacity are DISMISSED WITH PREJUDICE:
  - Count I: Unlawful Seizure, Detention, Search and Arrest
  - Count IV: Malicious Prosecution
  - Count V: False Arrest
  - Count VII: Assault and Battery (federal claim)
  - Count X: Intentional Infliction of Emotional Distress (federal claim)

- The following claims brought against Officer Doyle in his individual [*48] capacity remain pending:

  - Count II: Excessive Force (*42 U.S.C. § 1983*)

  - Count VI: Retaliatory Arrest (*42 U.S.C. § 1983*)
  - Count VIII: Assault and Battery (state claim)
  - Count IX: Loss of Consortium (state claim)
  - Count X: Intentional Infliction of Emotional Distress (state claim)
  - Claim for compensatory and punitive damages
- The following claim brought against the City of Huber Heights remains pending:

  - Count III (*42 U.S.C. § 1983* only)

Date: February 18, 2015

/s/ WALTER H. RICE

UNITED STATES DISTRICT JUDGE

---

*End of Document*

 Caution
As of: November 6, 2025 6:36 PM Z

## *Nance v. Kilpatrick*

United States District Court for the Eastern District of Tennessee

March 28, 2019, Filed

No.: 1:18-CV-11-TAV-CHS

**Reporter**
2019 U.S. Dist. LEXIS 52411 *; 2019 WL 1409847

LARRY DARNELL NANCE, JR., SHERRY NANCE, and SHERRY NANCE, as Conservator for and Best Friend of JUSTIN NANCE, Plaintiffs, v. TRENT MARTIN KILPATRICK, in his individual capacity as a Chattanooga Police Officer, and HANS ANDERSON, in his individual capacity as a Chattanooga Police Officer, Defendants.

## Core Terms

plaintiffs', arrest, summary judgment, qualified immunity, police officer, door, assault, circumstances, summary judgment motion, probable cause, opened, objectively unreasonable, warrantless entry, excessive force, front door, rights, constitutional right, effectuating, interaction, responded, courts, knock, disorder, exigent circumstances, use of force, handcuffed, indictment, lunged, severe, light most favorable

**Counsel: [*1]** For Larry Darnell Nance, Jr, Sherry Nance, Sherry Nance, As Conservator for and Best Friend of Justin Nance, Plaintiffs: Charles G Wright, Jr, River City Legal Group, PLLC, Chattanooga, TN.

For Trent Martin Kilpatrick, In his individual capacity as a Chattanooga Police Officer, Defendant: Janie Parks Varnell, LEAD ATTORNEY, Davis & Hoss, PC, Chattanooga, TN.

For Hans Anderson, In his individual capacity as a Chattanooga Police Officer, Defendant: Phillip A Noblett, LEAD ATTORNEY, Keith J Reisman, Office of Chattanooga City Attorney, Chattanooga, TN.

**Judges:** Thomas A. Varlan, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** Thomas A. Varlan

## Opinion

<u>**MEMORANDUM OPINION**</u>

This civil action is before the Court on plaintiffs' motion for partial summary judgment [Doc. 32] and defendants' motions for summary judgment [Docs. 45, 48]. Defendants responded in opposition to plaintiffs' motion [Docs. 39, 40], and plaintiffs replied [Doc. 41]. Plaintiffs also responded to defendants' motions [Docs. 56, 57], to which defendants replied [Docs. 61, 62]. For the reasons that follow, the Court will deny plaintiffs' partial motion for summary judgment, grant defendant Hans Anderson's motion for summary judgment, and grant in part and deny **[*2]** in part defendant Trent Kilpatrick's motion for summary judgment.

**I. Background**

2019 U.S. Dist. LEXIS 52411, *2

This case arises out of an arrest that took place on March 25, 2017, in Hamilton County, Tennessee [Doc. 1]. Plaintiffs were at their home when, at approximately 10:45 p.m., three City of Chattanooga police officers, Officers Kilpatrick, Anderson, and Gunn, arrived at the premise in response to a "disorder" call.

This was the second police visit to plaintiffs' house that day. As they arrived, Officers Gunn and Anderson advised Officer Kilpatrick that earlier in the day they had previously responded to a "shots fired" call at the same address, which was made by a neighbor who claimed that plaintiff Larry Nance was firing shots from his home [Doc. 40-1]. Officers Gunn and Anderson also advised Officer Kilpatrick that, during this prior encounter, Mr. Nance had refused their commands to take his hands out of his pockets, acted belligerently, and that the officers left the scene shortly thereafter without further contact [Docs. 39-1, 40-1].

Following this update, Officers Kilpatrick and Gunn approached plaintiff's front door by way of the front porch, while Officer Anderson positioned himself beside the porch, **[\*3]** so that he could observe anyone potentially coming from the side of the house [*Id.*]. No porch lights were on, so the officers used flashlights to make their approach.

Plaintiffs have a screen door, which opens outward over the porch, outside of their front door, which opens inward back into the house [*Id.*]. The parties dispute the specifics of whether the screen door was opened, by whom, and at what point, during the following interaction. However, the parties agree that plaintiff Sherry Nance opened the interior door of the home to speak with the officers once they accessed the porch [*Id.*]. Audio heard from Officer Kilpatrick's police-car camera shows that Mrs. Nance asked the police officers if she could help them, and was quickly joined by her husband, both of whom began to question why the officers were outside their door [Doc. 47]. Although not everything that was said can be heard clearly from the car video footage, it is evident that the officers responded that they had received a "disorder" call for this location [*Id.*]. The following exchange then occurs:

> Mr. Nance: Listen, you guys got to stop this, man. If this weirdo—
>
> Officer Kilpatrick: Hey listen to me, you aren't going to **[\*4]** tell me what I am and not going to do.
> Ms. Nance: We haven't done anything
> Officer Kilpatrick: And that's fine, but just give us a chance to come up here and talk to you; don't just start mouthing off.
> Mr. Nance: I'm going to tell you something right now.
> Officer Kilpatrick: Go ahead and tell me.
> Mr. Nance: This is done. This is done. This is done.
> Mr. Kilpatrick: Okay.
> Mr. Nance: This guy has been doing weird things—Mr. Kilpatrick: And that's fine, but you're not going to jump on me, buddy.
> Mr. Kilpatrick: And that's fine, but you're not going to jump on me, buddy.

Each party states that the other acted aggressively during this interaction, and it is undisputed that after this encounter Officer Kilpatrick entered into the Nance home to arrest Mr. Nance [Docs. 30, 31, 46-1]. The parties disagree as to why.

Plaintiffs assert in their affidavits that Mr. Nance attempted to end the conversation with the officers by closing the front door, after which Officer Kilpatrick opened the screen door, pushed upon the front door, and entered the Nance home [Docs. 30, 31]. However, Officer Kilpatrick states that Mr. Nance "made a sudden movement just inside the doorway that obstructed my view of his hands" **[\*5]** [Doc. 40-1] and that, given the previous "shots fired" call and Mr. Nance's belligerent attitude (which Officer Kilpatrick attributes to intoxication and Mr. Nance denies), Officer Kilpatrick feared that Mr. Nance was attempting to grab a weapon, and so he leaned forward into the open doorway to retain his visual [Docs. 40-1, 54]. Mr. Nance maintains that he made no sudden movements to warrant Officer Kilpatrick leaning across the threshold of his home in this manner [Doc. 41-1]. When Mr. Nance slammed the door, Officer Kilpatrick alleges that he raised his leg and arm to stop the door from striking his face [*Id.*].

At this point, Officer Kilpatrick states that he was the victim of an assault, and he therefore entered plaintiffs' residence, along with Officer Gunn, to arrest Mr. Nance [Doc. 40-1]. The arrest did not go smoothly, the fault for which the parties attribute to each other. Several household items ended up disordered and on the floor. Concerned

by the commotion, Defendant Anderson entered the house and saw that Mr. Nance, Officer Gunn, and Officer Kilpatrick were on the floor, with the officers on top of Mr. Nance [Doc. 39-1]. Officer Anderson states that he positioned himself **[*6]** between the three persons on the floor and Mrs. Nance, who at this point was screaming and on one side of the room [Doc. 39-1]. Officers Kilpatrick and Anderson then handcuffed Mr. Nance and removed him to Officer Kilpatrick's patrol car. The officers subsequently decided to transfer Mr. Nance from Officer Kilpatrick's car to Officer Anderson's car, since Officer Kilpatrick was identifying himself as the victim of an assault [Doc. 40-1].

That car transfer is also the subject of serious dispute. Officer Kilpatrick alleges that Mr. Nance lunged at him while being moved, forcing Officer Kilpatrick to block the lunge, which in turn caused Mr. Nance to lose his footing and fall [*Id.*]. Officer Anderson confirms that account [Doc. 39-1]. Mr. Nance, however, avers that he never lunged, but that Officer Kilpatrick nevertheless "body slammed" him onto the asphalt, breaking two of his ribs and causing other injuries [Doc. 1]. Once Mr. Nance was successfully deposited into Officer Anderson's police car, he was transported to the Hamilton County jail and charged with assault [Doc. 1].

Based on these events, plaintiffs accuse defendants of assault, battery, false imprisonment, intentional infliction **[*7]** of emotional distress, trespass to land, trespass to chattels, invasion of privacy, malicious prosecution, and various violations of the United States and Tennessee Constitutions [Doc. 1]. Plaintiffs request partial summary judgment on their claims brought under the *Fourth* and *Fourteenth Amendments of the United States Constitution* and *Article 1, Section 7 of the Tennessee State Constitution* [Doc. 32]. Defendants argue that they are entitled to summary judgment for all of plaintiffs' federal claims because they did not violate plaintiffs' constitutional rights. To the extent that the evidence reveals a constitutional violation, defendants state that summary judgment is appropriate under the doctrine of qualified immunity. Defendants request that all state law claims be remanded to state court, or alternatively, dismissed. This matter is now ripe for review.

## II. Standard of Review

Summary judgment under *Rule 56 of the Federal Rules of Civil Procedure* is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett, 477 U.S. 317, 330 n.2, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; *Moore v. Philip Morris Cos., 8 F.3d 335, 339 (6th Cir. 1993)*. All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving **[*8]** party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Burchett v. Kiefer, 310 F.3d 937, 942 (6th Cir. 2002)*.

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under *Rule 56*, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp., 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991)* (citing *Celotex, 477 U.S. at 317*). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

In a case such as this one, where parties have filed competing motions for summary judgment, each party, as movant, must establish that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. When evaluating cross-motions for summary judgment the Court should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the nonmoving party." *Wiley v. United States, 20 F.3d 222, 224 (6th Cir. 1994)*. If the Court finds that one party has failed meet its burden the other party is not considered to have automatically met theirs. Rather, the Court must evaluate each party's motions individually to determine if they have complied with *Rule 56* **[*9]** . "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to the resolution of the case on the existing record or that the district

court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)*. If the Court determines that a genuine issue of material fact exists, both motions must be denied. In the alternative, if the Court finds that no genuine issue of material fact exists and a party is entitled to prevail as a matter of law, the Court will render judgment. *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio, 437 F. Supp. 2d 706, 732 (S.D. Ohio 2006)*.

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id. at 250*. The Court does not weigh the evidence or determine the truth of the matter. *Id. at 249*. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989)*. Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson, 477 U.S. at 250*.

### III. Analysis

### A. Federal Constitutional Claims

In their motions for summary judgment, both Officers Kilpatrick and Anderson raise the defense of qualified immunity. Government officials are entitled to qualified immunity from liability for civil damages **[*10]** "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)* (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982))*. The relevant inquiry is "(1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right, and (2) was the right clearly established to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful." *Kennedy v. City of Cincinnati, 595 F.3d 327, 336 (6th Cir. 2010)* (quoting *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (U.S. 2001))* (internal quotation marks omitted). With respect to the second prong, courts must look at the specific facts relevant to each case, and not whether a right is clearly established "as a broad general proposition." *Saucier v. Katz, 533 U.S. at 201*. A failure to establish either prong is fatal to plaintiff's case, so a court may address them in the order it sees fit. *See Pearson, 555 U.S. at 236*.

The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)*. Qualified immunity is an immunity from suit, not a defense to liability. *Pearson, 555 U.S. at 231*. Where a defendant asserts qualified immunity, the plaintiff bears the burden of demonstrating that defendant is not entitled to it. *Silberstein v. City of Dayton, 440 F.3d 306, 311 (6th Cir. 2006)*. The plaintiff must produce "sufficient evidence **[*11]** to indicate that what the official allegedly did was objectively unreasonable in light of clearly established constitutional rights." *Andrews v. Hickman County, 700 F.3d 845, 853 (6th Cir. 2012)*. Where a plaintiff fails to offer sufficient evidence as to any prong he fails to carry his burden and summary judgment is appropriate for the defendant. *Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009)*. Courts must keep in mind that "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *McKenna v. Edgell, 617 F.3d 432, 437 (6th Cir. 2010)*.

Plaintiffs have brought several claims against Officers Anderson and Kilpatrick pursuant to the *Fourth*, *Fifth*, and *Fourteenth Amendments of the United States Constitution* [Doc. 1]. Specifically, they allege that defendants conducted an unconstitutional search of their property, illegally entered their home and invaded their privacy, used illegal force to effectuate an illegal arrest of plaintiff Larry Nance, and illegally attempted to force plaintiffs to speak with them.

**1. The Officers' Presence Outside of Plaintiffs' Home**

Officers Anderson and Kilpatrick are shielded by qualified immunity from plaintiffs' invasion of privacy claims. Plaintiffs allege that the co-defendants violated the *Fourth* and *Fourteenth Amendments of the United States Constitution* by approaching plaintiffs' front door and shining their flashlifts onto their front porch [Doc. **[*12]** 1]. The *Fourth Amendment*[1] states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the places to be searched, and the persons or things to be seized." *U.S. Const. amend. IV*. It is presumptively unreasonable for police officers to enter into a private home without a warrant. *Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)*. *Fourth Amendment* protections also extend to the curtilage of a house. *United States v. Dunn, 480 U.S. 294, 300, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)*. The *Fourth Amendment*, however, does not serve to completely bar police officers from ever entering onto someone's property unless accompanied by a valid warrant. Instead, the Supreme Court has stated that there is an "implicit license" by homeowners which allows persons to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida v. Jardines, 569 U.S. 1, 8, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013)*. Therefore, "a police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Id.*

In light of these standards, the evidence shows that the officers did not conduct an unconstitutional search of plaintiffs' property. **[*13]** Officers Kilpatrick, Gunn, and Anderson were responding to a call when they arrived at plaintiffs' house. They were allowed to approach plaintiffs' house by way of the front porch to knock on the door. *See Florida v. Jardines, 569 U.S. at 8*. The parties agree that no porch light was on when the officers arrived at the Nance home. Therefore, the officers were entitled to use flashlights to aid them in making their approach. *See United States v. Clay, 2011 U.S. Dist. LEXIS 65657, at \*14 (E.D. Tenn. Apr. 11, 2011)* (police officer did not violate the *Fourth Amendment* when he used a flashlight to enter onto a defendant's property and access the front stoop).

This calculus does not change because plaintiff Sherry Nance opened the front door to speak with the officers before they had fully made their way onto the porch and knocked on the door [Doc. 30]. Rather, this demonstrates that defendants were in the process of approaching the home, and therefore still acting under the implicit license which allowed them to do so.

Furthermore, Officer Anderson did not violate plaintiffs' constitutional rights by remaining to the side of the porch "so that [he] could see if anyone was coming from the side of the house" [Doc. 39-1] while Officers Kilpatrick and Gunn approached plaintiff in her doorway. First, Officer Anderson was within **[*14]** his rights to pause on his approach to the home and remain off the porch while officers Gunn and Kilpatrick engaged with Mrs. Nance. If he were to have remained there longer than it took for Officers Gunn and Kilpatrick to knock on the front door and briefly wait for an answer, then perhaps the implicit license he had to be there would expire. *See Jardines, 569 U.S. at 8*. However, plaintiff Sherry Nance opened the door and engaged with the officers before they could knock [Doc. 30]. His license to remain where he was, therefore, had not expired.

Second, the fact that Officer Anderson was looking to see if anyone would approach from the side of the house does not transform his conduct into an impermissible search. *See* 1 Wayne R. LaFave et al., *Search & Seizure* § 2.3(f) (5th ed., 2018 update) ("[W]hen the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the *Fourth Amendment*." (footnotes omitted)). The officers were responding to a "disorder" call, the second call concerning plaintiff Larry

---

[1] The *Fourteenth Amendment* renders the *Fourth Amendment* applicable to states. *Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961)*.

Nance that day, and were entitled to approach **[\*15]** the residence with caution. It was permissible for Officer Anderson to stand beside plaintiffs' porch, a place he was entitled to be under plaintiffs' implicit license. Viewing the evidence in a light most favorable to plaintiffs, plaintiffs have failed to establish that either officer's approach to plaintiffs' residence violated their *Fourth Amendment* rights. Officers Anderson and Kilpatrick are therefore entitled to qualified immunity. Because summary judgment is appropriate for defendants, plaintiffs' motion for summary judgment as to this count will be denied.

### 2. Entry Into Home

Furthermore, neither officers' entry into plaintiffs' home violated plaintiffs' clearly established constitutional rights. Although warrantless entries are "presumptively unreasonable," officers are nevertheless allowed to enter a home without a warrant under limited, "exigent" circumstances, including: "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Rohrig, 98 F.3d 1506, 1515 (6th Cir. 1996)* (citing *United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994)*. To determine whether a circumstance is truly "exigent" the court considers three factors: "whether the Government has demonstrated a need for **[\*16]** immediate action," "the governmental interest being served by the officers' entry into Defendant's home," and the weight of "this governmental interest against Defendant's interest in maintaining the privacy of his home." *Rohrig, 98 F.3d at 1518*. The court in *Rohrig* noted that a defendant's reasonable expectation of privacy in his home could be diminished by his own conduct. *Id.*

First, plaintiffs have failed to meet their burden demonstrating that qualified immunity does not apply to Officer Kilpatrick's warrantless entry into their home. Specifically, plaintiffs have not shown that Officer Kilpatrick violated one of their clearly established rights in a particularized sense—a necessary component to overcoming qualified immunity. *See Ashcroft v. al-Kidd, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)* ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Plaintiffs have offered no precedent to the facts at hand to demonstrate that plaintiffs' rights were clearly established in this situation. In their response, plaintiffs cite two cases, *Payton v. New York, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)* and *Florida v. Jardines, 569 U.S. 1, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013)*, for the proposition that Officer Kilpatrick's warrantless entry onto their property and into their home violated their constitutional **[\*17]** rights [Doc. 57]. However, the Supreme Court has repeatedly admonished lower courts to refrain from defining clearly established law at high levels of generality. *See, e.g., Ashcroft, 563 U.S. at 742* ("The general proposition, for example, that an unreasonable search or seizure violates the *Fourth Amendment* is of little help in determining whether the violative nature of particular conduct is clearly established.").

Neither of the cases cited by plaintiffs assist the Court in determining whether their rights were violated based on the specific facts at issue in this case. *Payton* stands for the general proposition that police cannot engage in warrantless entries into suspects' homes to make routine felony-arrests. *Payton, 445 U.S. at 576*. However, in this case the officers were responding to a "disorder" call, and Officer Kilpatrick maintains that his warrantless entry into plaintiffs' home was justified by exigent circumstances [Doc. 46]. Therefore, *Payton's* more general holding is not directly applicable here. *Jardines* stated that law enforcement officers who used drug-sniffing dogs on the front porch of a home without a warrant executed a "search" for the purposes of the *Fourth Amendment*. *Jardines, 569 U.S. at 7*. As discussed above, the officers in this case did not violate the *Jardines* **[\*18]** ruling by approaching plaintiffs' home by way of the front porch in order to knock on the door to speak with plaintiffs. Neither of the cases cited by plaintiffs, therefore, offer effective rebuttals of defendants' qualified immunity defense.

Furthermore, Officer Kilpatrick cites two cases, *Cummings v. City of Akron, 418 F.3d 676 (6th Cir. 2005)* and *United States v. Santana, 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976)*, to demonstrate his belief that his entry into plaintiffs' home was justified under the circumstances and legal under relevant caselaw [Doc. 46]. Officer Kilpatrick highlights the facts in these cases to demonstrate that interactions between police officers and citizens in the doorways of private homes can at times be considered interactions held in public space, during which, if probable cause arises, an officer can effectuate a warrantless arrest [*Id.*].

On one side of the spectrum is *Cummings*, whose circumstances demonstrate an interaction which took place in a private space. In *Cummings* police officers approached the defendant's home, opened a screen door, and knocked on defendant's front door. *418 F.3d at 679*. Defendant clearly manifested an intent to keep his home private, first by attempting to talk to the officers through his window, and later by only partially opening his door at their request. *Id. at 685*. During **[\*19]** the subsequent conversation, an officer intentionally stuck his foot in the door, and when the defendant refused the officers' request to enter the home and tried to shut the door, he was prevented from doing so by this officer's foot. *Id.* The officer maintained that defendant's act of shutting the door on his foot constituted an assault, and therefore he was justified in entering the home to arrest the defendant under the hot pursuit exception to the warrant requirement. *Id.* The Sixth Circuit disagreed, pointing out that "the key to the hot pursuit exception is that a suspect may not defeat an arrest which has been set in motion in a public place by the expedient of escaping to a private place." *Id. at 686* (citing *United States v. Santana, 427 U.S. 38, 43, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976))*. The court found that the defendant did not commit a crime in a public space because he "never fully exposed himself to public view, given that he opened the door very slightly, and only at the request of the police." *Id.*

In contrast, in *Santana* the Supreme Court determined that a defendant who was standing in the open doorway of a house was in a public space because "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she **[\*20]** had been standing completely outside her house." *427 U.S. at 42*. The Court found that she had no expectation of privacy there and so the police, who had probable cause to arrest her, could do so. *Id.* When the defendant attempted to retreat into the home to avoid her impending arrest, the Court found that the officers' warrantless entry into the home was appropriate under the hot pursuit exception. *Id.* The Court noted that "[t]he fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into [defendant]'s house." *Id. at 43*. The facts in *Santana* therefore demonstrate that a plaintiff standing in a doorway deemed to be a public space cannot necessarily reacquire *Fourth Amendment* protection simply by retreating back into the home. Co-defendant Kilpatrick argues that the present situation is more analogous to the facts in *Santana* than *Cummings*, and plaintiffs do not present relevant caselaw, or indeed even engage in an analysis of the two cases cited by Officer Kilpatrick, to rebut this assertion.

It is important to note that under the doctrine of qualified immunity it is not necessary for the Court to determine conclusively the constitutionality **[\*21]** of an officer's conduct. Rather, the Court must grant immunity unless "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and it is "beyond debate" that the officer's actions violated the clearly established law. *Ashcroft v. al-Kidd, 563 U.S. at 741*. The Court first finds that, given plaintiffs' proximity to their open door and their interactions with the police, the question of whether they placed themselves in the public view, and therefore in a public space, is not beyond debate.

The Court reaches this conclusion even when viewing the evidence in a light most favorable to plaintiffs. The undisputed evidence shows that, as Officers Kilpatrick and Gunn approached plaintiffs' front door, Mrs. Nance preemptively opened the door to engage in conversation with them [Doc. 30]. This is unlike the plaintiff in *Cummings*, who came to a window to speak with officers only after they knocked on his door. *418 F.3d at 679*. Furthermore, the facts demonstrate that Mrs. Nance opened the door wide enough for both herself and Larry Nance to view the officers and converse with them [Doc. 31]. Again, this is in contrast to the plaintiff in *Cummings* **[\*22]**, who only opened his door "very slightly," when asked by plaintiffs to come to the front door. *418 F.3d at 686*. Whereas the court in *Cummings* found that the plaintiff "never fully exposed himself to the public view, given that he only opened the door very slightly, and only at the request of the police," *418 F.3d at 686*, here Mrs. Nance opened the door before the police could request that she do so, and opened it wide enough for the police and both Larry and Sherry Nance to clearly see and converse with each other.[2] This is similar to the situation in *Santana*, where

_____

[2] Apart from the interior door, plaintiffs' home also has a screen door. As stated, the parties dispute when the screen door was opened and by whom. However, even if the screen door was initially closed when Sherry Nance first spoke with the officers, the

the plaintiff was exposed to public view and hearing. *Santana, 427 U.S. at 42*. Given these circumstances, a reasonable officer could have believed that the plaintiffs exposed themselves to public view.

Once exposed to the public view, and if probable cause arose, plaintiffs could not necessarily reclaim their *Fourth Amendment* protections merely by attempting to end their interaction with the police and retreating back into their house. *See e.g. Santana, 427 U.S. at 43* ("A suspect may not defeat an arrest which has been set in motion in a public place."). The question next becomes whether Officer Kilpatrick violated plaintiffs' clearly established rights by entering their home, or whether this entrance **[*23]** was justified due to exigent circumstances. In that regard, the Court finds that a reasonable officer in Kilpatrick's situation could have concluded that exigent circumstances justified his entrance. Again, plaintiffs do not point to relevant caselaw to demonstrate that Officer Kilpatrick must have understood his actions violated plaintiffs' rights. *See City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 504, 202 L. Ed. 2d 455* ("We have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the *Fourth Amendment* . . . While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular action beyond debate.") (internal quotations and citation omitted).

And, viewing the evidence in a light most favorable to the plaintiffs, the Court does not find that it was objectively unreasonable for Officer Anderson to have initially crossed plaintiffs' threshold without a warrant due to his perception of immediate risk of danger to police or others. *Johnson, 22 F.3d at 680*. Both parties describe their interaction as very heated, and the audio footage of the encounter supports the contentious nature of the encounter [Docs. 30, 31, 46-1, 47]. It is also undisputed that police officers had twice been **[*24]** called to plaintiffs' residence that day, once for a "shots fired" call, and then again for a "disorder" call. It is here that the recollections diverge. Plaintiffs allege that they tried to end the interaction by closing their front door, whereupon Officer Kilpatrick opened the screen door and subsequently "[threw] his arm out" in order to stop the interior door from also closing [Docs. 30, 31]. Although Mr. Nance asserts that he did not make any threatening movements toward Officer Kilpatrick or hide his hands from Kilpatrick during their encounter [Doc. 54], Officer Kilpatrick states that nevertheless at one point during their interaction his view of Mr. Nance's hands was obstructed, and given the previous "shots fired" call and the hostile situation then occurring, Officer Kilpatrick feared that Mr. Nance was attempting to grab a weapon [Doc. 46-1]. Officer Kilpatrick maintains that he leaned across the threshold of the Nance home in order to keep a visual on Mr. Nance's hands [*id.*].

Under the totality of the circumstances, Officer Kilpatrick's actions were not objectively unreasonable, even given plaintiffs' version of events. The parties were involved in a highly antagonistic **[*25]** encounter, and Officer Kilpatrick was aware that this was the second police call against plaintiffs that day, the first of which involved the alleged use of a gun. Even if Larry Nance was not reaching for a firearm, and was instead reaching for his interior door to close it and end the encounter with Officer Kilpatrick, under the circumstances Officer Kilpatrick was not objectively unreasonable to fear that Mr. Nance could be reaching for a firearm, as he believed Mr. Nance had been in possession of one earlier in the day. Therefore, based on the hostile situation and his knowledge of plaintiff, it was not objectively unreasonable for Officer Kilpatrick to fear that there was an immediate risk of danger to the police or others, which would justify his opening of the screen door and leaning across the threshold in an attempt to maintain a visual on Mr. Nance's hands. *See Bing ex rel. Bing v. City of Whitehall, Ohio, 456 F.3d 555, 564* (holding that dangerous exigent circumstances justified a warrantless home entry where the police knew plaintiff had access to a gun, the police had previously been called to plaintiff's residence because of shots fired, and plaintiff exhibited unstable behavior); *see also Daniel v. Cox, 1997 U.S. App. LEXIS 10588, 1997 WL 234615, at *3*

---

facts demonstrate that the parties could still clearly see and hear each other. Furthermore, even if the officers were the ones to eventually open the screen door, this fact is immaterial. In *Cummings*, the home also had a screen door outside of the house door. *418 F.3d at 679*. The officers there opened the screen door in order to knock on the interior door. *Id.* The court did not find this action to violate plaintiff's constitutional right; instead, the violation occurred when the officer attempted to enter into the home when plaintiff had clearly manifested an intent that it should remain a private space. *Id. at 686*. Here, as discussed above, plaintiffs did not clearly manifest an intent to keep their home private. Moreover, even if the officers did open the screen door in this case, the facts show that it swung outward over the porch, an area the police officers were legally allowed to be [Docs. 30, 31].

*(6th Cir. 1997)* (qualified immunity appropriate for police **[*26]** officer who opened the screen door of a home in an attempt to identify the source of movements in a house whose residents were knowingly prone to acts of violence and possibly armed).

Although Officer Kilpatrick may have only leaned across the threshold to retain a visual on Mr. Nance's hands, we know that Mr. Nance was not reaching for a gun, but was instead grabbing the door in order to shut it. Officer Kilpatrick, lacking the ability of hindsight which we now possess, saw the door swinging toward him and put up his hands to stop the door from closing on him. He then was not objectively unreasonable to believe himself to be the victim of an assault in a public space, here the doorway of the home.[3] Once Officer Kilpatrick believed he had probable cause to arrest the defendant for his assault, Mr. Nance could not necessarily "defeat an arrest which has been set in motion in a public place . . . by the expedient escaping to a private place." *Santana, 427 U.S. at 43*. Officer Kilpatrick was then was able to fully enter plaintiffs' home under the hot pursuit exception to warrantless entries. *See Johnson, 22 F.3d at 680*.

Furthermore, plaintiffs have also failed to show that Officer Anderson's warrantless entry into plaintiffs' home violated **[*27]** their clearly established rights. Officer Anderson also raised the defense of qualified immunity, asserting that his entrance was justified by exigent circumstances, namely his reasonable perception of the risk of danger to his fellow police officers and others within the home. *See Rohrig, 98 F.3d at 1515*. In response, plaintiffs again cite the holdings in *Payton v. New York* and *Florida v. Jardines*. *See Payton, 445 U.S. at 576; Jardines, 569 U.S. at 7*. As discussed above, the facts and circumstances in those cases do not aid the Court in determining whether qualified immunity should apply in this case. Plaintiffs have therefore failed to establish that Officer Anderson violated a clearly established right. The undisputed facts show that Officer Anderson responded to a "disorder" call at a location where, earlier in the day, he had responded to a "shot fired" complaint. Then, while standing to the side of the porch, he heard a verbal altercation between Officers Gunn, Kilpatrick, and Mr. Nance, saw the other two officers enter the house, and heard a commotion from inside the house which sounded like a fight. Based on these circumstances, it was reasonable for Officer Anderson to believe there was a risk of danger to his fellow police officers and others **[*28]** in the home so as to justify him passing through the doorway without a warrant.

Because plaintiffs fail to demonstrate that qualified immunity should not apply to both officers, summary judgment for defendants is therefore appropriate. Because summary judgment is appropriate for both defendants, plaintiffs' motion for summary judgment as to this count will be denied.


### 3. Arrest

Both officers are also entitled to qualified immunity against plaintiff Larry Nance's false arrest charge. To bring a false arrest claim under *42 U.S.C. § 1983*, a plaintiff must show that the arresting officer lacked probable cause to arrest him. *Voyticky v. Vill. Of Timberlake, 412 F.3d 669, 677 (6th Cir. 2005)* (citing *Fridley v. Horrighs, 291 F.3d 867, 872 (6th Cir. 2002))*. Probable cause exists where there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett v. Cumberland College, 316 F.3d 571, 580 (6th Cir. 2003)* (quoting *Michigan v. DeFillippo, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979))*. The reasonableness of a police officer's determination of probable cause is assessed based on an officer's knowledge at the time of an arrest. *Id.* (citing *Estate of Dietrich v. Burrows, 167 F.3d 1007, 1012 (6th Cir. 1999))*. In situations such as this, where there are multiple police officers involved in the

---

[3] Under Tennessee law, "A person commits assault who: (1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." *Tenn. Code Ann. § 39-13-101* (2018).

incident, courts must look at each **[*29]** defendant individually to determine if they violated the plaintiff's constitutional rights. *Newbill v. Neville, 2018 U.S. Dist. LEXIS 166399, at *14 (S.D. Ohio Sept. 27, 2018)*.

In the instant case, Officer Kilpatrick ordered Mr. Nance's arrest and Officer Anderson executed it. As discussed above, it was not objectively unreasonable for Officer Kilpatrick to believe himself to be the victim of an assault by Mr. Nance, thereby providing probable cause to order Mr. Nance's arrest.[4] Because plaintiffs cannot therefore establish that Officer Kilpatrick violated Mr. Nance's constitutional rights, qualified immunity is appropriate.

Furthermore, Officer Anderson only partially witnessed the events leading up to the arrest and therefore, when formulating probable cause to effectuate the arrest, relied in part on Officer Kilpatrick's assertion that Mr. Nance assaulted him. This reliance was justified based on the "collective knowledge" or "fellow officer" rule: "This doctrine recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *United States v. Lyons, 687 F.3d 754, 766 (6th Cir. 2012)* (citing *United States v. Hensley, 469 U.S. 221, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985))* (internal quotation omitted). The rule allows officers to rely in good faith on reports of other officers. To **[*30]** evaluate whether qualified immunity applies in these situations, courts consider "(1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Humphrey v. Mabry, 482 F.3d 840, 848 (6th Cir. 2007)*.

Here the fellow officer rule establishes probable cause on the part of Officer Anderson; therefore, there was no constitutional violation. Officer Anderson did not see all of the events culminating in Mr. Nance's arrest. He did however, hear a commotion and then, upon entering the Nance home, see Officer Kilpatrick and Mr. Nance on the floor together [Doc. 39-1]. Based on his perceptions, his reasonable reliance on Officer Kilpatrick's claim of assault, and Officer Kilpatrick's order to arrest Mr. Nance, Officer Anderson was justified in effectuating Mr. Nance's arrest.

At the summary judgment stage it is plaintiffs' burden to show that Officers Kilpatrick and Anderson are not entitled to qualified immunity, and here plaintiffs fail to do so, either by demonstrating that Officer Kilpatrick's belief that he was assaulted was objectively unreasonable **[*31]** or by adducing proof that Officer Anderson's reliance on Officer Kilpatrick's information and instructions was unreasonable. Plaintiffs have failed to meet their burden and qualified immunity therefore applies. Summary judgment for defendants is appropriate. Because summary judgment is appropriate for defendants, plaintiffs' motion for summary judgment as to this count will be denied.


## 4. Rights under *Miranda*

Both defendants are entitled to summary judgment on plaintiffs' claim that they "attempted to force [plaintiffs] to talk" to them in violation of the *Fifth* and *Fourteenth Amendments* [Doc. 1]. Plaintiffs fail to put forth any facts to support this claim. As discussed above, the officers were allowed to respond to a police call and approach plaintiffs' home. There is no evidence in the record that either officer attempted to interrogate plaintiffs in violation of their *Miranda* rights, which provide that defendants must be warned of their constitutional rights against self-incrimination. *Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)*. To the extent that plaintiffs allege a violation of their *Miranda* rights before Mr. Nance's arrest, these rights do not apply to persons not in custody. *See id.* To the extent that Mr. Nance alleges a violation of his *Miranda* **[*32]** rights after his arrest, defendant does not point to any evidence in the record supporting this assertion. Because there is no factual evidence supporting this claim, summary judgment for Officers Kilpatrick and Anderson is appropriate. Plaintiffs' motion for summary judgment as to this count will be denied.

---

[4] This is accordance with Tennessee law, which provides that "an officer may, without a warrant, arrest a person for a public offense committed or a breach of the peace threatened in the officer's presence." *Tenn. Code Ann. § 40-7-103*.

**5. Excessive Force**

The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." _Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)_. However, arresting and investigating officers are prohibited by the _Fourth Amendment_ from using excessive force. _Wells v. City of Dearborn Heights, 538 Fed. Appx. 631, 637 (6th Cir. 2013)_. Courts use the "objective reasonableness" test to determine whether this prohibition has been violated, asking "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." _Id._ (quoting _Graham v. Connor, 490 U.S. at 386_). "The test is fact specific, not mechanical, and the three most important factors for each case are: (1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee." _Id_. The test aids the Court in balancing "the nature and quality [*33] of the intrusion on a plaintiff's _Fourth Amendment_ interests against the countervailing governmental interests at stake." _Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013)_ (internal citation and quotations omitted). Moreover, this "reasonableness" inquiry is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." _Graham, 490 U.S. at 396_. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." _Id._

Plaintiff Larry Nance appears to assert that Officer Kilpatrick twice used excessive force on him: once when effectuating his arrest within plaintiffs' home, and again when moving him from one police car to another [Doc. 1]. In their motion for summary judgment plaintiffs do not analyze their excessive force claim at all [Doc. 34], and in their reply to Officer Kilpatrick's motion for summary judgment plaintiffs cite no case law to demonstrate with particularity how Officer Kilpatrick's use of force was unreasonable or excessive [Doc. 57]. Instead, in their reply brief, plaintiffs devote [*34] less than a page to their argument that Officer Kilpatrick's use of force was excessive, stating first that, "there is nothing objectively reasonable about a law enforcement officer entering someone's home to make an arrest without consent, without a warrant, and in clear violation of a U.S. Supreme Court case proscribing such misconduct" [Doc. 57]. The case plaintiffs reference is, once again, _Payton v. New York_ [_Id._]. Plaintiffs' reliance on this case has already been addressed and the Court reiterates that "a plaintiff may not allege the violation [of a constitutional right] in terms of a general, abstract right in order to survive summary judgment." _Lee v. Ritter, 2005 U.S. Dist. LEXIS 34988, at *27 (E.D. Tenn. Dec. 12, 2005)_. _Payton_'s facts are dissimilar to the facts here and its holding does not rebut Officer Kilpatrick's assertion that he made his warrantless entry based on exigent circumstances.

Plaintiffs then state, without any citation, that "Mr. Kilpatrick had _no_ right to use _any_ force to arrest Mr. Nance in his home without a warrant. His use of force was illegal and he did not have the protection of the law" [Doc. 57] (emphasis in original). These base legal allegations are neither supported by relevant facts nor case law. Plaintiffs have again [*35] failed to meet their burden in rebutting Officer Kilpatrick's defense of qualified immunity. _See Lee, 2005 U.S. Dist. LEXIS 34988, at *27_ ("Plaintiff [] bear[s] the burden of establishing that the constitutional right allegedly violated was sufficiently clear at the time of the alleged violation and in relation to the acts committed, 'that a reasonable official would understand that his or her conduct violated that right.'") (quoting _Wegener v. City of Covington, 933 F.2d 390, 392 (6th Cir. 1991))_.

First, the Court holds that, even viewing the evidence in a light most favorable to plaintiffs, qualified immunity applies to Officer Kilpatrick's use of force in effectuating the arrest of Mr. Nance within plaintiffs' home. Mr. Nance alleges that "Trent Kilpatrick grabbed me by the throat and pushed me into appliances and furniture" [Doc. 31]. The Court is not prepared to say that Officer Kilpatrick's actions were objectively unreasonable. In effectuating Mr. Nance's arrest, Officer Kilpatrick was responding to a rapidly-evolving situation. He had just engaged in a heated conversation with plaintiff, which ended in what Kilpatrick reasonably believed to be an assault against his person. Officer Kilpatrick was furthermore at plaintiffs' residence in the first place because he was responding [*36] to a "disorder" call, the second call against plaintiff that day. In deciding whether Officer Kilpatrick's actions were

objectively reasonable, the Court has evaluated the *Graham* factors and notes that although assault is a misdemeanor charge, the alleged assault was made against Officer Kilpatrick immediately preceding the arrest. Given the contentious nature of the parties' interaction, the alleged assault, and this history, Officer Kilpatrick was not objectively unreasonable in using this non-lethal force to detain Mr. Nance. *See Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)* ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the *Fourth Amendment*.") (internal quotation and citation omitted).

The Court will not, however, grant summary judgment to either party on Mr. Nance's claim of excessive force as to Officer Kilpatrick based on the transfer of Mr. Nance's from one police car to the other. When evaluating multiple incidents of alleged excessive force, courts analyze the events in "segments" and "judge each [segment] on its own terms to see if the officer was reasonable at each stage." *Dickerson v. McClellan, 101 F.3d 1151, 1161 (6th Cir. 1996)* (quoting *Plakas v. Drinski, 19 F.3d 1143, 1150 (7th Cir. 1994)*). Therefore, just because Officer Kilpatrick's use of force against plaintiff inside the [*37] house was reasonable, his later-alleged use of force is not shielded under a general aura of appropriacy.

It is undisputed that Mr. Nance was handcuffed and in Officer Kilpatrick's car when the officers decided to transfer Mr. Nance to Officer Anderson's car. Officers Kilpatrick and Anderson both state that, in the midst of this transfer, they saw Mr. Nance suddenly lunge at Officer Kilpatrick, who put his hands up to stop Mr. Nance from hitting him [Docs. 39-1, 46-1]. Both officers also state that Mr. Nance subsequently fell to the ground, and then was placed in Officer Anderson's patrol car without further incident [*Id.*]. Mr. Nance, however, recounts the incident differently. He states that he never lunged at Officer Kilpatrick, but was instead "thrown" to the ground by Officer Kilpatrick, breaking two of his ribs in the process [Doc. 54]. The video footage contains neither audio nor video of this incident.

When assessing Officer Kilpatrick's motion for summary judgment, the Court must view the facts in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. Here, there are factual discrepancies which are material to the Court's reasonableness inquiry and which preclude summary judgment for Officer [*38] Kilpatrick. In particular, there are questions of fact regarding whether Mr. Nance posed a threat to the officers on the scene or in any other way actively resisted his arrest. Using Mr. Nance's version of events, we must first ask if there was a constitutional violation. *Humphrey v. Mabry, 482 F.3d 840, 847 (6th Cir. 2007)*. Particularly, does a constitutional violation occur when a handcuffed defendant, making no sudden movements and posing no discernable threat, is "thrown" to the ground by an arresting police officer?

The answer is yes. Looking at the *Graham* factors and the particular circumstances of this case, the crime for which Mr. Nance was arrested, assault of a police officer, although serious, is still a misdemeanor. *See TENN. CODE ANN. § 39-13-101* (2018). Moreover, Mr. Nance's threat to the police and others was greatly reduced. As opposed to the earlier situation inside the house, here Mr. Nance was handcuffed and surrounded by two police officers who were securely monitoring him as he was moved from one police car to the other. Taking plaintiffs' facts as true, Mr. Nance at this point was not acting violently, threatening the police verbally, or in any other way acting in a potentially dangerous manner. Further, apart from alleging that Mr. Nance [*39] lunged, the officers do not state that Mr. Nance was behaving in a dangerous manner. Finally, Mr. Nance alleges that he did not try to resist the police officers or flee. Based on the totality of these circumstances, it would be objectively unreasonable for Officer Kilpatrick to throw Mr. Nance to the ground without prompt and with enough force to break his ribs.

Moreover, Mr. Nance's right to be free from excessive force while restrained and non-hostile is clearly established. Our circuit's caselaw makes clear "the right of [persons] who pose no safety risk to the police to be free from gratuitous violence during arrest." *Baker v. City of Hamilton, 471 F.3d 601, 608 (6th Cir. 2006)* (quoting *Shreve v. Jessamine Cnty. Fiscal Court, 453 F.3d 681, 688 (6th Cir. 2006)*). For example, in *Phelps v. Coy, 286 F.3d 295 (6th Cir. 2002)*, a handcuffed plaintiff was in the custody of police officers when one officer asked the plaintiff to lift his feet. *286 F.3d at 297*. When the plaintiff tried to comply, another officer interpreted the movement as the plaintiff trying to kick at the first officer. The second officer tackled the plaintiff, hit him twice in the face, and banged his head on the floor several times. The court, applying the *Fourth Amendment* objective reasonableness test, found

that qualitive immunity did not apply to the plaintiff's excessive force claim, explaining "there was simply no **[\*40]** governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was." *Id. at 301.*

Similarly, in *Burgess v. Fischer, 735 F.3d 462 (6th Cir. 2013)*, the court decided that qualified immunity did not apply in a situation where a handcuffed plaintiff, surrounded by four jail officials, was subjected to a takedown which resulted in several fractures to plaintiff's face and head. In *McDowell v. Rogers, 863 F.2d 1302, 1307 (6th Cir. 1988)*, a plaintiff who was handcuffed and not attempting violence or escape was allegedly hit with a nightstick by a police officer. Given the circumstances, the court stated that the "need for the application of force was thus nonexistent; the alleged force could only have been applied maliciously, and the amount of force allegedly used was sufficient to break [plaintiff's] rib." *Id. See also, Schreiber v. Moe, 596 F.3d 323, 332 (6th Cir. 2010)* ("[S]triking a neutralized suspect who is secured by handcuffs is objectively unreasonable).

Here, taking plaintiffs' version of events, Mr. Nance was handcuffed, securely between officers, and did not pose a safety risk. Given these circumstances, the need to use force against him was nonexistent, and given this circuit's case law, the application of gratuitous force enough to break Mr. Nance ribs would be objectively **[\*41]** unreasonable.

The Court, however, will also deny Mr. Nance's motion for summary judgment as to the unconstitutionality of Officer Kilpatrick's use of force. As discussed above, there is a material factual dispute as to whether Mr. Nance lunged at Officer Kilpatrick. When viewing plaintiff's motion, the Court analyzes all facts in a light most favorable to defendant. Here, both officers assert in their affidavits that Mr. Nance lunged at Officer Kilpatrick [Docs. 39-1, 46-1]. Considering the factors relevant to the objective reasonableness test we note that, although the crime at issue was a misdemeanor assault, it was made against Officer Kilpatrick. Furthermore, it would be reasonable for Officer Kilpatrick, seeing the plaintiff lunge in his direction, to believe that Mr. Nance was attempting to assault him again and actively resist his arrest. Because there is a genuine issue as to this material fact, summary judgment for Mr. Nance is likewise inappropriate and will be denied.

Officer Anderson, however, is entitled to summary judgment on Mr. Nance's claim of excessive force. The record shows that Officer Anderson only touched Mr. Nance in order to put handcuffs on him, which he was **[\*42]** entitled to do in effectuating the arrest [Doc. 48-2]. There is no evidence in the record that Mr. Nance was hurt by this act of handcuffing, or that this incident is the encounter on which he bases his use force claim. Because defendant Anderson has shown that there is no genuine dispute as to any material fact with respect to this claim, summary judgment is appropriate.

As to Mrs. Nance and Justin Nance's claims of excessive force, both officers are entitled to summary judgment, because plaintiffs have not asserted any facts to support allegations of excessive force.

## B. State Claims

Plaintiffs additionally assert several state-law claims based on the facts in this case. The Court has supplemental jurisdiction over these claims under *28 U.S.C. § 1367(a)*. Although plaintiffs' motion for summary judgment only relates to their federal and state constitutional claims [Doc. 32], defendants have moved for summary judgment on all claims [Docs. 45, 48]. The Court will thus evaluate plaintiffs' state-constitution claims based on the dueling motions and plaintiffs' common law and statutory claims based only on defendants' motions. *See Wiley, 20 F.3d at 224.*

Tennessee courts have provided that the doctrine of qualified immunity applies **[\*43]** additionally to police officers charged in state causes of action. *See Youngblood v. Clepper, 856 S.W.2d 405, 406 (Tenn. Ct. App. 1993)* (applying "common law" immunity to state law claims brought against a state trooper); *see also Rogers v. Gooding, 84 Fed. Appx. 473, 477 (6th Cir. 2003)* (finding that the district court properly applied qualified immunity to assault

and battery claims). The Court will thus evaluate each of plaintiffs' claims to determine whether qualified immunity applies and summary judgment is appropriate.

### 1. State Constitutional Claims

Plaintiffs' state constitutional claims must be dismissed against both defendants because Tennessee does not recognize a private right of action for violations of the Tennessee Constitution. *Cline v. Rogers, 87 F.3d 176, 180 (6th Cir. 1996)* ("The plaintiff can state no claim of a state constitutional violation in this case because Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution.") (citing *Lee v. Ladd, 834 S.W.2d 323, 325 (Tenn. Ct. App. 1992))*. Therefore, plaintiffs' motion for summary judgment brought pursuant *Article 1, sections 7* and *9* of the Constitution of the State of Tennessee will be denied.

### 2. Assault and Battery

Under Tennessee law, assault and battery claims alleged against police officers turn on the use of force, and whether it was reasonable or unreasonable. When alleging both claims for the same action, **[*44]** "a battery includes the assault and cannot be separated from it." *Lewis v. Metropolitan General Sessions Court for Nashville, 949 S.W.2d 696, 703 (Tenn. Ct. Crim. App. Feb. 13, 1996)* (citing *State v. Chaffin, 32 Tenn. 493, 494 (1852))*. An assault is "any act tending to do corporal injury to another, accompanied with such circumstances to denote at the time an intention, coupled with the present ability, of using actual violence against the person." *Butler v. City of Englewood, 2008 U.S. Dist. LEXIS 82004, 2008 WL 4006786, at *14 (E.D. Tenn. 2008)* (citing *Lewis, 949 S.W.2d at 703*). Battery is defined as "an intentional act that causes an unpermitted harmful or offensive bodily contact." *Doe v. Pizza, 2001 Tenn. App. LEXIS 224, at *14 (Tenn. Ct. App. Apr. 5, 2001)* (citing *Cary v. Arrowsmith, 777 S.W.2d 8, 21 (Tenn. Ct. App. 1989))*.

Police officers may be held liable for damages caused by their excessive use of force based on these state-law theories. *City of Mason v. Banks, 581 S.W.2d 621, 626 (Tenn. 1979)*. Conversely, "[t]he use of reasonable force to effectuate an arrest defeats a battery or an assault claim." *Brown v. Christian Bros. Univ., 428 S.W.3d 38, 58 (Tenn. Ct. App. 2013)*. When effectuating an arrest, "an officer may only use the force reasonably necessary to accomplish the arrest, with due regard to other attendant circumstances, such as his own safety or that of others present." *Id. at 625*. Tennessee courts employ the same excessive-force analysis in assault and battery claims as federal courts do to analyze these claims under *§ 1983*. *Harris v. Metro. Gov't of Nashville, 2007 U.S. Dist. LEXIS 92895, 2007 WL 4481176, at *9 (M.D. Tenn. Dec. 18, 2007)*.

As explained previously, plaintiff Larry Nance has asserted adequate factual grounds for his second claim of excessive force against Officer Kilpatrick based on the circumstances surrounding **[*45]** his transfer between Officer Kilpatrick and Officer Anderson's police cars. Because Tennessee assault and battery claims are analyzed under the same federal *§ 1983* "excessive force" standard, *see Harris, 2007 U.S. Dist. LEXIS 92895, 2007 WL 4481176, at *9*, plaintiff Larry Nance has set forth adequate grounds for his state-law assault and battery claims against Officer Kilpatrick. All other assault and battery claims against Officer Kilpatrick, and all assault and battery claims against Officer Anderson will be dismissed.

### 3. False Imprisonment

Under Tennessee law, false imprisonment is the unlawful detention or restraint of another without justification. Two elements must be proven by a plaintiff: (1) that he was restrained or detained against his will; and (2) the unlawfulness of this restraint or detention. *Cunningham v. Sisk, 2003 U.S. Dist. LEXIS 22109, 2003 WL 23471541, at *17 (E.D. Tenn. 2003)*. To be liable for false imprisonment, a defendant must act without probable cause. *Brown v. SCOA Industries, Inc., 741 S.W.2d 916, 920 (Tenn. Ct. App. 1987)*.

The Court has already determined that both Officer Kilpatrick and Officer Anderson had probable cause to arrest plaintiff Larry Nance. Officer Kilpatrick's probable cause to order the arrest was based upon his reasonable belief that Larry Nance assaulted him, and Officer Anderson had probable cause to effectuate the arrest, based on his own perceptions and Officer **[*46]** Kilpatrick's order.[5] Mr. Nance has therefore failed to establish the second element necessary for a false-imprisonment claim. Plaintiffs Sherry Nance and Justin Nance have not asserted any facts to indicate they were falsely arrested. Summary judgment in favor of defendants on this issue is therefore appropriate.

### 4. Trespass to Land

Under Tennessee law, "every unauthorized, and therefore unlawful entry, into the close of another, is a trespass." *Stout v. Carmax Auto Fin., 2013 U.S. Dist. Lexis 169707, at *9 (W.D. Tenn. Oct. 7, 2013)*. However, police officers may enter onto private land, approach the front door of a residence, knock, and ask questions of the residents. *See United States v. Clay, 2011 U.S. Dist. LEXIS 65657, at *12 (E.D. Tenn. 2011)* (citing *Hardesty v. Hamburg Twp., 461 F.3d 646, 654 (6th Cir. 2006))*. Both Officer Kilpatrick and Officer Anderson lawfully entered onto plaintiffs' land in order to approach plaintiffs' front door and engage with them. Furthermore, as already discussed, both officers legally entered into the Nance's home based on exigent circumstances. *See Rohrig, 98 F.3d 1506 (6th Cir. 1996)*. Because the officers' entry onto plaintiffs' land and into plaintiffs' home was lawful, summary judgment will be granted for defendants.

### 5. Trespass to Chattels

Plaintiffs allege that Officer Kilpatrick is liable for trespass to chattels because several household goods were damaged during Officer Kilpatrick's arrest of Larry **[*47]** Nance's [Doc. 1]. "A trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *Garner v. Coffee Cty. Bank, 2015 Tenn. App. LEXIS 873, 2015 WL 6445601, at *6 (Tenn. Ct. App. Oct 23, 2015)*. To maintain this claim plaintiffs must be able to prove that defendants "wrongfully interfered with or injured plaintiff's property [] causing actual damage to the property or depriving the Plaintiff of its use for a substantial period. *2015 Tenn. App. LEXIS 873, [WL] at 7*.

Plaintiffs' claim fails. First, there is no indication that Officer Kilpatrick intended to use or intermeddle with the Nance's household goods. In fact, the complaint doesn't allege that Officer Kilpatrick touched or intended to touch the household goods; it instead says that the goods were damaged by Larry Nance when he was "thrown into" them and "consequently knocked [them] over" [Doc. 1]. Based on the circumstances, it is clear that Officer Kilpatrick's intent was to subdue and arrest Mr. Nance, not intentionally intermeddle with the Nance's household goods. Furthermore, plaintiffs cannot prove that Officer Kilpatrick *wrongfully* interfered with the goods because Officer Kilpatrick was effectuating a lawful arrest and is entitled to qualified immunity for his non-lethal **[*48]** use of force. Summary judgment is therefore appropriate for Officer Kilpatrick.

### 6. Invasion of Privacy

---

[5] Tennessee courts utilize a doctrine similar to the federal "fellow officer" rule discussed by this Court when analyzing the lawfulness of Mr. Nance's arrest under federal law. Tennessee has adopted the "police team" rule so that police officers may "combine their collective perceptions so that if the composite otherwise satisfies the presence requirement that requirement is deemed satisfied although the arresting officer does not himself witness all the elements of the offense." *State v. Ash, 12 S.W.3d 800, 806 (Tenn. Crim. App. 1999)*. Therefore, under Tennessee law as well as federal law, Officer Anderson was allowed to rely on Officer Kilpatrick's account of Mr. Nance's alleged assault when formulating probable cause to arrest Mr. Nance.

Plaintiffs allege that both officers invaded their privacy by entering into plaintiffs' home without permission or a warrant [Doc. 1]. Under Tennessee law, an invasion of privacy occurs when a person "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another." *Roberts v. Essex Microtel Associates, II. L.P., 46 S.W.3d 205, 210-11 (Tenn. Ct. App. 2000)*. Warrantless entries into private homes can be considered invasions of privacy, however, an officer's warrantless entry into a private home is not considered an invasion of privacy if that entry is based on exigent circumstances. *Basden v. Lawson, 1992 Tenn. App. LEXIS 285, at *6 (Tenn. Ct. App. Mar. 27, 1992)*. Because both Officers Kilpatrick and Anderson's warrantless entries into plaintiffs' home were justified by exigent circumstances, plaintiffs' claim of invasion of privacy must fail and summary judgment is appropriate for both defendants.

### 7. Malicious Prosecution

To succeed on a claim of malicious prosecution, plaintiffs must show that an earlier civil or criminal action was (1) filed without probable cause; 2) filed with malice; and (3) terminated in favor of the plaintiffs. *Himmelfarb v. Allain, 380 S.W.3d 35, 38 (Tenn. 2012). Gordon v. Tractor Supply Co., No. M2015-01049-COA-R3-CV, 2016 Tenn. App. LEXIS 401, 2016 Tenn. App. LEXIS 401, at *28-29 (Ct. App. June 8, 2016)* (internal quotations and citations omitted). **[*49]**

> A grand jury's indictment creates a rebuttable presumption that probable cause to institute the criminal proceeding existed . . . At the summary judgment stage, evidence of a grand jury's indictment negates the element of lack of probable cause if the indictment is uncontested. To avoid this result, the nonmovant must produce evidence, at the summary judgment stage, that the indictment was procured by fraud. If the nonmovant fails to do so, then the fact that a grand jury issued an indictment equates to a finding of probable cause.

Although it is unclear from the complaint, it appears that only Mr. Nance is filing a malicious-prosecution claim, as he was the only plaintiff charged with a crime in Hamilton County Sessions Court. As discussed earlier in this opinion, Officers Kilpatrick and Anderson had probable cause to arrest Mr. Nance. Furthermore, a neutral and detached magistrate at the Hamilton County Jail found probable cause to allow the case to proceed to Hamilton County Sessions Court, where Mr. Nance then waived his right to challenge probable cause at a preliminary hearing and bound his case over the Hamilton County Grand Jury. The grand jury, comprised of twelve impartial **[*50]** jurors, then found probable cause when they indicted Mr. Nance for assault on a police officer. An indictment is required in order for a case to proceed to a court hearing, where, in this instance, it was dismissed [Doc. 48-1].

The grand jury's indictment in the Hamilton County case creates a rebuttable presumption that probable cause existed to institute that criminal proceeding. Furthermore, Mr. Nance has not produced evidence demonstrating that this indictment was obtained through fraud. Because Mr. Nance cannot prove this element, summary judgment for both defendants is appropriate.

### 8. Intentional Infliction of Emotional Distress

To sustain an intentional-infliction-of-emotional-distress claim in Tennessee, a plaintiff must show that the complained of conduct (1) was intentional or reckless; (2) was so outrageous as to not be tolerated by civil society; and (3) resulted in serious mental injury. *Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)*. Plaintiff's burden for demonstrating outrageous conduct is high; the Tennessee Supreme Court has explained that defendant's conduct must be "extreme" and "outrageous" and that, under Tennessee jurisprudence,

> It has not been enough that the defendant has acted with an intent which is tortious **[*51]** or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been

found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Id. at 622-23*.

First, summary judgment should be granted to Officer Anderson on plaintiffs' claims of intentional infliction of emotional distress. Officer Anderson's arrest of Mr. Nance, based on probable cause, was neither "extreme" nor "outrageous." As explained above, Officer Anderson's actions were legal when he entered onto the Nance's property, entered the Nance's home, participated in Mr. Nance's arrest, escorted Mr. Nance outside, and transferred Mr. Nance into his police car. None of these actions can be characterized as atrocious or utterly intolerable. Because plaintiffs' have failed to allege sufficient facts with respect to this second element, summary judgment for Officer Anderson is appropriate.

Summary judgment is also appropriate **[*52]** for Officer Kilpatrick on plaintiffs' intentional-infliction-of-emotional-distress claims. The third element, demonstrating a serious or severe mental injury, also carries a high burden. A severe or serious emotional injury occurs "where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Rogers v. Louisville Land Co., 367 S.W.3d 196, 208 (Tenn. 2012)* (quoting *Camper v. Minor, 915 S.W.2d 437, 446 (Tenn. 1996))*. Courts analyze plaintiffs' claims of severe mental injury based on the following non-exclusive factors:
> (1) Evidence of physiological manifestations of emotional distress, including but not limited to nausea, vomiting, headaches, severe weight loss or gain, and the like;
> (2) Evidence of psychological manifestations of emotional distress, including but not limited to sleeplessness, depression, anxiety, crying spells or emotional outbursts, nightmares, drug and/or alcohol abuse, and unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, and worry;
>
> (3) Evidence that the plaintiff sought medical treatment, was diagnosed with a medical or psychiatric disorder such as post-traumatic stress disorder, clinical depression, traumatically **[*53]** induced neurosis or psychosis, or phobia, and/or was prescribed medication;
> (4) Evidence regarding the duration and intensity of the claimant's physiological symptoms, psychological symptoms, and medical treatment;
>
> (5) Other evidence that the defendant's conduct caused the plaintiff to suffer significant impairment in his or her daily functioning; and
>
> (6) In certain instances, the extreme and outrageous character of the defendant's conduct is itself important evidence of serious mental injury.

*Rogers, 367 S.W.3d at 209-10*.

Based on these factors, plaintiffs have failed to point to evidence in the record sufficient for a reasonable jury to conclude that they were unable to cope with the mental stress engendered by Officer Kilpatrick and Officer Anderson's conduct. First, Larry Nance states in his deposition that any mental injuries he struggles with relate to several things, including the death of his mother, witnessing a co-worker die in his vehicle, and this incident [Doc. 48-1]. Furthermore, he states that he was only out of work for three or four days following this incident, and seems to attribute this missed work to his physical injuries following the event, rather than because of mental distress [Doc. 46-2]. **[*54]** Finally, he states that following this incident he chose not to be seen by a counselor, psychologist, or other mental-health professional [Doc. 48-1]. Looking at the nonexclusive factors in *Rogers*, the Court notes that Larry Nance has not alleged physiological symptoms related to this incident and did not appear to suffer significant impairment in his day-to-day functioning. Moreover, he has not sought counseling and he attributes his sleep troubles to several causes. Based on this analysis, the Court finds that Larry Nance has not demonstrated a serious or severe mental injury required to sustain his emotional-distress claim.

Sherry Nance has not offered any evidence regarding serious or severe emotional injuries she has suffered as a result of this incident. Her claim will therefore be dismissed.

The facts also do not establish that Justin Nance suffered serious or severe emotional hardship due to this event. Plaintiffs' complaint alleges that Justin Nance, who has severe autism and suffers intellectual challenges, observed his father's arrest and "was emotionally traumatized and suffered seizures for approximately two months" [Doc. 1]. However, Justin Nance did not visit his physician **[\*55]** until five months following this incident [Doc. 46-4]. Moreover, the doctor's notes from that subsequent visit report that he did not detect any changes in Justin's condition and that he "does sleep well and is doing very well," "he is doing extremely well," "he had no seizures and no behavior problems were reported," and his seizures have been "well controlled for more than two years now" [*Id.*]. Plaintiffs have not offered any proof to rebut this assessment. Because there is no evidence of any physiological or psychological manifestations of stress, and because it does not appear Justin sought medical treatment or was otherwise severely impaired based on this incident, the Court will grant summary judgment on Justin Nance's emotional distress claim to both defendants.

### IV. Conclusion

For the reasons discussed above, the Court **GRANTS** defendant Hans Anderson's motion for summary judgment [Doc. 48], **GRANTS in part** and **DENIES in part** defendant Trent Kilpatrick's motion for summary judgment [Doc. 45], and **DENIES** plaintiffs' partial motion for summary judgment [Doc. 32].

ORDER ACCORDINGLY.

/s/ Thomas A. Varlan

CHIEF UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Neutral
As of: November 6, 2025 6:44 PM Z

## *State v. Collier*

Court of Appeals of Ohio, Second Appellate District, Montgomery County

August 27, 2010, Rendered

C.A. CASE NO. 22686

**Reporter**

2010-Ohio-4039 *; 2010 Ohio App. LEXIS 3417 **; 2010 WL 3366191

STATE OF OHIO, Plaintiff-Appellee v. COLBY L. COLLIER, Defendant-Appellant

**Prior History:  [**1]** (Criminal appeal from Municipal Court). T.C. NO. 07CRB2364.

# Core Terms

mischief, tamper, sentence, trash, first assignment, top

# Case Summary

**Procedural Posture**

Defendant sought review of the judgment of a municipal court (Ohio), which convicted him of criminal mischief, in violation of *R.C. 2909.07(A)(1)*. Defendant contended that his conviction was not supported by sufficient evidence.

**Overview**
Defendant left a note on his neighbors' trash receptacle. In the note, defendant stated that the neighbors should close their blinds and that they should worry about the check they bounced and a late charge by a credit union. The neighbors contacted police, who filed a complaint against defendant for criminal mischief. The court held that defendant's criminal mischief conviction was not supported by sufficient evidence as no evidence was adduced that defendant in any way "tampered" with the neighbors' trash receptacle, in that the neighbors' trash can was not altered or rendered "unfit" for use as found by the municipal court; instead, defendant merely placed a piece of paper on top of the trash can and lay a stick on top of the paper. While defendant should have utilized a more appropriate and tactful approach to resolve any dispute with his neighbors, the record did not support defendant's conviction for criminal mischief.

**Outcome**
The court reversed the judgment of the trial court.

# LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

Evidence > Weight & Sufficiency

*HN1* **Substantial Evidence, Sufficiency of Evidence**

2010-Ohio-4039, *2010-Ohio-4039; 2010 Ohio App. LEXIS 3417, **1

If the evidence that supports a material element of an offense is insufficient, the defendant must be acquitted of that offense. In reviewing a claim of insufficient evidence, the relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

Criminal Law & Procedure > ... > Miscellaneous Offenses > Destruction of Property > Elements

*HN2* **Destruction of Property, Elements**

See *R.C. 2909.07(A)(1)*.

Governments > Legislation > Interpretation

*HN3* **Legislation, Interpretation**

Criminal statutes defining offenses are generally to be strictly construed against the State. Words and phrases contained in the Ohio Revised Code must be construed in accordance with their common usage.

Criminal Law & Procedure > ... > Miscellaneous Offenses > Destruction of Property > Elements

Governments > Legislation > Interpretation

*HN4* **Destruction of Property, Elements**

In *R.C. 2909.07(A)(1)*, the general words "otherwise improperly tamper" are proceeded by the much more specific terms "move, deface, damage, destroy." Consequently, the rule of statutory construction known as ejusdem generis applies. Under the rule of ejusdem generis, where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms.

Criminal Law & Procedure > ... > Miscellaneous Offenses > Destruction of Property > Elements

*HN5* **Destruction of Property, Elements**

Applying ejusdem generis to *R.C. 2909.07(A)(1)*, a showing of some change in either the physical location or physical condition of the property is necessary to sustain a conviction under the statute.

**Counsel:** RAYMOND J. DUNDES, Prosecuting Attorney, Lebanon, Ohio, Attorney for Plaintiff-Appellee.

ROBERT ALAN BRENNER, Beavercreek, Ohio, Attorney for Defendant-Appellant.

**Judges:** DONOVAN, P.J. BROGAN, J. and GRADY, J., concur.

**Opinion by:** DONOVAN

2010-Ohio-4039, *2010-Ohio-4039; 2010 Ohio App. LEXIS 3417, **1

# Opinion

DONOVAN, P.J.

[*P1]  Defendant-appellant Colby L. Collier appeals his conviction and sentence for one count of criminal mischief, in violation of R.C. 2909.07(A)(1), a misdemeanor of the third degree.

[*P2]  On November 8, 2007, Collier was charged by complaint with one count of criminal mischief. Collier pleaded not guilty at his arraignment of November 29, 2007. After a bench trial held on January 30, 2008, the court found Collier guilty of the single count of criminal mischief in a written decision filed on February 6, 2008. [1]

[*P3]  On March 12, 2008, Collier was sentenced to serve 60 days in jail and ordered to pay $ 200.00 in fines and court [**2] costs. On the condition that Collier complete five years of community control, the court suspended the jail sentence, as well as $ 100.00 of the fines imposed. The court also granted a stay of execution of Collier's sentence pending the outcome of his appeal on March 20, 2008. Collier filed a timely notice of appeal with this Court on March 24, 2008.

I

[*P4]  The incident which forms the basis for the instant appeal occurred on November 6, 2008, when Linda and John Adkins of Trotwood, Ohio, discovered an eight by ten inch piece of paper which had been placed on top of their trash receptacle. A stick had been placed on top of the paper. The paper was a handwritten note, which read as follows:

[*P5]  "Grey's and my chicken legs. Don't worry about my business! Worry about that $ 300.00 + check you bounced and the late charge by the credit union. You make $ 500/per pay. Peanuts 15 years on the job/no education. Close your blinds. Watchin [sic] you and that hippo have sex is repulsive. You need to detox and go to AA, drunk."

[*P6]  Recognizing the handwriting on the note to be that of her neighbor, Collier, Linda Adkins contacted the Trotwood Police Department. Officer Mary A. Vance responded to the report, [**3] spoke to both Linda and John Adkins, and filed a complaint against Collier for criminal mischief. Officer Vance also ran a fingerprint analysis on the note. The results of the analysis established that Collier's fingerprints were on the paper.

[*P7]  After a bench trial, Collier was subsequently found guilty of one count of criminal mischief, and the court sentenced him accordingly. It is from this judgment which Collier now appeals.

II

[*P8]  Collier's first assignment of error is as follows:

[*P9]  "COLBY COLLIER'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE."

[*P10]  In his first assignment of error, Collier argues that his conviction for criminal mischief was not supported by sufficient evidence. The State did not file a responsive brief.

[*P11]  If the evidence that supports a material element of an offense is insufficient, the defendant must be acquitted of that offense. In reviewing a claim of insufficient evidence, the relevant inquiry is whether, after

---

[1] We note that according to the bailiff for the trial court, no transcript exists of the bench trial because the "machine 'did not record' the trial." However, on April 13, 2010, the trial court approved an **App. R. 9(C)** statement of the evidence which has been utilized by this Court on appeal.

reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Britton, 181 Ohio App.3d 415, 2009 Ohio 1282, 909 N.E.2d 176.*

[*P12]  *R.C. 2909.07(A)(1)* describes  [**4] the offense of criminal mischief as follows:

[*P13]  "(A) No person shall

[*P14]  "(1) Without privilege to do so, knowingly move, deface, damage, destroy, or otherwise improperly tamper with the property of another."

[*P15]  Specifically, Collier contends that he did not "move, deface, damage, destroy, or tamper" with the Adkins' trash receptacle. Collier asserts that all he did was place a piece of paper on top of the trash can and lay a stick on top of the paper so that it would not blow away. Thus, Collins claims that there is no evidence which supports his conviction for criminal mischief.

[*P16]  In its written decision, the trial court found that Collier "improperly tampered" with the Adkins' trash receptacle by placing the note on top of it. The facts however do not support this finding.

[*P17]  Appellant relies upon *State v. Maxwell (April 13, 1988), Medina App. No. 1646, 1988 Ohio App. LEXIS 1413, 1988 WL 38075.* In *Maxwell*, Appellant looked inside serval cars' windows, and placed his hands on the cars' handles while at the Medina County Courthouse. *1988 Ohio App. LEXIS 1413, [WL] at *1.* Maxwell was convicted of committing criminal mischief under  *2909.07(A)(1).* Id. The court of appeals reversed, stating, "'(O)therwise improperly tamper' is not specifically defined by  [**5] statute, as the terms pertain to *R.C. 2909.07.* Although the Committee Comment to the statute appears to indicate that the legislature intended the statute to be a 'comprehensive prohibition,' criminal statutes defining offenses are generally to be 'strictly construed against the state.'" *1988 Ohio App. LEXIS 1413, [WL] at *2.* "'Words and phrases' contained in the Ohio Revised Code must be construed in accordance with their common usage." Id.; citing *State v. Carroll (1980), 62 Ohio St.2d 313, 405 N.E.2d 305.* Webster's Ninth New Collegiate Dictionary (1984, page 1204) defines the verb "tamper" to mean "to interfere so as to weaken or change for the worse" or "to try foolish or dangerous experiments" with an object. See *Maxwell, 1988 Ohio App. LEXIS 1413, [WL] at *2.* Black's Law Dictionary (8 Ed. 2004, page 1494) defines "tamper" as, "To meddle so as to alter (a thing); esp., to make changes that are illegal corrupting, or perverting."

[*P18]  "In *R.C. 2909.07(A)(1),* the general words 'otherwise improperly tamper' are proceeded by the much more specific terms 'move, deface, damage, destroy.' Consequently, the rule of statutory construction known as *ejusdem generis* applies." *Maxwell, 1988 Ohio App. LEXIS 1413, [WL] at *3.* "In explaining this rule the Supreme Court of Ohio has stated:

[*P19]  "'* * *.

[*P20]  "'Under  [**6] the rule of *ejusdem generis*, where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms.'

[*P21]  "'* * *.'"

[*P22]  Id.; quoting *State v. Aspell (1967), 10 Ohio St.2d 1, 225 N.E.2d 226,* paragraph two of the syllabus. See, also, *Light v. Ohio University (1986), 28 Ohio St.3d 66, 68, 28 Ohio B. 165, 502 N.E.2d 611.*

[*P23]  The court, applying *ejusdem generis* to *R.C. 2909.07(A)(1),* concluded "that a showing of some change in either the physical location or physical condition of the property is necessary to sustain a conviction under the statute." Id.

2010-Ohio-4039, *P24; 2010 Ohio App. LEXIS 3417, **6

 **[*P24]**  Upon analysis of *R.C. 2909.07(A)(1)* and the facts of the instant case, we conclude that no evidence was adduced that Collier in any way "tampered" with the Adkins' trash receptacle. The Adkins' trash can was not altered nor rendered "unfit" for use as found by the trial court. The trash can was not permanently altered or otherwise defaced. While Collier **[**7]** should have utilized a more appropriate and tactful approach to resolve any dispute with his neighbors, the record does not support Collier's conviction for criminal mischief pursuant to *R.C. 2909.07(A)(1)*.

 **[*P25]**  Collier's first assignment of error is sustained.

III

 **[*P26]**  Collier's second assignment of error is as follows:

 **[*P27]**  "THE TRIAL JUDGE ERRED IN SENTENCING COLBY COLLIER."

 **[*P28]**  In light of our disposition regarding Collier's first assignment, his second assignment of error is rendered moot.

IV

 **[*P29]**  Collier's first assignment of error having been sustained, his conviction and sentence for criminal mischief will be reversed and vacated, and he will be ordered discharged as to the offense with which he was charged.

. . . .

BROGAN, J. and GRADY, J., concur.

---

**End of Document**

 Neutral
As of: November 6, 2025 6:44 PM Z

# *State v. Cooke*

Court of Appeals of Ohio, Fifth Appellate District, Licking County

June 13, 2016, Date of Judgment

Case No. 15-CA-50

**Reporter**
2016-Ohio-3445 *; 2016 Ohio App. LEXIS 2300 **; 2016 WL 3280424

STATE OF OHIO, Plaintiff - Appellee -vs- JENNIFER COOKE, Defendant - Appellant

**Prior History: [**1]** CHARACTER OF PROCEEDING: Appeal from the Licking County Municipal Court, Case No. 15CRB00778.

**Disposition:** Affirmed in part, Vacated in part Final judgment entered.

## Core Terms

mischief, disorderly conduct, ejusdem generis, manifest, tamper, trashcan

## Case Summary

### Overview

HOLDINGS: [1]-Defendant's conviction for criminal mischief in violation of *R.C. 2909.07(A)(1)* was against the manifest weight of the evidence because there was no evidence to support the court's finding that defendant damaged or altered the condition of the porches on which she was jumping.

### Outcome
Affirmed in part, vacated in part, final judgment entered.

## LexisNexis® Headnotes

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Verdicts

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > Sufficiency of Evidence

*HN1* An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. In determining whether a verdict is against the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

2016-Ohio-3445, *2016-Ohio-3445; 2016 Ohio App. LEXIS 2300, **1

Criminal Law & Procedure > ... > Miscellaneous Offenses > Destruction of Property > Elements

*HN2* See *R.C. 2909.07(A)(1)*.

Criminal Law & Procedure > ... > Miscellaneous Offenses > Destruction of Property > Elements

Governments > Legislation > Interpretation

*HN3* In *R.C. 2909.07(A)(1)*, the general words "otherwise improperly tamper" are proceeded by the much more specific terms "move, deface, damage, destroy." Consequently, the rule of statutory construction known as ejusdem generis applies. Under the rule of ejusdem generis, where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms.

Governments > Legislation > Interpretation

Criminal Law & Procedure > ... > Miscellaneous Offenses > Destruction of Property > Elements

*HN4* Applying ejusdem generis to *R.C. 2909.07(A)(1)*, a showing of some change in either the physical location or physical condition of the property is necessary to sustain a conviction under the statute for criminal mischief.

**Counsel:** For Plaintiff-Appellee: TRICIA M. MOORE, Assistant Law Director, Newark, Ohio.

For Defendant-Appellant: MICHAEL R. DALSANTO, Newark, Ohio.

**Judges:** Hon. W. Scott Gwin, P.J., Hon. Patricia A. Delaney, J., Hon. Craig R. Baldwin, J. Gwin, P.J., and Delaney, J., concur.

**Opinion by:** Craig R. Baldwin

# Opinion

*Baldwin, J.*

 **[*P1]** Appellant Jennifer Cooke appeals a judgment of the Licking County Municipal Court convicting her of criminal mischief (*R.C. 2909.07(A)(1)*) and disorderly conduct while intoxicated (*R.C. 2917.11(B)(1)*). Appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

 **[*P2]** On May 7, 2015, appellant ran up and down Mound Street and Mound Court in Newark, Ohio, rapping and dancing. She jumped from one porch to another. Her behavior frightened several children.

 **[*P3]** Joseph Green was working on the brakes of a vehicle. When he said something about the measurements of the sockets, she would incorporate the numbers into her rap lyrics, and would use parts of what she heard other people saying in her songs. At about 10:30 p.m., appellant beat on Green's door. His 13-year-old daughter was frightened by appellant's behavior. **[**2]**

**[*P4]** Police arrived and Officer William Evans located appellant at her mom's residence. She had removed a curtain from a common area of her mom's apartment building and was wearing it as a cape, while rapping to the police about the state stealing her innocence and about her husband, who had passed away. Officer Evans could smell alcohol on appellant, and she did not appear to be "all there" when he tried to communicate with her. Tr. 25. Police handcuffed her and transported her to the police station. She continued her rapping while in the cruiser.

**[*P5]** Appellant was charged with criminal mischief, falsification, and disorderly conduct while intoxicated. The case proceeded to bench trial. In closing argument, the State conceded that the evidence did not support the charge of criminal mischief. The court found appellant not guilty of falsification and guilty of criminal mischief and disorderly conduct. The court specifically found as to criminal mischief that appellant tampered with property by being on it, and being a distraction and a nuisance. She was sentenced to sixty days incarceration for criminal mischief and thirty days incarceration for disorderly conduct, to be served consecutively, **[**3]** and fined $50.00 on each conviction.

**[*P6]** Appellant assigns two errors:

**[*P7]** "I. THE TRIAL COURT'S RULING THAT THE APPELLANT COMMITTED CRIMINAL MISCHIEF IN VIOLATION OF _SECTION 2909.07(A)(1) OF THE REVISED CODE_ IS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**[*P8]** "II. THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO _SUA SPONTE_ MERGE THE DISORDERLY CONDUCT AND CRIMINAL MISCHIEF CONVICTIONS BECAUSE THEY ARE ALLIED OFFENSES OF SIMILAR IMPORT."

I.

**[*P9]** In her first assignment of error, appellant argues that the judgment convicting her of criminal mischief is against the manifest weight and sufficiency of the evidence.

**[*P10]** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. _State v. Jenks, 61 Ohio St.3d 259, 574 N.E.2d 492_, paragraph two of the syllabus (1991). In determining whether a verdict is against the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the trier of fact **[**4]** "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." _State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541_, quoting _State v. Martin, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1983)_.

**[*P11]** Appellant was convicted of criminal mischief as defined by _R.C. 2909.07(A)(1)_:

**[*P12]** "(A) No person shall:

**[*P13]** "(1) Without privilege to do so, knowingly move, deface, damage, destroy, or otherwise improperly tamper with the property of another[.]"

**[*P14]** In _State v. Maxwell, 9th Dist. Medina No. 1646, 1988 Ohio App. LEXIS 1413, 1988 WL 38075 (April 13, 1988)_, a juvenile was found delinquent by reason of criminal mischief when he was observed in the parking lot of the courthouse placing his hands on car windows and looking inside. He was also observed attempting unsuccessfully to open several vehicles. In reversing the finding of delinquency, the court held:

In _R.C. 2909.07(A)(1)_, the general words "otherwise improperly tamper" are proceeded by the much more specific terms "move, deface, damage, destroy." Consequently, the rule of statutory construction known as _ejusdem generis_ applies. In explaining this rule, the Supreme Court of Ohio has stated:

"Under the rule of *ejusdem generis*, where in a statute terms are first used which are confined to a particular class of objects having well-known and definite features and characteristics, and then afterwards a term having perhaps a broader signification [**5] is conjoined, such latter term is, as indicative of legislative intent, to be considered as embracing only things of a similar character as those comprehended by the preceding limited and confined terms."

*State v. Aspell (1967), 10 Ohio St.2d 1, 225 N.E.2d 226*, paragraph two of the syllabus. See, also, *Light v. Ohio University (1986), 28 Ohio St.3d 66, 68, 28 Ohio B. 165, 502 N.E.2d 611*. Applying *ejusdem generis* to *R.C. 2909.07(A)(1)*, we conclude that a showing of some change in either the physical location or physical condition of the property is necessary to sustain a conviction under the statute. This interpretation is in accord with the facts present in other decisions addressing *R.C. 2909.07(A)(1)*. See, e.g., *State v. Isaac (1975), 44 Ohio Misc. 87, 337 N.E.2d 818* (door of unattended vehicle forced open with metal instrument); *State v. Kidwell (Mar. 18, 1981) Clermont App. Nos. 925/927, 1981 Ohio App. LEXIS 14273, unreported* (deep tire marks created in the yard of another); *State v. Evans (May 26, 1982), Hamilton App. No. C-810495, 1982 Ohio App. LEXIS 14583, unreported* (hose smelling of gasoline found near vehicle with gas tank cap about to fall off).

In the case *sub judice*, the testimony of the state's witnesses indicates that Maxwell merely peered into the vehicles in controversy and tried the door handles. There is no indication that Maxwell attempted to force open the locked doors and the evidence clearly indicates that Maxwell did nothing to change the location [**6] or condition of the vehicles. Consequently, the evidence was insufficient to sustain Maxwell's conviction of violating *R.C. 2909.07(A)(1)*.

[*P15] *Id*.

[*P16] In *State v. Collier, 2nd Dist. Montgomery No. 22686, 2010-Ohio-4039*, the defendant was convicted of criminal mischief after he placed a handwritten note on a neighbor's trash can, and secured it by placing a stick on top of the note. In reversing his conviction for criminal mischief, the Court of Appeals for the Second District cited *Maxwell* and concluded that there was no evidence that Collier had "tampered" with the trash can:

The Adkins' trash can was not altered nor rendered "unfit" for use as found by the trial court. The trash can was not permanently altered or otherwise defaced. While Collier should have utilized a more appropriate and tactful approach to resolve any dispute with his neighbors, the record does not support Collier's conviction for criminal mischief pursuant to *R.C. 2909.07(A)(1)*.

[*P17] *Id. at ¶24*.

[*P18] In the instant case, there is no evidence that appellant in any way tampered with the property of another as defined by the statute. Although the officer testified that she was wearing a cape made from a curtain taken from the common area of her mother's apartment building, there was no evidence presented as to the ownership of the [**7] curtain or whether she had permission to use the curtain.

[*P19] The State argues that unlike cars or trash cans, there is a sanctity to one's dwelling that not only covers the tangible property, but also the right to enjoyment and safety while in one's home. The State therefore argues that her presence on Green's porch, frightening his daughter, created a change in the physical condition of the home, even if only temporarily. We disagree. Had the legislature intended to create a difference in the definition of criminal mischief to protect the sanctity of one's home, they could have done so in the language of the statute. Further, the disturbance, annoyance, and alarm her behavior caused to the people in the neighborhood was punished by her disorderly conduct conviction, which she does not challenge as against the weight or sufficiency of the evidence. There is no evidence to support the court's finding that she damaged or altered the condition of the porches on which she was jumping.

[*P20] The first assignment of error is sustained.

2016-Ohio-3445, *P21; 2016 Ohio App. LEXIS 2300, **7

[*P21] Appellant's second assignment of error is rendered moot by our disposition of the first assignment of error.

[*P22] Appellant's conviction and sentence for disorderly conduct [**8] while intoxicated is affirmed. Appellant's conviction and sentence for criminal mischief is vacated. Pursuant to *App. R. 12(B)*, we hereby enter final judgment of acquittal on the charge of criminal mischief. Costs are assessed to appellee.

By: Baldwin, J.

Gwin, P.J., and

Delaney, J., concur.

---

**End of Document**

 Positive
As of: November 6, 2025 6:43 PM Z

## *State v. Pesec*

Court of Appeals of Ohio, Eleventh Appellate District, Portage County

July 27, 2007, Decided

CASE NO. 2006-P-0084

**Reporter**
2007-Ohio-3846 *; 2007 Ohio App. LEXIS 3487 **

STATE OF OHIO, Plaintiff-Appellee, - vs - JOSEPH PESEC, Defendant-Appellant.

**Prior History:** **[**1]** Criminal Appeal from the Court of Common Pleas, Case No. 2004 CR 0288.

**Disposition:** Affirmed.

## Core Terms

personal property, receive stolen property, trial court, complicity, ownership, real estate, stolen, gator, turf, real property, assigned error, grand theft, weight of the evidence, piece of equipment, circumstances, sufficient evidence, valuation, hearsay, felony, theft, cross-examination, fraudulent, manifest, bias, theft offense, fifth degree, confrontation, documents, knowingly, witnesses

## Case Summary

**Procedural Posture**

Defendant appealed a judgment from the Portage County Court of Common Pleas (Ohio), which convicted him of complicity to grand theft and receiving stolen property, in violation of *R.C. 2923.03*, *2913.02(A)(3)(B)*, and *2913.51*. He was sentenced to concurrent and consecutive terms of imprisonment.

**Overview**

A victim alleged that defendant removed various items of machinery and computer equipment from his property without his consent. The actions were viewed by two former employees of the victim. Upon questioning by police, defendant admitted that he took the property but he asserted that he had purchased it along with real property from another former employee of the victim. Prior to the pendency of the criminal appeal, civil actions were filed between the parties and the victim filed bankruptcy. Defendant was convicted as charged and he sought review. The court held that admission of testimony and other evidence regarding ownership and valuation of the property was not an abuse of discretion and did not violate defendant's confrontation rights under *U.S. Const. amend. VI* and *Ohio Const. art. I, § 10*. The weight and sufficiency of the evidence supported the convictions, as defendant was deemed to have acted "knowingly" under *R.C. 2901.22(B)* and there was sufficient evidence of the valuation of the property taken pursuant to *R.C. 2913.61(A)*. The victim's opinion testimony regarding valuation was admissible. There was no prejudice or bias in the trial judge's remarks.

**Outcome**
The court affirmed the judgment of the trial court.

## LexisNexis® Headnotes

Criminal Law & Procedure > Trials > Bench Trials

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence

*HN1* **Trials, Bench Trials**

A trial court has broad discretion in the admission and exclusion of evidence. Thus, an appellate court shall not disturb evidentiary rulings absent an abuse of discretion. An abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Moreover, in a bench trial, there is a presumption that a trial judge considers only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.

Criminal Law & Procedure > Trials > Bench Trials

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

*HN2* **Trials, Bench Trials**

In a bench trial, it is presumed that a court will only consider admissible evidence. The trial court, sitting as judge and jury, is afforded greater latitude in permitting incompetent or inadmissible evidence.

Evidence > ... > Exceptions > Public Records > General Overview

*HN3* **Exceptions, Public Records**

Public records fall within the hearsay exception of *Evid. R. 803(8)*.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Confrontation

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation

Evidence > ... > Exceptions > Public Records > General Overview

*HN4* **Criminal Process, Right to Confrontation**

Only "testimonial statements" are subject to scrutiny under the Confrontation Clause. Thus, public records are akin to business records, which by their nature are not testimonial and are not subject to the requirements of the Confrontation Clause.

Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Confrontation

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation

**HN5** **Criminal Process, Right to Confrontation**

See *U.S. Const. amend. VI*.


Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Confrontation

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation

**HN6** **Criminal Process, Right to Confrontation**

See *Ohio Const. art. I, § 10.*


Constitutional Law > ... > Fundamental Rights > Criminal Process > Right to Confrontation

Criminal Law & Procedure > Trials > Examination of Witnesses > Cross-Examination

Criminal Law & Procedure > Trials > Defendant's Rights > Right to Confrontation

**HN7** **Criminal Process, Right to Confrontation**

A criminal defendant's right to confront and cross-examine a witness is not unlimited. A trial court retains wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant. Thus, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish.


Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

Evidence > Types of Evidence > Circumstantial Evidence

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

Evidence > ... > Lay Witnesses > Opinion Testimony > General Overview

**HN8** **Larceny & Theft, Elements**

An owner of personal property is qualified to give an opinion as to the value of personal property. Moreover, circumstantial evidence, including photographs of personal property, may be used to prove the value of stolen items in a theft offense.


Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Evidence > Weight & Sufficiency

**HN9** **Standards of Review, Substantial Evidence**

A determination of whether a conviction is or is not supported by the weight of the evidence necessarily rests on the existence of sufficient evidence.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Evidence > Weight & Sufficiency

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

**_HN10_ Standards of Review, Substantial Evidence**

The standard of review for a sufficiency of the evidence claim is whether, after viewing the probative evidence and the inferences drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow a court to weigh the evidence. In essence, sufficiency is a test of adequacy; whether the evidence is legally sufficient to sustain a verdict. Thus, sufficiency of the evidence tests the burden of production.

Criminal Law & Procedure > ... > Stolen Property > Receiving Stolen Property > Elements

**_HN11_ Receiving Stolen Property, Elements**

See _R.C. 2913.51(A)_.

Criminal Law & Procedure > ... > Stolen Property > Receiving Stolen Property > Elements

**_HN12_ Receiving Stolen Property, Elements**

Receiving stolen property is a felony of the fifth degree if the value of the property is $ 500 or more but less than $ 5,000. _R.C. 2913.51(C)_.

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Knowledge

**_HN13_ Mens Rea, Knowledge**

See _R.C. 2901.22(B)_.

Criminal Law & Procedure > ... > Stolen Property > Receiving Stolen Property > Elements

Evidence > Types of Evidence > Circumstantial Evidence

**_HN14_ Receiving Stolen Property, Elements**

For purposes of receiving stolen property, in violation of _R.C. 2913.51_, "reasonable cause" entails determining whether a person of ordinary prudence and care would believe that property had been obtained through the

2007-Ohio-3846, *2007-Ohio-3846; 2007 Ohio App. LEXIS 3487, **1

commission of a theft offense. The State may use circumstantial evidence in order to prove that an appellant had the requisite knowledge or that he had reasonable cause to believe the items were stolen. In fact, circumstantial evidence can be used to support a conviction even if that evidence is reconcilable with a reasonable theory of innocence. Circumstantial evidence is therefore equally probative, especially as to a mental state in which the sole direct evidence is known to the accused. Moreover, because a defendant's mental state is difficult to demonstrate with direct proof, it may be inferred from the circumstances.

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

**HN15** **Larceny & Theft, Elements**

To establish value in theft offenses, the State need not prove value to an exact amount. Rather, all that is required is that some evidence be admitted to establish value. *R.C. 2913.61(C)*.

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

**HN16** **Larceny & Theft, Elements**

See *R.C. 2913.61(D)(2)*.

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

**HN17** **Larceny & Theft, Elements**

Pursuant to *R.C. 2913.61(D)(2)*, the proper method of valuation for equipment is the replacement cost.

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

**HN18** **Larceny & Theft, Elements**

See *R.C. 2913.02(A)(3)*.

Criminal Law & Procedure > Accessories > Aiding & Abetting

**HN19** **Accessories, Aiding & Abetting**

See *R.C. 2923.03(A)(2)*.

Criminal Law & Procedure > Accessories > Aiding & Abetting

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

2007-Ohio-3846, *2007-Ohio-3846; 2007 Ohio App. LEXIS 3487, **1

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

*HN20* **Accessories, Aiding & Abetting**

In order to prove complicity to grand theft, *R.C. 2913.02(A)(3)* and *2923.03(A)(2)*, when read together, require the State to produce evidence to show that a defendant has knowingly aided and abetted another in committing a theft. The terms "aid and abet" have been construed to mean to assist or facilitate the commission of a crime, or to promote its accomplishment. An offender must have taken some affirmative action to assist, encourage, or participate in the crime by some act, deed, word or gesture.

Criminal Law & Procedure > ... > Standards of Review > Substantial Evidence > General Overview

Evidence > Weight & Sufficiency

*HN21* **Standards of Review, Substantial Evidence**

When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered.

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > Credibility & Demeanor Determinations

Evidence > Weight & Sufficiency

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

*HN22* **Deferential Review, Credibility & Demeanor Determinations**

The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. The role of an appellate court in a manifest weight of the evidence challenge is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the State appropriately carried its burden of persuasion. The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of witnesses.

Criminal Law & Procedure > ... > Theft & Related Offenses > Larceny & Theft > Elements

Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution

*HN23* **Larceny & Theft, Elements**

For purposes of theft offenses, all that is necessary is evidence of a wrongful taking from the possession of another. Particular ownership is not vital as to a thief.

Criminal Law & Procedure > Trials > Witnesses > Credibility

Criminal Law & Procedure > ... > Standards of Review > Deferential Review > Credibility & Demeanor Determinations

### *HN24* Witnesses, Credibility

When assessing witness credibility, the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact. Indeed, the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it. Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict.

Criminal Law & Procedure > Preliminary Proceedings > Pretrial Motions & Procedures > Disqualification & Recusal

Evidence > Inferences & Presumptions > Presumptions

Criminal Law & Procedure > Trials > Burdens of Proof > General Overview

### *HN25* Pretrial Motions & Procedures, Disqualification & Recusal

Judicial bias is defined as a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts. A trial judge is presumed not to be biased or prejudiced, and a party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity. The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party.

**Counsel:** Victor V. Vigluicci, Portage County Prosecutor and Pamela J. Holder, Assistant Prosecutor, Ravenna, OH, (For Plaintiff-Appellee).

James L. Dye, Pickerington, OH, (For Defendant-Appellant).

**Judges:** MARY JANE TRAPP, J. JUDITH A. CHRISTLEY, J., Ret., Eleventh Appellate District, sitting by assignment, concurs in judgment only, GENE DONOFRIO, J., Seventh Appellate District, sitting by assignment, concurs.

**Opinion by:** MARY JANE TRAPP

## Opinion

MARY JANE TRAPP, J.

 **[*P1]** Defendant-appellant, Joseph Pesec ("Pesec"), appeals the judgment of the Portage County Court of Common Pleas finding him guilty of two counts of complicity to grand theft, felonies of the fourth degree in violation of *R.C. 2923.03* and *2913.02(A)(3), (B)*, and one count of receiving stolen property, a felony of the fifth degree, in violation of *R.C. 2913.51*. For the reasons that follow, we affirm.

 **[*P2] Facts Underlying Theft Offenses**

2007-Ohio-3846, *P3; 2007 Ohio App. LEXIS 3487, **1

[*P3]  The charges against Pesec stem from a complaint made by Larry Lomaz ("Lomaz") in May 2003 with the Portage County Sheriff's Department in which he alleged that Pesec had removed, without his consent, a bulldozer, a front end loader, and a turf gator from property [**2] located at 8550 State Route 224 in Deerfield.

[*P4]  Two of Lomaz's former employees personally observed Pesec and Albert Gibel ("Gibel") remove the machinery from the premises in December 2002 and in January 2003, along with computer equipment and files. Gibel was seen with a gun in his possession during the removal of the property. Two women videotaped the removal of the personal property by Pesec and Gibel.

[*P5]  After discovering that the personal property had been moved to Pesec's property, Lomaz went there and matched the serial number of the turf gator with his records. Lomaz asked Pesec to return the pieces of equipment to him and presented Pesec with his proof of purchase to show that he owned the equipment, but Pesec refused to return the items. According to Lomaz, Pesec said that he had purchased the equipment along with the eighty-eight acres of real property from Gibel for $ 10,000.

[*P6]  Detective Jack Herman of the Portage County Sheriff's Department interviewed Pesec on September 18, 2003. During the interview, Pesec admitted taking this property, but again stated that he did so after he purchased the real property from Albert Gibel.


[*P7]  **Gibel's Relationship with the Parties and Alleged Transfer [**3] of Real Property**

[*P8]  Albert Gibel was one of Lomaz's former employees who had previously been convicted of committing theft offenses (embezzlement) from the company Lomaz owned called Midwest Fireworks Manufacturing Company ("Midwest").

[*P9]  In the years preceding the underlying criminal appeal, Lomaz filed a civil lawsuit against Pesec in Portage County. Midwest also filed a civil lawsuit against Gibel in Cuyahoga County. [1] As part of that lawsuit against Gibel, the court ordered Midwest to transfer his equitable interest in the Deerfield real estate to the Cuyahoga County Clerk of Courts on November 12, 1999, and to "hold said deed as if it were a redelivery bond pending resolution of the trial court's determination."

[*P10]  Gibel filed a separate proceeding against the Cuyahoga County Clerk of Courts. On December 18, 2002, the court entered a "nunc pro tunc" ordering the clerk of courts to quit-claim the deed to the Deerfield real estate being held as a bond in the *Midwest v. Gibel* case to Gibel. [2] In a letter dated April 22, 2005, the court explained to counsel that when it issued that order, it only intended to relieve the clerk [**4] of any interest in the property. It stated that the "administrative" order "determined no issue of ownership ***. [with respect to the real property.]" The ownership of the Deerfield real property remained at issue, however, since Lomaz claimed his company, Pacific Financial Services ("Pacific") held the equitable interest. Gibel subsequently quit-claimed the property to Pesec.

**Bankruptcy Proceedings Filed by Lomaz**

[*P11]  In June 2003, Lomaz filed a bankruptcy petition in Ohio for Midwest and Pacific. Lomaz did not list any claim Midwest had against Pesec in the petition. Nor did Lomaz list any of the pieces of equipment Pesec removed from the property under items of personal property.

[*P12]  Beginning in May 2003, Pesec, through his attorney, Craig Conley ("Conley"), advised the bankruptcy receiver that he had these pieces of equipment in his possession and that he believed he had ownership rights to the equipment. Attorney Conley admittedly stated that they were unaware of which person may have owned the

---

[1] Lomaz has been declared a vexatious litigator in federal court.

[2] There was no prior order being corrected though.

2007-Ohio-3846, *P3; 2007 Ohio App. LEXIS 3487, **4

heavy equipment but that under the theory of hereditaments, they believed Pesec owned the equipment once he had title to the real property.

[*P13] Nevertheless, [**5] to obtain "clear" title, Pesec offered to pay the bankruptcy trustee $ 10,000 and later $ 12,000 for the real property and pieces of equipment. In his September 23, 2003 letter, Conley wrote the trustee stating that given Lomaz's representations regarding his ownership interest in the personal property that Pesec "understands *** there could be a future dispute as to ownership ***." The trustee refused to "sell" these items to Pesec.


### [*P14] Criminal Trial Against Pesec

[*P15] An indictment in the instant case was handed down against Pesec on July 28, 2004. With respect to the complicity to grand theft charges, Pesec was indicted for aiding and abetting Albert Gibel in removing the bulldozer and front loader without consent or by deception. The receiving stolen property charge involved the removal of the turf gator. A bench trial commenced on May 3, 2006. The trial court found Pesec guilty as charged. Pesec was sentenced on August 7, 2006, to a term of eighteen months for each count of complicity to grand theft, to run concurrently to one another, and to a term of nine months for receiving stolen property, to run consecutively.

[*P16] [**6] Pesec timely appealed, raising five assignments of errors for our review:

[*P17] "[1.] The trial court committed plain error in allowing the prosecuting attorney, through witness, Larry Lomaz to introduce false, misleading and prejudicial evidence as to the ownership of the Deerfield real-estate, and the nature of the transfer of that real-estate from the Cuyahoga County Court of Common Pleas to Albert Gibel, also introducing prejudicial hearsay evidence thereby depriving appellant of his right to a fair trial and confrontation as guaranteed by the *Sixth* and *Fourteenth Amendments to the United States Constitution* and *comparable provision*s of the *Ohio Constitution.*

[*P18] "[2.] The trial court erred and thereby deprived appellant of due process of law and confrontation as guaranteed by the *Sixth* and *Fourteenth Amendments to the United States Constitution* and *comparable provision*s of the *Ohio Constitution* by allowing hearsay evidence and/or lay-opinions to establish value of the property taken.

[*P19] "[3.] The trial court erred and thereby deprived appellant of due process of law as guaranteed by the *Fourteenth Amendment of the United States Constitution* and comparable provisions of the *Ohio Constitution* [**7] by overruling appellant's *Crim. R. 29* motion for judgment of acquittal, as the prosecution failed to prove all the element [sic] of the charge of receiving stolen property and complicity to grand theft.

[*P20] "[4.] The trial court erred and thereby deprived appellant of due process of law as guaranteed by the *Fourteenth Amendment to the United States Constitution* and comparable provisions of the *Ohio Constitution* by finding appellant guilty, as the verdict for the charges of receiving stolen property and complicity to grand theft were against the manifest weight of the evidence.

[*P21] "[5.] The trial court was improperly influenced, had inappropriate ex-parte communication or was otherwise biased to appellant's detriment such as to deprive appellant of due process of law as guaranteed by the *Fourteenth Amendment to the United States Constitution* and comparable provisions of the *Ohio Constitution.*"


### [*P22] Improper Hearsay Testimony and Violation of *Confrontation Clause*

[*P23] In his first and second assignments of error, Pesec challenges the trial court's allowance of testimony regarding the transfer of the real estate as well as the ownership and valuation of the personal property at issue in the case. Pesec [**8] characterizes the evidence as either improper or as hearsay and claims that with respect to the valuation issue, he was denied his right to confrontation.

**[*P24]**  The trial court has "broad discretion in the admission and exclusion of evidence." *State v. Bentley, 11th Dist. No. 2004-P-0053, 2005 Ohio 4648, at P19*, citing *State v. Hymore (1967), 9 Ohio St.2d 122, 128, 224 N.E.2d 126*. Thus, we "shall not disturb evidentiary rulings absent an abuse of discretion." Id. "An abuse of discretion connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Id., citing *State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144*. Moreover, in a bench trial, "there is a presumption that the trial judge 'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.'" *Jackson v. Herron, 11th Dist. No. 2003-L-145, 2005 Ohio 4046, at P28*, citing *State v. White (1968), 15 Ohio St.2d 146, 151, 239 N.E.2d 65*.

**[*P25]**  With this standard of review in mind, we turn to the testimony and evidence to which Pesec objects. First, Pesec objects to the state's characterization of the real estate as belonging to Lomaz when, **[**9]** in questioning Lomaz, the assistant prosecutor referred to the real property as "your property." Pesec also objects to Lomaz's testimony describing the transfer of the real estate from the Cuyahoga Clerk of Courts to Albert Gibel as a "fraudulent transfer" and to Lomaz's testimony that the Cuyahoga County Court of Common Pleas, in his civil lawsuit against Gibel, found that Gibel had fraudulently conveyed the real estate.

**[*P26]**  This argument lacks merit. To begin with, there was conflicting evidence presented as to who owns the real estate. Although Pesec claims that he had legal title to the property, Lomaz testified that the real estate was titled to Pacific, of which he was the primary shareholder. Thus, the ownership of the real property was in dispute. Moreover, regardless of who owns the real property, the ultimate issue in the case is whether Pesec inappropriately took the personal property from the owner (Lomaz) without permission. Thus, this line of questioning, even if erroneous, cannot be considered prejudicial. As the state argued in its motion in limine, the ownership of the real property is being used as a red herring by the defense since it has no probative value concerning **[**10]** the personal property taken. [3]

**[*P27]**  Furthermore, because this was a bench trial, it is presumed that the court will only consider admissible evidence. As we have previously noted: "The trial court, sitting as judge and jury, is afforded greater latitude in permitting incompetent or inadmissible evidence." *State v. Rock (Dec. 20, 1991), 11th Dist. No. 91-A-1582, 1991 Ohio App. LEXIS 6247, at *13*.

**[*P28]**  With respect to Lomaz's testimony that the real estate transfer was fraudulent, the trial court was able to review State's Exhibit 12, which included documents relating to his civil lawsuit against Gibel in Cuyahoga County to decipher whether the conveyance was in fact fraudulent. In addition, although Lomaz had testified on direct examination that these documents demonstrated that the Cuyahoga County Court of Common Pleas found that the transfer of the real estate was fraudulent, on cross-examination defense counsel elicited from Lomaz that no such finding was made. In fact, Lomaz conceded **[**11]** that the court granted judgment in his favor because it found that Gibel had engaged in discovery violations. Thus, although the end result was that judgment was entered in favor of Lomaz, the court did not per se make a finding that there was a fraudulent conveyance. Because defense counsel was able to effectively cross-examine Lomaz, we find that even if Lomaz mischaracterized the conveyance as fraudulent, any error would be harmless.

**[*P29]**  Pesec also objects to the introduction of the actual civil court documents, contending that these documents should have been excluded as hearsay. We reject this argument. These documents are public records and therefore fall within the hearsay exception of *Evid.R. 803(8)*. Moreover, only "testimonial statements" are subject to scrutiny under the *Confrontation Clause*. Thus, public records are akin to business records, which the Supreme Court has deemed "by their nature *** not testimonial" and are not subject to the requirements of the *Confrontation Clause*. *Crawford v. Washington (2004), 541 U.S. 36, 56, 124 S. Ct. 1354, 158 L. Ed. 2d 177*; *State v. Wills, 10th Dist. No. 05AP-509, 2006 Ohio 2295, at P13*; *Davis v. Washington (2006), 547 U.S. 813, 126 S. Ct. 2266, 165 L.*

---

[3] Pesec argued below that he may have been entitled to the personal property under the theory of hereditaments, which would make ownership of the real estate relevant. However, this theory was not argued on appeal.

*Ed. 2d 224, paragraph one of the syllabus.* Thus, Pesec **[\*\*12]** can hardly claim he was denied his right to confrontation.

**[\*P30]** Pesec also challenges the admissibility of Lomaz's opinion regarding the valuation of the personal property taken. Pesec contends that Lomaz's opinion was based solely on what others had told him. Since he was unable to confront and cross-examine the declarants who provided Lomaz with their valuations, Pesec argues the trial court violated his Sixth Amendment right to confrontation.

**[\*P31]** The *Sixth Amendment of the United States Constitution* provides: "In all criminal prosecutions, the accused shall enjoy the right to \*\*\* be confronted with the witnesses against him \*\*\*. *Article I, Section 10 of the Ohio Constitution* provides, in relevant part: In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel \*\*\* [and] meet the witnesses face to face \*\*\*." *State v. Minier (Sept. 28, 2001), 11th Dist. No. 2000-P-0025, 2001 Ohio 4285, P7, 2001 Ohio App. LEXIS 4411, at \*4,* citing *Delaware v. Van Arsdall (1986), 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674.*

**[\*P32]** However, "[a] criminal defendant's right to confront and cross-examine a witness is not unlimited." Id. "A trial court retains 'wide latitude insofar as the *Confrontation Clause* is concerned **[\*\*13]** to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. Thus, the *Confrontation Clause* guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense might wish.'" *Id. at P8, at \*5,* quoting *Delaware v. Fensterer (1985), 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15.*

**[\*P33]** In this case, when Lomaz was asked to estimate the value of the personal property, he replied:

**[\*P34]** "A. I was told by the person that worked on the equipment that I made --

**[\*P35]** "Mr. Jakmides: I object to what he was told.

**[\*P36]** "The Court: I'll sustain.

**[\*P37]** "Q. I want your opinion on what they were worth, Larry.

**[\*P38]** " \*\*\*

**[\*P39]** "I gave the value of the D-8 dozer anywhere from seventy-five to $ 100,000. I put significant improvements into the bulldozer. The International Crawler, I would estimate between twenty-five and $ 39,000, based upon the prices I saw on the market."

**[\*P40]** Although Lomaz initially began to testify as to what he was told by an unavailable declarant, the answer he ultimately gave was his own opinion based upon market **[\*\*14]** prices he discovered by himself. An owner of personal property is qualified to give an opinion as to the value of personal property. *State v. Clements* (Jan. 30, 1978), 8th Dist. No. 36914, 1978 Ohio App. LEXIS 9677 at \*5, citing *Bishop v. East Ohio Gas (1944), 143 Ohio St. 541, 56 N.E.2d 164.* Moreover, circumstantial evidence, including photographs of personal property, may be used to prove the value of stolen items in a theft offense. See *State v. Reid, 2d Dist. No. 2006 CA 53, 2007 Ohio 2139, at P14.* Thus, we find there was no infringement on Pesec's right to confront witnesses. Nor did the court admit into evidence impermissible hearsay.

**[\*P41]** Appellant's first and second assignments of error lack merit.

**[\*P42]** <u>**Sufficiency of the Evidence**</u>

**[*P43]**  In his third assignment of error, Pesec argues that there was insufficient evidence presented to sustain a conviction for receiving stolen property and complicity to grand theft. He contends that the state failed to prove that the personal property removed was stolen and failed to offer sufficient evidence regarding the value of these items.

**[*P44]**  We note that defense counsel failed to renew its motion for acquittal at the close of Pesec's case. Consequently, the state argues that Pesec **[**15]** waived his right to argue this issue on appeal. However, since Pesec also argued that his conviction was against the manifest weight of the evidence, we may decide this issue on its merits. *City of Chardon v. Patterson, 11th Dist. No. 2006-G-2726, 2007 Ohio 1769, at P14*; *State v. Heiney, 11th Dist. No. 2006-P-0073, 2007 Ohio 1199, at P11*. This is because a determination of whether a conviction is or is not supported by the weight of the evidence "necessarily rests on the existence of sufficient evidence." *State v. McCrory, 11th Dist. No. 2006-P-0017, 2006 Ohio 6348, at P40*.

**[*P45]**  As this court stated in *State v. Schlee (1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at 13*, the standard of review for a sufficiency of the evidence claim is "whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. ***" (Citations omitted.) "In essence, **[**16]** sufficiency is a test of adequacy[;] [w]hether the evidence is legally sufficient to sustain a verdict ***." *State v. Thompkins (1997), 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541*. Thus, sufficiency of the evidence tests the burden of production. *Id. at 390*.

**[*P46]**  With respect to the charge of receiving stolen property, Pesec challenges the sufficiency of the state's evidence regarding the ownership and valuation of the personal property. Pesec contends that the state failed to prove that the personal property taken was stolen and that these items belonged to Lomaz. Pesec also asserts that the state failed to prove that he had the requisite knowledge that the personal property was stolen. He also maintains that insufficient evidence was presented regarding the valuation of the items taken.

**[*P47]**  *R.C. 2913.51* sets forth the elements of receiving stolen property as follows:

**[*P48]**  "(A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Receiving stolen property is a felony of the fifth degree if the value of the property is $ 500 or more but less than $ 5,000. (*R.C. 2913.51(C)*).

**[*P49]**  *R.C. 2901.22(B)* **[**17]** defines the requisite culpable mental state for receiving stolen property of "knowingly" as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably cause a certain result or will be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

**[*P50]**  In addition to proving that appellant acted knowingly, the state was also required to prove that appellant had "reasonable cause" to believe the items were stolen. "Reasonable cause entails determining whether a person of ordinary prudence and care would believe that the property had been obtained through the commission of a theft offense." *State v. Overholt, 9th Dist. No. 02CA0108-M, 2003 Ohio 3500, at P22*, citing *State v. Petty (May 21, 1987), 8th Dist. No. 52069, 1987 Ohio App. LEXIS 7082*.

**[*P51]**  The state may use circumstantial evidence in order to prove that appellant had the requisite knowledge or that he had reasonable cause to believe the items were stolen. *In re: Lame (Sept. 25, 1998), 11th Dist. Nos. 96-P-0265, 96-P-0266, and 96-P-0267, 1998 Ohio App. LEXIS 4532, at *9*. In fact, "circumstantial **[**18]** evidence can be used to support a conviction 'even if that evidence is reconcilable with a reasonable theory of innocence.'" Id., citing *State v. Singletary (Aug. 6, 1994), 11th Dist. No. 93-A-1786, 1994 Ohio App. LEXIS 3745, at *6*. Circumstantial evidence is therefore "equally probative, especially as to a mental state in which the sole direct evidence is known to the accused. *** Moreover, because a defendant's mental state is difficult to demonstrate with direct proof, it may be 'inferred from the circumstances.'" *State v. Worthy, 11th Dist. No. 2004-L-137, 2005 Ohio 5871, at P24*, citing *State v. Logan (1979), 60 Ohio St. 2d 126, 131, 397 N.E.2d 1345*.

**[\*P52]** In this case, there was sufficient evidence presented upon which the trier of fact could reasonably conclude that appellant had the requisite knowledge and had reasonable cause to believe the pieces of equipment were stolen. To begin with, it can be inferred from the circumstances underlying the acquisition of the items taken that the items were retrieved without Lomaz's permission. Moreover, an ordinary person under like circumstances would have reason to believe the pieces of equipment were in fact stolen.

**[\*P53]** The evidence established that the underlying **[\*\*19]** circumstances surrounding the transaction, including the fact that such a low price was paid for the equipment and land, made the acquisition completely suspect. During the civil proceedings, when deposed, Pesec admitted that he paid Gibel in cash or in checks made out to "cash." [4] He also testified at the deposition that he paid Gibel $ 10,000 for the eighty-eight acres of real estate and personal property; that he had no contract or sales receipt for these transactions; and that he later learned that Gibel had embezzled from Lomaz. Although Pesec's attorney contacted the bankruptcy trustee when ownership was disputed, the evidence also shows that Pesec offered the trustee between $ 10,000 - $ 12,000 for the real estate and personal property. In essence, Pesec sought to "repurchase" what he claimed he already owned. Under these circumstances, it can be inferred that Pesec had knowledge that he was not the legal owner of the personal property and took these items from Lomaz without his permission. Moreover, under the circumstances presented, the evidence established that a person of ordinary prudence and care would have believed the items taken belonged to Lomaz.

**[\*P54]** Furthermore, although Pesec claims there was no evidence presented to show that the items removed were stolen, Lomaz specifically testified that he was the owner of the personal property and that he did not give Pesec permission to remove these items from the property. In addition to this testimony, Lomaz's employees personally observed Pesec and Gibel removing the personal property, and observed Gibel armed with a weapon. Pesec admitted to Detective Herman when he was interviewed that he removed the property and towed and stored it at his expense.

**[\*P55]** The fact that Lomaz did not identify each piece of equipment by its VIN number is immaterial. These pieces of equipment were not motor vehicles subject to the registration or certificate of title law and did not need to be identified by these numbers, as appellant suggests. To the contrary, we find that it was sufficient that Lomaz, as the owner of the equipment, identified the stolen property as his. See e.g., *Overholt at P25-26*, where owner of stolen ATV identified parts taken from the ATV as his own.

**[\*P56]** Thus, there was sufficient evidence presented to establish **[\*\*21]** that the personal property was stolen.

**[\*P57]** Finally, with respect to the value of the property taken, Pesec challenges Lomaz's testimony regarding valuation and states that there was no evidence regarding the value of the turf gator. The complicity to grand theft counts stems from the theft of the bulldozer and front end loader, found to be a felony of the fourth degree, with a value of more than $ 5,000 but less than $ 100,000. See, *R.C. 2923.03*; *R.C. 2913.02(A)(3)*, *(B)*. The receiving stolen property charge involves the theft of the turf gator, found to be a felony of the fifth degree with a value between $ 500 and $ 5,000, in violation of *R.C. 2913.51*.

**[\*P58]** Lomaz testified that in his opinion the value of the bulldozer was between $ 75,000 - $ 100,000 and the value of the front end loader was between $ 25,000 - $ 30,000. Although Pesec challenges this testimony as being inadmissible hearsay, we have found in the previous assignments of error that it was admissible. Notwithstanding this evidence, there was additional evidence in the record from the civil litigation to show that these items were at least worth $ 5,000. In fact, in his deposition, which was attached as an exhibit in this case, **[\*\*22]** Pesec opined that the value of these items was no more than $ 10,000 together.

**[\*P59]** To establish value in theft offenses, the state need not prove value to an exact amount. Rather, all that is required is that some evidence be admitted to establish value. *In re: Lame, at \*14*; *R.C. 2913.61(C)*. We find that

---

[4] This deposition was **[\*\*20]** introduced as an exhibit to the trial court and was made part of the record.

there was sufficient evidence presented regarding the value of the items underlying the complicity to grand theft charges.

[*P60]  Regarding the value of the turf gator, we disagree with Pesec that there was no proof introduced regarding its value. *R.C. 2913.61(D)(2)* provides in relevant part: "The value of *** equipment *** used in the *** business *** of its owner *** which retains substantial utility for its purpose regardless of its age or condition, is the costs of replacing the property with new property of like kind and quality." Lomaz testified that the turf gator was used in the business. Thus, the proper method of valuation for equipment is the replacement cost. The trial court could have reasonably concluded that the turf gator was used in the business and fell within the type of equipment designated in *R.C. 2913.61(D)(2)*. See *Overholt, at P40-41*.

[*P61]  Thus, to sustain a felony of the fifth  [**23] degree conviction for receiving stolen property, the state had to prove that the replacement value of the turf gator was $ 500 or more but less than $ 5,000. See *State v. Allen, 5th Dist. No. 2002CA00059, 2003 Ohio 229, at P12*, where trial court upheld conviction for receiving stolen property of a snow blower and edger by looking at the replacement value of these pieces of equipment. *Overholt, supra.*

[*P62]  In this case, Lomaz testified that he had purchased the turf gator in May 2003 at a cost of approximately $ 5,000. Based upon this recent purchase, we find that this was sufficient proof that the replacement value of a turf gator was at least $ 500 or more but less than $ 5,000, thereby satisfying the fifth degree felony conviction for receiving stolen property. Moreover, a photograph of the turf gator was introduced into evidence, and from the photograph its value could easily be found to be within the statutory range for a felony of the fifth degree. See *Reid, at P14*.

[*P63]  Thus, we find there was sufficient evidence presented to sustain a conviction for receiving stolen property.

[*P64]  With respect to the complicity to grand theft charges, *R.C. 2913.02* provides in relevant part that:

[*P65]  "(A) No person,  [**24] with purpose to deprive the owner of property *** shall knowingly obtain or exert control over either the property or services in any of the following ways *** (3) By deception."

[*P66]  *R.C. 2923.03*, the complicity statute, states:

[*P67]  "(A) No person, acting with the kind of culpability required for the commission of an offense, shall *** (2) Aid or abet another in committing the offense."

[*P68]  In order to prove complicity to grand theft, these statutes when read together require the state to produce evidence to show that the defendant has knowingly aided and abetted another in committing the theft. *State v. Hill, 11th Dist. No. 2005-A-0010, 2006 Ohio 1166, at P26*. As previously stated, the culpable mental state of "knowingly" is defined in *R.C. 2901.22(B)*. The terms "aid and abet" have been construed to mean "to assist or facilitate the commission of a crime, or to promote its accomplishment." *Id. at P25*, citing, *State v. Johnson (2001), 93 Ohio St.3d 240, 243, 2001 Ohio 1336, 754 N.E.2d 796*. The offender must have taken some "'affirmative action to assist, encourage, or participate in the crime by some act, deed, word or gesture.'" *Id.*, quoting *State v. Sims, 11th Dist. No. 2001-L-081. 2003 Ohio 324, at P44*.

[*P69]  In reviewing the record,  [**25] we find that there was sufficient evidence, when viewed in a light most favorable to the state, to establish each element of the crime of complicity to grand theft. Since we have already found that the items taken were stolen, the state has proven the underlying theft. In addition, the uncontroverted evidence revealed that Pesec assisted Gibel in removing the equipment from the property. Pesec was not a mere bystander; rather, he was an active participant. In fact, Lomaz's employees testified that they saw Pesec helping Gibel remove the equipment and the videotape they recorded, which was admitted into evidence, proves that this was the case.

**[\*P70]**  Thus, we find there was sufficient evidence presented to sustain a conviction for receiving stolen property and complicity to grand theft.

**[\*P71]**  Appellant's third assignment of error is overruled.

**[\*P72]** <u>Manifest Weight of the Evidence</u>

**[\*P73]**  In his fourth assignment of error, Pesec claims that his conviction was against the manifest weight of the evidence.

**[\*P74]**  "When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility **[\*\*26]** of witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered." *State v. Floyd, 11th Dist. No. 2005-T-0072, 2006 Ohio 4173, at P8*, citing *State v. Martin (1983), 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717*. See, also, *State v. Thompkins (1997) 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541*.

**[\*P75]**  "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Floyd at P9*, citing *Martin at 175*. "The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. Id., citing *Thompkins at 390* (Cook, J., concurring). "The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given the evidence and the credibility of witnesses." Id., citing *State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus*.

**[\*P76]**  In this case, there was evidence presented from which the trier of fact could determine that Pesec had committed the crimes of receiving stolen property **[\*\*27]** and complicity to grand theft. As previously stated, Lomaz testified that he owned the personal property in question and did not give Pesec permission to take the property from him. However, regardless of this testimony, the real focus must be on Pesec's knowledge regarding ownership and who had rightful possession of the equipment. All that is necessary is "evidence of a wrongful taking from the *possession* of another \*\*\*. Particular ownership is not vital as to the thief." *State v. Ray, 9th Dist. No. 21233, 2003 Ohio 2159, at P11*, quoting *State v. Emmons (1978), 57 Ohio App.2d 173, 177, 386 N.E.2d 838*. The record demonstrates that there was more than ample evidence presented to show that Pesec clearly knew that he did not own or rightfully possess the equipment and that Pesec also knew that Gibel did not own or have a right to the equipment either.

**[\*P77]**  To begin with, although Pesec claimed ownership, he never produced any documentation regarding the alleged land/equipment deal, such as a sales contract or sales receipts. Secondly, even if there was in fact such a deal, the price allegedly paid was unbelievably low. Pesec testified that he purchased the eighty-eight acres of real estate along with the **[\*\*28]** personal property for $ 10,000, and that he paid in cash. Furthermore, the evidence established that the equipment was removed with guns drawn. There was also evidence presented to show that Pesec subsequently offered to "buy" the equipment from the bankruptcy trustee, a fact that undercuts Pesec's position that he had owned the equipment in the first place. In addition, the evidence also showed that Pesec did not act like he owned the property. In particular, Pesec stored the equipment but did not use it or try to sell it. Pesec also knew there was "bad blood" between Lomaz and Gibel and that Gibel had previously embezzled from Lomaz.

**[\*P78]**  The trial court, as finder of fact, was free to believe the testimony of Lomaz; to discount Pesec's testimony that he believed he had legal title to the items of personal property; and to infer, based upon the evidence presented that Pesec had the requisite mens rea to commit complicity to grand theft. "When assessing witness credibility, [t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact." *Floyd, at P10*, citing *State v. Awan (1986), 22 Ohio St.3d 120, 123, 22 Ohio B. 199, 489 N.E.2d 277*. "Indeed, the factfinder is free to believe **[\*\*29]** all, part, or none of the testimony of each witness appearing before it." Id.

citing *City of Warren v. Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at *8*. "Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." Id.

 **[*P79]**  We find that the verdict was supported by the manifest weight of the evidence.

 **[*P80]**  Appellant's fourth assignment of error is overruled.


 **[*P81]** __Alleged Bias of Trial Judge__

 **[*P82]**  In his fifth assignment of error, Pesec contends that the trial court was biased and had a conflict with hearing his case because the judge was familiar with and involved in civil litigation he had brought against Gibel involving these underlying facts.

 **[*P83]**  Judicial bias is defined as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State v. LaMar, 95 Ohio St.3d 181, 2002 Ohio 2128, at P34, 767 N.E.2d 166*.

 **[*P84]**  A trial judge is "'presumed not to be biased or prejudiced,  **[**30]** and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.'" *Weiner v. Kwiat, 2d Dist. No. 19289, 2003 Ohio 3409, at P90*, quoting *Eller v. Wendy's Intl., Inc. (2000), 142 Ohio App. 3d 321, 340, 755 N.E.2d 906*. "The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party." Id.

 **[*P85]**  Specifically, Pesec objects to the following statements the trial court made in open court. First, during defense counsel's closing argument, the court interrupted defense counsel when he pointed out that there was civil litigation between Lomaz and Pesec. Pesec takes objection to the following remark made by the trial court: "Mr. Jakmides, for the record, so you know, I have had those cases in the past and within the last two months." Pesec also argues that during sentencing, the court was biased when she told him that she would not impose community control sanctions because he failed to "come clean with this Court."

 **[*P86]**  We do not believe the trial judge's remarks indicated hostility or ill will  **[**31]** or undue favoritism. The judge simply reiterated to the parties and counsel that she had familiarity with the case. However, Pesec can hardly claim that he was surprised by the court's involvement in the civil proceedings or that he "was unaware of this potential for conflict prior to the onset of the trial." To the contrary, the record demonstrates that before the trial began, the court, when ruling on the state's motion in limine, advised both counsel of her involvement in the civil litigation and expressed her belief that she would remain unbiased regardless of what evidence was admitted. The court stated: "Obviously, you both - you all know that I have the civil case as well, so I have heard bits and pieces of the civil litigation in this matter, so I am very familiar with what's going on. I'm not quite sure that I would at all be prejudiced by anything that comes in because I have a fairly good handle on what's going on in this case."

 **[*P87]**  Moreover, even though we find no judicial bias, if Pesec believed the trial judge could not conduct herself in an impartial manner, he should have raised the issue directly with the trial judge at this pretrial stage and then followed the proper  **[**32]** statutory procedures afforded him and filed an affidavit of prejudice with the Chief Justice of the Supreme Court of Ohio as soon as possible after he became aware of circumstances he believed supported disqualification. *R.C. 2701.03*; *Beer v. Griffith (1978), 54 Ohio St.2d 440, 441-442, 377 N.E.2d 775*; *In re Disqualification of Lotz Whitlach v. Whitlach, 100 Ohio St. 3d 1236, 2002 Ohio 7480, P5, 798 N.E.2d 19*. However, he failed to do this. Nevertheless, we see no prejudice or bias in the trial judge's remarks. We overrule his fifth assignment of error.

2007-Ohio-3846, *P88; 2007 Ohio App. LEXIS 3487, **32

 **[*P88]**  The judgment of the Portage County Court of Common Pleas is affirmed.

JUDITH A. CHRISTLEY, J., Ret., Eleventh Appellate District, sitting by assignment, concurs in judgment only,

GENE DONOFRIO, J., Seventh Appellate District, sitting by assignment, concurs.

---

**End of Document**